**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| RAMONA TROMBLEY, et al., on behalf of herself and all others similarly situated, <br><br> Plaintiffs, <br><br> -v- <br><br> NATIONAL CITY BANK, et al., <br><br> Defendants. | Case No. 1:10-CV-00232 <br><br> The Honorable John D. Bates |

**DECLARATION OF HASSAN A. ZAVAREEI**
**IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF**
**CLASS ACTION SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS AND**
**SETTING OF FINAL FAIRNESS HEARING**

I, Hassan A Zavareei, hereby declare as follows:

1.      I am a partner in the law firm of Tycko & Zavareei LLP ("T&Z"), and am an active member of the bars of the District of Columbia, Maryland and California. I also am a member of the following federal court bars: the Circuit Courts for the D.C. Circuit, Fifth Circuit, and Ninth Circuit, the District Courts for the District of Columbia and the Eastern District of Michigan and the Trademark Trial and Appeal Board. In addition, I have been admitted *pro hac vice* in numerous federal and state courts around the country.

2.      I am competent to testify to the matters stated herein. I submit this declaration in support of Plaintiff's Unopposed Motion for Preliminary Certification of a Class for Settlement Purposes and for Preliminary Approval of Class Action Settlement Agreement.

3.      I am one of the attorneys representing the named plaintiffs, Ramona Trombley, Jeff Doehner and Brian Wells in this putative class action lawsuit against National City Bank ("National City" or "Defendant").

4.      I am a 1990 graduate of the Duke University (*cum laude*), and a 1995 graduate of the University of California, Berkeley, School of Law (Order of the Coif).

5.      Following my graduation from law school, I joined the law firm of Gibson, Dunn & Crutcher LLP ("Gibson"), where I was a member of the Litigation Department, and a number of Gibson's practice groups, including the Class Action and Complex Litigation Group.  I was with Gibson until April of 2002.  During my time with Gibson, I worked on the defense of a number of class actions, and similar pieces of complex litigation, throughout the country.

6.      In April of 2002, I became one of the founding partners of T&Z.  Our firm's practice focuses on complex civil litigation, including consumer class actions.  Since the founding of our firm, T&Z has represented plaintiffs in a number of large class actions in various courts around the country, and has also represented plaintiffs in many other pieces of large, complex civil litigation.

7.      I am currently lead counsel in a putative class action General Electric in which we allege that certain GE-branded microwave ovens contain dangerous defects causing them to turn on spontaneously and catch fire.  *Christopher Cocks, et al., v. General Electric Company*, No. 09-cv-11912 (E.D. Mich.).  I am also lead counsel or co-counsel (with other law firms throughout the country) in six other putative class actions against banks regarding their overdraft fee policies, including *Marlene Willard, et al. v. Fifth Third Bancorp.*, No. 10-cv-00271 (N.D. Ga.); *Jessica Duval v. Citizens Financial Group, Inc.*, No. 10-cv-21080 (S.D. Fla.); *Mascaro v. TD Bank, Inc.*, No. 10-cv-21117 (S.D. Fla.); *David Johnson, et al v. UMB Bank, N.A. and UMB Financial Corporation d/b/a UMB Bank, N.A.*, No. 10-cv-00654 (W.D. Mo.); *Thomas Casto, et al. v. City National Bank, N.A.*, 10-cv-01089 (Cir. Ct. Kanawha County, W. Va.); and *Harold J. Joseph, Jr., et al., v. Commerce Bank, N.A. and Commerce Bancshares, Inc. d/b/a Commerce*

*Bank, N.A.*, No. 10-cv-00685 (Cir. Ct. Jackson County, Mo.).  Two of these cases are part of

coordinated MDL proceedings.  *In re Checking Acct. Overdraft Litig.*, No. 09- MD-02036 (S.D.

Fla.).

      8.     I have tried many cases to verdict.  Most recently, I was lead counsel in a jury

trial in Los Angeles Superior Court that spanned over four months.  I obtained a favorable

verdict in that case, which was the culmination of over four years of discovery and pre-trial

proceedings.  During those pretrial proceedings, I secured almost $2 million in sanctions (in

addition to numerous issue sanctions) against the opposing party for numerous discovery

violations that we uncovered through electronic discovery.  *Robin Singh Educational Services,*

*Inc. v. Blueprint Test Preparation LLC*, Los Angeles Superior Court, BC-330-098.

      9.     My partner, Jonathan K. Tycko, is also counsel for the named plaintiffs.  Mr.

Tycko received his law degree in 1992 from Columbia University Law School, where he was a

Stone Scholar, and earned a B.A. degree, with honors, in 1989 from The Johns Hopkins

University.

      10.     After graduating from law school, Mr. Tycko served for two years as law clerk to

Judge Alexander Harvey, II, of the United States District Court for the District of Maryland.

      11.     After his clerkship, Mr. Tycko joined Gibson where he was a member of the

Litigation Department and a number of specific practice groups, including the Class Action And

Complex Litigation Group and the Appellate And Constitutional Law Group.  Mr. Tycko was

also a member of the firm's Ethics Committee.

      12.     Mr. Tycko's practice has focused primarily on civil litigation. He has extensive

trial and appellate experience in consumer class action, real estate, housing, employment, False

Claims Act, environmental, media, and professional malpractice litigation.  Mr. Tycko has

represented a wide range of clients, including Fortune 500 companies, privately-held business, non-profit associations, and individuals.

13.     With respect to consumer class actions, Mr. Tycko was appointed co-lead counsel for the class in two prior cases:  *Wong v. TrueBeginnings LLC d/b/a True.com*, Civil Action No. 3-07CV1244-N (N.D. Tex.), and *Geis v. Airborne Health, et. al.*, Civil Action No. 2:07-cv-4238-KSH-PS (D. N.J.).  He has also acted as co-lead counsel in another consumer class action case currently pending in the United States Court of Appeals for the Ninth Circuit, *Minnick v. Clearwire US, LLC*, No. 10-35228 (9th Cir.).  During his time at Gibson, Dunn & Crutcher LLP, Mr. Tycko worked on the defense of many large consumer class actions or mass actions, representing companies such as Prudential Insurance Company, Ford Motor Company and Tenet Healthcare.

14.     My associate, Jeffrey D. Kaliel, has also worked extensively with me on this case and six other cases against national banks concerning their overdraft fee practices.

15.     Mr. Kaliel earned his law degree from Yale Law School in 2005.  Mr. Kaliel graduated from Amherst College *summa cum laude* in 2000 with a degree in Political Science. He spent one year studying Philosophy at Robinson College, Cambridge University, England.

16.     After law school, Mr. Kaliel joined the Honors Program at the Department of Homeland Security, where he worked on the Department's national security appellate litigation, helped to draft and implement regulations for new programs, and worked with the private sector on infrastructure protection programs.  Mr. Kaliel also helped investigate the DHS response to Hurricane Katrina in preparation for a Congressional inquiry.  In addition, Mr. Kaliel served as a Special Assistant US Attorney in the Southern District of California, prosecuting drug and border crimes and gaining valuable courtroom experience.

17.     In 2008, Mr. Kaliel worked in Namibia with Lawyers Without Borders on the observation of a 400-defendant treason trial arising from a 1998 armed rebellion.

18.     Mr. Kaliel is a former Staff Sergeant in the Army Reserve and a veteran of the second Iraq war, having served in Iraq in 2003. His publications include contributions to Homeland Security Today and American Bar Association's Homeland Security Handbook.

19.     Our firm currently has six full-time attorneys and we have sufficient resources to vigorously prosecute this case, and to represent the best interests of any class certified by the Court.  I have attached a true and correct copy of our firm's resume as Exhibit A.

20.     Before we initiated this lawsuit and after the case was filed, our firm spent a great deal of time researching the law and facts governing the banks' practices relating to charging overdraft fees to their customers.  There was a great deal of publicly available information that we examined during this process, including, but not limited to the following: FDIC Study of Bank Overdraft Programs," Federal Deposit Insurance Corporation, November, 2008; "CRS Report for Congress: Overdraft/Bounced-Check Protection." Congressional Research Center, May 13, 2008; "Bank Fees: Federal Banking Regulators Could Better Ensure That Consumers Have Required Disclosure Documents Prior to Opening Checking or Savings Accounts," U.S. Government Accountability Office, January, 2008; "National Bank Regulator Enabled Overdraft Abuses," Center for Responsible Lending, February, 2010; "Overdraft Fee Litigation and Legislation," WL 1789 PLI/Corp 319, Practicing Law Institute, 2009; "Overdrawn: Consumers Face Hidden Overdraft Charges From Nation's Largest Banks," Consumer Federation of America, June 9, 2005; "Banks Apply Pressure to Keep Fees Rolling In." *New York Times*, February 22, 2010; "Overdraft Explosion: Bank fees for overdrafts increase 35% in two years," Center for Responsible Lending, October 6, 2009; "Debit Card Overdraft Fees," The Greenlining

Institute, April, 2010; "Shredded Security," Center for Responsible Lending, June 18, 2008;

"CFA Survey: Sixteen Largest Bank Overdraft Fees and Terms," Consumer Federation of

America, July 31, 2009; Federal Reserve Board Regulation E. 12 CFR 205; "CFA Survey of Big

Bank Overdraft Fees and Terms," Consumer Federation of America, June, 2010; "Debit Card

Danger: Banks Offer Little Warning and Few Choices as Customers Pay a High Price for Debit

Card Overdrafts," Center for Responsible Lending, January 25, 2007.

21.     Shortly after we initiated this lawsuit defendant's counsel and I conferred to

explore and advance early resolution, as mandated by Fed. R. Civ. P. 26(f).   During the ongoing

negotiations, we obtained a great deal of information from Defendant informally.   After lengthy

negotiations, including dozens of telephone conferences and two in-person settlement

conferences in Philadelphia, the parties agreed to a settlement on July 28, 2010.   Before

executing that agreement, we obtained verified interrogatory responses confirming much of the

information previously relayed during the negotiation.   The negotiations that culminated in this

agreement were serious, informed and adversarial.

22.     In addition to the information discussed above, we also spent a great deal of time

analyzing the expert reports filed in another lawsuit challenging a bank's overdraft fee practices.

*Gutierrez v. Wells Fargo*, No. 07-cv-05923, 2010 WL 1233810 (N.D. Cal. March 26, 2010).   I

have attached a true and correct copy of the Supplemental Expert Report of Arthur Olsen (the

plaintiffs' expert) as Exhibit B.   I have attached a true and correct copy of the Expert Report of

Alan J. Cox in Support of Defendant Wells Fargo, N.A.'s Motion for Summary Judgment and/or

to Decertify Class, as Exhibit C.   Among other things, we used these reports as guideposts in

approximating the damages to the putative class in this lawsuit.   We also carefully examined the

settlement in *Closson v. Bank of America N.A.*, No. CGC 04436877 (Cal. Super. Ct. 2009).   I

have attached a true and correct copy of the *Closson* Settlement Agreement, as Exhibit D.  Based on the numerous public filings regarding that settlement (which was finally approved but is now on appeal before the Ninth Circuit), we were able to evaluate the strengths and weaknesses of that settlement in arriving at the settlement in this case.

23.     In short, our negotiations were premised on a wealth of knowledge and understanding of the legal and factual landscape underpinning this class action lawsuit.  Although we believe firmly in the merits of our claims, we also appreciate that due to uncertainty regarding numerous issues there is a great deal of risk associated with the claims.  Indeed, it is a real possibility that one legal ruling on one of a number of undecided legal issues could completely foreclose Plaintiffs' ability to prevail in this putative class action lawsuit.  In addition, we also possessed a great deal of knowledge and information that equipped us to decide upon numerous critical terms in the agreement, including the amount of the settlement fund.  Just as important, we were able to use the experience in the *Closson* settlement to structure the notice and distribution of the settlement funds in a fair way that maximizes recovery to the putative class members, and minimizes the risk that a significant portion of the fund would go to *cy pres*.

24.     Based on this information and my experience litigating other class actions (including on behalf of defendants when I was at Gibson), I believe that this is an excellent settlement agreement that provides substantial benefits to the Settlement Class Members.

On this 28th day of July, 2010, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

Hassan A. Zavareei

# Exhibit A

TYCKO & ZAVAREEI LLP

# FIRM RESUME

# 2010

# JONATHAN K. TYCKO
## PARTNER

In 2002, Jonathan K. Tycko helped found Tycko & Zavareei LLP.  Prior to that, Mr. Tycko was with Gibson, Dunn & Crutcher LLP, one of the nation's top law firms, where he was a member of the Litigation Department and a number of specific practice groups, including the Class Action And Complex Litigation Group and the Appellate And Constitutional Law Group. Mr. Tycko was also a member of the firm's Ethics Committee.

Mr. Tycko received his law degree in 1992 from Columbia University Law School, where he was a Stone Scholar, and earned a B.A. degree, with honors, in 1989 from The Johns Hopkins University.

After graduating from law school, Mr. Tycko served for two years as law clerk to Judge Alexander Harvey, II, of the United States District Court for the District of Maryland.

Mr. Tycko's practice has focused primarily on civil litigation. He has extensive trial and appellate experience in consumer class action, real estate, housing, employment, False Claims Act, environmental, media, and professional malpractice litigation. Mr. Tycko has represented a wide range of clients, including Fortune 500 companies, privately-held business, non-profit associations, and individuals.

With respect to consumer class actions, Mr. Tycko was appointed co-lead counsel for the class in two prior cases:  *Wong v. TrueBeginnings LLC d/b/a True.com*, Civil Action No. 3-07CV1244-N (N.D. Tex.), and *Geis v. Walgreen Co.*, Civil Action No. 2:07-cv-4238-KSH-PS (D. N.J.).  He has also acted as co-lead counsel in another consumer class action case currently pending in the United States Court of Appeals for the Ninth Circuit, *Minnick v. Clearwire US, LLC*, No. 10-35228 (9th Cir.).  During his time at Gibson, Dunn & Crutcher LLP, Mr. Tycko worked on the defense of many large consumer class actions or mass actions, representing companies such as Prudential Insurance Company, Ford Motor Company and Tenet Healthcare.

In addition, Mr. Tycko has handled many pro bono cases in the area of human rights law, including representation of political refugees seeking asylum, and preparation of amicus briefs on behalf of the Lawyers Committee for Human Rights (now known as Human Rights First) and other organizations and individuals in various appellate matters, including matters before the Supreme Court.

For two years, from 2002 through 2004, Mr. Tycko taught as an Adjunct Professor at the George Washington University Law School.

Mr. Tycko is an active member of the District of Columbia Bar, and currently serves as a member of the Rules of Professional Conduct Review Committee, which is the committee charged with analyzing and recommending potential amendments to the Rules of Professional Conduct that govern the practice of law in the District of Columbia.

He is admitted to practice before the courts of the District of Columbia, Maryland and New York, as well as before numerous federal courts, including the Supreme Court, the Circuit Courts for the D.C. Circuit, Third Circuit, Fourth Circuit, Ninth Circuit and Federal Circuit, the District Courts for the District of Columbia and District of Maryland, and the Court of Federal Claims.

# HASSAN A. ZAVAREEI
## PARTNER

Hassan Zavareei earned his law degree from the University of California, Berkeley School of Law in 1995, where he graduated as a member of the Order of the Coif.  Mr. Zavareei graduated *cum laude* from Duke University in 1990, with degrees in Comparative Area Studies and Russian.  After graduation from Boalt Hall, Mr. Zavareei joined the Washington, D.C. office of Gibson, Dunn & Crutcher LLP, one of the nation's premier law firms. In April of 2002, Mr. Zavareei became a founding partner of Tycko & Zavareei LLP.

Mr. Zavareei has handled numerous trials and appeals in state and federal courts across the nation in a wide range of practice areas.  Most recently, Mr. Zavareei prevailed on behalf of his client after a four month jury trial California.  That jury verdict came after years of hard-fought litigation, including an award of almost $2 million in sanctions against the opposing party due to revelations of discovery misconduct uncovered through electronic discovery.

Mr. Zavareei has significant experience and success in litigating nationwide class actions on behalf of plaintiffs and defendants. For instance, Mr. Zavareei managed the defense of a nationwide class action brought against a major insurance carrier, and, along with co-counsel, negotiated a nationwide class settlement. Mr. Zavareei successfully obtained court approval of the settlement, and supervised the administration of the multi-million dollar settlement fund. Mr. Zavareei is currently litigating several class action lawsuits on behalf of injured consumers.  Mr. Zavareei is currently lead counsel in a putative class action against General Electric concerning alleged defects in certain of its microwave ovens that cause them to turn on spontaneously and then catch on fire.  He also represents plaintiffs in seven separate putative class actions against national banks across the country regarding their practices of charging overdraft fees for debit card transactions.

In his civil rights practice, Mr. Zavareei represents individuals, groups of employees, and tenant associations in employment and fair housing litigation. Since co-founding Tycko & Zavareei LLP in 2002, Mr. Zavareei has obtained substantial judgments and settlements for his civil rights clients.

As part of his environmental and administrative law practice, Mr. Zavareei has obtained significant victories for his municipal and Indian Tribe clients in challenges to federal rulemakings, and negotiated complex settlements in CERCLA cases on behalf of Fortune 500 clients.

Mr. Zavareei is admitted to the State Bar of California, the Bar of the District of Columbia, the Bar of the State of Maryland, the District Court of the District of Columbia, and the Circuit Courts of the District of Columbia, the Ninth Circuit, and the Fifth Circuit.

# ANDREA R. GOLD
ASSOCIATE

Andrea Gold earned her law degree from the University of Michigan Law School in 2004, where she was an associate editor of the Journal of Law Reform, co-President of the Law Students for Reproductive Choice, and a student attorney at the Family Law Project clinical program. Ms. Gold graduated with high distinction from the University of Michigan Ross School of Business in 2001, concentrating her studies in Finance and Marketing.

After finishing law school, Ms. Gold was awarded a prestigious public interest fellowship by the Skadden Fellowship Foundation. The Skadden Fellowship Foundation was created by Skadden, Arps, Slate, Meagher & Flom, LLP, one of the nation's top law firms, to support the work of new attorneys at public interest organizations around the country. The Skadden Fellowship Foundation receives hundreds of applications each year, but only a very small number of Skadden fellows are selected.

As a Skadden fellow, Ms. Gold represented indigent battered women in dissolution of marriage, paternity, and order of protection matters. In this capacity, Ms. Gold was lead counsel at both trial and various evidentiary hearings. In addition to the aforementioned litigation experience, Ms. Gold provided legal counsel to clients, members of the legal community, and social service providers regarding the Illinois Victim's Safety and Security Act (VESSA), a state law protecting survivors of abuse from employment discrimination and providing for unpaid leave.

Ms. Gold became an associate at Tycko & Zavareei LLP in October 2006. Since that time, Ms. Gold has taken and defended numerous depositions in various cases, drafted appellate briefing and assisted in preparation for oral argument, participated in an over 25-day civil jury trial (including conducting a direct examination, writing and arguing various motions, preparing witnesses, and drafting jury instructions), and successfully brought and/or defended several case-dispositive motions.

Ms. Gold is a member of the District of Columbia Bar and a licensed member of the State Bar of Illinois. She is also a member of the National Employment Lawyer's Association and the Metropolitan Washington Employment Lawyer's Association.

# LORENZO B. CELLINI
## ASSOCIATE

Lorenzo Cellini graduated magna cum laude from the University of Arizona, James E. Rogers College of Law in 2004. In law school he was a member of the moot court board, a legal writing fellow and the recipient of the E. Thomas Sullivan Antitrust Award. He also received his B.A. from the University of Arizona, graduating magna cum laude and as a member of Phi Beta Kappa.

Before joining Tycko & Zavareei LLP, Mr. Cellini practiced law in Tucson, Arizona. He specialized in commercial litigation, with an emphasis on contract disputes, real estate, intellectual property and bankruptcy. Additional practice areas included real estate and business transactions, appellate, employment and civil rights law. Representative clients included large biomedical engineering, technology and real estate development firms, as well as local restaurants, banks and individuals.

Mr. Cellini also has substantial experience in antitrust law. While in law school, he served as a law clerk in the Antitrust Division of the U.S. Department of Justice, where he assisted in investigations of anticompetitive conduct and proposed mergers. Before attending law school, he worked in the Federal Trade Commission's Bureau of Competition.

Other legal experience includes externships with the University of Arizona Student Legal Services and Judge Raner Collins of the U.S. District Court for the District of Arizona.

Mr. Cellini is a member of the District of Columbia Bar, and also is admitted to practice before the Supreme Court of Arizona, U.S. District Court for the District of Arizona and the U.S. Court of Appeals for the Federal Circuit.

## MELANIE J. WILLIAMSON
ASSOCIATE

Prior to joining Tycko & Zavareei LLP, Melanie Williamson was a litigation associate at a large regional firm in the Midwest, where her practice focused on both complex civil litigation and civil rights law. Most recently, Ms. Williamson represented the trustees of a non-profit religious organization in a multi-million dollar property dispute, which involved complicated First Amendment questions regarding the effect of hierarchical religious relationships on the control and ownership of corporate property.

Ms. Williamson earned her law degree from Georgetown University Law Center in 2006. As a law student, she received an award for her writing on intellectual and cultural property, and served as an advocate for the Public Defender Service for the District of Columbia Civil Service Division. Ms. Williamson received her Bachelor's Degree in English Literature from Howard University's College of Arts and Sciences, where she was a James Baldwin Literary Criticism Excellence scholar and a two-time recipient of the Howard University Hilltop Achievement Scholarship. While an undergraduate student at Howard, Ms. Williamson established the Final Hour, an intellectual cooperative that provided resources and counseling to African American families dealing with mental illnesses and disability.

Ms. Williamson has also worked with the Ohio Public Defender as a trial attorney in criminal misdemeanor and felony matters, and has represented indigent persons in eviction and other civil litigation matters for the Legal Aid Society of Cincinnati.

Ms. Williamson joined Tycko & Zavareei LLP in August 2009. She is admitted to practice in the State of Ohio, the District of Columbia, and the United States District Court for the Southern District of Ohio. She is also a member of the American Bar Association, the National Bar Association, and the Washington Bar Association.

# JEFFREY D. KALIEL
## ASSOCIATE

Jeffrey Kaliel earned his law degree from Yale Law School in 2005. Mr. Kaliel graduated from Amherst College summa cum laude in 2000 with a degree in Political Science. He spent one year studying Philosophy at Robinson College, Cambridge University, England.

After law school, Mr. Kaliel joined the Honors Program at the Department of Homeland Security, where he worked on some of the Department's most important appellate litigation, helped to draft and implement regulations for new programs, and worked with the private sector on infrastructure protection programs. Mr. Kaliel also helped investigate the DHS response to Hurricane Katrina in preparation for a Congressional inquiry. In addition, Mr. Kaliel served as a Special Assistant US Attorney in the Southern District of California, prosecuting drug and border crimes and gaining valuable courtroom experience.

In 2008, Mr. Kaliel worked in Namibia with Lawyers Without Borders on the observation of a 400-defendant treason trial arising from a 1998 armed rebellion.

Mr. Kaliel is a former Staff Sergeant in the Army Reserve and a veteran of the second Iraq war, having served in Iraq in 2003. His publications include contributions to Homeland Security Today and American Bar Association's Homeland Security Handbook.

Mr. Kaliel is admitted to practice in California and Washington, DC.

# Exhibit B

Richard M. Heimann (State Bar No. 063607)
*E-mail: rheimann@lchb.com*
Michael W. Sobol (State Bar No. 194857)
*E-mail: msobol@lchb.com*
Barry R. Himmelstein (State Bar No. 157736)
*E-mail: bhimmelstein@lchb.com*
Roger N. Heller (State Bar No. 215348)
*E-mail: rheller@lchb.com*
Mikaela Bernstein (State Bar No. 261301)
*E-mail: mbernstein@lchb.com*
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Richard D. McCune (State Bar No. 132124)
*E-mail: rdm@mwtriallawyers.com*
Jae (Eddie) K. Kim (State Bar No. 236805)
*E-mail: jkk@mwtriallawyers.com*
McCUNE & WRIGHT, LLP
2068 Orange Tree Lane, Suite 216
Redlands, CA 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

*Attorneys for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA GUTIERREZ, ERIN WALKER, and WILLIAM SMITH, as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & CO.; WELLS FARGO BANK, N.A.; and DOES 1 through 125,<br><br>Defendants. | Case No. C 07-05923-WHA (JCSx)<br><br>**UNREDACTED SUPPLEMENTAL EXPERT REPORT OF ARTHUR OLSEN**<br><br>The Honorable William H. Alsup |

Pursuant to the Court's Order Denying Motion to File Supplemental Olsen Report Under Seal (Docket No. 389), Plaintiffs hereby file an unredacted version of Mr. Olsen's Supplemental Expert Report, attached hereto as Exhibit 1 ("Supplemental Olsen Report"). The Supplemental Olsen Report was filed as Exhibit B to Plaintiffs' Opposition To Wells Fargo's Administrative Motion Concerning Plaintiffs' Untimely Submission Of Proposed Findings Of Fact And Conclusions Of Law (Docket No. 380).

Respectfully submitted,

Dated: April 20, 2010                    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP


By: _____/s/ *Roger N. Heller*_____
                 Roger N. Heller

Richard M. Heimann (State Bar No. 063607)
Michael W. Sobol (State Bar No. 194857)
Barry R. Himmelstein (State Bar No. 157736)
Roger N. Heller (State Bar No. 215348)
Mikaela Bernstein (State Bar No. 261301)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Richard D. McCune (State Bar No. 132124)
Jae (Eddie) K. Kim (State Bar No. 236805)
McCUNE & WRIGHT, LLP
2068 Orange Tree Lane, Suite 216
Redlands, CA 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

*Attorneys for Plaintiffs and the Class*

866773.1

UNREDACTED SUPPLEMENTAL EXPERT REPORT
OF ARTHUR OLSEN
CASE NO. C 07-05923 WHA (JCSX)

# EXHIBIT 1

# Veronica Gutierrez, et al.

# v.

# Wells Fargo & Company, et al.

U.S. District Court

for the Northern District of California

*Civil Case No.:  CV-07-5923 WHA (JCSx)*

**Supplemental Expert Report of:**

# Arthur Olsen



April 12, 2010

# Table of Contents

I.   Introduction ........................................................................................................... 4

   A.   Assignment ...................................................................................................... 4

     1.   Identify Harmed Customers ..................................................................... 4

     2.   Determine Amount of Harm ..................................................................... 4

     3.   Calculate Summary Data ......................................................................... 4

   B.   Information Provided ....................................................................................... 5

   C.   Seven New Alternative Sequencing Orders .................................................... 5

   D.   Results ............................................................................................................. 6

II.   Additional Data Utilized ....................................................................................... 7

III.   Assumptions ........................................................................................................... 7

   A.   Alternative Sequencing Scenarios .................................................................. 8

IV.   Damage Calculations ............................................................................................. 9

     1.   Sequencing Order 1A ............................................................................... 9

     2.   Sequencing Order 2A ............................................................................. 11

     3.   Sequencing Order 2B ............................................................................. 12

     4.   Sequencing Order 2C ............................................................................. 14

     5.   Sequencing Order 3A ............................................................................. 16

     6.   Sequencing Order 3B ............................................................................. 17

     7.   Sequencing Order 3C ............................................................................. 19

V.   Methodology ........................................................................................................ 20

   A.   Run Alter Table Scripts ................................................................................ 21

   B.   Perform Calculations for Scenarios 2B & 3B, (aka 4 & 5) ........................... 21

   C.   Perform Calcs for Scenarios 2A, 2C, 3A, & 3C, (aka 6 – 9) ........................ 21

   D.   Update TRANSACTION_CODE_MASTER .................................................. 21

   E.   Perform Calculations for Scenario 1A .......................................................... 22

   F.   Create Reversal Stored Procedures ............................................................... 22

   G.   Calculate Damages ....................................................................................... 22

VI.   Signature .............................................................................................................. 23

Exhibit A – Cash Withdrawal Transaction Codes .......................................................... 24

Exhibit B – Damages .................................................................................................................... 27

Exhibit C – Source Code .............................................................................................................. 28

    A.    Procedures ........................................................................................................................ 28

        1.    RESEQUENCE_1_SP ............................................................................................ 28

        2.    RESEQUENCE_1B_SP .......................................................................................... 32

        3.    RESEQUENCE_2_AND_3_SP ................................................................................ 36

        4.    RESEQUENCE_CHECKS_FIRST_SP ................................................................. 42

        5.    REVERSAL_4 ......................................................................................................... 46

        6.    REVERSAL_5 ......................................................................................................... 48

        7.    REVERSAL_6 ......................................................................................................... 50

        8.    REVERSAL_7 ......................................................................................................... 52

        9.    REVERSAL_8 ......................................................................................................... 53

      10.      REVERSAL_9 ......................................................................................................... 55

      11.      REVERSAL_10 ....................................................................................................... 57

      12.      REVERSAL_FIFO_4 .............................................................................................. 59

      13.      REVERSAL_FIFO_5 .............................................................................................. 61

      14.      REVERSAL_FIFO_6 .............................................................................................. 64

      15.      REVERSAL_FIFO_7 .............................................................................................. 66

      16.      REVERSAL_FIFO_8 .............................................................................................. 68

      17.      REVERSAL_FIFO_9 .............................................................................................. 71

      18.      REVERSAL_FIFO_10 ............................................................................................ 73

Exhibit D – Inventory of Handoff Package ................................................................................. 76

Exhibit E – Detailed Class Representative Analysis .................................................................. 78

    1.    Wells Fargo Actual Processing Order ............................................................................ 81

    2.    Alternate Sequencing Order 1 ......................................................................................... 83

    3.    Alternate Sequencing Order 1A ...................................................................................... 84

    4.    Alternate Sequencing Order 2 ......................................................................................... 85

    5.    Alternate Sequencing Order 2A ...................................................................................... 86

    6.    Alternate Sequencing Order 2B ...................................................................................... 87

    7.    Alternate Sequencing Order 2C ...................................................................................... 88

    8.    Alternate Sequencing Order 3 ......................................................................................... 89

    9.    Alternate Sequencing Order 3A ...................................................................................... 90

    10.    Alternate Sequencing Order 3B ...................................................................................... 91

11.  Alternate Sequencing Order 3C ...................................................................................... 92

# I.  Introduction

InfinIT Consulting was retained by the Law Firms of Lieff, Cabraser, Heimann & Bernstein, LLP and McCune & Wright LLP to perform data analysis work on customer data provided by Wells Fargo Bank, in the matter of Gutierrez et al. v. Wells Fargo Bank, N.A. ("Wells Fargo").

I am a senior consultant specializing in the areas of database development and administration, with extensive experience analyzing data for both business intelligence solutions and litigation support.

I had previously performed calculations for all of Wells Fargo's California consumer customers for the time period of November 15, 2004, to June 30, 2008, for three alternative sequencing scenarios.  The results of this analysis were presented in my original report dated November 20, 2009.  I was asked in this assignment to perform additional calculations on the same customers for the same time period. Specifically, I was asked to calculate damages under seven additional alternative sequencing scenarios.

This report is intended to be a supplement to my original report dated November 20, 2009.

## A. Assignment

My assignment was to use the data provided by Wells Fargo to perform the following tasks:

### 1.  Identify Harmed Customers

Identify each customer that would have been assessed fewer overdraft fees if Wells Fargo had used one of seven additional alternative sequencing orders in posting the group that contained debit and check card, ACH, and check transactions, specifically excluding customers who were not harmed because of reversals, uncollectibles, or because they opted-out of the class.

### 2.  Determine Amount of Harm

For those customers who were harmed, calculate the amount of additional overdraft fees resulting from Wells Fargo's posting order compared to the alternative sequencing posting orders after reducing for reversals and uncollectibles.

### 3.  Calculate Summary Data

Extract summary calculations from the database, including calculations of the aggregate number of harmed customers and the aggregate amount of harm under the alternative sequence posting orders.

# B. Information Provided

This supplemental analysis was done using the same information that was provided during the original analysis. The only additional information utilized was a brief from Wells Fargo that was provided to the court on March 25, 2010, that detailed the processing method that Wells Fargo utilized prior to April, 2001.

# C. Seven New Alternative Sequencing Orders

I was asked to perform the same calculations as per my original report utilizing seven additional alternative sequencing orders. Each alternative sequencing order is essentially a variation on one of the three original scenarios presented in my original report, and is named as such. For instance, Sequencing Order 1A is the first variation of Scenario 1 from my original report. In addition, each alternative sequencing order has a scenario number which is used to identify that sequencing order in the source code.

Sequencing Order 1A – (aka Scenario #10):
Group cash withdrawals and the debit and check card transactions into group one, and group check and ACH transactions into group two. Order the transactions in both groups from low to high and then process group one and then group two. This scenario is the method used by Wells Fargo prior to April, 2001.

Sequencing Order 2A – (aka Scenario #7):
Group the debit and check card transactions before the check and ACH transactions and then sequence the debit cards transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from low to high. This is essentially the same as sequencing order #2 from my original report, except that for all transactions not found in the settlement data, (i.e. where time was not available), the time of 23:59:59 was used. This resulted in transactions without times being processed last for a given day, as opposed to first.

Sequencing Order 2B – (aka Scenario #4):
Group the debit and check card transactions after the check and ACH transactions and then sequence the debit cards transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from low to high. For all transactions not found in the settlement data, (i.e. where time was not available), the default time of 00:00:00 was used. This resulted in transactions without times being processed first for a given day.

Sequencing Order 2C – (aka Scenario #6):
Group the debit and check card transactions after the check and ACH transactions and then sequence the debit cards transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from low to high. This is essentially the same as sequencing order 2B, (above), except that for all transactions not found in the settlement data, (i.e. where time was not available), the time of 23:59:59 was used. This resulted in transactions without times being processed last for a given day, as opposed to first.

Sequencing Order 3A – (aka Scenario #9):
Group the debit and check card transactions before the check and ACH transactions and then sequence the debit cards transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from high to low.  This is essentially the same as sequencing order #3 from my original report, except that for all transactions not found in the settlement data, (i.e. where time was not available), the time of 23:59:59 was used.  This resulted in transactions without times being processed last for a given day, as opposed to first.

Sequencing Order 3B – (aka Scenario #5):
Group the debit and check card transactions after the check and ACH transactions, and then sequence the debit card transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from high to low.  For all transactions not found in the settlement data, (i.e. where time was not available), the default time of 00:00:00 was used.  This resulted in transactions without times being processed first for a given day.

Sequencing Order 3C – (aka Scenario #8):
Group the debit and check card transactions after the check and ACH transactions and then sequence the debit cards transactions in chronological order where I had the date and time of the transaction; and where I did not, sequence those debit card transactions from high to low.  This is essentially the same as sequencing order 3B, (above), except that for all transactions not found in the settlement data, (i.e. where time was not available), the time of 23:59:59 was used.  This resulted in transactions without times being processed last for a given day, as opposed to first.

Alternative sequencing orders 2A, 2B, 2C, 3A, 3B, and 3C assumed that Wells Fargo could continue to post check and ACH transactions in high to low order.

For each of the alternative scenarios, I was asked to compare the amount of overdraft fees that had been assessed by Wells Fargo with the amount of overdraft fees that would have been assessed under each alternative scenario.  If there was a difference, that customer was identified as a harmed customer.   The amount of the difference was determined to be the gross harm.  The gross harm was then reduced by reversals and uncollectibles as set forth below.

# D. Results

I was able to successfully determine the identity by account number of each customer that was harmed under each of the seven alternative sequencing scenarios.  I was also able to calculate the amount of harm for each customer under each of the seven alternative sequencing orders.  The listing of those individual customers and the amount of harm for each harmed customer under each of the alternative sequencing scenarios is found in the CLASS_DAMAGES table, which is in the database backup file that was provided to Wells Fargo in the supplemental handoff package.

I was also able to perform summary data calculations.  After accounting for uncollectibles and reversals, the aggregate damages under each of the alternate scenarios are:

<u>Sequencing Order 1A</u>
Last In First Out Reversal      $351,494,698.49
30 Day Reversal      $336,080,284.76

<u>Sequencing Order 2A</u>
Last In First Out Reversal      $214,379,710.68
30 Day Reversal      $202,994,035.46

<u>Sequencing Order 2B</u>
Last In First Out Reversal      $98,612,151.93
30 Day Reversal      $92,935,315.91
<u>Sequencing Order 2C</u>
Last In First Out Reversal      $98,596,704.27
30 Day Reversal      $92,920,530.85

<u>Sequencing Order 3A</u>
Last In First Out Reversal      $195,215,270.88
30 Day Reversal      $184,616,247.52

<u>Sequencing Order 3B</u>
Last In First Out Reversal      $73,806,898.60
30 Day Reversal      $69,386,603.74

<u>Sequencing Order 3C</u>
Last In First Out Reversal      $73,824,056.73
30 Day Reversal      $69,402,498.90

I was also able to calculate summary data requests. A summary of those calculations are found in this document, and can be easily recreated by running the queries provided against the database backup file that was provided to Wells Fargo in the handoff package.

# II.   Additional Data Utilized

The analysis detailed in this report was performed as a supplement to the analysis detailed in my original report from November 20, 2009. As such, the information relied upon was the same as that listed in the original report. However, since scenario 1A required that cash withdrawal transactions be identified, I have included two tables as Exhibit A. The first table lists all of the transaction codes actually found in the Wells Fargo transaction data for all customers on days that generated multiple overdraft charges, as well as the total number of occurrences of those codes. The second table lists the transaction codes that were ultimately classified as cash withdrawal for the purposes of scenario 1A calculations.

# III. Assumptions

All of the assumptions detailed in my original report were also made for the purposes of this supplemental analysis. The only exception is that for calculations for scenario 1A, cash withdrawal transactions were processed with the transactions grouped in posting group 50040.

# A. Alternative Sequencing Scenarios

For the purpose of this supplemental analysis, I was provided seven alternative sequencing orders by counsel.

Sequencing Order 1A – All debit and check card and cash withdrawal transactions first, followed by all check and ACH transactions. Both groups to be sorted from low to high.

Sequencing Order 2A – All debit and check card transactions first, followed by all check and ACH transactions. The check and ACH group to be left in the original order, (high to low), and the debit and check card transactions were to be sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions were to be given a timestamp of 23:59:59, (making them last for a given day), and were to be sorted from low to high.

Sequencing Order 2B – All check and ACH transactions first, followed by all debit and check card transactions. The check and ACH group to be left in the original order, (high to low), and the debit and check card transactions were to be sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions were to be given a timestamp of 00:00:00, (making them first for a given day), and were to be sorted from low to high.

Sequencing Order 2C – All check and ACH transactions first, followed by all debit and check card transactions. The check and ACH group to be left in the original order, (high to low), and the debit and check card transactions were to be sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions were to be given a timestamp of 23:59:59, (making them last for a given day), and were to be sorted from low to high.

Sequencing Order 3A – All debit and check card transactions first, followed by all check and ACH transactions. The check and ACH group to be left in the original order, (high to low), and the debit and check card transactions were to be sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions were to be given a timestamp of 23:59:59, (making them last for a given day), and were to be sorted from high to low.

Sequencing Order 3B – All check and ACH transactions first, followed by all debit and check card transactions. The check and ACH group to be left in the original order, (high to low), and the debit and check card transactions were to be sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions were to be given a timestamp of 00:00:00, (making them first for a given day), and were to be sorted from high to low.

Sequencing Order 3C – All check and ACH transactions first, followed by all debit and check card transactions. The check and ACH group to be left in the original order, (high to low), and the debit and check card transactions were to be sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions were to be given a timestamp of 23:59:59, (making them last for a given day), and were to be sorted from high to low.

Alternative sequencing orders 2A, 2B, 2C, 3A, 3B, and 3C assumed that Wells Fargo could continue to post check and ACH transactions in high to low order.

For each of the alternative sequencing scenarios, I was asked to determine the amount of overdraft fees that had been assessed by Wells Fargo, and determine the amount of overdraft fees that would have been

assessed under the alternative sequencing scenario. If there was a difference, that customer was identified as a harmed customer. The amount of the difference was determined to be the gross harm.

# IV. Damage Calculations

The following are the supplemental damage calculations that were requested by Counsel for the Plaintiffs. Included with each figure is the SQL code that was used to generate the result. The steps necessary to get the underlying data to a state where these findings could be determined are detailed in Section V below.

In all cases, the calculations are limited to the class period, (11/15/2004 through 6/30/2008), and rely on the assumption that the data provided by Wells Fargo was both complete and accurate.

The queries used to generate the results in this section are included in the handoff package in the $:\DATABASE CODE ADDITIONAL\QUERIES directory, as well as in the text below. The results are also summarized in table form in Exhibit B.

For each calculation, two numbers are given. One is the number of accounts with damages under the given scenario, (count), and the other is the amount of damages, (result).

Also included as Exhibit E at the end of this document is a detailed analysis of how the different scenarios were applied to a particular customer. This is a real world analysis using Veronica Gutierrez, a class representative named on this case.

### 1. Sequencing Order 1A

The following are the damage calculations for Sequencing Order 1A, which was defined above as all debit and check card and cash withdrawal transactions first, followed by all check and ACH transactions. Both groups sorted from low to high.

#### a. *Damages before reversals and before uncollectibles:*

Count: 1,833,994
Result: $447,368,076.96

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC10_RN_CN_UN > 0

SELECT SUM(SC10_RN_CN_UN)
  FROM CLASS_DAMAGES
```

#### b. *Damages before reversals and after uncollectibles:*

Count: 1,695,726
Result: $414,032,754.99

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC10_RN_CN_UY > 0

SELECT SUM(SC10_RN_CN_UY)
  FROM CLASS_DAMAGES
```

**c.   *Damages after LIFO reversals and before uncollectibles:***

Count: 1,641,201
Result: $381,790,830.35

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC10_RLI_CN_UN > 0

SELECT SUM(SC10_RLI_CN_UN)
  FROM CLASS_DAMAGES
```

**d.   *Damages after LIFO reversals and after uncollectibles:***

Count: 1,503,733
Result: $351,494,698.49

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC10_RLI_CN_UY > 0

SELECT SUM(SC10_RLI_CN_UY)
  FROM CLASS_DAMAGES
```

**e.   *Damages after 30 day reversals and before uncollectibles:***

Count: 1,594,039
Result: $365,430,980.94

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC10_R30_CN_UN > 0

SELECT SUM(SC10_R30_CN_UN)
  FROM CLASS_DAMAGES
```

**f.   *Damages after 30 day reversals and after uncollectibles:***

Count: 1,457,281
Result: $336,080,284.76

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC10_R30_CN_UY > 0

SELECT SUM(SC10_R30_CN_UY)
  FROM CLASS_DAMAGES
```

**2. Sequencing Order 2A**

The following are the damage calculations for Sequencing Order 2A, which was defined above as all debit and check card transactions first, followed by all check and ACH transactions. The check and ACH group was left in the original order, (high to low), and the debit and check card transactions were sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions given a timestamp of 23:59:59, (making them last for a given day), and sorted from low to high.

   ***a. Damages before reversals and before uncollectibles:***

Count: 1,491,806
Result: $278,643,858.97

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC7_RN_CN_UN > 0

SELECT SUM(SC7_RN_CN_UN)
  FROM CLASS_DAMAGES
```

   ***b. Damages before reversals and after uncollectibles:***

Count: 1,352,862
Result: $254,892,697.93

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC7_RN_CN_UY > 0

SELECT SUM(SC7_RN_CN_UY)
  FROM CLASS_DAMAGES
```

   ***c. Damages after LIFO reversals and before uncollectibles:***

Count: 1,326,067
Result: $235,647,906.73

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC7_RLI_CN_UN > 0

SELECT SUM(SC7_RLI_CN_UN)
  FROM CLASS_DAMAGES
```

**d.** *Damages after LIFO reversals and after uncollectibles:*

Count: 1,192,364
Result: $214,379,710.68

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC7_RLI_CN_UY > 0

SELECT SUM(SC7_RLI_CN_UY)
  FROM CLASS_DAMAGES
```

**e.** *Damages after 30 day reversals and before uncollectibles:*

Count: 1,275,983
Result: $223,396,007.89

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC7_R30_CN_UN > 0

SELECT SUM(SC7_R30_CN_UN)
  FROM CLASS_DAMAGES
```

**f.** *Damages after 30 day reversals and after uncollectibles:*

Count: 1,144,577
Result: $202,994,035.46

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC7_R30_CN_UY > 0

SELECT SUM(SC7_R30_CN_UY)
  FROM CLASS_DAMAGES
```

### 3. Sequencing Order 2B

The following are the damage calculations for Sequencing Order 2B, which was defined above as all check and ACH transactions first, followed by all debit and check card transactions. The check and ACH group was left in the original order, (high to low), and the debit and check card transactions were sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions given a timestamp of 00:00:00, (making them first for a given day), and sorted from low to high.

**a.** *Damages before reversals and before uncollectibles:*

Count: 1,126,468
Result: $133,895,236.97

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC4_RN_CN_UN > 0

SELECT SUM(SC4_RN_CN_UN)
  FROM CLASS_DAMAGES
```

**b.  Damages before reversals and after uncollectibles:**

Count:  1,000,729
Result:  $119,145,059.53

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC4_RN_CN_UY > 0

SELECT SUM(SC4_RN_CN_UY)
  FROM CLASS_DAMAGES
```

**c.  Damages after LIFO reversals and before uncollectibles:**

Count:  985,428
Result:  $111,570,230.08

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC4_RLI_CN_UN > 0

SELECT SUM(SC4_RLI_CN_UN)
  FROM CLASS_DAMAGES
```

**d.  Damages after LIFO reversals and after uncollectibles:**

Count:  867,678
Result:  $98,612,151.93

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC4_RLI_CN_UY > 0

SELECT SUM(SC4_RLI_CN_UY)
  FROM CLASS_DAMAGES
```

**e.  Damages after 30 day reversals and before uncollectibles:**

Count:  941,193
Result:  $105,294,318.17

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC4_R30_CN_UN > 0

SELECT SUM(SC4_R30_CN_UN)
  FROM CLASS_DAMAGES
```

***f.  Damages after 30 day reversals and after uncollectibles:***

Count:  826,770
Result:  $92,935,315.91

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC4_R30_CN_UY > 0

SELECT SUM(SC4_R30_CN_UY)
  FROM CLASS_DAMAGES
```

## 4.  Sequencing Order 2C

The following are the damage calculations for Sequencing Order 2C, which was defined above as all check and ACH transactions first, followed by all debit and check card transactions.  The check and ACH group was left in the original order, (high to low), and the debit and check card transactions were sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions given a timestamp of 23:59:59, (making them last for a given day), and sorted from low to high.

***a.  Damages before reversals and before uncollectibles:***

Count:  1,126,440
Result:  $133,876,651.97

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC6_RN_CN_UN > 0

SELECT SUM(SC6_RN_CN_UN)
  FROM CLASS_DAMAGES
```

***b.  Damages before reversals and after uncollectibles:***

Count:  1,000,705
Result:  $119,127,522.53

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC6_RN_CN_UY > 0

SELECT SUM(SC6_RN_CN_UY)
  FROM CLASS_DAMAGES
```

*c.* *Damages after LIFO reversals and before uncollectibles:*

Count:  985,396
Result:  $111,553,886.04

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC6_RLI_CN_UN > 0

SELECT SUM(SC6_RLI_CN_UN)
  FROM CLASS_DAMAGES
```

*d.* *Damages after LIFO reversals and after uncollectibles:*

Count:  867,645
Result:  $98,596,704.27

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC6_RLI_CN_UY > 0

SELECT SUM(SC6_RLI_CN_UY)
  FROM CLASS_DAMAGES
```

*e.* *Damages after 30 day reversals and before uncollectibles:*

Count:  941,162
Result:  $105,278,574.67

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC6_R30_CN_UN > 0

SELECT SUM(SC6_R30_CN_UN)
  FROM CLASS_DAMAGES
```

*f.* *Damages after 30 day reversals and after uncollectibles:*

Count:  826,734
Result:  $92,920,530.85

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC6_R30_CN_UY > 0

SELECT SUM(SC6_R30_CN_UY)
  FROM CLASS_DAMAGES
```

### 5. Sequencing Order 3A

The following are the damage calculations for Sequencing Order 3A, which was defined above as all debit and check card transactions first, followed by all check and ACH transactions. The check and ACH group was left in the original order, (high to low), and the debit and check card transactions were sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions given a timestamp of 23:59:59, (making them last for a given day), and sorted from high to low.

#### a. *Damages before reversals and before uncollectibles:*

Count: 1,383,758
Result: $253,086,820.97

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC9_RN_CN_UN > 0

SELECT SUM(SC9_RN_CN_UN)
  FROM CLASS_DAMAGES
```

#### b. *Damages before reversals and after uncollectibles:*

Count: 1,256,744
Result: $231,901,846.76

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC9_RN_CN_UY > 0

SELECT SUM(SC9_RN_CN_UY)
  FROM CLASS_DAMAGES
```

#### c. *Damages after LIFO reversals and before uncollectibles:*

Count: 1,230,443
Result: $214,157,050.71

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC9_RLI_CN_UN > 0

SELECT SUM(SC9_RLI_CN_UN)
  FROM CLASS_DAMAGES
```

#### d. *Damages after LIFO reversals and after uncollectibles:*

Count: 1,108,679
Result: $195,215,270.88

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC9_RLI_CN_UY > 0

SELECT SUM(SC9_RLI_CN_UY)
  FROM CLASS_DAMAGES
```

### e.  *Damages after 30 day reversals and before uncollectibles:*

Count: 1,181,233
Result: $202,733,291.33

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC9_R30_CN_UN > 0

SELECT SUM(SC9_R30_CN_UN)
  FROM CLASS_DAMAGES
```

### f.  *Damages after 30 day reversals and after uncollectibles:*

Count: 1,061,948
Result: $184,616,247.52

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC9_R30_CN_UY > 0

SELECT SUM(SC9_R30_CN_UY)
  FROM CLASS_DAMAGES
```

## 6.  Sequencing Order 3B

The following are the damage calculations for Sequencing Order 3B, which was defined above as all check and ACH transactions first, followed by all debit and check card transactions. The check and ACH group was left in the original order, (high to low), and the debit and check card transactions were sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions given a timestamp of 00:00:00, (making them first for a given day), and sorted from high to low.

### a.  *Damages before reversals and before uncollectibles:*

Count: 953,884
Result: $100,447,271.97

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC5_RN_CN_UN > 0

SELECT SUM(SC5_RN_CN_UN)
  FROM CLASS_DAMAGES
```

**b.   Damages before reversals and after uncollectibles:**

Count:  847,342
Result:  $89,481,036.84

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC5_RN_CN_UY > 0

SELECT SUM(SC5_RN_CN_UY)
  FROM CLASS_DAMAGES
```

**c.   Damages after LIFO reversals and before uncollectibles:**

Count:  830,271
Result:  $83,371,108.72

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC5_RLI_CN_UN > 0

SELECT SUM(SC5_RLI_CN_UN)
  FROM CLASS_DAMAGES
```

**d.   Damages after LIFO reversals and after uncollectibles:**

Count:  731,649
Result:  $73,806,898.60

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC5_RLI_CN_UY > 0

SELECT SUM(SC5_RLI_CN_UY)
  FROM CLASS_DAMAGES
```

**e.   Damages after 30 day reversals and before uncollectibles:**

Count:  788,596
Result:  $78,464,533.94

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC5_R30_CN_UN > 0

SELECT SUM(SC5_R30_CN_UN)
  FROM CLASS_DAMAGES
```

*f.* ***Damages after 30 day reversals and after uncollectibles:***

Count: 693,423
Result: $69,386,603.74

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC5_R30_CN_UY > 0

SELECT SUM(SC5_R30_CN_UY)
  FROM CLASS_DAMAGES
```

### 7. Sequencing Order 3C

The following are the damage calculations for Sequencing Order 3C, which was defined above as all check and ACH transactions first, followed by all debit and check card transactions. The check and ACH group was left in the original order, (high to low), and the debit and check card transactions were sorted in chronological order where I had the time of the transaction; and where I did not, the debit and check card transactions given a timestamp of 23:59:59, (making them last for a given day), and sorted from high to low.

*a.* ***Damages before reversals and before uncollectibles:***

Count: 953,956
Result: $100,469,457.97

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC8_RN_CN_UN > 0

SELECT SUM(SC8_RN_CN_UN)
  FROM CLASS_DAMAGES
```

*b.* ***Damages before reversals and after uncollectibles:***

Count: 847,413
Result: $89,502,506.56

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC8_RN_CN_UY > 0

SELECT SUM(SC8_RN_CN_UY)
  FROM CLASS_DAMAGES
```

*c.* ***Damages after LIFO reversals and before uncollectibles:***

Count: 830,342
Result: $83,388,996.85

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC8_RLI_CN_UN > 0

SELECT SUM(SC8_RLI_CN_UN)
  FROM CLASS_DAMAGES
```

### d. Damages after LIFO reversals and after uncollectibles:

Count: 731,709
Result: $73,824,056.73

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC8_RLI_CN_UY > 0

SELECT SUM(SC8_RLI_CN_UY)
  FROM CLASS_DAMAGES
```

### e. Damages after 30 day reversals and before uncollectibles:

Count: 788,660
Result: $78,481,231.94

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC8_R30_CN_UN > 0

SELECT SUM(SC8_R30_CN_UN)
  FROM CLASS_DAMAGES
```

### f. Damages after 30 day reversals and after uncollectibles:

Count: 693,470
Result: $69,402,498.90

```
SELECT COUNT(*)
  FROM CLASS_DAMAGES
 WHERE SC8_R30_CN_UY > 0

SELECT SUM(SC8_R30_CN_UY)
  FROM CLASS_DAMAGES
```

# V. Methodology

The purpose of this section is to provide a detailed description of the steps required to reproduce the findings included in this report. Where possible, any code referenced is included in Exhibit C, as well as in the handoff package given to Wells Fargo. In addition, a backup of the database WF_FINAL, (file

name WF_FINAL_NEW.bak), was also included in the handoff package, and that backup contains all of the necessary database objects, fully populated.  It is important to note that the steps detailed in this section assumes that all of the steps outlined in my original report of November 20, 2009, were performed prior to starting performing these steps.  Alternatively, the backup file WF_FINAL.bak, (which was previously provided to Wells Fargo), could be used as a starting point.

## A. Run Alter Table Scripts

The scripts necessary to make the required changes to existing tables are found in the $\DATABASE CODE ADDITIONAL\SCRIPTS directory, which was included in the handoff package provided to Wells Fargo.  (For a detailed list of the scripts, refer to Exhibit D).  Specifically, the following scripts should be run, and can be run in any order.  The primary purpose of these scripts is to add the columns necessary for the additional scenarios.

- ALTER_CLASS_DAILY_DETAIL.SQL
- ALTER_CLASS_DAMAGES.SQL

## B. Perform Calculations for Scenarios 2B & 3B, (aka 4 & 5)

The script necessary to perform the calculations for scenarios 2B and 3B can be found in the $\DATABASE CODE ADDITIONAL\PROCEDURES directory, which was included in the handoff package provided to Wells Fargo.  (For a detailed list of the scripts, refer to Exhibit D).  Specifically, the script is RESEQUENCE_CHECKS_FIRST_SP.SQL, and this script both creates and then executes the RESEQUENCE_CHECKS_FIRST_SP stored procedure, which populates the CLASS_DAILY_DETAIL table.

## C. Perform Calcs for Scenarios 2A, 2C, 3A, & 3C, (aka 6 – 9)

The script necessary to perform the calculations for scenarios 2A, 2C, 3A, and 3C can be found in the $\DATABASE CODE ADDITIONAL\PROCEDURES directory, which was included in the handoff package provided to Wells Fargo.  (For a detailed list of the scripts, refer to Exhibit D).  Specifically, the script is RESEQUENCE_2_AND_3_SP.SQL, and this script both creates and then executes the RESEQUENCE_2_AND_3_SP stored procedure, which populates the CLASS_DAILY_DETAIL table.

## D. Update TRANSACTION_CODE_MASTER

The script necessary to update the TRANSACTION_CODE_MASTER table can be found in the $\DATABASE CODE ADDITIONAL\SCRIPTS directory, which was included in the handoff package provided to Wells Fargo.  (For a detailed list of the scripts, refer to Exhibit D).  Specifically, the script is UPDATE_TRANSACTION_CODE_MASTER.SQL, and this script simply identifies the transaction codes that were considered cash withdrawal transactions for scenario 1A processing.

## E. Perform Calculations for Scenario 1A

The scripts necessary to perform the calculations for scenario 1A can be found in the $\DATABASE CODE ADDITIONAL\PROCEDURES directory, which was included in the handoff package provided to Wells Fargo. (For a detailed list of the scripts, refer to Exhibit D). Specifically, the scripts are RESEQUENCE_1_SP.SQL and RESEQUENCE_1B_SP.SQL, and can be run in any order. These scripts both create and then execute a stored procedure of the same name, which populates the CLASS_DAILY_DETAIL table.

## F. Create Reversal Stored Procedures

The scripts necessary to create all of the necessary reversal procedures can be found in the $\DATABASE CODE ADDITIONAL\PROCEDURES directory, which was included in the handoff package provided to Wells Fargo. (For a detailed list of the scripts, refer to Exhibit D). Specifically, the scripts are listed below, and can be run in any order.

- REVERSAL_4.SQL
- REVERSAL_5.SQL
- REVERSAL_6.SQL
- REVERSAL_7.SQL
- REVERSAL_8.SQL
- REVERSAL_9.SQL
- REVERSAL_10.SQL
- REVERSAL_FIFO_4.SQL
- REVERSAL_FIFO_5.SQL
- REVERSAL_FIFO_6.SQL
- REVERSAL_FIFO_7.SQL
- REVERSAL_FIFO_8.SQL
- REVERSAL_FIFO_9.SQL
- REVERSAL_FIFO_10.SQL

## G. Calculate Damages

Run the scripts POPULATE_DAMAGES.SQL and POPULATE_DAMAGES_10.SQL, which can be found in the $:\DATABASE CODE ADDITIONAL\SCRIPTS directory. This script populates the table CLASS_DAMAGES, which contains all of the damages for each of the class members, one column for each scenario.

# VI. Signature

To the best of my knowledge, all of the information in this document is truthful and accurate.

Arthur Olsen                                                                 4/12/2010

# Exhibit A – Cash Withdrawal Transaction Codes

The following is a listing of all of the transaction codes in priority group 50020, including the number of instances that each code was found in the Wells Fargo transaction data for all customers on all days where multiple overdraft charges were assessed.

| Posting Goup | Tran Code | Tran Description | Category | # of Instances |
|---|---|---|---|---|
| 50020 | 1053 | CASHED CHECK | CHECK | 90,548 |
| 50020 | 1059 | TELEPHONE TRANSFER WITHDRAWAL | TRANSFER | 23,178 |
| 50020 | 1187 | AUTOMATIC TRANSFER | TRANSFER | 90,419 |
| 50020 | 1197 | DEBIT MEMO | MEMO | 1,638 |
| 50020 | 5449 | INTER-CUSTOMER TRANSFER DEBIT | TRANSFER | 24,695 |
| 50020 | 5503 | SAVINGS WITHDRAWAL | WITHDRAWAL | 2 |
| 50020 | 5505 | CERTIFIED CHECK | CHECK | 3 |
| 50020 | 5519 | WF MERCHANT SERVICES TRANSACTION | MERCHANT CARD | 5,512 |
| 50020 | 5521 | WIRE TRANSFER WITHDRAWAL | WITHDRAWAL | 1,548 |
| 50020 | 5523 | DEPOSIT ADJUSTMENT | CREDIT ADJUSTMENT | 38 |
| 50020 | 5525 | DEBIT MEMO - CHARGEABLE | MEMO | 3 |
| 50020 | 5527 | DEBIT MEMO WITHOUT SERVICE FEE | MEMO | 17 |
| 50020 | 5593 | BOND DEBIT | WITHDRAWAL | 2 |
| 50020 | 5601 | MISCELLANEOUS DEBIT | WITHDRAWAL | 258 |
| 50020 | 5631 | DEPOSIT ADJUSTMENT | CREDIT ADJUSTMENT | 3 |
| 50020 | 5661 | TRANSFER FROM SAVINGS INSERT INTO TRANSACTION_CODE_MASTER VALUES (3270 TRF) | TRANSFER | 2 |
| 50020 | 5673 | ICC REGIONAL NETWORK CASH ADVANCE | ADVANCE | 2 |
| 50020 | 5685 | ONLINE TRANSFER | TRANSFER | 159,015 |
| 50020 | 5701 | ATM WITHDRAWAL | WITHDRAWAL | 81,469 |
| 50020 | 5703 | ATM WITHDRAWAL | WITHDRAWAL | 68,012 |
| 50020 | 5705 | ATM WITHDRAWAL | WITHDRAWAL | 9,431 |
| 50020 | 5707 | ATM TRANSFER TO SAVINGS | TRANSFER | 260 |
| 50020 | 5709 | ATM TRANSFER TO CHECKING | TRANSFER | 147 |
| 50020 | 5731 | ATM WITHDRAWAL | WITHDRAWAL | 2,509,012 |
| 50020 | 5733 | ATM WITHDRAWAL | WITHDRAWAL | 1,853,906 |
| 50020 | 5735 | ATM WITHDRAWAL | WITHDRAWAL | 649,983 |
| 50020 | 5737 | ATM TRANSFER TO SAVINGS | TRANSFER | 10,185 |
| 50020 | 5739 | ATM TRANSFER TO CHECKING | TRANSFER | 5,185 |
| 50020 | 5741 | ATM TRANSFER TO SAVINGS | TRANSFER | 26 |
| 50020 | 5745 | ATM TRANSFER TO SAVINGS | TRANSFER | 3 |
| 50020 | 5751 | ATM TRANSFER TO CHECKING | TRANSFER | 1 |
| 50020 | 5787 | CHECK CARD CASH ADVANCE ADJUSTMENT | ADVANCE | 1 |
| 50020 | 5791 | ATM PAYMENT | PURCHASE STAMPS | 303 |
| 50020 | 5797 | ATM PAYMENT | PURCHASE STAMPS | 12,250 |
| 50020 | 5911 | MISCELLANEOUS CHARGE OR CHECK | DEBIT ADJUSTMENT | 5 |
| 50020 | 5929 | WITHDRAWAL - TELEPHONE TRANSFER | TRANSFER | 27 |
| 50020 | 5998 | WELLS FARGO BUSINESS PAYROLL SERVICES | WITHDRAWAL | 326 |
| 50020 | 6188 | WITHDRAWAL MADE IN A BRANCH/STORE | WITHDRAWAL | 194,611 |
| 50020 | 6196 | CASH VAULT DEPOSIT CORRECTION | CREDIT ADJUSTMENT | 2 |
| 50020 | 6200 | IC TRANSFER FROM DDA TO CREDIT CARD | PAYMENT | 23 |
| 50020 | 6202 | ICC TRANSFER FROM DDA TO CREDIT CARD | PAYMENT | 1,283 |
| 50020 | 6216 | IC TRANSFER FROM DDA TO LINE OF CREDIT | PAYMENT | 15 |
| 50020 | 6218 | ICC TRANSFER FROM DDA TO LINE OF CREDIT | PAYMENT | 162 |
| 50020 | 6240 | BANK ORIGINATED DEBIT | BANK-INITIATED DEBIT | 2,172 |
| 50020 | 6248 | PROOF-ADJ ATM DEPOSIT KEYING ERROR | CREDIT ADJUSTMENT | 1,838 |
| 50020 | 6260 | CASHED CHECK | CHECK | 5,160 |
| 50020 | 6266 | BANK ORIGINATED DEBIT | BANK-INITIATED DEBIT | 7,831 |
| 50020 | 6268 | DEBIT MEMO - CHARGEABLE | MEMO | 1 |
| 50020 | 6310 | CHECK | CHECK | 15,206 |
| 50020 | 6330 | BOOK TRANSFER DEBIT | TRANSFER | 78 |
| 50020 | 6334 | INTERNATIONAL MONEY TRANSFER DEBIT | WITHDRAWAL | 279 |
| 50020 | 6359 | DIRECT DEPOSIT ADVANCE DR ADJUSTMENT | DIRECT DEPOSIT ADVANCE REVERSAL | 45 |
| 50020 | 6382 | DEBIT CARD DOUBLE POSTING ADJUSTMENT | DEBIT ADJUSTMENT | 13 |
| 50020 | 6384 | DEBIT CARD CHARGEBACK | DEBIT ADJUSTMENT | 13 |
| 50020 | 6386 | MERCHANT CARD DEPOSIT. ADJUSTMENT | MERCHANT CARD | 18 |
| 50020 | 6388 | MERCHANT ID ILLEGIBLE OR MISSING | MERCHANT CARD | 9 |
| 50020 | 6390 | MERCHANT CARD SALES DRAFT NOT RECEIVED | MERCHANT CARD | 9 |
| 50020 | 6392 | DEBIT CARD REVERSAL | DEBIT REVERSAL | 9 |
| 50020 | 6402 | CHECK | CHECK | 652 |
| 50020 | 6442 | IC ATM WITHDRAWAL CORR BANK INTER | WITHDRAWAL | 32 |
| 50020 | 6444 | IC ATM WITHDRAWAL CORR BANK INTRA | WITHDRAWAL | 2 |
| 50020 | 6446 | ICC ATM WITHDRAWAL CORR BANK INTER | WITHDRAWAL | 1,326 |
| 50020 | 6448 | ICC ATM WITHDRAWAL CORR BANK INTRA | WITHDRAWAL | 93 |
| 50020 | 6452 | IC ATM TRNX FROM CORR BANK INTRA | TRANSFER | 4 |

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**

**Page 25 of 92**

| Posting Goup | Tran Code | Tran Description | Category | # of Instances |
|---|---|---|---|---|
| 50020 | 6458 | IC ATM WITHDRAWAL INTERNATIONAL | WITHDRAWAL | 933 |
| 50020 | 6460 | ICC ATM WITHDRAWAL INTERNATIONAL | WITHDRAWAL | 106,091 |
| 50020 | 6508 | DEBIT RIGHT OF OFFSET | OVERDRAFT PROTECTION TRANSFER | 22,374 |
| 50020 | 6520 | ACH STTLMNT DEBIT - NON-RET | WITHDRAWAL | 13 |
| 50020 | 6566 | DRO BANK ORIGINATED DEBIT | BANK-INITIATED DEBIT | 351 |
| 50020 | 6572 | CROSS BANK TELEPHONE TRANSFER WDWL | TRANSFER | 792 |
| 50020 | 6609 | GUARANTEE W/CONVERSION CHECK | E-CHECK POS PURCHASE | 328 |
| 50020 | 6620 | MERCHANT SERVICES TRANSACTION | MERCHANT CARD | 27,506 |
| 50020 | 6628 | ATM DONATION | DONATION | 7 |
| 50020 | 6676 | AUTOMATIC TRANSFER-RECUR DEBIT INSERT INTO TRANSACTION_CODE_MASTER VALUES (DEBIT) | TRANSFER | 69,127 |
| 50020 | 6680 | AUTO TRANSFER-ONE TIME OR RECUR DEBIT INSERT INTO TRANSACTION_CODE_MASTER VALUES (DEBIT) | TRANSFER | 176 |
| 50020 | 6682 | GIFT CARD PURCHASE | GIFT CARD PURCHASE | 234 |
| 50020 | 6688 | FOREIGN DRAFT PURCHASE INSERT INTO TRANSACTION_CODE_MASTER VALUES (DEBIT) | PURCHASE CASH INSTRUMENT | 3 |
| 50020 | 6696 | AUTOMATIC TRANSFER-ONE TIME DEBIT INSERT INTO TRANSACTION_CODE_MASTER VALUES (DEBIT) | TRANSFER | 1,264 |
| 50020 | 6698 | AUTOMATIC TRANSFER-ONE TIME DEBIT INSERT INTO TRANSACTION_CODE_MASTER VALUES (DEBIT) | TRANSFER | 83 |
| 50020 | 6700 | AUTOMATIC TRANSFER-RECUR DEBIT P2P INSERT INTO TRANSACTION_CODE_MASTER VALUES (DEBIT) | TRANSFER | 182 |
| 50020 | 6706 | AUTO TRANSFER-ONE TIME DEBIT P2P INSERT INTO TRANSACTION_CODE_MASTER VALUES (DEBIT) | TRANSFER | 139 |
| 50020 | 7750 | ADJUSTMENTS-ADD ERROR ON DEPOSIT TICKET | CREDIT ADJUSTMENT | 75 |
| 50020 | 7754 | ADJUSTMENTS-CHECK LISTED NOT ENCLOSED | DEBIT ADJUSTMENT | 7 |
| 50020 | 7758 | ADJUSTMENTS-MISC ADJUSTMENT | DEBIT ADJUSTMENT | 32,574 |
| 50020 | 7774 | PROOF-ADJ ADDITION ERR ON DEPOSIT TICKET | CREDIT ADJUSTMENT | 47 |
| 50020 | 7776 | PROOF-ADJ TAPE TOTAL LISTED INCORRECTLY | DEBIT ADJUSTMENT | 8 |
| 50020 | 7778 | PROOF-ADJ CHECK LISTED NOT ENCLOSED | DEBIT ADJUSTMENT | 74 |
| 50020 | 7782 | PROOF-OUT OF BALANCE NO TAPE LISTING | DEBIT ADJUSTMENT | 102 |
| 50020 | 7784 | PROOF-ADJ NON NEGOTIABLE ITEM | DEBIT ADJUSTMENT | 19 |
| 50020 | 7786 | PROOF-ITEM LISTED INCORRECTLY | DEBIT ADJUSTMENT | 15 |
| 50020 | 7796 | ITEM PROCESSING-ENCODING ERROR | DEBIT ADJUSTMENT | 1 |
| 50020 | 7798 | ITEM PROC-OUT OF BAL NO TAPE LISTING | DEBIT ADJUSTMENT | 1 |
| 50020 | 7854 | ITEM PROCESSING-MISC ADJUSTMENT | DEBIT ADJUSTMENT | 1 |

The table below is a list of the transaction codes classified as "Cash Withdrawal" for the purpose of performing the scenario 1A calculations. This list is a subset of the codes listed in the table above.

| | | | |
|---|---|---|---|
| 1053 | 5731 | 6218 | 6520 |
| 1059 | 5733 | 6240 | 6566 |
| 1187 | 5735 | 6260 | 6572 |
| 5449 | 5737 | 6310 | 6609 |
| 5505 | 5741 | 6330 | 6628 |
| 5521 | 5745 | 6334 | 6676 |
| 5593 | 5791 | 6442 | 6680 |
| 5601 | 5797 | 6444 | 6682 |
| 5685 | 5929 | 6446 | 6688 |
| 5701 | 6188 | 6448 | 6696 |
| 5703 | 6200 | 6452 | 6698 |
| 5705 | 6202 | 6458 | 6700 |
| 5707 | 6216 | 6460 | 6706 |

# Exhibit B – Damages

| | Sequencing Order 1A | | Seqencing Order 2A | |
|---|---|---|---|---|
| | Count | Amount | Count | Amount |
| **Before Reversals, Before Uncollectables** | 1,833,994 | $447,368,076.96 | 1,491,806 | $278,643,858.97 |
| **Before Reversals, After Uncollectables** | 1,695,726 | $414,032,754.99 | 1,352,862 | $254,892,697.93 |
| **After LIFO Reversals, Before Uncollectables** | 1,641,201 | $381,790,830.35 | 1,326,067 | $235,647,906.73 |
| **After LIFO Reversals, After Uncollectables** | 1,503,733 | $351,494,698.49 | 1,192,364 | $214,379,710.68 |
| **After 30 Day Reversals, Before Uncollectables** | 1,594,039 | $365,430,980.94 | 1,275,983 | $223,396,007.89 |
| **After 30 Day Reversals, After Uncollectables** | 1,457,281 | $336,080,284.76 | 1,144,577 | $202,994,035.46 |

| | Seqencing Order 2B | | Seqencing Order 2C | |
|---|---|---|---|---|
| | Count | Amount | Count | Amount |
| **Before Reversals, Before Uncollectables** | 1,126,468 | $133,895,236.97 | 1,126,440 | $133,876,651.97 |
| **Before Reversals, After Uncollectables** | 1,000,729 | $119,145,059.53 | 1,000,705 | $119,127,522.53 |
| **After LIFO Reversals, Before Uncollectables** | 985,428 | $111,570,230.08 | 985,396 | $111,553,886.04 |
| **After LIFO Reversals, After Uncollectables** | 867,678 | $98,612,151.93 | 867,645 | $98,596,704.27 |
| **After 30 Day Reversals, Before Uncollectables** | 941,193 | $105,294,318.17 | 941,162 | $105,278,574.67 |
| **After 30 Day Reversals, After Uncollectables** | 826,770 | $92,935,315.91 | 826,734 | $92,920,530.85 |

| | Sequencing Order 3A | | Sequencing Order 3B | |
|---|---|---|---|---|
| | Count | Amount | Count | Amount |
| **Before Reversals, Before Uncollectables** | 1,383,758 | $253,086,820.97 | 953,884 | $100,447,271.97 |
| **Before Reversals, After Uncollectables** | 1,256,744 | $231,901,846.76 | 847,342 | $89,481,036.84 |
| **After LIFO Reversals, Before Uncollectables** | 1,230,443 | $214,157,050.71 | 830,271 | $83,371,108.72 |
| **After LIFO Reversals, After Uncollectables** | 1,108,679 | $195,215,270.88 | 731,649 | $73,806,898.60 |
| **After 30 Day Reversals, Before Uncollectables** | 1,181,233 | $202,733,291.33 | 788,596 | $78,464,533.94 |
| **After 30 Day Reversals, After Uncollectables** | 1,061,948 | $184,616,247.52 | 693,423 | $69,386,603.74 |

| | Sequencing Order 3C | |
|---|---|---|
| | Count | Amount |
| **Before Reversals, Before Uncollectables** | 953,956 | $100,469,457.97 |
| **Before Reversals, After Uncollectables** | 847,413 | $89,502,506.56 |
| **After LIFO Reversals, Before Uncollectables** | 830,342 | $83,388,996.85 |
| **After LIFO Reversals, After Uncollectables** | 731,709 | $73,824,056.73 |
| **After 30 Day Reversals, Before Uncollectables** | 788,660 | $78,481,231.94 |
| **After 30 Day Reversals, After Uncollectables** | 693,470 | $69,402,498.90 |

# Exhibit C – Source Code

All of the source code utilized during the analysis of the data necessary to create this document is listed in this section. Where possible, the actual code is included. This code was also provided to Wells Fargo in the form of individual files and in the form of a database backup in the handoff package.

## A. Procedures

Stored procedures are listed here, in alphabetical order. The SQL files associated with the following procedures can be found in the handoff package in the $:\DATABASE CODE ADDITIONAL\PROCEDURES directory.

### 1. RESEQUENCE_1_SP

```
CREATE PROCEDURE RESEQUENCE_1_SP

AS

BEGIN  -- procedure

SET NOCOUNT ON

CREATE TABLE #tmp_table (
    ACCT_NUM VARCHAR(18),
    LED_BAL NUMERIC(18,2),
    POST_DT DATETIME,
    SOR_TRAN_TYPE VARCHAR(4),
    SOR_TRAN_CAT VARCHAR(1),
    TRAN_AMT NUMERIC(18,2),
    TRAN_SEQ_NUM INT,
    TRAN_STMT_DESC VARCHAR(100),
    PROCESS_GROUP VARCHAR(50) )

DECLARE @ACCT_NUM VARCHAR(18),
        @POST_DT DATETIME,
        @TRAN_DT DATETIME,
        @ORIG_OD_FEE_COUNT INT,
        @ORIG_OD_FEE_AMOUNT NUMERIC(18,2),
        @SOR_TRAN_TYPE VARCHAR(4),
        @TRAN_AMT NUMERIC(18,2),
        @TRAN_SEQ_NUM INT,
        @FIRST_SEQ_NUM INT,
        @SECOND_SEQ_NUM INT,
        @FIRST_LED_BAL NUMERIC(18,2),
        @FIRST_TRAN_AMT NUMERIC(18,2),
        @SECOND_LED_BAL NUMERIC(18,2),
        @SECOND_TRAN_AMT NUMERIC(18,2),
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 28 of 92**

```
        @STARTING_BAL NUMERIC(18,2),
        @WORKING_BAL NUMERIC(18,2),
        @NEW_OD_COUNT INT,
        @COST_PER_OD NUMERIC(18,2),
        @COLL_BAL_RECALC_FLAG VARCHAR(1),
        @PROCESS_GROUP VARCHAR(50),
    @BAL_ADJ NUMERIC(18,2)


-- THE FIRST ACCT_NUM / TRAN_DT COMBINATION WITH AN ORIG_OD_FEE_COUNT
-- THAT IS NOT NULL, A NEW_10_OD_FEE_COUNT IS NULL, AND A
-- REMOVE_50020_FLAG = 0 IS CHOSEN FOR PROCESSING.

START_NEW_LOOP:

SELECT TOP(1)
        @ACCT_NUM = ACCT_NUM,
        @POST_DT = POST_DT,
        @TRAN_DT = TRAN_DT,
        @ORIG_OD_FEE_COUNT = ORIG_OD_FEE_COUNT,
        @ORIG_OD_FEE_AMOUNT = ORIG_OD_FEE_AMOUNT,
        @COLL_BAL_RECALC_FLAG = COLL_BAL_RECALC_FLAG
  FROM CLASS_DAILY_DETAIL
 WHERE ORIG_OD_FEE_COUNT IS NOT NULL
   AND NEW_10_OD_FEE_COUNT IS NULL
   AND REMOVE_50020_FLAG = 0


-- A CHECK TO SEE IF WE ARE DONE PROCESSING IS MADE.  SINCE @ACCT_NUM
-- IS SET TO NULL BEFORE A NEW LOOP IS STARTED, IF IT IS NULL HERE, IT
-- MEANS THAT THIS PROCEDURE HAS RUN OUT OF RECORDS TO PROCESS.

IF @ACCT_NUM IS NULL
BEGIN
    RETURN
END


-- LOAD A TEMPORARY TABLE WITH THE DETAIL RECORDS FOR THE CURRENT ACCOUNT
-- FOR THE CURRENT TRAN_DT.  ONLY RECORDS IN PRIORITY GROUP 50040 ARE
-- LOOKED AT BECAUSE THESE ARE THE ONLY ONES THAT CAN RESULT IN DAMAGES.
-- AMENDED TO INCLUDE CASH WITHDRAWAL TRANSACTIONS, WHICH ARE PRIMARILY
-- FOUND IN PRIORITY GROUP 50020.

BEGIN TRAN

IF @COLL_BAL_RECALC_FLAG = '0'
BEGIN
    INSERT INTO #tmp_table (
            ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
            TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC )
    SELECT ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
            TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
      FROM V_TRAN_CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND POST_DT = @TRAN_DT
         AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
```

```
                            FROM TRANSACTION_CODE_MASTER
                            WHERE PRIORITY_GROUP = 50040
                                OR ISNULL(PROCESS_GROUP, '') = 'CASH' )
END
IF @COLL_BAL_RECALC_FLAG = '1'
BEGIN
    INSERT INTO #tmp_table (
            ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
            TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC )
    SELECT ACCT_NUM, COLL_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
            TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
        FROM V_TRAN_CLASS_DAILY_DETAIL_RECALC
     WHERE ACCT_NUM = @ACCT_NUM
       AND POST_DT = @TRAN_DT
       AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
                                FROM TRANSACTION_CODE_MASTER
                               WHERE PRIORITY_GROUP = 50040
                                  OR ISNULL(PROCESS_GROUP, '') = 'CASH' )
END

UPDATE a
   SET a.PROCESS_GROUP = b.PROCESS_GROUP
  FROM #tmp_table a
  JOIN TRANSACTION_CODE_MASTER b
    ON a.SOR_TRAN_TYPE = b.TRAN_CODE

SELECT @COST_PER_OD = @ORIG_OD_FEE_AMOUNT / @ORIG_OD_FEE_COUNT


-- CALCULATE THE STARTING BALANCE.  THIS IS NECESSARY BECAUSE THE LEDGER
-- BALANCE DOES NOT INDICATE WHETHER IT IS NEGATIVE OR POSITIVE.  FOR THIS
-- PROCESS, WE ARE ONLY LOOKING AT THE DAYS WHERE REMOVE_50020_FLAG = 0,
-- SO THE ORIGINAL METHOD FOR DETERMINING STARTING BALANCE IS STILL VALID.
-- HOWEVER, ALL OF THE CASH TRANSACTIONS NEED TO BE ADDED TO THE BALANCE
-- SINCE THEY ARE EFFECTIVELY BEING MOVED TO PRIORITY GROUP 50040.

SELECT @FIRST_SEQ_NUM =  ( SELECT MIN(TRAN_SEQ_NUM)
                             FROM #tmp_table
                            WHERE ISNULL(PROCESS_GROUP, '') <> 'CASH' )

SELECT @SECOND_SEQ_NUM = ( SELECT MIN(TRAN_SEQ_NUM)
                             FROM #tmp_table
                            WHERE TRAN_SEQ_NUM > @FIRST_SEQ_NUM )

SELECT @FIRST_LED_BAL = LED_BAL,
       @FIRST_TRAN_AMT = TRAN_AMT
  FROM #tmp_table
 WHERE TRAN_SEQ_NUM = @FIRST_SEQ_NUM

SELECT @SECOND_LED_BAL = LED_BAL,
       @SECOND_TRAN_AMT = TRAN_AMT
  FROM #tmp_table
 WHERE TRAN_SEQ_NUM = @SECOND_SEQ_NUM

IF @FIRST_LED_BAL + ABS(@SECOND_TRAN_AMT) = @SECOND_LED_BAL
BEGIN
    SELECT @FIRST_LED_BAL = @FIRST_LED_BAL * -1
```

```
END

SELECT @STARTING_BAL = @FIRST_LED_BAL - @FIRST_TRAN_AMT

    SELECT @BAL_ADJ = SUM(TRAN_AMT)
      FROM #tmp_table
     WHERE ISNULL(PROCESS_GROUP, '') = 'CASH'

    SELECT @BAL_ADJ = 0 WHERE @BAL_ADJ IS NULL
    SELECT @STARTING_BAL = @STARTING_BAL + ABS(@BAL_ADJ)


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER TEN.
-- IN THIS CASE, ALL CASH WITHDRAWAL AND DEBIT CARD TRANSACTIONS ARE
-- PROCESSED TOGETHER, FROM LOW TO HIGH.  THEN ALL OTHER TRANSACIONS ARE
-- PROCESSED, FROM  LOW TO HIGH.

SELECT @NEW_OD_COUNT = 0,
       @WORKING_BAL = @STARTING_BAL

DECLARE method_ten_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM, t.PROCESS_GROUP
  FROM #tmp_table t
 ORDER BY CASE WHEN ISNULL(t.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN 'AAA' ELSE
'ZZZ' END,
         ABS(t.TRAN_AMT)

OPEN method_ten_cur
FETCH NEXT FROM method_ten_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT, @TRAN_SEQ_NUM,
@PROCESS_GROUP
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
    IF @WORKING_BAL < 0 AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END

    FETCH NEXT FROM method_ten_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM, @PROCESS_GROUP
END

CLOSE method_ten_cur
DEALLOCATE method_ten_cur

UPDATE CLASS_DAILY_DETAIL
   SET NEW_10_OD_FEE_COUNT = @NEW_OD_COUNT,
       NEW_10_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
   AND POST_DT = @POST_DT

DELETE FROM CLASS_DAILY_DETAIL_TMP
 WHERE ACCT_NUM = @ACCT_NUM
   AND POST_DT = @POST_DT


COMMIT TRAN
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 31 of 92**

```
-- GET READY FOR NEXT PASS

SELECT @ACCT_NUM = NULL
TRUNCATE TABLE #tmp_table

GOTO START_NEW_LOOP

END -- procedure
GO

EXECUTE RESEQUENCE_1_SP
GO
```

## 2. RESEQUENCE_1B_SP

```
CREATE PROCEDURE RESEQUENCE_1B_SP

AS

BEGIN  -- procedure

SET NOCOUNT ON

CREATE TABLE #tmp_table (
    ACCT_NUM VARCHAR(18),
    LED_BAL NUMERIC(18,2),
    POST_DT DATETIME,
    SOR_TRAN_TYPE VARCHAR(4),
    SOR_TRAN_CAT VARCHAR(1),
    TRAN_AMT NUMERIC(18,2),
    TRAN_SEQ_NUM INT,
    TRAN_STMT_DESC VARCHAR(100),
    PROCESS_GROUP VARCHAR(50) )

DECLARE @ACCT_NUM VARCHAR(18),
        @POST_DT DATETIME,
        @TRAN_DT DATETIME,
        @ORIG_OD_FEE_COUNT INT,
        @ORIG_OD_FEE_AMOUNT NUMERIC(18,2),
        @SOR_TRAN_TYPE VARCHAR(4),
        @TRAN_AMT NUMERIC(18,2),
        @TRAN_SEQ_NUM INT,
        @FIRST_SEQ_NUM INT,
        @SECOND_SEQ_NUM INT,
        @FIRST_LED_BAL NUMERIC(18,2),
        @FIRST_TRAN_AMT NUMERIC(18,2),
        @SECOND_LED_BAL NUMERIC(18,2),
        @SECOND_TRAN_AMT NUMERIC(18,2),
        @STARTING_BAL NUMERIC(18,2),
        @WORKING_BAL NUMERIC(18,2),
        @NEW_OD_COUNT INT,
        @COST_PER_OD NUMERIC(18,2),
        @COLL_BAL_RECALC_FLAG VARCHAR(1),
        @PROCESS_GROUP VARCHAR(50),
```

```
        @BAL_ADJ NUMERIC(18,2)


-- THE FIRST ACCT_NUM / TRAN_DT COMBINATION WITH AN ORIG_OD_FEE_COUNT
-- THAT IS NOT NULL, A NEW_10_OD_FEE_COUNT IS NULL, AND A
-- REMOVE_50020_FLAG = 1 IS CHOSEN FOR PROCESSING.

START_NEW_LOOP:

SELECT TOP(1)
        @ACCT_NUM = ACCT_NUM,
        @POST_DT = POST_DT,
        @TRAN_DT = TRAN_DT,
        @ORIG_OD_FEE_COUNT = ORIG_OD_FEE_COUNT,
        @ORIG_OD_FEE_AMOUNT = ORIG_OD_FEE_AMOUNT,
        @COLL_BAL_RECALC_FLAG = COLL_BAL_RECALC_FLAG
  FROM CLASS_DAILY_DETAIL
 WHERE ORIG_OD_FEE_COUNT IS NOT NULL
   AND NEW_10_OD_FEE_COUNT IS NULL
   AND REMOVE_50020_FLAG = 1


-- A CHECK TO SEE IF WE ARE DONE PROCESSING IS MADE.  SINCE @ACCT_NUM
-- IS SET TO NULL BEFORE A NEW LOOP IS STARTED, IF IT IS NULL HERE, IT
-- MEANS THAT THIS PROCEDURE HAS RUN OUT OF RECORDS TO PROCESS.

IF @ACCT_NUM IS NULL
BEGIN
    RETURN
END


-- LOAD A TEMPORARY TABLE WITH THE DETAIL RECORDS FOR THE CURRENT ACCOUNT
-- FOR THE CURRENT TRAN_DT.  ONLY RECORDS IN PRIORITY GROUP 50040 ARE LOOKED
-- AT BECAUSE THESE ARE THE ONLY ONES THAT CAN RESULT IN AN OVERDRAFT.
-- AMENDED TO INCLUDE CASH WITHDRAWAL TRANSACTIONS, WHICH ARE PRIMARILY
-- FOUND IN PRIORITY GROUP 50020.

BEGIN TRAN

IF @COLL_BAL_RECALC_FLAG = '0'
BEGIN
    INSERT INTO #tmp_table (
        ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
        TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC )
    SELECT ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
        TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
     FROM V_TRAN_CLASS_DAILY_DETAIL
    WHERE ACCT_NUM = @ACCT_NUM
      AND POST_DT = @TRAN_DT
      AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
                               FROM TRANSACTION_CODE_MASTER
                              WHERE PRIORITY_GROUP = 50040
                                 OR ISNULL(PROCESS_GROUP, '') = 'CASH' )
END
IF @COLL_BAL_RECALC_FLAG = '1'
BEGIN
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 33 of 92**

```
        INSERT INTO #tmp_table (
                ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
                TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC )
        SELECT ACCT_NUM, COLL_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
                TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
          FROM V_TRAN_CLASS_DAILY_DETAIL_RECALC
         WHERE ACCT_NUM = @ACCT_NUM
           AND POST_DT = @TRAN_DT
           AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
                                    FROM TRANSACTION_CODE_MASTER
                                   WHERE PRIORITY_GROUP = 50040
                                      OR ISNULL(PROCESS_GROUP, '') = 'CASH' )
END

UPDATE a
   SET a.PROCESS_GROUP = b.PROCESS_GROUP
  FROM #tmp_table a
  JOIN TRANSACTION_CODE_MASTER b
    ON a.SOR_TRAN_TYPE = b.TRAN_CODE

SELECT @COST_PER_OD = @ORIG_OD_FEE_AMOUNT / @ORIG_OD_FEE_COUNT


-- CALCULATE THE STARTING BALANCE.  THIS IS NECESSARY BECAUSE THE LEDGER
-- BALANCE DOES NOT INDICATE WHETHER IT IS NEGATIVE OR POSITIVE.  FOR THIS
-- PROCESS, WE ARE ONLY LOOKING AT THE DAYS WHERE REMOVE_50020_FLAG = 1.
-- IT IS ASSUMED THAT THE LAST TRANSACTION THAT IS EITHER IN PRIORITY
-- GROUP 50040 OR IS "CASH" RESULTS IN A NEGATIVE BALANCE.

SELECT @FIRST_SEQ_NUM = ( SELECT COUNT(*) FROM #tmp_table )

IF ISNULL(@FIRST_SEQ_NUM, 0) = 0
BEGIN
    UPDATE CLASS_DAILY_DETAIL
       SET NEW_10_OD_FEE_COUNT = @ORIG_OD_FEE_COUNT,
           NEW_10_OD_FEE_AMOUNT = @ORIG_OD_FEE_AMOUNT
     WHERE ACCT_NUM = @ACCT_NUM
       AND POST_DT = @POST_DT

    COMMIT TRAN

    SELECT @ACCT_NUM = NULL
    TRUNCATE TABLE #tmp_table

    GOTO START_NEW_LOOP
END

SELECT @SECOND_SEQ_NUM = ( SELECT MAX(TRAN_SEQ_NUM)
                             FROM #tmp_table )

SELECT @STARTING_BAL = ( SELECT LED_BAL * -1
                           FROM #tmp_table
                          WHERE TRAN_SEQ_NUM = @SECOND_SEQ_NUM )

SELECT @BAL_ADJ = SUM(TRAN_AMT)
  FROM #tmp_table
```

```
SELECT @BAL_ADJ = 0 WHERE @BAL_ADJ IS NULL
SELECT @STARTING_BAL = @STARTING_BAL + ABS(@BAL_ADJ)


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER TEN,
(1A).
-- IN THIS CASE, ALL CASH WITHDRAWAL AND DEBIT CARD TRANSACTIONS ARE
PROCESSED
-- TOGETHER, FROM LOW TO HIGH.  THEN ALL OTHER TRANSACIONS ARE PROCESSED,
FROM
-- LOW TO HIGH.

SELECT @NEW_OD_COUNT = 0,
       @WORKING_BAL = @STARTING_BAL

DECLARE method_ten_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM, t.PROCESS_GROUP
  FROM #tmp_table t
 ORDER BY CASE WHEN ISNULL(t.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN 'AAA' ELSE
'ZZZ' END,
        ABS(t.TRAN_AMT)

OPEN method_ten_cur
FETCH NEXT FROM method_ten_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT, @TRAN_SEQ_NUM,
@PROCESS_GROUP
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
    IF @WORKING_BAL < 0 AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END

    FETCH NEXT FROM method_ten_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM, @PROCESS_GROUP
END

CLOSE method_ten_cur
DEALLOCATE method_ten_cur

UPDATE CLASS_DAILY_DETAIL
    SET NEW_10_OD_FEE_COUNT = @NEW_OD_COUNT,
        NEW_10_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
   AND POST_DT = @POST_DT

COMMIT TRAN


-- GET READY FOR NEXT PASS

SELECT @ACCT_NUM = NULL
TRUNCATE TABLE #tmp_table

GOTO START_NEW_LOOP

END -- procedure
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfiniT Consulting**
**Page 35 of 92**

```
GO

EXECUTE RESEQUENCE_1B_SP
GO
```

## 3.  RESEQUENCE_2_AND_3_SP

```
CREATE PROCEDURE RESEQUENCE_2_AND_3_SP

AS

BEGIN  -- procedure

SET NOCOUNT ON

CREATE TABLE #tmp_table (
    ACCT_NUM VARCHAR(18),
    LED_BAL NUMERIC(18,2),
    POST_DT DATETIME,
    SOR_TRAN_TYPE VARCHAR(4),
    SOR_TRAN_CAT VARCHAR(1),
    TRAN_AMT NUMERIC(18,2),
    TRAN_SEQ_NUM INT,
    TRAN_STMT_DESC VARCHAR(100) )

DECLARE @ACCT_NUM VARCHAR(18),
        @POST_DT DATETIME,
        @TRAN_DT DATETIME,
        @ORIG_OD_FEE_COUNT INT,
        @ORIG_OD_FEE_AMOUNT NUMERIC(18,2),
        @SOR_TRAN_TYPE VARCHAR(4),
        @TRAN_AMT NUMERIC(18,2),
        @TRAN_SEQ_NUM INT,
        @FIRST_SEQ_NUM INT,
        @SECOND_SEQ_NUM INT,
        @FIRST_LED_BAL NUMERIC(18,2),
        @FIRST_TRAN_AMT NUMERIC(18,2),
        @SECOND_LED_BAL NUMERIC(18,2),
        @SECOND_TRAN_AMT NUMERIC(18,2),
        @STARTING_BAL NUMERIC(18,2),
        @WORKING_BAL NUMERIC(18,2),
        @NEW_OD_COUNT INT,
        @COST_PER_OD NUMERIC(18,2),
        @COLL_BAL_RECALC_FLAG VARCHAR(1)


-- THE FIRST ACCT_NUM / TRAN_DT COMBINATION WITH AN ORIG_OD_FEE_COUNT
-- THAT IS NOT NULL AND A NEW_6_OD_FEE_COUNT IS NULL IS CHOSEN FOR
-- PROCESSING.

START_NEW_LOOP:

SELECT TOP(1)
        @ACCT_NUM = ACCT_NUM,
        @POST_DT = POST_DT,
```

```
        @TRAN_DT = TRAN_DT,
        @ORIG_OD_FEE_COUNT = ORIG_OD_FEE_COUNT,
        @ORIG_OD_FEE_AMOUNT = ORIG_OD_FEE_AMOUNT,
        @COLL_BAL_RECALC_FLAG = COLL_BAL_RECALC_FLAG
  FROM CLASS_DAILY_DETAIL
 WHERE ORIG_OD_FEE_COUNT IS NOT NULL
   AND NEW_6_OD_FEE_COUNT IS NULL


-- A CHECK TO SEE IF WE ARE DONE PROCESSING IS MADE.  SINCE @ACCT_NUM
-- IS SET TO NULL BEFORE A NEW LOOP IS STARTED, IF IT IS NULL HERE, IT
-- MEANS THAT THIS PROCEDURE HAS RUN OUT OF RECORDS TO PROCESS.

IF @ACCT_NUM IS NULL
BEGIN
    RETURN
END


-- LOAD A TEMPORARY TABLE WITH THE DETAIL RECORDS FOR THE CURRENT ACCOUNT
-- FOR THE CURRENT TRAN_DT.  ONLY RECORDS IN PRIORITY GROUP 50040 ARE LOOKED
-- AT BECAUSE THESE ARE THE ONLY ONES THAT CAN RESULT IN DAMAGES.
-- DIFFERENT FROM ORIGINAL PROCEDURE BECAUSE THE COLL_BAL_RECALC_FLAG
-- ISSUE IS HANDLED IN ONE PASS, SO NO NEED TO RUN ANOTHER PROCEDURE.

BEGIN TRAN

IF @COLL_BAL_RECALC_FLAG = '0'
BEGIN
    INSERT INTO #tmp_table
    SELECT ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
           TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
      FROM V_TRAN_CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND POST_DT = @TRAN_DT
       AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
                                FROM TRANSACTION_CODE_MASTER
                               WHERE PRIORITY_GROUP = 50040 )
END
IF @COLL_BAL_RECALC_FLAG = '1'
BEGIN
    INSERT INTO #tmp_table
    SELECT ACCT_NUM, COLL_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
           TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
      FROM V_TRAN_CLASS_DAILY_DETAIL_RECALC
     WHERE ACCT_NUM = @ACCT_NUM
       AND POST_DT = @TRAN_DT
       AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
                                FROM TRANSACTION_CODE_MASTER
                               WHERE PRIORITY_GROUP = 50040 )
END

SELECT @COST_PER_OD = @ORIG_OD_FEE_AMOUNT / @ORIG_OD_FEE_COUNT


-- CALCULATE THE STARTING BALANCE.  THIS IS NECESSARY BECAUSE THE LEDGER
-- BALANCE DOES NOT INDICATE WHETHER IT IS NEGATIVE OR POSITIVE.
```

```
SELECT @FIRST_SEQ_NUM =  ( SELECT MIN(TRAN_SEQ_NUM)
                            FROM #tmp_table )

SELECT @SECOND_SEQ_NUM = ( SELECT MIN(TRAN_SEQ_NUM)
                            FROM #tmp_table
                            WHERE TRAN_SEQ_NUM > @FIRST_SEQ_NUM )

SELECT @FIRST_LED_BAL = LED_BAL,
       @FIRST_TRAN_AMT = TRAN_AMT
  FROM #tmp_table
 WHERE TRAN_SEQ_NUM = @FIRST_SEQ_NUM

SELECT @SECOND_LED_BAL = LED_BAL,
       @SECOND_TRAN_AMT = TRAN_AMT
  FROM #tmp_table
 WHERE TRAN_SEQ_NUM = @SECOND_SEQ_NUM

IF @FIRST_LED_BAL + ABS(@SECOND_TRAN_AMT) = @SECOND_LED_BAL
BEGIN
    SELECT @FIRST_LED_BAL = @FIRST_LED_BAL * -1
END

SELECT @STARTING_BAL = @FIRST_LED_BAL - @FIRST_TRAN_AMT


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER SIX.
-- IN THIS CASE, ALL DEBIT CARD TRANSACTIONS ARE PROCESSED LAST, SORTED
-- BY TRANSACTION DATETIME, THEN BY TRANSACTION AMOUNT, LOWEST TO HIGHEST.
-- ALL OTHER TRANSACTIONS ARE PROCESSED FIRST AND LEFT IN THE ORIGINAL ORDER.
-- THE TWIST IS THAT TRANSACTIONS WITHOUT TIMESTAMP ARE PROCESSED LAST FOR A
-- GIVEN DAY AS OPPOSED TO FIRST.

SELECT @NEW_OD_COUNT = 0,
       @WORKING_BAL = @STARTING_BAL

DECLARE method_six_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM
  FROM #tmp_table t
  LEFT OUTER JOIN V_TRAN_CLASS_DEBIT_CARD dc
    ON t.ACCT_NUM = dc.ACCT_NUM
   AND t.POST_DT = dc.POST_DT
   AND t.TRAN_SEQ_NUM = dc.TRAN_SEQ_NUM
  JOIN TRANSACTION_CODE_MASTER tcm
    ON t.SOR_TRAN_TYPE = tcm.TRAN_CODE
 ORDER BY CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ISNULL(dc.KZ_TRAN_DT, ISNULL(DATEADD(ss, -1, DATEADD(DD, 1, dc.TRAN_DT)),
DATEADD(ss, -1, DATEADD(DD, 1, t.POST_DT)))) ELSE '1900-01-01' END,
       CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ABS(t.TRAN_AMT) ELSE NULL END,
       t.TRAN_SEQ_NUM

OPEN method_six_cur
FETCH NEXT FROM method_six_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT, @TRAN_SEQ_NUM
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
```

```
    IF @WORKING_BAL < 0 AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END

    FETCH NEXT FROM method_six_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
END

CLOSE method_six_cur
DEALLOCATE method_six_cur

UPDATE CLASS_DAILY_DETAIL
    SET NEW_6_OD_FEE_COUNT = @NEW_OD_COUNT,
        NEW_6_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
    AND POST_DT = @POST_DT


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER SEVEN.
-- IN THIS CASE, ALL DEBIT CARD TRANSACTIONS ARE PROCESSED FIRST, SORTED
-- BY TRANSACTION DATETIME, THEN BY TRANSACTION AMOUNT, LOWEST TO HIGHEST.
-- ALL OTHER TRANSACTIONS ARE PROCESSED FIRST AND LEFT IN THE ORIGINAL ORDER.
-- THE TWIST IS THAT TRANSACTIONS WITHOUT TIMESTAMP ARE PROCESSED LAST FOR A
-- GIVEN DAY AS OPPOSED TO FIRST.

SELECT @NEW_OD_COUNT = 0,
       @WORKING_BAL = @STARTING_BAL

DECLARE method_seven_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM
  FROM #tmp_table t
  LEFT OUTER JOIN V_TRAN_CLASS_DEBIT_CARD dc
    ON t.ACCT_NUM = dc.ACCT_NUM
   AND t.POST_DT = dc.POST_DT
   AND t.TRAN_SEQ_NUM = dc.TRAN_SEQ_NUM
  JOIN TRANSACTION_CODE_MASTER tcm
    ON t.SOR_TRAN_TYPE = tcm.TRAN_CODE
 ORDER BY CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ISNULL(dc.KZ_TRAN_DT, ISNULL(DATEADD(ss, -1, DATEADD(DD, 1, dc.TRAN_DT)),
DATEADD(ss, -1, DATEADD(DD, 1, t.POST_DT)))) ELSE '2999-01-01' END,
        CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ABS(t.TRAN_AMT) ELSE NULL END,
        t.TRAN_SEQ_NUM

OPEN method_seven_cur
FETCH NEXT FROM method_seven_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
    IF @WORKING_BAL < 0 AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END
```

```
    FETCH NEXT FROM method_seven_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
END

CLOSE method_seven_cur
DEALLOCATE method_seven_cur

UPDATE CLASS_DAILY_DETAIL
    SET NEW_7_OD_FEE_COUNT = @NEW_OD_COUNT,
        NEW_7_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
    AND POST_DT = @POST_DT


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER EIGHT.
-- IN THIS CASE, ALL DEBIT CARD TRANSACTIONS ARE PROCESSED LAST, SORTED
-- BY TRANSACTION DATETIME, THEN BY TRANSACTION AMOUNT, HIGHEST TO LOWEST.
-- ALL OTHER TRANSACTIONS ARE PROCESSED FIRST AND LEFT IN THE ORIGINAL ORDER.
-- THE TWIST IS THAT TRANSACTIONS WITHOUT TIMESTAMP ARE PROCESSED LAST FOR A
-- GIVEN DAY AS OPPOSED TO FIRST.

SELECT @NEW_OD_COUNT = 0,
       @WORKING_BAL = @STARTING_BAL

DECLARE method_eight_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM
  FROM #tmp_table t
  LEFT OUTER JOIN V_TRAN_CLASS_DEBIT_CARD dc
    ON t.ACCT_NUM = dc.ACCT_NUM
   AND t.POST_DT = dc.POST_DT
   AND t.TRAN_SEQ_NUM = dc.TRAN_SEQ_NUM
  JOIN TRANSACTION_CODE_MASTER tcm
    ON t.SOR_TRAN_TYPE = tcm.TRAN_CODE
 ORDER BY CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ISNULL(dc.KZ_TRAN_DT, ISNULL(DATEADD(ss, -1, DATEADD(DD, 1, dc.TRAN_DT)),
DATEADD(ss, -1, DATEADD(DD, 1, t.POST_DT)))) ELSE '1900-01-01' END,
        CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ABS(t.TRAN_AMT) ELSE NULL END DESC,
        t.TRAN_SEQ_NUM

OPEN method_eight_cur
FETCH NEXT FROM method_eight_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
    IF @WORKING_BAL < 0  AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END

    FETCH NEXT FROM method_eight_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
END

CLOSE method_eight_cur
DEALLOCATE method_eight_cur
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 40 of 92**

```
UPDATE CLASS_DAILY_DETAIL
    SET NEW_8_OD_FEE_COUNT = @NEW_OD_COUNT,
        NEW_8_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
    AND POST_DT = @POST_DT


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER NINE.
-- IN THIS CASE, ALL DEBIT CARD TRANSACTIONS ARE PROCESSED FIRST, SORTED
-- BY TRANSACTION DATETIME, THEN BY TRANSACTION AMOUNT, HIGHEST TO LOWEST.
-- ALL OTHER TRANSACTIONS ARE PROCESSED FIRST AND LEFT IN THE ORIGINAL ORDER.
-- THE TWIST IS THAT TRANSACTIONS WITHOUT TIMESTAMP ARE PROCESSED LAST FOR A
-- GIVEN DAY AS OPPOSED TO FIRST.

SELECT @NEW_OD_COUNT = 0,
       @WORKING_BAL = @STARTING_BAL

DECLARE method_nine_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM
  FROM #tmp_table t
  LEFT OUTER JOIN V_TRAN_CLASS_DEBIT_CARD dc
    ON t.ACCT_NUM = dc.ACCT_NUM
   AND t.POST_DT = dc.POST_DT
   AND t.TRAN_SEQ_NUM = dc.TRAN_SEQ_NUM
  JOIN TRANSACTION_CODE_MASTER tcm
    ON t.SOR_TRAN_TYPE = tcm.TRAN_CODE
 ORDER BY CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ISNULL(dc.KZ_TRAN_DT, ISNULL(DATEADD(ss, -1, DATEADD(DD, 1, dc.TRAN_DT)),
DATEADD(ss, -1, DATEADD(DD, 1, t.POST_DT)))) ELSE '2999-01-01' END,
        CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ABS(t.TRAN_AMT) ELSE NULL END DESC,
        t.TRAN_SEQ_NUM

OPEN method_nine_cur
FETCH NEXT FROM method_nine_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT, @TRAN_SEQ_NUM
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
    IF @WORKING_BAL < 0  AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END

    FETCH NEXT FROM method_nine_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
END

CLOSE method_nine_cur
DEALLOCATE method_nine_cur

UPDATE CLASS_DAILY_DETAIL
    SET NEW_9_OD_FEE_COUNT = @NEW_OD_COUNT,
        NEW_9_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
    AND POST_DT = @POST_DT
```

```
COMMIT TRAN


-- GET READY FOR NEXT PASS

SELECT @ACCT_NUM = NULL
TRUNCATE TABLE #tmp_table

GOTO START_NEW_LOOP

END -- procedure
GO

EXECUTE RESEQUENCE_2_AND_3_SP
GO
```

## 4. RESEQUENCE_CHECKS_FIRST_SP

```
CREATE PROCEDURE RESEQUENCE_CHECKS_FIRST_SP

AS

BEGIN  -- procedure

SET NOCOUNT ON

CREATE TABLE #tmp_table (
    ACCT_NUM VARCHAR(18),
    LED_BAL NUMERIC(18,2),
    POST_DT DATETIME,
    SOR_TRAN_TYPE VARCHAR(4),
    SOR_TRAN_CAT VARCHAR(1),
    TRAN_AMT NUMERIC(18,2),
    TRAN_SEQ_NUM INT,
    TRAN_STMT_DESC VARCHAR(100) )

DECLARE @ACCT_NUM VARCHAR(18),
        @POST_DT DATETIME,
        @TRAN_DT DATETIME,
        @ORIG_OD_FEE_COUNT INT,
        @ORIG_OD_FEE_AMOUNT NUMERIC(18,2),
        @SOR_TRAN_TYPE VARCHAR(4),
        @TRAN_AMT NUMERIC(18,2),
        @TRAN_SEQ_NUM INT,
        @FIRST_SEQ_NUM INT,
        @SECOND_SEQ_NUM INT,
        @FIRST_LED_BAL NUMERIC(18,2),
        @FIRST_TRAN_AMT NUMERIC(18,2),
        @SECOND_LED_BAL NUMERIC(18,2),
        @SECOND_TRAN_AMT NUMERIC(18,2),
        @STARTING_BAL NUMERIC(18,2),
        @WORKING_BAL NUMERIC(18,2),
        @NEW_OD_COUNT INT,
        @COST_PER_OD NUMERIC(18,2),
        @COLL_BAL_RECALC_FLAG VARCHAR(1)
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 42 of 92**

```
-- THE FIRST ACCT_NUM / TRAN_DT COMBINATION WITH AN ORIG_OD_FEE_COUNT
-- THAT IS NOT NULL AND A NEW_1_OD_FEE_COUNT IS NULL IS CHOSEN FOR
-- PROCESSING.

START_NEW_LOOP:

SELECT TOP(1)
        @ACCT_NUM = ACCT_NUM,
        @POST_DT = POST_DT,
        @TRAN_DT = TRAN_DT,
        @ORIG_OD_FEE_COUNT = ORIG_OD_FEE_COUNT,
        @ORIG_OD_FEE_AMOUNT = ORIG_OD_FEE_AMOUNT,
        @COLL_BAL_RECALC_FLAG = COLL_BAL_RECALC_FLAG
  FROM CLASS_DAILY_DETAIL
 WHERE ORIG_OD_FEE_COUNT IS NOT NULL
   AND NEW_4_OD_FEE_COUNT IS NULL


-- A CHECK TO SEE IF WE ARE DONE PROCESSING IS MADE.  SINCE @ACCT_NUM
-- IS SET TO NULL BEFORE A NEW LOOP IS STARTED, IF IT IS NULL HERE, IT
-- MEANS THAT THIS PROCEDURE HAS RUN OUT OF RECORDS TO PROCESS.

IF @ACCT_NUM IS NULL
BEGIN
    RETURN
END


-- LOAD A TEMPORARY TABLE WITH THE DETAIL RECORDS FOR THE CURRENT ACCOUNT
-- FOR THE CURRENT TRAN_DT.  ONLY RECORDS IN PRIORITY GROUP 50040 ARE LOOKED
-- AT BECAUSE THESE ARE THE ONLY ONES THAT CAN RESULT IN DAMAGES.
-- DIFFERENT FROM ORIGINAL PROCEDURE BECAUSE THE COLL_BAL_RECALC_FLAG
-- ISSUE IS HANDLED IN ONE PASS, SO NO NEED TO RUN ANOTHER PROCEDURE.

BEGIN TRAN

IF @COLL_BAL_RECALC_FLAG = '0'
BEGIN
    INSERT INTO #tmp_table
    SELECT ACCT_NUM, LED_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
           TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
      FROM V_TRAN_CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND POST_DT = @TRAN_DT
       AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
                                FROM TRANSACTION_CODE_MASTER
                               WHERE PRIORITY_GROUP = 50040 )
END
IF @COLL_BAL_RECALC_FLAG = '1'
BEGIN
    INSERT INTO #tmp_table
    SELECT ACCT_NUM, COLL_BAL, POST_DT, SOR_TRAN_TYPE, SOR_TRAN_CAT,
           TRAN_AMT, TRAN_SEQ_NUM, TRAN_STMT_DESC
      FROM V_TRAN_CLASS_DAILY_DETAIL_RECALC
     WHERE ACCT_NUM = @ACCT_NUM
```

```
        AND POST_DT = @TRAN_DT
        AND SOR_TRAN_TYPE IN ( SELECT TRAN_CODE
                                 FROM TRANSACTION_CODE_MASTER
                                WHERE PRIORITY_GROUP = 50040 )
END

SELECT @COST_PER_OD = @ORIG_OD_FEE_AMOUNT / @ORIG_OD_FEE_COUNT


-- CALCULATE THE STARTING BALANCE.  THIS IS NECESSARY BECAUSE THE LEDGER
-- BALANCE DOES NOT INDICATE WHETHER IT IS NEGATIVE OR POSITIVE.

SELECT @FIRST_SEQ_NUM =  ( SELECT MIN(TRAN_SEQ_NUM)
                            FROM #tmp_table )

SELECT @SECOND_SEQ_NUM = ( SELECT MIN(TRAN_SEQ_NUM)
                            FROM #tmp_table
                           WHERE TRAN_SEQ_NUM > @FIRST_SEQ_NUM )

SELECT @FIRST_LED_BAL = LED_BAL,
       @FIRST_TRAN_AMT = TRAN_AMT
  FROM #tmp_table
 WHERE TRAN_SEQ_NUM = @FIRST_SEQ_NUM

SELECT @SECOND_LED_BAL = LED_BAL,
       @SECOND_TRAN_AMT = TRAN_AMT
  FROM #tmp_table
 WHERE TRAN_SEQ_NUM = @SECOND_SEQ_NUM

IF @FIRST_LED_BAL + ABS(@SECOND_TRAN_AMT) = @SECOND_LED_BAL THEN
BEGIN
    SELECT @FIRST_LED_BAL = @FIRST_LED_BAL * -1
END

SELECT @STARTING_BAL = @FIRST_LED_BAL - @FIRST_TRAN_AMT


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER FOUR.
-- IN THIS CASE, ALL DEBIT CARD TRANSACTIONS ARE PROCESSED LAST, SORTED
-- BY TRANSACTION DATETIME, THEN BY TRANSACTION AMOUNT, LOWEST TO HIGHEST.
-- ALL OTHER TRANSACTIONS ARE PROCESSED FIRST AND LEFT IN THE ORIGINAL ORDER.

SELECT @NEW_OD_COUNT = 0,
       @WORKING_BAL = @STARTING_BAL

DECLARE method_four_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM
  FROM #tmp_table t
  LEFT OUTER JOIN V_TRAN_CLASS_DEBIT_CARD dc
    ON t.ACCT_NUM = dc.ACCT_NUM
   AND t.POST_DT = dc.POST_DT
   AND t.TRAN_SEQ_NUM = dc.TRAN_SEQ_NUM
  JOIN TRANSACTION_CODE_MASTER tcm
    ON t.SOR_TRAN_TYPE = tcm.TRAN_CODE
 ORDER BY CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ISNULL(dc.KZ_TRAN_DT, ISNULL(dc.TRAN_DT, t.POST_DT)) ELSE '1900-01-01' END,
```

```
        CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ABS(t.TRAN_AMT) ELSE NULL END,
        t.TRAN_SEQ_NUM

OPEN method_four_cur
FETCH NEXT FROM method_four_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT, @TRAN_SEQ_NUM
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
    IF @WORKING_BAL < 0 AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END

    FETCH NEXT FROM method_four_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
END

CLOSE method_four_cur
DEALLOCATE method_four_cur

UPDATE CLASS_DAILY_DETAIL
    SET NEW_4_OD_FEE_COUNT = @NEW_OD_COUNT,
        NEW_4_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
    AND POST_DT = @POST_DT


-- REPROCESS THE RECORDS IN THE TEMPORARY TABLE USING METHOD NUMBER FIVE.
-- IN THIS CASE, ALL DEBIT CARD TRANSACTIONS ARE PROCESSED LAST, SORTED
-- BY TRANSACTION DATETIME, THEN BY TRANSACTION AMOUNT, HIGHEST TO LOWEST.
-- ALL OTHER TRANSACTIONS ARE PROCESSED FIRST AND LEFT IN THE ORIGINAL ORDER.

SELECT @NEW_OD_COUNT = 0,
        @WORKING_BAL = @STARTING_BAL

DECLARE method_five_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT t.SOR_TRAN_TYPE, t.TRAN_AMT, t.TRAN_SEQ_NUM
  FROM #tmp_table t
  LEFT OUTER JOIN V_TRAN_CLASS_DEBIT_CARD dc
    ON t.ACCT_NUM = dc.ACCT_NUM
   AND t.POST_DT = dc.POST_DT
   AND t.TRAN_SEQ_NUM = dc.TRAN_SEQ_NUM
  JOIN TRANSACTION_CODE_MASTER tcm
    ON t.SOR_TRAN_TYPE = tcm.TRAN_CODE
 ORDER BY CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ISNULL(dc.KZ_TRAN_DT, ISNULL(dc.TRAN_DT, t.POST_DT)) ELSE '1900-01-01' END,
        CASE WHEN ISNULL(tcm.PROCESS_GROUP, 'ZZZ') <> 'ZZZ' THEN
ABS(t.TRAN_AMT) ELSE NULL END DESC,
        t.TRAN_SEQ_NUM

OPEN method_five_cur
FETCH NEXT FROM method_five_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT, @TRAN_SEQ_NUM
WHILE @@FETCH_STATUS = 0
BEGIN
    SELECT @WORKING_BAL = @WORKING_BAL + @TRAN_AMT
    IF @WORKING_BAL < 0  AND @NEW_OD_COUNT < @ORIG_OD_FEE_COUNT
```

```
    BEGIN
        SELECT @NEW_OD_COUNT = @NEW_OD_COUNT + 1
    END

    FETCH NEXT FROM method_five_cur INTO @SOR_TRAN_TYPE, @TRAN_AMT,
@TRAN_SEQ_NUM
END

CLOSE method_five_cur
DEALLOCATE method_five_cur

UPDATE CLASS_DAILY_DETAIL
    SET NEW_5_OD_FEE_COUNT = @NEW_OD_COUNT,
        NEW_5_OD_FEE_AMOUNT = @NEW_OD_COUNT * @COST_PER_OD
 WHERE ACCT_NUM = @ACCT_NUM
    AND POST_DT = @POST_DT


COMMIT TRAN


-- GET READY FOR NEXT PASS

SELECT @ACCT_NUM = NULL
TRUNCATE TABLE #tmp_table

GOTO START_NEW_LOOP

END -- procedure
GO

EXECUTE RESEQUENCE_CHECKS_FIRST_SP
GO
```

## 5.  REVERSAL_4

```
CREATE PROCEDURE REVERSAL_4

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @NEW_DAMAGES NUMERIC(18,2),
        @POST_DT DATETIME,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #reversals (
    PK INT IDENTITY,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME )
```

```
DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES


OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

   SELECT @NEW_DAMAGES = 0
   TRUNCATE TABLE #reversals

   INSERT INTO #reversals (
      TRAN_AMT, POST_DT )
   SELECT TRAN_AMT, POST_DT
     FROM V_TRAN_CLASS_OD_REVERSALS
    WHERE ACCT_NUM = @ACCT_NUM
    ORDER BY POST_DT

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
   SELECT POST_DT,
          ORIG_OD_FEE_AMOUNT - NEW_4_OD_FEE_AMOUNT AS DAMAGES
     FROM CLASS_DAILY_DETAIL
    WHERE ACCT_NUM = @ACCT_NUM
      AND ORIG_OD_FEE_AMOUNT - NEW_4_OD_FEE_AMOUNT > 0
      AND REMOVE_50020_FLAG <> 1
    ORDER BY POST_DT

  OPEN calc_cur
  FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
  WHILE @@FETCH_STATUS = 0
  BEGIN

     DELETE FROM #reversals
      WHERE POST_DT < @POST_DT

     REVERSAL_LOOP:
     IF EXISTS ( SELECT *
                  FROM #reversals
                 WHERE DATEADD(dd, -30, POST_DT) <= @POST_DT )
     BEGIN
        SELECT @DAMAGES = @DAMAGES - (SELECT TRAN_AMT
                                       FROM #reversals
                                      WHERE PK = (SELECT MIN(PK)
                                                    FROM #reversals))

        DELETE FROM #reversals
         WHERE PK = (SELECT MIN(PK)
                       FROM #reversals)

        IF @DAMAGES > 0
        BEGIN
           GOTO REVERSAL_LOOP
        END
     END

     IF @DAMAGES < 0 SELECT @DAMAGES = 0
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 47 of 92**

```
    SELECT @NEW_DAMAGES = @NEW_DAMAGES + @DAMAGES

    FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
END -- calc_cur

CLOSE calc_cur
DEALLOCATE calc_cur

UPDATE CLASS_DAMAGES
   SET SC4_R30_CN_UN = @NEW_DAMAGES
 WHERE ACCT_NUM = @ACCT_NUM

FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 6. REVERSAL_5

```
CREATE PROCEDURE REVERSAL_5

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @NEW_DAMAGES NUMERIC(18,2),
        @POST_DT DATETIME,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #reversals (
   PK INT IDENTITY,
   TRAN_AMT NUMERIC(18,2),
   POST_DT DATETIME )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES


OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    SELECT @NEW_DAMAGES = 0
    TRUNCATE TABLE #reversals
```

```
 INSERT INTO #reversals (
    TRAN_AMT, POST_DT )
 SELECT TRAN_AMT, POST_DT
   FROM V_TRAN_CLASS_OD_REVERSALS
  WHERE ACCT_NUM = @ACCT_NUM
  ORDER BY POST_DT

DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
 SELECT POST_DT,
        ORIG_OD_FEE_AMOUNT - NEW_5_OD_FEE_AMOUNT AS DAMAGES
   FROM CLASS_DAILY_DETAIL
  WHERE ACCT_NUM = @ACCT_NUM
    AND ORIG_OD_FEE_AMOUNT - NEW_5_OD_FEE_AMOUNT > 0
    AND REMOVE_50020_FLAG <> 1
  ORDER BY POST_DT

 OPEN calc_cur
 FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
 WHILE @@FETCH_STATUS = 0
 BEGIN

    DELETE FROM #reversals
     WHERE POST_DT < @POST_DT

    REVERSAL_LOOP:
    IF EXISTS ( SELECT *
                 FROM #reversals
                WHERE DATEADD(dd, -30, POST_DT) <= @POST_DT )
    BEGIN
       SELECT @DAMAGES = @DAMAGES - (SELECT TRAN_AMT
                                      FROM #reversals
                                     WHERE PK = (SELECT MIN(PK)
                                                   FROM #reversals))

       DELETE FROM #reversals
        WHERE PK = (SELECT MIN(PK)
                      FROM #reversals)

       IF @DAMAGES > 0
       BEGIN
          GOTO REVERSAL_LOOP
       END
    END

    IF @DAMAGES < 0 SELECT @DAMAGES = 0

    SELECT @NEW_DAMAGES = @NEW_DAMAGES + @DAMAGES

    FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
 END -- calc_cur

 CLOSE calc_cur
 DEALLOCATE calc_cur

 UPDATE CLASS_DAMAGES
    SET SC5_R30_CN_UN = @NEW_DAMAGES
  WHERE ACCT_NUM = @ACCT_NUM
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfiniT Consulting**
**Page 49 of 92**

```
        FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 7.   REVERSAL_6

```
CREATE PROCEDURE REVERSAL_6

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @NEW_DAMAGES NUMERIC(18,2),
        @POST_DT DATETIME,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #reversals (
   PK INT IDENTITY,
   TRAN_AMT NUMERIC(18,2),
   POST_DT DATETIME )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES


OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    SELECT @NEW_DAMAGES = 0
    TRUNCATE TABLE #reversals

    INSERT INTO #reversals (
       TRAN_AMT, POST_DT )
    SELECT TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_REVERSALS
     WHERE ACCT_NUM = @ACCT_NUM
     ORDER BY POST_DT

   DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
    SELECT POST_DT,
           ORIG_OD_FEE_AMOUNT - NEW_6_OD_FEE_AMOUNT AS DAMAGES
```

```
     FROM CLASS_DAILY_DETAIL
   WHERE ACCT_NUM = @ACCT_NUM
     AND ORIG_OD_FEE_AMOUNT - NEW_6_OD_FEE_AMOUNT > 0
     AND REMOVE_50020_FLAG <> 1
   ORDER BY POST_DT

OPEN calc_cur
FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
WHILE @@FETCH_STATUS = 0
BEGIN

    DELETE FROM #reversals
     WHERE POST_DT < @POST_DT

    REVERSAL_LOOP:
    IF EXISTS ( SELECT *
                 FROM #reversals
                WHERE DATEADD(dd, -30, POST_DT) <= @POST_DT )
    BEGIN
       SELECT @DAMAGES = @DAMAGES - (SELECT TRAN_AMT
                                      FROM #reversals
                                     WHERE PK = (SELECT MIN(PK)
                                                  FROM #reversals))

       DELETE FROM #reversals
        WHERE PK = (SELECT MIN(PK)
                     FROM #reversals)

       IF @DAMAGES > 0
       BEGIN
          GOTO REVERSAL_LOOP
       END
    END

    IF @DAMAGES < 0 SELECT @DAMAGES = 0

    SELECT @NEW_DAMAGES = @NEW_DAMAGES + @DAMAGES

    FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
END -- calc_cur

  CLOSE calc_cur
  DEALLOCATE calc_cur

  UPDATE CLASS_DAMAGES
     SET SC6_R30_CN_UN = @NEW_DAMAGES
   WHERE ACCT_NUM = @ACCT_NUM

  FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 8. REVERSAL_7

```
CREATE PROCEDURE REVERSAL_7

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @NEW_DAMAGES NUMERIC(18,2),
        @POST_DT DATETIME,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #reversals (
    PK INT IDENTITY,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME )

DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    SELECT @NEW_DAMAGES = 0
    TRUNCATE TABLE #reversals

    INSERT INTO #reversals (
       TRAN_AMT, POST_DT )
    SELECT TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_REVERSALS
     WHERE ACCT_NUM = @ACCT_NUM
     ORDER BY POST_DT

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
    SELECT POST_DT,
           ORIG_OD_FEE_AMOUNT - NEW_7_OD_FEE_AMOUNT AS DAMAGES
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND ORIG_OD_FEE_AMOUNT - NEW_7_OD_FEE_AMOUNT > 0
       AND REMOVE_50020_FLAG <> 1
     ORDER BY POST_DT

    OPEN calc_cur
    FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
    WHILE @@FETCH_STATUS = 0
    BEGIN

        DELETE FROM #reversals
         WHERE POST_DT < @POST_DT
```

```
        REVERSAL_LOOP:
        IF EXISTS ( SELECT *
                        FROM #reversals
                    WHERE DATEADD(dd, -30, POST_DT) <= @POST_DT )
        BEGIN
            SELECT @DAMAGES = @DAMAGES - (SELECT TRAN_AMT
                                            FROM #reversals
                                            WHERE PK = (SELECT MIN(PK)
                                                            FROM #reversals))

            DELETE FROM #reversals
                WHERE PK = (SELECT MIN(PK)
                                FROM #reversals)

            IF @DAMAGES > 0
            BEGIN
                GOTO REVERSAL_LOOP
            END
        END

        IF @DAMAGES < 0 SELECT @DAMAGES = 0

        SELECT @NEW_DAMAGES = @NEW_DAMAGES + @DAMAGES

        FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
    END -- calc_cur

    CLOSE calc_cur
    DEALLOCATE calc_cur

    UPDATE CLASS_DAMAGES
        SET SC7_R30_CN_UN = @NEW_DAMAGES
     WHERE ACCT_NUM = @ACCT_NUM

    FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 9.  REVERSAL_8

```
CREATE PROCEDURE REVERSAL_8

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @NEW_DAMAGES NUMERIC(18,2),
```

```
        @POST_DT DATETIME,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #reversals (
    PK INT IDENTITY,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    SELECT @NEW_DAMAGES = 0
    TRUNCATE TABLE #reversals

    INSERT INTO #reversals (
        TRAN_AMT, POST_DT )
    SELECT TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_REVERSALS
     WHERE ACCT_NUM = @ACCT_NUM
     ORDER BY POST_DT

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
    SELECT POST_DT,
           ORIG_OD_FEE_AMOUNT - NEW_8_OD_FEE_AMOUNT AS DAMAGES
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND ORIG_OD_FEE_AMOUNT - NEW_8_OD_FEE_AMOUNT > 0
       AND REMOVE_50020_FLAG <> 1
     ORDER BY POST_DT

    OPEN calc_cur
    FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
    WHILE @@FETCH_STATUS = 0
    BEGIN

        DELETE FROM #reversals
         WHERE POST_DT < @POST_DT

        REVERSAL_LOOP:
        IF EXISTS ( SELECT *
                      FROM #reversals
                     WHERE DATEADD(dd, -30, POST_DT) <= @POST_DT )
        BEGIN
            SELECT @DAMAGES = @DAMAGES - (SELECT TRAN_AMT
                                            FROM #reversals
                                           WHERE PK = (SELECT MIN(PK)
                                                         FROM #reversals))

            DELETE FROM #reversals
             WHERE PK = (SELECT MIN(PK)
                           FROM #reversals)
```

```
        IF @DAMAGES > 0
        BEGIN
            GOTO REVERSAL_LOOP
        END
    END

    IF @DAMAGES < 0 SELECT @DAMAGES = 0

    SELECT @NEW_DAMAGES = @NEW_DAMAGES + @DAMAGES

    FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
END -- calc_cur

CLOSE calc_cur
DEALLOCATE calc_cur

UPDATE CLASS_DAMAGES
    SET SC8_R30_CN_UN = @NEW_DAMAGES
  WHERE ACCT_NUM = @ACCT_NUM

    FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 10. REVERSAL_9

```
CREATE PROCEDURE REVERSAL_9

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @NEW_DAMAGES NUMERIC(18,2),
        @POST_DT DATETIME,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #reversals (
    PK INT IDENTITY,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES
```

```
OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    SELECT @NEW_DAMAGES = 0
    TRUNCATE TABLE #reversals

    INSERT INTO #reversals (
       TRAN_AMT, POST_DT )
    SELECT TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_REVERSALS
     WHERE ACCT_NUM = @ACCT_NUM
     ORDER BY POST_DT

   DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
    SELECT POST_DT,
           ORIG_OD_FEE_AMOUNT - NEW_9_OD_FEE_AMOUNT AS DAMAGES
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND ORIG_OD_FEE_AMOUNT - NEW_9_OD_FEE_AMOUNT > 0
       AND REMOVE_50020_FLAG <> 1
     ORDER BY POST_DT

    OPEN calc_cur
    FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
    WHILE @@FETCH_STATUS = 0
    BEGIN

        DELETE FROM #reversals
         WHERE POST_DT < @POST_DT

        REVERSAL_LOOP:
        IF EXISTS ( SELECT *
                     FROM #reversals
                    WHERE DATEADD(dd, -30, POST_DT) <= @POST_DT )
        BEGIN
           SELECT @DAMAGES = @DAMAGES - (SELECT TRAN_AMT
                                          FROM #reversals
                                         WHERE PK = (SELECT MIN(PK)
                                                      FROM #reversals))
           DELETE FROM #reversals
            WHERE PK = (SELECT MIN(PK)
                         FROM #reversals)

           IF @DAMAGES > 0
           BEGIN
              GOTO REVERSAL_LOOP
           END
        END

        IF @DAMAGES < 0 SELECT @DAMAGES = 0

        SELECT @NEW_DAMAGES = @NEW_DAMAGES + @DAMAGES

        FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
    END -- calc_cur
```

```
    CLOSE calc_cur
    DEALLOCATE calc_cur

    UPDATE CLASS_DAMAGES
       SET SC9_R30_CN_UN = @NEW_DAMAGES
     WHERE ACCT_NUM = @ACCT_NUM

    FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 11. REVERSAL_10

```
CREATE PROCEDURE REVERSAL_10

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @NEW_DAMAGES NUMERIC(18,2),
        @POST_DT DATETIME,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #reversals (
    PK INT IDENTITY,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    SELECT @NEW_DAMAGES = 0
    TRUNCATE TABLE #reversals

    INSERT INTO #reversals (
       TRAN_AMT, POST_DT )
    SELECT TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_REVERSALS
     WHERE ACCT_NUM = @ACCT_NUM
```

```
   ORDER BY POST_DT

 DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
  SELECT POST_DT,
         ORIG_OD_FEE_AMOUNT - NEW_10_OD_FEE_AMOUNT AS DAMAGES
    FROM CLASS_DAILY_DETAIL
   WHERE ACCT_NUM = @ACCT_NUM
     AND ORIG_OD_FEE_AMOUNT - NEW_10_OD_FEE_AMOUNT > 0
   ORDER BY POST_DT

 OPEN calc_cur
 FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
 WHILE @@FETCH_STATUS = 0
 BEGIN

     DELETE FROM #reversals
      WHERE POST_DT < @POST_DT

     REVERSAL_LOOP:
     IF EXISTS ( SELECT *
                  FROM #reversals
                 WHERE DATEADD(dd, -30, POST_DT) <= @POST_DT )
     BEGIN
        SELECT @DAMAGES = @DAMAGES - (SELECT TRAN_AMT
                                       FROM #reversals
                                      WHERE PK = (SELECT MIN(PK)
                                                    FROM #reversals))

        DELETE FROM #reversals
         WHERE PK = (SELECT MIN(PK)
                       FROM #reversals)

        IF @DAMAGES > 0
        BEGIN
           GOTO REVERSAL_LOOP
        END
     END

     IF @DAMAGES < 0 SELECT @DAMAGES = 0

     SELECT @NEW_DAMAGES = @NEW_DAMAGES + @DAMAGES

     FETCH NEXT FROM calc_cur INTO @POST_DT, @DAMAGES
  END -- calc_cur

  CLOSE calc_cur
  DEALLOCATE calc_cur

  UPDATE CLASS_DAMAGES
     SET SC10_R30_CN_UN = @NEW_DAMAGES
   WHERE ACCT_NUM = @ACCT_NUM

  FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur
```

END

## 12. REVERSAL_FIFO_4

```
CREATE PROCEDURE REVERSAL_FIFO_4

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @TRAN_AMT NUMERIC(18,2),
        @POST_DT DATETIME,
        @PK INT,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #overdrafts (
   PK INT IDENTITY,
   OD_TYPE VARCHAR(1),
   TRAN_COUNT INT,
   TRAN_AMT NUMERIC(18,2),
   POST_DT DATETIME,
   REV_COUNT_APPLIED INT DEFAULT 0,
   REV_AMOUNT_APPLIED NUMERIC(18,2) DEFAULT 0,
   DAMAGES NUMERIC(18,2) DEFAULT 0 )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

   TRUNCATE TABLE #overdrafts

   INSERT INTO #overdrafts (
      OD_TYPE, TRAN_COUNT, TRAN_AMT, POST_DT )

-- SINGLE OD CHARGES

   SELECT 'S' AS OD_TYPE, 1 AS TRAN_COUNT, TRAN_AMT, POST_DT
     FROM V_TRAN_CLASS_OD_SINGLES
    WHERE ACCT_NUM = @ACCT_NUM

   UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE PART OF DAMAGES
```

```
    SELECT 'D' AS OD_TYPE, ORIG_OD_FEE_COUNT - NEW_4_OD_FEE_COUNT AS
TRAN_COUNT, ORIG_OD_FEE_AMOUNT - NEW_4_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND ORIG_OD_FEE_COUNT - NEW_4_OD_FEE_COUNT > 0

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE ALREADY EXCLUDED FROM DAMAGES

    SELECT 'V' AS OD_TYPE, NEW_4_OD_FEE_COUNT AS TRAN_COUNT,
NEW_4_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND NEW_4_OD_FEE_COUNT > 0

    UNION

    SELECT 'V' AS OD_TYPE, ORIG_OD_FEE_COUNT AS TRAN_COUNT, ORIG_OD_FEE_AMOUNT
AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 1

    ORDER BY POST_DT DESC, OD_TYPE


-- APPLY REVERSALS HERE

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
   SELECT TRAN_AMT, POST_DT
     FROM V_TRAN_CLASS_OD_REVERSALS
    WHERE ACCT_NUM = @ACCT_NUM
    ORDER BY POST_DT DESC

   OPEN calc_cur
   FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
   WHILE @@FETCH_STATUS = 0
   BEGIN

      SELECT @PK = 0
      SELECT @PK = MIN(PK)
        FROM #overdrafts
       WHERE POST_DT <= @POST_DT
         AND TRAN_COUNT > REV_COUNT_APPLIED

      IF @PK > 0
      BEGIN
         UPDATE #overdrafts
            SET REV_COUNT_APPLIED = REV_COUNT_APPLIED + 1,
                REV_AMOUNT_APPLIED = REV_AMOUNT_APPLIED + @TRAN_AMT
          WHERE PK = @PK
      END

      FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 60 of 92**

```
    END -- calc_cur

    CLOSE calc_cur
    DEALLOCATE calc_cur

    UPDATE #overdrafts
       SET DAMAGES = TRAN_AMT - REV_AMOUNT_APPLIED
     WHERE OD_TYPE = 'D'

    UPDATE #overdrafts
       SET DAMAGES = 0
     WHERE DAMAGES < 0

    SELECT @DAMAGES = 0
    SELECT @DAMAGES = SUM(DAMAGES)
      FROM #overdrafts

    UPDATE CLASS_DAMAGES
       SET SC4_RLI_CN_UN = @DAMAGES
     WHERE ACCT_NUM = @ACCT_NUM

    FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 13. REVERSAL_FIFO_5

```
CREATE PROCEDURE REVERSAL_FIFO_5

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @TRAN_AMT NUMERIC(18,2),
        @POST_DT DATETIME,
        @PK INT,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #overdrafts (
    PK INT IDENTITY,
    OD_TYPE VARCHAR(1),
    TRAN_COUNT INT,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME,
    REV_COUNT_APPLIED INT DEFAULT 0,
    REV_AMOUNT_APPLIED NUMERIC(18,2) DEFAULT 0,
    DAMAGES NUMERIC(18,2) DEFAULT 0 )
```

```
DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    TRUNCATE TABLE #overdrafts

    INSERT INTO #overdrafts (
        OD_TYPE, TRAN_COUNT, TRAN_AMT, POST_DT )

-- SINGLE OD CHARGES

    SELECT 'S' AS OD_TYPE, 1 AS TRAN_COUNT, TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_SINGLES
     WHERE ACCT_NUM = @ACCT_NUM

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE PART OF DAMAGES

    SELECT 'D' AS OD_TYPE, ORIG_OD_FEE_COUNT - NEW_5_OD_FEE_COUNT AS
TRAN_COUNT, ORIG_OD_FEE_AMOUNT - NEW_5_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND ORIG_OD_FEE_COUNT - NEW_5_OD_FEE_COUNT > 0

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE ALREADY EXCLUDED FROM DAMAGES

    SELECT 'V' AS OD_TYPE, NEW_5_OD_FEE_COUNT AS TRAN_COUNT,
NEW_5_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND NEW_5_OD_FEE_COUNT > 0

    UNION

    SELECT 'V' AS OD_TYPE, ORIG_OD_FEE_COUNT AS TRAN_COUNT, ORIG_OD_FEE_AMOUNT
AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 1

     ORDER BY POST_DT DESC, OD_TYPE


-- APPLY REVERSALS HERE
```

```
 DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
  SELECT TRAN_AMT, POST_DT
    FROM V_TRAN_CLASS_OD_REVERSALS
   WHERE ACCT_NUM = @ACCT_NUM
   ORDER BY POST_DT DESC

  OPEN calc_cur
  FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
  WHILE @@FETCH_STATUS = 0
  BEGIN

      SELECT @PK = 0
      SELECT @PK = MIN(PK)
        FROM #overdrafts
       WHERE POST_DT <= @POST_DT
         AND TRAN_COUNT > REV_COUNT_APPLIED

      IF @PK > 0
      BEGIN
         UPDATE #overdrafts
            SET REV_COUNT_APPLIED = REV_COUNT_APPLIED + 1,
                REV_AMOUNT_APPLIED = REV_AMOUNT_APPLIED + @TRAN_AMT
          WHERE PK = @PK
      END

      FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
  END -- calc_cur

  CLOSE calc_cur
  DEALLOCATE calc_cur

  UPDATE #overdrafts
     SET DAMAGES = TRAN_AMT - REV_AMOUNT_APPLIED
   WHERE OD_TYPE = 'D'

  UPDATE #overdrafts
     SET DAMAGES = 0
   WHERE DAMAGES < 0

  SELECT @DAMAGES = 0
  SELECT @DAMAGES = SUM(DAMAGES)
    FROM #overdrafts

  UPDATE CLASS_DAMAGES
     SET SC5_RLI_CN_UN = @DAMAGES
   WHERE ACCT_NUM = @ACCT_NUM

  FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 14. REVERSAL_FIFO_6

```
CREATE PROCEDURE REVERSAL_FIFO_6

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @TRAN_AMT NUMERIC(18,2),
        @POST_DT DATETIME,
        @PK INT,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #overdrafts (
   PK INT IDENTITY,
   OD_TYPE VARCHAR(1),
   TRAN_COUNT INT,
   TRAN_AMT NUMERIC(18,2),
   POST_DT DATETIME,
   REV_COUNT_APPLIED INT DEFAULT 0,
   REV_AMOUNT_APPLIED NUMERIC(18,2) DEFAULT 0,
   DAMAGES NUMERIC(18,2) DEFAULT 0 )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    TRUNCATE TABLE #overdrafts

    INSERT INTO #overdrafts (
        OD_TYPE, TRAN_COUNT, TRAN_AMT, POST_DT )

-- SINGLE OD CHARGES

    SELECT 'S' AS OD_TYPE, 1 AS TRAN_COUNT, TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_SINGLES
     WHERE ACCT_NUM = @ACCT_NUM

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE PART OF DAMAGES

    SELECT 'D' AS OD_TYPE, ORIG_OD_FEE_COUNT - NEW_6_OD_FEE_COUNT AS
TRAN_COUNT, ORIG_OD_FEE_AMOUNT - NEW_6_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
```

```
            AND ORIG_OD_FEE_COUNT - NEW_6_OD_FEE_COUNT > 0

        UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE ALREADY EXCLUDED FROM DAMAGES

        SELECT 'V' AS OD_TYPE, NEW_6_OD_FEE_COUNT AS TRAN_COUNT,
NEW_6_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
          FROM CLASS_DAILY_DETAIL
         WHERE ACCT_NUM = @ACCT_NUM
           AND REMOVE_50020_FLAG = 0
           AND NEW_6_OD_FEE_COUNT > 0

        UNION

        SELECT 'V' AS OD_TYPE, ORIG_OD_FEE_COUNT AS TRAN_COUNT, ORIG_OD_FEE_AMOUNT
AS TRAN_AMT, POST_DT
          FROM CLASS_DAILY_DETAIL
         WHERE ACCT_NUM = @ACCT_NUM
           AND REMOVE_50020_FLAG = 1

        ORDER BY POST_DT DESC, OD_TYPE


-- APPLY REVERSALS HERE

    DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
      SELECT TRAN_AMT, POST_DT
        FROM V_TRAN_CLASS_OD_REVERSALS
       WHERE ACCT_NUM = @ACCT_NUM
       ORDER BY POST_DT DESC

      OPEN calc_cur
      FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
      WHILE @@FETCH_STATUS = 0
      BEGIN

          SELECT @PK = 0
          SELECT @PK = MIN(PK)
            FROM #overdrafts
           WHERE POST_DT <= @POST_DT
             AND TRAN_COUNT > REV_COUNT_APPLIED

          IF @PK > 0
          BEGIN
             UPDATE #overdrafts
                SET REV_COUNT_APPLIED = REV_COUNT_APPLIED + 1,
                    REV_AMOUNT_APPLIED = REV_AMOUNT_APPLIED + @TRAN_AMT
              WHERE PK = @PK
          END

          FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
      END -- calc_cur

      CLOSE calc_cur
      DEALLOCATE calc_cur
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 65 of 92**

```
    UPDATE #overdrafts
       SET DAMAGES = TRAN_AMT - REV_AMOUNT_APPLIED
     WHERE OD_TYPE = 'D'

    UPDATE #overdrafts
       SET DAMAGES = 0
     WHERE DAMAGES < 0

    SELECT @DAMAGES = 0
    SELECT @DAMAGES = SUM(DAMAGES)
      FROM #overdrafts

    UPDATE CLASS_DAMAGES
       SET SC6_RLI_CN_UN = @DAMAGES
     WHERE ACCT_NUM = @ACCT_NUM

    FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 15. REVERSAL_FIFO_7

```
CREATE PROCEDURE REVERSAL_FIFO_7

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @TRAN_AMT NUMERIC(18,2),
        @POST_DT DATETIME,
        @PK INT,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #overdrafts (
    PK INT IDENTITY,
    OD_TYPE VARCHAR(1),
    TRAN_COUNT INT,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME,
    REV_COUNT_APPLIED INT DEFAULT 0,
    REV_AMOUNT_APPLIED NUMERIC(18,2) DEFAULT 0,
    DAMAGES NUMERIC(18,2) DEFAULT 0 )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES
```

```
OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    TRUNCATE TABLE #overdrafts

    INSERT INTO #overdrafts (
        OD_TYPE, TRAN_COUNT, TRAN_AMT, POST_DT )

-- SINGLE OD CHARGES

    SELECT 'S' AS OD_TYPE, 1 AS TRAN_COUNT, TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_SINGLES
     WHERE ACCT_NUM = @ACCT_NUM

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE PART OF DAMAGES

    SELECT 'D' AS OD_TYPE, ORIG_OD_FEE_COUNT - NEW_7_OD_FEE_COUNT AS
TRAN_COUNT, ORIG_OD_FEE_AMOUNT - NEW_7_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND ORIG_OD_FEE_COUNT - NEW_7_OD_FEE_COUNT > 0

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE ALREADY EXCLUDED FROM DAMAGES

    SELECT 'V' AS OD_TYPE, NEW_7_OD_FEE_COUNT AS TRAN_COUNT,
NEW_7_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND NEW_7_OD_FEE_COUNT > 0

    UNION

    SELECT 'V' AS OD_TYPE, ORIG_OD_FEE_COUNT AS TRAN_COUNT, ORIG_OD_FEE_AMOUNT
AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 1

     ORDER BY POST_DT DESC, OD_TYPE


-- APPLY REVERSALS HERE

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
   SELECT TRAN_AMT, POST_DT
     FROM V_TRAN_CLASS_OD_REVERSALS
    WHERE ACCT_NUM = @ACCT_NUM
    ORDER BY POST_DT DESC
```

```
OPEN calc_cur
FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
WHILE @@FETCH_STATUS = 0
BEGIN

    SELECT @PK = 0
    SELECT @PK = MIN(PK)
      FROM #overdrafts
     WHERE POST_DT <= @POST_DT
       AND TRAN_COUNT > REV_COUNT_APPLIED

    IF @PK > 0
    BEGIN
        UPDATE #overdrafts
           SET REV_COUNT_APPLIED = REV_COUNT_APPLIED + 1,
               REV_AMOUNT_APPLIED = REV_AMOUNT_APPLIED + @TRAN_AMT
         WHERE PK = @PK
    END

    FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
END -- calc_cur

CLOSE calc_cur
DEALLOCATE calc_cur

UPDATE #overdrafts
   SET DAMAGES = TRAN_AMT - REV_AMOUNT_APPLIED
 WHERE OD_TYPE = 'D'

UPDATE #overdrafts
   SET DAMAGES = 0
 WHERE DAMAGES < 0

SELECT @DAMAGES = 0
SELECT @DAMAGES = SUM(DAMAGES)
  FROM #overdrafts

UPDATE CLASS_DAMAGES
   SET SC7_RLI_CN_UN = @DAMAGES
 WHERE ACCT_NUM = @ACCT_NUM

FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 16. REVERSAL_FIFO_8

```
CREATE PROCEDURE REVERSAL_FIFO_8
```

```
AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @TRAN_AMT NUMERIC(18,2),
        @POST_DT DATETIME,
        @PK INT,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #overdrafts (
    PK INT IDENTITY,
    OD_TYPE VARCHAR(1),
    TRAN_COUNT INT,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME,
    REV_COUNT_APPLIED INT DEFAULT 0,
    REV_AMOUNT_APPLIED NUMERIC(18,2) DEFAULT 0,
    DAMAGES NUMERIC(18,2) DEFAULT 0 )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    TRUNCATE TABLE #overdrafts

    INSERT INTO #overdrafts (
        OD_TYPE, TRAN_COUNT, TRAN_AMT, POST_DT )

-- SINGLE OD CHARGES

    SELECT 'S' AS OD_TYPE, 1 AS TRAN_COUNT, TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_SINGLES
     WHERE ACCT_NUM = @ACCT_NUM

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE PART OF DAMAGES

    SELECT 'D' AS OD_TYPE, ORIG_OD_FEE_COUNT - NEW_8_OD_FEE_COUNT AS
TRAN_COUNT, ORIG_OD_FEE_AMOUNT - NEW_8_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND ORIG_OD_FEE_COUNT - NEW_8_OD_FEE_COUNT > 0

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE ALREADY EXCLUDED FROM DAMAGES
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 69 of 92**

```
    SELECT 'V' AS OD_TYPE, NEW_8_OD_FEE_COUNT AS TRAN_COUNT,
NEW_8_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND NEW_8_OD_FEE_COUNT > 0

    UNION

    SELECT 'V' AS OD_TYPE, ORIG_OD_FEE_COUNT AS TRAN_COUNT, ORIG_OD_FEE_AMOUNT
AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 1

     ORDER BY POST_DT DESC, OD_TYPE


-- APPLY REVERSALS HERE

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
    SELECT TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_REVERSALS
     WHERE ACCT_NUM = @ACCT_NUM
     ORDER BY POST_DT DESC

    OPEN calc_cur
    FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
    WHILE @@FETCH_STATUS = 0
    BEGIN

        SELECT @PK = 0
        SELECT @PK = MIN(PK)
          FROM #overdrafts
         WHERE POST_DT <= @POST_DT
           AND TRAN_COUNT > REV_COUNT_APPLIED

        IF @PK > 0
        BEGIN
           UPDATE #overdrafts
              SET REV_COUNT_APPLIED = REV_COUNT_APPLIED + 1,
                  REV_AMOUNT_APPLIED = REV_AMOUNT_APPLIED + @TRAN_AMT
            WHERE PK = @PK
        END

        FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
    END -- calc_cur

    CLOSE calc_cur
    DEALLOCATE calc_cur

    UPDATE #overdrafts
       SET DAMAGES = TRAN_AMT - REV_AMOUNT_APPLIED
     WHERE OD_TYPE = 'D'

    UPDATE #overdrafts
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 70 of 92**

```
     SET DAMAGES = 0
   WHERE DAMAGES < 0

   SELECT @DAMAGES = 0
   SELECT @DAMAGES = SUM(DAMAGES)
     FROM #overdrafts

   UPDATE CLASS_DAMAGES
     SET SC8_RLI_CN_UN = @DAMAGES
   WHERE ACCT_NUM = @ACCT_NUM

   FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 17. REVERSAL_FIFO_9

```
CREATE PROCEDURE REVERSAL_FIFO_9

AS

BEGIN

SET NOCOUNT ON

DECLARE @ACCT_NUM VARCHAR(18),
        @TRAN_AMT NUMERIC(18,2),
        @POST_DT DATETIME,
        @PK INT,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #overdrafts (
   PK INT IDENTITY,
   OD_TYPE VARCHAR(1),
   TRAN_COUNT INT,
   TRAN_AMT NUMERIC(18,2),
   POST_DT DATETIME,
   REV_COUNT_APPLIED INT DEFAULT 0,
   REV_AMOUNT_APPLIED NUMERIC(18,2) DEFAULT 0,
   DAMAGES NUMERIC(18,2) DEFAULT 0 )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
   FROM CLASS_DAMAGES


OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN
```

```
    TRUNCATE TABLE #overdrafts

    INSERT INTO #overdrafts (
        OD_TYPE, TRAN_COUNT, TRAN_AMT, POST_DT )

-- SINGLE OD CHARGES

    SELECT 'S' AS OD_TYPE, 1 AS TRAN_COUNT, TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_SINGLES
     WHERE ACCT_NUM = @ACCT_NUM

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE PART OF DAMAGES

    SELECT 'D' AS OD_TYPE, ORIG_OD_FEE_COUNT - NEW_9_OD_FEE_COUNT AS
TRAN_COUNT, ORIG_OD_FEE_AMOUNT - NEW_9_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND ORIG_OD_FEE_COUNT - NEW_9_OD_FEE_COUNT > 0

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE ALREADY EXCLUDED FROM DAMAGES

    SELECT 'V' AS OD_TYPE, NEW_9_OD_FEE_COUNT AS TRAN_COUNT,
NEW_9_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 0
       AND NEW_9_OD_FEE_COUNT > 0

    UNION

    SELECT 'V' AS OD_TYPE, ORIG_OD_FEE_COUNT AS TRAN_COUNT, ORIG_OD_FEE_AMOUNT
AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND REMOVE_50020_FLAG = 1

     ORDER BY POST_DT DESC, OD_TYPE


-- APPLY REVERSALS HERE

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
   SELECT TRAN_AMT, POST_DT
     FROM V_TRAN_CLASS_OD_REVERSALS
    WHERE ACCT_NUM = @ACCT_NUM
    ORDER BY POST_DT DESC

    OPEN calc_cur
    FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
    WHILE @@FETCH_STATUS = 0
    BEGIN
```

```
      SELECT @PK = 0
      SELECT @PK = MIN(PK)
        FROM #overdrafts
       WHERE POST_DT <= @POST_DT
         AND TRAN_COUNT > REV_COUNT_APPLIED

      IF @PK > 0
      BEGIN
         UPDATE #overdrafts
            SET REV_COUNT_APPLIED = REV_COUNT_APPLIED + 1,
                REV_AMOUNT_APPLIED = REV_AMOUNT_APPLIED + @TRAN_AMT
          WHERE PK = @PK
      END

      FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
   END -- calc_cur

   CLOSE calc_cur
   DEALLOCATE calc_cur

   UPDATE #overdrafts
      SET DAMAGES = TRAN_AMT - REV_AMOUNT_APPLIED
    WHERE OD_TYPE = 'D'

   UPDATE #overdrafts
      SET DAMAGES = 0
    WHERE DAMAGES < 0

   SELECT @DAMAGES = 0
   SELECT @DAMAGES = SUM(DAMAGES)
     FROM #overdrafts

   UPDATE CLASS_DAMAGES
      SET SC9_RLI_CN_UN = @DAMAGES
    WHERE ACCT_NUM = @ACCT_NUM

   FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
DEALLOCATE account_cur


END
```

## 18. REVERSAL_FIFO_10

```
CREATE PROCEDURE REVERSAL_FIFO_10

AS

BEGIN

SET NOCOUNT ON
```

**Supplemental Expert Report of Arthur Olsen – Provided by InfinIT Consulting**
**Page 73 of 92**

```
DECLARE @ACCT_NUM VARCHAR(18),
        @TRAN_AMT NUMERIC(18,2),
        @POST_DT DATETIME,
        @PK INT,
        @DAMAGES NUMERIC(18,2)

CREATE TABLE #overdrafts (
    PK INT IDENTITY,
    OD_TYPE VARCHAR(1),
    TRAN_COUNT INT,
    TRAN_AMT NUMERIC(18,2),
    POST_DT DATETIME,
    REV_COUNT_APPLIED INT DEFAULT 0,
    REV_AMOUNT_APPLIED NUMERIC(18,2) DEFAULT 0,
    DAMAGES NUMERIC(18,2) DEFAULT 0 )


DECLARE account_cur CURSOR LOCAL FAST_FORWARD FOR
SELECT ACCT_NUM
  FROM CLASS_DAMAGES

OPEN account_cur
FETCH NEXT FROM account_cur INTO @ACCT_NUM
WHILE @@FETCH_STATUS = 0
BEGIN

    TRUNCATE TABLE #overdrafts

    INSERT INTO #overdrafts (
        OD_TYPE, TRAN_COUNT, TRAN_AMT, POST_DT )

-- SINGLE OD CHARGES

    SELECT 'S' AS OD_TYPE, 1 AS TRAN_COUNT, TRAN_AMT, POST_DT
      FROM V_TRAN_CLASS_OD_SINGLES
     WHERE ACCT_NUM = @ACCT_NUM

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE PART OF DAMAGES

    SELECT 'D' AS OD_TYPE, ORIG_OD_FEE_COUNT - NEW_10_OD_FEE_COUNT AS
TRAN_COUNT, ORIG_OD_FEE_AMOUNT - NEW_10_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND ORIG_OD_FEE_COUNT - NEW_10_OD_FEE_COUNT > 0

    UNION

-- THE CHARGES ON MULTIPLE OD DAYS THAT ARE ALREADY EXCLUDED FROM DAMAGES

    SELECT 'V' AS OD_TYPE, NEW_10_OD_FEE_COUNT AS TRAN_COUNT,
NEW_10_OD_FEE_AMOUNT AS TRAN_AMT, POST_DT
      FROM CLASS_DAILY_DETAIL
     WHERE ACCT_NUM = @ACCT_NUM
       AND NEW_10_OD_FEE_COUNT > 0
```

```
    ORDER BY POST_DT DESC, OD_TYPE


-- APPLY REVERSALS HERE

  DECLARE calc_cur CURSOR LOCAL FAST_FORWARD FOR
   SELECT TRAN_AMT, POST_DT
     FROM V_TRAN_CLASS_OD_REVERSALS
    WHERE ACCT_NUM = @ACCT_NUM
    ORDER BY POST_DT DESC

   OPEN calc_cur
   FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
   WHILE @@FETCH_STATUS = 0
   BEGIN

      SELECT @PK = 0
      SELECT @PK = MIN(PK)
        FROM #overdrafts
       WHERE POST_DT <= @POST_DT
         AND TRAN_COUNT > REV_COUNT_APPLIED

      IF @PK > 0
      BEGIN
         UPDATE #overdrafts
            SET REV_COUNT_APPLIED = REV_COUNT_APPLIED + 1,
                REV_AMOUNT_APPLIED = REV_AMOUNT_APPLIED + @TRAN_AMT
          WHERE PK = @PK
      END

      FETCH NEXT FROM calc_cur INTO @TRAN_AMT, @POST_DT
   END -- calc_cur

   CLOSE calc_cur
   DEALLOCATE calc_cur

   UPDATE #overdrafts
      SET DAMAGES = TRAN_AMT - REV_AMOUNT_APPLIED
    WHERE OD_TYPE = 'D'

   UPDATE #overdrafts
      SET DAMAGES = 0
    WHERE DAMAGES < 0

   SELECT @DAMAGES = 0
   SELECT @DAMAGES = SUM(DAMAGES)
     FROM #overdrafts

   UPDATE CLASS_DAMAGES
      SET SC10_RLI_CN_UN = @DAMAGES
    WHERE ACCT_NUM = @ACCT_NUM

   FETCH NEXT FROM account_cur INTO @ACCT_NUM
END

CLOSE account_cur
```

```
DEALLOCATE account_cur

END
```

# Exhibit D – Inventory of Handoff Package

A directory has been created on the F drive on the server RPPWZD4001, and in this directory we have placed a backup of the database as well as all of the source code utilized in generating these findings. Specifically, the directory is F:\WF_HANDOFF_PACKAGE and contains the following files:

- WF_FINAL_NEW.bak – this is the final backup copy of the database that was used to generate the findings in this document. This database contains all of the tables, fully populated, as well as all of the database code.

- DATABASE_CODE_ADDITIONAL directory – this folder contains the all of the code necessary to recreate the WF_FINAL database from the WF_FINAL.bak file given to Wells Fargo at the conclusion of the initial investigation, as follows:

  - PROCEDURES\RESEQUENCE_1_SP.SQL
  - PROCEDURES\RESEQUENCE_1B_SP.SQL
  - PROCEDURES\RESEQUENCE_2_AND_3_SP.SQL
  - PROCEDURES\RESEQUENCE_CHECKS_FIRST_SP.SQL
  - PROCEDURES\REVERSAL_4.SQL
  - PROCEDURES\REVERSAL_5.SQL
  - PROCEDURES\REVERSAL_6.SQL
  - PROCEDURES\REVERSAL_7.SQL
  - PROCEDURES\REVERSAL_8.SQL
  - PROCEDURES\REVERSAL_9.SQL
  - PROCEDURES\REVERSAL_10.SQL
  - PROCEDURES\REVERSAL_FIFO_4.SQL
  - PROCEDURES\REVERSAL_FIFO_5.SQL
  - PROCEDURES\REVERSAL_FIFO_6.SQL
  - PROCEDURES\REVERSAL_FIFO_7.SQL
  - PROCEDURES\REVERSAL_FIFO_8.SQL
  - PROCEDURES\REVERSAL_FIFO_9.SQL
  - PROCEDURES\REVERSAL_FIFO_10.SQL

  - QUERIES\DAMAGE_CALCULATIONS_FOR_SCENARIO_4.SQL
  - QUERIES\DAMAGE_CALCULATIONS_FOR_SCENARIO_5.SQL
  - QUERIES\DAMAGE_CALCULATIONS_FOR_SCENARIO_6.SQL
  - QUERIES\DAMAGE_CALCULATIONS_FOR_SCENARIO_7.SQL
  - QUERIES\DAMAGE_CALCULATIONS_FOR_SCENARIO_8.SQL
  - QUERIES\DAMAGE_CALCULATIONS_FOR_SCENARIO_9.SQL
  - QUERIES\DAMAGE_CALCULATIONS_FOR_SCENARIO_10.SQL

  - SCRIPTS\ALTER_CLASS_DAILY_DETAIL.SQL
  - SCRIPTS\ALTER_CLASS_DAMAGES.SQL
  - SCRIPTS\POPULATE_DAMAGES.SQL

- o   SCRIPTS\POPULATE_DAMAGES.SQL
- o   SCRIPTS\UPDATE_TRANSACTION_CODE_MASTER.SQL

# Exhibit E – Detailed Class Representative Analysis

The purpose of this exhibit is to illustrate how each of the alternative sequencing scenarios were applied using a real world example. For this analysis, the activity on October 10, 2006, for customer Veronica Gutierrez is examined. Ms. Gutierrez is a class representative, but she is also a good example for this analysis because she has both cash withdrawals and debit card transactions on 10/10/2006, and some of those debit card transactions were not found in the settlement data, so they have no corresponding timestamp.

On October 11, 2006, Ms. Gutierrez was assessed four overdraft charges, each in the amount of $22, for a total of $88. These overdraft charges were based on activity that posted on October 10, 2006, so that is that date being examined here.

Her account never became uncollectible, and she did not have any reversals that could be applied to any of the overdraft charges on October 11, 2006. This includes both the LIFO method and the 30-Day method.

Table 1, (below), is a detailed list of the activity in the account on October 10, 2006, which contains the following fields:

- CUSTOMER NAME – Veronica Gutierrez. Customer name used instead of account number, which comes from the WF transaction data, for confidentiality considerations
- ACCT BAL – Account balance, which comes from the WF transaction data. However, starting balance had to be calculated since it does not otherwise exist in the WF data, and negative signs were added since the WF data does not indicate whether a balance is negative or positive.
- POST DATE – As mentioned above, this analysis is for the activity from October 10, 2006.
- TRAN CODE – The four digit transaction code assigned to each transaction by WF. This data comes from the WF transaction data.
- TRAN AMT – The amount of the transaction, which comes from the WF transaction data. Again, the WF transaction data does not include negative signs for debits, so these were added. They were identified by looking at the SOR_TRAN_CAT field in the WF data, but that field was not included in this table.
- SEQ NUM – The sequence number found in the WF transaction data. This is the order in which WF actually processed the transactions.
- TRANSACTION DETAIL – A detailed description of the transaction from the WF transaction data.
- POST GRP – The priority posting group. This data comes from the Transaction Code table provided by WF and the value is based on the TRAN CODE field.
- CATEGORY – For the purposes of my analysis, only cash withdrawal and debit card transactions had to be identified. Cash withdrawal transactions were given a value of "CASH" and debit card transactions a value of "DEBIT CARD"
- TRAN DATE – The actual date of the transaction, as parsed out of the TRANSACTION DETAIL field.
- TRAN TIME – The actual time of the transaction, where available. This information was pulled from the WF settlement data.

**TABLE 1 – Raw Transaction Detail**

| CUSTOMER NAME | ACCT BAL | POST DATE | TRAN CODE | TRAN AMT | SEQ NUM | TRANSACTION DETAIL | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|---|---|---|
| Veronica Gutierrez | 316.90 | | | | | Starting Balance | | | | |
| Veronica Gutierrez | 334.13 | 10/10/2006 | 5371 | 17.23 | 1 | CHECK CRD PUR RTRN 10/05 AUTOZONE #5635PONTANIA CA 446024000006509 283540013839957 | 10010 | | | |
| Veronica Gutierrez | 254.13 | 10/10/2006 | 5449 | -80.00 | 2 | ONLINE TRANSFER TO GUTIERREZ P REF# B6C0215V94-CHECKING TICKETS | 50020 | CASH | | |
| Veronica Gutierrez | 232.13 | 10/10/2006 | 5733 | -22.00 | 3 | ATM WITHDRAWAL - 10/06 MACH ID WCAD5985 *HOLLYWOOD BOWL/BANK OF AM HOLLYWOOD CA 6509 | 50020 | CASH | | |
| Veronica Gutierrez | 230.13 | 10/10/2006 | 5845 | -2.00 | 4 | NON-WELLS FARGO ATM TRANSACTION FEE | 50010 | | | |
| Veronica Gutierrez | 155.74 | 10/10/2006 | 5773 | -74.39 | 5 | CHECK CRD PURCHASE 10/07 ALBERTSONS #6590ONTARIO CA 446024000006509 283540009590866 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |
| Veronica Gutierrez | 90.74 | 10/10/2006 | 1051 | -65.00 | 6 | CHECK | 50040 | | | |
| Veronica Gutierrez | 42.75 | 10/10/2006 | 5773 | -47.99 | 7 | CHECK CRD PURCHASE 10/05 AUTOZONE #5635PONTANIA CA 446024000006509 283540013839958 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| Veronica Gutierrez | 16.24 | 10/10/2006 | 5773 | -26.51 | 8 | CHECK CRD PURCHASE 10/06 IHOP #7299RANCHO CUCAMO CA 446024000006509 283540007345389 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| Veronica Gutierrez | -0.99 | 10/10/2006 | 5773 | -17.23 | 9 | CHECK CRD PURCHASE 10/05 AUTOZONE #5635CHINO CA 446024000006509 283540013839956 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| Veronica Gutierrez | -12.26 | 10/10/2006 | 5773 | -11.27 | 10 | CHECK CRD PURCHASE 10/05 SUBWAY 3458 00035487FONTANA CA 446024000006509 283540000618320 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| Veronica Gutierrez | -20.36 | 10/10/2006 | 5773 | -8.10 | 11 | CHECK CRD PURCHASE 10/06 FARMER BOYS - IRWINDALIRWINDALE CA 446024000006509 283540009501542 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| Veronica Gutierrez | -23.59 | 10/10/2006 | 5773 | -3.23 | 12 | CHECK CRD PURCHASE 10/05 AUTOZONE #5635PONTANIA CA 446024000006509 283540013839959 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |

# 1. Wells Fargo Actual Processing Order

As mentioned above, when Wells Fargo processed the transactions above, they did so by sequence number. But in reality, the sequence numbers were simply applied to the transactions after they were sorted. As a result, transactions were processed by priority posting group, and for priority posting group 50040, from high to low. The result of this processing order was the assessment of four overdraft charges totaling $88. Taking just the relevant columns, this is illustrated in the table below. The last four transactions each resulted in a negative ledger balance, and in each case, generated an overdraft charge.

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|----------|-----------|----------|---------|----------|----------|-----------|-----------|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 155.74 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |
| 90.74 | 1051 | -65.00 | 6 | 50040 | | | |
| 42.75 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 16.24 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| -0.99 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| -12.26 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| -20.36 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| -23.59 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |

# 2. Alternate Sequencing Order 1

For alternative sequencing order number 1, (detailed in my original report), all transactions in priority posting group 50040 were resequenced from low to high. All other transactions were left in the original WF posting order.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|----------|-----------|----------|---------|----------|----------|-----------|-----------|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 226.90 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 218.80 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 207.53 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 190.30 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 163.79 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 115.80 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 50.80 | 1051 | -65.00 | 6 | 50040 | | | |
| -23.59 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |

# 3. Alternate Sequencing Order 1A

For alternative sequencing order number 1A, cash withdrawals had to be processed with the debit card transactions, so they were moved into priority posting group 50040. Then priority posting group 50040 was resequenced. First, cash withdrawals and debit card transactions were processed, ordered from low to high. Then all other transactions in posting group 50040 were processed, also ordered from low to high. All other transactions were left in the original WF posting order.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 332.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 328.90 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 320.80 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 309.53 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 292.30 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 270.30 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 243.79 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 195.80 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 121.41 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |
| 41.41 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| -23.59 | 1051 | -65.00 | 6 | 50040 | | | |

# 4. Alternate Sequencing Order 2

For alternative sequencing order number 2, (detailed in my original report), all transactions in priority posting group 50040 were resequenced. Debit card transactions were processed first, sorted by transaction date, then by transaction time, and then by transaction amount, from low to high. All other transactions were left in the original WF posting order.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 212.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 201.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 153.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 150.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 142.31 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 115.80 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 41.41 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |
| -23.59 | 1051 | -65.00 | 6 | 50040 | | | |

# 5. Alternate Sequencing Order 2A

For alternative sequencing order number 2A, all transactions in priority posting group 50040 were resequenced. Debit card transactions were processed first, sorted by transaction date, then by transaction time, and then by transaction amount, from low to high. All other transactions were left in the original WF posting order. In the case when the transaction time was not available, it was changed to 23:59:59 to ensure that those transactions would be processed last for a given day.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|----------|-----------|----------|---------|----------|----------|-----------|-----------|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 212.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 201.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 153.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 150.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 142.31 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| 115.80 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| 41.41 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 23:59:59 |
| -23.59 | 1051 | -65.00 | 6 | 50040 | | | |

# 6. Alternate Sequencing Order 2B

For alternative sequencing order number 2B, all transactions in priority posting group 50040 were resequenced. Debit card transactions were processed last, sorted by transaction date, then by transaction time, and then by transaction amount, from low to high. All other transactions were left in the original WF posting order.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 165.13 | 1051 | -65.00 | 6 | 50040 | | | |
| 147.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 136.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 88.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 85.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 77.31 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 50.80 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| -23.59 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |

# 7. Alternate Sequencing Order 2C

For alternative sequencing order number 2C, all transactions in priority posting group 50040 were resequenced. Debit card transactions were processed last, sorted by transaction date, then by transaction time, and then by transaction amount, from low to high. All other transactions were left in the original WF posting order. In the case when the transaction time was not available, it was changed to 23:59:59 to ensure that those transactions would be processed last for a given day.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---------|-----------|----------|---------|----------|----------|-----------|-----------|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 165.13 | 1051 | -65.00 | 6 | 50040 | | | |
| 147.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 136.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 88.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 85.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 77.31 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| 50.80 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| -23.59 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 23:59:59 |

# 8.  Alternate Sequencing Order 3

For alternative sequencing order number 3, (detailed in my original report), all transactions in priority posting group 50040 were resequenced.  Debit card transactions were processed first, sorted by transaction date, then by transaction time, and then by transaction amount, from high to low.  All other transactions were left in the original WF posting order.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance.  As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages.  To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22.  So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 212.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 201.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 153.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 150.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 123.90 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 115.80 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 41.41 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |
| -23.59 | 1051 | -65.00 | 6 | 50040 | | | |

# 9. Alternate Sequencing Order 3A

For alternative sequencing order number 3A, all transactions in priority posting group 50040 were resequenced. Debit card transactions were processed first, sorted by transaction date, then by transaction time, and then by transaction amount, from high to low. All other transactions were left in the original WF posting order. In the case when the transaction time was not available, it was changed to 23:59:59 to ensure that those transactions would be processed last for a given day.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 212.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 201.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 153.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 150.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 123.90 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| 115.80 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| 41.41 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 23:59:59 |
| -23.59 | 1051 | -65.00 | 6 | 50040 | | | |

# 10.    Alternate Sequencing Order 3B

For alternative sequencing order number 3B, all transactions in priority posting group 50040 were resequenced.  Debit card transactions were processed last, sorted by transaction date, then by transaction time, and then by transaction amount, from high to low.  All other transactions were left in the original WF posting order.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance.  As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages.  To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22.  So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 165.13 | 1051 | -65.00 | 6 | 50040 | | | |
| 147.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 136.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 88.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 85.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 58.90 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| 50.80 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 0:00:00 |
| -23.59 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 0:00:00 |

# 11.     Alternate Sequencing Order 3C

For alternative sequencing order number 3C, all transactions in priority posting group 50040 were resequenced. Debit card transactions were processed last, sorted by transaction date, then by transaction time, and then by transaction amount, from high to low. All other transactions were left in the original WF posting order. In the case when the transaction time was not available, it was changed to 23:59:59 to ensure that those transactions would be processed last for a given day.

Under this scenario, as shown in the table below, only one transaction results in a negative account balance. As a result, three of the four overdraft charges originally assessed by Wells Fargo are considered damages. To calculate the amount of damages, the original total amount assessed, ($88), is divided by the original number of overdraft charges assessed, (four), to come up with an amount per overdraft charge of $22. So in this case, damages total $66, (three excess charges multiplied by $22 per charge).

| ACCT BAL | TRAN CODE | TRAN AMT | SEQ NUM | POST GRP | CATEGORY | TRAN DATE | TRAN TIME |
|---|---|---|---|---|---|---|---|
| 316.90 | | | | | | | |
| 334.13 | 5371 | 17.23 | 1 | 10010 | | | |
| 254.13 | 5449 | -80.00 | 2 | 50020 | CASH | | |
| 232.13 | 5733 | -22.00 | 3 | 50020 | CASH | | |
| 230.13 | 5845 | -2.00 | 4 | 50010 | | | |
| 165.13 | 1051 | -65.00 | 6 | 50040 | | | |
| 147.90 | 5773 | -17.23 | 9 | 50040 | DEBIT CARD | 10/5/2006 | 11:00:00 |
| 136.63 | 5773 | -11.27 | 10 | 50040 | DEBIT CARD | 10/5/2006 | 12:15:00 |
| 88.64 | 5773 | -47.99 | 7 | 50040 | DEBIT CARD | 10/5/2006 | 13:48:00 |
| 85.41 | 5773 | -3.23 | 12 | 50040 | DEBIT CARD | 10/5/2006 | 21:39:00 |
| 58.90 | 5773 | -26.51 | 8 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| 50.80 | 5773 | -8.10 | 11 | 50040 | DEBIT CARD | 10/6/2006 | 23:59:59 |
| -23.59 | 5773 | -74.39 | 5 | 50040 | DEBIT CARD | 10/7/2006 | 23:59:59 |

# Exhibit C

Sonya D. Winner, SB # 200348
David M. Jolley, SB # 191164
Margaret G. May, SB # 234910
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
E-mail: swinner@cov.com

Attorneys for Defendant
WELLS FARGO BANK, N.A.

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA GUTIERREZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & COMPANY, *et al.*, <br><br> Defendants. | Civil Case No.: CV-07-5923 WHA (JCSx) <br><br> **DECLARATION OF ALAN J. COX IN SUPPORT OF DEFENDANT WELLS FARGO, N.A.'S MOTION FOR SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS** <br><br> Date: March 25, 2010 <br> Time: 8:00 a.m. <br> Dept.: Courtroom 9 <br><br> Honorable William H. Alsup |

**DECLARATION OF ALAN J. COX**

1.      I am a economist and Senior Vice President at the San Francisco office of National Economic Research Associates ("NERA").  I received a B.Sc. degree in Environmental Science from York University in Toronto in 1976 and a M.A. in Economics from the University of British Columbia in 1978.  In 1989, I received a Ph.D. in Economic Analysis and Policy from the Haas School of Business Administration at the University of California at Berkeley.  One of my areas of concentration for my Ph.D. was in Econometrics, the application of statistics to economic data.  My experience includes calculating damages in a variety of matters including contract disputes, securities, antitrust, and intellectual property.  These include, for example, the operation of financial markets, the performance of banks and savings and loan institutions, the competitiveness of credit card operations, and intellectual property matters related to the conversion of paper checks into electronic checks.

2.      I was retained to consider and comment upon the November 20, 2009 Expert Report of Mr. Arthur Olsen and the Expert Report (Feb. 20, 2009), Supplemental Report (March 4, 2009), and Reply Report (March 16, 2009) of plaintiffs' expert Dr. Charles D. Cowan, and to opine on issues in this case relating to plaintiffs' claims of injury and damages.

3.      During the course of my research and investigation in this matter, I have reviewed a wide variety of materials, a complete list of which is set out in my expert report (Expert Report of Alan J. Cox), which was served on plaintiffs in this litigation on January 27, 2010.  These materials included the following, among others:

- [Adjusted] First Amended Class Action Complaint, April 17, 2008.
- Deposition of Erin V. Walker, June 13, 2008.
- Deposition of William Smith, Jr., June 18, 2008.
- Deposition of Veronica Gutierrez, June 12, 2008.
- Deposition of Kenneth A. Zimmerman, November 10, 2008.
- Deposition of Stacey Pinkerd (Visa witness), February 10, 2009.
- Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment, July 9, 2008.
- Declaration of Lewis Mandell in Support of Plaintiffs' Motion for Class Certification, July 8, 2008.

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.: CV-07-5923 WHA (JCSx)

2

- Motion for Class Certification; Declaration of Richard D. McCune; Declaration of Lewis Mandell; Exhibits; [Proposed] Order, August 21, 2008.
- Order Denying Defendant's Motion for Summary Judgment and Granting In Part and Denying In Part Plaintiffs' Motion for Class Certification, September 11, 2008.
- Order on Motion Challenging Damage Study and Seeking Class Decertification, May 5, 2009.
- Expert Report Charles D. Cowan, Ph.D., February 20, 2009.
- Supplemental Report of Charles D. Cowan, Ph.D., March 4, 2009.
- Reply Report of Charles D. Cowan, Ph.D. to Report of Todd D. Menenberg, March 16, 2009.
- Deposition of Charles Cowan, March 27, 2009.
- Expert Report of Arthur Olsen, February 20, 2009.
- Supplement to Expert Report of Arthur Olsen, February 27, 2009.
- [New] Expert Report of Arthur Olsen, November 20, 2009.
- Deposition of Arthur Olsen, March 19 & 23, 2009.
- Expert Report of Todd D. Menenberg, March 16, 2009.
- Deposition of Todd D. Menenberg, March 26, 2009.

4.      The statements contained in this declaration are supported by the opinions and information contained in my expert report.  A redacted copy of my expert report, which includes my resume, is attached hereto as **Exhibit 2**.  It has been redacted to remove confidential information that is not germane to the matters addressed in this declaration so that the remainder of the report may be filed in the public record.  In addition to the matters addressed in this declaration, I have offered multiple other criticisms of Mr. Olsen's analysis, as well as the analysis previously supplied by Dr. Cowan.  My full response to those reports is set out in my expert report.

A.      **Flaws in Mr. Olsen's Scenarios**

5.      Mr. Olsen's calculations of damages are all inconsistent with what I understand to be the harm actually alleged in this case (i.e., overdraft fees as a result of Wells Fargo's practice of sequencing debit card transactions from highest to lowest dollar amount instead of in chronological order).  My understanding is that the Court certified the "Re-Sequencing" class to pursue claims on that basis.  However, in none of Mr. Olsen's re-

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.: CV-07-5923 WHA (JCSx)

3

1   sequencing scenarios does he even attempt to determine the number of overdraft charges that

2   would occur if debit card transactions were, in fact, posted chronologically.

3         6.     Mr. Olsen calculated "damages" on the basis of three alternative

4   sequencing orders – Sequencing Order #1, Sequencing Order #2, and Sequencing Order #3.

5   None of these alternative sequencing orders attempts to sequence debit card transactions in

6   chronological order. Sequencing Order #1 has no chronological component at all. Instead, Mr.

7   Olsen simply sorted debit-card purchases, checks, ACH transactions, and Bill Pay transactions

8   together from lowest to highest dollar amount. Sequencing Orders #2 and #3 are characterized

9   as being "chronological," but they are not. Instead, these scenarios merely sequence debit card

10  transactions in an approximate quasi-chronological order within each posting day (with the

11  posting day of a transaction determined by when merchants happened to submit such

12  transactions to the bank for payment).

13        7.     Moreover, for Sequencing Orders #2 and #3, Mr. Olsen sorted all debit

14  card transactions ahead of all checks, ACH transactions, and Bill Pay transactions. Once again,

15  this is far removed from genuine chronological ordering. Checks (like other returnable items)

16  are typically written or initiated by the customer before the debit card transactions that post on

17  the same day. (I conducted an analysis confirming this fact, as described in the next paragraph.)

18  Therefore, Mr. Olsen's arbitrary sequencing of checks, ACH transactions, and Bill Pay

19  transactions after all debit card transaction is contrary to a chronological posting order.

20        8.     As mentioned in the previous paragraph, I conducted an analysis to

21  confirm that checks are typically written before the debit card transactions that post on the same

22  day. I asked the team of data analysts at Wells Fargo working under the supervision of David

23  McGoveran (Wells Fargo's data analysis expert) to randomly select a sample of checks that

24  were posted on ten sample days. (As discussed below, I developed a stratified random sampling

25  methodology to ensure that the sample days selected were properly randomized and

26  representative.) I and employees of NERA acting under my supervision then reviewed the

27  checks and compiled information about the dates the checks were written. We calculated the

28  number of days that it took each check to clear (i.e., the days between the date on the check and

4

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.: CV-07-5923 WHA (JCSx)

the date that it was posted). The team of data analysts also generated a sample of debit card transactions for the same sample period. We calculated the number of days that it took each debit card transaction to clear for this sample (i.e., the days between when a debit card transaction was initiated and when it was presented to the bank for settlement). The data confirmed that check clearing times are typically greater than debit card transaction posting times. **Exhibit 1** to this declaration shows the result of this analysis.

9. Not only do Sequencing Orders #2 and #3 fail to sequence transactions in genuine chronological order, Mr. Olsen was not even able to accomplish the approximate quasi-chronological ordering that he attempted with those scenarios. This is because, for a significant number of debit card transactions, Mr. Olsen did not have a "timestamp" that would allow him to sequence them chronologically. For these transactions, Mr. Olsen arbitrarily defaulted to a time of midnight, placing them at the beginning of the posting day, and then sequenced transactions within that subgroup either low-to-high (Sequencing Order #2) or high-to-low (Sequencing Order #3). This approach also calculates overdraft fees in a manner that is inconsistent with the harm alleged in this case, which theoretically arises out of Wells Fargo not posting debit card transactions in chronological order.

10. For some customers, there can be wild swings in calculated damages depending on how Mr. Olsen chooses to sequence the debit card transactions without timestamps in customers' accounts. For example, when Mr. Olsen sequenced non-timestamped debit card transactions from high-to-low (Sequencing Order #3), Plaintiff Erin Walker is calculated to have $34 in damages (one excess fee). When those non-timestamped transactions are calculated from low-to-high (Sequencing Order #2), her calculated damages jump to $102 (three excess fees). These differences have absolutely nothing to do with the chronological ordering of her debit card transactions.

11. It is also notable that Mr. Olsen calculates $34 in damages for William Smith under his Sequencing Order #1. I understand that plaintiffs have admitted during discovery that William Smith is not a member of the Re-Sequencing Class. This confirms that

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.: CV-07-5923 WHA (JCSx)

5

the low-to-high methodology in this scenario is not rationally related to plaintiffs' claims in this case.

12. True chronological ordering, which Mr. Olsen did not consider, would require Wells Fargo to retroactively recalculate prior days on an ongoing basis as transactions were submitted for settlement. Due to these enormous technical challenges, I did not attempt to measure the impact of Mr. Olsen's failure to sequence on that basis. Nonetheless, an analysis based on genuine chronological sequencing would logically lead to very different results than what Mr. Olsen generated, because it would eliminate the float customers currently enjoy on debit card transactions and prevent them from using later deposits to cover such transactions and avoid overdrafts.

**B. My Alternative Scenarios**

13. I directed the team of data analysts under the supervision of Mr. McGoveran to run four alternative sequencing scenarios that modified Mr. Olsen's Sequencing Orders #2 and #3. These alternative scenarios used a stratified sampling methodology to identify ten random days for analysis. The sampling was performed using standard scientific methods approved by economists and statisticians. It is my opinion that the sampling methodology I used is sufficient and appropriate to support the conclusions I offer here concerning the material impacts of the flawed assumptions built into Mr. Olsen's scenarios. In order to focus on the impact of specific flaws, I directed that no other changes be made in his methodology, including on points (such as the failure to account for the impact of returned checks and his treatment of reversals) on which I believe his methodology was also flawed.

14. My first set of alternative sequencing scenarios replicated Mr. Olsen's methodology for Scenarios #2 and #3, with the one exception: checks, ACH transactions, and Bill Pay transactions were sequenced before, rather than after, debit card transactions. This ordering is more consistent with plaintiffs' chronological theory of posting than Mr. Olsen's placement of checks, ACH transactions, and Bill Pay transactions at the end of the line. I found that this adjustment reduced the total impact resulting from Mr. Olsen's calculations by approximately 60 percent. My report presents more precise measurements of the differential

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.: CV-07-5923 WHA (JCSx)

6

and resulting impact using both a ratio analysis and a standard statistical analysis. While I will be prepared, if asked, to testify about these details and the specific numbers involved, for current purposes I simply observe that correcting for this one flaw unquestionably has a material, statistically significant, impact on the results.

15.   My second set of alternative sequencing scenarios is a more complete attempt to sort all transactions (including all credits and debits) chronologically. In these alternative sequencing orders, checks, ACH transactions, and Bill Pay transactions are again sequenced first to be consistent with plaintiffs' chronological theory of posting, and then all other transactions are sequenced in chronological order within each posting day. I found that this adjustment reduced Olsen's damages numbers by approximately 66 percent. (Again, my report presents more precise measurements of the differential and resulting impact using both a ratio analysis and a standard statistical analysis.)

16.   Altering Mr. Olsen's scenarios as described above affects not only the quantification of damages, but the identification of which individuals were actually injured at all.

## C.   Items Returned Unpaid

17.   Mr. Olsen neglected to account for an important feature of Wells Fargo's overdraft program – overdraft tolerance. The bank determines, using a computer-based algorithm, the amount of overdraft tolerance that it will grant for each account when it encounters a debit for which there are insufficient funds. This is not an absolute limit, however, as the bank cannot refuse all items. Checks, ACH transactions, and Bill Pay transactions can be returned unpaid and a fee charged to the customer. The bank will generally return any returnable item (such as a check) that will, if honored, result in an overdraft that is greater than the overdraft tolerance calculated for that account. If, however, a non-returnable item (such as a debit card transaction) presented for settlement will result in an overdraft that is greater than the overdraft tolerance, the bank will honor the debit and charge an overdraft fee for that debit transaction.

18.     The implication of the application of overdraft tolerance is that re-sequencing the order in which debits are posted can result in checks, ACH transactions, and Bill Pay transactions being returned as "unpaid" that were not returned under Wells Fargo's current policy.  For example, on a given business day a customer might have $1200 in her account and an additional $100 in overdraft tolerance that the bank will grant her.  Suppose that on that day the bank is presented with a check for $1,250 for rent and a debit card transaction for a department store purchase of $80.  Under its current sequence, Wells Fargo would honor both transactions even though the $80 debit card transaction, posted last, would bring her below her overdraft tolerance.  Under Mr. Olsen's scenarios, the debit card transaction would be posted ahead of the check and reduce the balance to the point that the rent check would exceed the overdraft tolerance and be returned unpaid.

19.     Mr. Olsen failed to include any adjustment for the increased costs customers would incur as a result of an increased incidence of items (such as checks) being returned unpaid by the bank instead of paid into overdraft.  For example, returned checks may be submitted multiple times by the merchant, resulting in additional returned item fees.  There are also a large number of additional costs that are imposed on individuals who miss important payment deadlines for credit card bills, tax payments, mortgages, rent, and tuition fees.  Missing such deadlines can result in additional fees and possibly other negative consequences being imposed by credit card companies, the IRS, mortgage lenders, landlords, and schools.  In California, check bouncers are liable for a $25 bounced check fee in addition to a civil penalty of three times the check amount (up to $1,500).  Other adverse consequences can include late fees on bills (for example, credit card companies typically charge late fees of about $29) and loss of benefits if a bill (e.g., for tuition) is paid late because of a bounced check.

20.     A simple example shows how a customer can incur additional and substantial costs from a returned check as compared to one that is instead paid into overdraft.  Assume that a $200 check is returned rather than paid into overdraft.  The initial returned item fee of $34 is the same as the overdraft fee that would have been assessed if Wells Fargo had paid the check.  However, if the check was re-submitted by the payee before the customer was

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.: CV-07-5923 WHA (JCSx)

8

able to place sufficient funds in the account to cover the check, the bank would then charge the customer another $34 fee. Furthermore, if the check was written to pay a balance on a Citibank credit card and bouncing the check resulted in the customer failing to make the payment on time, the customer would have been charged a late fee of $29. Additionally, the customer's APR on the credit card could jump to 29.99 percent. Assuming the customer's actual APR prior to the bounced check was 9.99 percent and his average balance for the year remained unchanged at approximately $500, this would result in an increase in annual financing costs of $100.

21.     I asked the team of data analysts under the supervision of Mr. McGoveran to review the account days from which we had drawn checks to identify examples of checks that successfully cleared but which would have been returned unpaid under Mr. Olsen's re-sequencing scenarios. These included significant numbers of checks for items such as housing, payments to financial institutions, and the like.

22.     I also asked the data team to review all transactions (including checks, ACH, and Bill Pay) during the ten sample days that were paid in the actual world but that would have been returned unpaid by Wells Fargo under Mr. Olsen's alternative scenarios. The results of the analysis shows that, on average, 4.7 percent, 4.5 percent, and 4.4 percent of all overdraft items would have been returned unpaid (instead of paid into overdraft) under Mr. Olsen's Sequencing Orders #1, #2, and #3, respectively, had he appropriately accounted for returned items in his analysis.

### D.     Dr. Cowan's Opinions

23.     I have reviewed Dr. Cowan's Expert Report (Feb. 20, 2009), Supplemental Report (March 4, 2009), and Reply Report (March 16, 2009). Dr. Cowan used three methods to calculate damages, and based on representations from plaintiffs, I understand that plaintiffs may still offer testimony from Dr. Cowan relating to his Method 1 and Method 3. Method 2 relied on the prior sampling undertaken by Mr. Olsen, and I understand that plaintiffs have withdrawn that analysis, which in any event contained all of the flaws discussed above, among others. Method 1 included a back-casting approach based on Method 2, and Method 3 also relies upon certain results from Method 2. If Method 2 is not being considered, then

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.: CV-07-5923 WHA (JCSx)

9

1   Method 1 and Method 3 are both missing fundamental components derived from the withdrawn

2   Method 2.

3           24.     Dr. Cowan's Method 1 also relies on an untested and unsupported

4   estimate of revenue "lift" in California in 2001 based on a comparison that had nothing to do

5   with chronological posting.  Further, although Dr. Cowan based his calculation of Method 1 on

6   the assumption that 50 percent of overdraft revenues could be attributed to California, the

7   correct percentage is substantially lower.  Dr. Cowan admitted this error during his deposition.

8   This admitted error alone would suffice to render Dr. Cowan's results for Method 1 invalid.

9   Again, there are many other flaws in Dr. Cowan's methodology, which I have set out in detail in

10   my expert report.

11

12          I declare under the penalty of perjury under the laws of the United States and the

13   State of California that the foregoing is true and correct.

14          Executed in San Francisco, California on February 17, 2010.

15

16

17   _____
      ALAN J. COX

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS
Civil Case No.:  CV-07-5923 WHA (JCSx)

10

# EXHIBIT 1

**DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**



**Wells Fargo**
**Percentage of Check and Debit Card Transactions by Number of Business Days to Clear**

# EXHIBIT 2A

**DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**

PUBLIC REDACTED VERSION

EXPERT REPORT

OF

ALAN J. COX, PH.D.

ALAN J. COX
SENIOR VICE PRESIDENT

In Connection with

*Gutierrez et al. v. Wells Fargo*

# NATIONAL ECONOMIC
# RESEARCH ASSOCIATES

ONE FRONT STREET, SUITE 2600
SAN FRANCISCO, CA 94111
TELEPHONE: 415.291.1000   FACSIMILE: 415.291.1020
INTERNET: HTTP://WWW.NERA.COM

JANUARY 27, 2010



# Expert Report of Alan J. Cox, Ph.D.

### In Connection with

### VERONICA GUTIERREZ, ET AL V. WELLS FARGO & CO., ET AL.

# TABLE OF CONTENTS

I.    QUALIFICATIONS .................................................................................................1

II.    BACKGROUND AND PURPOSE OF THIS REPORT .................................................2

III.   DOCUMENTS REVIEWED AND RELIED UPON .....................................................7

IV.   SUMMARY OF FINDINGS .....................................................................................8

V.    OVERVIEW OF MR. OLSEN'S DAMAGES ANALYSIS ........................................10
    A.  Introduction: The Process of Posting Transactions to Checking Accounts ....10
    B.  Overview of Mr. Olsen's Damages Analysis ..................................................11

VI.   REBUTTAL OF MR. OLSEN'S DAMAGES ANALYSIS .........................................13
    A.  Introduction .....................................................................................................13
    B.  Mr. Olsen's Re-Sequencing Scenarios Are Inconsistent with the Claims at Issue in This Case ..................................................................................................17
        1.  Re-Sequencing Scenario #1 .....................................................................18
        2.  Re-Sequencing Scenarios #2 and #3 ........................................................19
    C.  Under Mr. Olsen's Re-Sequencing Scenarios Some of Wells Fargo's Customers Would Have Been Worse Off .............................................................................21
    D.  Examples of Wells Fargo's Customers Made Worse Off Under Mr. Olsen's Re-Sequencing Scenarios ......................................................................................30
    E.  Mr. Olsen's Re-Sequencing Scenarios #2 and #3 Do Not Describe the "But-For" World ...............................................................................................................32
        1.  Checks, ACH Transactions, and Bill Pay Transactions Logically Should Be Posted Before Debit Card Transactions .................................................33
        2.  In the "But-For" World the Bank Will Need To Maintain its Competitive Position ..35
    F.  The Logic Underlying Plaintiffs' "Chronological" Re-Sequencing Scenarios Would Lead to Wells Fargo Altering Some of its Grouping, Posting, and Sequencing Policies That Currently Benefit Many Customers .........................................................36
    G.  Mr. Olsen's Reversal Alternatives Suffer from Methodological Errors ............40
    H.  There Are Other More Reasonable Sequencing Scenarios That Would Reduce Mr. Olsen's Damages .............................................................................................41
    I.  Accounting for Customer Behavior, Causation, and Mitigation .......................47



n/e/r/a
Consulting Economists

    1. Mr. Olsen Fails To Account for Class Members Ability To Avoid Overdraft Fees ...47

    2. Damages Are Significantly Reduced When Accounting for Persons Who Overdraft Repeatedly .................................................................................................51

VII.  OVERVIEW OF DR. COWAN'S DAMAGES ANALYSIS ............................................................53

  A. Introduction ..........................................................................................................................53

  B. Overview of Dr. Cowan's Method 1 – Wells Fargo's "Lift" ...........................................54

  C. Overview of Dr. Cowan's Method 3 – Wells Fargo "Lift" and FDIC Report...................57

VIII. REVIEW OF DR. COWAN'S DAMAGES ANALYSIS ................................................................59

  A. Method 1 Uses an Untested and Unsupported Estimate of the "Lift" in California from 2001 ..............................................................................................................................59

  B. Method 1's "Lift" Is Based On Changes In Sequencing Different from Changes Contemplated by the Plaintiffs .........................................................................................60

  C. Dr. Cowan's Application of Method 1 Based On a Back-Casting Approach Is Unsupported .........................................................................................................................61

  D. Method 1 Based On a Back-Casting Approach Uses a "Lift" Calculated from Changes In Sequencing Different from Some of the Changes Contemplated by the Plaintiffs ...........................................................................................................................62

  E. Method 1 Uses Call Report Measures That Are Irrelevant ..............................................62

  F. Method 3 Suffers from Some of the Same Issues as Method 1 .........................................65

  G. Dr. Cowan's Method 3 Does Not Actually Use the FDIC Ratios from the FDIC Study of Bank Overdraft Programs ...................................................................................65

  H. Method 3 Uses a Ratio of Overdraft Fees-to-Call Report Measure from 2006 ...............67

  I. Dr. Cowan's Method 3 Uses the Same Methodology as Method 1 ...................................68

**Exhibits & Appendices**

Exhibits 1.1 – 5.2
Appendix A:   Resume of Alan J. Cox
Appendix B:   Documents Reviewed and Relied Upon
Appendix C:   Data Appendix



# EXPERT REPORT OF ALAN J. COX

In Connection With

## *Veronica Gutierrez, et al v. Wells Fargo & Co., et al.*

## I.  QUALIFICATIONS

My name is Alan J. Cox.  I am an economist and Senior Vice President at the San Francisco office of National Economic Research Associates ("NERA") where I participate in the Antitrust and Intellectual Property practices.  NERA provides expert economic and financial analysis for firms and government bodies on a variety of issues.  My business address is 1 Front Street, Suite 2600, San Francisco, CA 94111.

I received a B.Sc. degree in Environmental Science from York University in Toronto in 1976 and an M.A. in Economics from the University of British Columbia in 1978.  From 1978 to 1981, I served as a Visiting Economist at the Energy Laboratory at the Massachusetts Institute of Technology in Cambridge, MA.  In 1989, I received a Ph.D. in Economic Analysis and Policy from the Haas School of Business Administration at the University of California at Berkeley.  While at Berkeley I was also a Research Assistant at what became the University's Energy Institute and at the Institute of Business and Economic Research, where I did research on energy policy and on the impact of energy prices on investment and interest rates.

One of my areas of concentration for my Ph.D. was in Econometrics, the application of statistics to economic data.  For my thesis I implemented a cutting-edge statistical program to estimate the characteristics of the residential demand for telephone services.  A paper based upon my dissertation was recognized for an award by the Telecommunications Policy Research Conference and chosen for presentation at the 1988 Conference.  I have frequently applied statistical techniques in my work in damages calculation in antitrust, intellectual property, securities, and other types of litigation.

My experience includes calculating damages in a variety of matters including contract disputes, securities, antitrust, and intellectual property.  In securities matters, I have testified in class action securities fraud cases, criminal securities fraud matters, matters involving the valuation

1

of stocks and bonds and the value of the assets of limited partnerships. Other matters have involved the operation of financial markets, the performance of banks and savings and loan institutions, the competitiveness of credit card operations, and intellectual property matters related to the conversion of paper checks into electronic checks. I have testified in cases involving antitrust allegations arising out of licensing practices and have participated in matters before Federal and State Courts, the California Public Utilities Commission, and the Federal Energy Regulatory Commission. I provided testimony *pro bono* in defense of the fair-use rights of an artist who included copyrighted images in his art as a parody of those images. I also have provided testimony on matters involving the telecommunications industry and provided management-consulting services to the telephone industry.

I lecture frequently on market definition and damages calculations in antitrust and intellectual property matters, on the application of rigorous economic techniques for intellectual property valuation, and on risks associated with infringement and theft of intellectual property. I have published several papers on a range of competition issues and am a member of the Licensing Executives Society. Appendix A of this report contains my resume, which includes a list of my prior testimony in other cases.

NERA's fees for professional services are based on hourly billing rates. My time is currently billed at $550 per hour, and the research associates and the Senior Consultant with whom I have worked on this assignment have billing rates of $185–$460 per hour.

## II. BACKGROUND AND PURPOSE OF THIS REPORT

On April 17, 2008 Plaintiffs in this action filed an "[Adjusted] First Amended Class Action Complaint" alleging, among other things, that Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo" or "the Bank") had wrongfully charged overdraft fees on its customer's checking accounts.

The issues in this case arise out of the difference in time between when checking account transactions (such as debit card transactions, checks, and cash deposits) are initiated by customers and when the Bank is able to post these transactions. "Posting," for the purpose of this report, refers to the actual debiting or crediting of funds to a customer's checking account at the end of each business day, as opposed to a mere hold amount placed on the account. As

2

explained in the Zimmerman Declaration, the Bank is not able to process and post these transactions on a real time basis. This is the case both because the Bank does not have final settlement information on debit card transactions or checks at the time that they are initiated by customers and because computing capacity is not available. Account balances are finalized primarily through a batch process that takes place overnight after every business day on a Hogan Systems Platform ("Hogan").[1] For the purpose of this report, I will refer to a "posting date" as the business day that precedes the overnight period during which account transactions are processed on Hogan.

The complaint asserts that the alleged overcharges of overdraft fees resulted from the sequence in which the Bank posted debit card transactions for consumer checking accounts. Plaintiffs claim that they were harmed because the sequence was not based on the order in which the debit card transactions were initiated by the customer but rather the transactions were posted from highest dollar amount to lowest dollar amount on the day they were submitted to the Bank for payment (referred to as "high-to-low" posting). For instance, Plaintiffs in the complaint describe a situation involving class representative Veronica Gutierrez, who made seven debit card purchases over Columbus Day weekend (October 7 – 9, 2006). On October 10, 2006, Wells Fargo received the final settlement information for these seven debit card transactions, and the Bank posted these transactions in the normal manner after the close of business that day.[2]

In addition to the final settlement information for the seven debit card transactions, a check that Ms. Gutierrez had written on October 5, 2006 and an on-line transfer that she had made from her account were also presented to the Bank for settlement on October 10, 2006. The complaint states: "Notwithstanding that sufficient funds were in Plaintiff Veronica Gutierrez's Wells Fargo account to cover each of the transactions occurring between October 5-9, 2006," Wells Fargo assessed Ms. Gutierrez four insufficient funds overdraft charges.[3] The complaint later states that: "Plaintiffs were not notified by Wells Fargo that they would incur an

---

[1] "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008, pp. 1-2, ¶ 4 and conversations with Wells Fargo staff.

[2] For the reasons that I have already mentioned, debit card transactions are submitted to the Bank for settlement and payment after the preliminary authorization. Settlement often takes place on the day the customer initiated the transaction (if that day is business day) or on the first business day after the customer initiated the transaction (if the transaction was initiated on a weekend day or a holiday), but may occur two to three (or even more) days later.

[3] "[Adjusted] First Amended Class Action Complaint," April 17, 2008, p. 5, ¶ 16.

insufficient funds overdraft fee for an approved transaction where they had sufficient funds to cover the transaction at the time the transaction was made."[4]

In their "Opposition to Defendant Wells Fargo's Motion for Summary Judgment" Plaintiffs state:

> Plaintiff Veronica Gutierrez was misled by Wells Fargo's practice of presenting pending debit card charges to her in chronological order both online and through the automated telephone system. … it reasonably led her to believe what Wells Fargo was explicitly and implicitly telling all customers - that funds for debit card charges were immediately deducted from the account, and therefore were processed in chronological order.[5] (References deleted.)

Later in the opposition filing, Plaintiffs state their belief that this practice caused Ms. Gutierrez to incur more overdraft charges "than if the debit card charges were immediately withdrawn, i.e. posted in chronological order."[6]

In short, Plaintiffs are alleging that these debit card transactions should have been posted to the customer's account in "chronological" order – with "chronological" meaning the order that the transactions were initiated by the customer. Plaintiffs made the same point in the introduction of their opening brief on Plaintiffs' motion for class certification:

> This class action is brought on behalf of California Wells Fargo Bank checking account customers who were wrongfully assessed expensive overdraft fees as a result of Wells Fargo's uniform practice of charging overdraft fees for debit card transactions when these transactions were within the customers' available balance when the transactions were made.[7]

Plaintiffs also state: "Wells Fargo assesses overdraft fees for debit card transactions that had sufficient funds to cover the transactions when they occurred."[8] Later in the same brief, Plaintiffs make a clear statement of what they see as the issue in this case:

---

[4] "[Adjusted] First Amended Class Action Complaint," April 17, 2008, p. 9, ¶ 30.

[5] "[Unredacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion for Summary Judgment on All Causes of Action," April 9, 2009, p. 10.

[6] "[Unredacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion for Summary Judgment on All Causes of Action," April 9, 2009, p. 13-14.

[7] "Motion for Class Certification; Declaration of Richard D. McCune; Declaration of Lewis Mandell; Exhibits; [Proposed] Order," August 21, 2008, p. 1.

[8] "Motion for Class Certification; Declaration of Richard D. McCune; Declaration of Lewis Mandell; Exhibits; [Proposed] Order," August 21, 2008, p. 1.

4

[R]ather than taking [debit card] purchases and calculating the number of overdraft transactions by ordering the transactions in the order that they occurred and were processed by Wells Fargo, it programs its computer to reorder the transactions from highest to lowest to maximize the number of transactions that will become overdraft transactions.[9]

As the underlined phrases in the previous quotation indicate, the Plaintiffs are protesting the differences between overdraft fees that Wells Fargo would charge if they posted debit card transactions in the order that they were initiated by the customer and the overdraft fees that Wells Fargo actually charged when it posts transactions from highest to lowest on the date of settlement.

In its ruling on class certification the Court defined the "re-sequencing" class as follows:

…all Wells Fargo customers from November 15, 2004, to June 30, 2008, who incurred overdraft fees on debit card transactions as a result of the bank's practice of sequencing transactions from highest to lowest.[10]

Plaintiffs served the Expert Report of Arthur Olsen, dated February 20, 2009 ("Olsen Original Report"), and the Expert Report Charles D. Cowan, Ph.D., dated February 20, 2009 ("Cowan Original Report"). These reports claim to calculate the harm allegedly suffered by members of the class, as defined by the Court, as a result of Wells Fargo's posting order for debit card transactions. Dr. Cowan states in his report: "The primary claim that would lead to damages being suffered by the class is that Wells Fargo processed various debits on a depositors account at the end of a business day in order from highest to lowest, rather than processing these debits in the order received."[11] This is the same difference described in the class certification brief.

Mr. Olsen also submitted the Supplement to My Report of February 20, 2009, dated February 27, 2009 ("Olsen Supplemental Report"), and the Reply Report of Arthur Olsen to Report of Steven T. Visser, dated March 16, 2009 ("Olsen Reply Report"). The Court found that

---

[9] "Motion for Class Certification; Declaration of Richard D. McCune; Declaration of Lewis Mandell; Exhibits; [Proposed] Order," August 21, 2008, p. 6.

[10] "Order Denying Defendant's Motion for Summary Judgment and Granting In Part and Denying In Part Plaintiffs' Motion for Class Certification," September 11, 2008, p. 25.

[11] "Expert Report of Charles D. Cowan, Ph.D.," February 20, 2009, p. 2. The term "various debits" indicates that Dr. Cowan may have in mind more than the debit card transactions that are included in the definition of the class.

the methodology outlined in the various reports of Mr. Olsen and Plaintiffs' other damages expert, Dr. Cowan, did not constitute a proper damages study. Mr. Olsen undertook a new study and submitted the Expert Report of Arthur Olsen, dated November 20, 2009 ("Olsen Updated Report"), describing his updated damages analysis. I have been asked to review the Olsen Updated Report. I have been asked to determine whether the damages methodology implemented by Mr. Olsen gives a reliable measure of actual injury and damages to the Plaintiffs. In doing this, I have analyzed whether Mr. Olsen's methodology is consistent with the issues raised by Plaintiffs in their complaint and briefs in this matter and the extent to which his methodology appropriately measures the impact of the challenged practice on customers of the Bank and the Bank itself.[12]

Dr. Cowan also submitted the Supplemental Report of Charles D. Cowan, Ph.D., dated March 4, 2009 ("Cowan Supplemental Report"), and the Reply Report of Charles D. Cowan, Ph.D. to Report of Todd D. Menenberg, dated March 16, 2009 ("Cowan Reply Report"). Dr. Cowan did not file an additional report following the Court's decision regarding his and Mr. Olsen's earlier reports. The Cowan Supplemental Report describes three methodologies that Dr. Cowan claims provide damage estimates. One of these methodologies, his Method 2, extrapolates from Mr. Olsen's earlier study that the court has rejected as inadmissible. According to an e-mail sent from Barry Himmelstein, an attorney for the Plaintiffs: "As the data on which [Method 1] (1) and [Method 3] (3) were based remain unchanged, there was no reason for Dr. Cowan to redo these portions of his report either, and he may offer testimony at trial regarding those portions."[13] However, Methods 1 and 3 are both interrelated to the methodology (Method 2) rejected by the Court and withdrawn by Plaintiffs. I have been asked, therefore, to review Dr. Cowan's testimony and determine whether there is any portion of his outstanding reports that can be relied upon as a basis for calculating damages in this matter or otherwise quantifying the impact of the challenged practice.

---

[12] There is nothing in Mr. Olsen's updated damages analysis that pertains to any of the misrepresentation-based claims made by the Plaintiffs in their complaint. Mr. Olsen did not take into account any customer exposure to or reliance on any alleged misrepresentation. As a result, his analysis cannot, even apart from all of the other flaws discussed in this report, be used to identify the injured class members or measure damages as they relate to the misrepresentation-based claims.

[13] "E-Mail from Mr. Barry Himmelstein to Mr. David Jolley," November 30, 2009.

## III. DOCUMENTS REVIEWED AND RELIED UPON

In the course of my research and investigation in this matter I have reviewed expert reports, declarations, deposition testimony, data on consumer banking transactions, government and third-party reports on the banking system generally and Wells Fargo in particular, and other categories of documents. A complete list of all documents reviewed and relied upon is contained in Appendix B. Those that I refer to in this report include, among others:

- "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008
- "[Adjusted] First Amended Class Action Complaint," April 17, 2008
- "[Unredacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion for Summary Judgment on All Causes of Action," April 9, 2009
- "Motion for Class Certification; Declaration of Richard D. McCune; Declaration of Lewis Mandell; Exhibits; [Proposed] Order," August 21, 2008
- "Order Denying Defendant's Motion for Summary Judgment and Granting In Part and Denying In Part Plaintiffs' Motion for Class Certification," September 11, 2008
- Expert Report Charles D. Cowan, Ph.D., February 20, 2009
- "E-Mail from Mr. Barry Himmelstein to Mr. David Jolley," November 30, 2009
- "Expert Report of Arthur Olsen," November 20, 2009
- 74 Fed. Reg.
- "Deposition of Kenneth A. Zimmerman," November 10, 2008
- 59034 Federal Register / Vol. 74, No. 220 / Tuesday, November 17, 2009 / Rules and Regulations. Consumers
- The 2007 Federal Reserve Payments Study: Noncash Payment Trends in the United States: 2003-2006, *Federal Reserve*, 10 December 2007
- Cal. Civ. Code § 1719(a)(1)
- Mosi Secret and Stuart Pfeifer, "Debt Collection; Bad-Check Letters Are Misleading, Critics Say; A Company Uses Government Seals In Its Messages, an Act That Consumer Advocates Contend Is Dishonest," Los Angeles Times, 8 June 2009
- Tim Rowden, "$1.1 Million Is Collected In Bad Check Restitution; With Repayment, Prosecution is Avoided," St. Louis Post-Dispatch, 22 October 2001
- Liz Pulliam Weston, "Now Bounced Checks Can Trash Your Credit," msn.money
- Denise Trowbridge, "YOU, by the numbers" The Columbus Dispatch. 17 September 2006
- Deposition of Stacey Pinkerd," February 10, 2009
- Weinstock Peter G. and Stephanie E. Dreyer "Overdraft Protection Programs: The Emerging Battleground for Bankers and Consumer Advocates"

- Gregory F. Udell, "Pricing Returned Check Charges under Asymmetric Information," *Journal of Money, Credit, and Banking*. Vol. 18, No. 4 (November 1986)
- "Deposition of Maria Galindo," January 29, 2009
- "Erin V. Walker Account Statement for the Period from May 24, 2007 through June 25, 2007," GUT000502 (Exhibit 141 to the Deposition of Erin Walker)
- "Erin V. Walker Account Statement for the Period from June 26, 2007 through July 25, 2007," WFB-G 02058 (Exhibit 144 to the Deposition of Erin Walker)
- "Deposition of William Smith, Jr.," June 18, 2008
- "Deposition of Veronica Gutierrez," June 12, 2008
- "Services Charges On Deposits Update," February 2002 (WFB-G 07807-A)
- "ODRI Initiative Tracking, Analysis of Hogan Processing Changes," August 2002 (WFB-G 07775-A)
- WFB-G 07778-A ("ODRI Initiative Tracking, Analysis of Hogan Processing Changes")
- "Supplemental Report of Charles D. Cowan, Ph.D.," March 4, 2009
- "FDIC Study of Bank Overdraft Programs," November 2008
- Wells Fargo's Call Reports (RCON2210, RCON2215, RCON6810, RCON2215 and RCON6810, RIAD4079, RIAD4074, and RIAD4074 and RIAD4079)
- "Service Charges on Deposits – Update," February 2002 (WFB-G07812-A – WFB-G07813-A)
- "Deposition of Charles Cowan," March 27, 2009
- "Wells Fargo Call Report," Quarter End Date 9/30/2006
- "Reply Report of Charles D. Cowan, Ph.D. to Report of Todd D. Menenberg, March 16, 2009

## IV. SUMMARY OF FINDINGS

- Mr. Olsen's calculations of damages are all inconsistent with the cause of harm actually alleged by Plaintiffs in this matter. Plaintiffs allege that they were harmed because deductions from checking accounts were not "posted in chronological order." However, in none of Mr. Olsen's re-sequencing scenarios does he determine the overdraft charges that would occur if debit card transactions were posted chronologically. Furthermore, his re-sequencing of checks and ACH transactions to be posted to checking accounts actually conflicts with the concept of posting in chronological order.
- Mr. Olsen's calculation of damages suffer from a number of errors including:
  - He fails to account for the fact that some of Wells Fargo's customers, including members of the class, would actually be worse off under his re-sequencing scenarios due to his failure to account for items such as returned items.

- The application of Mr. Olsen's "chronological" re-sequencing scenarios ignores the likely response by Wells Fargo to alter some of its grouping, posting, and sequencing policies that currently benefit many of its customers, such as posting credits first.

- His two alternative methodologies used to account for overdraft fee reversals are flawed in a manner that most likely understates reversals and overstates his estimate of damages.

- There are more reasonable sequencing scenarios that are more closely in line with the Plaintiffs' claims in this matter that result in a lower estimate of damages.

  - Wells Fargo's Sequencing Scenarios A and B, which are modifications to Mr. Olsen's Re-Sequencing Scenarios #3 and #2, respectively, result in an estimate of damages of approximately $61.9 million and $77.5 million, respectively.

  - Wells Fargo's Sequencing Scenarios C and D, which are more realistic attempts at sequencing all transactions chronologically, result in an estimate of damages of approximately $57.5 million and $70.0 million, respectively.

- When accounting for persons who repeatedly overdraft their accounts, damages estimates are even lower.

  - Wells Fargo's Sequencing Scenario A results in an estimate of damages of approximately $5.4 million, $13.8 million, and $25.1 million when accounting for persons who overdraft their accounts during the class period on more than 2 posting dates, 5 posting dates, and 10 posting dates, respectively.

  - Wells Fargo's Sequencing Scenario B results in an estimate of damages of approximately $6.7 million, $17.2 million, and $31.5 million when accounting for persons who overdraft their accounts during the class period on more than 2 posting dates, 5 posting dates, and 10 posting dates, respectively.

  - Wells Fargo's Sequencing Scenario C results in an estimate of damages of approximately $5.0 million, $12.8 million, and $23.3 million when accounting for persons who overdraft their accounts during the class period on more than 2 posting dates, 5 posting dates, and 10 posting dates, respectively.

  - Wells Fargo's Sequencing Scenario D results in an estimate of damages of approximately $6.1 million, $15.6 million, and $28.4 million when accounting for persons who overdraft their accounts during the class period on more than 2 posting dates, 5 posting dates, and 10 posting dates, respectively.

- Dr. Cowan's calculation of damages suffer from a number of errors including:

  - Method 1 uses an untested and unsupported estimate of the "lift" in California from 2001 that is based on changes in sequencing different from the changes contemplated by the Plaintiffs and uses Call Report measures that are irrelevant for estimating overdraft fees.

  - Method 1 based on a back-casting approach, is unsupported and uses a "lift" calculated from changes in sequencing different from some of the changes that are the subject of this matter.

9

- ○ Method 3 also uses Call Report measures that are irrelevant and does not actually use the FDIC ratios that it allegedly is based on.

- ○ Dr. Cowan's Method 1 and Method 3 use essentially the same methodology and both require inputs from his Method 2, which is no longer being considered as a damages methodology, thereby rendering them irrelevant.

## V.  OVERVIEW OF MR. OLSEN'S DAMAGES ANALYSIS

## A.  Introduction:  The Process of Posting Transactions to Checking Accounts

Wells Fargo currently groups its credit and debit transactions received for settlement on a given business day and generally posts these groups of transactions in the following order:

- Overdraft Fees – Previous Day
- Deposits/Credits
- ATM and Cash Withdrawals
- All Other Debit Transactions – The Bank designates these debits as "Group 50040, which consists of Debit Card Transactions, Check Card Transactions, Checks, and Automatic Clearing House ("ACH") Transactions[14]

The items in the last group are processed in order of the largest to the smallest amount. The Bank's batch processing system is programmed to deduct from a customer's previous day's balance, adjusted by the first three items, the largest item in Group 50040, then the second largest, and so on. As Mr. Zimmerman explains, when a debit is encountered that is greater than the remaining balance in the account, the Bank must decide whether to accept and honor the debit or return it to the payee. If the debit is a debit card transaction that has been previously authorized, the Bank will honor it. If the debit is on an item that the Bank could decline, such as a check or an ACH transaction, then the Bank's program first draws down any overdraft protection sources to which the checking account is linked. If no such link has been arranged or if those sources of funds are also exhausted, the Bank's processing system is programmed to determine whether to pay an overdraft item.[15]

---

[14] "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008, p. 8, ¶ 25.

[15] "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008, pp. 9-10, ¶ 30.

## B.    Overview of Mr. Olsen's Damages Analysis

Mr. Olsen provides a damage analysis based on three "but-for" re-sequencing orders for debit transactions classified by Wells Fargo in Group 50040. Debit transactions in Group 50040 include, among others, debit card transactions, ACH transactions, checks, and bill pay transactions.  For each day during the damages period, Mr. Olsen identifies the customer accounts that had multiple overdrafts.  He then runs his but-for re-sequencing scenarios only on these accounts to determine the amount of overdraft fees that would have been incurred based on the grouping and re-sequencing defined in his scenarios.  Mr. Olsen's damages estimate consists of the difference between the actual overdraft fees incurred throughout the damages period and the but-for overdraft fees incurred based on his scenarios.

Mr. Olsen's re-sequencing scenarios are defined as follows:

- Re-Sequencing Scenario #1:
    - o   All Group 50040 transactions are sequenced from low-to-high.
- Re-Sequencing Scenario #2:
    - o   Debit card transactions are grouped separately from ACH transactions, checks, and bill pay transactions.
    - o   Debit card transactions are posted before ACH transactions, checks, and bill pay transactions.
    - o   The sequencing order for debit cards is chronological where a date/time stamp exists and low-to-high where a date/time stamp does not exist.
    - o   The sequencing order for ACH transactions, checks, and bill pay transactions remains high-to-low.
- Re-Sequencing Scenario #3:
    - o   Debit card transactions are grouped separately from ACH transactions, checks, and bill pay transactions, as in Scenario #2.
    - o   Debit card transactions are posted before ACH transactions, checks, and bill pay transactions, as in Scenario #2.
    - o   The sequencing order for debit cards is chronological where a date/time stamp exists and high-to-low where a date/time stamp does not exist.
    - o   The sequencing order for ACH transactions, checks, and bill pay transactions remains high-to-low.

Mr. Olsen provides two overdraft fee reversal alternatives used to reduce his gross damages calculated based on his re-sequencing scenarios outlined above.  The reversal alternatives reduce Mr. Olsen's damages by attempting to account for overdraft fees charged to

11

members of the class that were ultimately reversed since damages should not include overdraft fees that were later reversed. However, the data available does not link reversals to the overdraft item that was being reversed.[16] The only information that either the Bank or Mr. Olsen have is the date and the amount of each reversal. In order to attempt to take reversals into account, Mr. Olsen was asked to assume the following two patterns of reversals:

- Reversal Alternative #1:
  - ○ Each reversal fee is tied to the last overdraft fee before the reversal. According to the Olsen Updated Report: "Only those reversals that were tied to overdraft fees included in the harm analysis would reduce the amount of harm."[17] As I understand it this approach is likely to result in an underestimate of reversals and, therefore, an overestimate of damages. For example, suppose that one of the class members had five actual overdraft fees over several days during a given posting week and according to one of Mr. Olsen's re-sequencing scenarios would have only had three overdraft fees. Further assume that the two "challenged" overdraft fees, or the ones that allegedly caused the harm, were the second and third overdraft fees assessed and that these two fees were eventually reversed in the real world. It is my understanding that Mr. Olsen's LIFO approach (Reversal Alternative #1) would assign the two reversal fees to the last two overdraft fees assessed, or the fourth and fifth overdraft fees. Since these two fees were not included in Mr. Olsen's "harm analysis" the reversals of the challenged overdraft fees would not be accounted for under his analysis and as a result his damages would be inflated by two overdraft fees.

- Reversal Alternative #2:
  - ○ All reversal fees that occurred within 30 days after the day on which the customer incurred multiple overdraft fees are deducted from the amount charged. The major problem with this assumption is that it could miss reversals that were done later. Often customers will not know that they were charged multiple overdrafts until they look at their account statement. Mr. Zimmerman points out that class representative, Erin Walker, did not seek to have her overdraft fees reversed for over a month.[18] Mr. Olsen's Reversal Alternative #2 would have missed such a reversal.

It is easy to see that some reversals of fees Mr. Olsen counts as damages would not be accounted for under either of his reversal alternatives. Assume, for example, that on Day 1, a

---

[16] "Expert Report of Arthur Olsen," November 20, 2009, p. 14. ("The data did not indicate the specific overdraft fee that was being reversed.")

[17] "Expert Report of Arthur Olsen," November 20, 2009, p. 14.

[18] "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008, p. 17, ¶ 55. For instance, Exhibit M to the declaration shows, among others, three overdrafts during the posting cycle following June 6, 2007, and one each following June 8 and 11. According to the declaration, four of these five overdrafts were reversed on July 9, 2007.

class member had three overdraft fees, with a total overdraft on his account of $50, and Mr. Olsen calculates that the class member should have incurred only two overdraft fees (but again with a total overdraft of $50), resulting in measured damages of $34. Assume further that on Day 2 (the next day) a check for $40 is presented against the account, which is still overdrawn, and the bank pays it, assessing an additional overdraft fee that all in this case would agree is proper. If, 31 days later, the customer complains about the overdraft fees from Day 1 and one of the fees is reversed, Mr. Olsen would not credit the reversal under either of his approaches. Under Reversal Alternative #1, he would assign the reversal to the Day 2 fee that he did not count as damages. And, under Reversal Alternative #2, he would not count the reversal because it occurred more than 30 days later. Yet it is clear in this situation that Plaintiffs have no quarrel with the total amount of fees that this customer actually paid.

Finally, if an account was closed after a write-off for a negative balance then it was considered to be uncollectible and Mr. Olsen therefore reduces his gross damages by this uncollectible amount. It appears that Mr. Olsen did not consider accounts that may have been closed with a negative balance after the end of the class period, despite the fact that fees may have been incurred by the customer during the class period. (The effect of this is to understate write-offs and to artificially inflate damages.) It may also have identified some customers as incurring "injury" when if fact they did not.

Overall, all of Mr. Olsen's damages analyses fail to specifically identify the injured class members. He does not provide any opinions addressing this issue.

# VI. REBUTTAL OF MR. OLSEN'S DAMAGES ANALYSIS

## A. Introduction

In this section I review Mr. Olsen's estimates of damages in this matter for accuracy and consistency with the standards for damages calculations. This includes an analysis of Mr. Olsen's methodology for consistency with the specific claims made by the Plaintiffs in this matter; in particular, that debit card transactions should be sequenced in chronological order. I have also analyzed the impact that Mr. Olsen's re-sequencing scenarios would have had on Wells Fargo's customers and the likely responses of Wells Fargo to the changes in groupings and sequencing being suggested by Mr. Olsen.

Generally speaking, damages under Plaintiffs' theory should be the difference between costs borne by class members under the actual sequencing order used by Wells Fargo and those that would have been incurred with a sequencing order that is consistent with posting debit card transactions on the basis of the time in which the customer initiated the transaction, which is the difference upon which Plaintiffs' claim in this case is based.

Mr. Olsen's damages calculations are deficient for at least four major reasons. First, Mr. Olsen's Re-Sequencing Scenario #1 fails to address the claims made by the Plaintiffs – that customers were overcharged by an amount equal to the difference between the number of overdraft fees that actually occurred and the number of overdraft fees that would have occurred had the debit card transactions been posted in chronological order. This is a fundamental flaw in all three of Mr. Olsen's scenarios, but Re-Sequencing Scenario #1, in particular bears, no connection whatsoever to the Plaintiffs' claim.

Second, with respect to his Re-Sequencing Scenarios #2 and #3, Mr. Olsen fails to consider the other ways that the Bank might sequence transactions in a manner that is consistent with the Plaintiffs' claim that debit card transactions should be posted to checking accounts chronologically. Put another way, Mr. Olsen calculates damages under the false assumption that a "chronological" order of posting would apply to debit card transactions only, leaving unaffected other aspects of the Bank's current non-chronological methodology that actually benefit customers. The correct measure of damages in this case, if any, is the difference between the total amount of charges arising out of what the Bank actually does and other ways that the Bank might reasonably sequence debits and credits while still sequencing debit card transactions chronologically.

Third, Mr. Olsen makes errors in calculations and ignores harm that his methodology would impose on members of the class and on other bank customers who are not members of the class.

Fourth, Mr. Olsen makes no effort to account for consumer behavior and related issues of causation. An overdraft fee cannot reasonably be considered "damages" caused by the Bank if a class member knew about it, could easily have avoided it, and simply chose to incur the fee anyway.

To assist in reviewing Mr. Olsen's estimates of damages, I asked Wells Fargo to collect information on consumer checking accounts for randomly selected days for which data were available.[19] Following my instructions, staff at Wells Fargo implemented a stratified sampling strategy to obtain a sample of ten days from the 377 days that were available for the period from January 2007 to June 2008 time period on the company's BMG Teradata database and other databases.[20] The stratified sampling strategy was implemented as follows:

- Three strata were created and days were assigned to these strata.
  - Strata 1 is defined as days with a "high" amount of overdraft fee revenue. There were a total of 11 days in Strata 1. These were days typically after holidays.
  - Strata 2 is defined as days with a "medium high" amount of overdraft fee revenue and includes all Tuesdays during the sample period. There were a total of 76 days in Strata 2.
  - Strata 3 is defined as days with a "low" volume of overdraft fee revenue and includes all Wednesdays, Thursdays, and Fridays during the sample period. There were a total of 221 days in Strata 3.
  - The remaining 69 days, which were all Mondays, were eliminated from the sample selection process at this point because they represented days that had the lowest volume of overdraft fee revenue. It is my understanding that these days were eliminated from the process because Wells Fargo was limited in its resources and time for collecting the sample and, therefore, wanted to select sample posting days with a sufficient amount of overdraft activity to permit a robust analysis. I have been informed that Mondays have the lowest volume of overdraft fee revenue because these fees are associated with transactions that occur on Fridays, which are typically paydays. The elimination of Monday post days is a conservative approach from the Bank's perspective, likely resulting in higher damages numbers under its alternative sequencing scenarios. This is due to Wells Fargo's policy of posting credits (e.g., paychecks) first so that customers are able to use the "credit float" to their advantage and avoid incurring overdraft fees on some or all debit transactions that take place on Fridays.

- Each of the days in the three strata was then assigned a random number. The 11 days in Strata 1 were randomly assigned a number from 1 to 11. The 76 days in Strata 2

---

[19] The schedule approved by the Court did not provide sufficient time for a "full run" analysis that adjusted Mr. Olsen's model and applied it to all of the data for all customers for the entire period. It is my understanding that, after approving two extensions of the multi-month period given to Mr. Olsen to complete his analysis, the Court stated that no further extensions would be granted. My analysis therefore necessarily relies on a sample, which I believe is adequate to demonstrate the flaws in Mr. Olsen's analysis and to support the conclusions I offer here.

[20] The BMG Teradata data warehouse is a repository of deposit information holding 25 months of account level information for all deposit accounts in the Hogan system.

were randomly assigned a number from 1 to 76. The 221 days in Strata 3 were randomly assigned a number from 1 to 221.

- Three random numbers were generated and used to select three days from each strata. For example, "1" was the first random number generated and it was used to select a day from each of the strata that was also randomly assigned the number "1" under Step 2 (see previous bullet). This resulted in the selection of May 30, 2007 for Strata 1, October 2, 2007 for Strata 2, and May 23, 2008 for Strata 3. The same process was applied for random numbers "2" and "11." This process resulted in the selection of a total of nine days.

- June 10, 2008 was also selected, prior to the selection of the nine days under Step 3 (see previous bullet), because Wells Fargo already had XRMEMO timestamp data for this day based on another analysis it was conducting. This day was also randomly selected at the time this other analysis was being conducted and it is a member of Strata 2.

- In total, ten days were selected for the sample. These ten days represent the days in which overdraft fees were posted. Overdraft fees are actually posted a day after the transaction that caused the overdraft is posted. The selected days for the transactions that caused the overdraft (transaction days) are the following:

  o Tuesday, January 2, 2007

  o Tuesday, January 16, 2007

  o Tuesday, May 29, 2007

  o Monday, February 5, 2007

  o Monday, July 23, 2007

  o Monday, October 1, 2007

  o Monday, June 9, 2008

  o Thursday, May 17, 2007

  o Thursday, May 1, 2008

  o Thursday, May 22, 2008

- The primary reason for using a stratified random sampling plan is that to the extent the variation within the strata is smaller or more homogeneous than for the population as a whole, a stratified sample will provide a narrower confidence interval and greater precision than a simple random sample. In this case, the sampling is a disproportionate stratified sample. This simply means that some strata were "oversampled" while others were "undersampled" compared to their proportions in the population. (For example, we sampled 27 percent – 3 of the 11 high days even though high days are only 3 percent of the days (11/377) in the population.) Oversampling strata with higher variation helps improve the precision of sample estimates. Any estimates of population characteristics from the sample must be "re-

16

weighted" to correct for the over/underrepresentation. I have done this in my analysis.

Transaction information was then collected for each of the accounts in existence on these ten days that had one or more overdraft fees. Summary statistics of the sample are shown in Exhibit 2.1.

I also asked staff at Wells Fargo to pull a sample of checks that were posted on these ten days. To accomplish this, Wells Fargo first identified all of the accounts used by Mr. Olsen in his damages scenarios for these ten days. Then, Wells Fargo identified the subset of accounts that had a check written on one of the ten days. From this subset of accounts Wells Fargo randomly selected a sample of 500 accounts. These 500 accounts, along with the corresponding post dates, were forwarded to Wells Fargo's check processing team that developed a report with the corresponding check images. This process resulted in a randomly selected sample of 942 checks. Images for these 942 checks were collected and my staff reviewed the checks and compiled information on the dates that the checks were written and categorized the payees of these checks. I discuss the results of this review below. Overall, these checks represent 0.88 percent of all the checks that were written by Wells Fargo checking customers during our ten day sample (106,932, see Exhibit 2.1). [21]

## B. Mr. Olsen's Re-Sequencing Scenarios Are Inconsistent with the Claims at Issue in This Case

I have already described the claims made by Plaintiffs in this case. They claim that class members were harmed as a result of the sequencing of debit card transactions from highest to lowest instead of in the order that they were initiated by the customer. The Court's class definition limits the source of the alleged overcharges of overdraft fees to those resulting from the manner in which Wells Fargo sequences debit card transactions. Mr. Olsen's damages estimates are clearly inconsistent with this definition for several reasons.

In reality, sequencing debit card transactions, or all credit and debit transactions for that matter, in a truly chronological manner is not possible. None of Mr. Olsen's re-sequencing scenarios even come close to actually sequencing the Plaintiffs' debit card transactions in the

---

[21] 0.88 percent is equal to 942, the total number of checks in our 10-Day Check Sample, divided by 106,932, the total number of checks written by customers during the 10-day sample (see Exhibit 2.1).

order that they were initiated by the customer. Instead, Mr. Olsen creates three re-sequencing scenarios that ultimately sequence more than just debit card transactions (e.g., checks and ACH transactions) in an arbitrary manner that does not result in damages estimates consistent with the claims being made by the Plaintiffs. None of his scenarios even sequence all debit card transactions in chronological order. As a result, the results of Mr. Olsen's re-sequencing scenarios cannot serve as a reliable measure of damages in this matter.

### 1.    Re-Sequencing Scenario #1

Mr. Olsen's Re-Sequencing Scenario #1 (i.e., ordering all Group 50040 items from lowest to highest) is irrelevant on its face. It does not even attempt to sequence debit card transactions in chronological order, but rather sequences these transactions from low-to-high. The claims and class definition in this case are not based on the proposition that debit card transactions, or for that matter all debit transactions, must be ordered from lowest to highest. As I have already pointed out, Mr. Olsen's "but-for" world is one in which debit card transactions are posted in chronological order. Therefore, his Re-Sequencing Scenario #1 is inconsistent with such a "but-for" situation and a pure low-to-high posting order is no closer to chronological posting than is Wells Fargo's current practice of high-to-low posting.

The Court's definition of the class says nothing about ordering from lowest to highest, nor does it address fees associated with the ordering of checks, ACH transactions, or any other transactions that are not debit card transactions. Under Mr. Olsen's Re-Sequencing Scenario #1 there are likely to be situations in which the only transactions posted are due to checks and, therefore, any damages calculated under Mr. Olsen's methodology would be due to the re-ordering of checks. These are not the types of damages that this case is about.

It is notable that Mr. Olsen calculates $34 in damages for William Smith under Re-Sequencing Scenario #1. This is important because the Plaintiffs have admitted during discovery that William Smith is not a member of the re-sequencing class.[22] The fact that Mr. Olsen's Re-Sequencing Scenario #1 calculates damages for William Smith – who is admittedly not a member of the class – shows that the low-to-high methodology in this scenario is fundamentally flawed and is not rationally related to the Plaintiffs' claims in this case.

---

[22] "Plaintiffs' Amended Responses to Requests for Admission from Wells Fargo Bank, N.A. [Set Three] (Nos. 9-35)," December 24, 2008, p. 4.

## 2. Re-Sequencing Scenarios #2 and #3

Mr. Olsen's Re-Sequencing Scenarios #2 and #3 also fail to address Plaintiffs' claim of harm for several reasons. First, Mr. Olsen's sequencing in this way is not consistent with the manner in which Plaintiffs claim that class members expect that debit card transactions will be cleared. Mr. Olsen only re-sequences debit card transactions that post on a given day in the order in which they occurred. But, as Mr. Zimmerman explains, debit card transactions can only be posted when full settlement information is received by the Bank. For PIN-based debit card transactions that is generally the same day. For signature-based debit card transactions, final settlement may take up to three business days and on occasion even longer.[23] Any debit card transactions that are not presented for final settlement on the same day they were initiated by the customer will be sequenced out of order under Mr. Olsen's alternative scenarios, as is illustrated in Exhibit 1.3. In the situation depicted in this exhibit, a debit card transaction for $300 made before any other transaction on Day 1 does not post until Day 2 even under Mr. Olsen's Re-Sequencing Scenarios #2 and #3. Another debit card transaction for $75 made on Day 2 does not clear until Day 4.

Another example that demonstrates the difference between the manner in which Plaintiffs claim transactions should be re-sequenced and the way that Mr. Olsen actually re-sequences transactions is provided by the activities on Ms. Gutierrez's account from October 3, 2006 through October 13, 2006. Mr. Zimmerman has already indicated the manner in which the account would have been processed if it were possible to post all debit card transactions in the order that the transactions were initiated by the customer. He demonstrates this on the first and second page of Exhibit J to his declaration. Exhibit 1.1 replicates the first page of Exhibit J and highlights the transactions that could not possibly be sequenced in "true" chronological order because the transaction was initiated by the customer before other transactions that had already been settled. Still other transactions were initiated by the customer on days before Wells Fargo received the final settlement information to post these transactions and likely could not be

---

[23] "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008, p. 7, ¶ 22.

sequenced chronologically.[24]  In other words, the transactions can only be posted in a "true" chronological manner if all transactions have both the same transaction date and post date. Exhibit 1.1 demonstrates that this is not the case for Ms. Gutierrez's transactions for the period from October 3, 2006 through October 13, 2006.  Mr. Olsen's Re-Sequencing Scenarios are unable to sort the class members' transactions in "true" chronological order for this very reason – not all transactions have both the same transaction date and post date.

The reason Mr. Olsen did not attempt a scenario that sequences debit card transactions in genuine chronological order appears to be that in the real world, true chronological posting would be impossible.  True chronological posting would require Wells Fargo to retroactively recalculate prior days on an ongoing basis as transactions were submitted for settlement.  The fact that the correct damages measure undercuts the merits of the claim does _not_ provide a rational basis for calculating on the basis of some other measure.

Even within the context of a given posting date, Mr. Olsen's analysis does not fully sequence debit card transactions in chronological order.  For certain debit card transactions for which Wells Fargo did not have a date/time stamp (at least some of which were presumably transactions that were not submitted for authorization), he defaulted to low-to-high sequencing (Re-Sequencing Scenario #2) and high-to-low sequencing (Re-Sequencing Scenario #3).  The fact that he had to use this approach may demonstrate a logical flaw in Plaintiffs' underlying claim, but once again it clearly generates a result that is not consistent with that claim.

Placing ACH transactions, checks, and bill pay transactions after debit card transactions is also inconsistent with the idea that transactions in customer checking accounts should be posted in the order that the transactions were made.  As I will discuss in detail below, these are transactions that would typically have been initiated by the customer before the debit card transactions.  Mr. Olsen provides no reason for posting checks, ACH transactions, and bill pay transactions after debit card transactions.  He appears to be "cherry picking" which transactions should be re-sequenced chronologically and posts these transactions to maximize his measure of damages.  If Wells Fargo was required to post debit card transactions in chronological order (under Plaintiffs' theory that this is what customers reasonably expect), then it would logically

---

[24] For example, the check card purchase at Shell and Circle K were posted on the second and first day after the transactions were initiated by the customer and may have come before other transactions that posted on those same transaction days.

also need to post other transactions chronologically, where possible. This would certainly be more consistent with Plaintiffs' theory than the alternative sequencing approaches set out by Mr. Olsen.

In general, there is an overall increase in damages when comparing Mr. Olsen's Re-Sequencing Scenario #3 with his Re-Sequencing Scenario #2. For some customers, there can be wild swings in damages (and likely in the fact of injury itself) depending on how Mr. Olsen chooses to sequence the non-timestamped debit card transactions in customers' accounts. For example, when Mr. Olsen sequences non-timestamped debit card transactions from high-to-low (Re-Sequencing Scenario #3), Plaintiff Erin Walker is calculated to have $34 in damages. When those non-timestamped transactions are calculated from low-to-high (Re-Sequencing Scenario #2), her calculated damages jump threefold to $102. This difference has absolutely nothing to do with the chronological ordering of her debit card transactions, which is the focus of the Plaintiffs' claims in this case. Rather, this is just a side effect of how Mr. Olsen arbitrarily chooses to sequence non-timestamped debit card transactions.

## C.     Under Mr. Olsen's Re-Sequencing Scenarios Some of Wells Fargo's Customers Would Have Been Worse Off

Mr. Olsen neglects to account for an important feature of the Bank's overdraft program: overdraft tolerance. The Bank determines, using a computer-based algorithm, the amount of Overdraft Tolerance that it will grant for each account when it encounters a debit for which there are insufficient funds. However, this is not an absolute limit since the Bank cannot refuse all items. Checks and ACH transactions can be returned and a fee charged to the customer. The Bank will generally return any check that will, if honored, result in an overdraft that is greater than the Overdraft Tolerance computed for that account. If, however, a debit card or an ATM withdrawal transaction is encountered that will result in an overdraft that is greater than the Overdraft Tolerance, the Bank will honor the debit and charge an overdraft fee for that debit transaction.

The implication of this fact is that re-sequencing the order in which debits are posted can result in checks and ACH transactions being returned as "unpaid" that were not returned under Wells Fargo's current policy or in a scheduled bill pay transaction not being made. For example, on a given business day, a customer may have $1,000 in her account and an additional $300 in

Overdraft Tolerance that the bank will grant her. Suppose that on that day the Bank is presented with a check for $1,250 for rent and a settlement file for a grocery store debit card transaction of $100. Under its current sequence, Wells Fargo would honor both the check and the debit card transaction even though the total debit would bring her below her Overdraft Tolerance. Under at least one of Mr. Olsen's scenarios, the debit card transaction would be honored but the rent check would not. This would likely lead to fees and costs from the merchant (such as bounced check fees, late fees, and other penalties), returned item fees from Wells Fargo, and additional costs to the customer (including the personal stress of a bounced check). Mr. Olsen ignores these additional and important costs.

Evidence indicates that high-to-low sequencing remains a valid sequencing alternative for banks. In fact, in January 2009, the Board of Governors of the Federal Reserve System ("Board") and other federal banking agencies elected to retain the rule that banks have the right to sequence debit transactions in any manner they chose.[25] In rendering this decision the Board and other agencies noted UCC § 4-303, which allows bank to post debit transactions "in any order."[26] The agencies further noted that: [t]he commentary to [UCC] § 4-303 states that any posting order is permitted because (1) it is impossible to state a rule that would be fair in all circumstances, and (2) a drawer should have sufficient funds on deposit at all times, he or she should thus be indifferent to posting order."[27] The agencies also explained their decision to not require a particular sequencing approach:

> The Agencies believe that it would be difficult to set forth a bright-line rule that would clearly result in the best outcome for all or most consumers. For example, requiring institutions to pay smaller dollar items first may cause an institution to return unpaid a large dollar nondiscretionary item, such as a mortgage payment, if there is an insufficient amount of overdraft coverage remaining to cover the large dollar item after the smaller items have been paid. The Agencies also acknowledge the inherent complexity of payments processing and recognize that mandating a particular posting order could create complications for institutions seeking to move toward real-time transaction processing.[28]

---

[25] 74 Fed. Reg. at 5547-48.

[26] 74 Fed. Reg. at 5547 n.183.

[27] 74 Fed. Reg. at 5547 n.183.

[28] 74 Fed. Reg. at 5548.

22

Evidence also indicates that high-to-low sequencing is valued by some customers. Indeed, it appears that the Board reported that the participants in consumer testing that it commissioned "indicated that they would prefer to have their checks paid into overdraft, because those transactions represented important bills."[29] The Federal Reserve Bank of Philadelphia makes a similar point:

> Testing revealed that consumers found overdraft fees acceptable in the context of checks because if they opted out of the check service, the check would not be paid, yet they still would be charged an insufficient funds fee that is generally equivalent to an overdraft fee.[30]

According to the 2007 Federal Reserve Payments Study, the average value of returned checks increased from $731 in 2003 to $1,124 in 2006.[31] Wells Fargo's actual practice of high-to-low sequencing reduces the likelihood that high value checks will be returned, while Mr. Olsen's scenarios increase this likelihood. According to the ABA, 85 percent of consumers who paid an overdraft fee in 2008 said that they were glad that their payment was covered and not rejected or returned.[32] This percentage grew to 96 percent in 2009.[33]

Finally, evidence also indicates that high-to-low sequencing is valued by some of Wells Fargo's customers:

> Q. And was there a determination through consumer research as to which order the consumer preferred?
>
> A. The Norwest research supported a consumer preference for high to low, as it increased the likelihood that the more important transactions that a customer had -- for example, their mortgage check --would be made and not returned.[34]

---

[29] 59034 Federal Register / Vol. 74, No. 220 / Tuesday, November 17, 2009 / Rules and Regulations.

[30] "Final Rules on Credit Card and Overdraft Practices," Federal Reserve Bank of Philadelphia. [http://www.philadelphiafed.org/bank-resources/publications/consumer-compliance-outlook/2009/first-quarter/q1_04.cfm].

[31] The 2007 Federal Reserve Payments Study: Noncash Payment Trends in the United States: 2003-2006, *Federal Reserve*, 10 December 2007.

[32] "80 Percent of Consumers Paid No Overdraft Fees in Past Year, Says ABA Survey," ABA News Release, 8 August 2008. [http://www.aba.com/Press+Room/080808OverdraftFeeSurvey.htm].

[33] "ABA Survey: More Consumers Avoid Overdraft Fees," ABA News Release, 9 September 2009. [http://www.aba.com/Press+Room/090909ConsumerSurveyOverdraftFees.htm].

[34] "Deposition of Kenneth A. Zimmerman," November 10, 2008, p. 32.

Exhibit 1.2 provides an example of a situation in which a member of the class is made potentially worse off under Mr. Olsen's re-sequencing scenarios. It demonstrates some of the quantifiable impacts of Mr. Olsen's re-sequencing technique. The upper panel depicts a series of postings on a given day sequenced in the manner in which the Bank currently sequences them. It also shows the resulting overdraft charges assessed by the Bank. Columns (2) and (3) show the postings for debit card transactions and checks, respectively, sequenced from highest to lowest, as is currently done by the Bank. Column (4) shows the resulting balance after each posting. Column (5) shows the amount that the Bank will authorize an account to go into overdraft. Column (6) indicates the type of fee that the Bank will assess after determining the balance after each posting and comparing any resulting overdraft with the Overdraft Tolerance. Column (7) shows the resulting fee charged by the Bank. "Other Charges" are any charges that may be imposed on the account holder by such third parties as the person to whom the check is made out. These may include returned check fees and collection costs.

This example demonstrates a feature of Wells Fargo's overdraft service that Mr. Olsen ignores, resulting in another source of error. As I have already pointed out, Wells Fargo sequences all debit transactions from high to low, intermingling debit card transactions and checks. However, a debit card transaction has generally already been authorized and must be honored, even if such a deduction will result in an account balance that is even lower than the amount of Overdraft Tolerance. This is demonstrated in the upper panel of Exhibit 1.2. By the time the Bank processes the debit card transaction, this customer has almost completely exhausted the overdraft tolerance the Bank allows in her case. The debit card transaction actually takes her over that limit. Nevertheless, under the Bank's current policies, all three checks are honored by the Bank in this scenario. The Bank would have charged $136 in overdraft fees (Column (7)).

The middle panel of Exhibit 1.2 demonstrates the sequencing process under Mr. Olsen's Re-Sequencing Scenarios #2 and #3 in which debit card transactions are posted first in chronological order and then checks, ACH transactions, and bill pay transactions are posted next from high-to-low. In Mr. Olsen's formulation, he treats two transactions as overdrafts that actually result in insufficient funds, under the assumption that if all of the transactions had been honored before, they would all be honored now. Columns (7) and (9) show the three overdraft

# EXHIBIT 2B

**DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**

charges and total charges, respectively, that result from the application of Mr. Olsen's methodology. Since he calculates that there would have been four overdrafts under Wells Fargo's actual sequencing approach and three overdraft events under his methodology, Mr. Olsen would allege damages of $34 (= $136 - $102) in this case.

Such a conclusion would be incorrect as demonstrated in the bottom panel of Exhibit 1.2. Had Mr. Olsen taken into account Overdraft Tolerance and the manner in which a debit transactions can exceed Overdraft Tolerance, he would have found occasions when a check that had previously cleared or been given overdraft coverage would instead have been returned to the payee's bank, or "bounced." In the situation depicted on the bottom panel of Exhibit 1.2, the $200 and $105 checks would have each been returned for a Wells Fargo NSF fee of $34. In addition to that fee, the Bank's customer would have faced additional charges. For instance, the payee on the checks may have charged a "bounced check" fee to the customer, which is represented by the $35 "Other" fees shown in Column (8) of the lower panel for the $200 and $105 "bounced" checks. As the example in Exhibit 1.2 indicates, because of these other fees the Bank's customer is worse off under Mr. Olsen's scenario, accounting for Overdraft Tolerance, than under Mr. Olsen's scenario that incorrectly fails to account for Overdraft Tolerance (middle panel) and even under the Bank's current method of sequencing (upper panel).[35] Specifically, the customer would incur a total of $172 in total charges as opposed to only $136 under Wells Fargo's current sequencing methodology.

In many cases there could be even more additional costs incurred by the customer due to the returned checks. For example, assume that the $200 check was re-submitted by the payee before the Bank's customer was able to place sufficient funds in their account to cover the check. Wells Fargo would then charge the customer another $34 NSF fee, increasing the total fees incurred by the customer to $206. Furthermore, as will be discussed in detail below, assuming the $200 check was written to pay a balance on a Citibank credit card and bouncing the check resulted in the customer failing to make the payment on time, the customer would have been charged a late fee of $29 (increasing the total fees to $235). Additionally, the customer's APR on the credit card could jump to the default APR of 29.99 percent. Assuming that the customer's

---

[35] California Civil Code section 1719 provides that a payee of a returned check can collect a service charge of up to $25 for the first check and up to $35 for each subsequent check to that payee. Cal. Civ. Code § 1719(a)(1).

actual APR prior to the bounced check was 9.99 percent and their average balance for the year was approximately $500, this would result in an increase in annual financing costs of $100. In the end, this customer would end up ~~occurring~~ *incurring* total fees and costs of $335 under Mr. Olsen's Re-Sequencing Scenarios #2/#3, accounting for Overdraft Tolerance. Mr. Olsen, in fact, claims damages for this customer of $34.

There are a large number of additional costs that are imposed on individuals who miss important payment deadlines for credit cards, payments to the IRS, mortgages, rent, and tuition fees. Missing such deadlines can result in additional fees and possibly other negative consequences being imposed by credit card companies, the IRS, mortgage lenders, landlords, and schools. If an important check is rejected it may be difficult to be able to arrange to cover it, or circumstances may be such that notice does not reach the Bank customer in a timely way.

If an individual bounces a check to his credit card provider, numerous adverse consequences abound. For example, if it is a Citibank credit card, that individual's APR may "automatically increase to the default APR," which could be as high as 29.99 percent depending on the magnitude of the default and the individual's credit history. In addition, if the bounced check results in the individual failing to make his payment on time, he is subject to late fees of $15 on balances up to $100, $29 on balances between $100 and $250, and $39 on balances greater than $250.[36]

Other credit card companies have similar policies. If an individual's bounced check causes his payment to Discover to be late, he will be charged $19 on balances up to $250 and $39 on balances over $250. In addition, Discover may "terminate the availability of any introductory/promotional APRs on new transactions" and "increase your APRs for new transactions to variable Default Rates which will be determined by adding up to an additional 5 percentage points to the otherwise applicable APR."[37] Late payments to JPMorgan Chase cost

---

[36] Citibank Terms and Conditions,
[https://www.accountonline.com/ACQ/DisplayTerms?ProspectID=3C8507A6D4074D2B875F5885D20D3E00&sc=4T3Z1C49ZCAGMDM250W&B=M&app=UNSOL&BUS_TYP_CD=CONSUMER&siteId=CB&t=t&langl d=EN&BALCON_SC=&AAPID=&DOWNSELL_LEVEL=2&DOWNSELL_BRANDS=M%2CM%2C&Dow nsellSourceCode1=4T3Z2C29ZCAGMDM250W&DownsellSourceCode2=4T3Z3C39ZCAGMDM250W&B1=M&B2=M&d=&uc=3U2&AMEX_PID_AF_CODE=].

[37] "Discover Card: Important Card Information,"
[https://www.discovercard.com/cardmembersvcs/acqs/app/exec?dynaviewMain=INFO&brand=STUD&sc=RHT G].

26

$15 on balances up to $100, $29 on balances up to $250, and $39 on balances above $250. In addition, the individual's APR could rise to up to 29.99 percent.[38]

If an individual's tax payment check to the IRS bounces, he is liable for a penalty of two percent of the amount of the check. If the check is for less than $1,250 the penalty is the lesser of $25 or the amount of the check.[39] If the check's failure to clear causes the individual's payment to be late, he is generally liable for five percent of the tax owed for each month that his return is late. After sixty days, the minimum penalty for late filing is the lesser of $100 or 100 percent of the tax owed.[40]

The consequences for bouncing housing checks are also severe. In California, mortgage check bouncers are liable for a $25 bounced check fee in addition to a civil penalty of three times the check amount (up to $1,500).[41] Renters who bounce checks are subject to a $25 fee for the first check and $35 for all subsequent bounced checks. In addition to these fees, tenants may face additional inconveniences, such as having to obtain cashier's checks every month to pay rent.[42] A bounced check could even lead to eviction. According to the San Francisco Apartment Association:

> Most property owners do one of three things when a rent check bounces: they either (1) call the tenant, have copious verbal interaction regarding the bounced check and then continue to redeposit the check until, God willing, it finally clears the bank; or (2) issue the tenant a form known as a Notice and Demand Regarding Dishonored Check, available from SFAA or (3) serve the tenant with a Three-Day Notice to Pay Rent or Quit.[43]

According to a Government of California website:

> What about your [hypothetical] April 1 rent check that was returned by the landlord's bank? As a practical matter, you should make the check good

---

[38] Pricing & Terms – JPMorgan Chase. [https://www.firstusa.com/cgi-bin/webcgi/webserve.cgi?card=CM9C&page_type=appterms].

[39] "Topic 206 – Dishonored Payments." [http://www.irs.gov/taxtopics/tc206.html].

[40] "Topic 653 – IRS Notices and Bills, Penalties and Interest Charges." [http://www.irs.gov/taxtopics/tc653.html]. On January 1, 2009 the minimum penalty for returns over sixty days late rose to $135.

[41] "First Mortgage Bounced Check Fees," HSH Associates Financial Publishers. [http://library.hsh.com/read_article-hsh.asp?row_id=78].

[42] "Big, Bad, Bounced Check Clause," American Apartment Owners Association. [http://www.american-apartment-owners-association.org/blog/2009/12/03/big-bad-bounced-check-policy/].

[43] "No Excuses for Bounced Checks," San Francisco Apartment Association. [http://www.sfaa.org/0503wilson.html].

27

immediately. If you don't, the landlord can serve you with a three-day notice, which is the first step in an action to evict you (see Terminations and Evictions).[44]

Consequences beyond the charging of a late fee arise in other areas, including checks written to cover school tuition. A good example of these sorts of circumstances is this warning from the University of California at Davis:

> **Returned checks**. All students whose registration fee payment checks are returned for insufficient funds are not considered registered students and will be withdrawn from all classes. You will not receive credit for the quarter, and you must apply for readmission for the quarter in which you wish to re-register. If your check is returned after 4:00 p.m. on the deadline, you will be liable for a late registration payment fee plus a returned check charge of $25.00.[45] (emphasis added)

A link on that page leads to a further description of the consequences of a returned check:

> Once dropped from their classes other paid waitlisted students may be added into classes before registration is re-opened for all students. There will be no guarantee that a dropped student will be able to enroll in the same course(s) that were dropped due to non-payment of fees.[46]

Community colleges also have dire consequences for writing a bad tuition check. For example, De Anza Community College explicitly states its returned check policy:

> The Cashier's Office will notify you by mail if your check is returned for any reason (e.g., insufficient funds, stop payment or account closed). A "returned check hold" will be placed on all accounts, which will block your ability to add/drop classes, obtain grades or transcripts, or any other records or registration service. To remove the hold on your account, you must pay in cash or with certified funds the original check amount plus a $25 returned check charge. If your check is returned and you decide to drop all your classes, you must follow the procedure for dropping classes.

> De Anza College reserves the right to refuse to accept personal checks from persons who have previously written bad checks. If your check bounces, you are liable for up to three times the amount of the check or $100.00, whichever is

---

[44] "Living in the Rental Unit," California Department of Consumer Affairs. [http://www.dca.ca.gov/publications/landlordbook/living-in.shtml].

[45] "Registration Fee Payment," UC Davis Office of the University Registrar. [http://registrar.ucdavis.edu/CSRG/feepay.html].

[46] "Drop for Non Payment Information & FAQs," UC Davis Office of the University Registrar. [http://registrar.ucdavis.edu/html/npn_faq.html].

more, plus the face value of the check and any court costs. You may also face criminal charges.[47]

Having a check returned can have other consequences. Information on bounced checks is collected by companies that provide check verification services every day. As one such service describes:

> Every night, over 535 national retail chains contribute data about customers that have bounced checks in their stores to one central place, the SCAN database. Over 150,000 updates occur every night to ensure that the database is as accurate as possible.[48]

If not resolved in a timely manner, information on returned checks is passed on to organizations that may subject writers of such checks to arguably misleading mailings and telephone calls. Indeed, according to *The Los Angeles Times*, district attorneys in California often pass this information on to companies who send about 2 million vaguely worded and threatening letters to writers of returned checks.[49] In another jurisdiction, returned checks are reported to district attorneys, who send out warnings that a criminal summons to appear in court will be sent out within 15 days if there is no response.[50]

A bounced check can have an impact on many people who are not well-served by conventional credit scoring systems that are based on past borrowing and credit card history. As one financial columnist reported, one credit rating agency, Fair Isaacs, "launched a new scoring system that may soon allow lenders to make loans to more recent immigrants, young people and others who currently have a tough time getting credit" taking some of their data from "companies that monitor (and blacklist) people who bounce checks."[51] Fair Isaac estimates that

---

[47] "Returned Check Policy," DeAnza College. [http://www.deanza.edu/registration/cashier/check.html]. California State University San Marcos has a similar policy: "A dishonored check ... may result in the cancellation of class registration." http://www.csusm.edu/schedule/fall_2009/fee_payment_instructions.html

[48] "SCAN Check Verification and Collection Service." [http://www.nobouncedchecks.net/SCAN-check.html].

[49] Mosi Secret and Stuart Pfeifer, "Debt Collection; Bad-Check Letters Are Misleading, Critics Say; A Company Uses Government Seals In Its Messages, an Act That Consumer Advocates Contend Is Dishonest," Los Angeles Times, 8 June 2009.

[50] Tim Rowden, "$1.1 Million Is Collected In Bad Check Restitution; With Repayment, Prosecution is Avoided," St. Louis Post-Dispatch, 22 October 2001.

[51] Liz Pulliam Weston, "Now Bounced Checks Can Trash Your Credit," msn.money [http://articles.moneycentral.msn.com/Banking/YourCreditRating/NowBouncedChecksCanTrashYourCredit.asp x]. See also, Denise Trowbridge, "YOU, by the numbers" The Columbus Dispatch. 17 September 2006. Pointing out that an accidently bounced check can affect one's credit score.

there are 50 million American consumers who do not currently have credit scores and are therefore locked out of traditional credit markets.[52]

## D.   Examples of Wells Fargo's Customers Made Worse Off Under Mr. Olsen's Re-Sequencing Scenarios

These concerns are not merely theoretical. I used the check data set that I described earlier to determine the importance of customers' largest checks and the potential consequences of bouncing such checks. In reviewing the checks in the data set, I instructed my staff to categorize the payee on every check into one of 18 categories, including Financial Institutions, Housing, Utilities, and Retail Food, plus an "Unknown" category. For each account-day during which a check was presented for settlement, I determined how many checks were presented that day. I then divided all account-days for which a check had been presented into account-days that had one check, two checks, or three or more checks presented in each day. In our sample, 63.6 percent of customers who wrote a check that cleared on a particular day had no other checks clear that day, 20.9 percent had two checks clear, and 15.5 percent had three or more checks clear. As Exhibit 3.2c shows, the largest checks are most likely to be written to Individuals than to any other category of payee. Financial Institutions are the next most likely recipients of an account's largest check, followed by Retail Non-Food.[53] Other types of payees who are frequently the most important payee or the only payee are Utilities and Housing.

The failure of any of these checks to clear due to insufficient funds can cause inconvenience and embarrassment. The failure of some, such as those made to retail establishments, could have some of the financial consequences described above and lead to the possibility of having subsequent checks disapproved.

These are not just hypothetical considerations. I asked staff at Wells Fargo to review the account days from which we had drawn checks to identify examples of checks that successfully cleared but which would have been rejected under Mr. Olsen's re-sequencing scenarios. Specifically, I asked them to run Mr. Olsen's scenarios for those accounts, for those days. I then

---

[52]      Fico      Expansion      Score      –      Frequently      Asked      Questions. [https://www.ficoexpansionscore.com/Content/FAQs.aspx].

[53] Of course, many checks to individuals may have been checks for housing. In some cases, checks to individuals had a memo indicating that the check was for housing.

asked that they compare the amount of overdraft with the Overdraft Tolerance and determine whether any checks that were paid into overdraft under the Bank's current posting order would have been rejected under Mr. Olsen's re-sequencing scenarios. I also asked them to calculate the number of overdraft charges that would have been charged by Wells Fargo under its current sequencing practices and under the re-sequenced processing suggested by Mr. Olsen.

The results are shown in Exhibit 2.2a. The first row shows that one customer would have had a check for housing refused under Mr. Olsen's Re-Sequencing Scenario #1. It also indicates that the three overdrafts that the account would have experienced under the Bank's current practice would have been reduced to 1, 2, and 2 overdrafts under Mr. Olsen's Re-Sequencing Scenarios #1, #2 and #3, respectively. This is similar to the situation I described above. Under Re-Sequencing Scenario #1, Mr. Olsen will have calculated savings to this account equal to two overdraft charges. In fact, a check would have bounced, resulting in at least one NSF charge, though generally more since, as Mr. Zimmerman explained, checks are usually re-submitted for payment, resulting in more NSF charges. In addition, there are the additional charges imposed by the payee for a bounced check as well as costs that are not so easily quantifiable, such as inconvenience, embarrassment, and the impact on the relationship between the check writer and her landlord or mortgage-holder.

The negative impact of Mr. Olsen's alternative posting scenarios is even more evident on the customer who we have identified as number 190. In that case, a check written on that account that posted on January 2, 2007 would have been returned for insufficient funds under all three of Mr. Olsen's re-sequencing scenarios. Applying Mr. Olsen's methodology for Re-Sequencing Scenarios #2 and #3 would have resulted in no reduction in the number of overdrafts charged to account 190 on January 2, 2007. Such a situation, however, would likely have resulted in additional returned check charges imposed by the payee and other complications, making the Bank customer clearly worse off under Mr. Olsen's scenarios.

ACH transactions and bill pay transaction are similar to checks as the Bank also maintains the discretion to return these items. I asked staff at Wells Fargo to also run Mr. Olsen's re-sequencing scenarios on the ten day sample and to compare the amount of overdraft associated with ACH transactions with the Overdraft Tolerance and to determine whether any of these transactions would have been rejected under Mr. Olsen's scenarios. The results of this

31

analysis for Mr. Olsen's three re-sequencing scenarios are found in Exhibits 2.2b, 2.2c, and 2.2d. This analysis illustrates that 6,017, 7,379, and 7,379 ACH transactions in this ten day sample would have been returned under Mr. Olsen's Re-Sequencing Scenarios #1, #2, and #3, respectively had he taken into account Overdraft Tolerance. These are all items that Mr. Olsen would have treated as overdrafts when, in fact, they would have been returned as NSF. They could, therefore, have resulted in multiple NSF fees, other charges imposed by the payee, and other penalties of the sort that I described above.

Finally, I also asked staff at Wells Fargo to determine the proportion and total number of transactions that would have been returned by the Bank under Mr. Olsen's Re-Sequencing scenarios for the ten day sample. The results of this analysis are provided in Exhibit 2.4a. This analysis illustrates that, on average, 4.7 percent, 4.5 percent, and 4.4 percent of all overdraft items would have been returned under Mr. Olsen's Re-Sequencing Scenarios #1, #2, and #3, respectively, had he accounted for Wells Fargo's Overdraft Tolerance practice.

## E.   Mr. Olsen's Re-Sequencing Scenarios #2 and #3 Do Not Describe the "But-For" World

Even if it were the case that Re-Sequencing Scenarios #2 and #3 were consistent with the Plaintiffs' claim that debit card transactions in checking accounts should be posted in the order in which the customers initiated the transactions, the scenarios do not accurately reflect the manner in which the Bank would respond to a requirement that it sort debit card transactions in chronological order. First, these scenarios are inconsistent with the general concept of posting debit transactions chronologically, since checks and ACH transactions will almost always have been initiated before debit card transactions on a given posting day. Second, since the Bank is operating in a competitive market, it needs both to manage risk by not being overly lenient toward overdrafters (see 12 CFR § 7.4002) and it would have to make up any lost revenues that resulted from changes to its posting order. Competitive forces and concerns about the risks that the Bank faces if it cannot adequately discourage overdrafts will require responses that are not taken into account by Mr. Olsen's Re-Sequencing Scenarios #2 and #3.

32

## 1. Checks, ACH Transactions, and Bill Pay Transactions Logically Should Be Posted Before Debit Card Transactions

I have already indicated that most checks presented to the Bank will have been written before most debit card transactions posting that same day. Mr. Zimmerman pointed out that most PIN-based debit card transactions clear on the same business day that they are made. Signature-based debit card transactions are typically submitted to the Bank within two business days. Checks, ACH transactions, and bill pay transactions generally take longer to clear.

Transactions on the account of Ms. Gutierrez's demonstrate this also. The Zimmerman Declaration describes a check that she had written on September 28, 2006 and which was presented to the Bank for clearance on October 10. In the meantime, she had made five debit card purchases and one ATM withdrawal. Three of the debit card transactions and the ATM withdrawal had cleared before the check was even presented to the Bank – before the Bank even knew of its existence.

In order to determine the time between when a check is written and when it is presented to the Bank for settlement, I examined the sample of checks that I requested that Wells Fargo collect in a manner I have already described. My staff calculated the number of days that it took a check to clear – the days between the date on the check and the date that it was posted.[54] Exhibit 3.1b shows the distribution of the number of days between when checks are written and when checks are presented to the Bank for settlement. (I count a check that cleared the day after it was written as having cleared on the first day.)

Exhibit 3.1a shows the median number of days after a check is written that it clears in my sample.[55] These are shown for checks that cleared on each of my sample days and for the entire set. Over all days in the ten day sample, the median number of business days and calendar days after a check was written that was posted by Wells Fargo was 2 days and 5 days, respectively. It

---

[54] Eight checks had a wrong year in the written date (for example, checks referenced 2006 in the beginning of 2007). Written dates for these checks have been corrected to reflect the correct years. Four checks had no written date, and three checks only included month and year in the written date. Forty-three checks had been written to an illegible or unknown payees.

[55] The median clearing time is the number of days for a check to clear where half the checks posted that day took more than the median clearing time to clear and half the checks took less than the median clearing time to clear. I use the median as my measure of the clearing performance of a typical check rather than the average because the average can be affected by checks that took a long time to clear. If I used averages, then the calculated figures for checks would be even longer.

shows, for instance, that on Tuesday, January 2, 2007, at least half the checks were cleared during the overnight posting period after the second business day that the check was written. That corresponds to the fifth calendar day.

These check clearing times contrast with the speed with which debit card transactions are finalized for overnight processing. In order to determine the time between when a debit card transaction is initiated by the customer and when it is presented to the Bank for settlement I asked Wells Fargo to generate a sample of debit card transactions for the ten day sample. My staff calculated the number of days that it took a debit card transaction to clear for this sample – the days between the date on which the debit card transaction was initiated by the customer and the date that it was posted. Exhibit 2.3 shows the distribution of the number of days between when debit card transactions are initiated and when they are presented to the Bank for settlement. Over all days in the ten-day sample, the median number of business days and calendar days after a debit card transaction was initiated that it was posted by Wells Fargo was 0 days and 3 days, respectively.

Exhibit 3.1b shows the distribution of the number of days between when debit card transactions are initiated and when they are posted for settlement by Wells Fargo compared to the same metric for checks. The histogram in this exhibit clearly demonstrates that check clearing times are typically greater than debit card transaction posting times. Mr. Zimmerman supports this conclusion in his declaration, in which he states that nearly all PIN-based debit card transactions clear on the same business day that the transaction takes place if the transaction was initiated on a business day. If the transaction was initiated by the customer on a weekend or a holiday then nearly all PIN-based debit card transactions are finalized and post on the following business day.[56] According to Stacey Pinkerd, Head of Global Debit Products for Visa, Inc., 8 percent of Visa signature-based debit card transactions clear within one business day, 53-54 percent clear within two business days, and 95 percent clear within three business days.[57]

While statistics are not available for ACH and bill pay transactions, logic suggests that those are also initiated, on average, significantly further in advance of the posting date than are

---

[56] "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008, p. 7, ¶ 22.

[57] "Deposition of Stacey Pinkerd," February 10, 2009, p. 17.

debit card transactions. There is certainly no evidence to suggest that these transactions are "newer" than debit card transactions, yet Mr. Olsen's analysis treats them as if they were.

## 2.    In the "But-For" World the Bank Will Need To Maintain its Competitive Position

Wells Fargo competes with many other financial institutions for depositors and for access to the resources it needs, including its employees. It must attract depositors with competitive interest rates and services. It can pay those interest costs from the revenues it generates on the money that it lends and invests; revenues that are also constrained by the competitiveness of the market. If it offered lower interest rates on deposits, its deposits would decline and it would not be able to make loans. If it tried to charge more for loans, borrowers would borrow money from other institutions.

At the same time, in order to compete effectively, the Bank must offer services that customers need and expect and that are offered by other banks and savings institutions. Services that banks often offer to compete effectively include free checking, extended operating hours, and overdraft coverage. Banks operating in a competitive environment will need to offer overdraft coverage because a significant number of customers require overdraft coverage and want it as among the services that their banks provide.[58] As one article puts it: "The customer's perspective is that overdraft coverage is a popular service. It is in demand, and has become an expected component among standard banking products."[59]    Overdraft coverage provides protection for those who need it and imposes costs for those who abuse it by using it to cover expenditures with funds that they do not actually have in their accounts.

Banks operating in a competitive environment will offer some services, such as overdraft coverage, for a fee that is higher than the actual cost. This is in order to discourage relatively high-risk, high-cost customers and to encourage low-risk, low cost customers.[60]    At the same time, banks must cover at least some of their operating costs from the revenues that they generate

---

[58] Weinstock Peter G. and Stephanie E. Dreyer "Overdraft Protection Programs: The Emerging Battleground for Bankers and Consumer Advocates."

[59] Weinstock Peter G. and Stephanie E. Dreyer "Overdraft Protection Programs: The Emerging Battleground for Bankers and Consumer Advocates."

[60] Gregory F. Udell, "Pricing Returned Check Charges under Asymmetric Information," *Journal of Money, Credit, and Banking.* Vol. 18, No. 4 (November 1986).

from fees to make up for the costs of providing free checking, the costs of which cannot be covered by the interest that they earn by lending money deposited in checking accounts. In order to be able to provide free checking, therefore, banks must be able generate a margin on other products and services that they offer.

If there was a material drop in revenues because the Bank could no longer post transactions from customer checking accounts as it does now, it would be forced to raise those fees in some other way that customers and regulators would find acceptable. Market forces and business realities would require that it discontinue some of the practices that are favorable to its customers. For instance, it may put longer holds on larger portions of check deposits or it may post both credits and debits in a manner more consistent with when the transactions were actually initiated by the customer. This may not only generate the revenue needed to maintain its operations, it may also improve its risk management since Plaintiffs' proposed re-sequencing may make it harder to adequately discourage chronically overdrafting customers from indulging in that behavior. I discuss some of these possibilities in the next section.

## F. The Logic Underlying Plaintiffs' "Chronological" Re-Sequencing Scenarios Would Lead to Wells Fargo Altering Some of its Grouping, Posting, and Sequencing Policies That Currently Benefit Many Customers

A logical consequence of Plaintiffs' contentions that debit card transactions should be debited in the order that the transactions were made is that all other debits and credits should be posted in the order that they were made, to the extent that it is possible to do so. The Bank would likely respond to a requirement that it re-sequence debit card transactions by re-sequencing other transactions in a similar manner.

I note that Wells Fargo's current practice of sequencing debit transactions from high-to-low does not maximize the Bank's overdraft fee revenue. First, Wells Fargo does not apply a "pure" high-to-low posting methodology, but instead separates various categories of debit transactions into different posting groups. This reduces overdraft fee revenue. In addition, all credits that post on a given day are posted before any debits. Mr. Zimmerman explained in his declaration that all check deposits, cash deposits, or ACH deposits that are presented to the Bank

before the cut-off on particular business day will be credited to that account before any debits.[61] That means that if a cash deposit is made at three in the afternoon, it will be credited to an account before a POS debit card purchase made at nine that same morning. If the cut-off is on a business day that follows a weekend or a holiday, a debit card purchase can be made on a Saturday morning and covered with a check deposited on the next business day, possibly three calendar days later. If Wells Fargo was to stop posting credits before debits or to sequence all debit transactions in an absolute high-to-low order, then the Bank would actually generate more overdraft fee revenue than it currently does. Wells Fargo has chosen not to implement such revenue maximizing approaches .

The advantage of the current practice for the Bank's customers is that a customer can make a purchase when he does not have cash, cannot use his credit card, and has a small or no balance in his checking account. He can take advantage of the "float" by getting the funds and depositing them in the account before the cut-off time on Monday. If Monday is a holiday, he can make the deposit on the following Tuesday.

This deposit can be made with a paper check from another account that the customer maintains at the bank or even a third-party check. Alternatively, if he knows that a direct deposit, such as a paycheck, will be placed in his account before the close of business the next business day, he does not need to do anything. He can just take advantage of the later deposit being credited to his account before the earlier debit card transaction.

One of the logical responses to the Plaintiffs' claim that items should be sorted chronologically is to post deposits after earlier initiated debit transactions. If the POS debit card transaction would result in an overdraft at the time of the transaction, the customer would be assessed an overdraft fee. The Bank's customer would lose the float as a consequence of Plaintiffs' suggested sequencing order.

In some circumstances, the Bank is entitled to put a hold on a third-party check but, according to the Mr. Zimmerman's declaration, does so for only two percent of paper checks presented to the Bank. The Bank does not put holds on ACH transactions, direct deposit, or other forms of electronic checks. According to the rules of the Federal Reserve Board, the Bank

---

[61] "Declaration of Kenneth A. Zimmerman In Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment," July 9, 2008, p. 8, ¶ 25.

is required to make cash and some checks "available on the first business day *following* the banking day of deposit" (emphasis added) when deposited in person.[62]  The only checks required to be made available on the next business day are "checks drawn on an account held by your institution ('on-us checks')."[63]  The Bank is only required to make $100 available the next business day on many other types of checks.  The remaining amount must be made available by the second business day after the check is deposited in person if the check is drawn on a bank that is in the same Federal Reserve check-processing region.  In light of the possibly increased risk that may result from chronic overdrafters, the Bank may increase the proportion of check funds that it holds before crediting the check deposit to the payees account.  In that case, a check deposited after a POS debit card transaction (but before the next cut-off for overnight processing) may not cover the debit card transaction.  A potential class member would have substantially reduced his ability to take advantage of a float and would have increased uncertainly about its ability to cover a debit card transaction.  I note that Mr. Olsen does not account for some of Wells Fargo's processing methods, including its deposit hold procedures described in this paragraph, in his calculation of damages for any of his three re-sequencing scenarios.  As a result, in circumstances in which Wells Fargo would in fact place a hold on a portion or all of a deposit, Mr. Olsen actually credits the full amount immediately.  This would have the effect of erroneously increasing his estimate of damages.

Again, these are not just theoretical possibilities.  Class members and other Bank customers count on checks coming in to cover current purchases or checks that they may have written in the past.  For example, Maria Galindo, testified about a situation in which she had written a check for $20 that had not yet cleared her account – that is, it had not been posted in the overnight posting cycle.

> A.     Oh, no I'm sorry.  No.  If I had $20.00, then maybe I would spend the $20.00, even though something -- like let's say a check was out.  Because it hadn't gone through, I would spend the $20.00 and -- hoping that the paycheck the next day would cover it, it wouldn't come through.

---

[62] "A Guide for Financial Institutions: Compliance with Regulation CC," The Federal Reserve Board. [http://www.federalreserve.gov/PUBS/RegCC/regcc.htm].

[63] I am not referring here to U.S. Treasury checks, U.S. Postal Service money orders, Federal Reserve Bank and Federal Home Loan Bank checks, state or local government checks, cashier's, certified, or teller's checks, all of which must have next day availability.

Q.   Okay. So if you wrote a check, let's say three days earlier for $20.00, you had $20.00 in your account because the check hadn't come in yet, and you were getting paid the next day, sometimes you would take the $20.00 out knowing that -- or hoping that it was unlikely that the check would happen to come in that day. So if it came in the next day, you would be covered?

A.   Yes.[64]

Ms. Galindo might not have been able to take advantage of the float if the Bank could not apply its current policies regarding when it recognizes checks. The Bank could hold any funds on a check until after the next overnight posting cycle, as it is currently permitted to do. Furthermore, in the situation described by Ms. Galindo, she would be charged an overdraft or possibly an NSF fee if all transactions were re-sequenced in a manner consistent with Plaintiffs' view, even if the Bank's current hold policy was in place. If she had taken the $20 out of her account over a weekend and the withdrawal check was presented on the following business day, a chronological ordering of all transactions would require that the $20 check be debited first, followed by the debiting of the $20 withdrawal, followed by the crediting of the paycheck. Under a re-sequencing consistent with the Plaintiffs theory, Ms. Galindo would have an additional overdraft charge levied on her account.

Ms. Galindo was aware of the float and took advantage of it on several occasions as indicated by the following testimony:

Q   At some point in time, did you become aware that debit card purchases may post on days other than days when you made your purchase?

A   Yes.

Q.   And how long have you known that for?

A.   I don't know. Years.[65]

Later Ms. Galindo also testifies:

Q.   But, generally, when you would go on and see a Chevron [debit card] purchase and it would say pending for one dollar; you knew it was actually more than a dollar; is that correct?

---

[64] "Deposition of Maria Galindo," January 29, 2009, p. 53:24 - p. 54:13.

[65] "Deposition of Maria Galindo," January 29, 2009, p. 62:14-19.

A.      Yes.

Q.      And would you take that into account when you looked at your available balance?

A.      No, not always.

Q.      And why is that?

A.      Just because it'd be pending at a dollar. Sometimes, you would have a couple -- a day or two before it's going to post, if you're tight on cash.

Q.      So you knew -- you knew that available balance would mean you could get the money out?

A.      Yes.

Q.      But you also knew that you had spent more than a dollar at Chevron?

A.      Yes.

Q.      Did you think you could chance it?

A.      Sometimes, yeah.[66]

## G.      Mr. Olsen's Reversal Alternatives Suffer from Methodological Errors

Mr. Olsen's Reversal Alternative #1 is inappropriate. As previously discussed, as I understand it Mr. Olsen's approach creates the possibility that reversals that were actually granted for overdrafts that are a part of his damages analysis will not be accounted for (see Section V.B.). This would have the effect of understating the amount of reversals and, therefore, overstating damages that are based on Reversal Alternative #1. As a result, any of Mr. Olsen's damage calculations that use Reversal Alternative #1 are unrealistic and should not be considered reliable.

As previously discussed, Mr. Olsen's Reversal Alternative #2 accounts for reversal fees by reducing damages by all reversal fees that occurred within 30 days after the day on which the customer was harmed with an overdraft fee. However, it is the case that some overdraft fees are

---

[66] "Deposition of Maria Galindo," January 29, 2009, p. 83:21- p. 84:15.

actually reversed more than 30 days after they were assessed. As a result, Mr. Olsen's calculations based on Reversal Alternative #2 overstate damages because they understate the actual amount of reversals.

One of the named Plaintiffs in this matter, Erin Walker, had reversals that were granted more than 30 days after she was assessed the overdraft fee. This can be seen in Erin Walker's account statements for the periods from May 24, 2007 through June 25, 2007 and June 26, 2007 through July 25, 2007. According to Ms. Walker's May/June account statement she was assessed several overdraft fees on June 5, 2007.[67] Four of these overdraft fees were reversed on July 9, 2007.[68] This is greater than 30 days after the overdraft fees were assessed. Mr. Olsen's Reversal Alternative #2 would not have accounted for these four reversals and, therefore, would have overstated damages for just this one instance by 4 * $34 = $136.

## H.    There Are Other More Reasonable Sequencing Scenarios That Would Reduce Mr. Olsen's Damages

There are other more reasonable sequencing orders that Wells Fargo could have chosen that more closely model the Plaintiffs' theory of the case that transactions should be posted and sequenced chronologically. Furthermore, there is no justifiable reason why Mr. Olsen should be changing the manner in which checks, ACH transactions, and bill pay transactions are currently sequenced. This case is about debit card transactions and not these other types of debits.

In Mr. Olsen's Re-Sequencing Scenario #1 he chooses to sequence all debit transactions in Group 50040, which includes debit card, ACH, checks, and bill pay transactions, from low-to-high. As I have said, there is no justification for this sequencing order. Low-to-high sequencing is no closer to chronological posting than is high-to-low sequencing. This scenario is inappropriate and should not be relied upon as providing a reasonable damages calculation as it has no connection whatsoever to the Plaintiff's chronological transaction posting theory to this case. Since it is unrelated to the claims made in this case, it should not provide a basis for a

---

[67] "Erin V. Walker Account Statement for the Period from May 24, 2007 through June 25, 2007," GUT000502 (Exhibit 141 to the Deposition of Erin Walker).

[68] "Erin V. Walker Account Statement for the Period from June 26, 2007 through July 25, 2007," WFB-G 02058 (Exhibit 144 to the Deposition of Erin Walker).

"but-for" situation and no adjustments could make it a reasonable basis for a damages award in this case.

As I have said, Scenarios #2 and #3 appear to be attempts to be partly consistent with the claims stated by Plaintiffs but are inconsistent in important elements. In particular, Mr. Olsen posts checks, ACH and automatic bill paying after debit card transactions. That is clearly not consistent with an attempt to post in the order that transactions are made. Checks, as I have shown, are generally written significantly earlier than debit card transactions that post on the same day. ACH transactions and automatic bill pay have also been authorized by the account holder well before a debt card transaction.[69]

To be logically consistent with Plaintiffs' claims, all three must be posted before debit card transactions. The first set of Wells Fargo's alternative sequencing scenarios are modifications to Mr. Olsen's Re-Sequencing Scenarios #2 and #3 which partially improve on Mr. Olsen's incorrect specification of the Plaintiffs' alternative. Under these scenarios ACH transactions, checks, and automatic bill pay transactions are debited from an account before debit card transactions. Wells Fargo's Sequencing Scenarios A and B modify Mr. Olsen's Re-Sequencing Scenarios #3 and #2, respectively, to account for the fact that Wells Fargo is permitted to post and sequence ACH transactions, checks, and bill pay transactions in whatever manner they choose. Specifically, Wells Fargo's Sequencing Scenarios A and B sequence ACH transactions, checks, and bill pay transactions before debit card transactions; in contrast to Mr. Olsen's Re-sequencing Scenarios #2 and #3 that sequence ACH transactions, checks, and bill pay transactions after debit card transactions. Wells Fargo's Sequencing Scenarios A and B also differ from Mr. Olsen's re-sequencing scenarios in that they use additional timestamp data from XR Memo Reports that Mr. Olsen chose not to use. For more information regarding this timestamp data please see the expert report of David McGoveran.

They are represented graphically as follows:

---

[69] For any given posting day I understand from Mark Lentz that ACH transactions, on average, are authorized before debit card transactions

**Wells Fargo's Sequencing Scenario A – Modification to Mr. Olsen's Re-Sequencing Scenario #3**

| Type of Transaction | Credits | Cash /ATM | ACH /Checks / Bill Pay | Debit Card |
|---|---|---|---|---|
| Order in Which that Transaction is Sorted | Any order ⇨ | High to Low ⇨ | High to Low ⇨ | **Chronological**<br>• Default: Debit card transactions without timestamps default to the beginning of each transaction day from high to low. |

**Wells Fargo's Sequencing Scenario B – Modification to Mr. Olsen's RE-Sequencing Scenario #2**

| Type of Transaction | Credits | Cash/ ATM | ACH/C hecks/ Bill Pay | Debit Card |
|---|---|---|---|---|
| Order in Which that Transaction is Sorted | Any order ⇨ | High to Low ⇨ | High to Low ⇨ | **Chronological**<br>• Default: Debit card transactions without timestamps default to the beginning of each transaction day from low to high. |

Application of these two improvements to Mr. Olsen's scenarios using the ten day sample of transactions results in a significant reduction in damages. In particular, Wells Fargo's Sequencing Scenario A reduces the amount of total overdraft fees during the ten day sample period from $22.3 million (actual overdraft amount) to $19.4 million (hypothetical overdraft amount based on the sequencing defined under Scenario A). This results in an average percentage decline for the ten days of approximately 12.8 percent (= ($19.4 - $22.3) / $22.3) (see Exhibit 4.1b). Wells Fargo's Sequencing Scenario B results in a reduction in the amount of total overdraft fees during the ten day sample period from $22.3 million (actual overdraft amount) to $18.8 million (hypothetical overdraft amount based on the sequencing defined under Scenario

43

B). This results in an average percentage decline for the ten days of approximately 15.6 percent (= ($22.3 - $18.8) / $22.3) (see Exhibit 4.1d).

In order to apply the results for Scenarios A and B based on the ten day sample to estimate damages for the entire damages period, I have performed two analyses. The first analysis starts with the average percentage decline in overdraft fees for the ten day sample based on Mr. Olsen's re-sequencing scenarios. This is divided into his calculation of damages for the entire damages period. This ratio is multiplied by the average percentage decline in overdraft fees calculated for the ten day sample that results from comparing Wells Fargo's scenarios to its current practice. To perform this ratio analysis I asked Wells Fargo to run Mr. Olsen's re-sequencing scenario on the ten day sample. This resulted in an average percentage decline of 34.1 percent and 36.1 percent for Re-Sequencing Scenarios #3 and #2, respectively (see Exhibits 4.3c and 4.3b). Mr. Olsen's calculation of damages for the entire damages period is $184.6 million and $203.0 million for Re-Sequencing Scenarios #3 and #2, respectively (based on Reversal Alternative #2). Finally, as discussed in the previous paragraph, the average percentage decline for Wells Fargo's Sequencing Scenarios A and B were 12.8 percent and 15.6 percent, respectively. As calculated and presented in Exhibit 4.3a, the ratio analysis results in an estimate of "implied" damages for the entire damages period of $69.2 million and $87.9 million for Sequencing Scenarios A and B, respectively.

The second analysis involves making an estimate of the damages for the entire period from my stratified random sample of days. As noted earlier this is a disproportionate random sample since it oversamples some strata and undersamples others. To make estimates of the total damages I "reweighted" the data to correct for this over/under representation so that each strata is given the correct weight in the estimates of damages. This weighting scheme is calculated and presented in Exhibits 4.1c and 4.1e for scenarios A and B. Using the appropriate weights the weighted average percentage declines are 8.3 percent and 10.4 percent for Scenarios A and B, respectively. Multiplying these percentages by the total actual overdraft fees during the damages period of $1023.2 million results in an estimate of damages before reversals and uncollectibles of approximately $84.8 million and $106.4 million for Scenarios A and B, respectively (see Exhibit 4.1a). After accounting for reversals and uncollectibles, damages estimates are approximately $61.9 million and $77.5 million for Scenarios A and B, respectively (see Exhibit 4.1a). To

44

determine the reliability of these damages estimates, I have calculated 95 percent confidence intervals for each estimate.[70] The 95 percent confidence intervals represent an interval of damages that is 95 percent likely to contain the actual damages for the entire damages period. Exhibit 4.1a provides the 95 percent confidence intervals for the weighted average percentage decline and for the total damages both before and after accounting for reversals and uncollectibles.

Even these corrections to the sequencing do not characterize posting scenarios that are consistent with the claims made by Plaintiffs in this case. I have already shown the impact of just posting all debits in a manner that is consistent with the Plaintiffs claim while continuing to post all credits before any debits. The next step, consistent with the Plaintiffs claims, is to post both credits and debits in the order in which the transactions occurred. This ordering of postings is also a more realistic description of what the Bank would do in response to the need to control the risk associated with overdrafts.

The second set of alternative sequencing scenarios represents more accurate and realistic attempts to sort all transactions (including all credits and debits) chronologically compared to Mr. Olsen's Re-sequencing Scenarios #2 and #3. In these two sequencing orders, ACH transactions, checks, and bill pay transactions are posted first to account for the fact that these transactions most likely occurred on days prior to the particular posting day.

They are represented graphically as follows:

**Wells Fargo's Sequencing Scenario C – Chronological**

| **ACH/Checks/ Bill Pay** | | **Credits/Cash/ ATM/ Debit Card** |
|---|---|---|
| High to Low | ⇨ | **Chronological** <br><br> • Credit Default: Credits without timestamps default to the beginning of each transaction day in any order. <br><br> • Debit Default: Debits without timestamps default to the end of each transaction day from high to low. |

---

[70] The standard errors and confidence intervals were calculated using typical formulas for a disproportionate stratified sample design.

**Wells Fargo's Sequencing Scenario D – Chronological**

| ACH/Checks/ Bill Pay | | Credits/Cash/ ATM/ Debit Card |
|---|---|---|
| High to Low | ⇨ | **Chronological** <br><br> • Credit Default: Credits without timestamps default to the beginning of each transaction day in any order. <br><br> • Debit Default: Debits without timestamps default to the end of each transaction day from low to high. |

Application of these two scenarios using the ten day sample of transactions results in a significant reduction in damages. In particular, Wells Fargo's Sequencing Scenario C results in a reduction in the amount of total overdraft fees during the ten day sample period from $27.5 million (actual overdraft amount) to $24.5 million (hypothetical overdraft amount based on the sequencing defined under Scenario C). This results in an average percentage decline for the ten days of approximately 10.7 percent (($24.5 - $27.5) / $27.5) (see Exhibit 4.1f). Wells Fargo's Sequencing Scenario D results in a reduction in the amount of total overdraft fees during the ten day sample period from $27.5 million (actual overdraft amount) to $23.9 million (hypothetical overdraft amount based on the sequencing defined under Scenario D). This results in an average percentage decline for the ten days of approximately 12.9 percent (($23.9 - $27.5) / $27.5) (see Exhibit 4.1h).

I note that some of the class members are actually worse off under these two sequencing scenarios for many of the reasons discussed previously in this report. In particular, any of the class members that relied on "deposit float" generated by Wells Fargo's current policy of posting credits before debits to avoid incurring overdraft fees would likely have incurred more overdraft fees under the chronological sequencing implemented under Scenarios C and D.

In order to apply the results for Scenarios C and D based on the ten day sample to estimate damages for the entire damages period I have performed the same two analyses described above for Scenarios A and B (i.e., the ratio analysis and standard statistical analysis).

46

As calculated and presented in Exhibit 4.3a, the ratio analysis results in an estimate of "implied" damages for the entire damages period of $58.1 million and $72.7 million for Sequencing Scenarios C and D, respectively.

The second analysis is the standard statistical analysis used for stratified samples that derives weights for each of the sample results (i.e., the percentage decline in total overdraft fees as a percentage of actual overdraft fees calculated for each of the days in the sample). This weighting scheme is calculated and presented in Exhibits 4.1g and 4.1i and results in a weighted average percentage decline in overdraft fees of REDACTED percent and REDACTED percent for Scenarios C and D, respectively. Multiplying these percentages by the total actual overdraft fees during the damages period of REDACTED million results in an estimate of damages before reversals and uncollectibles of approximately $78.8 million and $96.0 million for Scenarios C and D, respectively (see Exhibit 4.1a). After accounting for reversals and uncollectibles, damages estimates are approximately $57.5 million and $70.0 million for Scenarios C and D, respectively (see Exhibit 4.1a). Exhibit 4.1a provides the 95 percent confidence intervals for the weighted average percentage decline and for the total damages both before and after accounting for reversals and uncollectibles.

# I.     Accounting for Customer Behavior, Causation, and Mitigation

## 1.     Mr. Olsen Fails To Account for Class Members Ability To Avoid Overdraft Fees

Mr. Olsen defines "potential class members" as customers who had accounts with multiple overdrafts in one day.[71] Mr. Olsen does not take into account issues involving learned behavior and causation – i.e., customers' ability to avoid overdraft fees. In economic terms, the concept of learned behavior reduces opportunism and requires that the harmed party take reasonable efforts to minimize the harm from an alleged action. A proper calculation of economic damages must take customers' ability to avoid injury into account. Some customers never overdrew their account and therefore never incurred overdraft fees. Other customers, after

---

[71] "The definition is all accounts that had at least one instance where multiple overdraft charges were assessed on a single posting date" ("Expert Report of Arthur Olsen," November 20, 2009, p. 18).

making an overdraft or making multiple overdrafts on the same day, changed how they manage their accounts in order to minimize overdraft fees. A large portion of Mr. Olsen's potential class, however, did not make reasonable efforts to minimize the overdraft fees incurred under Wells Fargo's overdraft policy. In fact, during the class period, a large number repeatedly (on more than ten separate posting days) spent more than they had in their accounts and incurred multiple overdraft fees. These class members account for nearly 60 percent of Mr. Olsen's damages.

Customers could have avoided these "damages" by taking any one of many steps to minimize or completely avoid incurring overdraft fees, including:

- More carefully recording ones purchases;
- Reducing the number of small purchases (or any purchases) made with one's debit card if uncertain of available funds;
- Using cash to pay for all transactions and only withdrawing the cash that is needed for food and discretionary items;
- Using credit cards in place of debit cards; and
- Switching to another bank that charges lower overdraft fees or has a different overdraft policy.

Many of these options are advocated by the Federal Reserve as ways to properly manage a bank account to avoid overdraft fees. The Federal Reserve Board's website, for example, summarizes: "The best way to avoid overdraft and bounced-check fees is to manage your account so you don't overdraw it." It continues: "Pay special attention to your electronic transactions. Record your ATM withdrawals and fees, debit card purchases, and online payments."[72]

---

[72] "Protecting Yourself from Overdraft and Bounced-Check Fees," Federal Reserve Board. phttp://www.federalreserve.gov/pubs/bounce/]. The Board goes on to advise:

- Keep track of how much money you have in your checking account by keeping your account register up-to-date. Record all checks when you write them and other transactions when you make them. And don't forget to subtract any fees.
- Pay special attention to your electronic transactions. Record your ATM withdrawals and fees, debit card purchases, and online payments.
- Don't forget about automatic bill payments you may have set up for utilities, insurance, or loan payments.
- Keep an eye on your account balance. Remember that some checks and automatic payments may not have cleared yet.
- Review your account statements each month. Between statements, you can find out which payments have cleared and check your balance by calling your bank or by checking online or at an ATM. Be sure to find out the actual amount in your account--your account balance not including any funds available to you through "courtesy overdraft-protection," or "bounce coverage," plans.

Maria Galindo actually testified that she stopped overdrawing her account once she began to keep track of her transactions.

> Q.    If you turn to the second page, you'll see that there's an overdraft fee that posted on February 15, 2008. It appears that it'd been quite a while since youd had an overdraft until this point in time…Had you done anything differently? Had you done anything differently over the two-year period before this that would have changed the manner in which you kept track of your transactions?
>
> A.    I started using the register, check register I started using it for all my transactions.
>
> Q.    And how did that help you?
>
> A.    Helped me manage my money better and avoid those overdraft fees.
>
> Q.    Would it help you by not having to guess as to whether you had enough money left?
>
> A.    Right.[73]

Thus, even if the account holders were not aware of the Wells Fargo's explicit overdraft policy, performing any one (or combination) of the recommended actions would have reduced or eliminated their overdraft fees. Moreover, even if they continued to incur overdraft fees, they could have taken actions (like Marie Galindo did) to minimize fees once they became aware of how Wells Fargo sequenced their transactions.

Indeed, the Plaintiffs in this matter demonstrate that such customers can learn how to avoid overdrafts and mitigate their "damages." Plaintiffs in this matter have testified that, due to the possibility of overdraft charges, they altered there behavior in a number of ways to avoid incurring overdraft fees. William Smith, Jr. for example, "tried to keep more money in to cover it just in case…"[74] Veronica Gutierrez testified that she "found other means rather than writing

---

[73] "Deposition of Marie Galindo," January 29, 2009, pp. 87:13 - 88:8.

[74] "Deposition of William Smith, Jr.," June 18, 2008, p. 54:3-4.

checks...."[75] These statements demonstrate that Plaintiffs can, by taking certain actions, avoid incurring multiple overdraft fees.

The data show that a large portion of Mr. Olsen's potential class members continued to incur overdraft fees that Mr. Olsen treats as damages numerous times after they had more than adequate notice, through their own personal experience of the challenged practice. Mr. Olsen estimates that there were 2,312,484 potential class members. My calculations, shown in Exhibit 4.2, show at most 2,152,106 accounts. Of this amount, 754,738 accounts (or 35 percent) had only one incident of multiple overdrafts occurring on the same day during the class period. Another 379,716 accounts (18 percent) had only two incidents of multiple overdrafts occurring on the same day during the class period. Thus, a significant number of customers with multiple overdrafts on one or two days (approximately 53 percent) managed to avoid regularly repeating the problem during the class period.[76]

On the other hand, a large number of account holders did have repeated days of multiple overdrafts. It is my understanding that Wells Fargo issues overdraft notices immediately after they occur. These accounts with three or more multiple overdrafts, therefore, represent customers who would have been notified that they had overdrawn from their accounts for multiple transactions. Despite these notifications, a large number of accounts continued to incur the multiple overdraft fees. Customers with three or more days of multiple overdrafts represent a large portion of Mr. Olsen's potential class (1,017,652 accounts out of the 2,152,106, or 47.3 percent of the total).[77] Indeed, a large portion of Mr. Olsen's potential class had multiple overdrafts on a frequent basis. Exhibit 4.2 shows that 244,941 accounts (11 percent) had over 10 instances of multiple overdrafts. On average, this group had multiple overdrafts on 27 days

---

[75] "Deposition of Veronica Gutierrez," June 12, 2008, p. 102:6-7. Ms. Gutierrez went on to testify "because it was easier for me to account for money in the account that I pulled out right away than writing a check and contemplating when would the bank post it to my account" (p. 102:11-14).

[76] Customers added near the end of the class would have had less time to incur multiple overdraft charges on one day. Limiting Mr. Olsen's potential class to accounts opened between November 15 and December 31, 2004, a similar percentage (51 percent) of these accounts avoided repeated the problem throughout the rest of the class period (see Appendix C.2).

[77] This number is likely to be higher because Mr. Olsen class period begins in November 2004. Some potential class members may have had multiple overdrafts before the class period began. Appendix C.2 shows that 1,195,256 accounts were opened before the class period began.

throughout the class period (see Exhibit 4.4). This group averaged multiple overdrafts once every 48 days.

Mr. Olsen's failure to account for customer behavior and its effect on causation leads him to overestimate damages. While account holders with three or more multiple overdrafts made up 47.3 percent of the potential class, they make up 91.3 percent of Mr. Olsen's damages (see Exhibit 4.2). Furthermore, customers who repeatedly incurred multiple overdrafts contribute the most to damages – account holders that had multiple overdrafts on 11 or more dates throughout the class period make up nearly 60 percent (59.4 percent) of Mr. Olsen's alleged damages calculations.

## 2. Damages Are Significantly Reduced When Accounting for Persons Who Overdraft Repeatedly

Accounting for persons who overdraft their accounts repeatedly results in a significant reduction in damages. In Exhibit 4.2, I have provided a breakdown of my estimates of damages for all four Wells Fargo sequencing scenarios by the number of post dates with multiple overdraft charges. In other words, my damages estimates are divided into those damages for class members that had "1" post day with multiple overdrafts, "2" post days with multiple overdrafts, "3" post days with multiple overdrafts, etc.

The breakdown into these categories is based on the percentage breakdown of Mr. Olsen's damages using his Re-Sequencing Scenario #2 (with Reversal Alternative #2). These percentages are also provided in Exhibit 4.2. It is interesting to note that approximately 59 percent of damages are derived from class members with 10 or more post dates with multiple overdrafts.

The following table provides a breakdown of my estimates of damages for all four Wells Fargo sequencing scenarios assuming that the injured members of the class include: (1) only those class members who have "2" or less post days with multiple overdrafts; (2) only those class members who have "5" or less post days with multiple overdrafts; and (3) only those class members who have "10" or less post days with multiple overdrafts.

## Table 1
## Damages under Scenarios A, B, C and D
## Accounting for Persons Who Overdraft Repeatedly
## Entire Damages Period, November 15, 2004 - June 30, 2008

| Number of Post Dates With Multiple Overdraft Charges | Scenario A | Scenario B | Scenario C | Scenario D |
|---|---|---|---|---|
| | (U.S. Dollars) | | | |
| (1) | (2) | (3) | (4) | (5) |
| 2 Post Dates or Less | $ 5,364,415 | $ 6,719,355 | $ 4,986,219 | $ 6,066,718 |
| 5 Post Dates or Less | 13,761,624 | 17,237,525 | 12,791,418 | 15,563,280 |
| 10 Post Dates or Less | 25,108,694 | 31,450,630 | 23,338,510 | 28,395,895 |

The following table provides a breakdown of Mr. Olsen's estimates of damages for all three of his re-sequencing scenarios based on the same three categories of injured class members defined above.

## Table 2
## Damages under Mr. Olsen's Scenarios #1, #2 and #3
## Accounting for Persons Who Overdraft Repeatedly
## Entire Damages Period, November 15, 2004 - June 30, 2008

| Number of Post Dates With Multiple Overdraft Charges | Scenario #1 | Scenario #2 | Scenario #3 |
|---|---|---|---|
| | (U.S. Dollars) | | |
| (1) | (2) | (3) | (4) |
| 2 Post Dates or Less | $ 27,573,070 | $ 17,602,945 | $ 16,007,626 |
| 5 Post Dates or Less | 70,734,690 | 45,157,787 | 41,065,231 |
| 10 Post Dates or Less | 129,058,582 | 82,392,388 | 74,925,336 |

# VII. OVERVIEW OF DR. COWAN'S DAMAGES ANALYSIS

## A. Introduction

As I discussed above, I understand that Dr. Cowan is still serving as an expert for the Plaintiffs with respect to his opinions on the impact of the challenged practice and damages based on the application of his Method 1 and Method 3 as outlined and discussed in the Cowan Original Report, the Cowan Supplemental Report, and the Cowan Reply Report. In order to respond to the Plaintiffs' damages theories and methodologies in full, which now include the damages opinions expressed in the Olsen Updated Report, I have been asked to also provide rebuttal opinions with respect to Dr. Cowan's damages opinions based on his Method 1 and Method 3. The following sections provide an overview and rebuttal of Dr. Cowan's damages analysis under his Method 1 and Method 3. I have also reviewed and incorporate by reference herein the response to Dr. Cowan's methodology that was set out in the March 11, 2009 Expert Witness Report of Todd D. Menenberg ("Menenberg Report").

With respect to Dr. Cowan's Method 2, I understand that Plaintiffs have withdrawn his damages analysis. As I will describe in detail in the following sections, Dr. Cowan's Method 1 using a back-casting approach and Method 3 relies upon certain results from his Method 2. If Method 2 is not being considered, then Method 1 using a back-casting approach and Method 3 are both missing fundamental components derived from the withdrawn Method 2. Dr. Cowan has provided no opinions addressing this issue. Furthermore, Plaintiffs have also not provided any opinions from Dr. Cowan addressing the opinions expressed in the Olsen Updated Report. I will provide responsive opinions on Dr. Cowan's Method 2 and any opinions addressing the updated damages analysis by Mr. Olsen if the Court permits Plaintiffs to provide any testimony about these issues. Even if Plaintiffs had not withdrawn Dr. Cowan's damages analysis on the basis of his Method 2, it is still flawed, because Dr. Cowan frequently makes assertions without providing adequate basis and provides no statistical analysis to support the applicability of his sample to the entire damages period (in addition to the various reasons set out in the Menenberg Report).

# EXHIBIT 2C

**DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**

Overall, Dr. Cowan's damages analysis for Methods 1 and 3 are performed in an aggregate manner that does not specifically identify the injured class members. He does not provide any opinions addressing this issue.

## B. Overview of Dr. Cowan's Method 1 – Wells Fargo's "Lift"

Dr. Cowan bases his Method 1 solely on a handful of documents of unidentified provenance and purpose prepared in 2001 by Wells Fargo in which it was estimated that the Bank could receive an estimated annualized $40 million "lift" in income from a series of diverse changes to the processing of debit transactions being implemented at that time.[78] Dr. Cowan translated this annualized lift into a quarterly lift of $10 million in income; and then further translated it into a quarterly lift of $5 million in income in California (assuming approximately half of the lift would occur in California).[79] Dr. Cowan then divided the purported quarterly lift by certain measures or items reported by Wells Fargo in its Call Report for Q4 2001. These were:

- Demand Deposits,
- Transaction Deposits,
- Transaction Deposits + MMD (i.e., Money Market Deposits),
- Non-Interest Income
- Net Operating Revenue

I refer to these as Call Report Measures.

The division gave him five unique lift-to-Call Report Measure ratios for Q4 2001. Each of these ratios was multiplied by the appropriate Call Report Measure for each quarter during the damages period (Q4 2004 – Q2 2008) to estimate damages for the quarter. Mathematically that can be written as:

---

[78] See WFB-G 07807-A ("Services Charges On Deposits Update," February 2002, Timeline that points out the lift on 4th quarter of 2001 (BSE Phase 1)); WFB-G 07775-A ("ODRI Initiative Tracking, Analysis of Hogan Processing Changes," August 2002, Table showing the initiatives (Phase 1: Sort Order) and the net annualized effect); and WFB-G 07778-A ("ODRI Initiative Tracking, Analysis of Hogan Processing Changes," Text box at the bottom of the page that shows two numbers. Net driver based revenue forecast (41,000,000) and annualized pre-implementation estimate (40,000,000)).

[79] "Supplemental Report of Charles D. Cowan, Ph.D.," March 4, 2009, pp. 8-9.

$$(1)\ \text{Damages1}(Q_i, Y_j) = \left( \frac{\$5,000,000}{\text{Call Report Measure}(Q4,\ 2001)} \right) \times \text{Call Report Measure}(Q_i, Y_j)$$

Where:

<u>Damages1($Q_i$, $Y_j$)</u> = Damages under Dr. Cowan's Method 1 in quarter $Q_i$ (i = 1 – 4) of year $Y_j$ (j = 2004 – 2008).

<u>$5,000,000</u> = Dr. Cowan's estimate of the quarterly increase in overdraft fees in California as of the end of 2001 due to changes in the ordering of debits to high-to-low.

<u>Call Report Measure($Q4$, 2001)</u> = Value for the chosen Call Report Measure in the 4[th] quarter of 2001 in which the choices for Call Report Measure include Demand Deposits, Transaction Deposits, Transaction Deposits + MMD, Non-Interest Income, and Net Operating Revenue.

<u>Call Report Measure($Q_i$, $Y_j$)</u> = Value for the chosen Call Report Measure in quarter $Q_i$ (i = 1 – 4) of year $Y_j$ (j = 2004 – 2008).

Summing up the quarterly figures throughout the damages period resulted in the following five damages estimates:

- Call Report Measure = Demand Deposits: $77.87 million
- Call Report Measure = Transaction Deposits: $89.94 million
- Call Report Measure = Transaction Deposits + MMD: $239.69 million
- Call Report Measure = Non-Interest Income: $97.01 million
- Call Report Measure = Operating Revenue: $120.09 million

Dr. Cowan also performed a back-casting analysis, using lift information from his Method 2, to arrive at an alternative estimate of damages under Method 1.[80] Specifically, for each year during the damages period he used a different lift rate as opposed to the constant lift rate used in equation 1 above. For 2004, the lift rate that Dr. Cowan used was the same rate used in equation 1 above (i.e., $5,000,000 divided by the appropriate Call Report Measure for Q4 2001). For each successive year in the damages period (i.e., 2005 through 2008), Dr. Cowan adjusted the annual lift rate to account for changes in the ratio of overdraft fees-to-Call Report Measures by using the lift rate of 13.97% that he calculated under Scenario 1 of his Method 1. Each year's lift year was determined by the following equation:

$$(2)\ \text{Lift Rate}(Y_j) = 13.97\% \times \left( \frac{\text{Overdrafts - CA}(Y_{j-1})}{\text{Call Report Measure}(Y_{j-1})} \right)$$

---

[80] "Supplemental Report of Charles D. Cowan, Ph.D.," March 4, 2009, pp. 22-24.

Where:

Lift Rate($Y_j$) = Dr. Cowan's estimate of the increase in overdraft fees, as a percentage of the chosen Call Report Measure, in California in year $Y_j$ ($j = 2005 - 2008$).

13.97% = Dr. Cowan's estimate of the increase in overdraft fees (i.e., damages), as a percentage of the total overdraft fees incurred by class members in the sample during the entire damages period, based on the ordering of debits according to Scenario 1 of his Method 2.[81]

Overdrafts – CA($Y_{j-1}$) = Total overdraft fees in California in year $Y_{j-1}$ ($j = 2005 - 2008$).

Call Report Measure($Y_{j-1}$) = Value for the chosen Call Report Measure in year $Y_{j-1}$ ($j = 2005 - 2008$).

Dr. Cowan then calculated damages in the each year using the following equations:

$$(3)\ \text{Damages1BC}(2004) = \left( \frac{\$5{,}000{,}000}{\text{Call Report Measure}(Q4,\ 2001)} \right) \times \text{Call Report Measure}(2004)$$

and

$$\text{Damages1BC}(Y_j) = \text{Lift Rate}(Y_j) \times \text{Call Report Measure}(Y_j)$$

Substituting from Equation (2) for Lift Rate($Y_j$)

$$\text{Damages1BC}(Y_j) = 13.97\% \times \left( \frac{\text{Overdrafts - CA}(Y_{j-1})}{\text{Call Report Measure}(Y_{j-1})} \right) \times \text{Call Report Measure}(Y_j)$$

Where:

Damages1BC($Y_j$) = Damages under Dr. Cowan's Method 1 using a back-casting approach in year $Y_j$ ($j = 2005- 2008$).

Call Report Measure($Y_j$) = Value for the chosen Call Report Measure in year $Y_j$ ($j = 2005 - 2008$).

Summing up the annual figures throughout the damages period resulted in the following five damages estimates:

- Call Report Measure = Demand Deposits: $207.64 million
- Call Report Measure = Transaction Deposits: $213.50 million
- Call Report Measure = Transaction Deposits + MMD: $232.66 million
- Call Report Measure = Non-Interest Income: $203.26 million

---

[81] Under Scenario 1 Dr. Cowan grouped debit card transactions separately from checks and ACH transactions; sequenced debit card transactions before checks and ACH transactions; and sequenced all transactions in chronological order when the time of the transaction was known and from low-to-high when it was not. ("Supplemental Report of Charles D. Cowan, Ph.D.," March 4, 2009, p. 18)

- Call Report Measure = Operating Revenue: $199.02 million

## C. Overview of Dr. Cowan's Method 3 – Wells Fargo "Lift" and FDIC Report

Dr. Cowan's Method 3 is based on several ratios provided in an FDIC report on overdrafts in the banking industry and on the results of his Method 2. His damages analysis under this method begins with the use of ratios from the FDIC report of NSF-related fee income and service charge fees to the same Call Report Measures discussed under Method 1. Dr. Cowan refers to the NSF-related fee income ratios as Ratios A. The values for these ratios are as follows:[82]

- NSF-Related Fee Income / Demand Deposits = 5.27%
- NSF-Related Fee Income / Transaction Deposits = 3.69%
- NSF-Related Fee Income / Transaction + MMD Deposits = 0.86%
- NSF-Related Fee Income / Non-Interest Income = 22.7%
- NSF-Related Fee Income / Net Operating Revenue = 6.0%

The second set of ratios based on service charge fees are referred to as Ratios B. The values for these ratios are as follows:[83]

- Service Charge Fees / Demand Deposits = 7.26%
- Service Charge Fees / Transaction Deposits = 5.08%
- Service Charge Fees / Transaction + MMD Deposits = 1.19%
- Service Charge Fees / Non-Interest Income = 31.3%
- Service Charge Fees / Net Operating Revenue = 8.2%

Dr. Cowan multiplies these ratios by Wells Fargo's Call Report Measures to arrive at estimates of Wells Fargo's NSF-related fee income (using Ratios A) and service charge fees

---

[82] "FDIC Study of Bank Overdraft Programs," November 2008, pp. 57 (see the "Noninterest income" and "Net operating revenue" rows and "Greater than $1 Billion" column under the "Ratio of NSF-related fee income to" heading) & 60 (see the "Demand deposits," "Transaction deposits," and "Trans. and MMD deposits" rows and "Greater than $1 Billion" column under the "Ratio of NSF-related fee income to" heading).

[83] "FDIC Study of Bank Overdraft Programs," November 2008, pp. 57 (see the "Noninterest income" and "Net operating revenue" rows and "Greater than $1 Billion" column under the "Ratio of Call Report service charge fees on deposit accounts to" heading) & 60 (see the "Demand deposits," "Transaction deposits," and "Trans. and MMD deposits" rows and "Greater than $1 Billion" column under the "Ratio of Call Report service charge fees on deposit accounts to").

(using Ratios B).[84] These estimates are, in turn, multiplied by a ratio of overdraft fees to NSF fees to arrive at estimates of Wells Fargo's overdraft fees. The ratio of overdraft fees to NSF fees is calculated using (1) Wells Fargo's Supplemental Response that indicates the company collected REDACTED in overdraft fees from January through December 2006 and (2) Dr. Cowan's estimate of Wells Fargo's NSF-related fee income using Ratios A from January through December 2006. Finally, Dr. Cowan multiplies his estimate of Wells Fargo's overdraft fees by the appropriate ratio of Wells Fargo's damages calculated under Method 2 to total overdraft fees assessed to the class members in the sample during the entire damages period (which is equal to $99,608,000). There is a unique damage number, or "lift," resulting from each of the damages scenarios presented under Dr. Cowan's Method 2.

In summary, for each quarter during the damages period and for a given Method 2 scenario and FDIC ratio, Dr. Cowan's Method 3 calculates damages using the following equation:

$$\text{Damages3}(Q_i, Y_j) = \text{FDIC Ratio}(R_k) \times \text{Call Report Measure}(Q_i, Y_j) \times$$

$$(4) \left( \frac{\text{REDACTED}}{\sum_{i=1}^{4} \text{NSF Fee}(Q_i, 2006)} \right) \times \left( \frac{\text{Lift}(S_l)}{\$99,608,000} \right)$$

Where:

<u>Damages3($Q_i$, $Y_j$)</u> = Damages under Dr. Cowan's Method 3 in quarter $Q_i$ ($i = 1 - 4$) of year $Y_j$ ($j = 2004 - 2008$).

<u>FDIC Ratio($R_k$)</u> = Ratio of NSF-related fee income ($k = A$) or service charge fees ($k = B$) to the chosen Call Report Measure taken from the FDIC report on overdrafts in the banking industry.

<u>Call Report Measure($Q_i$, $Y_j$)</u> = Value for the chosen Call Report Measure in quarter $Q_i$ ($i = 1 - 4$) of year $Y_j$ ($j = 2004 - 2008$).

REDACTED = Total Wells Fargo overdraft fees from January through December 2006 taken from Wells Fargo's Supplemental Response.

<u>NSF Fee($Q_i$, 2006)</u> = Dr. Cowan's estimate of Wells Fargo's NSF-related fee income using FDIC Ratio($R_A$) in quarter $Q_i$ ($i = 1 - 4$) of 2006.

<u>Lift($S_l$)</u> = Dr. Cowan's estimate of the increase in overdraft fees in California based on scenario $S_l$ ($l = 1 - 8$) from his damages calculations under Method 2.

---

[84] Wells Fargo's Call Report measures come from the following: RCON2210, RCON2215, RCON6810, RCON2215 and RCON6810, RIAD4079, RIAD4074, and RIAD4074 and RIAD4079.

$99,608,000 = Total overdraft fees assessed by Wells Fargo to the class members in the sample (used in Dr. Cowan's Method 2) during the entire damages period.

Since there are two sets of FDIC ratios (Ratios A and B), five Call Report Measures per set of FDIC ratios, and eight unique "lifts" generated from the Method 2 scenarios, Dr. Cowan calculates $2*5*8 = 80$ damages estimates under Method 3.

## VIII. REVIEW OF DR. COWAN'S DAMAGES ANALYSIS

### A. Method 1 Uses an Untested and Unsupported Estimate of the "Lift" in California from 2001

The annualized "lift" as of the end of 2001 of $40 million that Dr. Cowan's Method 1 relies on to calculate damages was a projection that Dr. Cowan never tested for its accuracy and reliability. In fact, it was a projection only for the 12 months (i.e., January through December 2002) and did not evaluate any period beyond 2002.[85]

Dr. Cowan assumes, without any support whatsoever, that 50% of the $10 million "lift" would result from accounts in California.[86] Dr. Cowan offered no explanation for why he used this unsupported assumption. In its January 2002 Operating Review, the Wells Fargo Consumer Deposits Group performed an analysis of overdrafts and returned items. In this analysis, it forecasted revenues of REDACTED million for California and Border Banking and total revenues of REDACTED million. Although Dr. Cowan claimed that 50% of overdraft revenues could be attributed to California, this data indicates that the correct percentage is approximately REDACTED percent.[87] In fact, Mr. Cowan admits in his deposition that he had "subsequently been told that it's about REDACTED percent of the market."[88] This admitted error alone would suffice to render Dr. Cowan's results for Method 1 invalid.

---

[85] ODRI Initiative Tracking, Analysis of Hogan Processing Changes, August 2002. WFB-G 07775-A.

[86] "Supplemental Report of Charles D. Cowan, Ph.D.," March 4, 2009. p 8-9.

[87] Service Charges on Deposits – Update, February 2002. WFB-G07812-A – WFB-G07813-A.

[88] "Deposition of Charles Cowan," 27 March 2009, p. 115:5-6.

## B. Method 1's "Lift" Is Based On Changes In Sequencing Different from Changes Contemplated by the Plaintiffs

Furthermore, the $40 million "lift" estimated by Wells Fargo is not relevant to the Plaintiffs' claims in this case. In order for the "lift" to be pertinent to this case, the Plaintiffs must be seeking to reverse the change that resulted in the "lift." In fact, Mr. Lentz' estimate was based on changes in the sort order that are different from the changes that are being contemplated in the Plaintiffs' three but-for sequencing orders presented in the Olsen Original Report. Nor do they reflect a comparison with the but-for world associated with Plaintiff's claim in this case, i.e., the sequencing of transactions in chronological order.

Prior to the change in sequencing in late 2001/early 2002, debit transactions were organized into the following two groups:

- Debit Group 1 – Cash withdrawn to purchase cashier's checks/money orders; cash transfers to other accounts; ATM; and POS debit card transactions.
- Debit Group 2 – Checks and ACH transactions.

Debit Group 1 transactions were posted first from low-to-high. Then, Debit Group 2 transactions were posted, also from low-to-high. None of these transactions were posted in any kind of chronological order. After the change in sequencing, debit transactions were organized into the following two groups (the changes are highlighted in bold):

- Debit Group 1 – Cash withdrawn to purchase cashier's checks/money orders; cash transfers to other accounts; and ATM; and POS debit card transactions.
- Debit Group 2 – **POS debit card transactions**; checks; and ACH transactions.

Debit Group 1 transactions were sequenced first from high-to-low. Then, Debit Group 2 transactions were sequenced, also from high-to-low. This is the existing sequencing that is currently being used by Wells Fargo and is the subject of this litigation. Therefore, the changes that occurred in late 2001/early 2002, and that formed the basis for the $40 million "lift" estimate, included the re-grouping of POS debit card transactions from Debit Group 1 to Debit Group 2 and the change in sequencing for both Debit Groups from low-to-high to high-to-low.

The three sequencing scenarios presented in the Olsen Updated Report are different from the changes implemented in late 2001/early 2002. In order for the $40 million "lift" estimated by Wells Fargo to be of any use for purposes of comparison to Mr. Olsen's sequencing scenarios,

the pre-late 2001/early 2002 debit groupings and sequencing must be the same as the debit groupings and sequencing defined in Mr. Olsen's scenarios. They are not.[89] Mr. Olsen's Sequencing Scenario #1 groups POS debit card transactions, checks, and ACH transactions together and sequences them from low-to-high. This scenario is not the same as the groupings and sequencing prior to the changes in late 2001/early 2002 because it does not have POS debit card transactions in a separate group from checks and ACH transactions. (As discussed above, it bears no relation to the issues in this case in any event.) Mr. Olsen's Sequencing Scenarios #2 and #3 group POS debit card transactions separately from checks and ACH transactions, and sequence both groups chronologically (low-to-high or high-to-low if time stamps do not exist). These scenarios are definitely not the same as the groupings and sequencing prior to the late 2001/early 2002 changes because they post transactions chronologically and not from low-to-high.

Because the $40 million "lift" projected by Wells Fargo in late 2001/early 2002 was based on changes in debit processing that are different from those contemplated in Mr. Olsen's 3 sequencing scenarios, and bear no relationship to the claims in this case, the results obtained under Dr. Cowan's Method 1 are meaningless.

## C. Dr. Cowan's Application of Method 1 Based On a Back-Casting Approach Is Unsupported

For the years 2005 through 2008 Dr. Cowan performs a back-casting approach to modify the lift rate used in Method 1 to account for the increase over time in the ratio of overdraft fees to the various Call Report Measures. According to equation (2), the lift rate in 2005 is equal to the 13.97% lift rate determined under Dr. Cowan's Method 2 multiplied by the ratio of total overdraft fees in California in 2004 to the Call Report Measure in 2004. Similarly, the lift rate in 2006 is equal to 13.97% multiplied by the ratio of total overdraft fees in California in 2005 to the Call Report Measure in 2005. The lift rates in 2007 and 2008 are based on ratios calculated using 2006 and 2007 figures, respectively. Why is Dr. Cowan using a 1-year lag to calculate the ratio of California overdraft fees to the Call Report Measure? He offers no explanation.

---

[89] For the estimate of the late 2001/early 2002 changes to be useful in measuring damages, moreover, it would need to measure the impact of the challenged practice within the framework of Plaintiffs' underlying legal theory of what was required. Again, it does not.

In general, one would expect that the lift rate in 2005 would be calculated using the ratio of California overdraft fees to the Call Report Measure for 2005, and not for 2004. The same is true for the calculation of the lift rates in 2006, 2007, and 2008. Not surprisingly, if one were to adjust Dr. Cowan's equation (2) to calculate the lift rate based on this more logical approach, his Method 1 using a back-casting approach (see equation (3)) would produce almost the same exact results as Dr. Cowan's Method 2. In other words, performed correctly Dr. Cowan's Method 1 based on back-casting is essentially the same as Method 2, and therefore offers no new information about damages.

## D.     Method 1 Based On a Back-Casting Approach Uses a "Lift" Calculated from Changes In Sequencing Different from Some of the Changes Contemplated by the Plaintiffs

As discussed in the previous section, Dr. Cowan's Method 1 is based on a back-casting approach uses the 13.97% lift calculated for Scenario 1 under Dr. Cowan's Method 2 damages analysis. Scenario 1 groups debit card transactions separately from checks and ACH transactions, and sequences these transactions chronologically if a time stamp exists and from low-to-high if one does not exist. This scenario is different from Mr. Olsen's Sequencing Scenario #1, which groups debit card transactions, checks, and ACH transactions together and sorts them from low-to-high. This scenario is also different from Mr. Olsen's Sequencing Scenario #3, which groups debit card transactions separately from checks and ACH transactions and sorts both groups chronologically if a time stamp exists and from high-to-low if one does not exist. Therefore, Dr. Cowan's Method 1 based on a back-casting approach cannot be used to support or corroborate Mr. Olsen's damages calculations based on either Sequencing Scenario #1 or #3.

## E.     Method 1 Uses Call Report Measures That Are Irrelevant

Wells Fargo's Transaction Deposits + MMD, Non-Interest Income, and Net Operating Revenue Call Report Measures contain numerous items unrelated to overdraft activity and fees.

For example, as reported in the Call Report, Wells Fargo's Non-Interest Income for the quarter ended 9/30/2006 was comprised of the following categories of income: [90]

- Income from fiduciary activities – 8.6%
- Service charges on deposit accounts in domestic offices – 23.7%
- Trading revenue – 3.1%
- Investment banking, advisory, brokerage, and underwriting fees and commissions – 3.6%
- Venture capital revenue – 0.0%
- Net servicing fees – 7.0%
- Net securitization income – 3.6%
- Underwriting income from insurance and reinsurance activities – 0.8%
- Income from other insurance activities – 0.0%
- Net gains (losses) on sales of loans and leases – 5.6%
- Net gains (losses) on sales of other real estate owned – 0.0%
- Net gains (losses) on sales of other assets (excluding securities) – 0.1%
- Other noninterest income – 43.9%

The only category of income related to overdraft activity is "Service charges on deposit accounts in domestic offices," which represented only 23.7% of total Non-Interest Income. In other words, 76.3% of Non-Interest Income had nothing to do with overdraft activity. Nonetheless, Dr. Cowan's Method 1 calculations (see equations (1), (2), and (3)) result in changes in damages as Non-Interest Income increases/decreases, regardless of whether or not the increase/decrease is due to rising/falling service charges or in other categories of income unrelated to overdraft activities.

Net Operating Revenue also includes categories of income and expense that are unrelated to overdraft activity. Specifically, Wells Fargo's Call Report for the quarter ended September 30, 2006 included the following categories: [91]

- Interest income:

---

[90] "Wells Fargo Call Report," Quarter End Date 9/30/2006, pp. 4-5.

[91] "Wells Fargo Call Report," Quarter End Date 9/30/2006, pp. 3-5.

- o Interest and fee income on loans – 78.6%
- o Income from lease financing receivables – 0.7%
- o Interest income on balances due from depository institutions – 0.3%
- o Interest and dividend income on securities – 11.9%
- o Interest income from trading assets – 0.3%
- o Interest income on federal funds sold and securities purchased under agreements to resell – 0.7%
- o Other interest income – 0.2%
- Interest expense:
  - o Interest on deposits – (29.8)%
  - o Expense of federal funds purchased and securities sold under agreements to repurchase – (2.6)%
  - o Interest on trading liabilities and other borrowed money – (0.9)%
  - o Interest on subordinated notes and debentures – (1.6)%
- Non-interest income – 42.2%

The inclusion of so many categories of income and expenses that are uncorrelated with overdraft activity renders the use of Net Operating Revenue to derive estimates of overdraft fees inappropriate.

Finally, Wells Fargo's Transaction Deposits + MMD Call Report Measure also includes account types and balances, such as money market deposit ("MMD") accounts, which are less prone to incurring overdrafts and, therefore, are not as applicable for purposes of estimating the volume and amount of overdraft fees during the damages period. In fact, MMD accounts are structured in a manner that discourages and even penalizes account holders from regularly withdrawing money. As a result, MMD accounts are not regularly used by account holders to support overdraft activity. Despite these facts, Dr. Cowan chooses to use this Call Report Measure to estimate damages. His calculations based on Transaction Deposits + MMD results in overstated and unrealistic damages. According to Exhibit 5.2, MMD accounts have accounted for all of the growth in the Transaction Deposits + MMD Call Report Measure since December 2001. Since this measure grew by 34% during the damages period, Dr. Cowan's use of Transaction Deposits + MMD dramatically overstates overdraft fees. Therefore, it comes as no surprise that Dr. Cowan's largest damages figures under Method 1 results from using Transaction Deposits + MMD as the Call Report Measure.

In addition to the issues regarding the use of certain Call Report Measures addressed in the previous paragraphs, all of the Call Report Measures used by Dr. Cowan include both consumer and business accounts. Dr. Cowan uses these measures to estimate damages related to overdraft fees incurred by consumers only. His ratio of lift to Call Report Measure, therefore, includes in the denominator deposits in business accounts. This would only be appropriate if business deposits were a constant proportion of all deposits from the last quarter of 2001, when Dr. Cowan estimated the ratio, through the end of the class period. In fact, they are not, as is shown in Exhibit 5.1. It shows that consumer deposits varied from 66.6 percent of total deposits in January of 2002 to 59.8 percent in November of 2007. I calculated that Dr. Cowan's estimate of the ratio of lift to Call Report Measure can vary by as much as 10 percent as a result of this change.[92]

## F. Method 3 Suffers from Some of the Same Issues as Method 1

Dr. Cowan's use of Call Report Measures such as Transaction Deposits + MMD, Non-Interest Income, and Net Operating Revenue under Method 3 suffer from the same issues previously discussed in my rebuttal of Dr. Cowan's Method 1. In particular, these measures contain items that are unrelated to overdraft activity.

## G. Dr. Cowan's Method 3 Does Not Actually Use the FDIC Ratios from the FDIC Study of Bank Overdraft Programs

According to Dr. Cowan, his Method 3 "brings in numbers from an outside source," which "includes several useful ratios that can be applied to the Wells Fargo situation."[93] As discussed above, this outside source is the FDIC Study of Bank Overdraft Programs. Under his Method 3, Dr. Cowan uses these ratios to obtain an estimate of damages (see equation (4), FDIC Ratio($R_k$)). Despite claiming that he uses the FDIC ratios to calculate damages, the manner in which Dr. Cowan applies the methodology under Method 3 results in a set of damage figures that

---

[92] If $R$ is the ratio of lift to Call Report Measure, $L$ is the "Lift," $C$ is the amount of consumer demand deposits and $B$ the amount of business demand deposits, then $R = L/C$. Dr. Cowan is actually measuring $R' = L/(C+B)$. Using data on consumer and business deposits from Wells Fargo, this gives the relationship between $R/R' = (C+B)/C$. The value of $R/R'$ in January of 2002 is 89.8 percent of the value in November, 2007.

[93] "Supplemental Report of Charles D. Cowan, Ph.D.," March 4, 2009, p. 12.

are independent of these ratios. In other words, these ratios are not actually used by Dr. Cowan in any material way in computing damages. The following set of equations demonstrate why this is the case.

Starting with equation (4), which is the equation that Dr. Cowan uses to calculate damages under Method 3, we see that damages in any quarter are a function of the following variables and constants:

- FDIC ratio;
- Call Report Measure for that quarter;
- Lift from a given scenario under Dr. Cowan's Method 2;
- Two constants ( REDACTED and \$99,608,000); and
- Sum of the estimate of Wells Fargo's quarterly NSF fees for 2006.

The equation that specifies damages for a particular quarter under Dr. Cowan's Method 3 is as follows:

$$\text{Damages3}(Q_i, Y_j) = \text{FDIC Ratio}(R_k) \times \text{Call Report Measure}(Q_i, Y_j) \times$$

$$(4) \left( \frac{\text{REDACTED}}{\sum_{i=1}^{4} \text{NSF Fee}(Q_i, 2006)} \right) \times \left( \frac{\text{Lift}(S_l)}{\$99,608,000} \right)$$

After reviewing Dr. Cowan's Method 3 work papers, it is clear that he calculates the sum of the estimate of Wells Fargo's quarterly NSF fees for 2006 according to equation (5):

$$(5) \sum_{i=1}^{4} \text{NSF FEE}(Q_i, 2006) = \text{FDIC Ratio}(R_k) \times \sum_{i=1}^{4} \text{Call Report Measure}(Q_i, 2006)$$

Substituting equation (5) into equation (4) results in the following version of Dr. Cowan's damages equation under Method 3:

$$\text{Damages3}(Q_i, Y_j) = \text{FDIC Ratio}(R_k) \times \text{Call Report Measure}(Q_i, Y_j) \times$$

$$(6) \left( \frac{\text{REDACTED}}{\text{FDIC Ratio}(R_k) \times \sum_{i=1}^{4} \text{Call Report Measure}(Q_i, 2006)} \right) \times \left( \frac{\text{Lift}(S_l)}{\$99,608,000} \right)$$

66

Simple algebra results in the elimination of FDIC Ratio($R_k$) from equation (6) above since this term is in both the numerator and denominator of the equation. Therefore, equation (6) simplifies to the following equation:

Damages($Q$, $Y_j$) = Call Report Measure($Q$, $Y_j$) ×

$$(7) \left( \frac{\text{REDACTED}}{\sum_{i=1}^{4} \text{Call Report Measure}(Q_i, 2006)} \right) \times \left( \frac{\text{Lift}(S_i)}{\$99,608,000} \right)$$

In summary, Dr. Cowan's damages under Method 3 do not, in fact, use the FDIC ratios presented in the FDIC's Study of Bank Overdraft Programs. His methodology only uses information from the Call Reports, lift figures from Method 2, a constant from Wells Fargo's Supplemental Response ( REDACTED ), and the total overdraft fees assessed to the class during the damages period ($99,608,000). Why does Dr. Cowan claim that he used ratios provided by the FDIC report? The answer appears to be that he is somehow unaware that the manner in which he applied Method 3 – in particular, his decision to use the FDIC ratio twice in equation (6) above – eliminates its effect on damages. Therefore, Dr. Cowan's Method 3 is not based on information from the FDIC report at all. It is effectively just another application of Method 2 – the method rejected by the Court and on which Plaintiffs no longer rely – since the "lift" is the primary driver of damages in equation (7).

## H. Method 3 Uses a Ratio of Overdraft Fees-to-Call Report Measure from 2006

Instead of using ratios from the FDIC report, equation (7) indicates that Dr. Cowan's Method 3 is actually based on the ratio of Wells Fargo's total overdraft fees for 2006 ( REDACTED ) to the total for 2006 of the chosen Call Report Measure (e.g., Demand Deposits, Transaction Deposits, etc.). Therefore, Dr. Cowan's Method 3 assumes that data from 2006 is applicable to the entire damages period (2004 – 2008). There are a number of issues with using a ratio from 2006 to model damages in earlier years (2004 and 2005) and later years (2007 and 2008). According to Mark Lentz, a Senior Vice President at Wells Fargo, there have been a number of changes throughout the damages period that would make the use of only one ratio measure at a point in time inappropriate.

Customers have shifted their payment preferences over time. The volume of debit card transactions has risen over the damages period such that debit card transactions have now overtaken check transactions. Furthermore, customers are now engaging in more ACH transactions and bill pay transactions. This gradual change in the types and associated volume of transactions would certainly affect the volume of overdrafts and, therefore, the level of damages. In particular, one would expect that as the usage of debit cards has increased throughout the damages period that the number of overdrafts due to debit card transactions and the amount of damages would also increase. Therefore, a 2006 overdraft fee-to-Call Report Measure ratio would likely overestimate overdrafts and damages due to debit card transactions for 2004 and 2005, and underestimate overdrafts and damages due to debit card transactions for 2007 and 2008.

There have also been changes during the damages period in the mix of customer accounts and the minimum requirements for opening certain accounts. For example, Wells Fargo began offering an Opportunity Checking account, which is marketed to customers that tend to use the company's overdraft services more often than traditional customers. As more customers open Opportunity Checking and other types of accounts, the relationship between overdraft fees and Call Report Measures changes. Wells Fargo has also made changes in its overdraft coverage penetration rate that has affected the volume and amount of overdraft fees.

In summary, changes in customers' preferences for payment types, changes in the mix of account types and minimum requirements, and other changes in Wells Fargo's policies such as modifications to the ODP penetration rate have occurred throughout the damages period. These changes have a direct effect on the relationship between overdraft fees and certain Call Report Measures. Using only a ratio from 2006, as Dr. Cowan does, will not account for these changes.

# I.    Dr. Cowan's Method 3 Uses the Same Methodology as Method 1

Dr. Cowan's Method 3 can also be viewed as just another application of Method 1. This becomes apparent when we re-write equation (7) as follows:

$$(8) \quad \text{Damages}(Q_i, Y_j) = \left( \frac{\text{REDACTED}}{\$99,608,000} \right) \left( \frac{\text{Lift}(S_i)}{\sum_{i=1}^{4} \text{Call Report Measure}(Q_i, 2006)} \right) \times$$

Call Report Measure$(Q_i, Y_j)$

Equation (1), which was used to calculate Dr. Cowan's damages under Method 1, is repeated here for comparison purposes.

$$(1) \quad \text{Damages}(Q_i, Y_j) = \left( \frac{\$5,000,000}{\text{Call Report Measure}(Q4, 2001)} \right) \times \text{Call Report Measure}(Q_i, Y_j)$$

Comparing the two equations shows how similar Dr. Cowan's Method 1 and Method 3 actually are. Both methods start with a measure of "lift" – Method 1's lift coming from an internal Wells Fargo analysis and Method 3's "lift" coming from the results of Dr. Cowan's Method 2. Next, both methods divide their respective "lift" by a chosen Call Report measure.[94] Finally, both methods multiply the ratio of "lift"-to-Call Report measure by the quarterly Call Report measure to arrive at a quarterly estimate of damages. These two methods are essentially the same.

Dr. Cowan emphatically states in his Reply Report the following:

However, I recognized in my report that the information I had was limited – WHICH IS WHY I CAME UP WITH THREE METHODS.[95]

In reality, he has at most applied two methods. Methods 1 and 3 are the same. Furthermore, Method 3 is heavily based on Method 2.

---

[94] Under Method 3 there is also a constant term of $\left( \frac{\text{REDACTED}}{\$99,608,000} \right)$, which can be viewed as a multiplier that adjusts for the fact that the "lift" in equation (8) is for the entire damages period while the Call Report measure is only for 2006.

[95] "Reply Report of Charles D. Cowan, Ph.D. to Report of Todd D. Menenberg," March 16, 2009, p. 4, (emphasis in the original).

Alan J. Cox

**Exhibit 1.1**
**Posting Date vs. Transaction Date for Veronica Gutierrez's Account**
**October 3, 2006 - October 13, 2006**

| Posting Date[1] | Transaction Date[1,2] | Transaction | Transaction Amount |
|---|---|---|---|
| (1) | (2) | (3) | --(U.S. Dollars)-- (4) |
| Thursday, October 05, 2006 | Tuesday, October 03, 2006 | Check Crd Purchase [Shell Oil] | $  -27.05 |
| Thursday, October 05, 2006 | Wednesday, October 04, 2006 | POS Purchase [Circle K] | -4.43 |
| Thursday, October 05, 2006 | Thursday, October 05, 2006 | Interest Payment | 0.01 |
| Thursday, October 05, 2006 | Thursday, October 05, 2006 | Monthly Service Fee | -12.00 |
| Thursday, October 05, 2006 | Thursday, October 05, 2006 | Discount for ACH Direct Deposits | 2.00 |
| Thursday, October 05, 2006 | Thursday, October 05, 2006 | Monthly Point-of-Sale (POS) Purchase Fee | -1.00 |
| Friday, October 06, 2006 | Thursday, October 05, 2006 | Check Crd Purchase [Walgreen] | -8.07 |
| Tuesday, October 10, 2006 | Thursday, October 05, 2006 | Check Crd [Purchase Return Autozone] | 17.23 |
| Tuesday, October 10, 2006 | Tuesday, October 10, 2006 | Online Transfer to Gutierrez P. | -80.00 |
| Tuesday, October 10, 2006 | Friday, October 06, 2006 | ATM Withdrawal | -22.00 |
| Tuesday, October 10, 2006 | Tuesday, October 10, 2006 | Non-Wells Fargo ATM Transaction Fee | -2.00 |
| Tuesday, October 10, 2006 | Saturday, October 07, 2006 |  Check Crd Purchase [Albertson's] | -74.39 |
| Tuesday, October 10, 2006 | Tuesday, October 10, 2006 | Check No. 1103 | -65.00 |
| Tuesday, October 10, 2006 | Thursday, October 05, 2006 | Check Crd Purchase [Autozone] | -47.99 |
| Tuesday, October 10, 2006 | Friday, October 06, 2006 | Check Crd Purchase [IHOP] | -26.51 |
| Tuesday, October 10, 2006 | Thursday, October 05, 2006 | Check Crd Purchase [Autozone] | -17.2 |
| Tuesday, October 10, 2006 | Thursday, October 05, 2006 | Check Crd Purchase [Subway] | -11.27 |
| Tuesday, October 10, 2006 | Friday, October 06, 2006 | Check Crd Purchase [Farmer Boys] | -8.10 |
| Tuesday, October 10, 2006 | Thursday, October 05, 2006 | Check Crd Purchase [Autozone] | -3.23 |
| Wednesday, October 11, 2006 | Wednesday, October 11, 2006 | Overdraft Fee | -22.00 |
| Wednesday, October 11, 2006 | Wednesday, October 11, 2006 | Overdraft Fee | -22.00 |
| Wednesday, October 11, 2006 | Wednesday, October 11, 2006 | Overdraft Fee | -22.00 |
| Wednesday, October 11, 2006 | Wednesday, October 11, 2006 | Overdraft Fee | -22.00 |
| Wednesday, October 11, 2006 | Monday, October 09, 2006 | Check Crd Purchase [Jack in the Box] | -5.68 |
| Thursday, October 12, 2006 | Thursday, October 12, 2006 | Overdraft Fee | -22.00 |
| Thursday, October 12, 2006 | Tuesday, October 10, 2006 | Check Crd Purchase [ExxonMobil] | -20.01 |
| Friday, October 13, 2006 | Friday, October 13, 2006 | Overdraft Fee | -33.00 |
| Friday, October 13, 2006 | Friday, October 13, 2006 | Autozone West In Payroll | 412.90 |
| Friday, October 13, 2006 | Friday, October 13, 2006 | ATM Withdrawal | -20.00 |

**Source:** Declaration of Kenneth A. Zimmerman in Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment, August 21, 2009. See Exhibit J, p. 1.

**Notes:**

[1] Highlighting has been added to the transactions that cannot be sequenced in "true" chronological order. Differences between posting and transaction dates are over business days and take holidays into consideration. Holidays used are U.S. Federal holidays, available at http://www.opm.gov/ Operating_Status_Schedules/fedhol/2006.asp. October 9, 2006 was Columbus Day.

[2] For certain transactions, including some debit card transactions, the "transaction date" has been inferred from the description of the transaction provided by the merchant (or bank, in the case of ATM transactions) in the settlement file for the transaction. This information appears on a customer's monthly account statement under the heading "Description." The identification of the merchant is also derived from this "Description" field.

## Exhibit 1.2
## An Example in Which a Member of the Class Is Worse off
## Under Mr. Olsen's Re-Sequencing Scenarios

### Wells Fargo Actual Sequencing

| Transaction Number | Debit Card | Check | Ending Balance | Overdraft Tolerance | Fee Assessed | Bank's Charges | Other Charges | Total Charges |
|---|---|---|---|---|---|---|---|---|
| | | | ----(U.S. Dollars)---- | | | ----(U.S. Dollars)---- | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| Initial Balance | | | $ 500 | | | | | |
| 1 | | $ 400 | 100 | $ (210) | None | $ - | $ - | $ - |
| 2 | | 200 | (100) | (210) | OD | 34 | - | 34 |
| 3 | | 105 | (205) | (210) | OD | 34 | - | 34 |
| 4 | $ 100 | | (305) | (210) | OD | 34 | - | 34 |
| 5 | 90 | | (395) | (210) | OD | 34 | - | 34 |
| Total: | | | | | | $ 136 | $ - | $ 136 |

### Mr. Olsen's Re-sequencing Scenarios #2 and #3 without Accounting for Overdraft Tolerance

| Transaction Number | Debit Card | Check | Ending Balance | Overdraft Tolerance | Fee Assessed | Bank's Charges | Other Charges | Total Charges |
|---|---|---|---|---|---|---|---|---|
| | | | ----(U.S. Dollars)---- | | | ----(U.S. Dollars)---- | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| Initial Balance | | | $ 500 | | | | | |
| 1 | $ 100 | | 400 | -- | None | $ - | $ - | $ - |
| 2 | 90 | | 310 | -- | None | - | - | - |
| 3 | | $ 400 | (90) | -- | OD | 34 | - | 34 |
| 4 | | 200 | (290) | -- | OD | 34 | - | 34 |
| 5 | | 105 | (395) | -- | OD | 34 | - | 34 |
| Total: | | | | | | $ 102 | $ - | $ 102 |

### Mr. Olsen's Re-sequencing Scenarios #2 and #3 Accounting for Overdraft Tolerance

| Transaction Number | Debit Card | Check | Ending Balance | Overdraft Tolerance | Fee Assessed | Bank's Charges | Other Charges | Total Charges |
|---|---|---|---|---|---|---|---|---|
| | | | ----(U.S. Dollars)---- | | | ----(U.S. Dollars)---- | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| Initial Balance | | | $ 500 | | | | | |
| 1 | $ 100 | | 400 | $ (210) | None | $ - | $ - | $ - |
| 2 | 90 | | 310 | (210) | None | - | - | - |
| 3 | | $ 400 | (90) | (210) | OD | 34 | - | 34 |
| 4 | | 200 | (290) | (210) | NSF | 34 | 35 | 69 |
| 5 | | 105 | (395) | (210) | NSF | 34 | 35 | 69 |
| Total: | | | | | | $ 102 | $ 70 | $ 172 |

-- not applicable

## Exhibit 1.3
## Mr. Olsen's Scenarios Do Not Represent Chronological Posting

| Day | Transaction Order | Actual Posting | Mr. Olsen's Re-Sequencing Scenario #2 | Mr. Olsen's Re-Sequencing Scenarios #2 and #3 |
|---|---|---|---|---|
| (1) | (2) | (U.S. Dollars) (3) | (4) | (5) |
| Day 1 | $ -300 | $ -100 | $ -25 | $ -25 |
| | -25 | -25 | -100 | -100 |
| | -100 | -- | -- | -- |
| Day 2 | $ -75 | $ -400 | $ -17 | $ -300 |
| | -400 | -300 | -300 | -400 |
| | -17 | -17 | -400 | -17 |
| Day 3 | $ -275 | $ -300 | $ -275 | $ -275 |
| | -300 | -275 | -300 | -300 |
| | -10 | -- | -- | -- |
| | -25 | -- | -- | -- |
| Day 4 | -- | $ -75 | $ -10 | $ -75 |
| | -- | -25 | -25 | -10 |
| | -- | -10 | -75 | -25 |

Source: For detailed explanation of Mr. Olsen's Re-Sequencing Scenarios, see Expert Report of Art Olsen, November 20, 2009, p. 9-10.

Note: Assumes all transactions are debit card transactions and the date and time of each transaction are known.

Exhibit 2.1

10-Day Sample Summary Statistics

Posted Dates, January 2, 2007 - June 9, 2008

| Posted Date | Total Number of Potential Class Members[1] | Transaction Count for Potential Class Members | Debit Card Transaction Count for Potential Class Members | Check Transaction Count for Potential Class Members | Total Number of Potential Class Members with Check Transactions | Overdraft Fee Count for Potential Class Members | Overdraft Fee Amount for Potential Class Members (U.S. Dollars) |
|---|---|---|---|---|---|---|---|
| | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Tuesday, January 02, 2007 | 34,209 | 227,185 | 115,953 | 13,980 | 8,736 | 113,573 | $ 3,753,427 |
| Tuesday, January 16, 2007 | 34,265 | 255,883 | 131,725 | 16,344 | 13,003 | 126,743 | 4,183,999 |
| Monday, February 05, 2007 | 21,936 | 147,722 | 74,682 | 11,003 | 7,086 | 76,172 | 2,515,929 |
| Thursday, May 17, 2007 | 12,463 | 58,285 | 23,135 | 6,559 | 4,254 | 33,788 | 1,121,507 |
| Tuesday, May 29, 2007 | 35,555 | 266,239 | 153,965 | 15,857 | 3,662 | 134,028 | 4,452,527 |
| Monday, July 23, 2007 | 26,415 | 175,375 | 93,743 | 8,944 | 5,672 | 51,695 | 3,036,549 |
| Monday, October 01, 2007 | 26,245 | 180,083 | 89,648 | 11,438 | 7,551 | 52,690 | 3,037,563 |
| Thursday, May 01, 2008 | 12,266 | 57,534 | 21,748 | 5,904 | 4,048 | 33,182 | 1,098,764 |
| Thursday, May 22, 2008 | 11,205 | 51,425 | 22,214 | 5,251 | 3,586 | 29,944 | 986,271 |
| Monday, June 09, 2008 | 29,830 | 193,434 | 166,031 | 11,150 | 7,644 | 160,695 | 3,321,697 |
| Total: | | 1,612,736 | 832,844 | 106,992 | | 831,825 | $ 27,498,033 |

Source: Wells Fargo

Note:

[1] Potential Class numbers are defined as Wells Fargo customers who have incurred more than one overdraft fee in a given posted day.

**Exhibit 2.2a**

**Examples of Checks Which Would Be Returned in Mr. Olsen's Scenarios**

**Once Overdraft Tolerance Is Considered[1]**

| Account Index | Post Date | Category | Mr. Olsen's Scenario(s) in Which Item Would Be Returned | Amount of the Returned Check —(U.S. Dollars)— | Original vs. Scenario's Number of Overdrafts[2] |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 464 | Thursday, May 17, 2007 | Housing | 1 | $ 1,580.07 | 3 to 1,2,2 |
| 144 | Tuesday, January 16, 2007 | Financial Institution | 1 | 1,312.26 | 10 to 4,10,10 |
| 190 | Tuesday, January 02, 2007 | Insurance | 1,2,3 | 2,534.00 | 3 to 1,3,3 |
| 330 | Tuesday, January 02, 2007 | Utilities | 1,2,3 | 405.65 | 8 to 2,2,4 |
| 373 | Tuesday, January 16, 2007 | Utilities | 2,3 | 95.00 | 7 to 4,4,4 |
| 373 | Tuesday, January 16, 2007 | Individual | 1 | 128.00 | 7 to 4,4,4 |
| 364 | Monday, July 23, 2007 | Retail - Non-Food | 1,2,3 | 1,000.00 | 2 to 1, 2, 2 |

**Source:** Wells Fargo, 10-Day Check Sample. See Appendix C.1.

Notes:

[1] None of the above checks were returned in actuality.

[2] Number of overdraft charges that results from Wells Fargo Actual Sequencing is compared to the number of overdraft charges that results from Mr. Olsen's Re-Sequencing Scenarios #1, #2 and #3.

## Exhibit 2.2b
## Wells Fargo
## Categorization of ACH Transactions
## Which Would Be Returned Under Mr. Olsen's Scenario #1

| Category | Returned Item Count | Percent of ACH |
|---|---|---|
| | | ------(Percent)------ |
| (1) | (2) | (3) |
| Other | 1,132 | 18.8 % |
| Mortgage | 857 | 14.2 |
| Credit Card | 744 | 12.4 |
| Communication | 657 | 10.9 |
| Payment | 493 | 8.2 |
| (Blank) | 402 | 6.7 |
| Insurance | 373 | 6.2 |
| Line/Loan | 313 | 5.2 |
| Bank | 280 | 4.7 |
| Auto Loan | 176 | 2.9 |
| Utilities | 101 | 1.7 |
| Retail | 97 | 1.6 |
| Fitness | 69 | 1.1 |
| Municipal Payment | 46 | 0.8 |
| Internet Purchases | 44 | 0.7 |
| Investment | 43 | 0.7 |
| Services | 40 | 0.7 |
| Health Care | 32 | 0.5 |
| Tax | 28 | 0.5 |
| Student Loan | 22 | 0.4 |
| Club | 16 | 0.3 |
| Education | 10 | 0.2 |
| Gas | 10 | 0.2 |
| Gambling | 6 | 0.1 |
| Pharmaceutical | 4 | 0.1 |
| Rent | 4 | 0.1 |
| Transfer | 4 | 0.1 |
| Restaurant | 3 | 0.0 |
| Travel | 3 | 0.0 |
| Security | 2 | 0.0 |
| Beauty & Fitness | 1 | 0.0 |
| DMV | 1 | 0.0 |
| Home Expense | 1 | 0.0 |
| Non-Profit | 1 | 0.0 |
| Pet | 1 | 0.0 |
| Postal Service | 1 | 0.0 |
| **Total ACH Returned Items:** | **6,017** | **100 %** |

**Source:** Wells Fargo

**Notes:**

[1] Note that ACH transactions included above consist of transaction codes 1055 and 6512 (Preauthorized Debit and ACH Electronic Check Debit, respectively). These transactions would be reversed and also charged an NSF fee.

[2] The transactions above represent about 40% of all returned items and 64% of all non-check returned items in Scenario #1.

## Exhibit 2.2c
## Wells Fargo
## Categorization of ACH Transactions
## Which Would Be Returned Under Mr. Olsen's Scenario #2

| Category | Returned Item Count | Percent of ACH |
|---|---|---|
| | | ----(Percent)---- |
| (1) | (2) | (3) |
| Other | 1,395 | 18.9 % |
| Credit Card | 941 | 12.8 |
| Communication | 897 | 12.2 |
| Mortgage | 755 | 10.2 |
| Payment | 632 | 8.6 |
| Insurance | 580 | 7.9 |
| (Blank) | 381 | 5.2 |
| Bank | 375 | 5.1 |
| Line/Loan | 311 | 4.2 |
| Retail | 192 | 2.6 |
| Auto Loan | 169 | 2.3 |
| Utilities | 145 | 2.0 |
| Fitness | 119 | 1.6 |
| Internet Purchases | 106 | 1.4 |
| Investment | 66 | 0.9 |
| Services | 53 | 0.7 |
| Municipal Payment | 52 | 0.7 |
| Health Care | 43 | 0.6 |
| Tax | 35 | 0.5 |
| Club | 24 | 0.3 |
| Student Loan | 24 | 0.3 |
| Gas | 15 | 0.2 |
| Education | 14 | 0.2 |
| Restaurant | 11 | 0.1 |
| Gambling | 7 | 0.1 |
| Grocery | 7 | 0.1 |
| Pharmaceutical | 7 | 0.1 |
| Transfer | 6 | 0.1 |
| Rent | 4 | 0.1 |
| Security | 4 | 0.1 |
| Travel | 3 | 0.0 |
| Pet | 2 | 0.0 |
| Beauty & Fitness | 1 | 0.0 |
| Home Expense | 1 | 0.0 |
| Non-Profit | 1 | 0.0 |
| Postal Service | 1 | 0.0 |
| **Total ACH Returned Items:** | **7,379** | **100 %** |

**Source:** Wells Fargo

Notes:

[1] Note that ACH transactions included above consist of transaction codes 1055 and 6512 (Preauthorized Debit and ACH Electronic Check Debit, respectively). These transactions would be reversed and also charged an NSF fee.

[2] The transactions above represent about 38% of all returned items and 59% of all non-check returned items in Scenario #2.

## Exhibit 2.2d
## Wells Fargo
## Categorization of ACH Transactions
## Which Would Be Returned Under Mr. Olsen's Scenario #3

| Category | Returned Item Count | Percent of ACH |
| --- | --- | --- |
| | | ----(Percent)---- |
| (1) | (2) | (3) |
| Other | 1,395 | 18.9 % |
| Credit Card | 941 | 12.8 |
| Communication | 897 | 12.2 |
| Mortgage | 755 | 10.2 |
| Payment | 632 | 8.6 |
| Insurance | 580 | 7.9 |
| (Blank) | 381 | 5.2 |
| Bank | 375 | 5.1 |
| Line/Loan | 311 | 4.2 |
| Retail | 192 | 2.6 |
| Auto Loan | 169 | 2.3 |
| Utilities | 145 | 2.0 |
| Fitness | 119 | 1.6 |
| Internet Purchases | 106 | 1.4 |
| Investment | 66 | 0.9 |
| Services | 53 | 0.7 |
| Municipal Payment | 52 | 0.7 |
| Health Care | 43 | 0.6 |
| Tax | 35 | 0.5 |
| Club | 24 | 0.3 |
| Student Loan | 24 | 0.3 |
| Gas | 15 | 0.2 |
| Education | 14 | 0.2 |
| Restaurant | 11 | 0.1 |
| Gambling | 7 | 0.1 |
| Grocery | 7 | 0.1 |
| Pharmaceutical | 7 | 0.1 |
| Transfer | 6 | 0.1 |
| Rent | 4 | 0.1 |
| Security | 4 | 0.1 |
| Travel | 3 | 0.0 |
| Pet | 2 | 0.0 |
| Beauty & Fitness | 1 | 0.0 |
| Home Expense | 1 | 0.0 |
| Non-Profit | 1 | 0.0 |
| Postal Service | 1 | 0.0 |
| **Total ACH Returned Items:** | **7,379** | **100 %** |

**Source:** Wells Fargo

**Notes:**

[1] Note that ACH transactions included above consist of
transaction codes 1055 and 6512 (Preauthorized Debit and
ACH Electronic Check Debit, respectively). These
transactions would be reversed and also charged an NSF fee.

[2] The transactions above represent about 38% of all returned
items and 59% of all non-check returned items in Scenario #3.

**Exhibit 2.3**
**Wells Fargo**
**10-Day Debit Card Transaction Data**
**Median Number of Days Between the Debit**
**Transactions and Their Posted Dates**
**Posted Dates, January 2, 2007 - June 9, 2008**

| Posted Date | Business Days[1] | Calendar Days |
|---|---|---|
| (1) | (2) | (3) |
| | ---(Number of Days)--- | |
| Tuesday, January 02, 2007 | 0 | 3 |
| Tuesday, January 16, 2007 | 0 | 3 |
| Monday, February 05, 2007 | 0 | 2 |
| Thursday, May 17, 2007 | 1 | 1 |
| Tuesday, May 29, 2007 | 0 | 3 |
| Monday, July 23, 2007 | 0 | 2 |
| Monday, October 01, 2007 | 0 | 2 |
| Thursday, May 01, 2008 | 1 | 1 |
| Thursday, May 22, 2008 | 1 | 1 |
| Monday, June 09, 2008 | 0 | 2 |
| Over All Days in 10-Day Sample | 0 | 3 |

**Notes:** See Appendix C.4 for description of data.

[1] These numbers are calculated using the Excel Function Networkdays(x,y,z) minus 1 where x is the date the transaction is made, y the date it posted and z is the information on holidays. Holidays used are U.S. Federal holidays, available at http://www.opm.gov/Operating_Status_Schedules/fedhol/2006.asp.



## Exhibit 2.4a
## Wells Fargo
## Transactions that Would have Been Returned by Wells Fargo Under Mr. Olsen's Scenarios

Incremental Total Return Items as a Percent of Original Overdraft Fees [1,2,3,4]

| | 1/2/2007 | 1/16/2007 | 2/5/2007 | 5/17/2007 | 5/29/2007 | 7/23/2007 | 10/1/2007 | 5/1/2008 | 5/22/2008 | 6/9/2008 | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | Σ(1) to (10)yr (11) |
| | | | | | (Percent) | | | | | | |
| Scenario 1 | 4.61% | 4.27% | 5.27% | 5.02% | 4.42% | 3.97% | 6.03% | 6.57% | 3.27% | 3.74% | 4.72% |
| Scenario 2 | 4.04 | 3.81 | 5.28 | 4.92 | 4.40 | 4.06 | 5.48 | 5.99 | 3.13 | 3.68 | 4.48 |
| Scenario 3 | 3.91 | 3.65 | 5.09 | 4.83 | 4.21 | 3.93 | 5.37 | 5.97 | 3.05 | 3.56 | 4.35 |

Average Transaction Associated with Incremental Returned Transactions [2,3]

| | 1/2/2007 | 1/16/2007 | 2/5/2007 | 5/17/2007 | 5/29/2007 | 7/23/2007 | 10/1/2007 | 5/1/2008 | 5/22/2008 | 6/9/2008 | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | Σ(1) to (10)yr (11) |
| | | | | | (U.S. Dollars) | | | | | | |
| Scenario 1 | $ (1,739.25) | $ (1,892.18) | $ (1,044.67) | $ (1,465.18) | $ (791.47) | $ (774.61) | $ (673.50) | $ (1,301.15) | $ (676.28) | $ (936.09) | $ (1,159.44) |
| Scenario 2 | (938.54) | (924.80) | (693.65) | (1,081.90) | (545.75) | (535.88) | (678.29) | (959.75) | (514.26) | (629.61) | (751.04) |
| Scenario 3 | (938.55) | (924.80) | (693.61) | (1,081.87) | (545.50) | (535.85) | (678.29) | (959.75) | (514.26) | (629.61) | (751.01) |

Source: Wells Fargo. See Exhibit 2.4b for methodology.

Notes:

1. These results are based off of a simulation of pay/return behavior using SAS. The transaction that exceeds the OD Limit is returned and the balance for subsequent transactions is increased by that transaction amount.

2. Original Overdraft Fees include all Overdraft Fees assigned by Mr. Olsen after filtering to ensure that transactions are $0.010 and removing accounts which opted out of the class. The following filter of Olsen's logic code not be applied to this analysis: (CASE WHEN UPD.NEW_COUNT < WF_ORIG_OD_FEE_COUNT THEN UPD.NEW_COUNT ELSE WF.ORIG_OD_FEE_COUNT END). The effect of not applying this filter should be minimal.

3. Certain transaction codes do not ever get assessed an NSF fee, but are returned and the balance for subsequent transactions is increased by that transaction amount.

4. Total fee counts are reduced slightly (<1.4%) as a result of adding back the transaction amount of the returned item and returning items without charging an NSF fee.

# Exhibit 2.4b

## Wells Fargo

## Transactions that Would have Been Returned by Wells Fargo Under Mr. Olsen's Scenarios

## Methodology

1 The tables produced from Wells Fargo's streamlined replication of Mr. Olsen's three scenarios were utilized and the following three fields were appended:

Must-pay transaction indicator. An indicator designating transactions which have already been authorized and which cannot be returned

Non-NSF Fee transaction indicator. An indicator designating those transactions which can be returned, but for which we cannot charge an NSF fee

ODLIMIT: This is the amount of Overdraft Tolerance.

2 This new table was filtered for the following items to ensure that that they are 50,040 and do not include the opt-outs. (See Expert Reports of Art Olsen and Devrit McGovern.)

3 Once the filters were applied, we checked to make sure that our SAS code replicated Olsen's overdraft assignments exactly. Next, instead of using Olsen's methodology of applying an OD fee if the ledger balance is less than 0, we assign an OD fee under the following circumstances:

    i The transaction causes the ledger balance to be < 0 and the balance is within the ODLIMIT (and not a must-pay item).

    ii The transaction causes the ledger balance to be < 0 and the transaction is a must-pay item (regardless of ODLIMIT).

4 In addition, an item is **returned** (the balance is NOT reduced by this transaction amount) and an **NSF fee** is assessed, if the following circumstances are met:

    i The transaction causes the ledger balance to be < 0 and the balance exceeds the ODLIMIT (and not a must-pay item or Non-NSF fee item).

5 Finally, an item is **returned** (the balance is NOT reduced by this transaction amount) but an **NSF fee is not** assessed, if the following circumstances are met:

    i The transaction causes the ledger balance to be < 0 and the balance exceeds the ODLIMIT (and not a must-pay item **BUT IS a Non-NSF fee item**).

**Exhibit 3.1a**
**Wells Fargo 10-Day Check Sample**
**Median Number of Days Between**
**Checks' Written and Posted Dates**
**Posted Dates, January 2, 2007 - June 9, 2008**

| Posted Date | Business Days | Calendar Days |
|---|---|---|
| (1) | (2) | (3) |
| | ---(Number of Days)--- | |
| Tuesday, January 02, 2007 | 2 | 5 |
| Tuesday, January 16, 2007 | 3 | 6 |
| Monday, February 05, 2007 | 3 | 5 |
| Thursday, May 17, 2007 | 3 | 4 |
| Tuesday, May 29, 2007 | 2 | 5 |
| Monday, July 23, 2007 | 3 | 5 |
| Monday, October 01, 2007 | 2 | 4 |
| Thursday, May 01, 2008 | 2 | 2 |
| Thursday, May 22, 2008 | 3 | 3 |
| Monday, June 09, 2008 | 2 | 4 |
| Over All Days in 10-Day Sample | 2 | 5 |

**Note:** See Appendix C.1 for description of data.



Exhibit 3.1b
Wells Fargo
Percentage of Check and Debit Card Transactions by Number of Business Days to Clear

Checks ■ Debit Card Transactions

Source: Wells Fargo 10-Day Check Sample (see Appendix C.1) and Wells Fargo Debit Card Transaction Date (see Appendix C.4)
Note: A check that clears the day after it was written is defined as clearing one day later.



Exhibit 3.1e

Wells Fargo 10-Day Check Sample

Average Check Amount by Category

Source: Wells Fargo 10-Day Check Sample (see Appendix C.1).



Exhibit 3.1d

Wells Fargo 10-Day Check Sample
Total Value of each Category

Source: Wells Fargo 10-Day Check Sample (see Appendix C.1).



**Exhibit 3.1e**
**Wells Fargo 10-Day Check Sample**
**Number of Checks by Category**

Source: Wells Fargo 10-Day Check Sample (see Appendix C.1).



Exhibit 3.1f

Wells Fargo 10-Day Check Sample

Number of Checks Written by Transaction Amount

Source: Wells Fargo 10-Day Check Sample (see Appendix C.1).

## Exhibit 3.2a

## Wells Fargo 10-Day Check Sample

## Distribution of the Largest Check Posted in an Account Day[1,2]

| Category (1) | One Check Posted in an Account Day —(Number of Checks)— (2) | Category (3) | Two Checks Posted in an Account Day —(Number of Checks)— (4) | Category (5) | Three or More Checks Posted in an Account Day —(Number of Checks)— (6) |
|---|---|---|---|---|---|
| Individual | 54 | Utilities | 14 | Retail - Non-Food | 11 |
| Financial Institution | 46 | Financial Institution | 19 | Retail - Food | 8 |
| Housing | 37 | Individual | 22 | Individual | 10 |
| Services | 26 | Retail - Non-Food | 8 | Other | 7 |
| Other | 27 | Housing | 17 | Financial Institution | 16 |
| Utilities | 27 | Charity | 5 | Unknown | 5 |
| Retail - Non-Food | 26 | Services | 6 | Utilities | 1 |
| Retail - Food | 23 | Other | 5 | Services | 6 |
| Medical | 21 | Retail - Food | 3 | Medical | 1 |
| Unknown | 15 | Unknown | 2 | Housing | 9 |
| Education | 14 | Check Cashing Service | 5 | Self | 7 |
| Misc. Government | 13 | Misc. Government | 2 | Misc. Government | 2 |
| Insurance | 11 | Medical | 1 | Check Cashing Service | 1 |
| Self | 10 | Education | 3 | Education | 1 |
| Charity | 8 | Insurance | 2 | Insurance | 3 |
| Check Cashing Service | 7 | Self | 5 | Taxes | 1 |
| Taxes | 3 | Taxes | 1 | Restaurants | 0 |
| Retail - Unknown | 1 | Retail - Unknown | 1 | Charity | 1 |
| Restaurants | 0 | Restaurants | 0 | Retail - Unknown | 0 |
| Column Percent of Total: | 63.6 % | | 20.9 % | | 15.5 % |

**Source:** Wells Fargo 10-Day Check Sample, see Appendix C.1.

**Notes:**

[1] One account day includes all checks posted to one account on one day.

[2] In the instances in which there were two checks for the same amount within an account day that were tied for largest check, both are included if they fall under different categories.

Exhibit 3.2b

Wells Fargo 10-Day Check Sample

Percentage of the Largest Checks Posted in an Account Day

for Each Category[1,2]

| Category | One Check Posted in an Account Day[3] (Percent) | Category | Two Checks Posted in an Account Day (Percent) | Category | Three or More Checks Posted in an Account Day (Percent) |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| Individual | 15.3 % | Utilities | 11.8 % | Retail - Non-Food | 12.9 % |
| Financial Institution | 13.0 | Financial Institution | 16.0 | Retail - Food | 9.4 |
| Housing | 10.5 | Individual | 18.5 | Individual | 11.8 |
| Services | 7.3 | Retail - Non-Food | 6.7 | Other | 8.2 |
| Other | 7.6 | Housing | 14.3 | Financial Institution | 18.8 |
| Utilities | 7.6 | Charity | 4.2 | Utilities | 1.2 |
| Retail - Non-Food | 7.3 | Services | 5.0 | Services | 7.1 |
| Retail - Food | 6.5 | Other | 4.2 | Medical | 1.2 |
| Medical | 5.9 | Retail - Food | 2.5 | Housing | 10.6 |
| Education | 4.0 | Check Cashing Service | 4.2 | Self | 8.2 |
| Misc. Government | 3.7 | Misc. Government | 1.7 | Misc. Government | 2.4 |
| Insurance | 3.1 | Medical | 0.8 | Check Cashing Service | 1.2 |
| Self | 2.8 | Education | 2.5 | Education | 1.2 |
| Charity | 2.3 | Insurance | 1.7 | Insurance | 3.5 |
| Check Cashing Service | 2.0 | Self | 4.2 | Taxes | 1.2 |
| Taxes | 0.8 | Taxes | 0.8 | Restaurants | 0.0 |
| Retail - Unknown | 0.3 | Retail - Unknown | 0.8 | Charity | 1.2 |
| Restaurants | 0.0 | Restaurants | 0.0 | Retail - Unknown | 0.0 |
| **Total:** | **100.0 %** | | **100.0 %** | | **100.0 %** |

Source: Wells Fargo 10-Day Check Sample, see Appendix C.1.

Notes:

[1] One account day includes all checks posted to one account on one day.

[2] In the instances in which there were two checks for the same amount within an account day that were tied for largest check, both are included if they fall under different categories.

[3] Percentages are calculated as the number of checks per category posted in an account day over the total checks posted in each column. This calculation excludes the "Unknown" category. See Exhibit 3.2a.

# Exhibit 3.2c

## Wells Fargo 10-Day Check Sample

### Category Percentage of the Largest Check Posted in an Account Day of All Checks Posted in an Account Day[1,2]

| Category | One Check Posted in an Account Day[2] | Two Checks Posted in an Account Day | Three or More Checks Posted in an Account Day | All Checks Posted in an Account Day |
| --- | --- | --- | --- | --- |
| | | (Percent) | | |
| (1) | (2) | (3) | (4) | (5) = (2)+(3)+(4) |
| Individual | 9.7 % | 3.9 % | 1.8 % | 15.4 % |
| Financial Institution | 8.2 | 3.4 | 2.9 | 14.5 |
| Retail – Non-Food | 4.7 | 1.4 | 2.0 | 8.1 |
| Utilities | 4.8 | 2.5 | 0.2 | 7.5 |
| Housing | 6.6 | 3.0 | 1.6 | 11.3 |
| Other | 4.8 | 0.9 | 1.3 | 7.0 |
| Retail – Food | 4.1 | 0.5 | 1.4 | 6.1 |
| Services | 4.7 | 1.1 | 1.1 | 5.8 |
| Medical | 3.8 | 0.2 | 0.2 | 4.1 |
| Misc. Government | 2.3 | 0.4 | 0.4 | 3.0 |
| Education | 2.5 | 0.5 | 0.2 | 3.2 |
| Insurance | 2.0 | 0.4 | 0.5 | 2.9 |
| Charity | 1.4 | 0.9 | 0.2 | 2.5 |
| Check Cashing Service | 1.3 | 0.8 | 0.2 | 2.3 |
| Self | 1.8 | 0.8 | 1.3 | 3.9 |
| Taxes | 0.5 | 0.2 | 0.2 | 0.9 |
| Retail – Unknown | 0.2 | 0.2 | 0.0 | 0.4 |
| Restaurants | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total:** | **63.4 %** | **21.3 %** | **15.2 %** | **100.0 %** |

Source: Wells Fargo 10-Day Check Sample, see Appendix C.1.

Notes:

[1] One account day includes all checks posted to one account on one day

[2] In the instances in which there were two checks for the same amount within an account day that were tied for largest check, both are included if they fall under different categories

[3] Percentages are calculated as the number of checks per category posted in a account day over the total checks posted. This calculation excludes the "Unknown" category. See Exhibit 3.2a.

# Exhibit 3.2d

## Wells Fargo 10-Day Check Sample

### Average Amount of Largest Check

### Posted to an Account in a Day by Category[1,2]

| Category | | Average Amount of Largest Check | |
|---|---|---|---|
| | One Check Posted in an Account Day | Two Checks Posted in an Account Day | Three or More Checks Posted in an Account Day |
| (1) | (2) | (3) | (4) |
| | (U.S. Dollars) | (U.S. Dollars) | |
| Unknown | $ 140.98 | $ 2,525.00 | $ 329.57 |
| Charity | 115.38 | 293.00 | 510.00 |
| Financial Institution | 450.66 | 1,015.92 | 1,265.21 |
| Housing | 1,056.75 | 1,611.10 | 1,178.56 |
| Medical | 244.10 | 330.00 | 500.00 |
| Retail - Food | 86.50 | 63.49 | 134.76 |
| Retail - Non-Food | 213.06 | 170.57 | 544.65 |
| Retail - Unknown | 85.40 | 50.00 | 0.00 |
| Services | 173.26 | 758.72 | 904.95 |
| Taxes | 631.68 | 530.00 | 1,241.61 |
| Education | 425.93 | 99.17 | 200.00 |
| Utilities | 168.52 | 173.26 | 150.49 |
| Other | 317.54 | 255.00 | 607.44 |
| Restaurants | 0.00 | 0.00 | 0.00 |
| Self | 472.97 | 830.00 | 624.14 |
| Check Cashing Service | 273.57 | 275.00 | 300.00 |
| Misc. Government | 93.20 | 208.20 | 119.50 |
| Individual | 338.36 | 383.68 | 885.80 |
| Insurance | 128.57 | 147.65 | 1,161.33 |

Source: Wells Fargo 10-Day Check Sample; see Appendix C.1.

Notes:

[1] One account day includes all checks posted to one account on one day.

[2] In the instances in which there were two checks for the same amount within an account day that were tied for largest check, both are included if they fall under different categories.

# EXHIBIT 2D

**DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**

Exhibit 4.1a

Summary of Damages under Wells Fargo Scenarios A, B, C and D

Not Accounting for Persons Who Overdraft Repeatedly

| Scenario | Percent Change (Percent) | | | Total Overdraft Fees for Class Period | Total Damages Not Accounting for Reversals and Uncollectibles (U.S. Dollars) | | | Percent Adjustment[2] (Percent) | Total Damages Accounting for Reversals and Uncollectibles (U.S. Dollars) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lower Bound | Midpoint[1] | Upper Bound | | Lower Bound | Midpoint | Upper Bound | | Lower Bound | Midpoint | Upper Bound |
| (1) | (2) | (3) | (4) | (5) | (6) = (2)*(5) | (7) = (3)*(5) | (8) = (4)*(5) | (9) | (10) = (6)*(9) | (11) = (7)*(9) | (12) = (8)*(9) |
| Scenario A | 6.68 % | 8.29 % | 9.90 % | $ 1,023,240,394 | $ 68,349,082 | $ 84,808,265 | $ 101,267,441 | 27.05 % | $ 49,857,810 | $ 61,864,100 | $ 73,870,383 |
| Scenario B | 8.35 | 10.40 | 12.44 | 1,023,240,394 | 85,422,871 | 106,367,156 | 127,311,365 | 27.15 | 62,231,537 | 77,489,688 | 92,747,784 |
| Scenario C | 6.78 | 7.70 | 8.63 | 1,023,240,394 | 69,364,648 | 78,829,212 | 88,293,776 | 27.05 | 50,598,623 | 57,502,629 | 64,406,635 |
| Scenario D | 7.94 | 9.39 | 10.83 | 1,023,240,394 | 81,225,436 | 96,035,936 | 110,846,404 | 27.15 | 59,173,658 | 69,963,276 | 80,752,872 |

Source: Total Overdraft Fees for Class Period, Wells Fargo.

Notes:

[1] See Exhibits 4.1c, 4.1e, 4.1g, and 4.1i weighted-average percent change calculations for Wells Fargo Scenarios A, B, C, and D, respectively.

[2] Calculated based on Mr. Olsen's damages adjustment for uncollectibles and reversals. Mr. Olsen's Scenario #2 corresponds to Wells Fargo Scenarios B and D and the adjustment is calculated as (278,654,005.97 - 203,002,626.86) / 278,654,005.97. Mr. Olsen's Scenario #3 corresponds to Wells Fargo Scenarios A and C and the adjustment is calculated as (253,071,216.97 - 184,604,919.21) / 253,071,216.97. See Expert Report of Art Olsen, November 20, 2009, pp. 23-26.

**Exhibit 4.1b**

**Overdraft Damages Analysis**

**Wells Fargo Scenario A**

| Transaction Date | Original Overdraft Count | Scenario A Overdraft Count | Original Overdraft Amount | Scenario A Overdraft Amount | Scenario A Percent Change |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | ----(Number of Overdrafts)---- | | ----(U.S. Dollars)---- | | ----(Percent)---- |
| | | | | | ((5)-(4))/(4) |
| Tuesday, January 02, 2007 | 75,252 | 62,110 | $ 2,479,739 | $ 2,047,010 | (17.45) % |
| Tuesday, January 16, 2007 | 88,090 | 73,075 | 2,899,127 | 2,402,651 | (17.13) |
| Monday, February 05, 2007 | 65,476 | 58,367 | 2,159,580 | 1,924,184 | (10.90) |
| Thursday, May 17, 2007 | 29,742 | 28,704 | 986,869 | 952,647 | (3.47) |
| Tuesday, May 29, 2007 | 115,966 | 98,973 | 3,828,407 | 3,265,776 | (14.70) |
| Monday, July 23, 2007 | 77,605 | 67,934 | 2,565,794 | 2,246,613 | (12.44) |
| Monday, October 01, 2007 | 79,931 | 70,622 | 2,632,641 | 2,325,546 | (11.66) |
| Thursday, May 01, 2008 | 29,619 | 28,501 | 979,822 | 943,153 | (3.74) |
| Thursday, May 22, 2008 | 26,328 | 24,923 | 875,241 | 828,968 | (5.29) |
| Monday, June 09, 2008 | 86,733 | 75,378 | 2,857,880 | 2,483,805 | (13.09) |
| **Total:** | **674,742** | **588,587** | **$ 22,265,100** | **$ 19,420,353** | **(12.78) %** |

Source: Wells Fargo.

Exhibit 4.1c

Overdraft Damages Analysis - Weighted Average Percentage

Wells Fargo Scenario A

| Posted Date | Strata | Percent of Strata Days Sampled (Percent) | Weight | Original Overdraft Amount | Scenario A Overdraft Amount | Weighted Original Overdraft Amount | Weighted Scenario A Overdraft Amount |
|---|---|---|---|---|---|---|---|
| | | | | | (U.S. Dollars) | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) (4)*(5) | (8) (4)*(6) |
| Tuesday, January 02, 2007 | Medium High | 25.00 % | 5.04 % | $ 2,479,739 | $ 2,047,010 | $ 124,974 | $ 103,165 |
| Tuesday, January 16, 2007 | High | 33.33 | 0.97 | 2,899,127 | 2,402,651 | 28,197 | 23,368 |
| Monday, February 05, 2007 | Medium High | 25.00 | 5.04 | 2,159,580 | 1,924,184 | 108,838 | 96,975 |
| Thursday, May 17, 2007 | Low | 33.33 | 25.64 | 986,869 | 952,647 | 253,043 | 244,268 |
| Tuesday, May 29, 2007 | High | 33.33 | 0.97 | 3,828,407 | 3,265,776 | 37,235 | 31,763 |
| Monday, July 23, 2007 | Medium High | 25.00 | 5.04 | 2,565,794 | 2,246,613 | 129,311 | 113,225 |
| Monday, October 01, 2007 | Medium High | 25.00 | 5.04 | 2,632,641 | 2,325,546 | 132,680 | 117,203 |
| Thursday, May 01, 2008 | Low | 33.33 | 25.64 | 979,822 | 943,153 | 251,236 | 241,834 |
| Thursday, May 22, 2008 | Low | 33.33 | 25.64 | 875,241 | 828,968 | 224,421 | 212,556 |
| Monday, June 09, 2008 | High | 33.33 | 0.97 | 2,857,880 | 2,483,805 | 27,795 | 24,157 |
| **Total:** | | | | $ 22,265,100 | $ 19,420,353 | $ 1,317,729 | $ 1,208,513 |
| | | | | | Weighted Average Percentage[1] | | (8.29) % |

Source: Wells Fargo.

Note:

[1] Weighted Average Percentage is calculated as Column (8) Total minus Column (7) Total divided by Column (7) Total.

Exhibit 4.1d

Overdraft Damages Analysis

Wells Fargo Scenario B

| Transaction Date | Original Overdraft Count | Scenario B Overdraft Count | Original Overdraft Amount | Scenario B Overdraft Amount | Scenario B Percent Change |
|---|---|---|---|---|---|
| | (2) | (Number of Overdrafts) (3) | (U.S. Dollars) (4) | (5) | (Percent) (6) ((5)-(4))/(4) |
| (1) | | | | | |
| Tuesday, January 02, 2007 | 75,252 | 60,138 | $ 2,479,739 | $ 1,982,365 | (20.06) % |
| Tuesday, January 16, 2007 | 88,090 | 70,095 | 2,899,127 | 2,304,903 | (20.50) |
| Monday, February 05, 2007 | 65,476 | 56,050 | 2,159,580 | 1,848,785 | (14.39) |
| Thursday, May 17, 2007 | 29,742 | 28,134 | 986,869 | 933,960 | (5.36) |
| Tuesday, May 29, 2007 | 115,966 | 94,539 | 3,828,407 | 3,120,866 | (18.48) |
| Monday, July 23, 2007 | 77,605 | 65,598 | 2,565,794 | 2,170,101 | (15.42) |
| Monday, October 01, 2007 | 79,931 | 69,071 | 2,632,641 | 2,274,671 | (13.60) |
| Thursday, May 01, 2008 | 29,619 | 28,409 | 979,822 | 940,091 | (4.05) |
| Thursday, May 22, 2008 | 26,328 | 24,262 | 875,241 | 807,340 | (7.76) |
| Monday, June 09, 2008 | 86,733 | 72,843 | 2,857,880 | 2,401,220 | (15.98) |
| **Total:** | **674,742** | **569,139** | **$ 22,265,100** | **$ 18,784,302** | **(15.63) %** |

Source: Wells Fargo.

**Exhibit 4.1e**

**Overdraft Damages Analysis – Weighted Average Percentage**

**Wells Fargo Scenario B**

| Posted Date | Strata | Percent of Strata Days Sampled (Percent) | Weight | Original Overdraft Amount | Scenario B Overdraft Amount | Weighted Original Overdraft Amount | Weighted Scenario B Overdraft Amount |
|---|---|---|---|---|---|---|---|
| | | | | | (U.S. Dollars) | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) (4)*(5) | (8) (4)*(6) |
| Tuesday, January 02, 2007 | Medium High | 25.00 % | 5.04 % | $ 2,479,739 | $ 1,982,365 | $ 124,974 | $ 99,907 |
| Tuesday, January 16, 2007 | High | 33.33 | 0.97 | 2,899,127 | 2,304,903 | 28,197 | 22,417 |
| Monday, February 05, 2007 | Medium High | 25.00 | 5.04 | 2,159,580 | 1,848,785 | 108,838 | 93,175 |
| Thursday, May 17, 2007 | Low | 33.33 | 25.64 | 986,869 | 933,960 | 253,043 | 239,477 |
| Tuesday, May 29, 2007 | High | 33.33 | 0.97 | 3,828,407 | 3,120,866 | 37,235 | 30,353 |
| Monday, July 23, 2007 | Medium High | 25.00 | 5.04 | 2,565,794 | 2,170,101 | 129,311 | 109,368 |
| Monday, October 01, 2007 | Medium High | 25.00 | 5.04 | 2,632,641 | 2,274,671 | 132,680 | 114,639 |
| Thursday, May 01, 2008 | Low | 33.33 | 25.64 | 979,822 | 940,091 | 251,236 | 241,049 |
| Thursday, May 22, 2008 | Low | 33.33 | 25.64 | 875,241 | 807,340 | 224,421 | 207,010 |
| Monday, June 09, 2008 | High | 33.33 | 0.97 | 2,857,880 | 2,401,220 | 27,795 | 23,354 |
| **Total:** | | | | $ 22,265,100 | $ 18,784,302 | $ 1,317,729 | $ 1,180,750 |
| | | | | | Weighted Average Percentage:[1] | | (10.40) % |

**Source:** Wells Fargo.

**Note:**

[1] Weighted Average Percentage is calculated as Column (8) Total minus Column (7) Total multiplied by Column (7) Total.

Exhibit 4.1f
Overdraft Damages Analysis
Wells Fargo Scenario C

| Transaction Date | Original Overdraft Count | Scenario C Overdraft Count | Original Overdraft Amount | Scenario C Overdraft Amount | Scenario C Percent Change |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | (Number of Overdrafts) | | (U.S. Dollars) | | (Percent) |
| | | | | | ((5)-(4))/(4) |
| Tuesday, January 02, 2007 | 113,578 | 101,011 | $ 3,753,427 | $ 3,347,835 | (10.81) % |
| Tuesday, January 16, 2007 | 126,743 | 114,380 | 4,183,999 | 3,784,223 | (9.55) |
| Monday, February 05, 2007 | 76,172 | 68,316 | 2,515,929 | 2,260,717 | (10.14) |
| Thursday, May 17, 2007 | 33,788 | 32,234 | 1,121,507 | 1,071,490 | (4.46) |
| Tuesday, May 29, 2007 | 134,028 | 115,414 | 4,432,527 | 3,826,826 | (13.66) |
| Monday, July 23, 2007 | 91,695 | 80,284 | 3,036,549 | 2,664,363 | (12.26) |
| Monday, October 01, 2007 | 92,088 | 82,352 | 3,037,295 | 2,722,928 | (10.35) |
| Thursday, May 01, 2008 | 33,180 | 31,822 | 1,098,696 | 1,055,538 | (3.93) |
| Thursday, May 22, 2008 | 29,944 | 28,204 | 996,271 | 939,771 | (5.67) |
| Monday, June 09, 2008 | 100,606 | 86,838 | 3,321,697 | 2,875,053 | (13.45) |
| **Total:** | **831,822** | **740,855** | **$ 27,497,897** | **$ 24,548,744** | **(10.73) %** |

Source: Wells Fargo.

Exhibit 4.1g

Overdraft Damages Analysis - Weighted Average Percentage

Wells Fargo Scenario C

| Posted Date | Strata | Percent of Strata Days Sampled (Percent) | Weight | Original Overdraft Amount | Scenario C Overdraft Amount | Weighted Original Overdraft Amount | Weighted Scenario C Overdraft Amount |
|---|---|---|---|---|---|---|---|
| | | | | | (U.S. Dollars) | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) (4)*(5) | (8) (4)*(6) |
| Tuesday, January 02, 2007 | Medium High | 25.00 % | 5.04 % | $ 3,753,427 | $ 3,347,835 | $ 189,165 | $ 168,724 |
| Tuesday, January 16, 2007 | High | 33.33 | 0.97 | 4,183,999 | 3,784,223 | 40,693 | 36,805 |
| Monday, February 05, 2007 | Medium High | 25.00 | 5.04 | 2,515,929 | 2,260,717 | 126,797 | 113,935 |
| Thursday, May 17, 2007 | Low | 33.33 | 25.64 | 1,121,507 | 1,071,490 | 287,566 | 274,741 |
| Tuesday, May 29, 2007 | High | 33.33 | 0.97 | 4,432,527 | 3,826,826 | 43,110 | 37,219 |
| Monday, July 23, 2007 | Medium High | 25.00 | 5.04 | 3,036,549 | 2,664,363 | 153,036 | 134,278 |
| Monday, October 01, 2007 | Medium High | 25.00 | 5.04 | 3,037,295 | 2,722,928 | 153,073 | 137,230 |
| Thursday, May 01, 2008 | Low | 33.33 | 25.64 | 1,098,696 | 1,055,538 | 281,717 | 270,651 |
| Thursday, May 22, 2008 | Low | 33.33 | 25.64 | 996,271 | 939,771 | 255,454 | 240,967 |
| Monday, June 09, 2008 | High | 33.33 | 0.97 | 3,321,697 | 2,875,053 | 32,307 | 27,962 |
| Total: | | | | $ 27,497,897 | $ 24,548,744 | $ 1,562,918 | $ 1,442,513 |

Weighted Average Percentage:[1]          (7.70) %

Source: Wells Fargo.

Note:

[1] Weighted Average Percentage is calculated as Column (8) Total minus Column (7) Total multiplied by Column (7) Total.

Exhibit 4.1h
Overdraft Damages Analysis
Wells Fargo Scenario D

| Transaction Date | Original Overdraft Count | Scenario D Overdraft Count | Original Overdraft Amount | Scenario D Overdraft Amount | Scenario D Percent Change |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | (Number of Overdrafts) | | (U.S. Dollars) | | (Percent) |
| | | | | | ((5)-(4))/(4) |
| Tuesday, January 02, 2007 | 113,578 | 99,051 | $ 3,753,427 | $ 3,283,532 | (12.52) % |
| Tuesday, January 16, 2007 | 126,743 | 111,596 | 4,183,999 | 3,692,979 | (11.74) |
| Monday, February 05, 2007 | 76,172 | 66,222 | 2,515,929 | 2,192,564 | (12.85) |
| Thursday, May 17, 2007 | 33,788 | 31,714 | 1,121,507 | 1,054,437 | (5.98) |
| Tuesday, May 29, 2007 | 134,028 | 111,283 | 4,432,527 | 3,691,816 | (16.71) |
| Monday, July 23, 2007 | 91,695 | 77,918 | 3,036,549 | 2,587,194 | (14.80) |
| Monday, October 01, 2007 | 92,088 | 80,870 | 3,037,295 | 2,674,382 | (11.95) |
| Thursday, May 01, 2008 | 33,180 | 31,717 | 1,098,696 | 1,052,078 | (4.24) |
| Thursday, May 22, 2008 | 29,944 | 27,607 | 996,271 | 920,278 | (7.63) |
| Monday, June 09, 2008 | 100,606 | 84,262 | 3,321,697 | 2,791,549 | (15.96) |
| **Total:** | **831,822** | **722,240** | **$ 27,497,897** | **$ 23,940,809** | **(12.94) %** |

Source: Wells Fargo.

**Exhibit 4.1i**

**Overdraft Damages Analysis - Weighted Average Percentage**

**Wells Fargo Scenario D**

| Posted Date | Strata | Percent of Strata Days Sampled (Percent) | Weight | Original Overdraft Amount | Scenario D Overdraft Amount | Weighted Original Overdraft Amount | Weighted Scenario D Overdraft Amount |
|---|---|---|---|---|---|---|---|
| | | | | | (U.S. Dollars) | | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) (4)*(5) | (8) (4)*(6) |
| Tuesday, January 02, 2007 | Medium High | 25.00 % | 5.04 % | $ 3,753,427 | $ 3,283,532 | $ 189,165 | $ 165,483 |
| Tuesday, January 16, 2007 | High | 33.33 | 0.97 | 4,183,999 | 3,692,979 | 40,693 | 35,918 |
| Monday, February 05, 2007 | Medium High | 25.00 | 5.04 | 2,515,929 | 2,192,564 | 126,797 | 110,501 |
| Thursday, May 17, 2007 | Low | 33.33 | 25.64 | 1,121,507 | 1,054,437 | 287,566 | 270,368 |
| Tuesday, May 29, 2007 | High | 33.33 | 0.97 | 4,432,527 | 3,691,816 | 43,110 | 35,906 |
| Monday, July 23, 2007 | Medium High | 25.00 | 5.04 | 3,036,549 | 2,587,194 | 153,036 | 130,389 |
| Monday, October 01, 2007 | Medium High | 25.00 | 5.04 | 3,037,295 | 2,674,382 | 153,073 | 134,783 |
| Thursday, May 01, 2008 | Low | 33.33 | 25.64 | 1,098,696 | 1,052,078 | 281,717 | 269,764 |
| Thursday, May 22, 2008 | Low | 33.33 | 25.64 | 996,271 | 920,278 | 255,454 | 235,969 |
| Monday, June 09, 2008 | High | 33.33 | 0.97 | 3,321,697 | 2,791,549 | 32,307 | 27,150 |
| **Total:** | | | | **$ 27,497,897** | **$ 23,940,809** | **$ 1,562,918** | **$ 1,416,231** |

Weighted Average Percentage:[1]   (9.39) %

Source: Wells Fargo.

Note:

[1] Weighted Average Percentage is calculated as Column (8) Total minus Column (7) Total multiplied by Column (7) Total.

## Exhibit 4.1j
## Wells Fargo Overdraft Damages Analysis
## Weight Calculation

| Posted Date | Strata | Sample Fraction[1] | Strata Weight[2] (Percent) | Combined Weight |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) (3)*(4) |
| Tuesday, January 02, 2007 | Medium High | 25.00 % | 20.16 % | 5.04 % |
| Tuesday, January 16, 2007 | High | 33.33 | 2.92 | 0.97 |
| Monday, February 05, 2007 | Medium High | 25.00 | 20.16 | 5.04 |
| Thursday, May 17, 2007 | Low | 33.33 | 76.92 | 25.64 |
| Tuesday, May 29, 2007 | High | 33.33 | 2.92 | 0.97 |
| Monday, July 23, 2007 | Medium High | 25.00 | 20.16 | 5.04 |
| Monday, October 01, 2007 | Medium High | 25.00 | 20.16 | 5.04 |
| Thursday, May 01, 2008 | Low | 33.33 | 76.92 | 25.64 |
| Thursday, May 22, 2008 | Low | 33.33 | 76.92 | 25.64 |
| Monday, June 09, 2008 | High | 33.33 | 2.92 | 0.97 |

**Notes:**

[1] Sample fraction is 25% for Medium High days because 4 Medium High days were chosen and 33% for Low and High days because 3 days were chosen.

[2] Strata weight is calculated as the number of total days of each Strata in the sample divided by the total number of days in the sample (377 days, including Mondays). For the Medium High Strata, it is calculated as 76/377 = 20%, for the High Strata, it is calculated as 11/377 = 3% and for the Low Strata, it is calculated as (221+69)/377 = 77%. Low Strata includes 69 Mondays, which were originally eliminated from the sample selection process because they represented days that had the lowest volume of overdraft fee revenue.

Exhibit 4.2

Total Damages Under Scenarios A, B, C and D Accounting for Persons Who Overdraft Repeatedly

Entire Damages Period, November 15, 2004 - June 30, 2008

**Scenario A**

| Number of Post Dates With Multiple Overdraft Charges (1) | Number of Accounts (2) | Percentage of All Accounts (Percent) (3) | Mr. Olsen's Re-Sequencing Scenario #2 Damages after 30-Day Reversals (U.S. Dollars) (4) | Percentage of Total Damages (Percent) (4)÷Σ(4) (5) | Damages Not Accounting for Persons Who Overdraft Repeatedly (U.S. Dollars) (5)*$61,864,100[1] (6) | Damages Accounting for Persons Who Overdraft Repeatedly prev(7)+(6) (7) |
|---|---|---|---|---|---|---|
| 1 Post Date | 754,738 | 35.07 % | $ 8,264,706 | 4.07 % | $ 2,518,631 | $ 2,518,631 |
| 2 Post Dates | 379,716 | 17.64 | 9,338,238 | 4.60 | 2,845,784 | 5,364,415 |
| 3 Post Dates | 230,942 | 10.73 | 9,503,489 | 4.68 | 2,896,144 | 8,260,559 |
| 4 Post Dates | 155,282 | 7.22 | 9,226,600 | 4.55 | 2,811,763 | 11,072,322 |
| 5 Post Dates | 111,004 | 5.16 | 8,824,754 | 4.35 | 2,689,302 | 13,761,624 |
| 6 Post Dates | 83,104 | 3.86 | 8,308,323 | 4.09 | 2,531,922 | 16,293,547 |
| 7 Post Dates | 64,824 | 3.01 | 7,873,931 | 3.88 | 2,399,544 | 18,693,090 |
| 8 Post Dates | 51,169 | 2.38 | 7,456,825 | 3.67 | 2,272,433 | 20,965,523 |
| 9 Post Dates | 41,904 | 1.95 | 6,986,954 | 3.44 | 2,129,242 | 23,094,764 |
| 10 Post Dates | 34,482 | 1.60 | 6,608,567 | 3.26 | 2,013,930 | 25,108,694 |
| >10 Post Dates | 244,941 | 11.38 | 120,610,239 | 59.41 | 36,755,405 | 61,864,100 |
| Total: | 2,152,106 | 100.00 % | $ 203,002,627 | 100.00 % | $ 61,864,100 | |

**Scenario B**

| Number of Post Dates With Multiple Overdraft Charges (1) | Number of Accounts (2) | Percentage of All Accounts (Percent) (3) | Mr. Olsen's Re-Sequencing Scenario #2 Damages after 30-Day Reversals (U.S. Dollars) (4) | Percentage of Total Damages (Percent) (4)÷Σ(4) (5) | Damages Not Accounting for Persons Who Overdraft Repeatedly (U.S. Dollars) (5)*$77,489,688[1] (6) | Damages Accounting for Persons Who Overdraft Repeatedly prev(7)+(6) (7) |
|---|---|---|---|---|---|---|
| 1 Post Date | 754,738 | 35.07 % | $ 8,264,706 | 4.07 % | $ 3,154,784 | $ 3,154,784 |
| 2 Post Dates | 379,716 | 17.64 | 9,338,238 | 4.60 | 3,564,570 | 6,719,355 |
| 3 Post Dates | 230,942 | 10.73 | 9,503,489 | 4.68 | 3,627,650 | 10,347,004 |
| 4 Post Dates | 155,282 | 7.22 | 9,226,600 | 4.55 | 3,521,956 | 13,868,961 |
| 5 Post Dates | 111,004 | 5.16 | 8,824,754 | 4.35 | 3,368,564 | 17,237,525 |
| 6 Post Dates | 83,104 | 3.86 | 8,308,323 | 4.09 | 3,171,434 | 20,408,959 |
| 7 Post Dates | 64,824 | 3.01 | 7,873,931 | 3.88 | 3,005,619 | 23,414,577 |
| 8 Post Dates | 51,169 | 2.38 | 7,456,825 | 3.67 | 2,846,402 | 26,260,979 |
| 9 Post Dates | 41,904 | 1.95 | 6,986,954 | 3.44 | 2,667,044 | 28,928,023 |
| 10 Post Dates | 34,482 | 1.60 | 6,608,567 | 3.26 | 2,522,607 | 31,450,630 |
| >10 Post Dates | 244,941 | 11.38 | 120,610,239 | 59.41 | 46,039,059 | 77,489,688 |
| Total: | 2,152,106 | 100.00 % | $ 203,002,627 | 100.00 % | $ 77,489,688 | |

## Scenario C

| Number of Post Dates With Multiple Overdraft Charges (1) | Number of Accounts (2) | Percentage of All Accounts (Percent) (3) | Mr. Olsen's Re-Sequencing Scenario #2 Damages after 30-Day Reversals (U.S. Dollars) (4) | Percentage of Total Damages (Percent) (4)$\Sigma$(4) (5) | Damages Not Accounting for Persons Who Overdraft Repeatedly (U.S. Dollars) (5)*57,502,629[1] (6) | Damages Accounting for Persons Who Overdraft Repeatedly (U.S. Dollars) prev(7)+(6) (7) |
|---|---|---|---|---|---|---|
| 1 Post Date | 754,738 | 35.07% | $ 8,264,706 | 4.07% | $ 2,341,065 | $ 2,341,065 |
| 2 Post Dates | 379,716 | 17.64 | 9,338,238 | 4.60 | 2,645,154 | 4,986,219 |
| 3 Post Dates | 230,942 | 10.73 | 9,503,489 | 4.68 | 2,691,963 | 7,678,182 |
| 4 Post Dates | 155,282 | 7.22 | 9,226,600 | 4.55 | 2,613,532 | 10,291,714 |
| 5 Post Dates | 111,004 | 5.16 | 8,824,754 | 4.35 | 2,499,704 | 12,791,418 |
| 6 Post Dates | 83,104 | 3.86 | 8,308,323 | 4.09 | 2,353,420 | 15,144,838 |
| 7 Post Dates | 64,824 | 3.01 | 7,873,931 | 3.88 | 2,230,374 | 17,375,212 |
| 8 Post Dates | 51,169 | 2.38 | 7,456,825 | 3.67 | 2,112,224 | 19,487,436 |
| 9 Post Dates | 41,904 | 1.95 | 6,986,954 | 3.44 | 1,979,128 | 21,466,564 |
| 10 Post Dates | 34,482 | 1.60 | 6,608,567 | 3.26 | 1,871,946 | 23,338,510 |
| >10 Post Dates | 244,941 | 11.38 | 120,610,239 | 59.41 | 34,164,119 | 57,502,629 |
| Total: | 2,152,106 | 100.00% | $ 203,002,627 | 100.00% | $ 57,502,629 | |

## Scenario D

| Number of Post Dates With Multiple Overdraft Charges (1) | Number of Accounts (2) | Percentage of All Accounts (Percent) (3) | Mr. Olsen's Re-Sequencing Scenario #2 Damages after 30-Day Reversals (U.S. Dollars) (4) | Percentage of Total Damages (Percent) (4)$\Sigma$(4) (5) | Damages Not Accounting for Persons Who Overdraft Repeatedly (U.S. Dollars) (5)*69,963,276[1] (6) | Damages Accounting for Persons Who Overdraft Repeatedly (U.S. Dollars) prev(7)+(6) (7) |
|---|---|---|---|---|---|---|
| 1 Post Date | 754,738 | 35.07% | $ 8,264,706 | 4.07% | $ 2,848,367 | $ 2,848,367 |
| 2 Post Dates | 379,716 | 17.64 | 9,338,238 | 4.60 | 3,218,351 | 6,066,718 |
| 3 Post Dates | 230,942 | 10.73 | 9,503,489 | 4.68 | 3,275,304 | 9,342,021 |
| 4 Post Dates | 155,282 | 7.22 | 9,226,600 | 4.55 | 3,179,876 | 12,521,897 |
| 5 Post Dates | 111,004 | 5.16 | 8,824,754 | 4.35 | 3,041,383 | 15,563,280 |
| 6 Post Dates | 83,104 | 3.86 | 8,308,323 | 4.09 | 2,863,399 | 18,426,679 |
| 7 Post Dates | 64,824 | 3.01 | 7,873,931 | 3.88 | 2,713,689 | 21,140,368 |
| 8 Post Dates | 51,169 | 2.38 | 7,456,825 | 3.67 | 2,569,937 | 23,710,305 |
| 9 Post Dates | 41,904 | 1.95 | 6,986,954 | 3.44 | 2,407,999 | 26,118,304 |
| 10 Post Dates | 34,482 | 1.60 | 6,608,567 | 3.26 | 2,277,591 | 28,395,895 |
| >10 Post Dates | 244,941 | 11.38 | 120,610,239 | 59.41 | 41,567,381 | 69,963,276 |
| Total: | 2,152,106 | 100.00% | $ 203,002,627 | 100.00% | $ 69,963,276 | |

Source: Accounts by the number of posted dates with multiple overdraft fees is provided by Wells Fargo.

Notes:

[1] See Exhibits 4.1a for Wells Fargo Scenarios A-D midpoint damages after reversals and uncollectibles calculations

## Exhibit 4.3a

## Summary of Damages under Wells Fargo Scenarios A, B, C and D

## Ratio Analysis

| | Wells Fargo | | Mr. Olsen | | | |
|---|---|---|---|---|---|---|
| Scenario | Percent Change[1] ---(Percent)--- | Corresponding Scenario | Damages ---(U.S. Dollars)--- | Percent Change[2] ---(Percent)--- | Wells Fargo Implied Damages ---(U.S. Dollars)--- |
| (1) | (2) | (3) | (4) | (5) | (6) ((4)/(5))*(2) |
| Scenario A | (12.78) % | Scenario #3 | $ 184,604,919 | (34.08) % | $ 69,201,403 |
| Scenario B | (15.63) | Scenario #2 | 203,002,627 | (36.11) | 87,885,952 |
| Scenario C | (10.73) | Scenario #3 | 184,604,919 | (34.08) | 58,088,976 |
| Scenario D | (12.94) | Scenario #2 | 203,002,627 | (36.11) | 72,721,096 |

**Source:** For aggregate damages accounting for uncollectibles and reversals under each of Mr. Olsen's Scenarios, see Report of Art Olsen, November 20, 2009, p. 10.

**Note:**

[1] For percent calculations, see Exhibits 4.1b, 4.1d, 4.1f, and 4.1h for Wells Fargo Re-Sequencing Scenarios A, B, C, and D, respectively.

[2] For percent calculations, see Exhibits 4.3b and 4.3c for Mr. Olsen's Re-Sequencing Scenarios #2 and #3, respectively.

Exhibit 4.3b

Overdraft Damages Ratio Analysis

Mr. Olsen's Re-Sequencing Scenario #2

| Transaction Date | Original Overdraft Count | Mr.Olsen's Re-Sequencing Scenario #2 Overdraft Count | Original Overdraft Amount | Mr.Olsen's Re-Sequencing Scenario #2 Overdraft Amount | Mr.Olsen's Re-Sequencing Scenario #2 Percent Change |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | ----(Number of Overdrafts)---- | | ----(U.S. Dollars)---- | | (5)-(4))/(4) |
| | | | | | ----(Percent)---- |
| Tuesday, January 02, 2007 | 75,252 | 41,149 | $ 2,479,739 | $ 1,351,908 | (45.48) % |
| Tuesday, January 16, 2007 | 88,090 | 47,666 | 2,899,127 | 1,566,057 | (45.98) |
| Monday, February 05, 2007 | 65,476 | 41,987 | 2,159,580 | 1,384,622 | (35.88) |
| Thursday, May 17, 2007 | 29,742 | 23,224 | 986,869 | 772,198 | (21.75) |
| Tuesday, May 29, 2007 | 115,966 | 73,409 | 3,828,407 | 2,423,416 | (36.70) |
| Monday, July 23, 2007 | 77,605 | 51,794 | 2,565,794 | 1,713,832 | (33.20) |
| Monday, October 01, 2007 | 79,931 | 51,541 | 2,632,641 | 1,697,472 | (35.52) |
| Thursday, May 01, 2008 | 29,619 | 22,864 | 979,822 | 758,021 | (22.64) |
| Thursday, May 22, 2008 | 26,328 | 20,778 | 875,241 | 692,221 | (20.91) |
| Monday, June 09, 2008 | 86,733 | 56,553 | 2,857,880 | 1,865,261 | (34.73) |
| Total: | 674,742 | 430,965 | $ 22,265,100 | $ 14,225,008 | (36.11) % |

Source: Wells Fargo.

Exhibit 4.3c

Overdraft Damages Ratio Analysis

Mr. Olsen's Re-Sequencing Scenario #3

| Transaction Date | Original Overdraft Count | Mr.Olsen's Re-Sequencing Scenario #3 Overdraft Count | Original Overdraft Amount | Mr.Olsen's Re-Sequencing Scenario #3 Overdraft Amount | Mr.Olsen's Re-Sequencing Scenario #3 Percent Change |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | ---(Number of Overdrafts)--- | | ---(U.S. Dollars)--- | | ---(Percent)--- ((5)-(4))/(4) |
| Tuesday, January 02, 2007 | 75,252 | 42,542 | $ 2,479,739 | $ 1,397,329 | (43.65) % |
| Tuesday, January 16, 2007 | 88,090 | 49,644 | 2,899,127 | 1,630,812 | (43.75) |
| Monday, February 05, 2007 | 65,476 | 43,540 | 2,159,580 | 1,435,131 | (33.55) |
| Thursday, May 17, 2007 | 29,742 | 23,680 | 986,869 | 787,141 | (20.24) |
| Tuesday, May 29, 2007 | 115,966 | 76,608 | 3,828,407 | 2,527,895 | (33.97) |
| Monday, July 23, 2007 | 77,605 | 53,486 | 2,565,794 | 1,769,174 | (31.05) |
| Monday, October 01, 2007 | 79,931 | 52,577 | 2,632,641 | 1,731,266 | (34.24) |
| Thursday, May 01, 2008 | 29,619 | 22,941 | 979,822 | 760,595 | (22.37) |
| Thursday, May 22, 2008 | 26,328 | 21,338 | 875,241 | 710,555 | (18.82) |
| Monday, June 09, 2008 | 86,733 | 58,425 | 2,857,880 | 1,926,421 | (32.59) |
| **Total:** | **674,742** | **444,781** | **$ 22,265,100** | **$ 14,676,319** | **(34.08) %** |

Source: Wells Fargo.

## Exhibit 4.4
## Average Time Between Posting Dates with Multiple Overdraft Charges
## Entire Damages Period, November 15, 2004 - June 30, 2008

| Number of Post Dates with Multiple Overdraft Charges | Average Time[1] |
|---|---|
| | --(Number of Days)-- |
| (1) | (2) |
| 1 Post Date | -- |
| 2 Post Dates | 147.03 |
| 3 Post Dates | 127.02 |
| 4 Post Dates | 112.86 |
| 5 Post Dates | 102.18 |
| 6 Post Dates | 93.31 |
| 7 Post Dates | 86.18 |
| 8 Post Dates | 79.54 |
| 9 Post Dates | 74.12 |
| 10 Post Dates | 69.45 |
| >10 Post Dates | 48.29 |

### Average Number of Multiple Overdraft Days for Class Members
### with More than 10 Post Dates with Multiple Overdrafts

| | | --(Number of Days)-- |
|---|---|---|
| | (1) | (2) |
| (a) | Number of days in the class period | 1,305.00 |
| (b) | Average time between post dates with multiple overdrafts | 48.29 |
| (c) (a)/(b) | Average number of multiple overdraft days | 27.02 |

-- not applicable

**Source:** Wells Fargo.

**Notes:**

[1] Average Time represents the average number of days in between post dates with multiple overdrafts.



**Exhibit 5.1**

**Wells Fargo Ratio of Consumer to Total Account Balances**

**January 2002 - December 2008**

Source: Wells Fargo Monthly Account Volumes, January 2002 - November 2009 ("portfolio_200911.xls", received from Counsel December 23, 2009).

Note: Total Account Balances include Consumer and Business Account Balances. Balances are monthly averages.

## Exhibit 5.2

## Wells Fargo Quarter-End Deposit Balances for Money Market and Transaction Accounts
## Quarters Ended December 2001 - September 2009



Sources: Deposit Balance data are taken from Wells Fargo FDIC Call Reports, available at http://www2.fdic.gov/Call_TFR_Rpts/.
Interest rate is the 6-month U.S. Treasury constant maturity rate on the last business day of the respective quarter, available at www.federalreserve.gov/releases/h15/data.htm.
Wells Fargo acquired Pacific Northwest Bancorp on November 3, 2003, see https://www.wellsfargo.com/press/pacificnorthwest2003110?year=2003.
Dr. Cowan takes the ratio of the overdraft "lift" to transaction accounts plus money market accounts. See Supplemental Report of Charles D. Cowan, Ph. D, March 4, 2009,
p. 15.

# EXHIBIT 2E

**DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**

**NERA**
Economic Consulting

**Alan J. Cox**
Senior Vice President

National Economic Research Associates, Inc.
1 Front St., Suite 2600
San Francisco, California  94111
+1 415 291 1000 Fax +1 415 291 1020
Direct Dial: +1 415 291-1009
Alan.cox@nera.com
www..nera.com

# Alan J. Cox

## Education

**University of California, Berkeley**
Ph.D., Business Administration, Economic Analysis and Policy Program, 1989
Major Fields: Industrial Organization, Finance, Econometrics

**University of British Columbia**
M.A., Economics, 1978

**York University, Toronto**
B.S., Environmental Science, 1976

## Professional Experience

**NERA Economic Consulting**

2001-            Senior Vice President

1998-2001     Vice President

1994-1998     Senior Consultant
Undertakes and provides testimony in projects involving economic, statistical, financial, and antitrust analysis.

1988-1989     Senior Analyst
Contributed to antitrust, telecommunications, natural gas, electricity, and airport landing fee cases.

**Law & Economics Consulting Group, Inc.**

1993-1994     Senior Economist
Provided economic analysis and testimony in antitrust and securities litigation and in regulatory proceedings.

Alan J. Cox

| | |
|---|---|
| 1989-1993 | Vice President<br>Responsible for managing growth for the firm and providing leadership to an<br>expanding staff of M.B.A.s, M.A.s, and Ph.Ds. |
| | **University of California, Berkeley** |
| 1983-1989 | Research Assistant<br>Conducted research on California energy policy. |
| | **Minimax Research Corporation** |
| 1985-1986 | Economist<br>Conducted analysis of electricity demand analysis and demand-side management<br>and strategic analysis on the impact of regulatory changes for telephone utilities. |
| | **Massachusetts Institute of Technology** |
| 1978-1981 | Visiting Economist<br>Investigated the economic consequences to electric utilities of independent power<br>producers and alternative energy sources. |
| | **University of British Columbia** |
| 1978 | Research Associate<br>Conducted research on energy demand and cogeneration potential in the British<br>Columbia pulp and paper industry. |
| | **Geological Survey of Canada** |
| 1975 | Field Party Leader<br>Managed crew gathering data on the electrical properties of permafrost in remote<br>Arctic sites. |

# Teaching Experience

| | |
|---|---|
| | **St. Mary's College of California** |
| 1994-1995 | Visiting Lecturer, Graduate School of Management<br>Taught Industrial Structure and Competitive Strategy. |
| | **Northeastern University** |
| 1989 | Adjunct Lecturer, Graduate School of Management<br>Taught Managerial Economics. |
| | **University of California, Berkeley** |
| 1984-1985 | Teaching Assistant<br>Taught Intermediate Microeconomics. |

Alan J. Cox

# Honors

16th Annual Telecommunications Policy Research Conference, Finalist, Graduate Student Paper Contest, 1988

Ph.D. Fellowship, Social Sciences and Humanities Research Council of Canada, 1981

Special M.A. Fellowship, Social Sciences and Humanities Research Council of Canada, 1976

Tina and Maurice Wagner Foundation Fellowship, University of British Columbia, 1976

York University In-Course Scholarship, 1975

Alan J. Cox

# Expert Testimony, Affidavits, and Reports

*In re: Application of San Pablo Bay Pipeline Company LLC for Approval of Tariffs for San Joaquin Valley Crude Oil Pipeline* (Application No. 08-09-024 before the Public Utilities Commission of the State of California).
*Direct Testimony* regarding San Pablo Bay Pipeline Company's market power, prepared for Chevron Products Company, dated November 16, 2009.

*Pioneer Drive, LLC* v. *Nissan Diesel America, Inc., et al.*, U.S. District Court, for the District of Montana, Missoula Division Case No. CV 08-115-M-DWM
*Expert Report* dated October 1, 2009, on behalf of plaintiff, regarding damages suffered due to defendants' alleged breach of joint venture agreement.

*Ricardo Alfonso Leon, et al.* v. *Jose Francisco Leon, et al*, Superior Court of California, County of Los Angeles Case No. BC 376704, related to Case No. BP 069765.
*Deposition Testimony* on August 21, 2009, on behalf of plaintiffs, assessing of damages for misappropriated assets.

*Mike Alexandros, et al.* v. *KOR Electronics, Inc., et al.*, Orange County Superior Court Case No. 06-CC-07881.
*Deposition* testimony on April 29, 2009, regarding damages to minority shareholder plaintiffs as a result of alleged fraud and breach of fiduciary duty by controlling shareholder defendants.

*Tarlton Pauley Morton* v. *Peter Morton, et al.*, Los Angeles County Superior Court Case No. BC 364390
*Deposition Testimony* on March 16, 2009 regarding valuation of "Hard Rock" trademark.

*In re Textainer Financial Services Corporation, et al.*, San Francisco County Superior Court Case No. CGC 05-440303
*Deposition Testimony* on damages due to alleged breach of fiduciary duty, February 6, 2008.

*In re: REMEC Incorporated Securities Litigation, et al.*, U.S. District Court, Southern District of California, Case No. 04 CV 1948 JM (AJB)
*Deposition* Testimony on March 11, 2009; *Expert Rebuttal Report,* dated February 3, 2009, *Expert Report* dated December 23, 2008 and *Declaration* in Support of Defendants' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, regarding loss causation and reliance, dated September 22, 2008.

*Dong Ah Tire & Rubber Co. Ltd.* v. *Glasforms, Inc.,* v. *CTG International, Inc. and Taishan Fiberglass, Inc., et al.*, U.S. District Court for the Northern District of California, San Jose Division Case No. C06-03359-JF (RS) (Consolidated with Case No. C06-00213 JF(RS))
*Trial Testimony* on September 10, 2009, *Deposition Testimony* on April 28, 2009 and *Expert Rebuttal Report*, dated October 10, 2008, on behalf of third-party defendants CTG International, Inc. and Taishan Fiberglass, Inc., rebutting plaintiff's expert's report claiming commercial damages for recall costs, lost profits, and costs to repair reputation due to third-party defendants' supplying allegedly defective fiberglass.

Alan J. Cox

*Silicon Image, Inc.* v. *Analogix Semiconductor, Inc.*, U.S. District Court, Northern District of California, San Francisco Division Case No. C 07-00635 JCS
*Deposition* on September 19, 2008, *Rebuttal Report*, dated August 8, 2008, on behalf of defendant, Analogix, on damages as a result of alleged patent infringement, misappropriation and intentional interference with contractual relations and unfair competition.

*Applera Corporation – Applied Biosystems Group* v. *Illumina Inc., Solexa, Inc. and Stephen Macevicz, et al.*, U.S. District Court, Northern District of California Case No. 07 CV 02845 WHA
*Trial testimony* on January 21, 2009, *Supplemental Rebuttal Expert Report,* dated October 3, 2008, *Deposition Testimony* on June 24, 2008, *Expert Rebuttal* Report, dated June 13, 2008 and *Expert Report,* dated May 30, 2008, on behalf of plaintiff, Applera Corporation - Applied Biosystems Group, on damages relating to the misappropriation of patents by defendants.

*Ajaxo, Inc. and K.C. Multimedia, Inc.* v. *Bank of America Technology And Operations, Inc., Bank of America Corporation, Bank of America National Association and Allen Tam*, U.S. District Court, Eastern District of California, Sacramento Division Case No. 2:07-cv-945 GEB GGH
*Rebuttal Report*, dated August 8, 2008 on behalf of defendant, Bank of America, on damages relating to alleged copyright infringement.

*The Board of Trustees of the Leland Stanford Junior University and Litton Systems, Inc.* v. *Tyco International*, et al., U.S. District Court, Central District of California Case No. Cv-00-10584-TJH-(RCx)
*Deposition Testimony* on June 5, 2008 and *Expert Report* dated May 20, 2008, on behalf of defendant Pirelli S.p.A., on reasonable royalty damages as a result of alleged patent infringement by Pirelli.

*Lite-On IT Corp. and Lite-On (USA) International, Inc.* v. *Toshiba Corporation,* U.S. District Court, Central District of California, Western Division, Case No. CV07-4758 GPS (AJWx)
*Deposition Testimony* on November 19, 2008, *Rebuttal and Supplemental Expert Report*, dated November 11, 2008 and *Expert Report* on damages resulting from alleged fraud, dated October 7, 2008.

*All American Semiconductor, Inc.* v. *Hynix Semiconductor, Inc., et al., Case No. C 07-01200 PJH; DRAM Claims Liquidation Trust, By Its Trustee, Wells Fargo Bank, N.A.* v. *Hynix Semiconductor, Inc., et al., Case No. C 07-1381 PJH, Edge Electronics, Inc.* v. *Hynix Semiconductor, Inc., et al., Case No. C 07-01207 PJH, Jaco Electronics, Inc.* v. *Hynix Semiconductor, Inc., et al., Case No. C 07-01212 PJH, Sun Microsystems, Inc., et al.* v. *Hynix Semiconductor, Inc., et al., Case No. C 06-01665 PHJ, UNISYS Corporation* v. *Hynix Semiconductor, Inc., et al., Case No. C 06-02915 PJH*
*Deposition Testimony* on April 22, 2008 and *Expert Report* dated March 7, 2008 on liability arising from alleged participation in a price fixing cartel.

Alan J. Cox

*3Com Corporation* v. *Realtek Semiconductor Corporation,* U.S. District Court, Northern District Court of California San Francisco Division Case No. CV-03-2177VRW
*Trial Testimony* on April 2, 2008, *Deposition Testimony* on November 6, 2007, and *Expert Rebuttal Report*, on behalf of defendant, regarding reasonable royalty damages due to defendant's alleged infringement of patents, October 19, 2007.

*Interface, Inc.* v. *Shaw Industries, Inc., Mohawk Industries, Inc., and Collins & Aikman Floor Coverings, Inc., U.S. District Court, Northern District of Georgia, Atlanta Division* Case Nos. 4:05 CV-0189-HLM, 4:05-CV-0190-HLM, and 4:05-CV-0191-HLM
*Deposition Testimony* on December 13-14, 2007, *Expert Surrebuttal* Report, dated October 29, 2007 and *Expert Report,* dated September 13, 2007, on behalf of plaintiff regarding damages arising from infringement of patent on carpet design.

*OMAX Corp.* v. *Flow International Corp.*, Case No. CV 04-2334-RSL
*Deposition* dated June 7-8, 2007, *Expert Rebuttal Report* dated April 13, 2007 and *Expert Report* dated March 2, 2007.

*Melvin Gene Snow, et al.* v. *Lenscrafters, Inc.*, et al.
*Declaration* on class certification issues*,* January 29, 2007.

*In re DRAM Antitrust Litigation, MDL No. 1486*
*Deposition* dated October 20, 2006 and Expert *Report* dated October 2, 2006.

*Certain Incremental Dental Positioning Adjustment Appliances and Methods of Producing Same*
United States International Trade Commission Inv. No. 337-TA-562
*Expert Report* dated August 25, 2006.

*Crowley Marine Services, Inc.* v. *Alaska Village Electric Cooperative, Inc.*, U.S. District Court for the Northern District of Alaska Case No. 3:06-CV-54-TMB
*Expert Report* dated July 24, 2006.

*Align Technology, Inc.* v. *Orthoclear, Inc. and Orthoclear Holdings, Inc.*, U.S. District Court for the Northern District of California San Francisco/Oakland Division Case No. C 05 2948 MMC
*Deposition* dated June 26, 2006 and *Expert Report* dated May 28, 2006.

*Synopsys, Inc.* v. *Magma Design Automation, Inc.*, U.S. District Court, Northern District Court of California San Francisco Division Case No. C-04-03923 MMC (JCS)
*Expert Report* dated March 20, 2006.

*Globespan Virata* v. *Texas Instruments and Stanford University,* Case No. 03-2954
*Trial testimony*, January 24-26, 2006 in New Jersey District Court on patent infringement claims. Retained by Texas Instruments and Stanford. Jury awarded client $112 million.

*E & J Gallo Winery* v. *EnCana Corporation, et al,* U.S. District Court, Eastern District of California Case No. CV F 03-5412 AWI LJO
*Deposition testimony* on May 21, 2009 and *Revised Rebuttal Report* dated April 1, 2009.

*Securities and Exchange Commission* v. *Alexander J. Yaroshinsky, Sofia K. Yaroshinsky, and Victor E. Zak*, U.S. District Court for the Southern District of New York, Case No. 06cv2401 (S.D.N.Y.)
*Expert Rebuttal Report*, on behalf of defendants, regarding the materiality of alleged inside information, December 1, 2007.

*Nara Bancorp, Inc. and Nara Bank* v. *Benjamin B. Hong,* Arbitration Case No. 72 166 00775 06 A, CJ
*Arbitration Testimony* before the American Arbitration Association, Los Angeles, May 15, 2007. Testimony on materiality, unjust enrichment from insider trading and harm to reputation as a result of withholding of material information.

*Securities and Exchange Commission* v. *Jeremy R. Lent, et al.*
*Expert Report* dated July 31, 2006.

*In Re Novastar Financial, Inc. Securities Litigation*, U.S. District Court for the Western District of Missouri Case No. 04-0330-CV-W-ODS
*Declaration* dated June 26, 2006

*Capital Ventures International* v. *Network Commerce Inc., et al.*, U.S. District Court, Western Division of Washington Case No. C 01-0675L
*Deposition* dated June 30, 2006, *Rebuttal Report* dated April 19, 2006 and *Expert Report* dated March 20, 2006

*NZMP (USA), Inc. et al.* v. *Richard D. Marconi, et al.*, Superior Court of the State of California, for the County of Orange Case No. 03CC00030
*Deposition* dated June 11, 2006 and *Expert Report dated May 15, 2006.*

# PUBLICATIONS

"2 Economists' Take On i4i V. Microsoft," column published in *Law360*, 23 November 2009, with Mario Lopez, reviewing the damages raised in the CAFC's hearings in the I4I case and the appropriate standards for estimating damages in patent infringement cases.

"Intellectual Property Rights Protection in China: Economic Damages Still Need Improving," Oliver Wyman Journal, pp. 93-94, Spring 2009, with Kristina Sepetys.

"Intellectual Property Rights Protection in China:  Trends in Litigation and Economic Damages," working paper, 13 February 2009, with Kristina Sepetys (English and Chinese versions).

"Intellectual Property Rights Protection in China: Litigation and Economic Damages, and Case Strategies," *Thompson/West* 197 Supp. 4 (March 2006), pp. 401-421.

Alan J. Cox

"Intellectual Property Rights Protection in China: Litigation and Economic Damages" with Sepetys, Kristina. *Global Intellectual Property Asset management Report* Volume 8, Number 1 (January 2006), p. 1, 18-22.

"Intellectual Property Rights Protection in China: Litigation and Economic Damages, and Case Strategies," with Sepetys, Kristina. *Economic Approaches to Intellectual Property Policy, Litigation, and Management,* ed. Gregory K. Leonard and Lauren J. Strioh (New York: NERA Economic Consulting, 2005).

"The Frequently Forgotten Benefits of Price Discrimination," *Economics of Antitrust - New Issues, Questions, and Insights*, ed. Dr. Lawrence Wu (White Plains: National Economic Research Associates, 2004), 99-107.

"A Better Consumer Survey for Better Damages," *IP Value Commentator*, (April 2003).

# PRESENTATIONS AND WORKING PAPERS

"Damage Quantification in Patent Litigation: Putting the 'Reasonable' in Reasonable Royalty Rate Determinations," seminar hosted by NERA in Toronto, Canada on December 9, 2009. Dr. Cox and colleague, Mark Berenblut discussed patent valuation and reasonable royalties.

"Groundhog Day: Recurring Themes on Reasonable Royalties in Recent IP Damage Cases," NERA working paper, December 7, 2009, with colleagues Dr. Elizabeth M. Bailey and Dr. Gregory K. Leonard.

"Economic Basis for Damages Awards in United States Patent Litigation," a lecture on damages in patent infringement matters given at the University of Washington, School of Law, on October 20, 2009.

"Damages and Economic Analysis of Liability in International Context," presented by Dr. Alan Cox at the ABTL's 36th Annual Conference, "Lost in Translation: Cross-Border Litigation Tactics and Strategies." The conference took place at The Broadmoor, Colorado Springs, CO on October 1-4, 2009.

Moderator, "Trying Damages in a Patent Case: The Impact of Some Recent Decisions," teleconference organized by Law Seminars International on September 29, 2009. Dr. Cox, joined by colleagues Dr. David Blackburn (NERA); Richard F. Cauley of Wang, Hartmann; James W. Morando of Farrella Braun, and Darin W. Snyder of O'Melveny & Myers, discussed trends in Federal Circuit patent damages decisions.

"Entire Market Value Rule and Apportionment in Calculating Patent Damages." Presentation with Gregory Leonard given at Latham & Watkins LLP in San Francisco, CA on August 6, 2009.

"Impact of Patent Purchase and Patent Reform on Enforcement Damages," presented by Dr. Alan Cox at the ICAP / Ocean Tomo 2009 IP Markets Conference and Patent Auction held in Chicago, IL on July 22-23, 2009.

Alan J. Cox

"Patent Damages," a conference presented by Law Seminars International on April 20, 2009 in San Francisco, CA, co-chaired by Alan Cox and Alexander Brainerd, Esq., Sonnenschein Nath & Rosenthal LLP.

"Antitrust and Intellectual Property Economics and Litigation in China" seminar, sponsored by NERA Economics Consulting. Dr. Cox, with Fei Deng and Gregory Leonard presented an overview of recent trends in the Chinese business and legal climate in Washington, D.C. on April 16, 2009, and in San Francisco on April 23, 2009.

"Hot Topics in Copyright Trademark and Patent Law." Session organized and moderated at the ABA's 24th Annual Intellectual Property Conference in Arlington, VA: "The Supreme Court's Effect on patent Licensing and Litigation Practice." April 4, 2009.

"Trends in Damage Awards for Intellectual Property Infringement in the People's Republic of China." Presentation to the American Society of International Law at its March 25, 2009 annual meeting in Washington, D.C. Dr. Cox discussed the current status of judicial enforcement of intellectual property rights and the impact of revisions in the Patent Law.

"Shareholder Class Action Litigation – Recent Trends." Presentation to the Arizona Chapter of the National Association of Corporate Directors Institute, on March 3, 2009 in Scottsdale, Arizona. Dr. Cox discussed recent trends in shareholder class action litigation and the ways in which Board members can be on top of this issue.

"Basic Economic Analysis in Securities Class Action," a lecture on damages in securities fraud matters given at the University of Washington, School of Law, on February 25, 2009.

"An Economic View on Current Issues in Reasonable Royalty Analyses," Presentation to Wilson Sonsini Goodrich & Rosati, Palo Alto, California on January 29, 2009.

"A Short Course in Economics: Lecture 1, Supply and Demand," at O'Melveny & Myers LLP of San Francisco on January 28, 2009.

"Antitrust Problems in Standard-Setting" presented at the conference on China's Antimonopoly Law and Regulation on Abuse of Intellectual Property Rights, hosted by the China Society for World Trade Organization Studies under MOFCOM, on April 27, 2008 in Beijing, China.

Panelist, "Recent Antitrust Enforcement Activity in the Payment Card Industry: A TransAtlantic View," telephone Brownbag Program hosted by The Financial Services Committee of the American Bar Association Section of Antitrust Law on February 22, 2008 in Washington, DC.

"Trends in Securities Class Actions and Issues in Subprime Litigation," a conference presented by the Oregon State Bar Regulations Section in Portland, Oregon on January 16, 2008.

Alan J. Cox

"Innovative Strategies for Litigating Class Action Suits," a conference presented by Law Seminars International on November 12-13, 2007 in Los Angeles, California.  Presentation by Alan Cox entitled "Role of Expert Testimony – Economic Experts:  Strategies to employ experts, when and how to effectively use them."

"Standards Bodies & Patent Pools – Key Legal and Business Developments," a conference presented by Law Seminars International on October 11-12, 2007, in Arlington, VA.  Dr. Alan Cox delivered a presentation entitled "Tips for Determining 'Reasonable' Royalties," with Gil Ohana, Esq., of Wilmer, Cutler, Pickering, Hale and Door LLP.

"Calculating & Proving Patent Damages," Law Seminars International Advanced Workshop. Program Co-Chair with Darylyn Durie.  Presentation entitled, "Getting the Data You Want From the Other Side through Discovery and 30(b)(6) Depositions," given in San Francisco, February 27-28, 2006.

"Standard Setting, Market Power and Intellectual Property Value," given in Portland, Oregon on April 26, 2005; Seattle, Washington on April 27, 2005 and in San Francisco on April 28, 2005.

"Economic Basis for Damages Awards in United States Patent Litigation," presented to the Guangdong Intellectual Property Protection Association and Guangdong Intellectual Property Office in Guangzhou, China on November 10, 2004.

"Calculating and Proving Patent Damages," Law Seminars International Advanced Workshop. Program Co-Chair with F. Ross Boundy (Christen O'Connor Johnson Kindness, LLP).  Speech entitled, "The Law and the Economics: Why you Need to do Rigorous Economic Analysis in Order to Develop a Case," given at the Washington State Convention and Trade Center in Seattle, Washington on November 2, 2004.

"Calculating and Proving Patent Damages," Law Seminars International Advanced Workshop. Program Co-Chair with James E. Hartley (Holland & Hart LLP).  Speech entitled, "The Law and the Economics: Why you Need to do Rigorous Economic Analysis in Order to Develop a Case," given at the Denver Marriott City Center on September 20, 2004.

"Key Issues Facing Boards of Directors:  The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Bingham McCutchen for boards of directors and their advisors at a session in Santa Clara, CA on March 4, 2004.

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Akin, Gump, Strauss, Hauer & Feld for boards of directors and their advisors at a session in San Francisco, CA on January 13, 2004.

"Advanced IP Licensing Transactions - Business and Legal Issues," Law Seminars International Comprehensive Workshop.  Presentation by Alan Cox about Valuing Intellectual Property, held in Seattle, WA on January 12, 2004.

Alan J. Cox

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and Dorsey & Whitney for boards of directors and their advisors at a session in Seattle, WA on December 11, 2003.

"An Advanced Workshop on Calculating & Proving Patent Damages - Recent Developments and New Tools for Success," A conference presented by Law Seminars International on November 12, 2003 in Seattle, WA. Speech entitled, "The Need for More Rigorous Economic Analysis in Proving Damages: An Interplay between Law and Economics," by Program Co-Chairs F. Ross Boundy, Esq. of Christensen O'Connor Johnson Kindness, PLLC and Alan J. Cox of NERA. Also speech entitled, "The Use of Surveys for IP Damage Calculation," by Professor Kenneth E. Train of NERA and "Panel Discussion: Discovery of Expert Drafts and Notes - Reasonable methods of planning for and dealing with expert discovery" by Alyssa Lutz of NERA and others.

"Showing Up When It's Over: Claiming Rates in Shareholder Class Actions," Presentation prepared by Marcia Mayer and Svetlana Starykh given by Alan Cox at the Practising Law Institute conference "Securities Litigation & Enforcement Institute 2003" on October 2, 2003 in San Francisco, CA.

"Calculating and Proving IP Damages - Recent developments, new tools for success," Law Seminars International Advanced Workshop. Program Co-Chairs were Phillip A. Beutel of NERA and Michael R. Levinson of Seyfarth Shaw. Cox Speech entitled, "The Need for More Rigorous Economic Analysis in Proving Damages: An Interplay between Law and Economics," given at the Mid-America Club in Chicago, IL on April 22, 2003.

"Calculating and Proving IP Damages," Law Seminars International Advanced Workshop. Program Co-Chair with Philip J. McCabe, Esq. (Kenyon & Kenyon). Speech entitled, "The Basic Economics of Damages Calculation in Intellectual Property Matters," given at the Grand Hyatt San Francisco on January 13, 2003.

"Basic Economics of Rigorous Intellectual Property Damages Calculation," Presentation with Kenneth Train and Christian Dippon given at Marsh in San Francisco, CA on December 3, 2002.

"Economic Damages in Securities Fraud Matters," NERA Luncheon Seminars with Adam Werner given at the Fifth Avenue Suites Hotel in Portland, OR on November 19, 2002 and at the W Hotel in Seattle, WA on November 20, 2002.

"Basic Economics of Rigorous Intellectual Property Damages Calculation," Presentation with Kenneth Train and Christian Dippon given at Covington & Burling, LLP in San Francisco, CA on November 11, 2002.

"Basic Economic Analysis in Securities Class Action," Presentation given at Skadden, Arps, Slate, Meagher & Flom, LLP in San Francisco, CA on October 30, 2002.

Alan J. Cox

"Key Issues Facing Boards of Directors: The Revolution in SEC Disclosure & Enforcement," Presentation co-hosted by the Directors Roundtable and the Directors Roundtable Business School Council event for boards of directors and their advisors at a session in Seattle, WA on September 24, 2002, in Chicago, IL on October 1, 2002 and in Santa Clara, CA and San Francisco, CA on October 2, 2002.

"Basic Economic Analysis in Securities Class Action," Presentation given to Marsh FINPRO in San Francisco, CA on September 18, 2002.

"Basic Economic Analysis in Securities Class Action," Presentation given to Marsh Risk & Insurance Services in San Diego, CA on September 17, 2002.

"Basic Economic Analysis in Securities Class Action," Presentation given to Marsh FINPRO in Los Angeles, CA on September 13, 2002.

"Trends in Intellectual Property Litigation and the Impact of Litigation on Valuations," Presentation given to Marsh Seminar on "Managing IP Risks and Rewards" in Montreal, Canada on June 19, 2002.

"Materiality and Damages in Securities Fraud Cases," Presentation given to Gray, Cary, Ware & Freidenrich Securities Litigation Partners' Meeting given at the Marriott San Diego Del Mar in San Diego, CA on June 8, 2002.

"Testing Market Efficiency," Presentation given to the Securities Litigation Sub-Committee of the Colorado Bar Association at Holland & Hart, LLP in Denver, CO on April 17, 2002.

"Trends in Intellectual Property Litigation," Presentation with Jesse David given to the Licensing Executives Society, Silicon Valley Chapter, hosted by Cadence Design Systems, Inc. in San Jose, CA on March 27, 2002.

"Using an Economic Expert in Commercial Litigation," Speech given to Gibson, Dunn & Crutcher in Palo Alto, CA on March 20, 2002.

"IP Damages: Getting and Paying the Right Amount," Speech given at the American Conference Institute's 7th National Advanced Forum on "Litigating Patent Disputes" held in San Francisco, CA on February 28-March 1, 2002.

"Standard Setting, Market Power and IP Value," Speech given at Weil, Gotshal & Manges in Redwood City, CA on February 13, 2002.

"Trends in Litigation, How Claims and Losses Are Valued," Speech at the American Bankers Association Insurance Risk Management Annual Conference in San Diego, CA on February 4, 2002.

"Intellectual Property Risk Management: The Costly Consequences of Incomplete Valuation," Speech given at the 26th CRIMS Conference held in Ottawa, Ontario on September 9-12, 2001.

"Challenging the Efficient Market Assumption in Securities Class Action Matters," Speech presented to Holland & Hart in Denver, CO on September 12, 2001.

"Economic Analysis in Securities Fraud Cases," Speech delivered to Morrison & Foerster, San Francisco, CA on July 25, 2001.

"Valuation of Intellectual Property and Securities Class Action Damage Estimation at NERA," Workshop presentation to the Marsh Technology Group Annual meeting in Vancouver, Canada on June 19, 2001.

"Bursting Bubbles and Stampeding Herds: Was That Stock Trading in an Efficient Market?" Speech presented to Shearman & Sterling, San Francisco, CA on May 23, 2001, O'Melveny & Meyers, Los Angeles, CA on May 30, 2001, Gray, Cary, Ware & Freidenrich, San Diego, CA on June 6, 2001, Latham & Watkins, San Francisco, CA on June 26, 2001, Baker & McKenzie, San Diego, CA on July 18, 2001.

"A Cautionary Tale: IP Valuation in Court," Course sponsored by the Milken Institute and The Patent & License Exchange, Inc. (pl-x) at the Milken Institute in Santa Monica, CA on January 19, 2001.

"Risk and Intellectual Property," Talk with Lloyd Elam of Marsh, Canada before the Risk and Insurance Management Society (RIMS) Ottawa, Canada Chapter on October 11, 2000.

"Economic Analysis Applied to Litigation and Business Risk Assessment in a Changing Economy," Talk given to Marsh Los Angeles "Hot Topics" Session on August 8, 2000.

"NERA and Intellectual Property Valuations," Breakfast seminar presented by the Marsh Canada Technology Group, *Emerging Risks & Emerging Solutions*, Saskatoon, Saskatchewan, Canada on June 14, 2000 and in Calgary, Alberta, Canada on June 16, 2000.

"Using an Expert in Commercial Litigation," Presentation for the ABA National Program, "Winning the Business Jury Trial" held in San Francisco, CA on May 19, 2000.

"Recent Trends in Securities Litigation and Test of Whether a Stock is Traded Efficiently," Speech before the Securities Litigation Practice Group of Gibson, Dunn & Crutcher, LLP in San Diego, CA on March 24, 2000.

"Securities Class Action Damage Analysis Trends in Litigation & Limits," Presentation to the Marsh & McLennan Company in San Francisco on January 27, 2000.

**Documents Reviewed and Relied Upon**
*Veronica Gutierrez, et al* v. *Wells Fargo & Company, et al.*
**U.S. District Court, Northern District of California**
**Case No. C 07-05923 WHA**

## Depositions

- Deposition of Mark Lentz, PMK Wells Fargo Bank, dated April 25, 2008.

  – Exhibit 1 to Deposition of Mark Lentz [transaction data details tables], Bates Stamp WFB-G 00001-00008.

  – Exhibit 2 to Deposition of Mark Lentz [transaction data details spreadsheets], Bates Stamp WFB-G 00009-00028.

- Deposition of Julie A. Gray (Part I), Wells Fargo, SVP & Compliance Manager, dated May 28, 2008.

  – Exhibit 1 to Deposition of Julie A. Gray [Wells Fargo overdraft fees letter dated January 28, 2008], Bates Stamp WFB-G 04592-04593.

  – Exhibit 2 to Deposition of Julie A. Gray [Wells Fargo August 31, 2007 re complaint letter to Better Business Bureau], Bates Stamp WFB-G 04714.

  – Exhibit 3 to Deposition of Julie A. Gray [Wells Fargo customer call list], Bates Stamp WFB-G 07119-07121.

- Deposition of Julie A. Gray (Part II), SVP & Compliance Manager of Wells Fargo Bank (The National Association), dated May 28, 2008.

- Deposition of Karen Moore (Part I), Wells Fargo, SVP Product Management, Consumer Deposit Group, dated June 2, 2008.

- Deposition of Edward Michael Kadletz, Wells Fargo, Head of Debit Card, dated June 11, 2008.

- Deposition of Veronica Gutierrez, plaintiff, dated June 12, 2008.

  – Exhibit 101 to Deposition of Veronica Gutierrez [account application], Bates Stamp GUT000011.

  – Exhibit 102 to Deposition of Veronica Gutierrez [input worksheet], Bates Stamp GUT000070.

  – Exhibit 103 to Deposition of Veronica Gutierrez [welcome to Wells Fargo], Bates Stamp GUT000001-000002.

  – Exhibit 104 to Deposition of Veronica Gutierrez [checking, savings & more], Bates Stamp GUT000007-000010.

  – Exhibit 105 to Deposition of Veronica Gutierrez [checking, savings with handwritten notes], Bates Stamp GUT000003-000006.

  – Exhibit 106 to Deposition of Veronica Gutierrez [ATM check card], Bates Stamp GUT000071-000072.

- Exhibit 107 to Deposition of Veronica Gutierrez [account agreement], Bates Stamp WFB-G 00040-00109.

- Exhibit 108 to Deposition of Veronica Gutierrez [fee & information schedule], Bates Stamp WFB-G 00158-00196.

- Exhibit 109 to Deposition of Veronica Gutierrez [account agreement April 03], Bates Stamp WFB-G 00156-00157.

- Exhibit 110 to Deposition of Veronica Gutierrez [enrollment online], Bates Stamp WFB-G 000068-000069.

- Exhibit 111 to Deposition of Veronica Gutierrez [May 08 online account summary], Bates Stamp WFB-G 01644-01654.

- Exhibit 112 to Deposition of Veronica Gutierrez [account statement October-November 04], Bates Stamp GUT000085-000090.

- Exhibit 113 to Deposition of Veronica Gutierrez [account statement January-February 03], Bates Stamp WFB-G 01693-01695.

- Exhibit 114 to Deposition of Veronica Gutierrez [account statement May-June 03], Bates Stamp WFB-G 01705-01708.

- Exhibit 115 to Deposition of Veronica Gutierrez [account statement October-November 03], Bates Stamp WFB-G 01725-01728.

- Exhibit 116 to Deposition of Veronica Gutierrez [account statement April-May 06], Bates Stamp GUT000251-000257.

- Exhibit 117 to Deposition of Veronica Gutierrez [Gutierrez Response to Wells Interrogatories Set One].

- Exhibit 118 to Deposition of Veronica Gutierrez [account statement September-October 06], Bates Stamp WFB-G 01901-01906.

- Exhibit 119 to Deposition of Veronica Gutierrez [account statement October-November 06], Bates Stamp GUT000215-000220.

- Exhibit 120 to Deposition of Veronica Gutierrez [copies of 3 checks], Bates Stamp WFB-G 07399-07401.

- Exhibit 121 to Deposition of Veronica Gutierrez [NSF notice], Bates Stamp GUT000221-000225.

- Exhibit 122 to Deposition of Veronica Gutierrez [Gutierrez Document Response#1].

- Exhibit 123 to Deposition of Veronica Gutierrez [First Amended Complaint].

- Exhibit 124 to Deposition of Veronica Gutierrez [Plaintiffs' Initial Disclosure].

- Exhibit 125 to Deposition of Veronica Gutierrez [savings account brochure], Bates Stamp GUT000569-000570.

- Exhibit 126 to Deposition of Veronica Gutierrez [Wells products & services], Bates Stamp WFB-G 07467-07468.

- Exhibit 127 to Deposition of Veronica Gutierrez [Wells envelope - no address], Bates Stamp GUT000582-000583.

- Deposition of Erin Walker, plaintiff, dated June 13, 2009.

  - Exhibit 128 to Deposition of Erin Walker [account application], Bates Stamp GUT000505.

  - Exhibit 129 to Deposition of Erin Walker [welcome to Wells Fargo].

  - Exhibit 130 to Deposition of Erin Walker [welcome].

  - Exhibit 131 to Deposition of Erin Walker [account agreement], Bates Stamp WFB-G 00844-00911.

  - Exhibit 132 to Deposition of Erin Walker [account fee information], Bates Stamp WFB-G 00912-00941.

  - Exhibit 133 to Deposition of Erin Walker [transaction record].

  - Exhibit 134 to Deposition of Erin Walker [overdraft protection questions], Bates Stamp WFB-G 01601-01602.

  - Exhibit 135 to Deposition of Erin Walker [checking & savings terms], Bates Stamp WFB-G 01603-01607.

  - Exhibit 136 to Deposition of Erin Walker [account statement September-October 06], Bates Stamp WFB-G 02013-02016.

  - Exhibit 137 to Deposition of Erin Walker [account statement October-November 06], Bates Stamp WFB-G 02017-02020.

  - Exhibit 138 to Deposition of Erin Walker [account statement March-April 07], Bates Stamp WFB-G 02040-02045.

  - Exhibit 139 to Deposition of Erin Walker [copies of three checks], Bates Stamp WFB-G 07402-07404.

  - Exhibit 140 to Deposition of Erin Walker [account statement February-March07], Bates Stamp WFB-G 02035-02039.

  - Exhibit 141 to Deposition of Erin Walker [account statement May-June 07], Bates Stamp GUT000500-000504.

  - Exhibit 142 to Deposition of Erin Walker [copy of one check], Bates Stamp WFB-G 07405

  - Exhibit 143 to Deposition of Erin Walker [NSF notice], Bates Stamp GUT000584.

  - Exhibit 144 to Deposition of Erin Walker [account statement June-July 07], Bates Stamp WFB-G 02057-02059.

  - Exhibit 145 to Deposition of Erin Walker [overdraft letter], dated June 26, 2007.

  - Exhibit 146 to Deposition of Erin Walker [2007 calendar].

  - Exhibit 147 to Deposition of Erin Walker [business card of Wells representative, Romel Rivera].

- – Exhibit 148 to Deposition of Erin Walker [Walker Responses to Wells' Interrogatories, Set One].

- – Exhibit 149 to Deposition of Erin Walker [Wells' Interrogatories, Set One, to Walker].

- Deposition of William Smith, Jr., plaintiff, dated June 18, 2008.

  - – Exhibit 150 to Deposition of William Smith [account application], Bates Stamp WFB-G 07545-07546.

  - – Exhibit 151 to Deposition of William Smith [account activity on July 12, 2007], Bates Stamp GUT000374-000378.

  - – Exhibit 152 to Deposition of William Smith [account activity on July 13, 2007], Bates Stamp GUT000444-000445.

  - – Exhibit 153 to Deposition of William Smith [account activity on July 17, 2007], Bates Stamp GUT000446.

  - – Exhibit 154 to Deposition of William Smith [account activity on July 19, 2007], Bates Stamp GUT000447.

  - – Exhibit 155 to Deposition of William Smith [account activity questions], Bates Stamp WFB-G 01608-01609.

  - – Exhibit 156 to Deposition of William Smith [account statement December-January 2003], Bates Stamp WFB-G 02073-02076.

  - – Exhibit 157 to Deposition of William Smith [account statement January-February 2003], Bates Stamp WFB-G 02077-02079.

  - – Exhibit 158 to Deposition of William Smith [account statement February-March 2003], Bates Statement WFB-G 02080-02083.

  - – Exhibit 159 to Deposition of William Smith [account statement May-June 2003], Bates Stamp WFB-G 02092-02095.

  - – Exhibit 160 to Deposition of William Smith [account statement October-November 2003], Bates Stamp WFB-G 02112-02115.

  - – Exhibit 161 to Deposition of William Smith [account statement December-January 2004], WFB-G 02119-02122.

  - – Exhibit 162 to Deposition of William Smith [important account information], Bates Stamp WFB-G 01512.

  - – Exhibit 163 to Deposition of William Smith [account statement September-October 2006], Bates Stamp GUT000476-000485.

  - – Exhibit 164 to Deposition of William Smith [Smith copy of check], Bates Stamp GUT000482.

  - – Exhibit 165 to Deposition of William Smith [ATM transaction dated April 18, 2009], Bates Stamp GUT000449.

  - – Exhibit 166 to Deposition of William Smith [account statement November-December 2005], Bates Stamp WFB-G 02232-02236.

4

- – Exhibit 167 to Deposition of William Smith [account statement June-July 2007], Bates Stamp WFB-G 02330-02334.

- – Exhibit 168 to Deposition of William Smith [NSF notice], Bates Stamp GUT000448.

- – Exhibit 169 to Deposition of William Smith [Smith Response to Wells Interrogatories, Set One].

- Deposition of Karl Willard, Wells Fargo, Manager of Product Delivery and Services for the Consumer Deposits Group, dated June 24, 2008.

  - – Exhibit 70 to Deposition of Karl Willard [Exception Items Worksheet for Gutierrez account], Bates Stamp WFB-G 07610-07612.

  - – Exhibit 71 to Deposition of Karl Willard [Debit Card Preauthorization by Willard], Bates Stamp WFB-G 00029-00039.

  - – Exhibit 72 to Deposition of Karl Willard [E. Walker Activity Worksheet of March 16, 2007], Bates Stamp WFB-G 07622-07640.

  - – Exhibit 73 to Deposition of Karl Willard [Example of XR Memo Report & Transaction Posting Journal], Bates Stamp WFB-G 07609.

  - – Exhibit 74 to Deposition of Karl Willard [Deposition Notice of Willard], dated June 16, 2008.

- Deposition of Debbie Chacon, Wells Fargo Hogan Systems Architect, dated June 25, 2008.

- Deposition of John Ahrendt, Wells Fargo Bank, Marketing Database, Decision Support and Strategies Manager, dated July 2, 2008.

- Deposition of Karen Moore (Part II), Rule 30(b)(6) witness of Wells Fargo Bank (California Consumer Deposit Accounts), dated July 2, 2008.

  - – Exhibit 79 to Deposition of Karen Moore [Deposition Notice], dated June 19, 2008.

  - – Exhibit 80 to Deposition of Karen Moore [Wells' Objection to Deposition Notice], dated June 23, 2008.

  - – Exhibit 81 to Deposition of Karen Moore [NSF notice], Bates Stamp WFB-G 07692.

  - – Exhibit 82 to Deposition of Karen Moore [debit card terms], Bates Stamp WFB-G 07667-07680.

  - – Exhibit 83 to Deposition of Karen Moore [account agreement], Bates Stamp WFB-G 00391-00453.

- Deposition of Dawn Maureen Avrech, Wells Fargo Technology Manager, dated July 9, 2008.

- Deposition of Paul Williamson, Wells Fargo Bank Technology Manager Three, dated July 9, 2008.

- Deposition of Kenneth A. Zimmerman, Wells Fargo Bank, Senior Vice President, dated November 10, 2008.

  - – Exhibit 1 to Deposition of Kenneth A. Zimmerman [Wells' Initial Disclosures], dated March 21, 2008.

- Exhibit 2 to Deposition of Kenneth A. Zimmerman [Declaration in Support of Motion for Summary Judgment], dated July 9, 2008.

- Exhibit 3 to Deposition of Kenneth A. Zimmerman [Wells Mobile Service ad], Bates Stamp WFB-G 04048.

- Exhibit 4 to Deposition of Kenneth A. Zimmerman [Debit Credit Card Message Requests 2003-2006], Bates Stamp WFB-G 01536.

- Exhibit 5 to Deposition of Kenneth A. Zimmerman [Managing Your Money], Bates Stamp WFB-G 04221-04222.

- Exhibit 6 to Deposition of Kenneth A. Zimmerman [Giving Hope].

- Exhibit 7 to Deposition of Kenneth A. Zimmerman [Financial Education].

- Exhibit 8 to Deposition of Kenneth A. Zimmerman [Working Together].

- Exhibit 9 to Deposition of Kenneth A. Zimmerman [Hands On Banking].

- Exhibit 10 to Deposition of Kenneth A. Zimmerman [Hands on Banking Adults Guide].

- Exhibit 11 to Deposition of Kenneth A. Zimmerman [Hands on Banking Young Adults Guide].

- Exhibit 12 to Deposition of Kenneth A. Zimmerman [Wells checking package ad], Bates Stamp WFB-G 04064.

- Exhibit 13 to Deposition of Kenneth A. Zimmerman [what are our values?].

- Deposition of Robin Raber-Luna, Wells Fargo Bank, SVP and Manager of Consumer Deposit Group, dated December 16, 2008.

  - Exhibit 1 to Deposition of Robin Raber-Luna [Consumer Account Agreement dated October 2, 2006], Bates Stamp WFB-G 00844-00911.

  - Exhibit 2 to Deposition of Robin Raber-Luna [Consumer Overdraft Pilot dated November 29, 2007], Bates Stamp WFB-G 37248-37262.

  - Exhibit 3 to Deposition of Robin Raber-Luna [account tips and news], Bates Stamp WFB-G 01529-01535.

- Deposition of Brenda Yost, Wells Fargo Bank, Senior Vice President of Debit Card Marketing, dated December 17, 2008          .

  - Exhibit 1 to Deposition of Brenda Yost [Wells brochure: checking savings & more], Bates Stamp GUT000002-000005.

- Deposition of Stacey Pinkerd, Head of Global Debit Products for Visa, Inc., dated February 10, 2009.

  - Exhibit 1 to Deposition of Stacey Pinkerd [authorization holds], Bates Stamp WFB-G 01686--01687.

- Deposition of Charles Douglas Cowan, Ph.D., of Analytic Focus LLC, dated March 27, 2009.

  - Exhibit 222 to Cowan deposition [Expert Report of Cowan, dated February 20, 2009].

- – Exhibit 223 to Cowan deposition [Supplemental Report of Cowan, dated March 4, 2009].
- – Exhibit 224 to Cowan deposition [Reply Report to Report of T. Menenberg, dated March 16, 2009].
- – Exhibit 225 to Cowan deposition [Rebuttal Report to Report of C. James, dated February 20, 2009].
- – Exhibit 226 to Cowan deposition ["Using Statistics to Even the Odds with Experts" article from For The Defense, July 2006].
- – Exhibit 227 to Cowan deposition [October 16, 2008 McCune correspondence to Covington].
- – Exhibit 228 to Cowan deposition [Wells Fargo Supplemental Responses to Special Interrogatories, dated February 26, 2009].
- – Exhibit 229 to Cowan deposition [FFIEC updated report, dated September 28, 2006].
- – Exhibit 230 to Cowan deposition [daily average pct accounts incurring], Bates Stamp WFB-G08575—08599.
- – Exhibit 231 to Cowan deposition [transactions], Bates Stamp GUT002233—002240.
- – Exhibit 232 to Cowan deposition [Wells Fargo ODRI Initiative Tracking Analysis of Hogan Processing Changes], Bates Stamp WFB-G07772-A--07796-A.
- – Exhibit 233 to Cowan deposition [Interpretive letter dated May 17, 2007 from Comptroller of the Currency], Bates Stamp WFB-G39046—039052.
- – Exhibit 234 to Cowan deposition [e-mail string re processing order in CA dated January 23, 2001], Bates Stamp WFB-G07799—07800.
- ▪ Deposition of Edward Michael Kadletz, Wells Fargo Head of Debit Card, dated June 11, 2008.
- ▪ Deposition of expert, Christopher James, PhD, dated March 25, 2009.
- ▪ Deposition of expert, Todd D. Menenberg, dated March 26, 2009.
- ▪ Deposition of expert, Arthur Olsen, Volume I, dated March 19, 2009.
- ▪ Deposition of expert, Arthur Olsen, Volume II, dated March 23, 2009.
- ▪ Deposition of Maria Galindo, potential plaintiff witness, dated January 29, 2009.

## Expert Reports

- ▪ Expert Report of Art Olsen, dated February 20, 2009.
- ▪ Supplement to Expert Report of Art Olsen, dated February 27, 2009.
- ▪ Expert Report of Art Olsen, dated November 20, 2009.
- ▪ March 6, 2009 Rebuttal Report of Charles D. Cowan, Ph.D. to Report of Christopher M. James, dated February 20, 2009.
- ▪ Supplemental Report of Charles D. Cowan, Ph.D., dated March 4, 2009.

- Expert Report of Charles D. Cowan, Ph.D., dated February 20, 2009.
- Expert Report of Christopher M. James, dated February 20, 2009.
- Responsive Expert Report of Christopher M. James, dated March 6, 2009.
- March 13, 2009 Rebuttal Report of Christopher M. James to the Report of Charles D. Cowan, dated March 6, 2009.
- Responsive Expert Report of David Vogel, dated March 6, 2009.
- Responsive Expert Report of Dr. Itamar Simonson, dated March 6, 2009.
- Expert Report of Lewis Mandell, Ph.D., dated February 20, 2009.
- Expert Report of Marshall Schminke, Ph.D., dated February 20, 2009.
- March 13, 2009 Reply Report of Marshall Schminke, Ph.D. to Report of Dr. David Vogel.
- Responsive Expert Report of Paul Carrubba, dated March 6, 2009.
- Expert Report of Steven T. Visser, dated March 11, 2009.
- March 16, 2009 Reply Report of Art Olsen to Report of Steven T. Visser.
- Expert Report of Todd D. Menenberg, dated March 11, 2009.
- March 16, 2009 Reply Report of Charles Cowen to Report of Todd D. Menenberg.
- IT Consultant Profile for Art Olsen (provided for McCune & Wright, LLP).
- Work papers of Charles Cowan (plaintiffs' expert), Method 1.
- Work papers of Charles Cowan (plaintiffs' expert), Method 2.
- Work papers of Charles Cowan (plaintiffs' expert), Method 3.
- Work papers of Charles Cowan (plaintiffs' expert), Method Comparison.
- IT Consultant Profile for Art Olsen (provided for McCune & Wright, LLP).
- IT Consultant Profile for Daniel Schneiderman (provided for McCune & Wright, LLP).
- IT Consultant Profile for Jerod Powell (provided for McCune & Wright, LLP).
- InFinIT Consulting Brochure.

## Legal Documents

- [Adjusted] First Amended Class Action Complaint & Demand for Jury, dated April 17, 2008.
- Declaration of Lewis Mandell in Support of Plaintiffs' Motion for Class Certification, dated July 8, 2008.
    - Exhibit 1 to Declaration of Lewis Mandell [Mandell curriculum vitae].
- Declaration of Kenneth A. Zimmerman in Support of Wells Faro Bank, N.A.'s Motion for Summary Judgment, dated July 9, 2008.

- Exhibit A to Zimmerman Declaration [Consumer Account Agreement], Bates Stamp WFB-G 00391-00454.
- Exhibit B to Zimmerman Declaration [Consumer Information Fee and Account Information], Bates Stamp WFB-G 00605-00635.
- Exhibit C to Zimmerman Declaration [Smith Account Statement], Bates Stamp WFB-G 02112-02115.
- Exhibit D to Zimmerman Declaration [important account information], Bates Stamp WFB-G 01512-01513.
- Exhibit E to Zimmerman Declaration [Walker Account Statement], Bates Stamp WFB-G02013-02016.
- Exhibit F to Zimmerman Declaration ["your new checking account"], Bates Stamp WFB-G02732-02743.
- Exhibit G to Zimmerman Declaration [NSF notice], Bates Stamp WFB-G07692.
- Exhibit H to Zimmerman Declaration [Online account activity], Bates Stamp WFB-G01645-01646.
- Exhibit I to Zimmerman Declaration [checking & savings terms glossary], Bates Stamp WFB-G01603.
- Exhibit J to Zimmerman Declaration [Veronica Gutierrez transaction activity].
- Exhibit K to Zimmerman Declaration [Gutierrez Account Statement], Bates Stamp WFB-G01901-01912.
- Exhibit L to Zimmerman Declaration [Walker Account Statement], Bates Stamp WFB-G02052-02059.
- Exhibit M to Zimmerman Declaration [Erin Walker transaction activity].
- Exhibit N to Zimmerman Declaration [William Smith transaction activity].
- Exhibit O to Zimmerman Declaration [Smith Account Statement], Bates Stamp WFB-G02330-02334

- [unredacted] Declaration of Mark Lentz, dated July 28, 2008.
  - Exhibit A to Lentz Declaration: Deposition of John Ahrendt, dated July 2, 2008.
  - Exhibit B to Lentz Declaration: Deposition of Dawn Avrech, dated July 9, 2008.
  - Exhibit C to Lentz Declaration: Deposition of Debbie Chacon, dated June 25, 2008.
  - Exhibit D to Lentz Declaration: Deposition of Paul Williamson, dated July 9, 2008.
  - Exhibit E to Lentz Declaration: Wells Fargo statement - withdrawal example, Bates Stamp WFB-G02333.
  - Exhibit F to Lentz Declaration: Account Statements of Matthew Dahlquist, Claudia Sanchez, Anthony and Crystal Santillanes, Jennifer Prey, Anthony Tschoepe and David Rogers.

- Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, dated September 11, 2008.

- Defendant Wells Fargo Bank, N.A.'s Notice of Motion and Motion for Clarification of Class Definitions, dated September 22, 2008.

- Order Re Electronic Data Security, dated December 16, 2008.

- Stipulation re Expert Discovery and Order dated February 3, 2009, and e-mail dated February 4, 2009 from David Jolley to Steven Visser and Todd Menenberg re Stipulation.

- Order on Motion Challenging Damage Study and Seeking Class Decertification, dated May 5, 2009.

- [Un-Redacted] Plaintiffs' Opposition to Defendant Wells Fargo's Motion for Summary Judgment on all Causes of Action, dated April 9, 2009.

- Declaration of Veronica Gutierrez in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, April 8, 2009.

- Declaration of Richard D. McCune in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment On All Causes, April 9, 2009.

    - Exhibit 1 to McCune Declaration [FDIC Study of Bank Overdraft Programs, November 2008].

    - Exhibit 2 to McCune Declaration [Wells Fargo's Response to Set One of Plaintiff Walker's Special Interrogatories [1-23].

    - Exhibit 3 to McCune Declaration [Account statement for Eugenie & Victor Espinosa, dated April 16, 2001], Bates Stamp GUT001052; 001058; 001060.

    - Exhibit 4 to McCune Declaration [Deposition of Kenneth Zimmerman, dated November 10, 2008].

    - Exhibit 5 to McCune Declaration [Wells Fargo News Release "Wells Fargo Reports Record Quarterly Earnings Per Share, dated April 17, 2001], Bates Stamp GUT001957.

    - Exhibit 6 to McCune Declaration [Wells Fargo Form DEF 14A - Proxy Statement, filed March 20, 2001 for period ending April 24, 2001], Bates Stamp GUT001984; 002011; 002013

    - Exhibit 7 to McCune Declaration [Wells Fargo Service Charges on Deposits - Update, February 2002], Bates Stamp WFB-G07806-A - 07807-A; and 07816-A.

    - Exhibit 8 to McCune Declaration [Mass Market Deposits - November Business Letter], Bates Stamp WFB-G 07797-A - 077978-A.

    - Exhibit 9 to McCune Declaration [Wells Fargo ODRI Initiative Tracking Analysis of Hogan Processing Changes, April 2002], Bates Stamp WFB-G00753-A; 07760-A; and 07764-A.

– Exhibit 10 to McCune Declaration [E-mail string, top one addressed to K. Moore; M. Clore and C. Williams from S. Petersen re processing order change in CA dated January 23, 2001], Bates Stamp WFB-G07799 – 07800.

– Exhibit 11 to McCune Declaration [V. Gutierrez account statement, dated October 6 - November 6, 2006], Bates Stamp GUT000215 – 000220.

– Exhibit 12 to McCune Declaration [E-mail string, top one addressed to K. Moore; D. Messamore from K. Zimmerman re update on service charges on deposits, dated May 2, 2002, Bates Stamp WFB-G07817-A.

– Exhibit 13 to McCune Declaration [Customer complaint letter addressed to Wells Fargo, sender name redacted, dated August 2006], Bates Stamp WFB-G06090 – 06091.

– Exhibit 14 to McCune Declaration [Customer complaint letter addressed to Comptroller of Currency, dated May 2, 2006, sender name redacted], Bates Stamp WFB-G05287 – 05288.

– Exhibit 15 to McCune Declaration [Customer complaint letter addressed to Wells Fargo, sender name redacted, dated August 24, 2007], Bates Stamp WFB-G05445.

– Exhibit 16 to McCune Declaration [Customer complaint letter addressed to Comptroller of Currency, dated September 15, 2007, sender name redacted], Bates Stamp WFB-G05159 – 05162.

– Exhibit 17 to McCune Declaration [Customer complaint letter addressed to Board of Governors of the Federal Reserve System, sender name redacted, undated], Bates Stamp WFB-G05328 – 05329.

– Exhibit 18 to McCune Declaration [Customer complaint letter addressed to Wells Fargo Bank, dated February 6, 2008, sender name redacted], Bates Stamp WFB-G05500 – 05504.

– Exhibit 19 to McCune Declaration [Customer letter addressed to Wells Fargo Bank, dated February 19, 2008, sender name redacted], Bates Stamp WFB-G05532.

– Exhibit 20 to McCune Declaration [Customer complaint correspondence addressed to Wells Fargo Customer Service, dated February 27, 2008, sender name redacted], Bates Stamp WFB-G05600 – 05602.

– Exhibit 21 to McCune Declaration [extract of Deposition of Eugene Adams, plaintiff witness, dated February 9, 2009].

– Exhibit 22 to McCune Declaration [Deposition of Julie A. Gray, dated May 28, 2008].

– Exhibit 23 to McCune Declaration [Wells Fargo's Supplemental Response to Certain of Plaintiffs' Special Interrogatories].

– Exhibit 24 to McCune Declaration [Supplemental Report of Charles D. Cowan, Ph.D., dated March 4, 2009].

– Exhibit 25 to McCune Declaration [Curriculum Vitae of Lewis Mandell].

– Exhibit 26 to McCune Declaration [Expert Report of Lewis Mandell, Ph.D. of February 20, 2009].

– Exhibit 27 to McCune Declaration [Wells Fargo Account Activity as of July 13, 2007, account number and name unavailable], Bates Stamp GUT000444 – 000445.

– Exhibit 28 to McCune Declaration [Wells Fargo "Managing Your Money"], Bates Stamp, WFB-H04221.

– Exhibit 29 to McCune Declaration [Welcome to Wells Fargo], Bates Stamp WFB-G03831 – 03832.

– Exhibit 30 to McCune Declaration [Debit / Credit Card Message Requests for the Period 01/01/2003 to 06/01/06], Bates Stamp WFB-G01536.

– Exhibit 31 to McCune Declaration [Wells Fargo Check Cards], Bates Stamp WFB-G02744.

– Exhibit 32 to McCune Declaration [Wells Fargo Checking, Savings, And More], Bates Stamp WFB-G03734; and 03737.

– Exhibit 33 to McCune Declaration [Get Back Into Checking With the Wells Fargo Opportunity Package], Bates Stamp WFB-G03805 – 03806.

– Exhibit 34 to McCune Declaration [Three Wells Fargo advertisements], Bates Stamp WFB-G04064; 04027; and 04048.

– Exhibit 35 to McCune Declaration [Deposition of Brenda Yost, dated December 17, 2008].

– Exhibit 36 to McCune Declaration [ATM cards versus debit cards, also known as a check card].

– Exhibit 37 to McCune Declaration [extract of Deposition of Pamela Erwin, Wells Fargo employee "Hands on Program," dated January 12, 2009].

– Exhibit 38 to McCune Declaration [Wells Fargo Consumer Account Agreement], Bates Stamp WFB-G00640 – 00703.

– Exhibit 39 to McCune Declaration [Consumer Account Agreement and Safe Deposit Box Lease Terms], Bates Stamp WFB-G38582; and 38593.

– Exhibit 40 to McCune Declaration [Wells Fargo Checking, Savings and More], Bates Stamp, WFB-G000007 – 000010.

– Exhibit 41 to McCune Declaration [Deposition of Veronica Gutierrez, dated June 12, 2008.

- – Exhibit 42 to McCune Declaration [Wells Fargo Account Activity Questions] Bates Stamp WFB-G01608.

- – Exhibit 43 to McCune Declaration [Declaration of William Smith in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, dated July 30, 2008].

- – Exhibit 44 to McCune Declaration [Wells Fargo account statement for period June 16 through July 17, 2007 of William Charles Smith, Jr.], Bates Stamp WFB-G02330 – 02333.

- – Exhibit 45 to McCune Declaration [Declaration of Erin Walker in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, dated July 30, 2008].

- – Exhibit 46 to McCune Declaration – withdrawn.

- – Exhibit 47 to McCune Declaration [Wells Fargo Service Charges on Deposits - Update, dated February 2002], Bates Stamp WFB-G07806-A - 07807-A.

- – Exhibit 48 to McCune Declaration [August 21, 2008 Reporter's Transcript of Proceedings - between Court and Sonya Winner, Esq].

- – Exhibit 49 to McCune Declaration [Deposition of Karen Moore, dated June 2, 2008].

- Order re Motion for Summary Judgment, dated May 5, 2009.

- Order re Motion for Partial Summary Judgment, dated May 5, 2009.

- Order Accepting Joint Proposed Amended Schedule, Joint Statement of Proposed Amended Schedule, dated May 20, 2009.

- [Proposed] Second Order re Electronic Data Security.

- Second Order re Electronic Data Security, dated June 2, 2009.

- Requests for Production of Documents from Wells Fargo to Plaintiff Gutierrez, dated March 25, 2008.

- Request for Production of Documents from Wells Fargo Bank to Plaintiff Gutierrez (Set Two) dated June 5, 2008, and Gutierrez's Response to Request for Production of Documents from Wells Fargo Bank (Set Two), dated July 7, 2008.

- Request for Production of Documents from Wells Fargo Bank to Plaintiff Gutierrez (Set Three) dated June 17, 2008, and Gutierrez's Response to Request for Production of documents from Wells Fargo Bank (Set Three), dated July 18, 2008.

- Request for Production of Documents from Wells Fargo Bank to Plaintiff Gutierrez (Set Four) dated August 29, 2008, and Gutierrez's Responses to Request for Production of Documents From Wells Fargo Bank (Set Four), dated October 28, 2008.

- Requests for Production of Documents from Wells Fargo to Plaintiff Erin Walker (Set One), dated March 7, 2008, and Plaintiff Walker's Responses to Requests for Production of Documents Propounded by Wells Fargo Bank (Set One), dated April 23, 2008.

- Request for Production of Documents from Wells Fargo Bank to Plaintiff Walker (Set Two), dated June 5, 2008, and Walker's Response to Request for Production of Documents from Wells Fargo (Set Two), dated July 7, 2008.

- Request for Production of Documents from Wells Fargo Bank to Plaintiff Walker (Set Three), dated June 17, 2008, and Walker's Response to Request for Production of Documents from Wells Fargo Bank (Set Three), dated July 18, 2008.

- Request for Production of Documents from Wells Fargo Bank to Plaintiff Walker (Set Four), dated August 29, 2008, and  Walker's Response to Request for Production of Documents from Wells Fargo Bank (Set Four), dated September 30, 2008.

- Requests for Production of Documents from Wells Fargo Bank to Plaintiff William Smith (Set One), dated March 7, 2008, and Plaintiff Smith's Responses to Requests for Production of Documents Propounded by Wells Fargo Bank (Set One), dated April 23, 2008.

- Requests for Production of Documents from Wells Fargo Bank to Plaintiff William Smith (Set Two), dated June 5, 2008, and Plaintiff Smith's Responses to Requests for Production of Documents Propounded by Wells Fargo Bank (Set Two), dated July 7, 2008.

- Requests for Production of Documents from Wells Fargo Bank to Plaintiff William Smith (Set Three), dated June 17, 2008, and Plaintiff Smith's Responses to Requests for Production of Documents Propounded by Wells Fargo Bank (Set Three), dated July 18, 2008.

- Request for Production of Documents from Wells Fargo Bank to Plaintiffs, Walker, Gutierrez and Smith (Set Six), dated January 21, 2008, and Plaintiffs' Responses to Request for Production of Documents from Wells Fargo Bank (Set Six), dated February 27, 2009.

- Plaintiff Veronica Gutierrez's Requests for Production of Documents Propounded to Defendant Wells Fargo Bank (Set One), dated October 23, 2008, and Wells Fargo's Response to Gutierrez's Requests for Production of Documents (Set One), dated December 1, 2008.

- Plaintiff's Requests for Production of Documents Propounded to Defendant Wells Fargo & Company (Set One), dated March 20, 2008, and Wells Fargo Bank's Response to Plaintiff Walker's Requests for Production of Documents (Set One), dated May 8, 2008.

- Requests for Production of Documents Propounded to Defendant Wells Fargo Bank (Set Two), dated May 28, 2008.

- Special Interrogatories from Wells Fargo & Co to Plaintiff Gutierrez (Set One), dated March 25, 2008, and Gutierrez's Responses to Special Interrogatories Propounded by Wells Fargo Bank (Set One), dated April 23, 2008.

- Special Interrogatory from Wells Fargo Bank to Plaintiff Gutierrez (Set Two), dated June 5, 2008, and Gutierrez's Response to Special Interrogatory from Wells Fargo Bank (Set Two), dated July 7, 2008.

- Special Interrogatories from Wells Fargo Bank to Plaintiff Erin Walker (Set One), dated March 7, 2008, and Plaintiff Walker's Responses to Special Interrogatories Propounded by Wells Fargo Bank (Set One), dated April 23, 2008.

- Special Interrogatory From Wells Fargo Bank to Plaintiff Erin Walker (Set Two), dated June 5, 2008, and Walker's Response to Special Interrogatory from Wells Fargo Bank (Set Two), dated July 7, 2008.

- Special Interrogatories from Wells Fargo Bank to Plaintiff William Smith (Set One), dated March 7, 2008, and Plaintiff William Smith's Responses to Special Interrogatories Propounded by Defendant Wells Fargo Bank (Set One), dated April 23, 2008.

- Special Interrogatory from Wells Fargo Bank to Plaintiff William Smith (Set Two), dated June 5, 2008, and Smith's Response to Special Interrogatory from Wells Fargo Bank (Set Two), dated July 7, 2008.

- Special Interrogatories From Wells Fargo Bank to Plaintiffs, Walker, Gutierrez and Smith (Set Three), dated October 17, 2008, and Plaintiffs' Responses to Special Interrogatories from Wells Fargo Bank (Set Three), dated November 17, 2008.

- Plaintiffs' (Walker, Gutierrez & Smith) Amended Responses to Special Interrogatories from Wells Fargo Bank (Set Three), dated December 24, 2008.

- Special Interrogatories from Wells Fargo Bank to Plaintiffs, Walker, Gutierrez and Smith (Set Four), dated November 24, 2008, and Plaintiffs' Responses to Special Interrogatories from Wells Fargo Bank (Set Four), dated December 29, 2008.

- Special Interrogatories from Wells Fargo Bank to Plaintiffs, Walker, Gutierrez and Smith (Set Five), dated December 29, 2008, and Plaintiffs' Response to Special Interrogatories from Wells Fargo Bank (Set Five), dated February 2, 2009.

- Special Interrogatories from Wells Fargo Bank to Plaintiffs, Walker, Gutierrez and Smith (Set Six) dated January 21, 2009, and Plaintiffs' Responses to Special Interrogatories from Wells Fargo Bank (Set Six), dated February 27, 2009.

- Requests for Admissions from Wells Fargo Bank to Plaintiff Gutierrez (Set One), dated March 25, 2008, and Gutierrez's Response to Requests for Admissions Propounded by Wells Fargo Bank (Set One), dated April 23, 2008.

- Requests for Admissions from Wells Fargo Bank to Plaintiff Gutierrez (Set Two) dated June 5, 2008, and Plaintiff Gutierrez Response to Request for Admissions from Wells Fargo Bank (Set Two), dated July 7, 2008.

- Requests for Admissions from Wells Fargo Bank to Plaintiff Erin Walker (Set One), dated March 7, 2008, and Plaintiff Walker's Responses to Requests for Admissions Propounded by Wells Fargo Bank (Set One), dated April 23, 2008.

- Requests for Admissions from Wells Fargo Bank to Plaintiff Walker (Set Two), dated June 5, 2008, and Walker's Response to Request for Admissions from Wells Fargo Bank (Set Two), dated July 7, 2008.

- Requests for Admissions from Wells Fargo Bank to Plaintiff William Smith (Set One), dated March 7, 2008, and Plaintiff William Smith's Responses to Requests for Admissions Propounded by Wells Fargo Bank (Set One), dated April 23, 2008.

- Requests for Admission from Wells Fargo Bank to Plaintiff Smith (Set Two), dated June 5, 2008, and William Smith's Responses to Request for Admissions from Wells Fargo Bank (Set Two), dated July 7, 2008.

- Plaintiffs' Responses to Requests for Admission from Wells Fargo Bank (Set Three), dated November 17, 2008, and Requests for Admission from Wells Fargo Bank to Plaintiffs (Set Three), dated October 17, 2008.

- Plaintiffs' Amended Responses to Request for Admissions from Wells Fargo Bank, Set Three (9-35), December 24, 2008,

- Plaintiffs' [Erin Walker] Special Interrogatories Propounded to Defendant, Wells Fargo Bank (Set One), dated March 20, 2008, and Wells Fargo Bank's Response to Plaintiff Erin Walker's Special Interrogatories (Set One), dated May 8, 2008.

- Plaintiff Veronica Gutierrez's Special Interrogatories Propounded to Defendant, Wells Fargo Bank (Set One), dated January 12, 2009.

- Plaintiff Veronica Gutierrez's Requests for Admission Propounded to Defendant, Wells Fargo Bank (Set One), dated January 12, 2009.

- Plaintiff Veronica Gutierrez's Request for Production of Documents Propounded to Defendant, Wells Fargo Bank (Set Two), dated January 12, 2009.

- Wells Fargo Bank, N.A.'s Response to Plaintiffs' Second Set of Special Interrogatories, dated February 13, 2009.

- Wells Fargo Bank, N.A.'s Response to Plaintiffs' January 12, 2009 Request for Admissions, dated February 17, 2009.

- Wells Fargo Bank, N.A.'s Response to Plaintiffs' January 12, 2009 Requests for Production of Documents, dated February 17, 2009.

- Declaration of Todd Menenberg (submitted in connection with Wells' Motion for Summary Judgment), March 19, 2009.

  – Exhibit to Todd Menenberg Declaration [Expert Witness Report of Todd Menenberg, dated March 11, 2009].

- Joint Administrative Motion to Modify Schedule, dated September 14, 2009.

- Order Granting Joint Administrative Motion to Modify Schedule, dated September 23, 2009.

- Motion for Class Certification; Declaration of Richard D. McCune; Declaration of Lewis Mandell; Exhibits; [Proposed] Order, July 10, 2008.

**Call Reports**

- Wells Fargo Bank Call Report for Fourth Quarter 2001.

- Wells Fargo Bank Call Report for Fourth Quarter 2002.

- Wells Fargo Bank Call Report for Fourth Quarter 2003.

- Wells Fargo Bank Call Report for Fourth Quarter 2004.

- Wells Fargo Bank Call Report for Fourth Quarter 2005.

- Wells Fargo Bank Call Report for Fourth Quarter 2006.

- Wells Fargo Bank Call Report for Fourth Quarter 2007.

- Wells Fargo Bank Call Report for Fourth Quarter 2008.

- Wells Fargo Bank Call Report for First Quarter 2001.

- Wells Fargo Bank Call Report for Second Quarter 2001.
- Wells Fargo Bank Call Report for Third Quarter 2001.
- Wells Fargo Bank Call Report for Fourth Quarter 2001.
- Wells Fargo Bank Call Report for First Quarter 2002.
- Wells Fargo Bank Call Report for Second Quarter 2002.
- Wells Fargo Bank Call Report for Third Quarter 2002.
- Wells Fargo Bank Call Report for Fourth Quarter 2002.
- Wells Fargo Bank Call Report for First Quarter 2003.
- Wells Fargo Bank Call Report for Second Quarter 2003.
- Wells Fargo Bank Call Report for Third Quarter 2003.
- Wells Fargo Bank Call Report for Fourth Quarter 2003.
- Wells Fargo Bank Call Report for First Quarter 2004.
- Wells Fargo Bank Call Report for Second Quarter 2004.
- Wells Fargo Bank Call Report for Third Quarter 2004.
- Wells Fargo Bank Call Report for Fourth Quarter 2004.
- Wells Fargo Bank Call Report for First Quarter 2005.
- Wells Fargo Bank Call Report for Second Quarter 2005.
- Wells Fargo Bank Call Report for Third Quarter 2005.
- Wells Fargo Bank Call Report for Fourth Quarter 2005.
- Wells Fargo Bank Call Report for First Quarter 2006.
- Wells Fargo Bank Call Report for Second Quarter 2006.
- Wells Fargo Bank Call Report for Third Quarter 2006.
- Wells Fargo Bank Call Report for Fourth Quarter 2006.
- Wells Fargo Bank Call Report for First Quarter 2007.
- Wells Fargo Bank Call Report for Second Quarter 2007.
- Wells Fargo Bank Call Report for Third Quarter 2007.
- Wells Fargo Bank Call Report for Fourth Quarter 2007.
- Wells Fargo Bank Call Report for First Quarter 2008.
- Wells Fargo Bank Call Report for Second Quarter 2008.
- Wells Fargo Bank Call Report for Third Quarter 2008.
- Wells Fargo Bank Call Report for Fourth Quarter 2008.
- Wells Fargo Bank Call Report for First Quarter 2009.

- Wells Fargo Bank Call Report for Second Quarter 2009.
- Wells Fargo Bank Call Report for Third Quarter 2009.
- Wells Fargo Call Report RC-E Data Mapping Example Q1 2007.
- Call Reports Glossary.

## Banking Transactions

- Pre-Authorization Details, Database Table Summary; Columns & Definitions, Bates Stamp WFB-G 00029-00031.
- Telephone Transaction Details, Database Table Summary; Columns & Definitions, Bates Stamp WFB-G 00034-00035.
- ATM Transaction Details, Database Table Summary; Columns & Definitions, Bates Stamp WFB-G 00036-00039.
- Wells Fargo Consumer Account Agreement, Bates Stamp WFB-G 00391-00454.
- Wells Fargo California, Consumer Account Fee and Information Schedule, Bates Stamp WFB-G 00605-00635.
- Bank Activity Worksheet for Account #6018590767 (Timothy M. Fox), Bates Stamp WFB-G 07415-7430.
- Example of the XRMEMO Report and Transaction Posting Journal, Bates Stamp WFB-G 07609.
- Wells Fargo Bank Exception Items Worksheet, Bates Stamp WFB-G 07610-07621.
- Wells Fargo Activity Worksheet for Erin V. Walker Account #6433237648 dated March 16, 2007, Bates Stamp WFB-G 07622-07640.
- Wells Fargo Activity Worksheet for Erin V. Walker Account #6433237648 dated June 8, 2007, Bates Stamp WFB-G 07650-07651.
- Wells Fargo Activity Worksheet for William C. Smith, Jr. Account #806832184 dated July 12, 2007, Bates Stamp WFB-G 07652-07653.
- Wells Fargo Business Online Account Summary for William C. Smith, Bates Stamp WFB-G 07654-07655.
- Online Activity Details, Database Table Summary; Columns & Definitions, Bates Stamp WFB-G 00032-00033.
- Online Activity for User (March 19-21, 2007), Bates Stamp WFB-G 07657.
- Online Activity for User SCHAFEJA (June 8-14, 2007), Bates Stamp WFB-G 07658.
- Online Activity for User SCHAFEJA (July 1-3, 2007), Bates Stamp WFB-G 07659.
- Online Activity for User SCHAFEJA (July 3-4, 2007), Bates Stamp WFB-G 07660.
- Online Activity for User SCHAFEJA (July 4, 2007), Bates Stamp WFB-G 07661.
- Online Activity for User SCHAFEJA (July 4-5, 2007), Bates Stamp WFB-G 07662.
- Online Activity for User SCHAFEJA (July 5-7, 2007), Bates Stamp WFB-G 07663.

- Online Activity for User SCHAFEJA (July 7, 2007), Bates Stamp WFB-G 07664.
- Online Activity for User SCHAFEJA (July 10-13, 2007), Bates Stamp WFB-G 07665.
- Online Activity for User SCHAFEJA (July 13, 2007), Bates Stamp WFB-G 07666.
- Wells Fargo Bank Memo Transaction Information for William C. Smith, Jr. Account #806832184, Bates Stamp WFB-G 07681-07684.
- Wells Fargo Bank Memo Transaction Information for Account #1885720910, Bates Stamp WFB-G 07685-07687.
- Wells Fargo Bank Memo Transaction Information for Erin V. Walker Account #6433237648, Bates Stamp WFB-G 07688-07691.
- Express ATM Transaction Report for Account #1885720910, dated October 13, 2006, Bates Stamp WFB-G 07693-07694.
- Wells Fargo Consolidation of Transaction Posting Groups - policy, Bates Stamp WFB-G 07751-07752.
- Wells Fargo ODRI Initiative Tracking Analysis of Hogan Processing Changes, dated April 2002, Bates Stamp WFB-G 07753A - 07771A.
- Wells Fargo ODRI Initiative Tracking Analysis of Hogan Processing Changes, dated August 2002, Bates Stamp WFB-G 07772A- 07796A.
- Wells Fargo Service Charges on Deposits - Update, February 2002, Bates Stamp, WFB-G 07806A-07816A.
- Wells Fargo ODRI Initiative Tracking Analysis of Hogan Processing Draft, dated December 2001, Bates Stamp WFB-G 08462-08476.
- Overdraft Income - 2002 Forecast from Tim Smith / Adam, Bates Stamp WFB-G 08477-08494.
- Consumer Overdraft Income - 2002 Forecast from Tim Smith / Adam, Bates Stamp WFB-G 08495-08520.
- Regional Phase 1, 2A, and 2B Updates, Bates Stamp WFB-G 08521.
- Charge-Off Analysis; Phase 1A/B vs. Full Optimization, Bates Stamp WFB-G 08522.
- Summary of Impact of Phase 1A-C and 2A-C, Bates Stamp WFB-G 08531.
- Impact of Phase 1A & 1B (1), Bates Stamp WFB-G 08532-08547.
- Impact of Phase 1A & 1B (2), Bates Stamp WFB-G 08548-08553.
- Impact of Phase 1A & 1B (3), Bates Stamp WFB-G 08554-08567.
- Wells Fargo BSE Overdraft Processing Initiatives - Update, dated September 23, 2002, Bates Stamp WFB-G 08568-08574.
- Breakdown of Accounts Incurring OD Fees by Region (1), Bates Stamp WFB-G 08575-08599.
- Breakdown of Accounts Incurring OD Fees by Region (2), Bates Stamp WFB-G08600-08625.
- 2002 Plan OD/RI Initiatives, Bates Stamp WFB-G08455-08461.
- FDIC Study of Bank Overdraft Programs, November 2008, Bates Stamp GUT001088-001207.

- Regional Banking Checking and ODR Data, Bates Stamp WFB-G 39002-39003.
- Wells Fargo Account Portfolio.

## Miscellaneous

- Email from Art Olsen to Mark Lentz re Initial Data Review, dated January 7, 2009.
- Email from RDM to David Jolley re computer data request, dated January 13, 2009.
- E-mail string, top one dated November 30, 2009 from Barry Himmelstein, Esq., Lieff, Cabraser, Heimann & Bernstein, LLP to David Jolley, Esq., Covington Burling LLP re Expert Report Issues.

## News Articles

- "Consumer Federation Of America Director, Financial Services Jean Ann Fox Prepared Testimony Before The Senate Banking, Housing and Urban Affairs Committee Hearing On Protecting Consumers From Abusive Overdraft Fees: The Fairness and Accountability in Receiving Overdraft Coverage Act, as Released by the Committee," *Financial Market Regulatory Wire*, November 17, 2009.
- Lisa M. Krieger, "UC Learning to Handle the Boom in Freshman Enrollment; University System is Thinking of Creative Ways to Accommodate a Surge in the Student Population, *Contra Costa Times*, October 8, 2006.
- Suzanne Pardington, "UC, Once Gold Standard, Dulled by Pinched Pennies; The Top Faculty and Grad Students that Cal and its Sister Campuses Need to Stay in the Elite Can Find Better Resources Elsewhere," *Contra Costa Times*, September 14, 2004.
- Kelly St. John, "College Students Race for Space / Public Schools Expect Enrollment 'tidal wave'," *The San Francisco Chronicle*, March 17, 2003.
- Selicia Kennedy-Ross, "Community College Costs Luring More Students," *San Bernardino County Sun* (KRTBN), June 20, 2005.
- Eleanor Yang, "Crammed Sessions / College Students Struggle to Graduate as Schools Cut Classes, Raise Tuition," *The San Diego Union - Tribune*, May 15, 2004.
- Mosi Secret and Stuart Pfeifer, "Debt Collection; Bad-Check Letters Are Misleading, Critics Say; A Company Uses Government Seals in its Messages, An Act That Consumer Advocates Contend is Dishonest," *Los Angeles Times*, June 8, 2009.
- Tim Rowden, "$1.1 Million is Collected in Bad Check Restitution; With Repayment, Prosecution is Avoided," *St. Louis Post-Dispatch*, October 22, 2001.
- Liz Pulliam Weston, "Now Bounced Checks Can Trash Your Credit," *MSN.Money*.
- Denise Trowbridge, "You, By the Numbers," *The Columbus Dispatch*, September 17, 2006.
- GAAP v. Reg Data Quick Reference, *SNL Financial* (2007).
- Gregory F. Udell, "Pricing Returned Check Charges Under Asymmetric Information," *Journal of Money, Credit and Banking*, Vol. 18, No. 4 (November 1986).

## Government and Third Party Reports

- Department of the Treasury; Office of the Comptroller of the Currency; Federal Reserve System; Federal Deposit Insurance Corporation; National Credit Union Administration - Joint Guidance on Overdraft Protection Programs, dated February 17, 2005.

- Center for Responsible Lending brochure "Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts", dated January 25, 2007.

- Center for Responsible Lending brochure "Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans", dated July 11, 2007.

- U.S. Government Accountability Office, Report "Bank Fees, Federal Banking Regulator Could Better Ensure That Consumers Have Required Disclosure Documents Prior to Opening Checking or Savings Accounts," dated January 2008.

- 59034 Federal Register / Vol. 74, No. 220 / November 17, 2009 / Rules and Regulations. Consumers.

- "Consumer Federation of America Director, Financial Services Jean Ann Fox Prepared Testimony Before The Senate Banking, Housing And Urban Affairs Committee Hearing On Protecting Consumers From Abusive Overdraft Fees: The Fairness and Accountability."

- Peter G. Weinstock and Stephanie E. Dreyer, "Overdraft Protection Programs: The Emerging Battleground for Bankers and Consumer Advocates."

- "FDIC Study of Bank Overdraft Programs," November 2008, pp. 57 and 60.

- Schedule RC-E -- Deposit Liabilities, General Instructions.

- Bank Regulatory Data Quick Reference, SNL Financial (2009).

- Instructions for Preparation of Consolidated Reports of Condition and Income (FFIEC 031 and 041).

- 2007 Federal Reserve, 10 December 2007, "The 2007 Federal Reserve Payments Study: noncash Payment Trends in the United States: 2003-2006."

- http://www.philadelphiafed.org/bank-resources/publications/consumer-compliance-outlook/2009/first-quarter/q1_04.cfm.

- http://www.dca.a.gov/publications/landlordbook/living-in_shtml (referenced 1/8/10).

- http://www.ucsc.edu/ppmanual/pdf/acg0012/pdf (referenced 12/30/09).

- http://registrar.ucdavis.edu/CSRG/feepay.html (referenced 1/8/10).

- http://registrar.ucdavis.edu/html/npn_faq.html (referenced 1/8/10).

- http://deanza.edu/registration/cashier/check.html (referenced 1/12/10).

- http://www.csum.edu/schedule/fall_2009/fee_payment_instructions.html (accessed 1/14/10).

- http://www.econlib.org/library/Enc/LawandEconomics.html.

- http://www.federalreserve.gov/pubs/bounce.

- http://articles.moneycentralmsn.com/Banking/YourCreditRating/NowBouncedChecksCanTrashYourCredt.aspx (accessed 1/12/10.
- http://ficoexpansionscore.com/Content/FAQx.asp.
- http://www.nobouncedchecks.net/SCAN-check.html (referenced 1/9/10).
- http://www.aba.com/Press+Room/080808OverdraftFeeSurvey.htm.
- http://www.aba.com/Press+Room/090909ConsumerSurveyOverdraftFees.htm.
- http://www.wellsfargo.com/credit_cards/rewards/terms.
- http://www.discovercard.com/cardmembersvcs/acqs/app/exec?dynaviewMain=INFO&brand=STUD&sc=RHTG.
- http://www.firstusa/com/cgi-bin/webcgi/webserve.cgi?card=CM9C&page_type=appterms.
- http://www.irs.gov/taxtopics/tc206.html.
- http://www.irs.gov/taxtopics/tc653.html.
- http://library.hsh.com/read_article-hsh.asp?row_id=78.
- http://www.american-apartment-owners-association.org/blog/2009/12/03/big-bad-bounced-check-policy/.
- http://sfaa.org/0503wilson.html.
- http://www.dca.ca.gov/publications/landlordbook/living-in.shtml (referenced 1/8/10).
- http://www.federalreserve.gov/PUBS/RegCC/regcc.htm.
- http://www.accountonline.com – Citibank Terms and Conditions.
- http://www.csusm.edu/schedule/fall_2009/fee_payment_instructions.html.
- https://www.ficoexpansionscore.com/Content/FAQs.aspx.

## References

- *California Civil Code* § 1719.
- *California Civil Code* § 1719 (a) (1).
- 73 Federal Register 28904-01; 2008 Westlaw 2076604 (F.R.) Proposed rule.
- 74 Federal Register 5498-01, 2009 Westlaw 192880 (F.R.) Final Rule.
- 74 Federal Register at 5547-48.
- Uniform Commercial Code § 4-303.
- *Paul Miller et al.* v. *Bank of America, NT & SA, et al*, 46 Cal.4th 630, 207 P.3d 531, 94 Cal.Rptr.3d 31.

# EXHIBIT 2F

**DECLARATION OF ALAN J. COX IN SUPPORT OF
DEFENDANT WELLS FARGO, N.A.'S MOTION FOR
SUMMARY JUDGMENT AND/OR TO DECERTIFY CLASS**

## Appendix C.1
## Wells Fargo 10-Day Check Sample Data
## Posted Dates, January 2, 2007 - June 9, 2008

| Account ID[1] | Transaction Amount (U.S. Dollars) | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | (Number of Days) | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 1 | $ 76.10 | 1/10/2007 | 1/16/2007 | Unknown | 6 | 3 | |
| 1 | 1,175.03 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 1 | 15.00 | 1/31/2007 | 2/5/2007 | Unknown | 5 | 3 | |
| 1 | 50.00 | 2/1/2007 | 2/5/2007 | Unknown | 4 | 2 | |
| 1 | 26.94 | 5/15/2007 | 5/17/2007 | Unknown | 2 | 2 | |
| 1 | 72.19 | 5/15/2007 | 5/17/2007 | Unknown | 2 | 2 | |
| 1 | 1,175.03 | 5/15/2007 | 5/17/2007 | Financial Institution | 2 | 2 | |
| 2 | 2,953.64 | 9/26/2007 | 10/1/2007 | Financial Institution | 5 | 3 | |
| 2 | 750.00 | 6/2/2008 | 6/9/2008 | Unknown | 7 | 5 | |
| 2 | 1,241.61 | 6/3/2008 | 6/9/2008 | Taxes | 6 | 4 | |
| 2 | 220.00 | 6/6/2008 | 6/9/2008 | Individual | 3 | 1 | |
| 2 | 290.00 | | 10/1/2007 | Financial Institution | | | |
| 3 | 1,000.00 | 10/30/2006 | 1/16/2007 | Charity | 78 | 51 | |
| 3 | 20.00 | 12/31/2006 | 1/16/2007 | Individual | 16 | 9 | |
| 3 | 4,000.00 | 1/13/2007 | 1/16/2007 | Financial Institution | 3 | 0 | |
| 4 | 59.95 | 7/16/2007 | 7/23/2007 | Utilities | 7 | 5 | |
| 4 | 90.40 | 7/16/2007 | 7/23/2007 | Misc. Government | 7 | 5 | |
| 5 | 267.00 | 5/1/2008 | 5/22/2008 | Services | 21 | 15 | |
| 5 | 98.35 | 5/2/2008 | 5/22/2008 | Unknown | 20 | 14 | |
| 5 | 39.95 | 5/6/2008 | 5/22/2008 | Other | 16 | 12 | |
| 5 | 40.00 | 5/20/2008 | 5/22/2008 | Individual | 2 | 2 | |
| 5 | 137.44 | | 5/22/2008 | Retail - Non-Food | | | |
| 6 | 500.00 | 5/18/2007 | 5/17/2007 | Individual | (1) | (3) | |
| 6 | 164.00 | 5/20/2007 | 5/29/2007 | Misc. Government | 9 | 5 | |
| 6 | 30.00 | 5/25/2007 | 5/29/2007 | Services | 4 | 1 | |
| 6 | 50.00 | 5/26/2007 | 5/29/2007 | Individual | 3 | 0 | |
| 7 | 154.00 | 1/11/2007 | 1/16/2007 | Education | 5 | 2 | |
| 8 | 133.53 | 5/20/2007 | 5/29/2007 | Utilities | 9 | 5 | |
| 8 | 102.59 | 5/25/2007 | 5/29/2007 | Utilities | 4 | 1 | |
| 9 | 30.00 | 4/24/2008 | 5/1/2008 | Other | 7 | 5 | |
| 10 | 42.89 | 7/21/2007 | 7/23/2007 | Retail - Non-Food | 2 | 0 | |
| 11 | 16.38 | 5/16/2007 | 5/17/2007 | Retail - Food | 1 | 1 | |
| 12 | 50.00 | 12/21/2006 | 2/5/2007 | Individual | 46 | 29 | |
| 12 | 100.00 | 12/21/2006 | 2/5/2007 | Individual | 46 | 29 | |
| 12 | 200.00 | 1/30/2007 | 2/5/2007 | Education | 6 | 4 | X |
| 12 | 600.00 | 7/6/2007 | 7/23/2007 | Individual | 17 | 11 | |
| 12 | 10.00 | 7/19/2007 | 7/23/2007 | Unknown | 4 | 2 | |
| 12 | 86.00 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 13 | 25.00 | 5/24/2007 | 5/29/2007 | Charity | 5 | 2 | |
| 13 | 190.00 | 9/29/2007 | 10/1/2007 | Financial Institution | 2 | 0 | |
| 14 | 85.00 | 5/24/2007 | 5/29/2007 | Individual | 5 | 2 | |
| 15 | 12.00 | 6/5/2008 | 6/9/2008 | Other | 4 | 2 | |
| 15 | 34.00 | 6/5/2008 | 6/9/2008 | Other | 4 | 2 | |
| 15 | 995.00 | 6/5/2008 | 6/9/2008 | Housing | 4 | 2 | |
| 16 | 1,573.78 | 10/1/2007 | 10/1/2007 | Housing | 0 | 0 | |
| 16 | 42.90 | 10/2/2007 | 10/1/2007 | Utilities | (1) | (3) | |
| 17 | 300.00 | 1/12/2007 | 1/16/2007 | Check Cashing Service | 4 | 1 | |
| 18 | 775.00 | 1/10/2007 | 1/16/2007 | Taxes | 6 | 3 | |
| 19 | 97.50 | 5/20/2007 | 5/29/2007 | Services | 9 | 5 | |
| 20 | 146.37 | 5/26/2007 | 5/29/2007 | Retail - Food | 3 | 0 | |
| 21 | 260.00 | 6/5/2008 | 6/9/2008 | Unknown | 4 | 2 | |
| 22 | 34.72 | 7/5/2007 | 7/23/2007 | Medical | 18 | 12 | |
| 23 | 46.00 | 12/15/2006 | 1/2/2007 | Services | 18 | 10 | |
| 24 | 127.22 | 5/28/2007 | 5/29/2007 | Financial Institution | 1 | 0 | |
| 25 | 2,000.00 | 6/1/2007 | 7/23/2007 | Other | 52 | 35 | |
| 26 | 32.14 | 12/28/2006 | 1/2/2007 | Retail - Food | 5 | 2 | |
| 26 | 10.00 | 12/31/2006 | 1/2/2007 | Charity | 2 | 0 | |
| 26 | 919.00 | 12/31/2006 | 1/2/2007 | Self | 2 | 0 | |
| 26 | 10.00 | 5/24/2007 | 5/29/2007 | Medical | 5 | 2 | |

| Account ID[1] | Transaction Amount | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | -(U.S. Dollars)- | | | | ----------(Number of Days)-------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 26 | 10.00 | 5/24/2007 | 5/29/2007 | Medical | 5 | 2 | |
| 26 | 22.50 | 5/26/2007 | 5/29/2007 | Retail - Food | 3 | 0 | |
| 27 | 2,165.00 | 1/1/2007 | 1/16/2007 | Financial Institution | 15 | 9 | |
| 27 | 119.10 | 1/10/2007 | 1/16/2007 | Misc. Government | 6 | 3 | |
| 27 | 498.25 | 1/10/2007 | 1/16/2007 | Financial Institution | 6 | 3 | |
| 27 | 622.81 | 1/10/2007 | 1/16/2007 | Financial Institution | 6 | 3 | |
| 28 | 410.60 | 12/18/2006 | 1/2/2007 | Medical | 15 | 9 | |
| 29 | 21.64 | 12/24/2006 | 1/2/2007 | Retail - Non-Food | 9 | 4 | |
| 29 | 1,032.78 | 12/26/2006 | 1/2/2007 | Services | 7 | 4 | |
| 29 | 10.00 | 12/31/2006 | 1/2/2007 | Charity | 2 | 0 | |
| 30 | 100.00 | 7/10/2007 | 7/23/2007 | Other | 13 | 9 | |
| 30 | 9.65 | 7/18/2007 | 7/23/2007 | Retail - Non-Food | 5 | 3 | |
| 30 | 13.13 | 7/19/2007 | 7/23/2007 | Restaurants | 4 | 2 | |
| 30 | 6.85 | 7/20/2007 | 7/23/2007 | Unknown | 3 | 1 | |
| 30 | 26.52 | 7/20/2007 | 7/23/2007 | Restaurants | 3 | 1 | |
| 31 | 35.01 | 2/2/2007 | 2/5/2007 | Medical | 3 | 1 | |
| 31 | 450.00 | 2/2/2007 | 2/5/2007 | Individual | 3 | 1 | |
| 32 | 38.68 | 4/30/2008 | 5/1/2008 | Retail - Non-Food | 1 | 1 | |
| 32 | 91.15 | 4/30/2008 | 5/1/2008 | Retail - Food | 1 | 1 | |
| 32 | 135.77 | 4/30/2008 | 5/1/2008 | Retail - Non-Food | 1 | 1 | |
| 33 | 5.00 | 7/16/2007 | 7/23/2007 | Charity | 7 | 5 | |
| 34 | 59.68 | | 6/9/2008 | Utilities | | | |
| 34 | 248.92 | 6/5/2008 | 6/9/2008 | Utilities | 4 | 2 | |
| 35 | 33.61 | 6/4/2008 | 6/9/2008 | Unknown | 5 | 3 | |
| 35 | 126.00 | 6/5/2008 | 6/9/2008 | Individual | 4 | 2 | |
| 36 | 299.55 | 4/23/2008 | 5/1/2008 | Services | 8 | 6 | |
| 37 | 1,758.84 | 6/5/2008 | 6/9/2008 | Financial Institution | 4 | 2 | |
| 38 | 35.04 | 7/15/2007 | 7/23/2007 | Services | 8 | 5 | |
| 38 | 50.00 | 7/15/2007 | 7/23/2007 | Unknown | 8 | 5 | |
| 38 | 120.83 | 7/15/2007 | 7/23/2007 | Utilities | 8 | 5 | |
| 38 | 136.31 | 7/15/2007 | 7/23/2007 | Unknown | 8 | 5 | |
| 39 | 144.00 | 7/4/2007 | 7/23/2007 | Unknown | 19 | 12 | |
| 39 | 530.00 | 7/17/2007 | 7/23/2007 | Taxes | 6 | 4 | |
| 40 | 300.00 | 4/29/2008 | 5/1/2008 | Individual | 2 | 2 | |
| 41 | 217.00 | 6/6/2008 | 6/9/2008 | Retail - Non-Food | 3 | 1 | |
| 42 | 150.00 | 7/17/2007 | 7/23/2007 | Services | 6 | 4 | |
| 42 | 750.00 | 7/17/2007 | 7/23/2007 | Housing | 6 | 4 | |
| 43 | 109.34 | 12/22/2006 | 1/16/2007 | Utilities | 25 | 14 | |
| 44 | 354.21 | 5/19/2008 | 5/22/2008 | Medical | 3 | 3 | |
| 45 | 51.43 | 5/15/2007 | 5/17/2007 | Retail - Non-Food | 2 | 2 | |
| 45 | 200.00 | 5/16/2007 | 5/17/2007 | Retail - Non-Food | 1 | 1 | |
| 46 | 30.00 | 9/26/2007 | 10/1/2007 | Retail - Non-Food | 5 | 3 | |
| 47 | 343.00 | 12/28/2006 | 1/2/2007 | Other | 5 | 2 | |
| 48 | 10.00 | 12/31/2006 | 1/2/2007 | Charity | 2 | 0 | |
| 48 | 200.00 | 12/31/2006 | 1/2/2007 | Charity | 2 | 0 | |
| 48 | 137.00 | 2/1/2007 | 2/5/2007 | Retail - Non-Food | 4 | 2 | |
| 48 | 20.00 | 2/4/2007 | 2/5/2007 | Charity | 1 | 0 | |
| 49 | 348.00 | 5/16/2008 | 5/22/2008 | Utilities | 6 | 4 | |
| 49 | 78.04 | 5/21/2008 | 5/22/2008 | Utilities | 1 | 1 | |
| 50 | 50.00 | 6/5/2008 | 6/9/2008 | Retail - Non-Food | 4 | 2 | |
| 51 | 700.00 | 12/20/2006 | 1/2/2007 | Insurance | 13 | 7 | |
| 51 | 540.00 | 12/26/2006 | 1/2/2007 | Insurance | 7 | 4 | |
| 51 | 15.00 | 12/28/2006 | 1/2/2007 | Financial Institution | 5 | 2 | |
| 52 | 306.00 | 1/10/2007 | 1/16/2007 | Education | 6 | 3 | |
| 53 | 25.00 | 4/29/2008 | 5/29/2007 | Self | 30 | 20 | |
| 54 | 200.00 | 12/14/2006 | 1/2/2007 | Services | 19 | 11 | |
| 54 | 200.00 | 12/28/2006 | 1/2/2007 | Individual | 5 | 2 | |
| 54 | 53.34 | 1/25/2007 | 2/5/2007 | Medical | 11 | 7 | |
| 54 | 502.00 | 1/30/2007 | 2/5/2007 | Other | 6 | 4 | |
| 54 | 27.20 | 1/31/2007 | 2/5/2007 | Utilities | 5 | 3 | |
| 54 | 62.00 | 2/1/2007 | 2/5/2007 | Services | 4 | 2 | |
| 54 | 1,000.00 | 2/2/2007 | 2/5/2007 | Financial Institution | 3 | 1 | |
| 55 | 284.95 | 9/30/2007 | 10/1/2007 | Medical | 1 | 0 | |
| 56 | 130.00 | 2/1/2007 | 2/5/2007 | Services | 4 | 2 | |
| 57 | 80.00 | 1/9/2007 | 1/16/2007 | Other | 7 | 4 | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | (Number of Days) | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 58 | 105.00 | 4/25/2007 | 5/17/2007 | Charity | 22 | 16 | |
| 58 | 36.62 | 5/11/2007 | 5/17/2007 | Unknown | 6 | 4 | |
| 59 | 232.50 | 1/4/2007 | 1/16/2007 | Insurance | 12 | 7 | |
| 59 | 334.00 | 1/10/2007 | 1/16/2007 | Financial Institution | 6 | 3 | |
| 60 | 300.00 | 12/16/2006 | 1/2/2007 | Check Cashing Service | 17 | 9 | |
| 60 | 300.00 | 12/29/2006 | 1/2/2007 | Check Cashing Service | 4 | 1 | |
| 60 | 900.00 | 1/30/2007 | 2/5/2007 | Individual | 6 | 4 | |
| 60 | 300.00 | 2/2/2007 | 2/5/2007 | Check Cashing Service | 3 | 1 | |
| 60 | 300.00 | 5/25/2007 | 5/29/2007 | Check Cashing Service | 4 | 1 | |
| 61 | 232.98 | 5/25/2007 | 5/29/2007 | Insurance | 4 | 1 | |
| 62 | 17.66 | 6/1/2008 | 6/9/2008 | Utilities | 8 | 5 | |
| 62 | 100.00 | 6/1/2008 | 6/9/2008 | Retail - Non-Food | 8 | 5 | |
| 62 | 140.00 | 6/1/2008 | 6/9/2008 | Financial Institution | 8 | 5 | |
| 62 | 144.00 | 6/1/2008 | 6/9/2008 | Housing | 8 | 5 | |
| 63 | 130.00 | 5/19/2007 | 5/29/2007 | Individual | 10 | 5 | |
| 63 | 200.00 | 5/25/2007 | 5/29/2007 | Individual | 4 | 1 | |
| 64 | 98.48 | 12/22/2006 | 1/2/2007 | Retail - Non-Food | 11 | 5 | |
| 65 | 40.70 | 12/22/2006 | 1/2/2007 | Utilities | 11 | 5 | |
| 66 | 240.00 | 4/4/2007 | 5/17/2007 | Services | 43 | 31 | |
| 67 | 2,447.86 | 9/26/2007 | 10/1/2007 | Financial Institution | 5 | 3 | |
| 68 | 1,650.00 | 1/1/2007 | 1/16/2007 | Housing | 15 | 9 | |
| 69 | 196.38 | 5/13/2007 | 5/17/2007 | Financial Institution | 4 | 3 | |
| 69 | 90.05 | 5/22/2007 | 5/29/2007 | Misc. Government | 7 | 4 | |
| 70 | 3.21 | 7/19/2007 | 7/23/2007 | Utilities | 4 | 2 | |
| 70 | 58.39 | 7/19/2007 | 7/23/2007 | Retail - Non-Food | 4 | 2 | |
| 70 | 600.00 | 7/23/2007 | 7/23/2007 | Financial Institution | 0 | 0 | |
| 71 | 1,260.00 | 1/4/2007 | 1/16/2007 | Housing | 12 | 7 | |
| 71 | 15.50 | 1/12/2007 | 1/16/2007 | Services | 4 | 1 | |
| 72 | 20.00 | 4/27/2008 | 5/1/2008 | Other | 4 | 3 | |
| 72 | 45.00 | 4/27/2008 | 5/1/2008 | Services | 4 | 3 | |
| 73 | 356.44 | 7/17/2007 | 7/23/2007 | Unknown | 6 | 4 | |
| 74 | 275.00 | 12/21/2006 | 1/2/2007 | Medical | 12 | 6 | |
| 75 | 90.00 | 5/22/2007 | 5/29/2007 | Individual | 7 | 4 | |
| 75 | 17.32 | 5/25/2007 | 5/29/2007 | Services | 4 | 1 | |
| 76 | 60.00 | 2/2/2007 | 2/5/2007 | Retail - Non-Food | 3 | 1 | |
| 76 | 1,000.00 | 2/2/2007 | 2/5/2007 | Financial Institution | 3 | 1 | |
| 76 | 105.48 | 7/16/2007 | 7/23/2007 | Utilities | 7 | 5 | |
| 76 | 77.35 | 7/18/2007 | 7/23/2007 | Utilities | 5 | 3 | |
| 77 | 53.56 | 5/24/2007 | 5/29/2007 | Retail - Non-Food | 5 | 2 | |
| 77 | 29.95 | 5/25/2007 | 5/29/2007 | Other | 4 | 1 | |
| 77 | 81.40 | 5/25/2007 | 5/29/2007 | Retail - Non-Food | 4 | 1 | |
| 78 | 20.00 | 1/4/2007 | 1/16/2007 | Unknown | 12 | 7 | |
| 79 | 248.00 | 4/25/2008 | 5/1/2008 | Other | 6 | 4 | |
| 80 | 53.21 | 4/30/2008 | 5/1/2008 | Medical | 1 | 1 | |
| 81 | 54.67 | 1/12/2007 | 1/16/2007 | Insurance | 4 | 1 | |
| 82 | 28.54 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 82 | 207.07 | 5/26/2007 | 5/29/2007 | Retail - Food | 3 | 0 | |
| 82 | 48.70 | 5/27/2007 | 5/29/2007 | Retail - Non-Food | 2 | 0 | |
| 82 | 102.50 | 5/27/2007 | 5/29/2007 | Retail - Food | 2 | 0 | |
| 83 | 87.00 | 1/11/2007 | 1/16/2007 | Education | 5 | 2 | |
| 83 | 90.00 | 2/1/2007 | 2/5/2007 | Individual | 4 | 2 | |
| 84 | 922.50 | 9/15/2007 | 10/1/2007 | Individual | 16 | 10 | |
| 85 | 53.67 | 1/11/2007 | 1/16/2007 | Retail - Food | 5 | 2 | |
| 85 | 536.00 | 5/15/2007 | 5/17/2007 | Housing | 2 | 2 | |
| 86 | 110.00 | 10/1/2007 | 10/1/2007 | Other | 0 | 0 | |
| 87 | 500.00 | 2/1/2007 | 2/5/2007 | Housing | 4 | 2 | |
| 88 | 150.00 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 88 | 100.00 | 1/14/2007 | 1/16/2007 | Self | 2 | 0 | |
| 89 | 275.00 | 12/12/2006 | 1/16/2007 | Financial Institution | 35 | 22 | |
| 90 | 79.00 | 12/28/2006 | 1/2/2007 | Medical | 5 | 2 | |
| 90 | 22.43 | 12/29/2006 | 1/2/2007 | Retail - Food | 4 | 1 | |
| 90 | 30.62 | 12/31/2006 | 1/2/2007 | Retail - Non-Food | 2 | 0 | |
| 90 | 132.11 | 12/31/2006 | 1/2/2007 | Retail - Non-Food | 2 | 0 | |
| 91 | 26.58 | 1/4/2007 | 1/16/2007 | Utilities | 12 | 7 | |
| 91 | 55.20 | 1/8/2007 | 1/16/2007 | Utilities | 8 | 5 | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | ---------(Number of Days)--------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 91 | 302.55 | 1/11/2007 | 1/16/2007 | Taxes | 5 | 2 | |
| 91 | 894.89 | 1/11/2007 | 1/16/2007 | Taxes | 5 | 2 | |
| 91 | 1,203.05 | 1/11/2007 | 1/16/2007 | Housing | 5 | 2 | |
| 91 | 450.00 | 1/12/2007 | 1/16/2007 | Retail - Non-Food | 4 | 1 | |
| 92 | 300.00 | 1/2/2007 | 1/16/2007 | Check Cashing Service | 14 | 9 | |
| 92 | 370.00 | 1/14/2007 | 1/16/2007 | Financial Institution | 2 | 0 | |
| 92 | 300.00 | 5/7/2007 | 5/29/2007 | Check Cashing Service | 22 | 15 | |
| 92 | 121.23 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 92 | 36.13 | 5/25/2007 | 5/29/2007 | Retail - Food | 4 | 1 | |
| 93 | 104.12 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 93 | 1,000.00 | 6/2/2008 | 6/9/2008 | Housing | 7 | 5 | |
| 94 | 34.56 | 5/24/2007 | 5/29/2007 | Retail - Non-Food | 5 | 2 | |
| 94 | 134.00 | 5/26/2007 | 5/29/2007 | Services | 3 | 0 | |
| 94 | 170.00 | 5/27/2007 | 5/29/2007 | Retail - Food | 2 | 0 | |
| 95 | 15.32 | 5/26/2007 | 5/29/2007 | Retail - Food | 3 | 0 | |
| 95 | 12.32 | 5/27/2007 | 5/29/2007 | Retail - Food | 2 | 0 | |
| 96 | 10.00 | 9/20/2007 | 10/1/2007 | Individual | 11 | 7 | |
| 97 | 299.00 | 2/2/2007 | 2/5/2007 | Financial Institution | 3 | 1 | |
| 97 | 224.15 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 97 | 300.00 | 6/6/2008 | 6/9/2008 | Financial Institution | 3 | 1 | |
| 98 | 114.50 | 5/17/2008 | 5/22/2008 | Other | 5 | 3 | |
| 98 | 524.07 | 5/17/2008 | 5/22/2008 | Other | 5 | 3 | |
| 98 | 183.00 | 5/19/2008 | 5/22/2008 | Services | 3 | 3 | |
| 99 | 1,960.00 | 8/1/2007 | 10/1/2007 | Housing | 61 | 42 | |
| 99 | 1,960.00 | 9/1/2007 | 10/1/2007 | Housing | 30 | 19 | |
| 99 | 115.83 | 9/27/2007 | 10/1/2007 | Retail - Food | 4 | 2 | |
| 99 | 67.02 | 9/28/2007 | 10/1/2007 | Retail - Food | 3 | 1 | |
| 99 | 161.41 | 9/28/2007 | 10/1/2007 | Retail - Non-Food | 3 | 1 | |
| 99 | 178.46 | 9/28/2007 | 10/1/2007 | Retail - Non-Food | 3 | 1 | |
| 100 | 114.00 | 1/10/2007 | 1/16/2007 | Utilities | 6 | 3 | |
| 100 | 87.93 | 5/20/2008 | 5/22/2008 | Retail - Food | 2 | 2 | |
| 100 | 107.00 | 5/20/2008 | 5/22/2008 | Financial Institution | 2 | 2 | |
| 101 | 171.00 | 5/30/2008 | 6/9/2008 | Retail - Non-Food | 10 | 6 | X |
| 101 | 25.00 | 6/6/2008 | 6/9/2008 | Other | 3 | 1 | |
| 101 | 100.00 | 6/6/2008 | 6/9/2008 | Other | 3 | 1 | |
| 101 | 219.00 | 6/6/2008 | 6/9/2008 | Financial Institution | 3 | 1 | |
| 102 | 125.00 | 12/27/2006 | 1/2/2007 | Services | 6 | 3 | |
| 103 | 102.16 | 12/28/2006 | 1/2/2007 | Retail - Food | 5 | 2 | |
| 103 | 20.00 | 12/29/2006 | 1/2/2007 | Retail - Non-Food | 4 | 1 | |
| 103 | 24.15 | 12/29/2006 | 1/2/2007 | Retail - Food | 4 | 1 | |
| 103 | 150.00 | 12/29/2006 | 1/2/2007 | Individual | 4 | 1 | |
| 103 | 30.20 | 12/30/2006 | 1/2/2007 | Retail - Food | 3 | 0 | |
| 104 | 5,180.00 | 5/28/2008 | 6/9/2008 | Housing | 12 | 8 | |
| 104 | 176.00 | 6/5/2008 | 6/9/2008 | Financial Institution | 4 | 2 | |
| 105 | 25.78 | 1/11/2007 | 1/16/2007 | Retail - Non-Food | 5 | 2 | |
| 105 | 67.42 | 1/11/2007 | 1/16/2007 | Retail - Non-Food | 5 | 2 | |
| 105 | 29.57 | 1/12/2007 | 1/16/2007 | Retail - Non-Food | 4 | 1 | |
| 105 | 94.57 | 1/12/2007 | 1/16/2007 | Retail - Non-Food | 4 | 1 | |
| 105 | 106.44 | 1/12/2007 | 1/16/2007 | Retail - Non-Food | 4 | 1 | |
| 105 | 254.10 | 5/19/2008 | 5/22/2008 | Retail - Non-Food | 3 | 3 | |
| 105 | 139.00 | 5/20/2008 | 5/22/2008 | Retail - Non-Food | 2 | 2 | |
| 106 | 20.60 | 1/27/2007 | 2/5/2007 | Medical | 9 | 5 | |
| 106 | 24.30 | 1/27/2007 | 2/5/2007 | Individual | 9 | 5 | |
| 106 | 25.00 | 1/30/2007 | 2/5/2007 | Retail - Non-Food | 6 | 4 | |
| 106 | 121.62 | 1/30/2007 | 2/5/2007 | Other | 6 | 4 | |
| 106 | 26.00 | 1/31/2007 | 2/5/2007 | Restaurants | 5 | 3 | |
| 107 | 69.00 | 5/10/2007 | 5/17/2007 | Services | 7 | 5 | |
| 108 | 50.00 | 12/28/2006 | 1/2/2007 | Financial Institution | 5 | 2 | |
| 108 | 9.20 | 5/12/2008 | 5/17/2007 | Services | 5 | 3 | |
| 108 | 52.00 | 5/12/2008 | 5/17/2007 | Services | 5 | 3 | |
| 108 | 45.55 | 9/28/2007 | 10/1/2007 | Retail - Food | 3 | 1 | |
| 109 | 75.00 | 1/15/2007 | 2/5/2007 | Education | 21 | 14 | |
| 110 | 528.00 | 4/22/2008 | 5/1/2008 | Other | 9 | 7 | |
| 110 | 200.00 | 4/29/2008 | 5/1/2008 | Charity | 2 | 2 | |
| 110 | 1,000.00 | 5/1/2008 | 5/1/2008 | Self | 0 | 0 | |

| Account ID[1] | Transaction Amount | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | -(U.S. Dollars)- | | | | --------(Number of Days)-------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 111 | 150.72 | 2/1/2007 | 2/5/2007 | Utilities | 4 | 2 | |
| 111 | 67.00 | 4/24/2007 | 5/17/2007 | Misc. Government | 23 | 17 | |
| 112 | 56.84 | 9/23/2007 | 10/1/2007 | Utilities | 8 | 5 | |
| 113 | 1,000.00 | 12/11/2006 | 1/2/2007 | Utilities | 22 | 14 | |
| 113 | 63.00 | 12/20/2006 | 1/2/2007 | Medical | 13 | 7 | |
| 113 | 1,240.00 | 12/20/2006 | 1/2/2007 | Financial Institution | 13 | 7 | |
| 113 | 201.00 | 12/21/2006 | 1/2/2007 | Other | 12 | 6 | |
| 113 | 219.00 | 12/21/2006 | 1/2/2007 | Other | 12 | 6 | |
| 113 | 258.89 | 12/23/2006 | 1/2/2007 | Utilities | 10 | 4 | |
| 113 | 73.52 | 12/27/2006 | 1/2/2007 | Medical | 6 | 3 | |
| 113 | 2,950.13 | 12/27/2006 | 1/16/2007 | Services | 20 | 12 | |
| 113 | 85.43 | 12/29/2006 | 1/16/2007 | Utilities | 18 | 10 | |
| 113 | 108.84 | 12/29/2006 | 1/2/2007 | Retail - Food | 4 | 1 | |
| 113 | 180.00 | 12/29/2006 | 1/2/2007 | Individual | 4 | 1 | |
| 113 | 642.00 | 12/29/2006 | 1/16/2007 | Individual | 18 | 10 | |
| 113 | 600.00 | 12/30/2006 | 1/2/2007 | Self | 3 | 0 | |
| 113 | 435.00 | 1/8/2007 | 1/16/2007 | Financial Institution | 8 | 5 | |
| 113 | 446.00 | 1/10/2007 | 1/16/2007 | Education | 6 | 3 | |
| 113 | 92.72 | 1/14/2007 | 1/16/2007 | Retail - Non-Food | 2 | 0 | |
| 114 | 4,080.30 | 4/30/2008 | 5/22/2008 | Services | 22 | 16 | |
| 114 | 560.25 | 5/23/2008 | 5/22/2008 | Other | (1) | (3) | |
| 115 | 50.00 | 1/5/2007 | 1/16/2007 | Financial Institution | 11 | 6 | |
| 115 | 5,000.00 | | 1/16/2007 | Unknown | | | |
| 116 | 2,071.00 | 9/20/2007 | 10/1/2007 | Medical | 11 | 7 | |
| 117 | 120.05 | 7/20/2007 | 7/23/2007 | Taxes | 3 | 1 | |
| 118 | 150.00 | 12/24/2006 | 1/2/2007 | Unknown | 9 | 4 | |
| 118 | 120.00 | 12/27/2006 | 1/2/2007 | Unknown | 6 | 3 | |
| 118 | 91.33 | 12/28/2006 | 1/2/2007 | Retail - Food | 5 | 2 | |
| 119 | 80.00 | 7/21/2007 | 7/23/2007 | Individual | 2 | 0 | |
| 120 | 20.00 | 5/22/2007 | 5/29/2007 | Other | 7 | 4 | |
| 121 | 131.47 | 5/10/2007 | 5/17/2007 | Insurance | 7 | 5 | |
| 121 | 1,494.66 | 5/15/2007 | 5/17/2007 | Housing | 2 | 2 | |
| 122 | 29.00 | 3/17/2008 | 5/1/2008 | Individual | 45 | 33 | |
| 122 | 13.49 | 3/31/2008 | 5/1/2008 | Individual | 31 | 23 | |
| 122 | 30.00 | 5/1/2008 | 5/1/2008 | Self | 0 | 0 | |
| 122 | 4.40 | 6/1/2008 | 6/9/2008 | Insurance | 8 | 5 | |
| 122 | 20.00 | 6/1/2008 | 6/9/2008 | Financial Institution | 8 | 5 | |
| 122 | 12.56 | 6/6/2008 | 6/9/2008 | Unknown | 3 | 1 | |
| 122 | 23.78 | 6/7/2008 | 6/9/2008 | Retail - Non-Food | 2 | 0 | |
| 123 | 500.00 | 4/30/2008 | 5/1/2008 | Services | 1 | 1 | |
| 124 | 250.00 | 1/31/2007 | 2/5/2007 | Check Cashing Service | 5 | 3 | |
| 124 | 155.00 | 2/2/2007 | 2/5/2007 | Financial Institution | 3 | 1 | |
| 124 | 100.00 | 5/25/2007 | 5/29/2007 | Financial Institution | 4 | 1 | |
| 125 | 1,656.96 | 1/10/2007 | 1/16/2007 | Housing | 6 | 3 | |
| 125 | 1,588.74 | 5/11/2007 | 5/17/2007 | Housing | 6 | 4 | |
| 126 | 105.00 | 4/29/2007 | 5/1/2008 | Services | 2 | 2 | |
| 127 | 2.00 | 5/17/2007 | 5/17/2007 | Financial Institution | 0 | 0 | |
| 127 | 1,362.06 | 5/17/2007 | 5/17/2007 | Financial Institution | 0 | 0 | |
| 128 | 640.64 | 12/1/2006 | 1/2/2007 | Other | 32 | 20 | |
| 129 | 194.19 | 12/24/2006 | 1/2/2007 | Other | 9 | 4 | |
| 130 | 143.24 | 5/29/2008 | 6/9/2008 | Insurance | 11 | 7 | |
| 130 | 13.33 | 6/2/2008 | 6/9/2008 | Medical | 7 | 5 | |
| 131 | 1,228.50 | 2/2/2007 | 2/5/2007 | Housing | 3 | 1 | |
| 132 | 68.00 | 9/29/2007 | 10/1/2007 | Utilities | 2 | 0 | |
| 133 | 500.00 | 5/25/2007 | 5/29/2007 | Services | 4 | 1 | |
| 134 | 55.17 | 12/24/2006 | 1/2/2007 | Insurance | 9 | 4 | |
| 135 | 1,250.00 | 2/2/2007 | 2/5/2007 | Housing | 3 | 1 | |
| 136 | 1,071.00 | 2/1/2007 | 2/5/2007 | Housing | 4 | 2 | |
| 137 | 500.00 | 9/24/2007 | 10/1/2007 | Financial Institution | 7 | 5 | |
| 138 | 43.48 | 5/25/2007 | 5/29/2007 | Retail - Food | 4 | 1 | |
| 139 | 29.00 | 2/1/2007 | 2/5/2007 | Other | 4 | 2 | |
| 140 | 112.00 | 1/16/2007 | 2/5/2007 | Unknown | 20 | 14 | |
| 140 | 28.61 | 1/30/2007 | 2/5/2007 | Medical | 6 | 4 | |
| 140 | 45.82 | 2/1/2007 | 2/5/2007 | Retail - Non-Food | 4 | 2 | |
| 141 | 80.00 | 5/31/2007 | 5/29/2007 | Individual | (2) | (4) | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | ----------(Number of Days)--------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 142 | 20.00 | 5/26/2007 | 5/29/2007 | Charity | 3 | 0 | |
| 142 | 510.00 | 5/26/2007 | 5/29/2007 | Charity | 3 | 0 | |
| 142 | 200.00 | 5/27/2007 | 5/29/2007 | Retail - Non-Food | 2 | 0 | |
| 143 | 68.91 | 12/28/2006 | 1/2/2007 | Utilities | 5 | 2 | |
| 144 | 2,787.50 | 12/29/2006 | 1/2/2007 | Financial Institution | 4 | 1 | |
| 144 | 37.00 | 1/2/2007 | 1/2/2007 | Services | 0 | 0 | |
| 144 | 117.00 | 1/7/2007 | 1/16/2007 | Other | 9 | 5 | |
| 144 | 20.00 | 1/12/2007 | 1/16/2007 | Utilities | 4 | 1 | |
| 144 | 47.00 | 1/12/2007 | 1/16/2007 | Services | 4 | 1 | |
| 144 | 75.00 | 1/12/2007 | 1/16/2007 | Utilities | 4 | 1 | |
| 144 | 300.00 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 144 | 1,312.26 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 144 | 283.00 | 1/16/2007 | 1/16/2007 | Financial Institution | 0 | 0 | |
| 144 | 120.00 | 7/19/2007 | 7/23/2007 | Other | 4 | 2 | |
| 144 | 169.12 | 7/23/2007 | 7/23/2007 | Utilities | 0 | 0 | |
| 145 | 30.00 | 12/24/2006 | 1/2/2007 | Unknown | 9 | 4 | |
| 146 | 195.00 | 7/18/2007 | 7/23/2007 | Financial Institution | 5 | 3 | |
| 147 | 90.06 | 5/10/2007 | 5/17/2007 | Education | 7 | 5 | |
| 148 | 226.25 | 12/27/2006 | 1/2/2007 | Check Cashing Service | 6 | 3 | |
| 148 | 472.81 | 12/27/2006 | 1/2/2007 | Check Cashing Service | 6 | 3 | |
| 148 | 500.00 | 12/27/2006 | 1/2/2007 | Individual | 6 | 3 | |
| 149 | 46.43 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 149 | 60.00 | 5/25/2007 | 5/29/2007 | Retail - Non-Food | 4 | 1 | |
| 149 | 38.44 | 5/27/2007 | 5/29/2007 | Retail - Food | 2 | 0 | |
| 149 | 242.00 | 5/27/2007 | 5/29/2007 | Services | 2 | 0 | |
| 150 | 10.00 | 12/25/2006 | 1/2/2007 | Charity | 8 | 4 | |
| 150 | 395.00 | 12/28/2006 | 1/2/2007 | Financial Institution | 5 | 2 | |
| 151 | 2,303.98 | 5/16/2007 | 5/17/2007 | Housing | 1 | 1 | |
| 152 | 80.00 | 5/25/2007 | 5/29/2007 | Retail - Non-Food | 4 | 1 | |
| 152 | 59.50 | 5/27/2007 | 5/29/2007 | Retail - Food | 2 | 0 | |
| 152 | 40.00 | 8/29/2007 | 10/1/2007 | Other | 33 | 22 | |
| 152 | 35.00 | 9/19/2007 | 10/1/2007 | Other | 12 | 8 | |
| 152 | 100.00 | 9/25/2007 | 10/1/2007 | Individual | 6 | 4 | |
| 152 | 101.14 | 9/27/2007 | 10/1/2007 | Retail - Food | 4 | 2 | |
| 152 | 500.00 | 5/19/2007 | 5/22/2008 | Medical | 3 | 3 | |
| 152 | 26.00 | 5/21/2008 | 5/22/2008 | Restaurants | 1 | 1 | |
| 152 | 165.14 | 5/21/2008 | 5/22/2008 | Retail - Food | 1 | 1 | |
| 153 | 50.00 | 9/27/2007 | 10/1/2007 | Individual | 4 | 2 | |
| 154 | 28.27 | 5/25/2007 | 5/29/2007 | Retail - Food | 4 | 1 | |
| 154 | 42.98 | 5/25/2007 | 5/29/2007 | Retail - Non-Food | 4 | 1 | |
| 154 | 86.56 | 5/25/2007 | 5/29/2007 | Retail - Non-Food | 4 | 1 | |
| 155 | 2,100.00 | 6/1/2008 | 6/9/2008 | Housing | 8 | 5 | |
| 156 | 1,000.00 | 4/29/2008 | 5/1/2008 | Self | 2 | 2 | |
| 157 | 100.00 | 1/29/2007 | 2/5/2007 | Financial Institution | 7 | 5 | |
| 157 | 285.90 | 1/29/2007 | 2/5/2007 | Housing | 7 | 5 | |
| 158 | 245.87 | 5/21/2008 | 5/22/2008 | Retail - Non-Food | 1 | 1 | |
| 159 | 70.00 | 12/29/2006 | 1/2/2007 | Individual | 4 | 1 | |
| 159 | 290.00 | 12/29/2006 | 1/2/2007 | Individual | 4 | 1 | |
| 160 | 143.34 | 9/27/2007 | 10/1/2007 | Individual | 4 | 2 | |
| 161 | 32.72 | | 6/9/2008 | Utilities | | | |
| 161 | 49.17 | 6/5/2008 | 6/9/2008 | Utilities | 4 | 2 | |
| 162 | 1,000.00 | 7/20/2007 | 7/23/2007 | Taxes | 3 | 1 | |
| 163 | 1,843.00 | 4/30/2008 | 5/1/2008 | Financial Institution | 1 | 1 | |
| 163 | 300.00 | 5/24/2008 | 6/9/2008 | Individual | 16 | 9 | |
| 164 | 42.71 | 1/11/2007 | 1/16/2007 | Retail - Food | 5 | 2 | |
| 164 | 100.00 | 1/11/2007 | 1/16/2007 | Financial Institution | 5 | 2 | |
| 164 | 150.49 | 1/16/2007 | 1/16/2007 | Utilities | 0 | 0 | |
| 165 | 2,045.00 | 1/3/2007 | 1/16/2007 | Housing | 13 | 8 | |
| 166 | 80.00 | 2/1/2007 | 2/5/2007 | Education | 4 | 2 | |
| 166 | 1,000.00 | 2/1/2007 | 2/5/2007 | Individual | 4 | 2 | |
| 166 | 175.00 | 5/25/2007 | 5/29/2007 | Education | 4 | 1 | |
| 167 | 1,400.00 | 1/3/2007 | 1/16/2007 | Housing | 13 | 8 | |
| 167 | 162.35 | 1/10/2007 | 1/16/2007 | Insurance | 6 | 3 | |
| 168 | 50.00 | 5/25/2007 | 5/29/2007 | Financial Institution | 4 | 1 | |
| 168 | 70.00 | 5/25/2007 | 5/29/2007 | Financial Institution | 4 | 1 | |

| Account ID[1] | Transaction Amount | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | -(U.S. Dollars)- | | | | ---------(Number of Days)--------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 169 | 20.00 | 7/15/2007 | 7/23/2007 | Charity | 8 | 5 | |
| 170 | 85.00 | 4/27/2008 | 6/9/2008 | Individual | 43 | 29 | |
| 170 | 15.00 | 6/3/2008 | 6/9/2008 | Education | 6 | 4 | |
| 170 | 1,395.00 | 6/5/2008 | 6/9/2008 | Housing | 4 | 2 | |
| 170 | 50.00 | 6/8/2008 | 6/9/2008 | Charity | 1 | 0 | |
| 171 | 118.77 | 7/20/2007 | 7/23/2007 | Financial Institution | 3 | 1 | |
| 172 | 1,325.00 | 1/12/2007 | 1/16/2007 | Individual | 4 | 1 | |
| 173 | 65.00 | 7/20/2007 | 7/23/2007 | Financial Institution | 3 | 1 | |
| 174 | 33.80 | 5/13/2008 | 5/22/2008 | Individual | 9 | 7 | |
| 174 | 63.88 | 5/22/2008 | 5/22/2008 | Retail - Non-Food | 0 | 0 | |
| 175 | 100.00 | 9/12/2007 | 10/1/2007 | Individual | 19 | 13 | |
| 175 | 10.48 | 9/28/2007 | 10/1/2007 | Misc. Government | 3 | 1 | |
| 176 | 25.00 | 5/1/2008 | 6/9/2008 | Charity | 39 | 26 | |
| 177 | 70.00 | 7/18/2007 | 7/23/2007 | Medical | 5 | 3 | |
| 177 | 126.07 | 9/21/2007 | 10/1/2007 | Utilities | 10 | 6 | |
| 177 | 357.00 | 9/26/2007 | 10/1/2007 | Financial Institution | 5 | 3 | |
| 177 | 2,700.00 | 9/28/2007 | 10/1/2007 | Individual | 3 | 1 | |
| 178 | 24.85 | 1/11/2007 | 1/16/2007 | Retail - Non-Food | 5 | 2 | |
| 178 | 107.70 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 179 | 52.85 | 1/8/2007 | 1/16/2007 | Utilities | 8 | 5 | |
| 179 | 2,248.06 | 1/10/2007 | 1/16/2007 | Financial Institution | 6 | 3 | |
| 180 | 1,000.00 | 10/10/2007 | 10/1/2007 | Housing | (9) | (8) | |
| 181 | 75.00 | 1/31/2007 | 2/5/2007 | Housing | 5 | 3 | |
| 181 | 700.00 | 1/31/2007 | 2/5/2007 | Housing | 5 | 3 | |
| 182 | 92.06 | 12/26/2006 | 1/2/2007 | Misc. Government | 7 | 4 | |
| 183 | 30.00 | 6/6/2008 | 6/9/2008 | Services | 3 | 1 | |
| 184 | 50.00 | 1/7/2007 | 1/16/2007 | Financial Institution | 9 | 5 | |
| 185 | 203.64 | 12/30/2006 | 1/2/2007 | Retail - Food | 3 | 0 | |
| 186 | 40.00 | 5/15/2007 | 5/29/2007 | Services | 14 | 9 | |
| 186 | 60.00 | 5/22/2007 | 5/29/2007 | Individual | 7 | 4 | |
| 187 | 150.00 | 12/27/2006 | 1/2/2007 | Services | 6 | 3 | |
| 187 | 900.00 | 12/28/2006 | 1/2/2007 | Individual | 5 | 2 | |
| 187 | 1,000.00 | 12/28/2006 | 1/2/2007 | Individual | 5 | 2 | |
| 187 | 3,000.00 | 12/29/2006 | 1/2/2007 | Individual | 4 | 1 | |
| 187 | 3,252.14 | 12/29/2006 | 1/2/2007 | Retail - Non-Food | 4 | 1 | |
| 187 | 1,800.00 | 12/30/2006 | 1/2/2007 | Self | 3 | 0 | |
| 188 | 27.92 | 1/12/2007 | 1/16/2007 | Insurance | 4 | 1 | |
| 188 | 152.05 | 1/12/2007 | 1/16/2007 | Insurance | 4 | 1 | |
| 189 | 121.50 | 1/8/2007 | 1/16/2007 | Education | 8 | 5 | |
| 189 | 49.55 | 1/10/2007 | 1/16/2007 | Retail - Non-Food | 6 | 3 | |
| 190 | 46.95 | 12/20/2006 | 1/2/2007 | Services | 13 | 7 | |
| 190 | 97.56 | 12/20/2006 | 1/2/2007 | Retail - Non-Food | 13 | 7 | |
| 190 | 2,534.00 | 12/30/2006 | 1/2/2007 | Insurance | 3 | 0 | |
| 191 | 729.55 | 1/11/2007 | 1/16/2007 | Utilities | 5 | 2 | |
| 192 | 299.00 | 7/20/2007 | 7/23/2007 | Services | 3 | 1 | |
| 192 | 43.00 | 9/28/2007 | 10/1/2007 | Individual | 3 | 1 | |
| 193 | 29.08 | 5/22/2007 | 5/29/2007 | Retail - Non-Food | 7 | 4 | |
| 193 | 38.16 | 5/22/2007 | 5/29/2007 | Retail - Food | 7 | 4 | |
| 193 | 4.59 | 5/26/2007 | 5/29/2007 | Retail - Non-Food | 3 | 0 | |
| 194 | 755.00 | 6/5/2008 | 6/9/2008 | Housing | 4 | 2 | |
| 195 | 750.00 | 6/6/2008 | 6/9/2008 | Financial Institution | 3 | 1 | |
| 196 | 71.38 | 1/13/2007 | 1/16/2007 | Insurance | 3 | 0 | |
| 197 | 100.00 | 6/7/2008 | 6/9/2008 | Self | 2 | 0 | |
| 198 | 130.00 | 12/27/2006 | 1/2/2007 | Individual | 6 | 3 | |
| 199 | 334.00 | 5/18/2007 | 5/29/2007 | Services | 11 | 6 | |
| 200 | 36.00 | 5/14/2007 | 5/17/2007 | Education | 3 | 3 | |
| 200 | 1.25 | 5/15/2007 | 5/17/2007 | Services | 2 | 2 | |
| 201 | 380.00 | 5/10/2007 | 5/17/2007 | Education | 7 | 5 | |
| 202 | 30.00 | 5/23/2007 | 5/29/2007 | Other | 6 | 3 | |
| 203 | 248.50 | 5/10/2007 | 5/29/2007 | Misc. Government | 19 | 12 | |
| 204 | 59.42 | 5/25/2007 | 5/29/2007 | Utilities | 4 | 1 | |
| 204 | 267.01 | 5/25/2007 | 5/29/2007 | Utilities | 4 | 1 | |
| 204 | 78.33 | 5/20/2008 | 5/22/2008 | Utilities | 2 | 2 | |
| 205 | 141.00 | 5/21/2008 | 5/22/2008 | Services | 1 | 1 | |
| 206 | 67.05 | 12/20/2006 | 1/2/2007 | Utilities | 13 | 7 | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | ---------(Number of Days)--------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 207 | 71.00 | 12/10/2006 | 1/2/2007 | Other | 23 | 14 | |
| 208 | 50.00 | 4/25/2008 | 5/1/2008 | Charity | 6 | 4 | |
| 209 | 250.00 | 1/8/2007 | 1/16/2007 | Individual | 8 | 5 | |
| 210 | 700.00 | 1/15/2007 | 2/5/2007 | Individual | 21 | 14 | |
| 210 | 2,500.00 | 7/21/2007 | 7/23/2007 | Retail - Non-Food | 2 | 0 | |
| 211 | 80.01 | 6/2/2008 | 6/9/2008 | Utilities | 7 | 5 | |
| 211 | 40.00 | 6/5/2008 | 6/9/2008 | Utilities | 4 | 2 | |
| 212 | 50.00 | 5/3/2007 | 7/23/2007 | Individual | 81 | 55 | |
| 213 | 495.00 | 5/31/2008 | 6/9/2008 | Individual | 9 | 5 | |
| 213 | 100.00 | 6/2/2008 | 6/9/2008 | Individual | 7 | 5 | |
| 213 | 75.00 | 6/5/2008 | 6/9/2008 | Individual | 4 | 2 | |
| 213 | 65.00 | 6/6/2008 | 6/9/2008 | Individual | 3 | 1 | |
| 213 | 290.81 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 214 | 180.00 | 1/10/2007 | 1/16/2007 | Education | 6 | 3 | |
| 215 | 69.21 | 5/16/2007 | 5/17/2007 | Retail - Food | 1 | 1 | |
| 216 | 24.00 | 4/22/2008 | 6/9/2008 | Unknown | 48 | 33 | |
| 217 | 15.39 | 12/29/2006 | 1/2/2007 | Retail - Non-Food | 4 | 1 | |
| 217 | 50.00 | 12/29/2006 | 1/2/2007 | Retail - Unknown | 4 | 1 | |
| 218 | 50.00 | 1/26/2007 | 2/5/2007 | Retail - Non-Food | 10 | 6 | |
| 219 | 27.90 | 12/23/2006 | 1/2/2007 | Retail - Food | 10 | 4 | X |
| 219 | 33.99 | 12/23/2006 | 1/2/2007 | Retail - Food | 10 | 4 | X |
| 219 | 50.00 | 12/28/2006 | 1/2/2007 | Self | 5 | 2 | |
| 220 | 551.26 | 6/2/2008 | 6/9/2008 | Other | 7 | 5 | |
| 221 | 377.00 | 5/21/2007 | 5/29/2007 | Retail - Non-Food | 8 | 5 | |
| 221 | 25.55 | 5/26/2007 | 5/29/2007 | Retail - Food | 3 | 0 | |
| 221 | 1,453.54 | 6/4/2008 | 6/9/2008 | Housing | 5 | 3 | |
| 222 | 14.43 | 5/9/2007 | 5/17/2007 | Medical | 8 | 6 | |
| 222 | 120.00 | 5/9/2007 | 5/17/2007 | Services | 8 | 6 | |
| 222 | 95.32 | 5/15/2007 | 5/17/2007 | Retail - Non-Food | 2 | 2 | |
| 222 | 57.45 | 6/5/2008 | 6/9/2008 | Services | 4 | 2 | |
| 223 | 188.27 | 4/30/2008 | 5/1/2008 | Individual | 1 | 1 | |
| 224 | 160.00 | 5/15/2008 | 5/22/2008 | Insurance | 7 | 5 | |
| 225 | 5.70 | 7/21/2007 | 7/23/2007 | Retail - Food | 2 | 0 | |
| 226 | 246.21 | 6/9/2008 | 6/9/2008 | Financial Institution | 0 | 0 | |
| 227 | 29.99 | 7/1/2007 | 7/23/2007 | Services | 22 | 14 | |
| 228 | 702.00 | 12/29/2006 | 1/2/2007 | Financial Institution | 4 | 1 | |
| 228 | 300.00 | 9/30/2007 | 10/1/2007 | Services | 1 | 0 | |
| 229 | 90.00 | 5/31/2008 | 6/9/2008 | Self | 9 | 5 | |
| 230 | 300.00 | 9/10/2007 | 10/1/2007 | Check Cashing Service | 21 | 15 | |
| 230 | 176.47 | 9/25/2007 | 10/1/2007 | Check Cashing Service | 6 | 4 | |
| 231 | 28.76 | 5/28/2007 | 5/29/2007 | Retail - Food | 1 | 0 | |
| 231 | 30.00 | 5/28/2007 | 5/29/2007 | Retail - Food | 1 | 0 | |
| 232 | 20.90 | 5/18/2007 | 5/29/2007 | Restaurants | 11 | 6 | |
| 232 | 25.00 | 5/25/2007 | 5/29/2007 | Other | 4 | 1 | |
| 233 | 230.00 | 9/27/2007 | 10/1/2007 | Education | 4 | 2 | |
| 234 | 169.00 | 7/12/2007 | 7/23/2007 | Financial Institution | 11 | 7 | |
| 234 | 50.50 | 7/17/2007 | 7/23/2007 | Retail - Non-Food | 6 | 4 | |
| 234 | 40.00 | 7/21/2007 | 7/23/2007 | Retail - Unknown | 2 | 0 | |
| 235 | 80.49 | 9/28/2007 | 10/1/2007 | Retail - Food | 3 | 1 | |
| 236 | 186.69 | 12/24/2006 | 1/2/2007 | Utilities | 9 | 4 | |
| 236 | 80.00 | 12/26/2006 | 1/2/2007 | Individual | 7 | 4 | |
| 236 | 1,144.40 | 12/29/2006 | 1/2/2007 | Financial Institution | 4 | 1 | |
| 237 | 200.00 | 12/29/2006 | 1/2/2007 | Medical | 4 | 1 | |
| 238 | 20.00 | 5/14/2008 | 5/22/2008 | Charity | 8 | 6 | |
| 239 | 20.00 | 12/22/2006 | 1/16/2007 | Individual | 25 | 14 | |
| 239 | 38.75 | 1/9/2007 | 1/16/2007 | Utilities | 7 | 4 | |
| 240 | 99.00 | 5/12/2007 | 5/17/2007 | Medical | 5 | 3 | |
| 241 | 251.40 | 5/20/2008 | 5/22/2008 | Utilities | 2 | 2 | |
| 241 | 121.40 | 5/21/2008 | 5/22/2008 | Utilities | 1 | 1 | |
| 242 | 41.00 | 5/15/2007 | 5/17/2007 | Retail - Non-Food | 2 | 2 | |
| 243 | 40.00 | 4/28/2008 | 5/1/2008 | Medical | 3 | 3 | |
| 244 | 100.37 | 7/14/2007 | 7/23/2007 | Unknown | 9 | 5 | |
| 244 | 180.00 | 7/14/2007 | 7/23/2007 | Housing | 9 | 5 | |
| 245 | 360.00 | 1/31/2007 | 2/5/2007 | Charity | 5 | 3 | |
| 246 | 40.04 | 5/24/2007 | 5/29/2007 | Insurance | 5 | 2 | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | --------(Number of Days)-------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 246 | 350.00 | 5/24/2007 | 5/29/2007 | Financial Institution | 5 | 2 | |
| 247 | 75.00 | 5/29/2008 | 6/9/2008 | Individual | 11 | 7 | |
| 248 | 161.34 | 5/24/2007 | 5/29/2007 | Services | 5 | 2 | |
| 249 | 210.00 | 7/21/2007 | 7/23/2007 | Financial Institution | 2 | 0 | |
| 250 | 1,350.00 | 9/24/2007 | 10/1/2007 | Housing | 7 | 5 | |
| 251 | 75.01 | 1/10/2007 | 1/16/2007 | Retail - Food | 6 | 3 | |
| 251 | 3.98 | 1/11/2007 | 1/16/2007 | Retail - Food | 5 | 2 | |
| 251 | 10.17 | 1/11/2007 | 1/16/2007 | Retail - Food | 5 | 2 | |
| 251 | 12.93 | 1/15/2007 | 1/16/2007 | Retail - Food | 1 | 0 | |
| 251 | 20.00 | 4/30/2007 | 5/29/2007 | Education | 29 | 20 | |
| 252 | 87.46 | 7/15/2007 | 7/23/2007 | Utilities | 8 | 5 | |
| 253 | 742.25 | 9/27/2007 | 10/1/2007 | Housing | 4 | 2 | |
| 254 | 1,402.19 | 12/29/2006 | 1/2/2007 | Housing | 4 | 1 | |
| 255 | 326.00 | 12/27/2006 | 1/2/2007 | Misc. Government | 6 | 3 | |
| 255 | 125.53 | 1/1/2007 | 1/2/2007 | Retail - Non-Food | 1 | 0 | |
| 256 | 199.99 | 9/28/2007 | 10/1/2007 | Financial Institution | 3 | 1 | |
| 257 | 42.90 | 12/23/2006 | 1/2/2007 | Retail - Non-Food | 10 | 4 | |
| 257 | 850.00 | 12/30/2006 | 1/2/2007 | Self | 3 | 0 | |
| 258 | 300.00 | 2/2/2007 | 2/5/2007 | Check Cashing Service | 3 | 1 | |
| 259 | 40.00 | 5/13/2007 | 5/29/2007 | Education | 16 | 10 | |
| 260 | 1,200.00 | 6/3/2007 | 5/29/2007 | Financial Institution | (5) | (5) | |
| 260 | 230.00 | 5/13/2008 | 6/9/2008 | Charity | 27 | 18 | |
| 260 | 50.00 | 6/3/2008 | 6/9/2008 | Retail - Non-Food | 6 | 4 | |
| 261 | 300.00 | 1/8/2007 | 1/16/2007 | Education | 8 | 5 | |
| 261 | 350.00 | 6/4/2008 | 6/9/2008 | Housing | 5 | 3 | |
| 262 | 204.95 | 12/28/2006 | 1/2/2007 | Retail - Non-Food | 5 | 2 | |
| 262 | 127.70 | 12/29/2006 | 1/2/2007 | Retail - Food | 4 | 1 | |
| 263 | 325.00 | 12/20/2006 | 1/2/2007 | Financial Institution | 13 | 7 | |
| 264 | 125.00 | 5/7/2007 | 5/17/2007 | Medical | 10 | 8 | |
| 265 | 40.00 | 5/21/2007 | 5/29/2007 | Unknown | 8 | 5 | |
| 266 | 100.00 | 5/24/2007 | 5/29/2007 | Individual | 5 | 2 | |
| 267 | 150.00 | 5/30/2008 | 6/9/2008 | Individual | 10 | 6 | |
| 267 | 400.00 | 6/5/2008 | 6/9/2008 | Individual | 4 | 2 | |
| 268 | 165.00 | 4/7/2007 | 5/29/2007 | Services | 52 | 35 | X |
| 269 | 800.00 | 6/5/2008 | 6/9/2008 | Individual | 4 | 2 | |
| 270 | 225.00 | 7/17/2007 | 7/23/2007 | Financial Institution | 6 | 4 | |
| 270 | 25.09 | 7/18/2007 | 7/23/2007 | Retail - Non-Food | 5 | 3 | |
| 270 | 34.36 | 7/18/2007 | 7/23/2007 | Restaurants | 5 | 3 | |
| 270 | 104.73 | 7/18/2007 | 7/23/2007 | Retail - Non-Food | 5 | 3 | |
| 271 | 1,350.00 | 4/8/2008 | 5/1/2008 | Housing | 23 | 17 | |
| 272 | 383.39 | 4/29/2008 | 5/1/2008 | Other | 2 | 2 | |
| 273 | 119.22 | 2/1/2007 | 2/5/2007 | Insurance | 4 | 2 | |
| 273 | 120.00 | 7/13/2007 | 7/23/2007 | Medical | 10 | 6 | |
| 274 | 83.00 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 274 | 141.21 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 275 | 347.80 | 1/30/2007 | 2/5/2007 | Insurance | 6 | 4 | |
| 275 | 699.39 | 1/30/2007 | 2/5/2007 | Financial Institution | 6 | 4 | |
| 275 | 400.00 | 2/1/2007 | 2/5/2007 | Housing | 4 | 2 | |
| 276 | 250.00 | 5/20/2007 | 5/29/2007 | Individual | 9 | 5 | |
| 276 | 137.00 | 6/9/2008 | 6/9/2008 | Financial Institution | 0 | 0 | |
| 277 | 10.00 | 12/20/2006 | 1/2/2007 | Other | 13 | 7 | |
| 277 | 59.63 | 12/21/2006 | 1/16/2007 | Restaurants | 26 | 15 | |
| 277 | 100.00 | 1/8/2007 | 1/16/2007 | Unknown | 8 | 5 | |
| 277 | 100.00 | 1/26/2007 | 1/16/2007 | Unknown | (10) | (10) | |
| 278 | 200.00 | 12/30/2006 | 1/2/2007 | Utilities | 3 | 0 | |
| 278 | 1,400.00 | 1/2/2007 | 1/2/2007 | Self | 0 | 0 | |
| 279 | 120.00 | 4/24/2008 | 5/1/2008 | Individual | 7 | 5 | |
| 279 | 95.00 | 4/28/2008 | 5/1/2008 | Individual | 3 | 3 | |
| 279 | 476.00 | 6/2/2008 | 6/9/2008 | Medical | 7 | 5 | |
| 280 | 332.60 | 12/30/2006 | 1/2/2007 | Other | 3 | 0 | |
| 281 | 115.00 | 1/1/2007 | 1/2/2007 | Check Cashing Service | 1 | 0 | |
| 282 | 500.00 | 9/30/2007 | 10/1/2007 | Individual | 1 | 0 | |
| 283 | 40.52 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 284 | 150.00 | 5/25/2007 | 5/29/2007 | Individual | 4 | 1 | |
| 285 | 70.00 | 1/11/2007 | 1/16/2007 | Individual | 5 | 2 | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | ---------(Number of Days)--------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 286 | 210.00 | 1/2/2007 | 1/16/2007 | Medical | 14 | 9 | |
| 286 | 350.00 | 1/12/2007 | 1/16/2007 | Medical | 4 | 1 | |
| 287 | 22.00 | 9/17/2007 | 10/1/2007 | Other | 14 | 10 | |
| 288 | 267.59 | 1/8/2007 | 1/16/2007 | Insurance | 8 | 5 | |
| 289 | 125.00 | 7/21/2007 | 7/23/2007 | Financial Institution | 2 | 0 | |
| 290 | 463.83 | 7/15/2007 | 7/23/2007 | Utilities | 8 | 5 | |
| 291 | 55.00 | 5/31/2008 | 6/9/2008 | Individual | 9 | 5 | |
| 291 | 41.00 | 6/1/2008 | 6/9/2008 | Individual | 8 | 5 | |
| 292 | 62.00 | 1/9/2007 | 1/16/2007 | Financial Institution | 7 | 4 | |
| 293 | 165.46 | 1/12/2007 | 1/16/2007 | Retail - Non-Food | 4 | 1 | |
| 294 | 37.43 | 5/15/2007 | 5/17/2007 | Retail - Non-Food | 2 | 2 | |
| 294 | 151.09 | 5/25/2007 | 5/29/2007 | Retail - Non-Food | 4 | 1 | |
| 295 | 100.00 | 9/26/2007 | 10/1/2007 | Retail - Non-Food | 5 | 3 | |
| 296 | 35.85 | 2/28/2008 | 5/1/2008 | Retail - Non-Food | 63 | 45 | |
| 296 | 38.65 | 2/28/2008 | 5/1/2008 | Retail - Non-Food | 63 | 45 | |
| 296 | 200.00 | 2/28/2008 | 5/1/2008 | Retail - Non-Food | 63 | 45 | |
| 296 | 50.00 | 4/28/2008 | 5/1/2008 | Individual | 3 | 3 | |
| 297 | 355.00 | 6/5/2008 | 6/9/2008 | Individual | 4 | 2 | |
| 298 | 155.00 | 6/6/2008 | 6/9/2008 | Individual | 3 | 1 | |
| 299 | 1,149.54 | 6/3/2008 | 6/9/2008 | Unknown | 6 | 4 | |
| 299 | 118.84 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 299 | 161.05 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 299 | 90.00 | 6/7/2008 | 6/9/2008 | Self | 2 | 0 | |
| 299 | 90.00 | 6/9/2008 | 6/9/2008 | Self | 0 | 0 | |
| 300 | 25.00 | 1/20/2007 | 2/5/2007 | Medical | 16 | 10 | |
| 300 | 900.00 | 2/1/2007 | 2/5/2007 | Individual | 4 | 2 | |
| 301 | 15.96 | 1/10/2007 | 1/16/2007 | Retail - Non-Food | 6 | 3 | |
| 302 | 300.00 | 1/2/2007 | 1/16/2007 | Check Cashing Service | 14 | 9 | |
| 302 | 15.00 | 1/9/2007 | 1/16/2007 | Medical | 7 | 4 | |
| 302 | 1,140.00 | 1/12/2007 | 1/16/2007 | Individual | 4 | 1 | |
| 303 | 70.00 | 5/11/2007 | 5/17/2007 | Housing | 6 | 4 | |
| 303 | 100.00 | 5/11/2007 | 5/17/2007 | Housing | 6 | 4 | |
| 303 | 1,200.00 | 5/11/2007 | 5/17/2007 | Housing | 6 | 4 | |
| 303 | 1,600.00 | 5/11/2007 | 5/17/2007 | Housing | 6 | 4 | |
| 304 | 174.98 | 5/24/2007 | 5/29/2007 | Other | 5 | 2 | |
| 305 | 34.00 | 4/29/2008 | 5/1/2008 | Utilities | 2 | 2 | |
| 305 | 201.46 | 5/21/2008 | 5/22/2008 | Retail - Food | 1 | 1 | |
| 306 | 200.00 | 12/20/2006 | 1/2/2007 | Individual | 13 | 7 | |
| 306 | 350.00 | 12/20/2006 | 1/2/2007 | Housing | 13 | 7 | |
| 306 | 58.00 | 12/27/2006 | 1/2/2007 | Other | 6 | 3 | |
| 307 | 155.27 | 4/29/2008 | 5/1/2008 | Utilities | 2 | 2 | |
| 307 | 358.00 | 4/30/2008 | 5/1/2008 | Utilities | 1 | 1 | |
| 308 | 79.00 | 7/20/2007 | 7/23/2007 | Financial Institution | 3 | 1 | |
| 309 | 59.92 | 1/2/2007 | 1/16/2007 | Individual | 14 | 9 | |
| 309 | 2,403.08 | 1/11/2007 | 1/16/2007 | Housing | 5 | 2 | |
| 310 | 20.00 | 6/2/2008 | 6/9/2008 | Misc. Government | 7 | 5 | |
| 311 | 300.00 | 7/23/2007 | 7/23/2007 | Check Cashing Service | 0 | 0 | |
| 312 | 316.11 | 1/4/2007 | 1/16/2007 | Other | 12 | 7 | |
| 313 | 210.00 | 7/20/2007 | 7/23/2007 | Individual | 3 | 1 | |
| 314 | 420.00 | 7/20/2007 | 7/23/2007 | Services | 3 | 1 | |
| 314 | 738.35 | 6/3/2008 | 6/9/2008 | Housing | 6 | 4 | |
| 315 | 60.00 | 12/28/2006 | 1/2/2007 | Retail - Food | 5 | 2 | |
| 315 | 134.95 | 12/28/2006 | 1/2/2007 | Retail - Food | 5 | 2 | |
| 315 | 800.00 | 12/30/2006 | 1/2/2007 | Self | 3 | 0 | |
| 316 | 100.00 | 12/31/2006 | 1/16/2007 | Individual | 16 | 9 | |
| 316 | 50.00 | 1/9/2007 | 1/16/2007 | Retail - Non-Food | 7 | 4 | |
| 316 | 50.00 | 1/12/2007 | 1/16/2007 | Other | 4 | 1 | |
| 316 | 100.00 | 1/12/2007 | 1/16/2007 | Retail - Food | 4 | 1 | |
| 316 | 300.00 | 2/1/2007 | 2/5/2007 | Financial Institution | 4 | 2 | |
| 316 | 1,295.00 | 2/1/2007 | 2/5/2007 | Housing | 4 | 2 | |
| 317 | 30.00 | 12/26/2006 | 1/2/2007 | Medical | 7 | 4 | |
| 318 | 200.00 | 5/29/2007 | 5/29/2007 | Financial Institution | 0 | 0 | |
| 319 | 26.91 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 320 | 400.00 | 1/19/2007 | 1/16/2007 | Housing | (3) | (5) | |
| 321 | 76.16 | 7/19/2007 | 7/23/2007 | Retail - Food | 4 | 2 | |

| Account ID[1] | Transaction Amount | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | -(U.S. Dollars)- | | | | ---------(Number of Days)-------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 322 | 50.00 | 5/15/2007 | 5/17/2007 | Retail - Non-Food | 2 | 2 | |
| 322 | 27.47 | 5/21/2007 | 5/29/2007 | Retail - Non-Food | 8 | 5 | |
| 322 | 341.90 | 5/21/2007 | 5/29/2007 | Insurance | 8 | 5 | |
| 322 | 476.36 | 5/21/2007 | 5/29/2007 | Insurance | 8 | 5 | |
| 322 | 1,800.00 | 5/25/2007 | 5/29/2007 | Financial Institution | 4 | 1 | |
| 323 | 33.00 | 12/29/2006 | 1/2/2007 | Financial Institution | 4 | 1 | |
| 324 | 400.00 | 6/1/2008 | 6/9/2008 | Housing | 8 | 5 | |
| 325 | 25.00 | 7/20/2007 | 7/23/2007 | Services | 3 | 1 | |
| 326 | 300.00 | 1/25/2007 | 2/5/2007 | Check Cashing Service | 11 | 7 | |
| 327 | 20.00 | 4/24/2008 | 5/1/2008 | Medical | 7 | 5 | |
| 328 | 70.19 | 4/29/2008 | 5/1/2008 | Utilities | 2 | 2 | |
| 329 | 443.20 | 1/5/2007 | 1/2/2007 | Housing | (3) | (5) | |
| 330 | 405.65 | 12/27/2006 | 1/2/2007 | Utilities | 6 | 3 | |
| 331 | 197.47 | 12/29/2006 | 1/2/2007 | Other | 4 | 1 | |
| 332 | 70.00 | 5/1/2008 | 5/22/2008 | Misc. Government | 21 | 15 | |
| 333 | 225.00 | 5/7/2007 | 5/29/2007 | Individual | 22 | 15 | |
| 333 | 101.00 | 5/23/2007 | 5/29/2007 | Utilities | 6 | 3 | |
| 333 | 156.35 | 4/28/2008 | 5/1/2008 | Retail - Food | 3 | 3 | |
| 334 | 12.83 | 12/30/2006 | 1/2/2007 | Retail - Food | 3 | 0 | |
| 334 | 350.00 | 1/1/2007 | 1/2/2007 | Education | 1 | 0 | |
| 334 | 818.00 | 1/1/2007 | 1/2/2007 | Services | 1 | 0 | |
| 334 | 106.22 | 5/19/2008 | 5/22/2008 | Housing | 3 | 3 | |
| 335 | 300.00 | 9/28/2007 | 10/1/2007 | Check Cashing Service | 3 | 1 | |
| 335 | 208.94 | 10/1/2007 | 10/1/2007 | Utilities | 0 | 0 | |
| 336 | 165.00 | 5/24/2007 | 5/29/2007 | Unknown | 5 | 2 | |
| 337 | 37.84 | 5/26/2007 | 5/29/2007 | Retail - Non-Food | 3 | 0 | |
| 338 | 128.39 | 9/19/2007 | 10/1/2007 | Misc. Government | 12 | 8 | |
| 339 | 121.00 | 7/12/2007 | 7/23/2007 | Financial Institution | 11 | 7 | |
| 340 | 60.00 | 12/28/2006 | 1/2/2007 | Utilities | 5 | 2 | |
| 341 | 1,500.00 | 7/18/2007 | 7/23/2007 | Other | 5 | 3 | |
| 342 | 81.09 | 12/28/2006 | 1/2/2007 | Utilities | 5 | 2 | |
| 343 | 328.00 | 1/2/2007 | 1/16/2007 | Utilities | 14 | 9 | |
| 343 | 7.00 | 2/4/2007 | 2/5/2007 | Charity | 1 | 0 | |
| 343 | 132.00 | 2/4/2007 | 2/5/2007 | Charity | 1 | 0 | |
| 343 | 970.00 | 2/4/2007 | 2/5/2007 | Self | 1 | 0 | |
| 344 | 97.41 | 5/25/2007 | 5/29/2007 | Unknown | 4 | 1 | |
| 345 | 12.00 | 7/17/2007 | 7/23/2007 | Other | 6 | 4 | |
| 345 | 25.00 | 7/18/2007 | 7/23/2007 | Other | 5 | 3 | |
| 346 | 125.00 | 4/23/2008 | 5/1/2008 | Other | 8 | 6 | |
| 346 | 67.00 | 4/29/2008 | 5/1/2008 | Utilities | 2 | 2 | |
| 347 | 1,150.00 | 6/5/2008 | 6/9/2008 | Housing | 4 | 2 | |
| 348 | 38.00 | 5/26/2007 | 5/29/2007 | Self | 3 | 0 | |
| 349 | 663.00 | 9/15/2007 | 10/1/2007 | Financial Institution | 16 | 10 | |
| 349 | 40.00 | 9/28/2007 | 10/1/2007 | Other | 3 | 1 | |
| 349 | 900.00 | | 10/1/2007 | Financial Institution | | | |
| 350 | 375.00 | 12/16/2006 | 1/16/2007 | Individual | 31 | 18 | |
| 351 | 120.00 | 1/31/2007 | 2/5/2007 | Services | 5 | 3 | |
| 352 | 50.00 | 6/27/2007 | 7/23/2007 | Misc. Government | 26 | 17 | |
| 352 | 1,000.00 | 7/22/2007 | 7/23/2007 | Self | 1 | 0 | |
| 353 | 700.00 | 7/21/2007 | 7/23/2007 | Other | 2 | 0 | |
| 354 | 43.29 | 9/20/2007 | 10/1/2007 | Retail - Non-Food | 11 | 7 | |
| 354 | 1,270.00 | 6/5/2008 | 6/9/2008 | Housing | 4 | 2 | |
| 355 | 550.00 | 1/13/2007 | 1/16/2007 | Financial Institution | 3 | 0 | |
| 356 | 16.39 | 1/5/2007 | 1/16/2007 | Utilities | 11 | 6 | |
| 356 | 115.00 | 1/9/2007 | 1/16/2007 | Utilities | 7 | 4 | |
| 357 | 154.98 | 4/30/2008 | 5/1/2008 | Retail - Food | 1 | 1 | |
| 358 | 68.49 | 9/25/2007 | 10/1/2007 | Utilities | 6 | 4 | |
| 358 | 5.00 | 9/28/2007 | 10/1/2007 | Financial Institution | 3 | 1 | |
| 358 | 100.00 | 9/28/2007 | 10/1/2007 | Financial Institution | 3 | 1 | |
| 359 | 20.00 | 7/25/2007 | 7/23/2007 | Education | (2) | (4) | |
| 360 | 25.00 | 7/20/2007 | 7/23/2007 | Other | 3 | 1 | |
| 361 | 47.59 | 5/25/2007 | 5/29/2007 | Retail - Non-Food | 4 | 1 | |
| 361 | 20.52 | 5/28/2007 | 5/29/2007 | Retail - Non-Food | 1 | 0 | |
| 362 | 500.00 | 9/24/2007 | 10/1/2007 | Individual | 7 | 5 | |
| 363 | 1,754.39 | 6/2/2008 | 6/9/2008 | Individual | 7 | 5 | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | ---------(Number of Days)-------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 364 | 27.13 | 7/15/2007 | 7/23/2007 | Misc. Government | 8 | 5 | |
| 364 | 62.39 | 7/15/2007 | 7/23/2007 | Utilities | 8 | 5 | |
| 364 | 1,000.00 | 7/21/2007 | 7/23/2007 | Retail - Non-Food | 2 | 0 | |
| 365 | 65.00 | 4/29/2008 | 5/1/2008 | Medical | 2 | 2 | |
| 366 | 150.00 | 9/27/2007 | 10/1/2007 | Individual | 4 | 2 | |
| 367 | 300.00 | 4/20/2008 | 5/22/2008 | Other | 32 | 23 | |
| 368 | 100.00 | 5/10/2008 | 5/22/2008 | Medical | 12 | 8 | |
| 369 | 50.00 | 5/24/2007 | 5/29/2007 | Financial Institution | 5 | 2 | |
| 370 | 43.94 | 5/28/2007 | 5/29/2007 | Retail - Food | 1 | 0 | |
| 371 | 556.00 | 4/9/2008 | 5/1/2008 | Financial Institution | 22 | 16 | |
| 372 | 250.00 | 5/13/2007 | 5/17/2007 | Housing | 4 | 3 | |
| 372 | 700.00 | 5/13/2007 | 5/17/2007 | Housing | 4 | 3 | |
| 373 | 46.50 | 1/1/2007 | 1/16/2007 | Unknown | 15 | 9 | X |
| 373 | 128.00 | 1/6/2007 | 1/16/2007 | Individual | 10 | 5 | X |
| 373 | 95.00 | 1/16/2007 | 1/16/2007 | Utilities | 0 | 0 | |
| 374 | 182.70 | 1/11/2007 | 1/16/2007 | Retail - Food | 5 | 2 | |
| 374 | 1,112.90 | 1/29/2007 | 2/5/2007 | Housing | 7 | 5 | |
| 374 | 10.00 | 5/23/2007 | 5/29/2007 | Individual | 6 | 3 | |
| 375 | 87.02 | 12/28/2006 | 1/2/2007 | Retail - Non-Food | 5 | 2 | |
| 376 | 50.70 | 12/28/2006 | 1/2/2007 | Utilities | 5 | 2 | |
| 376 | 900.00 | 1/2/2007 | 1/2/2007 | Individual | 0 | 0 | |
| 376 | 29.25 | 2/1/2007 | 2/5/2007 | Retail - Non-Food | 4 | 2 | |
| 377 | 100.00 | 1/25/2007 | 2/5/2007 | Individual | 11 | 7 | |
| 378 | 15.00 | 7/19/2007 | 7/23/2007 | Individual | 4 | 2 | |
| 379 | 485.38 | 5/16/2007 | 5/17/2007 | Financial Institution | 1 | 1 | |
| 379 | 1,207.16 | 5/16/2007 | 5/17/2007 | Financial Institution | 1 | 1 | |
| 380 | 90.51 | 12/30/2006 | 1/2/2007 | Retail - Food | 3 | 0 | |
| 381 | 1,446.74 | 9/24/2007 | 10/1/2007 | Self | 7 | 5 | |
| 382 | 80.00 | 5/28/2008 | 6/9/2008 | Misc. Government | 12 | 8 | |
| 383 | 33.42 | 1/13/2007 | 1/16/2007 | Retail - Food | 3 | 0 | |
| 384 | 67.00 | 9/28/2007 | 10/1/2007 | Misc. Government | 3 | 1 | |
| 385 | 88.56 | 4/16/2008 | 5/1/2008 | Insurance | 15 | 11 | |
| 386 | 150.00 | 1/7/2007 | 1/16/2007 | Charity | 9 | 5 | |
| 386 | 2,400.00 | 1/13/2007 | 1/16/2007 | Financial Institution | 3 | 0 | |
| 386 | 32.00 | 7/16/2007 | 7/23/2007 | Services | 7 | 5 | |
| 387 | 60.00 | 1/2/2007 | 1/16/2007 | Other | 14 | 9 | |
| 388 | 70.00 | 5/19/2008 | 5/22/2008 | Individual | 3 | 3 | |
| 389 | 14.97 | 7/16/2007 | 7/23/2007 | Services | 7 | 5 | |
| 389 | 4,836.24 | 7/16/2007 | 7/23/2007 | Housing | 7 | 5 | |
| 390 | 791.00 | 12/23/2006 | 1/2/2007 | Financial Institution | 10 | 4 | |
| 391 | 182.93 | 5/25/2007 | 5/29/2007 | Financial Institution | 4 | 1 | |
| 392 | 205.00 | 5/4/2007 | 5/29/2007 | Insurance | 25 | 16 | |
| 393 | 54.00 | 9/27/2007 | 10/1/2007 | Unknown | 4 | 2 | |
| 393 | 1,268.99 | 9/27/2007 | 10/1/2007 | Utilities | 4 | 2 | |
| 393 | 1,275.47 | 9/28/2007 | 10/1/2007 | Other | 3 | 1 | |
| 394 | 50.00 | 12/25/2006 | 1/2/2007 | Individual | 8 | 4 | |
| 395 | 1,762.49 | 7/19/2007 | 7/23/2007 | Financial Institution | 4 | 2 | |
| 396 | 600.00 | 12/28/2006 | 1/2/2007 | Individual | 5 | 2 | |
| 396 | 100.00 | 12/30/2006 | 1/2/2007 | Utilities | 3 | 0 | |
| 396 | 62.07 | 12/31/2006 | 1/2/2007 | Retail - Food | 2 | 0 | |
| 397 | 250.00 | 12/29/2006 | 1/2/2007 | Financial Institution | 4 | 1 | |
| 398 | 1,000.00 | 12/28/2006 | 1/2/2007 | Other | 5 | 2 | |
| 398 | 2,000.00 | 12/28/2006 | 1/2/2007 | Other | 5 | 2 | |
| 398 | 1,500.00 | 12/29/2006 | 1/2/2007 | Other | 4 | 1 | |
| 398 | 1,000.00 | 12/31/2006 | 1/2/2007 | Other | 2 | 0 | |
| 398 | 1,908.00 | 12/31/2006 | 1/2/2007 | Other | 2 | 0 | |
| 398 | 300.00 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 398 | 1,000.00 | 1/12/2007 | 1/16/2007 | Other | 4 | 1 | |
| 399 | 170.00 | | 1/2/2007 | Individual | | | X |
| 400 | 61.29 | 9/28/2007 | 10/1/2007 | Retail - Food | 3 | 1 | |
| 400 | 75.00 | 9/29/2007 | 10/1/2007 | Individual | 2 | 0 | |
| 401 | 70.00 | 1/12/2007 | 1/16/2007 | Individual | 4 | 1 | |
| 401 | 75.00 | 1/13/2007 | 1/16/2007 | Individual | 3 | 0 | |
| 402 | 250.00 | 12/29/2006 | 1/2/2007 | Individual | 4 | 1 | |
| 403 | 332.09 | 12/28/2006 | 1/2/2007 | Financial Institution | 5 | 2 | |

| Account ID[1] | Transaction Amount | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | -(U.S. Dollars)- | | | | --------(Number of Days)-------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 404 | 27.99 | 5/1/2008 | 5/1/2008 | Utilities | 0 | 0 | |
| 404 | 29.20 | 5/1/2008 | 5/1/2008 | Utilities | 0 | 0 | |
| 404 | 1,260.00 | 5/1/2008 | 5/1/2008 | Housing | 0 | 0 | |
| 405 | 575.30 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 405 | 1,377.00 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 406 | 500.00 | 1/30/2007 | 2/5/2007 | Self | 6 | 4 | |
| 406 | 1,000.00 | 9/25/2007 | 10/1/2007 | Self | 6 | 4 | |
| 406 | 180.00 | 5/26/2008 | 6/9/2008 | Other | 14 | 9 | |
| 407 | 1,950.00 | 12/22/2006 | 1/16/2007 | Housing | 25 | 14 | |
| 407 | 69.63 | 1/9/2007 | 1/16/2007 | Utilities | 7 | 4 | |
| 408 | 184.00 | 1/8/2007 | 1/16/2007 | Unknown | 8 | 5 | |
| 409 | 180.00 | 1/23/2007 | 2/5/2007 | Self | 13 | 9 | |
| 409 | 105.58 | 4/29/2008 | 5/1/2008 | Misc. Government | 2 | 2 | |
| 410 | 600.00 | 4/23/2008 | 5/1/2008 | Housing | 8 | 6 | |
| 410 | 1,400.00 | 4/29/2008 | 5/1/2008 | Housing | 2 | 2 | |
| 410 | 1,700.00 | 4/29/2008 | 5/1/2008 | Housing | 2 | 2 | |
| 411 | 100.00 | 12/18/2006 | 1/16/2007 | Charity | 29 | 18 | |
| 411 | 700.00 | 1/12/2007 | 1/16/2007 | Individual | 4 | 1 | |
| 412 | 500.00 | 5/23/2007 | 5/29/2007 | Housing | 6 | 3 | |
| 413 | 100.00 | 12/18/2006 | 1/2/2007 | Individual | 15 | 9 | X |
| 414 | 50.00 | 5/11/2007 | 5/17/2007 | Misc. Government | 6 | 4 | |
| 415 | 143.00 | 12/26/2006 | 1/2/2007 | Medical | 7 | 4 | |
| 415 | 175.96 | 12/26/2006 | 1/2/2007 | Utilities | 7 | 4 | |
| 415 | 210.10 | 12/26/2006 | 1/2/2007 | Utilities | 7 | 4 | |
| 415 | 638.92 | 12/26/2006 | 1/2/2007 | Financial Institution | 7 | 4 | |
| 415 | 1,583.00 | 12/27/2006 | 1/2/2007 | Utilities | 6 | 3 | |
| 415 | 1,500.00 | 12/30/2006 | 1/2/2007 | Individual | 3 | 0 | |
| 415 | 3,000.00 | 1/1/2007 | 1/2/2007 | Individual | 1 | 0 | |
| 416 | 200.00 | 4/12/2008 | 5/1/2008 | Services | 19 | 13 | |
| 417 | 63.00 | 1/10/2007 | 1/16/2007 | Utilities | 6 | 3 | |
| 417 | 1,200.00 | 1/10/2007 | 1/16/2007 | Housing | 6 | 3 | |
| 418 | 3,000.00 | 5/22/2008 | 5/22/2008 | Individual | 0 | 0 | |
| 419 | 52.70 | 12/31/2006 | 1/2/2007 | Retail - Food | 2 | 0 | |
| 420 | 98.00 | 9/29/2007 | 10/1/2007 | Financial Institution | 2 | 0 | |
| 421 | 500.00 | 9/22/2007 | 10/1/2007 | Individual | 9 | 5 | |
| 422 | 32.90 | 1/21/2007 | 2/5/2007 | Insurance | 15 | 10 | |
| 423 | 70.00 | 5/9/2007 | 5/17/2007 | Medical | 8 | 6 | |
| 424 | 107.94 | 9/25/2007 | 10/1/2007 | Misc. Government | 6 | 4 | |
| 424 | 400.00 | 9/30/2007 | 10/1/2007 | Self | 1 | 0 | |
| 425 | 35.92 | 9/22/2007 | 10/1/2007 | Retail - Non-Food | 9 | 5 | |
| 425 | 20.00 | 9/28/2007 | 10/1/2007 | Individual | 3 | 1 | |
| 425 | 25.00 | 9/30/2007 | 10/1/2007 | Individual | 1 | 0 | |
| 426 | 916.00 | 6/4/2008 | 6/9/2008 | Housing | 5 | 3 | |
| 427 | 731.70 | 12/21/2006 | 1/2/2007 | Financial Institution | 12 | 6 | |
| 427 | 125.00 | 6/29/2007 | 7/23/2007 | Other | 24 | 15 | |
| 427 | 25.00 | 7/19/2007 | 7/23/2007 | Services | 4 | 2 | |
| 427 | 117.71 | 7/21/2007 | 7/23/2007 | Retail - Food | 2 | 0 | |
| 428 | 300.00 | 5/25/2007 | 5/29/2007 | Utilities | 4 | 1 | |
| 428 | 245.00 | 10/1/2007 | 10/1/2007 | Utilities | 0 | 0 | |
| 429 | 60.00 | 4/27/2008 | 5/22/2008 | Individual | 25 | 18 | |
| 430 | 475.40 | 6/6/2008 | 6/9/2008 | Utilities | 3 | 1 | |
| 431 | 100.00 | 5/24/2007 | 5/29/2007 | Misc. Government | 5 | 2 | |
| 432 | 350.00 | 12/29/2006 | 1/2/2007 | Self | 4 | 1 | |
| 433 | 300.00 | 6/5/2008 | 6/9/2008 | Individual | 4 | 2 | |
| 433 | 3,008.06 | 6/9/2008 | 6/9/2008 | Housing | 0 | 0 | |
| 433 | 3,494.26 | 6/9/2008 | 6/9/2008 | Financial Institution | 0 | 0 | |
| 434 | 45.05 | 5/24/2007 | 5/29/2007 | Individual | 5 | 2 | |
| 435 | 31.00 | 7/19/2007 | 7/23/2007 | Services | 4 | 2 | |
| 436 | 100.00 | 9/27/2007 | 10/1/2007 | Individual | 4 | 2 | |
| 437 | 600.00 | 6/10/2008 | 6/9/2008 | Housing | (1) | (3) | |
| 438 | 620.00 | 5/3/2008 | 6/9/2008 | Financial Institution | 37 | 24 | |
| 439 | 600.00 | 5/24/2007 | 5/29/2007 | Individual | 5 | 2 | |
| 440 | 120.00 | 9/26/2007 | 10/1/2007 | Retail - Non-Food | 5 | 3 | |
| 441 | 111.08 | 7/19/2007 | 7/23/2007 | Services | 4 | 2 | |
| 441 | 119.58 | 7/19/2007 | 7/23/2007 | Misc. Government | 4 | 2 | |

| Account ID[1] | Transaction Amount -(U.S. Dollars)- | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | | | | | ----------(Number of Days)-------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 441 | 158.76 | 7/19/2007 | 7/23/2007 | Utilities | 4 | 2 | |
| 441 | 168.05 | 7/19/2007 | 7/23/2007 | Retail - Non-Food | 4 | 2 | |
| 441 | 937.07 | 7/19/2007 | 7/23/2007 | Retail - Non-Food | 4 | 2 | |
| 442 | 500.00 | 5/20/2008 | 5/22/2008 | Financial Institution | 2 | 2 | |
| 443 | 63.63 | 1/16/2007 | 1/16/2007 | Financial Institution | 0 | 0 | |
| 444 | 439.61 | 2/3/2007 | 2/5/2007 | Housing | 2 | 0 | |
| 445 | 3,906.00 | 6/5/2008 | 6/9/2008 | Education | 4 | 2 | |
| 446 | 53.47 | 6/9/2008 | 6/9/2008 | Retail - Food | 0 | 0 | |
| 447 | 600.00 | 9/28/2007 | 10/1/2007 | Individual | 3 | 1 | |
| 448 | 126.75 | 7/16/2007 | 7/23/2007 | Insurance | 7 | 5 | |
| 449 | 565.00 | 5/1/2008 | 5/1/2008 | Individual | 0 | 0 | |
| 450 | 1,261.34 | 7/23/2007 | 7/23/2007 | Housing | 0 | 0 | |
| 451 | 30.00 | 12/29/2006 | 1/2/2007 | Unknown | 4 | 1 | |
| 451 | 35.00 | 1/9/2007 | 1/16/2007 | Medical | 7 | 4 | |
| 452 | 250.00 | 5/13/2008 | 5/22/2008 | Individual | 9 | 7 | |
| 453 | 299.00 | 12/29/2006 | 1/2/2007 | Unknown | 4 | 1 | |
| 453 | 29.53 | 7/22/2007 | 7/23/2007 | Retail - Non-Food | 1 | 0 | |
| 454 | 75.00 | 5/15/2007 | 5/29/2007 | Services | 14 | 9 | |
| 454 | 33.97 | 5/17/2007 | 5/29/2007 | Unknown | 12 | 7 | |
| 455 | 200.00 | 9/26/2007 | 10/1/2007 | Individual | 5 | 3 | |
| 456 | 100.00 | 12/26/2006 | 1/2/2007 | Retail - Non-Food | 7 | 4 | |
| 457 | 225.00 | 12/9/2006 | 1/2/2007 | Check Cashing Service | 24 | 14 | |
| 457 | 50.00 | 12/28/2006 | 1/2/2007 | Financial Institution | 5 | 2 | |
| 458 | 25.00 | 4/28/2008 | 5/1/2008 | Medical | 3 | 3 | |
| 458 | 30.00 | 4/28/2008 | 5/1/2008 | Retail - Non-Food | 3 | 3 | |
| 458 | 45.00 | 4/29/2008 | 5/1/2008 | Individual | 2 | 2 | |
| 459 | 148.71 | 4/30/2008 | 5/1/2008 | Utilities | 1 | 1 | |
| 459 | 500.00 | 5/1/2008 | 5/1/2008 | Self | 0 | 0 | |
| 460 | 1,072.35 | 5/19/2007 | 5/17/2007 | Retail - Non-Food | (2) | (3) | |
| 461 | 422.00 | 1/2/2007 | 2/5/2007 | Financial Institution | 34 | 23 | |
| 461 | 100.00 | 1/22/2007 | 2/5/2007 | Utilities | 14 | 10 | |
| 462 | 345.00 | 2/2/2007 | 2/5/2007 | Financial Institution | 3 | 1 | |
| 462 | 102.20 | 10/1/2007 | 10/1/2007 | Utilities | 0 | 0 | |
| 463 | 148.83 | 5/9/2008 | 5/22/2008 | Unknown | 13 | 9 | |
| 464 | 490.00 | 1/12/2007 | 1/16/2007 | Financial Institution | 4 | 1 | |
| 464 | 242.00 | 1/31/2007 | 2/5/2007 | Financial Institution | 5 | 3 | |
| 464 | 480.00 | 5/11/2007 | 5/17/2007 | Other | 6 | 4 | |
| 464 | 1,580.07 | 5/16/2007 | 5/17/2007 | Housing | 1 | 1 | |
| 464 | 25.00 | 7/20/2007 | 7/23/2007 | Other | 3 | 1 | |
| 465 | 10.00 | 2/1/2007 | 2/5/2007 | Services | 4 | 2 | |
| 465 | 26.18 | 2/1/2007 | 2/5/2007 | Utilities | 4 | 2 | |
| 465 | 75.00 | 2/1/2007 | 2/5/2007 | Misc. Government | 4 | 2 | |
| 466 | 63.60 | 7/13/2007 | 7/23/2007 | Utilities | 10 | 6 | |
| 467 | 39.42 | 1/11/2007 | 1/16/2007 | Retail - Non-Food | 5 | 2 | |
| 468 | 200.00 | 1/30/2007 | 2/5/2007 | Utilities | 6 | 4 | |
| 469 | 100.00 | 5/8/2007 | 5/29/2007 | Services | 21 | 14 | |
| 469 | 100.00 | 5/21/2007 | 5/29/2007 | Services | 8 | 5 | |
| 470 | 47.00 | 5/21/2007 | 5/29/2007 | Services | 8 | 5 | |
| 470 | 450.00 | 6/5/2008 | 6/9/2008 | Individual | 4 | 2 | |
| 471 | 300.00 | 7/19/2007 | 7/23/2007 | Individual | 4 | 2 | |
| 472 | 250.00 | 1/3/2007 | 1/16/2007 | Insurance | 13 | 8 | |
| 472 | 100.00 | 1/10/2007 | 1/16/2007 | Financial Institution | 6 | 3 | |
| 472 | 56.74 | 1/12/2007 | 1/16/2007 | Retail - Non-Food | 4 | 1 | |
| 473 | 559.43 | 9/29/2007 | 10/1/2007 | Financial Institution | 2 | 0 | |
| 474 | 16.52 | 1/1/2007 | 1/16/2007 | Utilities | 15 | 9 | |
| 475 | 350.00 | 1/12/2007 | 1/16/2007 | Unknown | 4 | 1 | |
| 476 | 160.70 | 4/30/2008 | 5/1/2008 | Retail - Non-Food | 1 | 1 | |
| 477 | 945.00 | 5/18/2007 | 5/29/2007 | Housing | 11 | 6 | |
| 477 | 895.00 | 9/21/2007 | 10/1/2007 | Housing | 10 | 6 | |
| 478 | 300.00 | 12/15/2006 | 1/2/2007 | Check Cashing Service | 18 | 10 | |
| 479 | 85.40 | 9/26/2007 | 10/1/2007 | Retail - Unknown | 5 | 3 | |
| 480 | 10.00 | 9/26/2007 | 10/1/2007 | Unknown | 5 | 3 | |
| 481 | 74.00 | 5/9/2008 | 5/22/2008 | Medical | 13 | 9 | |
| 481 | 100.00 | 5/12/2008 | 5/22/2008 | Other | 10 | 8 | |
| 482 | 120.00 | 1/9/2007 | 1/16/2007 | Individual | 7 | 4 | |

| Account ID[1] | Transaction Amount | Written Date[2] | Posted Date | Category | Calendar Days Difference | Business Days Difference[4] | Non-Sufficient Funds |
|---|---|---|---|---|---|---|---|
| | -(U.S. Dollars)- | | | | ---------(Number of Days)--------- | | |
| (1) | (2) | (3) | (4) | (5) | (6) (4)-(3) | (7) (4)-(3) | (8) |
| 483 | 20.00 | 4/9/2008 | 5/1/2008 | Unknown | 22 | 16 | |
| 483 | 300.00 | 4/16/2008 | 5/1/2008 | Check Cashing Service | 15 | 11 | |
| 483 | 14.00 | 4/24/2008 | 5/1/2008 | Other | 7 | 5 | |
| 483 | 299.99 | 5/1/2008 | 5/1/2008 | Check Cashing Service | 0 | 0 | |
| 483 | 600.00 | 5/1/2008 | 5/1/2008 | Self | 0 | 0 | |
| 484 | 700.00 | 1/1/2007 | 1/2/2007 | Housing | 1 | 0 | |
| 485 | 93.00 | 7/9/2007 | 7/23/2007 | Misc. Government | 14 | 10 | |
| 486 | 770.00 | 9/25/2007 | 10/1/2007 | Charity | 6 | 4 | |
| 486 | 100.00 | 9/29/2007 | 10/1/2007 | Charity | 2 | 0 | |
| 487 | 15.00 | 4/28/2008 | 5/1/2008 | Education | 3 | 3 | |
| 487 | 140.00 | 4/28/2008 | 5/1/2008 | Education | 3 | 3 | |
| 488 | 192.50 | 5/21/2008 | 6/9/2008 | Medical | 19 | 12 | |
| 489 | 100.00 | 4/30/2008 | 5/1/2008 | Unknown | 1 | 1 | |
| 490 | 450.00 | 4/3/2008 | 6/9/2008 | Charity | 67 | 46 | |
| 491 | 2,000.00 | 1/31/2007 | 2/5/2007 | Housing | 5 | 3 | |
| 492 | 36.00 | 4/22/2008 | 5/1/2008 | Utilities | 9 | 7 | |
| 492 | 105.91 | 4/24/2008 | 5/1/2008 | Other | 7 | 5 | |
| 492 | 80.00 | 4/25/2008 | 5/1/2008 | Medical | 6 | 4 | |
| 492 | 47.64 | 6/3/2008 | 6/9/2008 | Utilities | 6 | 4 | |
| 493 | 600.00 | 6/5/2008 | 6/9/2008 | Housing | 4 | 2 | |
| 493 | 500.00 | 6/18/2008 | 6/9/2008 | Housing | (9) | (9) | |
| 494 | 50.00 | 1/10/2007 | 1/16/2007 | Financial Institution | 6 | 3 | |
| 494 | 370.00 | 1/10/2007 | 1/16/2007 | Financial Institution | 6 | 3 | |
| 495 | 72.63 | 5/12/2007 | 5/17/2007 | Medical | 5 | 3 | |
| 495 | 120.00 | 5/12/2007 | 5/17/2007 | Utilities | 5 | 3 | |
| 496 | 51.00 | 12/22/2006 | 1/2/2007 | Unknown | 11 | 5 | |
| 496 | 375.00 | 12/29/2006 | 1/2/2007 | Individual | 4 | 1 | |
| 496 | 15.00 | 5/23/2007 | 5/29/2007 | Medical | 6 | 3 | |
| 496 | 25.00 | 5/23/2007 | 5/29/2007 | Other | 6 | 3 | |
| 496 | 50.00 | 5/24/2007 | 5/29/2007 | Individual | 5 | 2 | |
| 496 | 364.18 | 5/24/2007 | 5/29/2007 | Retail - Food | 5 | 2 | |
| 497 | 25.00 | 1/11/2007 | 1/16/2007 | Individual | 5 | 2 | |
| 498 | 160.00 | 6/1/2008 | 6/9/2008 | Charity | 8 | 5 | |
| 498 | 24.00 | 6/2/2008 | 6/9/2008 | Restaurants | 7 | 5 | |
| 499 | 145.14 | 1/11/2007 | 1/16/2007 | Retail - Food | 5 | 2 | |
| 499 | 60.00 | 1/12/2007 | 1/16/2007 | Other | 4 | 1 | |
| 500 | 350.00 | 5/18/2007 | 5/29/2007 | Individual | 11 | 6 | |
| 500 | 600.00 | 5/22/2007 | 5/29/2007 | Individual | 7 | 4 | |

**Source:** Wells Fargo.

**Notes:**

[1] Each unique account identifier denotes a different account in the sample.

[2] Missing entries indicate illegible or missing dates. Eight checks had a wrong year in the written date (for example, checks referenced 2006 in the beginning of 2007). Written dates for these checks have been corrected to reflect to correct years. Four checks had no written date, and three checks only included month and year in the written date.

[3] These numbers are calculated using the Excel Function Networkdays(x,y,x) minus 1 where x is the date the check is written, y the date it posted and z is the information on holidays. Holidays used are U.S. Federal holidays, available at http://www.opm.gov/Operating_Status_Schedules /fedhol/2006.asp.

# Appendix C.2
# Number of Accounts by the Number of
# Post Dates with Multiple Overdraft Charges

### Accounts opened before November 15, 2004

| Number of Post Dates With Multiple Overdraft Charges | Number of Accounts | Percentage of All Accounts | |
|---|---|---|---|
| (1) | (2) | (3) | |
| 1 Post Date | 365,254 | 30.56 | % |
| 2 Post Dates | 193,698 | 16.21 | |
| 3 Post Dates | 124,229 | 10.39 | |
| 4 Post Dates | 87,244 | 7.30 | |
| 5 Post Dates | 65,112 | 5.45 | |
| 6 Post Dates | 50,464 | 4.22 | |
| 7 Post Dates | 40,549 | 3.39 | |
| 8 Post Dates | 32,746 | 2.74 | |
| 9 Post Dates | 27,353 | 2.29 | |
| 10 Post Dates | 23,110 | 1.93 | |
| >10 Post Dates | 185,497 | 15.52 | |
| **Total:** | **1,195,256** | **100.00** | **%** |

### Accounts Opened between
### November 15, 2004 and December 31, 2004

| Number of Post Dates With Multiple Overdraft Charges | Number of Accounts | Percentage of All Accounts | |
|---|---|---|---|
| (1) | (2) | (3) | |
| 1 Post Date | 11,168 | 33.42 | % |
| 2 Post Dates | 5,912 | 17.69 | |
| 3 Post Dates | 3,712 | 11.11 | |
| 4 Post Dates | 2,554 | 7.64 | |
| 5 Post Dates | 1,811 | 5.42 | |
| 6 Post Dates | 1,403 | 4.20 | |
| 7 Post Dates | 1,019 | 3.05 | |
| 8 Post Dates | 852 | 2.55 | |
| 9 Post Dates | 666 | 1.99 | |
| 10 Post Dates | 576 | 1.72 | |
| >10 Post Dates | 3,747 | 11.21 | |
| **Total:** | **33,420** | **100.00** | **%** |

**Source:** Wells Fargo.

Appendix C.3

**Transactions that Would Have Been Returned by Wells Fargo Under Mr. Olsen's Scenarios**

**Incremental Return Item Fees as a Percent of Original Overdraft Fees[2,4]**

| | 1/2/2007 | 1/16/2007 | 2/5/2007 | 5/17/2007 | 5/29/2007 | 7/23/2007 | 10/1/2007 | 5/1/2008 | 5/22/2008 | 6/9/2008 | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) (Σ(1) to (10))/10 |
| | | | | | | (Percent) | | | | | |
| Scenario 1 | 4.04 % | 3.85 % | 4.19 % | 4.22 % | 3.17 % | 3.05 % | 5.03 % | 6.03 % | 2.66 % | 2.80 % | 3.90 % |
| Scenario 2 | 3.40 | 3.28 | 4.07 | 4.12 | 2.98 | 2.92 | 4.53 | 5.48 | 2.51 | 2.61 | 3.59 |
| Scenario 3 | 3.29 | 3.14 | 3.92 | 4.04 | 2.85 | 2.82 | 4.44 | 5.46 | 2.45 | 2.53 | 3.49 |

**Incremental Return Items (no Fees) as a Percent of Original Overdraft Fees[2,3,4]**

| | 1/2/2007 | 1/16/2007 | 2/5/2007 | 5/17/2007 | 5/29/2007 | 7/23/2007 | 10/1/2007 | 5/1/2008 | 5/22/2008 | 6/9/2008 | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) (Σ(1) to (10))/10 |
| | | | | | | (Percent) | | | | | |
| Scenario 1 | 0.56 % | 0.42 % | 1.08 % | 0.80 % | 1.25 % | 0.92 % | 1.00 % | 0.55 % | 0.61 % | 0.95 % | 0.81 % |
| Scenario 2 | 0.64 | 0.53 | 1.22 | 0.80 | 1.42 | 1.14 | 0.95 | 0.51 | 0.62 | 1.07 | 0.89 |
| Scenario 3 | 0.62 | 0.51 | 1.17 | 0.79 | 1.36 | 1.11 | 0.93 | 0.51 | 0.61 | 1.03 | 0.86 |

**Incremental Total Return Items as a Percent of Original Overdraft Fees[2,3,4]**

| | 1/2/2007 | 1/16/2007 | 2/5/2007 | 5/17/2007 | 5/29/2007 | 7/23/2007 | 10/1/2007 | 5/1/2008 | 5/22/2008 | 6/9/2008 | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) (Σ(1) to (10))/10 |
| | | | | | | (Percent) | | | | | |
| Scenario 1 | 4.61 % | 4.27 % | 5.27 % | 5.02 % | 4.42 % | 3.97 % | 6.03 % | 6.57 % | 3.27 % | 3.74 % | 4.72 % |
| Scenario 2 | 4.04 | 3.81 | 5.28 | 4.92 | 4.40 | 4.06 | 5.48 | 5.99 | 3.13 | 3.68 | 4.48 |
| Scenario 3 | 3.91 | 3.65 | 5.09 | 4.83 | 4.21 | 3.93 | 5.37 | 5.97 | 3.05 | 3.56 | 4.36 |

**Average Transaction Associated with Incremental Returned Transactions[1,2,3]**

| | 1/2/2007 | 1/16/2007 | 2/5/2007 | 5/17/2007 | 5/29/2007 | 7/23/2007 | 10/1/2007 | 5/1/2008 | 5/22/2008 | 6/9/2008 | Average |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11)<br>(Σ(1) to (10))/10 |
| | | | | | (U.S. Dollars) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Scenario 1 | $ (1,739.29) | $ (1,892.18) | $ (1,044.67) | $ (1,465.18) | $ (791.47) | $ (774.61) | $ (973.50) | $ (1,301.15) | $ (676.28) | $ (936.09) | $ (1,159.44) |
| Scenario 2 | (938.54) | (924.80) | (693.65) | (1,081.90) | (545.75) | (533.89) | (678.29) | (969.75) | (514.26) | (629.61) | (751.04) |
| Scenario 3 | (938.55) | (924.80) | (693.61) | (1,081.87) | (545.50) | (533.85) | (678.29) | (969.75) | (514.26) | (629.61) | (751.01) |

**Source:** Wells Fargo. See Appendix C.2.

**Notes:**

1. These results are based off of a simulation of pay/return behavior using SAS. The transaction that exceeds the OD Limit is returned and the balance for subsequent transactions is increased by that transaction amount.

2. Original Overdraft Fees include all Overdraft Fees assigned by Olsen after filtering for the following criteria: COLL_BAL_RECALC_FLAG<>2, REMOVE_50020_FLAG<>1, and removing accounts which opted out of the class. The following filter of Olsen's logic could not be applied to this analysis: (CASE WHEN UPD.NEW_COUNT < WF.ORIG_OD_FEE_COUNT THEN UPD.NEW_COUNT ELSE WF.ORIG_OD_FEE_COUNT END). The effect of not applying this filter should be minimal.

3. Certain transaction codes do not ever get assessed an NSF fee, but are returned and the balance for subsequent transactions is increased by that transaction amount.

4. Total fee counts are reduced slightly (<1.4%) as a result of adding back the transaction amount of the returned item and returning items without charging an NSF fee.

# Appendix C.4
# Wells Fargo
# 10-Day Debit Card Transaction Data
# Posted Dates, January 2, 2007 - June 9, 2008

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | ------------(Number of Days)------------ | |
| (1) | (2) | (3) | (4) | (5) |
| 12/4/2006 | 1/2/2007 | 2 | 29 | 19 |
| 11/27/2006 | 1/2/2007 | 1 | 36 | 24 |
| 11/21/2006 | 1/2/2007 | 2 | 42 | 27 |
| 12/28/2006 | 1/2/2007 | 12,654 | 5 | 2 |
| 11/17/2006 | 1/2/2007 | 1 | 46 | 29 |
| 12/30/2006 | 1/2/2007 | 32,561 | 3 | 0 |
| 12/23/2006 | 1/2/2007 | 54 | 10 | 4 |
| 12/21/2006 | 1/2/2007 | 31 | 12 | 6 |
| 12/17/2006 | 1/2/2007 | 5 | 16 | 9 |
| 12/19/2006 | 1/2/2007 | 12 | 14 | 8 |
| 11/13/2006 | 1/2/2007 | 1 | 50 | 33 |
| 1/1/2007 | 1/2/2007 | 10,864 | 1 | 0 |
| 11/26/2006 | 1/2/2007 | 1 | 37 | 24 |
| 11/22/2006 | 1/2/2007 | 2 | 41 | 26 |
| 12/10/2006 | 1/2/2007 | 2 | 23 | 14 |
| 12/27/2006 | 1/2/2007 | 865 | 6 | 3 |
| 12/9/2006 | 1/2/2007 | 10 | 24 | 14 |
| 12/29/2006 | 1/2/2007 | 28,184 | 4 | 1 |
| 12/22/2006 | 1/2/2007 | 38 | 11 | 5 |
| 12/15/2006 | 1/2/2007 | 6 | 18 | 10 |
| 11/9/2006 | 1/2/2007 | 1 | 54 | 34 |
| 12/5/2006 | 1/2/2007 | 1 | 28 | 18 |
| 12/14/2006 | 1/2/2007 | 2 | 19 | 11 |
| 11/1/2006 | 1/2/2007 | 1 | 62 | 40 |
| 11/3/2006 | 1/2/2007 | 2 | 60 | 38 |
| 12/7/2006 | 1/2/2007 | 3 | 26 | 16 |
| 12/12/2006 | 1/2/2007 | 3 | 21 | 13 |
| 11/30/2006 | 1/2/2007 | 1 | 33 | 21 |
| 12/2/2006 | 1/2/2007 | 1 | 31 | 19 |
| 12/18/2006 | 1/2/2007 | 7 | 15 | 9 |
| 12/1/2006 | 1/2/2007 | 4 | 32 | 20 |
| 10/28/2006 | 1/2/2007 | 3 | 66 | 42 |
| 11/4/2006 | 1/2/2007 | 1 | 59 | 37 |
| 12/24/2006 | 1/2/2007 | 61 | 9 | 4 |
| 11/11/2006 | 1/2/2007 | 1 | 52 | 33 |
| 12/11/2006 | 1/2/2007 | 3 | 22 | 14 |
| 12/25/2006 | 1/2/2007 | 21 | 8 | 4 |
| 12/26/2006 | 1/2/2007 | 90 | 7 | 4 |
| 11/6/2006 | 1/2/2007 | 1 | 57 | 37 |
| 12/13/2006 | 1/2/2007 | 6 | 20 | 12 |
| 11/18/2006 | 1/2/2007 | 1 | 45 | 28 |
| 12/31/2006 | 1/2/2007 | 25,432 | 2 | 0 |
| 11/24/2006 | 1/2/2007 | 2 | 39 | 25 |
| 12/8/2006 | 1/2/2007 | 2 | 25 | 15 |

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | ----------(Number of Days)---------- | |
| (1) | (2) | (3) | (4) | (5) |
| 12/20/2006 | 1/2/2007 | 6 | 13 | 7 |
| 11/16/2006 | 1/2/2007 | 1 | 47 | 30 |
| 12/16/2006 | 1/2/2007 | 5 | 17 | 9 |
| 1/2/2007 | 1/2/2007 | 4,995 | 0 | 0 |
| 1/13/2007 | 1/16/2007 | 35,529 | 3 | 0 |
| 1/8/2007 | 1/16/2007 | 61 | 8 | 5 |
| 1/10/2007 | 1/16/2007 | 980 | 6 | 3 |
| 1/3/2007 | 1/16/2007 | 10 | 13 | 8 |
| 12/16/2006 | 1/16/2007 | 3 | 31 | 18 |
| 11/3/2006 | 1/16/2007 | 1 | 74 | 47 |
| 1/4/2007 | 1/16/2007 | 15 | 12 | 7 |
| 12/21/2006 | 1/16/2007 | 4 | 26 | 15 |
| 11/1/2006 | 1/16/2007 | 1 | 76 | 49 |
| 1/5/2007 | 1/16/2007 | 21 | 11 | 6 |
| 12/22/2006 | 1/16/2007 | 3 | 25 | 14 |
| 11/28/2006 | 1/16/2007 | 1 | 49 | 32 |
| 12/9/2006 | 1/16/2007 | 1 | 38 | 23 |
| 12/23/2006 | 1/16/2007 | 3 | 24 | 13 |
| 12/12/2006 | 1/16/2007 | 1 | 35 | 22 |
| 12/29/2006 | 1/16/2007 | 5 | 18 | 10 |
| 1/15/2007 | 1/16/2007 | 17,498 | 1 | 0 |
| 1/16/2007 | 1/16/2007 | 5,436 | 0 | 0 |
| 1/14/2007 | 1/16/2007 | 26,685 | 2 | 0 |
| 12/31/2006 | 1/16/2007 | 2 | 16 | 9 |
| 11/6/2006 | 1/16/2007 | 1 | 71 | 46 |
| 1/9/2007 | 1/16/2007 | 134 | 7 | 4 |
| 12/1/2006 | 1/16/2007 | 2 | 46 | 29 |
| 12/6/2006 | 1/16/2007 | 1 | 41 | 26 |
| 1/11/2007 | 1/16/2007 | 13,623 | 5 | 2 |
| 11/4/2006 | 1/16/2007 | 2 | 73 | 46 |
| 1/2/2007 | 1/16/2007 | 4 | 14 | 9 |
| 1/1/2007 | 1/16/2007 | 2 | 15 | 9 |
| 1/6/2007 | 1/16/2007 | 19 | 10 | 5 |
| 1/7/2007 | 1/16/2007 | 31 | 9 | 5 |
| 12/15/2006 | 1/16/2007 | 6 | 32 | 19 |
| 12/30/2006 | 1/16/2007 | 3 | 17 | 9 |
| 12/28/2006 | 1/16/2007 | 5 | 19 | 11 |
| 11/7/2006 | 1/16/2007 | 1 | 70 | 45 |
| 11/9/2006 | 1/16/2007 | 1 | 68 | 43 |
| 12/26/2006 | 1/16/2007 | 1 | 21 | 13 |
| 11/13/2006 | 1/16/2007 | 1 | 64 | 42 |
| 12/7/2006 | 1/16/2007 | 1 | 40 | 25 |
| 1/12/2007 | 1/16/2007 | 31,626 | 4 | 1 |
| 12/3/2006 | 2/5/2007 | 1 | 64 | 42 |
| 1/15/2007 | 2/5/2007 | 2 | 21 | 14 |
| 1/22/2007 | 2/5/2007 | 1 | 14 | 10 |
| 1/2/2007 | 2/5/2007 | 1 | 34 | 23 |
| 1/20/2007 | 2/5/2007 | 2 | 16 | 10 |
| 12/13/2006 | 2/5/2007 | 1 | 54 | 35 |
| 1/25/2007 | 2/5/2007 | 10 | 11 | 7 |

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | ------------(Number of Days)------------ | |
| (1) | (2) | (3) | (4) | (5) |
| 1/29/2007 | 2/5/2007 | 30 | 7 | 5 |
| 1/14/2007 | 2/5/2007 | 3 | 22 | 14 |
| 1/23/2007 | 2/5/2007 | 4 | 13 | 9 |
| 1/16/2007 | 2/5/2007 | 2 | 20 | 14 |
| 1/21/2007 | 2/5/2007 | 5 | 15 | 10 |
| 2/3/2007 | 2/5/2007 | 23,889 | 2 | 0 |
| 2/4/2007 | 2/5/2007 | 11,685 | 1 | 0 |
| 2/2/2007 | 2/5/2007 | 22,916 | 3 | 1 |
| 12/28/2006 | 2/5/2007 | 7 | 39 | 25 |
| 1/30/2007 | 2/5/2007 | 76 | 6 | 4 |
| 2/1/2007 | 2/5/2007 | 11,031 | 4 | 2 |
| 12/29/2006 | 2/5/2007 | 1 | 38 | 24 |
| 1/7/2007 | 2/5/2007 | 1 | 29 | 19 |
| 1/27/2007 | 2/5/2007 | 19 | 9 | 5 |
| 1/12/2007 | 2/5/2007 | 1 | 24 | 15 |
| 1/10/2007 | 2/5/2007 | 1 | 26 | 17 |
| 1/26/2007 | 2/5/2007 | 18 | 10 | 6 |
| 1/6/2007 | 2/5/2007 | 1 | 30 | 19 |
| 1/24/2007 | 2/5/2007 | 5 | 12 | 8 |
| 2/5/2007 | 2/5/2007 | 3,874 | 0 | 0 |
| 1/13/2007 | 2/5/2007 | 2 | 23 | 14 |
| 1/31/2007 | 2/5/2007 | 866 | 5 | 3 |
| 1/19/2007 | 2/5/2007 | 1 | 17 | 11 |
| 1/18/2007 | 2/5/2007 | 2 | 18 | 12 |
| 1/28/2007 | 2/5/2007 | 22 | 8 | 5 |
| 11/4/2006 | 2/5/2007 | 1 | 93 | 60 |
| 1/11/2007 | 2/5/2007 | 1 | 25 | 16 |
| 5/2/2007 | 5/17/2007 | 2 | 15 | 11 |
| 4/21/2007 | 5/17/2007 | 1 | 26 | 18 |
| 5/9/2007 | 5/17/2007 | 17 | 8 | 6 |
| 5/8/2007 | 5/17/2007 | 12 | 9 | 7 |
| 12/22/2006 | 5/17/2007 | 1 | 146 | 100 |
| 12/4/2006 | 5/17/2007 | 2 | 164 | 114 |
| 5/14/2007 | 5/17/2007 | 734 | 3 | 3 |
| 5/3/2007 | 5/17/2007 | 4 | 14 | 10 |
| 5/17/2007 | 5/17/2007 | 4,071 | 0 | 0 |
| 4/30/2007 | 5/17/2007 | 1 | 17 | 13 |
| 5/11/2007 | 5/17/2007 | 24 | 6 | 4 |
| 5/6/2007 | 5/17/2007 | 3 | 11 | 8 |
| 5/15/2007 | 5/17/2007 | 9,612 | 2 | 2 |
| 5/13/2007 | 5/17/2007 | 48 | 4 | 3 |
| 5/4/2007 | 5/17/2007 | 3 | 13 | 9 |
| 5/12/2007 | 5/17/2007 | 34 | 5 | 3 |
| 5/5/2007 | 5/17/2007 | 4 | 12 | 8 |
| 4/22/2007 | 5/17/2007 | 6 | 25 | 18 |
| 4/18/2007 | 5/17/2007 | 1 | 29 | 21 |
| 5/16/2007 | 5/17/2007 | 8,523 | 1 | 1 |
| 4/27/2007 | 5/17/2007 | 2 | 20 | 14 |
| 5/10/2007 | 5/17/2007 | 25 | 7 | 5 |
| 5/7/2007 | 5/17/2007 | 5 | 10 | 8 |

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | -----------(Number of Days)----------- | |
| (1) | (2) | (3) | (4) | (5) |
| 5/14/2007 | 5/29/2007 | 3 | 15 | 10 |
| 4/27/2007 | 5/29/2007 | 8 | 32 | 21 |
| 5/28/2007 | 5/29/2007 | 17,191 | 1 | 0 |
| 5/15/2007 | 5/29/2007 | 8 | 14 | 9 |
| 5/16/2007 | 5/29/2007 | 7 | 13 | 8 |
| 5/2/2007 | 5/29/2007 | 2 | 27 | 18 |
| 5/9/2007 | 5/29/2007 | 2 | 20 | 13 |
| 4/22/2007 | 5/29/2007 | 1 | 37 | 25 |
| 4/29/2007 | 5/29/2007 | 1 | 30 | 20 |
| 5/26/2007 | 5/29/2007 | 40,804 | 3 | 0 |
| 3/30/2007 | 5/29/2007 | 1 | 60 | 41 |
| 2/22/2007 | 5/29/2007 | 2 | 96 | 67 |
| 4/3/2007 | 5/29/2007 | 1 | 56 | 39 |
| 4/18/2007 | 5/29/2007 | 1 | 41 | 28 |
| 5/3/2007 | 5/29/2007 | 2 | 26 | 17 |
| 5/22/2007 | 5/29/2007 | 200 | 7 | 4 |
| 5/24/2007 | 5/29/2007 | 18,775 | 5 | 2 |
| 4/24/2007 | 5/29/2007 | 1 | 35 | 24 |
| 4/26/2007 | 5/29/2007 | 6 | 33 | 22 |
| 5/29/2007 | 5/29/2007 | 5,616 | 0 | 0 |
| 1/17/2007 | 5/29/2007 | 1 | 132 | 92 |
| 4/7/2007 | 5/29/2007 | 1 | 52 | 35 |
| 5/27/2007 | 5/29/2007 | 30,139 | 2 | 0 |
| 4/21/2007 | 5/29/2007 | 1 | 38 | 25 |
| 4/13/2007 | 5/29/2007 | 1 | 46 | 31 |
| 5/8/2007 | 5/29/2007 | 3 | 21 | 14 |
| 5/17/2007 | 5/29/2007 | 9 | 12 | 7 |
| 4/15/2007 | 5/29/2007 | 1 | 44 | 30 |
| 5/19/2007 | 5/29/2007 | 46 | 10 | 5 |
| 5/10/2007 | 5/29/2007 | 4 | 19 | 12 |
| 5/5/2007 | 5/29/2007 | 10 | 24 | 15 |
| 5/20/2007 | 5/29/2007 | 83 | 9 | 5 |
| 4/20/2007 | 5/29/2007 | 1 | 39 | 26 |
| 5/4/2007 | 5/29/2007 | 4 | 25 | 16 |
| 5/21/2007 | 5/29/2007 | 120 | 8 | 5 |
| 5/18/2007 | 5/29/2007 | 50 | 11 | 6 |
| 5/11/2007 | 5/29/2007 | 8 | 18 | 11 |
| 5/7/2007 | 5/29/2007 | 1 | 22 | 15 |
| 12/8/2006 | 5/29/2007 | 1 | 172 | 117 |
| 4/23/2007 | 5/29/2007 | 2 | 36 | 25 |
| 4/11/2007 | 5/29/2007 | 1 | 48 | 33 |
| 1/1/2007 | 5/29/2007 | 2 | 148 | 102 |
| 4/25/2007 | 5/29/2007 | 2 | 34 | 23 |
| 4/16/2007 | 5/29/2007 | 1 | 43 | 30 |
| 2/21/2007 | 5/29/2007 | 1 | 97 | 68 |
| 5/25/2007 | 5/29/2007 | 39,548 | 4 | 1 |
| 5/12/2007 | 5/29/2007 | 8 | 17 | 10 |
| 5/13/2007 | 5/29/2007 | 11 | 16 | 10 |
| 4/19/2007 | 5/29/2007 | 1 | 40 | 27 |
| 5/23/2007 | 5/29/2007 | 1,271 | 6 | 3 |

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | ------------(Number of Days)------------ | |
| (1) | (2) | (3) | (4) | (5) |
| 5/6/2007 | 5/29/2007 | 1 | 23 | 15 |
| 6/22/2007 | 7/23/2007 | 2 | 31 | 20 |
| 7/9/2007 | 7/23/2007 | 11 | 14 | 10 |
| 7/1/2007 | 7/23/2007 | 2 | 22 | 14 |
| 7/16/2007 | 7/23/2007 | 63 | 7 | 5 |
| 7/2/2007 | 7/23/2007 | 1 | 21 | 14 |
| 7/3/2007 | 7/23/2007 | 5 | 20 | 13 |
| 6/14/2007 | 7/23/2007 | 1 | 39 | 26 |
| 7/19/2007 | 7/23/2007 | 14,483 | 4 | 2 |
| 6/13/2007 | 7/23/2007 | 1 | 40 | 27 |
| 6/26/2007 | 7/23/2007 | 3 | 27 | 18 |
| 7/21/2007 | 7/23/2007 | 29,486 | 2 | 0 |
| 7/14/2007 | 7/23/2007 | 43 | 9 | 5 |
| 6/1/2007 | 7/23/2007 | 1 | 52 | 35 |
| 7/7/2007 | 7/23/2007 | 7 | 16 | 10 |
| 6/24/2007 | 7/23/2007 | 1 | 29 | 19 |
| 7/8/2007 | 7/23/2007 | 3 | 15 | 10 |
| 7/10/2007 | 7/23/2007 | 4 | 13 | 9 |
| 7/13/2007 | 7/23/2007 | 13 | 10 | 6 |
| 7/22/2007 | 7/23/2007 | 13,956 | 1 | 0 |
| 7/11/2007 | 7/23/2007 | 9 | 12 | 8 |
| 7/15/2007 | 7/23/2007 | 45 | 8 | 5 |
| 6/11/2007 | 7/23/2007 | 1 | 42 | 29 |
| 1/1/2007 | 7/23/2007 | 1 | 203 | 140 |
| 7/20/2007 | 7/23/2007 | 29,494 | 3 | 1 |
| 5/5/2007 | 7/23/2007 | 1 | 79 | 53 |
| 7/23/2007 | 7/23/2007 | 4,847 | 0 | 0 |
| 6/29/2007 | 7/23/2007 | 12 | 24 | 15 |
| 6/12/2007 | 7/23/2007 | 1 | 41 | 28 |
| 7/4/2007 | 7/23/2007 | 2 | 19 | 12 |
| 7/6/2007 | 7/23/2007 | 1 | 17 | 11 |
| 6/25/2007 | 7/23/2007 | 1 | 28 | 19 |
| 7/12/2007 | 7/23/2007 | 8 | 11 | 7 |
| 7/5/2007 | 7/23/2007 | 1 | 18 | 12 |
| 6/28/2007 | 7/23/2007 | 4 | 25 | 16 |
| 6/30/2007 | 7/23/2007 | 2 | 23 | 14 |
| 7/18/2007 | 7/23/2007 | 1,108 | 5 | 3 |
| 7/17/2007 | 7/23/2007 | 119 | 6 | 4 |
| 9/27/2007 | 10/1/2007 | 12,566 | 4 | 2 |
| 9/10/2007 | 10/1/2007 | 1 | 21 | 15 |
| 9/24/2007 | 10/1/2007 | 61 | 7 | 5 |
| 9/15/2007 | 10/1/2007 | 2 | 16 | 10 |
| 9/29/2007 | 10/1/2007 | 28,638 | 2 | 0 |
| 9/22/2007 | 10/1/2007 | 27 | 9 | 5 |
| 9/3/2007 | 10/1/2007 | 1 | 28 | 19 |
| 9/5/2007 | 10/1/2007 | 1 | 26 | 18 |
| 9/12/2007 | 10/1/2007 | 2 | 19 | 13 |
| 9/16/2007 | 10/1/2007 | 4 | 15 | 10 |
| 8/30/2007 | 10/1/2007 | 2 | 32 | 21 |
| 7/14/2007 | 10/1/2007 | 1 | 79 | 54 |

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | -----------(Number of Days)----------- |  |
| (1) | (2) | (3) | (4) | (5) |
| 9/14/2007 | 10/1/2007 | 2 | 17 | 11 |
| 9/9/2007 | 10/1/2007 | 1 | 22 | 15 |
| 8/21/2007 | 10/1/2007 | 1 | 41 | 28 |
| 9/11/2007 | 10/1/2007 | 1 | 20 | 14 |
| 9/4/2007 | 10/1/2007 | 2 | 27 | 19 |
| 8/27/2007 | 10/1/2007 | 1 | 35 | 24 |
| 8/18/2007 | 10/1/2007 | 1 | 44 | 29 |
| 6/15/2007 | 10/1/2007 | 1 | 108 | 74 |
| 9/21/2007 | 10/1/2007 | 11 | 10 | 6 |
| 9/30/2007 | 10/1/2007 | 14,366 | 1 | 0 |
| 9/23/2007 | 10/1/2007 | 37 | 8 | 5 |
| 9/28/2007 | 10/1/2007 | 27,326 | 3 | 1 |
| 8/29/2007 | 10/1/2007 | 4 | 33 | 22 |
| 9/18/2007 | 10/1/2007 | 7 | 13 | 9 |
| 8/15/2007 | 10/1/2007 | 1 | 47 | 32 |
| 9/17/2007 | 10/1/2007 | 8 | 14 | 10 |
| 8/31/2007 | 10/1/2007 | 3 | 31 | 20 |
| 10/1/2007 | 10/1/2007 | 4,780 | 0 | 0 |
| 9/20/2007 | 10/1/2007 | 9 | 11 | 7 |
| 5/30/2007 | 10/1/2007 | 1 | 124 | 86 |
| 9/8/2007 | 10/1/2007 | 3 | 23 | 15 |
| 8/25/2007 | 10/1/2007 | 1 | 37 | 24 |
| 9/13/2007 | 10/1/2007 | 1 | 18 | 12 |
| 9/26/2007 | 10/1/2007 | 1,018 | 5 | 3 |
| 9/25/2007 | 10/1/2007 | 140 | 6 | 4 |
| 9/2/2007 | 10/1/2007 | 1 | 29 | 19 |
| 9/19/2007 | 10/1/2007 | 13 | 12 | 8 |
| 4/18/2008 | 5/1/2008 | 5 | 13 | 9 |
| 3/15/2008 | 5/1/2008 | 1 | 47 | 33 |
| 4/1/2008 | 5/1/2008 | 4 | 30 | 22 |
| 3/23/2008 | 5/1/2008 | 1 | 39 | 28 |
| 3/24/2008 | 5/1/2008 | 1 | 38 | 28 |
| 4/7/2008 | 5/1/2008 | 2 | 24 | 18 |
| 4/12/2008 | 5/1/2008 | 4 | 19 | 13 |
| 3/18/2008 | 5/1/2008 | 1 | 44 | 32 |
| 4/10/2008 | 5/1/2008 | 3 | 21 | 15 |
| 4/25/2008 | 5/1/2008 | 28 | 6 | 4 |
| 4/24/2008 | 5/1/2008 | 21 | 7 | 5 |
| 4/5/2008 | 5/1/2008 | 4 | 26 | 18 |
| 4/19/2008 | 5/1/2008 | 5 | 12 | 8 |
| 4/30/2008 | 5/1/2008 | 7,622 | 1 | 1 |
| 4/16/2008 | 5/1/2008 | 3 | 15 | 11 |
| 3/30/2008 | 5/1/2008 | 1 | 32 | 23 |
| 4/15/2008 | 5/1/2008 | 2 | 16 | 12 |
| 3/31/2008 | 5/1/2008 | 1 | 31 | 23 |
| 3/19/2008 | 5/1/2008 | 1 | 43 | 31 |
| 5/1/2008 | 5/1/2008 | 4,296 | 0 | 0 |
| 4/22/2008 | 5/1/2008 | 13 | 9 | 7 |
| 4/20/2008 | 5/1/2008 | 9 | 11 | 8 |
| 4/29/2008 | 5/1/2008 | 9,049 | 2 | 2 |

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | -----------(Number of Days)----------- | |
| (1) | (2) | (3) | (4) | (5) |
| 4/28/2008 | 5/1/2008 | 512 | 3 | 3 |
| 4/21/2008 | 5/1/2008 | 7 | 10 | 8 |
| 4/14/2008 | 5/1/2008 | 4 | 17 | 13 |
| 4/8/2008 | 5/1/2008 | 4 | 23 | 17 |
| 3/21/2008 | 5/1/2008 | 1 | 41 | 29 |
| 4/11/2008 | 5/1/2008 | 3 | 20 | 14 |
| 4/2/2008 | 5/1/2008 | 2 | 29 | 21 |
| 4/4/2008 | 5/1/2008 | 5 | 27 | 19 |
| 4/17/2008 | 5/1/2008 | 7 | 14 | 10 |
| 4/6/2008 | 5/1/2008 | 1 | 25 | 18 |
| 4/13/2008 | 5/1/2008 | 3 | 18 | 13 |
| 4/3/2008 | 5/1/2008 | 2 | 28 | 20 |
| 3/20/2008 | 5/1/2008 | 1 | 42 | 30 |
| 4/9/2008 | 5/1/2008 | 1 | 22 | 16 |
| 4/26/2008 | 5/1/2008 | 37 | 5 | 3 |
| 4/23/2008 | 5/1/2008 | 16 | 8 | 6 |
| 4/27/2008 | 5/1/2008 | 65 | 4 | 3 |
| 5/18/2008 | 5/22/2008 | 90 | 4 | 3 |
| 2/21/2008 | 5/22/2008 | 1 | 91 | 65 |
| 5/17/2008 | 5/22/2008 | 51 | 5 | 3 |
| 2/14/2008 | 5/22/2008 | 1 | 98 | 69 |
| 5/14/2008 | 5/22/2008 | 11 | 8 | 6 |
| 5/10/2008 | 5/22/2008 | 2 | 12 | 8 |
| 5/16/2008 | 5/22/2008 | 43 | 6 | 4 |
| 5/19/2008 | 5/22/2008 | 498 | 3 | 3 |
| 5/6/2008 | 5/22/2008 | 1 | 16 | 12 |
| 5/7/2008 | 5/22/2008 | 1 | 15 | 11 |
| 4/28/2008 | 5/22/2008 | 2 | 24 | 18 |
| 5/9/2008 | 5/22/2008 | 3 | 13 | 9 |
| 5/5/2008 | 5/22/2008 | 1 | 17 | 13 |
| 5/12/2008 | 5/22/2008 | 6 | 10 | 8 |
| 5/11/2008 | 5/22/2008 | 3 | 11 | 8 |
| 5/8/2008 | 5/22/2008 | 2 | 14 | 10 |
| 5/22/2008 | 5/22/2008 | 4,098 | 0 | 0 |
| 3/13/2008 | 5/22/2008 | 2 | 70 | 50 |
| 5/15/2008 | 5/22/2008 | 31 | 7 | 5 |
| 5/20/2008 | 5/22/2008 | 9,259 | 2 | 2 |
| 5/21/2008 | 5/22/2008 | 8,091 | 1 | 1 |
| 4/26/2008 | 5/22/2008 | 1 | 26 | 18 |
| 5/13/2008 | 5/22/2008 | 16 | 9 | 7 |
| 6/3/2008 | 6/9/2008 | 131 | 6 | 4 |
| 5/28/2008 | 6/9/2008 | 10 | 12 | 8 |
| 1/13/2008 | 6/9/2008 | 1 | 148 | 102 |
| 5/23/2008 | 6/9/2008 | 4 | 17 | 10 |
| 6/6/2008 | 6/9/2008 | 33,248 | 3 | 1 |
| 3/16/2008 | 6/9/2008 | 2 | 85 | 59 |
| 5/25/2008 | 6/9/2008 | 2 | 15 | 9 |
| 5/30/2008 | 6/9/2008 | 28 | 10 | 6 |
| 5/2/2008 | 6/9/2008 | 1 | 38 | 25 |
| 6/5/2008 | 6/9/2008 | 16,806 | 4 | 2 |

| Authorization Date | Posted Date | Transaction Count | Calendar Days Difference | Business Days Difference[1] |
|---|---|---|---|---|
| | | -(Frequency)- | ------------(Number of Days)------------ | |
| (1) | (2) | (3) | (4) | (5) |
| 6/4/2008 | 6/9/2008 | 952 | 5 | 3 |
| 3/1/2008 | 6/9/2008 | 6 | 100 | 69 |
| 6/7/2008 | 6/9/2008 | 33,188 | 2 | 0 |
| 6/9/2008 | 6/9/2008 | 5,610 | 0 | 0 |
| 4/11/2008 | 6/9/2008 | 1 | 59 | 40 |
| 5/14/2008 | 6/9/2008 | 1 | 26 | 17 |
| 5/7/2008 | 6/9/2008 | 2 | 33 | 22 |
| 5/27/2008 | 6/9/2008 | 1 | 13 | 9 |
| 2/16/2008 | 6/9/2008 | 1 | 114 | 78 |
| 5/24/2008 | 6/9/2008 | 1 | 16 | 9 |
| 5/31/2008 | 6/9/2008 | 29 | 9 | 5 |
| 1/9/2008 | 6/9/2008 | 1 | 152 | 105 |
| 4/20/2008 | 6/9/2008 | 2 | 50 | 34 |
| 1/11/2008 | 6/9/2008 | 1 | 150 | 103 |
| 5/18/2008 | 6/9/2008 | 2 | 22 | 14 |
| 5/16/2008 | 6/9/2008 | 3 | 24 | 15 |
| 6/2/2008 | 6/9/2008 | 69 | 7 | 5 |
| 5/29/2008 | 6/9/2008 | 12 | 11 | 7 |
| 5/20/2008 | 6/9/2008 | 1 | 20 | 13 |
| 5/22/2008 | 6/9/2008 | 5 | 18 | 11 |
| 6/8/2008 | 6/9/2008 | 15,866 | 1 | 0 |
| 6/1/2008 | 6/9/2008 | 43 | 8 | 5 |
| 5/26/2008 | 6/9/2008 | 1 | 14 | 9 |

**Source:** Wells Fargo.

Note:

[1] These numbers are calculated using the Excel Function Networkdays(x,y,x) minus 1 where x is the date the transaction is made, y the date it posted and z the information on holidays. Holidays used are U.S. Federal holidays, available at http://www.opm.gov/Operating_Status_Schedules /fedhol/2006.asp.

# Exhibit D

1    WHATLEY DRAKE & KALLAS LLP
     Mitchell M. Breit (Admitted *Pro Hac Vice*)
2    1540 Broadway, 37th Floor
     New York, NY 10036
3    Phone:  (212) 447-7070
     Fax:    (212) 447-7077

4

5    DAVIS, COWELL & BOWE, LLP
     Steven L. Stemerman (State Bar No. 067690)
     Elizabeth A. Lawrence (State Bar No. 111781)
6    595 Market Street, Suite 1400
     San Francisco CA 94105
7    Telephone:    (415) 597-7200
     Facsimile:    (415) 597-7201

8

     Attorneys for Plaintiffs
9

10   ARNOLD & PORTER LLP
     LAURENCE J. HUTT (State Bar No. 066269)
     777 South Figueroa Street, 44th Floor
11   Los Angeles, California  90017-5844
     Telephone:  (213) 243-4000
12   Facsimile:  (213) 243-4199

13   Attorneys for Defendants

14   *Additional Counsel Listed on Last Page*

15

16            SUPERIOR COURT OF THE STATE OF CALIFORNIA

17               COUNTY OF SAN FRANCISCO

18

| | |
|---|---|
| RHONDA J. CLOSSON and ARIANA NASH on behalf of themselves and all others similarly situated, | Case No. CGC 04436877 |
| | **CLASS ACTION** |
| Plaintiffs, | **FINAL SETTLEMENT AGREEMENT** |
| v. | |
| BANK OF AMERICA N.A., BANK OF AMERICA CALIFORNIA N.A., BANK OF AMERICA CORP., and DOES 1-50, | |
| Defendants. | |

1    This Settlement Agreement ("Settlement") is entered into by and between plaintiff Ariana Nash,

2    individually and as representative of the Settlement Class (as defined below), on the one hand, and

3    defendant Bank of America, N.A., on the other hand.  This Settlement is subject to preliminary and

4    final approval by the Court.

## DEFINITIONS

6    1.    As used in this Settlement, the following terms have the meanings specified below:

7    (a)    "Action" means and refers to the action entitled *Closson, et al. v. Bank of*

8    *America N.A., et al.*, Case No. CGC 04-436 877 in the files of the San Francisco Superior Court.

9    (b)    "Bank of America" or "Defendant" means Bank of America, N.A. (sued in

10   the Action as Bank of America N.A.) and includes Bank of America California, N.A. (sued in the

11   Action as Bank of America California N.A.) and Bank of America Corporation (sued in the Action

12   as Bank of America Corp.), except that references to a "Bank of America debit card" shall mean a

13   debit card, check card or any other bank card used for debit purchases bearing the Bank of America

14   logo or brand, including such cards bearing the Bank of America logo or brand issued by any

15   subsidiary or affiliate of Bank of America, and such cards bearing the logo or brand of another

16   financial institution acquired by or merged into Bank of America, including Fleet Bank, N.A.,

17   LaSalle Bank N.A., LaSalle Bank Midwest N.A., and United States Trust Company, N.A., but only

18   after April 1, 2004, for Fleet Bank, N.A., only after July 1, 2007, for United States Trust Company,

19   N.A., and only after October 1, 2007, for LaSalle Bank N.A. and LaSalle Bank Midwest N.A.;

20   references to "Bank of America debit card transaction(s)" shall mean transaction(s) effectuated with

21   or relating to such Bank of America debit card(s); references to a "Bank of America account" shall

22   mean an account maintained by or with Bank of America or any subsidiary or affiliate of Bank of

23   America; references to a "Bank of America account agreement" or "Bank of America account

24   information" shall mean an account agreement or account information relating to a Bank of

25   America account; and references to a "Bank of America website" shall mean a website and web

26   pages created, operated, maintained or owned by Bank of America or any subsidiary or affiliate of

27   Bank of America.

28

- 1 -

1         (c)     "Claim Form" means and refers to the claim form to be completed, signed

2 under penalty of perjury, and timely submitted to the Claims Administrator by each Settlement

3 Class Member seeking to obtain a distribution of settlement funds provided for in Paragraph 10(a)

4 of this Settlement.  As specified in Paragraphs 18 and 19, Claim Forms will be provided to

5 Settlement Class Members by mail ("Mailed Claim Form") and/or on the Settlement Website

6 ("Web Claim Form") and will be available upon request of any Settlement Class Member from the

7 Claims Administrator.  The Parties' proposed Mailed Claim Form is attached as Exhibit C.  The

8 Parties' proposed Web Claim Form is attached as Exhibit E.

9         (d)     "Claims Administrator" means the settlement administrator retained by Bank

10 of America pursuant to Paragraph 25.

11         (e)     "Class Counsel" means and refers to Whatley Drake & Kallas LLC, 1540

12 Broadway, 37th Floor, New York, NY 10036; Davis, Cowell & Bowe, LLP, 595 Market Street,

13 Suite 1400, San Francisco, CA 94105; McCune & Wright, 2068 Orange Tree Lane, Suite 215,

14 Redlands, CA 92374; and Rosner & Mansfield, LLP, 10085 Carroll Canyon Road, Suite 100, San

15 Diego, CA 92131; or their respective successor(s).

16         (f)     "Class Period" means December 6, 2000 through and including December

17 31, 2007.

18         (g)     "Closson" means Rhonda J. Closson.

19         (h)     "Complaint" means the Complaint and the First Amended Complaint, and

20 any other or further amended or supplemental complaints, filed in the Action.

21         (i)     "Court" means the Superior Court of the State of California for the County of

22 San Francisco.

23         (j)     "Defendant's Counsel" means Arnold & Porter LLP, 777 S. Figueroa Street,

24 44th Floor, Los Angeles, California 90017.

25         (k)     "Effective Date" has the meaning set forth in Paragraph 27 of this Settlement.

26         (l)     "Final Hearing" means the hearing in the Action for the Court to consider

27 final approval of this Settlement and entry of the Judgment.

28

FINAL SETTLEMENT AGREEMENT

1    (m)   "Judgment" means the Judgment and Order of Dismissal with Prejudice to be

2    entered in the Action in connection with the Settlement after the Final Hearing.  The Judgment shall

3    be substantially in the form of Exhibit F.

4    (n)   "Notice" means the Notice of Proposed Class Action Settlement to be given

5    to Settlement Class Members in connection with the Settlement following the filing of the

6    Preliminary Approval Order.  As provided in Paragraphs 18-20, Notice will be given to Settlement

7    Class Members by mail ("Mailed Notice") or electronically ("Electronic Notice") and by

8    publication ("Published Notice").  The Parties' proposed form of Mailed Notice is attached hereto

9    as Exhibit B-1.  The Parties' proposed form of Electronic Notice is attached hereto as Exhibit B-2.

10   The Parties' proposed form of Published Notice is attached hereto as Exhibit D.  Based upon the

11   Preliminary Approval Order and the date set by the Court for the Final Hearing, the Parties shall

12   fill-in or substitute concrete calendar dates in the Notice to the extent reasonably feasible, before the

13   Notice is provided to Settlement Class Members.

14   (o)   "Parties" means the Plaintiff and Defendant in the Action.

15   (p)   "Plaintiff" means plaintiff Ariana Nash, individually and as representative of

16   the Settlement Class.

17   (q)   "Preliminary Approval Order" means the Order Preliminarily Approving

18   Settlement and Providing for Notice to the Class.  The Parties' proposed form of Preliminary

19   Approval Order is attached hereto as Exhibit A.

20   (r)   "Settlement Class Member[s]" means all persons who are members of the

21   Settlement Class to be certified under Paragraph 8 hereof.

22   (s)   "Settlement Fund" means the amount referred to in the first sentence of

23   Paragraph 10(a).

24   (t)   "Settlement Website" means a website to be created and maintained by the

25   Claims Administrator entitled Rust Consulting, Inc.

26                                   **RECITALS**

27   2.    The Action was commenced on December 6, 2004, by Rhonda J. Closson and Ariana

28   Nash, individually and in a representative capacity on behalf of a putative class, against Bank of

- 3 -

FINAL SETTLEMENT AGREEMENT

1    America, N.A. (erroneously named as Bank of America N.A.), Bank of America California, N.A.

2    (erroneously named as Bank of America California N.A.), and Bank of America Corporation

3    (erroneously named as Bank of America Corp.).   At Closson's request, the Court, on January 30,

4    2007, approved her withdrawal as a putative class representative, without waiving her right to be

5    part of any class that may be certified in the Action.  On July 11, 2007, the Court approved a

6    stipulation of the Parties and dismissed Bank of America California, N.A. and Bank of America

7    Corp. from the Action without prejudice.

8        3.      In the Complaint, Plaintiff alleges, among other things, that she was a Bank of

9    America accountholder and had, and had used, a debit card in connection with her account; that

10   Bank of America posted debit card (and other) transactions to accounts in high-to-low order instead

11   of in chronological order; that Bank of America allowed and authorized customers to overdraw their

12   account balances through debit card transactions and failed to warn customers when a debit card

13   transaction would cause their accounts to be overdrawn; that certain account balance and other

14   account information available to Bank of America customers is not current or accurate; that Bank of

15   America made statements in its account agreements, in advertising, on its website, and otherwise,

16   that encouraged and induced customers to use their Bank of America debit cards; that Bank of

17   America's conduct in the foregoing respects was intended to increase, and had the effect of

18   increasing, the number of insufficient funds, returned item, overdraft and overlimit fees Bank of

19   America charged customers; that Bank of America's customer agreements are unconscionable; and

20   that Bank of America does not provide copies of its account agreements to customers until after

21   they open their accounts.

22       4.      Based on these allegations, Plaintiff, on behalf of herself and in a representative

23   capacity, asserts claims for unlawful, unfair, and fraudulent business practices and false advertising

24   under California's Unfair Competition Law and False Advertising Law (Cal. Bus. & Prof. Code

25   §§17200 and 17500); and for violation of the California Consumers Legal Remedies Act (Cal. Civ.

26   Code §1750 *et seq.*).  Plaintiff seeks injunctive relief, restitution and disgorgement, corrective

27   advertising, compensatory damages, punitive damages, reasonable attorneys' fees and costs

28   pursuant to California Code of Civil Procedure § 1021.5, and pre- and post-judgment interest.

- 4 -

FINAL SETTLEMENT AGREEMENT

5.      Bank of America has filed an Answer in the Action denying all claims asserted against it, denying all allegations of wrongdoing and liability, and denying that Plaintiff or the putative class she represents is entitled to any relief whatsoever.  In particular, Bank of America disputes Plaintiff's allegations that Bank of America engaged in any respect in any illegal, fraudulent, deceptive, or unfair conduct or advertising or charged any fees that were not lawful and duly provided for in its customer agreements.  Bank of America further contends that Plaintiff's claims and the relief sought based thereon are preempted by the provisions of the National Bank Act (12 U.S.C. 21 *et seq*.) and by regulations of the Office of the Comptroller of the Currency promulgated thereunder.  Nevertheless, solely for the purpose of avoiding the burden, expense, risk and uncertainty of continuing to litigate the Action, and for the purpose of putting to rest the controversies engendered by the Action, and without any admission of any liability or wrongdoing whatsoever, Bank of America desires to settle the Action and all claims asserted in or subsumed by the Action on the terms and conditions set forth herein.

6.      Class Counsel have investigated the facts relating to the claims alleged in the Action, and the underlying events and transactions forming the subject matter of the Action, and have analyzed the applicable legal principles.  While Plaintiff and Class Counsel believe that the claims asserted in the Action have merit, they have concluded, based upon their investigation, taking into account the sharply contested issues involved, the unsettled state of the applicable law, the inherent problems of proof and legal defenses which may be an impediment to prevailing in whole or in part on the claims they assert, the risks, uncertainties and costs of further prosecution of the Action, and the substantial benefits to be received pursuant to this Settlement, that a resolution and compromise on the terms set forth herein is fair, reasonable, adequate and in the best interests of the Settlement Class Members.

7.      Under the circumstances, Plaintiff, on behalf of herself and the members of the Settlement Class and Bank of America, through their respective duly authorized counsel of record in the Action, hereby agree that this Action, and all matters and claims in the Complaint, and all matters and claims arising out of or related to the allegations or subject matter of the Complaint and

1   Action, are settled, compromised, and dismissed, on the merits and with prejudice, upon the below

2   terms and conditions.

3   **TERMS OF THE SETTLEMENT**

4   In consideration of the complete and final settlement of the Action, and under the terms and

5   conditions herein, the Parties agree as follows:

6   **Certification of the Settlement Class**

7   8.   For settlement purposes only, the Parties agree that the Court may certify a

8   Settlement Class defined as follows:

9   Any person who, at any time between December 6, 2000 and December 31, 2007,
    resided in the United States and had an account at Bank of America accessible
10  through a Bank of America debit card, and either (i) paid at least one insufficient
    funds fee, overdraft fee, returned item fee, or similar fee, that was assessed to the
11  person's account within five business days after a Bank of America debit card
    transaction either occurred or posted to the account, or (ii) paid at least one overlimit
12  fee, or similar fee, that was assessed for an account cycle in which a Bank of America
    debit card transaction either occurred or posted to the person's account. ("Debit card"
13  means debit card, check card or any other bank card used for debit purchases.)

14  Excluded from the Settlement Class are Bank of America, any parent, subsidiary,
    affiliate or sister company of Bank of America, and all officers or directors of Bank
15  of America or any parent, subsidiary, affiliate or sister company at any time during
    the Class Period, and the legal representatives, heirs, successors, and assigns of any of
16  the foregoing.  Also excluded from the Settlement Class is any person who timely
    submits a valid request to be excluded from this Settlement.

17

18  9.   If the Court does not certify the Settlement Class, or limits or changes the

19  composition of the Settlement Class, either Party shall have the right to terminate the Settlement by

20  serving on the other Party's counsel and filing with the Court a notice of termination within ten

21  court days of its receipt of notice of the Court's ruling.

22  **Settlement Consideration**

23  10.   Subject to approval by the Court, and except as otherwise expressly stated in

24  Paragraph 10(e), the total monetary consideration to be provided by Bank of America pursuant to

25  this Settlement shall be $35 million, inclusive of all of Class Counsel's attorneys' fees and costs of

26  litigation, the incentive payment to Plaintiff referred to in Paragraph 10(d), and the administrative

27  costs of settlement described in Paragraph 10(e)(1).  Said $35 million shall be apportioned and

28  distributed as follows:

- 6 -

FINAL SETTLEMENT AGREEMENT

1      (a)      **Benefits to Settlement Class Members:**  Within 30 days after the Effective

2    Date, Bank of America will pay a total of $ 35 million less the sum of (i) the amount awarded by

3    the Court to Class Counsel for attorneys' fees and litigation costs pursuant to Paragraphs 10(c) and

4    12; (ii) the amount awarded by the Court as an incentive payment to Plaintiff pursuant to Paragraph

5    10(d); and (iii) $2.5 million for administrative costs of settlement pursuant to Paragraph 10(e); to

6    Settlement Class Members in partial refund of overdraft, returned item, insufficient funds and

7    overlimit fees.

8                 (1)      To receive a refund under this paragraph, a Settlement Class Member

9           shall submit a Claim Form no later than 45 days prior to the Final Hearing, attesting under

10          penalty of perjury that the person submitting the Claim Form is a person residing in the

11          United States who, at any time between December 6, 2000 and December 31, 2007, had an

12          Account at Bank of America with a Bank of America debit card and either (i) paid at least

13          one insufficient funds fee, overdraft fee, returned item fee, or similar fee, that was assessed

14          to the person's account within five business days after a Bank of America debit card

15          transaction either occurred or posted to the account, or (ii) paid at least one overlimit fee, or

16          similar fee, that was assessed for an account cycle in which a Bank of America debit card

17          transaction either occurred or posted to the person's account.

18               (2)      Bank of America may take such steps as it deems necessary and

19          appropriate in its sole discretion to verify the information provided on Claim Forms

20          submitted by Settlement Class Members and to prevent fraudulent claims under this

21          Settlement.  In doing so, Bank of America shall be entitled to rely on the information

22          contained in its business records relating to the Settlement Class Members' accounts.

23          Nothing herein is intended or shall be construed to obligate Bank of America to verify each

24          or any Claim Form submitted.

25               (3)      Each Settlement Class Member shall submit no more than one Claim

26          Form, regardless of the number of insufficient funds, returned item, overdraft or overlimit

27          fees, or similar fees, such Settlement Class Member may have paid during the Class Period

28

FINAL SETTLEMENT AGREEMENT

1   as a result of the use of a Bank of America debit card.  In the event that a Settlement Class

2   Member files multiple Claim Forms, only a single valid Claim Form will be honored.

3   (4)   The amount to be received by each Settlement Class Member under

4   this Settlement shall be determined as of the Effective Date on a pro rata basis by dividing

5   the Settlement Fund by the number of Settlement Class Members timely submitting a valid

6   Claim Form, but excluding the number of Settlement Class Members who submit a Claim

7   Form that is untimely, incomplete or fraudulent (as determined under Paragraph 10(a)(2)).

8   If the amount to be received by each Settlement Class Member who timely submitted a valid

9   Claim Form, as calculated in accordance with the preceding sentence, exceeds $78.00, each

10   such Settlement Class Member shall receive $78.00, and the amount not distributed to

11   Settlement Class Members as a result of this $78.00 cap shall be paid into the cy pres fund

12   provided for in Paragraph 10(b).  In no event shall Bank of America be required to pay out

13   in the aggregate to Settlement Class Members more than the Settlement Fund.  Payments to

14   Settlement Class Members pursuant to this paragraph will be made by mailing checks to

15   them at the addresses stated in their respective Claim Forms.

16   (5)   Any portion of the Settlement Fund that is not paid to Settlement

17   Class Members pursuant to Paragraph 10(a) shall be paid into the *cy pres* fund provided for

18   in Paragraph 10(b) and shall not revert to Bank of America.

19   (6)   The payments provided for in Paragraph 10(a) do not constitute an

20   "amount that will be payable to all Settlement Class Members" or an "amount to which

21   [class members] are entitled pursuant to the judgment" contemplated herein, as those terms

22   are used in §384 of the California Code of Civil Procedure.

23   (b)   ***Cy Pres Funds***:  Bank of America shall create a *cy pres* fund consisting of (i)

24   the difference, if any, between the $2.5 million set aside pursuant to Paragraph 10(e) to cover the

25   administrative costs of this Settlement and the actual administrative costs of this Settlement

26   (assuming the actual administrative costs of this Settlement are less than $2.5 million), and (ii) any

27   funds not paid to Settlement Class Members pursuant to Paragraph 10(a), such as, by way of

28   example only, funds sent to Settlement Class Members under Paragraph 10(a) that are not cashed or

- 8 -

1   that are not deliverable and funds in excess of the maximum amount distributable to Settlement

2   Class Members under Paragraph 10(a)(4).  Notwithstanding the foregoing sentence, in the event the

3   actual administrative costs of this Settlement, as described in Paragraph 10(e)(1), equal or exceed

4   $2.5 million and in the further event that all funds provided for in Paragraph 10(a) are paid to

5   Settlement Class Members, Bank of America will have no obligation to create a *cy pres* fund under

6   this paragraph or as part of the Settlement.  The amount in the *cy pres* fund, if any, shall be

7   distributed, as follows:

8              (1)     The Parties shall mutually agree upon up to four recipients of the

9       monies, if any, in the *cy pres* fund.  Any such recipients shall be subject to Court approval.

10      If the Parties are unable to agree upon four such recipients, the Court in the Action shall

11      select the remaining recipients of the *cy pres* fund.

12             (2)     Any monies in the *cy pres* fund shall be distributed *pro rata* to the

13      four recipients selected in accordance with subparagraph (1) above to fund consumer

14      financial education projects.

15             (3)     Each distribution of *cy pres* funds shall carry the restriction that the

16      funds may not be used to finance, promote, or facilitate litigation or lobbying activities

17      against financial institutions.  Violation by a recipient of the foregoing restrictions shall

18      obligate the recipient to forfeit the entire distribution amount, used or unused, so that the

19      funds may be redistributed to another recipient mutually agreed upon by the Parties or, if no

20      agreement is reached, selected by the Court in the Action.

21             (4)     The amounts to be paid out of the *cy pres* fund, if any, shall be paid as

22      soon as is practicable following the distribution of funds to Settlement Class Members under

23      Paragraph 10(a) and the payment of the administrative costs under Paragraph 10(e).

24       (c)     **Attorneys' Fees and Costs to Plaintiff Counsel:**  As more fully set forth in

25   Paragraph 12, Bank of America shall not oppose an application by Class Counsel for attorneys' fees

26   and litigation costs in an amount not exceeding $8.125 million (of the $35 million).  Bank of

27   America shall have no other or further liability for fees and costs of Plaintiff, any Settlement Class

28   Member, or any Class Counsel.  If the Court approves a payment to Class Counsel of less than

- 9 -

1    $8.125 million, the difference between the sum requested by Class Counsel and the amount actually

2    awarded to Class Counsel shall be added to the Settlement Fund referred to in Paragraph 10(a) for

3    distribution to the Settlement Class.

4           (d)     **Incentive Payment to Plaintiff:**  Bank of America shall not oppose an

5    application by Class Counsel for Court approval for a payment of not more than $10,000 (out of the

6    $35 million) to Plaintiff for her service as the representative of the Settlement Class in the Action.

7    Except as specified in this subparagraph and in Paragraph 10(a), Bank of America shall have no

8    other or further obligation to make any payment to Plaintiff or any Settlement Class Member.  If the

9    Court approves a payment to Plaintiff of less than $10,000, the difference between the sum

10   requested for Plaintiff and the amount actually awarded to Plaintiff shall be added to the Settlement

11   Fund referred to in Paragraph 10(a) for distribution to the Settlement Class.

12          (e)     **Administrative Costs of Settlement:**  $2.5 million (of the $35 million) shall

13   be used by Bank of America to cover, pay for and/or reimburse all fees, costs and expenses (as such

14   fees, costs and expenses are incurred) relating to implementation or effectuation of the Settlement,

15   as follows:

16          (1)     The fees, costs and expenses payable from said $2.5 million shall

17          include, among other items, without limitation, the fees, costs and expenses of preparing,

18          printing and mailing the Mailed Notice and Mailed Claim Forms; preparing, placing and

19          publishing the Published Notice; preparing and transmitting the Electronic Notice and Web

20          Claim Form; creating, hosting and maintaining the Settlement Website; establishing,

21          operating and maintaining the 1-800 number for Settlement inquiries; receiving, processing

22          and verifying Claim Forms; data storage; establishing and maintaining the Post Office box

23          required for opt-outs; opt-out processing costs; any costs incurred in preparing to perform or

24          performing the actions required by Paragraphs 18-20; preparing, disseminating and filing

25          any data or reports required by the Settlement or the Court; preparing and transmitting

26          payments to Settlement Class Members; account reconciliation; the performance of the other

27          duties of the Claims Administrator described in Paragraph 26; administration and labor

28

- 10 -

1    incidental or related to the foregoing; and any and all other actions reasonably necessary to

2    the performance, approval and effectuation of the Settlement.

3          (2)    In the event the $2.5 million is insufficient to cover such fees, costs

4    and expenses, Bank of America will be responsible to pay the additional amount of such

5    fees, costs and expenses.  Any additional amount paid by Bank of America in accordance

6    with the immediately preceding sentence shall be over and above the total settlement sum of

7    $35 million.  If the actual amount of such fees, costs and expenses is less than $2.5 million,

8    the difference between such actual amount and $2.5 million shall be paid into the *cy pres*

9    fund pursuant to Paragraph 10(b).

10          (f)    **Business Practices:**  Bank of America represents that, following the

11    commencement of the Action:

12          (1)    Bank of America has ceased running the advertisement referenced in

13    paragraphs 25 and 26 of the Complaint and deleted from its website and advertising the

14    statement that, when a Bank of America debit card is used for a debit card purchase

15    transaction, the money for the purchase comes out of the customer's account at the time the

16    customer spends it;

17          (2)    Bank of America has created an educational brochure and launched

18    an online fee education site and a promotional campaign to raise awareness of Bank of

19    America's customers concerning Bank of America's account processes and fees, including,

20    without limitation:

21          The creation and dissemination of The *Helpful Information for Better*

22    *Banking Guidebook* that provides customers with straightforward descriptions of bank

23    processes and how customers can better manage their accounts to attempt to avoid or

24    minimize fees.

25          The creation and operation of a fully functional online fee and bank

26    processes education and management website

27    (**www.bankofamerica.com/feesandprocesses**) as a customer resource and to provide quick

28

- 11 -

FINAL SETTLEMENT AGREEMENT

1    access to information about account alerts, overdraft protection, and online banking, among

2    other subjects; and

3               (3)    Bank of America has revised various account brochures and customer

4    notices, including its *Personal Schedule of Fees, Deposit Agreement and Disclosures*, and

5    insufficient funds/overdraft notices, to provide more information and practical solutions to

6    various customer account concerns.

7    **Waiver of Five-Year Period**

8               11.    The time for bringing this Action to trial under §583.310 of the California Code of

9    Civil Procedure shall be extended for a period equal to the period from June 30, 2007, to the earlier

10   of the date on which this Settlement is terminated pursuant to written notice as permitted by this

11   Settlement, or the Effective Date.  Such extension shall be in addition to any other extensions, if

12   any, previously agreed to by the Parties and/or mandated or applicable by law.

13   **Attorneys' Fees and Costs**

14              12.    Class Counsel will seek Court approval for payment by Bank of America of not

15   more than $8.125 million for attorneys' fees and litigation costs incurred in prosecuting, handling

16   and resolving the Action, and Bank of America agrees not to oppose such application.  Bank of

17   America shall have no other or further liability for fees and costs of Plaintiff, any Settlement Class

18   Member, or any Class Counsel.

19              (a)    If the Court awards attorneys' fees and litigation costs to Class

20        Counsel in an amount less than $8.125 million, the difference between $8.125 million and

21        the amount actually awarded shall be added to the Settlement Fund for distribution to

22        Settlement Class Members pursuant to Paragraph 10(a).

23              (b)    Even though Class Counsel shall not seek Court approval for payment

24        by Bank of America of not more than $8.125 million for attorneys' fees and litigation costs

25        incurred in prosecuting, handling and resolving the Action, in the event the Court were to

26        award attorneys' fees and litigation costs to Class Counsel in excess of $8.125 million, Class

27        Counsel will waive any such amount awarded in excess of $8.125 million.

28

- 12 -

1    (c)    Unless the Settlement is terminated as provided in the Settlement,

2    Bank of America shall pay the attorneys' fees and litigation costs awarded by the Court to

3    Class Counsel within 30 days of the Effective Date.

4    (d)    Bank of America's obligation to pay attorneys' fees and litigation

5    costs to Class Counsel hereunder is conditioned upon Class Counsel's providing Bank of

6    America with W-9s and/or their respective taxpayer identification numbers no later than 10

7    business days prior to payment.

8    (e)    Except as otherwise expressly set forth above, the Settlement shall not

9    be conditioned upon or subject to Court approval of an award of any particular amount of

10   attorneys' fees and litigation costs to Class Counsel.

11   **Releases**

12   13.    As of the Effective Date, Plaintiff and each Settlement Class Member shall be

13   deemed to have fully released and forever discharged Bank of America, N.A., Bank of America

14   California, N.A, Bank of America Corp., any parent, affiliate or sister company of any of the

15   foregoing, any direct or indirect subsidiary of any of the foregoing, any successor to any of the

16   foregoing, and all of the past and present employees, agents, representatives, attorneys, insurers,

17   officers, and directors of each of them, of and from any and all rights, claims, actions, causes of

18   action, demands and remedies, known or unknown, liquidated or unliquidated, legal, statutory, or

19   equitable, that result from, arise out of, are based upon, or relate to the conduct, omissions, duties or

20   matters alleged in the Complaint, including claims relating to any or all of the following matters,

21   provided such claims result from, arise out of, or are based upon the use of a Bank of America debit

22   card by the cardholder or by an authorized user of the debit card that led to the assessment of one or

23   more insufficient funds fees, overdraft fees, overlimit fees, returned item fees, or similar fees:  (a)

24   the order or manner in which Bank of America debit card and other transactions are posted to and

25   debited from Bank of America accounts on days when a Bank of America debit card is used or a

26   Bank of America debit card transaction is posted; (b) the authorization, approval and handling of

27   any Bank of America debit card transactions; (c) any fees or charges resulting from or relating to

28   Bank of America debit card transactions; (d) any failure to warn when Bank of America debit card

- 13 -

1   transactions would cause a Bank of America account to be overdrawn or a fee assessed; (e) the

2   accuracy of any Bank of America account balance or other Bank of America account information

3   relating to a Bank of America debit card provided or shown online or through other means; (f) any

4   conduct, representations or statements (in Bank of America account agreements or otherwise)

5   encouraging the use of Bank of America debit cards or reliance on any Bank of America account

6   balance or other Bank of America account information relating to a Bank of America debit card

7   provided or shown online or through other means; (g) the timing and manner of distribution of Bank

8   of America account agreements as it relates to Bank of America debit cards; and (h) any advertising

9   or advertisements relating to any of the foregoing.

10      14.     Plaintiff and each Settlement Class Member further waive and release any and all

11   provisions, rights, and benefits conferred by § 1542 of the California Civil Code or similar laws of

12   any other state or jurisdiction.  Section 1542 of the California Civil Code reads:

13      §1542.  Certain claims not affected by general release.  A general release does not
        extend to claims which the creditor does not know or suspect to exist in his favor at
14      the time of executing the release, which if known by him must have materially
        affected his or her settlement with the debtor.
15

16      15.     Plaintiff or any Settlement Class Member may hereafter discover facts other than or

17   different from those that he/she knows or believes to be true with respect to the subject matter of the

18   claims released pursuant to the terms of Paragraphs 13 and 14, or the law applicable to such claims

19   may change.  Nonetheless, each of those individuals expressly agrees that, as of the Effective Date,

20   he/she shall have waived and fully, finally, and forever settled and released any known or unknown,

21   suspected or asserted or unasserted, liquidated or unliquidated, contingent or non-contingent claims

22   with respect to all of the matters described in or subsumed by Paragraphs 13 and 14.  Further, each

23   of those individuals agrees and acknowledges that he/she shall be bound by this Settlement,

24   including by the releases contained in this paragraph and in Paragraphs 13 and 14, and that all of

25   their claims in the Action shall be dismissed with prejudice and released, whether or not such claims

26   are concealed or hidden; without regard to subsequent discovery of different or additional facts and

27   subsequent changes in the law; and even if he/she never receives actual notice of the Settlement,

28   never submits a Claim Form, or never receives a distribution of funds from the Settlement.

- 14 -

FINAL SETTLEMENT AGREEMENT

16.    As of the Effective Date, Bank of America shall be deemed to have, and by operation of the Judgment shall have, fully, finally and forever released and discharged Plaintiff, any Settlement Class Member who actively assisted Plaintiff in initiating or prosecuting the Action, and Class Counsel from any and all claims based upon the initiation, prosecution, or resolution of the Action.  Nothing herein shall operate or be construed to release any claims or rights by Bank of America to recover any past, present, or future amounts that may be owed by Plaintiff or by any Settlement Class Member or Class Counsel on his/her accounts, loans or debts with Bank of America, pursuant to the terms and conditions of such accounts, loans or debts.

**Preliminary Court Approval**

17.    The Plaintiff shall promptly make, and Bank of America shall not oppose, a motion in the Action for entry of the Preliminary Approval Order by the Court, which order will:

(a)    Preliminarily approve this Settlement;

(b)    Approve the form of Notice to be provided to the Settlement Class, including the form of Mailed Notice, the form of Electronic Notice, and the form of Published Notice;

(c)    Direct that such Notice be provided to the Settlement Class, in accordance with the Settlement;

(d)    Establish a procedure for Settlement Class Members to object to the Settlement or to exclude themselves from the Settlement Class, and set a date, not later than 45 days prior to the date set for the Final Hearing, after which no one shall be allowed to object to the Settlement or to exclude himself/herself from the Settlement Class;

(e)    Pending final determination of whether the Settlement should be approved, stay all proceedings in the Action except those related to the effectuation of the Settlement; and

(f)    Schedule a date for the Final Hearing which is at least 270 days after the filing of the Preliminary Approval Order by the Court.

Plaintiff will set the hearing on the motion for entry of the Preliminary Approval Order on a date agreed to by Defendants.

- 15 -

1    **Notice to Settlement Class Members of Settlement**

2    18.    Commencing no later than 45 days after the filing by the Court of the Preliminary

3    Approval Order, the Claims Administrator shall post on the Settlement Website a copy of the

4    Electronic Notice, the Web Claim Form in .html and .pdf format that can be completed and

5    submitted online, and any other documents agreed to by the Parties.  These documents shall remain

6    available on the Settlement Website until at least the date set for the Final Hearing.

7    19.    Within 135 days from the beginning of the calendar month after the filing by the

8    Court of the Preliminary Approval Order, Bank of America shall mail, or cause to be mailed, the

9    Mailed Notice to all persons having a Bank of America account for which a Bank of America debit

10    card has been issued and who, as of the time of such mailing, have mailing addresses in the United

11    States for purposes of communicating with Bank of America and receive their periodic account

12    statements from Bank of America by mail.  Bank of America may insert the Mailed Notice into and

13    as part of the regular account statement mailing to such accountholders, as a statement insert or

14    similar document, as long as the insert is clearly marked to indicate that it is a legal notice which

15    may affect the recipient's legal rights.  The Mailed Notice will be sent to such accountholders at the

16    last known address as shown on Bank of America's computerized records with respect to their

17    accounts.  At least 15 days before the Final Hearing, Bank of America or the Claims Administrator

18    shall file with the Court and serve on Class Counsel and Defendant's Counsel one or more

19    declarations stating that the Mailed Notice was provided in accordance with the requirements of the

20    Preliminary Approval Order.

21    20.    Within 135 days from the beginning of the calendar month after the filing by the

22    Court of the Preliminary Approval Order, Bank of America shall give the Electronic Notice to all

23    persons having a Bank of America account for which a debit card has been issued and who, as of

24    the time of giving such notice, receive their periodic account statements from Bank of America

25    electronically on-line.  The Electronic Notice will be available through a designated link on the

26    same webpage from which such accountholders may click to view their monthly account

27    statements.  In the same email in which such accountholders are notified by Bank of America that

28    their recent account statement is available to view online (which email is sent to such

- 16 -

1   accountholders at the last known email address as shown on Bank of America's computerized

2   records with respect to their accounts), they will also be notified that the statement is accompanied

3   by a legal notice which may affect the recipient's legal rights.  At least 15 days before the Final

4   Hearing, Bank of America or the Claims Administrator shall file with the Court and serve on Class

5   Counsel and Defendant's Counsel one or more declarations stating that the Electronic Notice was

6   provided in accordance with the requirements of the Preliminary Approval Order.

7        21.    In addition to the Mailed Notice and the Electronic Notice, Bank of America shall

8   provide Notice of this Settlement by publishing a ¼ page Published Notice in a national edition of

9   USA Today on the first available Friday and then again on a Monday, Tuesday, Wednesday or

10  Thursday at least ten days after the date the first notice was published.  Both instances of

11  publication of the Published Notice shall occur during the same account statement mailing cycle in

12  which Mailed Notice is provided pursuant to Paragraph 19.  At least 15 days before the Final

13  Hearing, Bank of America or the Claims Administrator shall file with the Court and serve on Class

14  Counsel and Defendant's Counsel one or more declarations stating that the Published Notice was

15  provided in accordance with the requirements of the Preliminary Approval Order.

16  **Exclusion from the Settlement Class and Bank of America's Right to Terminate Settlement**

17       22.    If a Settlement Class Member wishes to be excluded from the Settlement Class, the

18  Settlement Class Member's written request for exclusion must be mailed to and received by the

19  Claims Administrator no later than 45 days prior to the date set for the Final Hearing.  The request

20  for exclusion must refer to *Closson v. Bank of America N.A.* and must list the account number(s) of

21  the Settlement Class Member's Bank of America account(s) linked to a Bank of America debit card.

22  In addition, the request for exclusion must include, for each account listed: (1) the full names and

23  current addresses of everyone whose name is on the account; (2) a statement that everyone whose

24  name is on the account satisfies the criteria set forth in Paragraph 8 to be a Settlement Class

25  Member; (3) a statement of intention to exclude everyone whose name is on the account from the

26  Settlement Class; and (4) the signature of everyone whose name is on the account.

27       23.    Bank of America shall have the right to terminate the Settlement by serving on Class

28  Counsel and filing with the Court a notice of termination within ten court days of its receipt from

- 17 -

FINAL SETTLEMENT AGREEMENT

1  the Claims Administrator of the report specified in Paragraph 26(g)(ii) if the number of Settlement

2  Class Members who timely request exclusion from the Settlement Class equals or exceeds the

3  number specified in a Supplemental Agreement executed concurrently with this Settlement by the

4  Parties.

5  **Objections to Settlement**

6        24.    Any Settlement Class Member who does not opt out of the Settlement Class may

7  object to the Settlement by filing with the Court and delivering to Class Counsel and Defendant's

8  Counsel, by first class mail, postmarked not later than 45 days prior to the date set for the Final

9  Hearing (unless such time is extended for such Settlement Class Member in a writing signed by

10  Class Counsel and Defendant's Counsel), a written statement of objection and information showing

11  the objector satisfies the criteria set forth in Paragraph 8 to be a Settlement Class Member.  The

12  written statement of objection must set forth (i) the name of this Action; (ii) the Settlement Class

13  Member's full name, address, telephone number, and (iii) the specific reasons for the objection.  All

14  Settlement Class Members or their attorneys who intend to appear at the Final Hearing must file

15  with the Court and serve upon Class Counsel and Defendant's Counsel, not later than 45 days prior

16  to the date set for the Final Hearing (unless such time is extended for such Settlement Class

17  Member in a writing signed by Class Counsel and Defendant's Counsel), a notice of their intention

18  to appear.

19  **Settlement Administration**

20        25.    Bank of America shall retain Rust Consulting Inc. as the Claims Administrator.

21  Bank of America shall pay the fees and costs of the Claims Administrator and the fees and costs of

22  any other third-party vendors performing tasks necessary for the implementation or effectuation of

23  the Settlement as provided in Paragraph 10(e)(1).

24        26.    The duties of the Claims Administrator, in addition to any other duties that may be

25  specifically described herein, are as follows:

26            (a)    Receive and process all Claims Forms and all requests for exclusion from the

27      Settlement Class;

28

- 18 -

1      (b)    Establish and operate an "800" number to receive and respond to requests for

2  Claim Forms and questions about the Settlement;

3      (c)    If requested by Bank of America, prepare, print and mail the Mailed Notice

4  and Mailed Claim Forms, prepare, place and cause to be published the Published Notice, and

5  prepare and transmit the Electronic Notice and Web Claim Form;

6      (d)    Establish and maintain a Post Office box for requests for exclusion from the

7  Settlement Class and shall handle all requests for exclusion;

8      (e)    Create, host and maintain the Settlement Website

9      (f)    Receive and process Claim Forms, and prepare and transmit payments to

10  Settlement Class Members pursuant to Paragraph 10(a);

11      (g)    Provide the following lists to Bank of America, Class Counsel, and

12  Defendant's Counsel (except that on the lists provided to Class Counsel and Defendant's Counsel

13  any account numbers or partial social security numbers shall be redacted), starting on the Effective

14  Date and periodically thereafter:

15      (i)    a list identifying (by the available information regarding name,

16  address, and/or account number) those persons who have returned a Mailed or Web

17  Claim Form; and

18      (ii)    a list identifying those persons who have submitted a request

19  for exclusion pursuant to Paragraph 22 and the terms of the Preliminary Approval

20  Order, and copies of all such requests for exclusion, with a complete list of all

21  persons requesting exclusion from the Settlement Class being provided to Bank of

22  America, Class Counsel, and Defendant's Counsel no later than 35 days prior to the

23  date set for the Final Hearing;

24      (h)    Provide, if necessary, any or all of the declarations required by Paragraphs

25  19-21; and

26      (i)    Maintain and oversee data storage relating to the Settlement and claims

27  process, and engage in account reconciliation, and general administration incidental to the

28  foregoing.

- 19 -

FINAL SETTLEMENT AGREEMENT

1   The Claims Administrator's fees, costs and expenses in performing the foregoing duties will be

2   included in the notice and administrative costs of this Settlement provided for in Paragraph 10(e)(1).

3   **Effective Date of Settlement**

4       27.     The Effective Date of the Settlement shall be 10 days after all of the following

5   conditions have occurred and been satisfied:

6           (a)     This Settlement has been signed by the Parties, Class Counsel and

7   Defendant's Counsel;

8           (b)     The Court has entered the Preliminary Approval Order substantially in the

9   form of Exhibit A attached hereto;

10          (c)     Notice has been provided to the Settlement Class as required by the

11  Preliminary Approval Order and Bank of America or the Claims Administrator has filed one

12  or more declarations attesting that such notice was provided;

13          (d)     The Court has entered the Judgment and Order of Dismissal with Prejudice

14  substantially in the form of Exhibit F attached hereto;

15          (e)     Notice of Entry of the Judgment and Order of Dismissal with Prejudice has

16  been served in accordance with §664.5 of the California Code of Civil Procedure to the

17  Parties and to any persons, or their counsel, who objected to the Settlement in the manner

18  provided for in the Preliminary Approval Order; and

19          (f)     The Judgment and Order of Dismissal with Prejudice has become Final.  The

20  Judgment and Order of Dismissal with Prejudice shall be deemed to have become Final:  (i)

21  70 days after Notice of Entry of the Judgment and Order of Dismissal with Prejudice has

22  been served, if no notice or other document is filed within that time seeking appeal, review,

23  rehearing, reconsideration, vacation, or any other action regarding the Judgment; or (ii) if

24  any such notice or document is filed, then 15 days after the date upon which all appellate

25  and/or other proceedings resulting from the notice or document have been finally terminated

26  or resolved in such a manner as to permit no further judicial action, challenge, modification

27  or review of the Judgment.

28  **No Admission of Liability**

- 20 -

1    28.    Bank of America expressly denies any and all liability in this Action.  By entering

2    into this Settlement, Bank of America is not admitting any liability whatsoever to Plaintiff, any

3    Settlement Class Member or any other person or entity or the truth of any allegations or

4    circumstances, nor is Bank of America waiving any claim, counterclaim, defense, or affirmative

5    defense except to the extent otherwise expressly provided by this Settlement.

6    **Termination of Settlement**

7    29.    This Settlement may be terminated as provided in Paragraphs 9, 12(b), and 23.  This

8    settlement may also be terminated by either Party by providing written notice to counsel for the

9    opposing Party and the Court within 10 days after any of the following occurrences:

10    (a)    Any court rejects, modifies, amends, or declines to approve the Settlement;

11    (b)    Any court incorporates into, or deletes or strikes from, the Preliminary

12    Approval Order, Judgment, or the Settlement, any provision which the Party seeking to terminate

13    the Settlement regards as material; or

14    (c)    Any court makes any order precluding Plaintiff or Bank of America from

15    proceeding in whole or in part with the Settlement.

16    30.    In the event of a termination in accordance with the provisions of this Settlement:

17    (a)    This Settlement, except for this paragraph and Paragraphs 9, 11, 23, and 28,

18    shall be null and void and of no further effect;

19    (b)    Any certification of the Settlement Class by the Court will be vacated;

20    (c)    The Parties will be returned to their positions *quo ante* with respect to all

21    facets of the Action, including, without limitation, with respect to the appropriateness of class

22    certification, as if the Settlement had not been entered into;

23    (d)    Neither the Settlement terms nor any publicly disseminated information

24    regarding the Settlement, including, without limitation, the Mailed, Electronic, and Published

25    Notices, court filings, orders and public statements relating to the Settlement, may thereafter be

26    used as evidence for any purpose whatsoever; and

27    (e)    The fact of, and any documents, findings, decisions, or orders relating to, any

28    failure of a court to approve the Settlement or any modification or amendment of the Settlement by

- 21 -

1 a court, as well as the fact and contents of any objections which may have been filed to the

2 Settlement, may not be used as evidence for any purpose whatsoever.

3      31.    However nothing in the preceding paragraph is intended or will be construed to limit

4 a Party's right to use or to offer the Settlement in evidence in any action or proceeding in any court

5 or other tribunal to enforce or implement its terms, to support or defend the Settlement Agreement,

6 including on any appeal from the Judgment, or to enforce or assert a claim or defense of *res*

7 *judicata*, collateral estoppel, claim or issue preclusion, settlement, release, merger and bar, or any

8 similar claim or defense against a Settlement Class Member.

9 **Media or Internet Communications**

10      32.    No Party, Class Counsel or Defendants' Counsel, or anyone else acting on behalf of

11 any of them may issue any press release, or make any comments to the news media (either on or off

12 the record) or on any blog or online forum or website, or instigate any Party or third party to make

13 any comments to the news media (either on or off the record) or on any blog or online forum or

14 website, except that a press release may be issued upon joint written agreement of Class Counsel

15 and Defendants' Counsel, and except that in response to inquiries by the press or otherwise, a Party,

16 Class Counsel, or Defendants' Counsel may say that the Settlement was arrived at after extensive

17 negotiations; the Settlement is fair and reasonable and in the best interests of all Parties and

18 Settlement Class Members; the Settlement was entered into in order to end costly, burdensome and

19 lengthy litigation; and/or the Settlement does not constitute any admission of any wrongdoing by

20 Defendants, which continue to assert that they acted lawfully at all times, and except that in

21 response to inquiries or requests by the press or otherwise, Class Counsel and Defendants' Counsel

22 may send copies of the Complaint and settlement documents.  Class Counsel shall explain to

23 Plaintiff her obligations and commitments under this paragraph but, if despite Class Counsel's best

24 efforts, there is a violation of this paragraph by the Plaintiff, Class Counsel shall have no liability

25 for such violation and such violation shall not result in a termination of this Settlement.

26 **General Provisions**

27      33.    This Settlement constitutes the entire agreement between and among the Parties with

28 respect to the settlement of the Action.  This Settlement shall not be construed more strictly against

1   one party than another merely because it may have been prepared by counsel for one of the Parties,

2   it being recognized that, because of the arms-length negotiations resulting in the Settlement, all

3   Parties hereto have contributed substantially and materially to the preparation of the Settlement.

4   This Settlement supersedes all prior negotiations and agreements and may not be modified or

5   amended except by a writing signed by the Parties, Class Counsel and Defendant's Counsel.

6       34.     Each Party to the Settlement warrants that he, she or it is acting upon his, her or its

7   independent judgment and upon the advice of his, her or its own counsel and not in reliance upon

8   any warranty or representation, express or implied, of any nature or kind by any other person, other

9   than the warranties and representations expressly made in the Settlement.

10      35.     All of the Exhibits to this Settlement are material and integral parts hereof and are

11  fully incorporated by reference.  All captions used in the Settlement are for reference and

12  convenience only and shall not be used in interpreting the Settlement.

13      36.     The Parties, Class Counsel, and Defense Counsel shall execute all documents and

14  perform any additional acts necessary and proper to effectuate the terms of the Settlement and to

15  obtain the benefit of the Settlement for the Parties and Settlement Class Members.

16      37.     The Parties, Class Counsel, and Defense Counsel shall not engage in any conduct or

17  make any statements, directly or indirectly, (a) to encourage, promote, or solicit Settlement Class

18  Members or their counsel to request exclusion from the Settlement Class or to object to the

19  Settlement, or (b) to facilitate, induce or cause the non-fulfillment of a condition or the occurrence

20  of an event giving rise to a Party's right to terminate this Settlement.

21      38.     The Settlement shall be binding upon, and shall inure to the benefit of, the Parties,

22  the Settlement Class Members, the persons released in Paragraphs 13-16, and the respective heirs,

23  administrators, successors, and assigns of each of them.  Except as provided in the foregoing

24  sentence, nothing in this Settlement is intended to create any legally enforceable rights in any other

25  person or to make any other person, including, but without limitation, an agreed upon recipient of *cy*

26  *pres* funds pursuant to Paragraph 10(b), a beneficiary of this Settlement.

27      39.     This Settlement shall be construed, enforced and administered in accordance with the

28  laws of the State of California without reference to its conflict of laws principles.

- 23 -

FINAL SETTLEMENT AGREEMENT

40.     The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of the Settlement, and all Parties and Settlement Class Members submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement.

41.     This Settlement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together constitute one and the same instrument.

**AGREED AND ACCEPTED:**

DATED: 7/30/08 , 2008          ARIANA NASH

DATED: _____, 2008          BANK OF AMERICA, N.A.

By: _____

Title: _____

- 24 -

FINAL SETTLEMENT AGREEMENT

40.     The Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of the Settlement, and all Parties and Settlement Class Members submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement.

41.     This Settlement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together constitute one and the same instrument.


**AGREED AND ACCEPTED:**


DATED: _____, 2008       ARIANA NASH


                                    _____


DATED: July 30, 2008                BANK OF AMERICA, N.A.

                                    By:  David Rudis

                                    _____

                                    Title: SVP

- 24 -

**APPROVED AS TO FORM:**

WHATLEY DRAKE & KALLAS LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

DAVIS, COWELL & BOWE, LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

MCCUNE & WRIGHT

By: _____
    Attorneys for Plaintiff
    and Settlement Class

ROSNER & MANSFIELD, LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

ARNOLD & PORTER, LLP

By: _____
    Laurence J. Hutt
    Attorneys for Defendant

FINAL SETTLEMENT AGREEMENT

**APPROVED AS TO FORM:**

WHATLEY DRAKE & KALLAS LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

DAVIS, COWELL & BOWE, LLP

By: _Elizabeth A. Lawrence_ by permission GV
    Attorneys for Plaintiff
    and Settlement Class

MCCUNE & WRIGHT

By: _____
    Attorneys for Plaintiff
    and Settlement Class

ROSNER & MANSFIELD, LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

ARNOLD & PORTER, LLP

By: _____
    Laurence J. Hutt
    Attorneys for Defendant

- 25 -

**APPROVED AS TO FORM:**

WHATLEY DRAKE & KALLAS LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

DAVIS, COWELL & BOWE, LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

MCCUNE & WRIGHT

By: _____
    Attorneys for Plaintiff
    and Settlement Class

ROSNER & MANSFIELD, LLP

By: _____
    Attorneys for Plaintiff
    and Settlement Class

ARNOLD & PORTER, LLP

By: _____
    Laurence J. Hutt
    Attorneys for Defendant

- 25 -

**APPROVED AS TO FORM:**

WHATLEY DRAKE & KALLAS LLP

By: _____
      Attorneys for Plaintiff
      and Settlement Class

DAVIS, COWELL & BOWE, LLP

By: _____
      Attorneys for Plaintiff
      and Settlement Class

MCCUNE & WRIGHT

By: _____
      Attorneys for Plaintiff
      and Settlement Class

ROSNER & MANSFIELD, LLP

By: _____
      Attorneys for Plaintiff
      and Settlement Class

ARNOLD & PORTER, LLP

By: *Lawrence J. Hutt / F.B.*
      Laurence J. Hutt
      Attorneys for Defendant

FINAL SETTLEMENT AGREEMENT

*Additional Counsel Continued From First Page*

MCCUNE & WRIGHT
RICHARD D. MCCUNE (State Bar No. 1321240
2068 Orange Tree Lane, Suite 215
Redlands, CA 92374

ROSNER & MANSFIELD
Alan M. Mansfield (State Bar No. 125998)
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131

Attorneys for Plaintiff

Of Counsel:

ARNOLD & PORTER LLP
HOWARD N. CAYNE (Admitted *pro hac vice*)
555 Twelfth Street NW
Washington, DC 20004-1206
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Attorneys for Defendants

- 26 -