**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RAMONA TROMBLEY, BRIAN WELLS, AND JEFF DOEHNER, Individually and on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**NATIONAL CITY BANK,** *et al.*,<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CIVIL ACTION NO:  10-00232-JDB**<br>)<br>)<br>)<br>)<br>)<br>) |

**NATIONAL CITY BANK'S RESPONSE TO COURT'S
QUESTIONS AND TO OBJECTIONS OF ROBERT MATOS**

## I.   INTRODUCTION

By Order entered August 18, 2010, the Court directed the parties to file supplemental briefs answering two questions:  (1) whether jurisdiction over this matter exists in light of the interpretation given the Class Action Fairness Act ("CAFA") in *Cappuccitti v. DirecTV, Inc.*, 611 F.3d 1252 (11th Cir. 2010), *rehearing pet. pending*, and (2) whether and to what extent approval of the settlement here would impact other class actions against National City Bank ("NCB")[1] and/or Multidistrict Litigation ("MDL") proceedings in the Southern District of Florida pertaining to overdraft fees.  In Section II below, NCB[1] will respond to the Court's

---

[1]      As averred in the Complaint, NCB's parent was acquired by PNC Financial Services Group.  In connection therewith, NCB was merged into PNC Bank, N.A., and NCB therefore no longer exists as a legal entity.  But because the complaint names NCB, and more importantly, because the settlement pertains only to NCB's customers (not to PNC customers who never had a relationship with NCB), *see infra* Section II(B), this brief shall refer to NCB, not PNC.

questions.  In Part III, NCB will take this opportunity to address the objections raised by

Objector Robert Matos ("Objector") that are appropriately addressed at this juncture by the

settling defendant.

## II.   THIS COURT HAS JURISDICTION OVER THIS MATTER, AND THE SETTLEMENT WILL NOT INAPPROPRIATELY IMPACT THE MDL

### A.   Jurisdiction

#### 1.   Federal Question Jurisdiction Exists By Virtue of the Electronic Funds Transfer Act Claim

In *Cappuccitti* the sole basis for federal jurisdiction was the CAFA.  That is not

the case here.  Plaintiffs have pleaded a claim under the Electronic Funds Transfer Act, 15 U.S.C

§ 1693 *et seq*.  While NCB would contest the viability and merits of that claim were the

settlement not approved, its existence confers federal question jurisdiction over that claim, and

over the remainder of the claims through supplemental jurisdiction.  *See* 28 U.S.C §§ 1331,

1367(a).  Accordingly, while NCB will proceed below to answer the Court's question regarding

*Cappuccitti* and CAFA jurisdiction, subject matter jurisdiction here need not be founded on the

CAFA.

#### 2.   CAFA Does Not Require A Class Action Plaintiff's Claim To Exceed $75,000

In 2005, Congress enacted the CAFA to broaden federal court jurisdiction over

class actions involving small individual dollar amount claims that, when aggregated, satisfy an

amount in controversy threshold of $5,000,000.  The CAFA provides in relevant part that:

> The district courts shall have original jurisdiction of any civil
> action in which the matter in controversy exceeds the sum or value
> of $5,000,000, exclusive of interest and costs, and is a class action
> in which –
>
> (A) any member of a class of plaintiffs is a citizen of a State
> different from any defendant;

(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

28 U.S.C § 1332(d)(2).  The CAFA has three requirements for establishing subject matter jurisdiction: "(a) a combined alleged claim of more than $5,000,000, § 1332(d)(6); (b) more than 100 members in the proposed class, § 1332(d)(5)(B); and (c) diversity of citizenship, § 1332(d)(2)(A)."  *National Consumers League v. General Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010).

    This action satisfies these elements.  First, Plaintiffs allege that the claims of the putative class members, when aggregated, exceed $5,000,000.  (*See* Compl. ¶ 10.)  Although National City disputes liability, satisfaction of the amount-in-controversy requirement can hardly be disputed given the proposed settlement fund of $12,000,000.  Second, the putative class, being composed of NCB customers who incurred overdraft fees in connection with electronic debit transactions, easily exceeds more than 100 members.  Third, there exists minimal diversity, as "some members of the Classes are citizens of states different from" National City.  (*Id.* at ¶10.)

    *Cappuccitti* challenges the first element.  There, the Eleventh Circuit held that the district court lacked jurisdiction over the plaintiffs' class action claims because, although the plaintiff satisfied the aggregate amount in controversy set forth in § 1332(d), a class action plaintiff must also satisfy § 1332(a)'s $75,000 amount in controversy requirement.  *See Cappuccitti*, 611 F.3d at 1256.  Thus, if *Cappuccitti* were correctly decided, there would be no CAFA jurisdiction over Plaintiffs' claims.

NCB respectfully submits, however, that *Cappuccitti* was wrongly decided and is contrary to the plain language of the CAFA statute.  Section 1332(d) commands that the aggregated amount in controversy for class actions must exceed $5,000,000.  *See* 28 U.S.C. § 1332(d)(2).  The statutory text contains no additional amount-in-controversy requirement applicable to class actions, and does not incorporate or otherwise refer to the amount-in-controversy provision of § 1332(a).

By contrast, § 1332(d)(11) expressly mandates that, in addition to satisfying the amount-in-controversy requirements of the CAFA, a "mass action" must also satisfy the $75,000 amount-in-controversy requirement of section 1332(a).  *See* 28 U.S.C. § 1332 (d)(11)(B)(i) ("jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).").  The court in *Cappuccitti* incorporated this requirement applicable to "mass actions" into the requirement for "class actions," but there was simply no textual basis for it to do so.  Congress carefully defined "class actions" separately from "mass actions"; one is not the same as the other.  *Compare* 28 U.S.C. § 1332(d)(1)(b) *with* 28 U.S.C. § 1332 (d)(11)(B)(i).  Indeed, Congress "deemed" mass actions to be removable under the provision applicable to class actions, *id.* § 1332(d)(11)(A), but it immediately thereafter imposed the $75,000 requirement as an ***additional*** requirement for mass action claims.  *Id.* § 1332 (d)(11)(B)(i).  That the incorporation of § 1332(a)'s amount-in-controversy requirement was added to the narrower ***mass action*** provision, but omitted from the broader ***class action*** provision, is dispositive.  *See Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 452 (2002) ("it is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion.' " (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17

(1983) (in turn quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972)).

        *Cappuccitti's* holding on CAFA jurisdiction was issued *sua sponte* and, as noted

above, a petition for rehearing is presently pending in the Eleventh Circuit.  It is telling that, in

the five years since the CAFA was enacted, no other court of appeals has ever adopted the

principle announced in *Cappuccitti* (*Cappuccitti* itself acknowledges this, 611 F.3d at 1256); nor

is NCB aware of any district court having done so.  Not surprisingly, courts within this District

have found subject matter jurisdiction to exist over class actions where the CAFA requirements

of section 1332(d) have been met.  *See, e.g., Radosti v. Envision EMI, LLC*, No. 09-887, 2010

WL 2292343, at *26 (D.D.C. June 8, 2010) (approving class action settlement where plaintiffs

sought to recover tuition paid in the range of $2,380 to $2,729 per class member and finding "[i]t

is undisputed that the Court has jurisdiction over this class action under the diversity statute as

amended by CAFA.  *See* 28 U.S.C. §  1332(d).").

        Even where courts within this District have held that subject matter jurisdiction

did not exist over class actions, they looked only to the requirements of section 1332(d), and not

to whether section 1332(a) had also been satisfied.  *See*, *e.g.*, *Wexler v. United Air Lines, Inc.,*

496 F. Supp. 2d 150 (D.D.C. 2007) (finding subject matter jurisdiction did not exist under

§ 1332(d) due to uncertainty over the number of class members).  "CAFA [] contains a

$5,000,000 amount in controversy requirement.  28 U.S.C. § 1332(d)(2).  The claims of all class

members are aggregated to reach this amount.  28 U.S.C. § 1332(d)(6).  To calculate the total

amount, the average class members claim is multiplied by the number of class members."  *Id*. at

155.  That analysis squarely comports with the text of the CAFA; *Cappuccitti's* does not.  Thus,

even apart from federal question jurisdiction, this Court has CAFA jurisdiction over Plaintiffs' claims.

> ### B.     Impact Of The Settlement On The MDL

The impact of the settlement presented to the Court for preliminary approval, if given final approval, will be limited.  By releasing the claims (except for opt-outs' claims) of former NCB customers and current PNC customers who were once NCB customers, the settlement would presumably stop the lawsuit in which Objector Matos is the named plaintiff from proceeding as a class action.  *Matos v. National City Bank* is a later filed class action, however, and, as shown below, it is entirely appropriate that the present litigation and settlement take precedence over *Matos*; beyond that, the settlement will not impact MDL overdraft litigation.

A slight bit of background is in order on this point.  As noted above in footnote 1, NCB was acquired by PNC; NCB no longer exists as a legal entity.  The instant complaint was filed against NCB on behalf of a class of NCB customers.  It does not seek to certify a class of PNC customers who were not originally NCB customers.  By contrast, three actions against PNC have been filed in the MDL that fit that description.  Accordingly, the parties to this settlement were very careful in drafting the Settlement Agreement and ancillary documents to not release the claims of PNC customers who did not come to PNC via NCB.  In this regard it is significant that Objector Matos, who is represented by counsel on the Plaintiffs' Executive Committee overseeing the MDL, has not argued that this settlement will interfere with the cases pending against **PNC**.[2]

---

[2]     The *Casayuran* (as amended) and *Hernandez* actions against PNC do make general references to the NCB merger and conclusorily state that PNC includes NCB, but the allegations of those complaints are directed solely against PNC.

By contrast, it is entirely appropriate that *Trombley* take precedence over any

other litigation complaining of NCB practices and seeking to certify a NCB class.  This lawsuit

was filed before any other such complaint.  Indeed, to date only one other such complaint has

been filed, that being the *Matos* action, but *Matos* was not filed until June 1, 2010, almost four

months after *Trombley*.

That this Court need not be concerned with the impact of this settlement on the

MDL proceedings, in light of its impact only on the NCB class for which *Trombley* was the first-

filed complaint and *Matos* the later-filed action, is established by the action of the Judicial Panel

on Multidistrict Litigation ("the Panel").  In its August 9, 2010 Order, the Panel vacated CTO-16

and held that this Court should preside over the matter and decide whether the Settlement

Agreement should be approved:

> Plaintiffs and defendant National City Bank in an action pending in
> the District of Columbia *(Trombley)* have separately moved  . . .
> to vacate the Panel's order conditionally transferring the action to
> MDL No. 2036.  Plaintiffs' Lead Counsel and Plaintiffs' Executive
> Committee in the MDL oppose the two motions.
>
> After considering all argument of counsel, we will grant the
> motions to vacate.  The moving parties have informed the Panel
> that they have reached a settlement that if approved, will fully
> resolve *Trombley*.  In light of this development, we conclude that
> transfer of the action to MDL No. 2036 is not presently warranted.

(Order Vacating Conditional Transfer Order August 9, 2010, Exhibit A).  The Panel added that

"[i]n the event that the settlement is not approved or does not fully resolve *Trombley*, nothing in

this order bars future transfer of the action to MDL No. 2036."  (*Id.* n.1.)

In determining that this Court should decide whether to approve the *Trombley*

settlement the Panel was fully aware of the *Matos* action, not least because Plaintiffs' Lead

Counsel and the Plaintiffs' Executive Committee had opposed vacating CTO-16 on the basis that

*Trombley* was similar to the *Matos* action and that *Matos* was pending in the MDL:

Of particular import to the Panel's consideration of this motion is the fact that National City is already a defendant before Judge King in MDL No. 2036.  On June 1, 2010, a case styled *Matos v. National City Bank*, No. 1:10-cv-21771-JLK, was filed in the Southern District of Florida.  Simultaneously with the filing of the complaint in *Matos*, a notice pursuant to S.D. Fla. L.R. 3.8, was filed with the Court that established that the action was related to pending multidistrict litigation before Judge King entitled *In Re: Checking Account Overdraft Litigation*, Case No. 1:09-MD-02036-JLK.  *See* DE # 4 in Case No. 1:10-cv-21771-JLK (S.D. Fla.). . . .

The inclusion of National City in MDL No. 2036 is also warranted in light of the fact that National City has been acquired by PNC Bank.  Indeed, the charter for National City Bank was merged into PNC Bank, N.A. in November 2009.  As the Panel may recall, a pending case against PNC Bank, *Casayuran v. PNC Bank*, No. 09-5155 (D.N.J.), was previously transferred to MDL No. 2036 on February 3, 2010.

(Opposition of Plaintiffs' Lead Counsel and Plaintiffs' Executive Committee to Motion to Vacate CTO-16, Exhibit B).  Thus, had the Panel felt that the *Trombley* settlement would improperly interfere with *Matos* and the MDL proceeding **that it had created**, it surely would not have vacated CTO-16.  But it did, establishing that the impact of the settlement on the *Matos* action should not be a concern of this Court.

As noted, the settlement, if approved, will not impact any attempts in the MDL actions against PNC to certify classes of PNC customers other than those who were originally NCB customers.  Nor, certainly, will the settlement have any impact on any other lawsuit pending in the MDL against any of the other banks that are defendants there.  In short, this Court has been authorized by the Panel that created the MDL to decide whether the settlement should be approved, and in doing so the Court will not be interfering with the MDL court.

## III.    THE OBJECTOR'S OBJECTIONS ARE UNFOUNDED

Plaintiffs' brief in support of their motion to approve the settlement correctly sets forth the legal standards for granting preliminary approval and anticipates and addresses a

number of the objections subsequently asserted by Objector.  Additionally, NCB understands

that Plaintiffs will further respond to these objections in their supplemental brief.  Accordingly,

in this brief NCB will address the following points:  the recent judgment against Wells Fargo

entered in *Gutierrez v. Wells Fargo Bank*, No. 07-5923, 2010 WL 3155934 (N.D. Cal. Aug. 10,

2010), the fairness of the distribution plan; and the ease of the claims process.

### A. *Gutierrez* Is Starkly Distinguishable From The Case At Bar On Both The Facts And the Law

Objector seeks to capitalize on the $203 million judgment of restitution awarded

against Wells Fargo in *Gutierrez*, but that award cannot serve as a guide to the fairness of this

settlement.[3]  As will be seen below, far more relevant to this case than a California decision

subject to appeal is *Hassler v. Sovereign Bank*, a New Jersey federal district court overdraft fee

decision that was dismissed under Rule 12(b)(6) – **and which dismissal was affirmed on appeal**

**by the United States Court of Appeals for the Third Circuit.**  644 F. Supp. 2d 509 (D.N.J.

2009), *aff'd* 2010 WL 893134 (3d Cir. March 15, 2010).

#### 1. *Gutierrez* Is Legally Distinguishable

The *Gutierrez* judgment was based almost entirely on California's Unfair

Competition Law, Cal. Bus & Prof. Code § 17200 ("Section 17200"), a statute that is uniquely

Californian, with unique claims and theories of recovery.  Indeed, Objector's counsel, who are

members of the Plaintiffs' Executive Committee in the MDL, have divided cases in the MDL

into two categories:  California-only classes claiming under Section 17200, and all other

---

[3]      Plaintiffs, in their motion seeking preliminary approval, referenced expert reports filed in *Gutierrez*.  Because there is no feasible process using NCB data systems for determining the marginal increases in overdraft fees due to sequencing methods, and other relevant calculations, Plaintiffs' counsel utilized expert models described in *Gutierrez* as proxies for such determinations.  The use of those models has no bearing, however, on the differences in fact and law that go to the merits of the respective cases.

jurisdictions.  (*See* Joint Status Conference Statement, filed October 19, 2009 in *In re: Checking Account Overdraft Litigation*, MDL No. 2036 (S.D. Fla.), Doc. No. 100.)  One feature of a Section 17200 claim is that, "[u]nlike a common law fraud claim, a UCL fraud claim requires no proof that the plaintiff was actually deceived." *Gutierrez*, 2010 WL 3155934 at *47 (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025-26 (9th Cir. 2008)).  Similarly, in addition to allowing a court to award restitution "without individualized proof of deception, reliance and injury," Section 17200 also provides that absent class members on whose behalf the action is prosecuted need not show on an individualized basis that they lost money as a result of the alleged violation.  *Id* at *47 (citing *In re: Tobacco II Cases*, 46 Cal. 4th 298, 320 (Cal. 2009)).

The law in other jurisdictions is considerably different.  NCB was headquartered in Ohio and had a substantial portion of its customer base in Ohio, Michigan and other midwestern states.  Plaintiffs Trombley and Wells are from Michigan, and Doehner from Ohio. In Ohio, that state's consumer protection statute, the Consumer Sales Practices Act, not only has more stringent elements than the UCL, but it does not even cover financial institutions in the first instance.  They are carved out of the statute by an exemption applicable to transactions involving intangibles.  *See Martin v. General Motors Acceptance Corp.*, 825 N.E. 2d 1138, 1147 (Ct. App. Ohio 2005).  Similarly, the Michigan Consumer Protection Act exempts transactions of a type subject to active regulation by a government regulator.  This does not entail a preemption analysis, nor does it require an analysis of the purported illegality of the conduct.  "[W]e conclude that the relevant inquiry is not whether the specific misconduct alleged by the plaintiffs is specifically authorized.  Rather it is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct is prohibited." *Smith v. Globe Life Ins.*

*Co.*, 460 Mich. 446, 465, 597 N.W.2d 28 (1999); *see also Newton v. BankWEST,* 686 N.W.2d

491, 493 (Ct. App. Mich. 2004).  Overdraft fees are unquestionably permitted by federal law,

even if certain practices in connection with those fees are challenged, so the Michigan statute

does not apply.  In sum, *Gutierrez*, based as it is on a California consumer protection statute with

no analog in other states relevant to this lawsuit, is far off the mark and cannot serve as a guide

to the fairness of the settlement here.

There is another California-centric aspect to *Gutierrez*.  Over the years, many

jurisdictions, including Ohio, have found high-to-low sorting orders to be lawful, in part based

on Uniform Commercial Code § 4-303(b), which allows banks to pay items presented to it "in

any order."  *See Daniels v. PNC Bank, N.A.*, 137 Ohio App. 3d 247, 249, 738 N.E. 2d 447, 449

(Ct. App. Ohio 2000) (affirming dismissal of claims brought under Ohio law challenging high-

to-low posting).  The California legislature, however, added a specific proviso to this UCC

section limiting a bank's discretion in this regard.  Cal. Com. Code § 4303(b), cmt. 7.  Neither

Michigan nor Ohio impose this restriction.

These distinctions between California law and the laws applicable to Plaintiffs'

claims here highlight that this case is far closer to *Hassler*, a case asserting, under New Jersey

law claims of the same nature as those asserted here and in *Gutierrez*.  In *Hassler*, Judge

Simandle analyzed plaintiff's New Jersey Consumer Fraud Act, good faith and fair dealing, and

unjust enrichment claims and dismissed them all because the high-to-low practice was disclosed

to consumers.  Because the parties' contract authorized high-to-low posting, a customer could

not claim that such practice was not within the reasonable expectations of the parties.  644 F.

Supp. 2d at 517, 519-20.

Unlike *Gutierrez*, *Hassler* is a final decision.  The Third Circuit affirmed it in a non-published but nonetheless thorough opinion in which it agreed with the district court's reasoning on every point.  *See* 2010 WL 893134.  On the Consumer Fraud Act claim, for example, the Third Circuit stated:  "where the claim is based on written statements, the court must make the legal determination of whether a practice can be said to be unfair in light of the written statements. . . .  This claim was properly dismissed.  The Account Agreement explicitly provided for the reordering of charges of which Hassler complains."  *Id*. at *3.[4]  The Third Circuit undertook a similar analysis, and reached the same conclusion, for each of the other claims asserted in *Hassler*.  Its opinion serves, at the least, to place *Gutierrez* in an entirely different perspective than that presented by the Objector.

### 2.     *Gutierrez* **Is Factually Distinguishable**

*Gutierrez* is also inapt because its facts are quite distinguishable.  Most significantly, as to the Section 17200 deception claim, *Gutierrez* was based principally on findings that the account agreement and disclosures raised no reasonable expectation on the consumer's part that debits would be sorted high-to-low.  *See* 2010 WL 3155934 at *47-48.  That is not the case here.

---

[4]     Unpublished opinions may be, and frequently are, cited as persuasive authority.  *See City of Newark, N.J. v. U.S. Dep't of Labor*, 2 F.3d 31, 33 n.3 (3d Cir. 1993) ("Although we recognize that this unpublished opinion lacks precedential authority, we nonetheless consider persuasive its evaluation of a factual scenario virtually identical to the one before us in this case."); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F. Supp. 2d 526, 536 (M.D. Pa. 2006) (noting that "[a] nonprecedential opinion may nonetheless be persuasive"); *Mayer v. Gottheiner*, 382 F. Supp. 2d 635, 659 n.27 (D.N.J. 2005) (listing Third Circuit cases relying on unpublished opinions); *United States v. Torres*, 268 F. Supp. 2d 455, 460 n.9 (E.D. Pa. 2003) (noting that "unpublished opinions . . . may serve as persuasive authority" under the Third Circuit Local Appellate Rules).

*First*, NCB disclosed its processing order.  NCB's Account Agreement stated: "Generally, Bank pays Items and Entries from the Account in the order of greatest dollar amount to least dollar amount, but Bank reserves the right to pay Items and Entries in any order."  (NCB Account Agreement, Exhibit C, p. 6.).  In *Hassler*, both the Third Circuit and Judge Simandle held that such a disclosure, using the word "generally," sufficiently apprises the consumer of the method of processing.  2010 WL 893134 at *3; 644 F. Supp.2d at 517.

By contrast, the Wells Fargo disclosures at issue in *Gutierrez* did not tell the consumer that the bank "generally" posted high to low; they instead disclosed that "the Bank may, if it chooses, post Items in the order of the highest dollar amount to the lowest dollar amount.  The Bank may change the order of posting Items to the Account at any time without notice."  The disclosure then disclosed the possible consequence "if the Bank pays items in the order of highest-to-lowest dollar amount. . . ."  *Gutierrez*, 2010 WL 3155934 at *33 ¶ 206. Judge Alsup concluded from this disclosure that it "reinforced the misleading impression that Wells Fargo had not yet chosen to post in the order of the highest dollar amount to the lowest dollar amount or that it would exercise discretion on a case-by-case basis."  *Id*. at *34 ¶ 208. NCB takes no position on whether Judge Alsup drew the correct conclusion from the Wells Fargo disclosure, because that is of no moment here.  The point is that the NCB disclosure was fundamentally different from the Wells Fargo disclosure, as confirmed by *Hassler*.

*Second*, Judge Alsup pointed out that the Wells Fargo marketing materials for its debit card repeatedly told consumers that:  debit card transactions would be "*immediately withdrawn from your account*"; "Check card and ATM transactions *generally reduce the balance in your account immediately*"; "Remember, *the money comes right out of your checking account the minute you use your debit card*"; and "Remember that . . . *the money is immediately*

*withdrawn from your checking account.  If you don't have enough money in your account to*

*cover the withdrawal, your purchase won't be approved.*"  *Id.* at *36 ¶ 224 (emphasis in

opinion).  Judge Alsup found these to undermine any sense of a high-to-low posting order that a

consumer may have acquired from the Account Agreement, because they implied chronological

posting.

Again, NCB need not opine whether Judge Alsup drew the correct conclusion.

All that need be said here is that a critical difference between *Gutierrez* and *Trombley* is that no

such statements were made by NCB.

Other differences exist between Wells Fargo and NCB, both as to disclosures and

practices, but this brief need not catalog all such differences.  The critical point is that there are

stark differences between *Trombley* and *Gutierrez* on both the facts and the law, and those

differences render the judgment in *Gutierrez* – even if affirmed on appeal, which is by no means

certain – irrelevant to Plaintiffs' motion for preliminary approval.

**B.     The Proposed Allocation Is Fair And Equitable, And Objector's Objection
To The Two-Month Window For Compensation Ignores Settled Principles
Of Law**

The Objector's principal complaint about the method of allocation is that each

class member will receive only his or her two highest months' worth of overdraft fees.  Objector

believes that each class member should receive all overdraft fees stemming from sequencing,

regardless of how many months the consumer kept doing the same thing without changing his or

her behavior, even after knowing or having reason to know – from the experience of paying

multiple overdraft fees – the impact of NCB's practices.  (*See* Objection at 7-8.)  The Objector

correctly notes that the argument that a "chronic" overdrafter should not be rewarded after he or

she had actual or constructive knowledge of the bank's practices was "implicitly rejected in

*Gutierrez*" because Judge Alsup – without discussion – declined to reduce damages on that basis.

*Id*. at 9-10.  This implicit rejection does not undercut this settlement because it is, instead, simply another flaw of *Gutierrez*.  And for Judge Alsup to have rejected this fundamental mitigation principle without a single word of analysis is, at best, puzzling.

As explained above, the Third Circuit has held that the question in these cases is whether the consumer had a reasonable expectation that posting would be performed in the manner in which it actually happened.  In that light, the restriction of claims to a two-month period is wholly warranted under legal principles too well embedded in the law to require extensive citation.  Plaintiffs' first and third claims are for breach of the covenant of good faith and fair dealing and breach of contract; those contract claims are subject to a customer's duty to mitigate.  The second claim, for unconscionability, is if anything a contract-based claim.  (Many jurisdictions recognize the doctrine only as a "shield," not a "sword.")  To the extent this claim were to be found to be viable offensive claim, it, too, would be subject to mitigation.  The conversion and unjust enrichment claims are, if viable at all (most jurisdictions do not permit an unjust enrichment claim where a written contract exists, for example), premised on the consumer being misled about, or not authorizing, what the bank is doing with the consumer's funds. Whether characterized as a lack of reliance or failure to mitigate, a consumer cannot obtain compensation under such theories once the bank's practices are known.  *See, e.g., Schiff v. Rice Mazda Motor of America, Inc., et al.*, 102 F. Supp. 2d 891, 899 (S.D. Ohio 2002) (limiting plaintiff's damages to $100 where he failed to mitigate damages and finding "[i]n a breach of contract case  .  .  . 'the injured party must make every reasonable effort to minimize the damages suffered.'" *citing Goodwin, Inc. v. Coe*, 62 Mich. App. 405, 407 (1975); *see also, Sade v. Staley*, 212 F. Supp. 631, 632 (D.D.C. 1963) ("A person who is injured by a breach of contract must take reasonable steps to mitigate his damages.  He may not sit back and watch his damages grow

and seek to collect them when in his judgment they have become sufficiently enhanced.  He must use appropriate means to cut off the damages as much as possible.").

The settlement's provision that a class member may obtain compensation for two months' worth of overdraft charges is therefore fair and, indeed, ample.  Bear in mind that consumers were notified of overdraft charges as soon as they occurred – they need not have waited for a monthly statement to see that multiple overdraft charges had been incurred.  (A sample notice is attached hereto as Exh. D).  The notice itemized the transactions; explained that NCB offered ways to protect against overdrafts; and encouraged the consumer to inquire at a branch or call a toll-free number if he or she had any questions about the overdrafts.  Thus, after two months of receiving such notices, the consumer either (i) understood how overdraft fees were imposed, either from his or her own review of statements and disclosures or from asking at a branch or through the toll-free number, or (ii), chose not to find out.  The law does not permit recovery beyond the period of such actual or constructive knowledge.

The settlement is actually generous in this regard.  It could have provided that the class member can seek compensation for the *first* two months of multiple overdraft fees, regardless of the fact that the second month happened to contain few or none of them.  Instead, a class member's compensation will be based on the heaviest two months of fees, even though the consumer had actual or constructive knowledge based on the first month's activity.  Thus, if a year after receiving the first set of overdraft notices the class member again incurred multiple overdraft fees, the settlement would permit recovery, but the law would not.  This provision, negotiated by Settlement Class counsel to maximize a claimant's recovery, is more than fair.

**C.     Objector's Complaint That The Claims Process Is Unduly Burdensome Ignores The Ease Of The Process**

The Objector believes a claims process is unnecessary and unduly burdensome. (*See* Objection at 10-11.)  The Objector ignores the facts and the nature of the process.

First, NCB does not have the capacity to determine whether and by how much any given individual was affected by the posting sequence that is at the heart of the complaint. Nor can NCB discern on an automated, manageable basis whether overdrafts resulted from debit card transactions rather than checks (which are not part of the lawsuit).  Accordingly, a class member who believes he or she incurred overdraft fees by using his or her debit card must say so on a claim form – but that is all he or she must do.  The class member then has the option of letting the Settlement Administrator determine the payment amount by identifying the two highest months' worth of overdraft fees (in which at least one debit transaction was made) from a database to be supplied by NCB.  The class member need not go searching through past bank statements or the like to calculate his or her claim.

Note that this will in many cases result in a higher payment than called for under the theory of the complaint.  The NCB database (which is compiled from the overdraft notices such as the exemplar attached as Exh. D) only itemizes the overdraft fees, their dates, and like information.  This database cannot be used to actually calculate that, for example, four overdraft fees on January 30 would have been two had a different sequencing method been used.  The settling parties, however, felt that it was important to make the claims process simple by taking the burden of calculating the claim off of the class member where the class member so chooses, and so it was agreed that this method would be used despite its propensity toward overcompensation.  The Objector's attack on this method is groundless.

IV.    **CONCLUSION**

This Court has jurisdiction over this matter under both federal question/supplemental jurisdiction and CAFA jurisdiction.  The settlement will not interfere with the MDL proceedings, as the Panel implicitly concluded in revoking its own Conditional Transfer Order; the only lawsuit which this case directly and substantially impacts is the later-filed *Matos* action of which the Panel was fully aware.  The Objector's objections are meritless as, NCB respectfully submits, will be found to be the case after the full hearing procedures provided by Rule 23, but at the present juncture the Court has before it only Plaintiffs' motion for preliminary approval of the settlement, and such motion should certainly be granted under the applicable standards for preliminary approval.

Respectfully submitted,

        /s/ Gary C. Tepper
Gary C. Tepper (DC # 348698)
Ballard Spahr LLP
601 13th Street, N.W.
Suite 1000 South
Washington D.C.,   20005-3807
(202) 661-2200
E-mail:   tepperg@ballardspahr.com

Daryl J. May (PA #35916) admitted *pro hac vice*
Mariah Murphy (PA #88540) admitted *pro hac vice*
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8103
E-mail:   may@ballardspahr.com

Counsel for Defendant National City Bank

Dated:   September 8, 2010

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 8th day of September 2010, a copy of National City Bank's Response to Court's Questions and to Objections of Robert Matos was filed electronically with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all parties and counsel in this case with an electronic mail address registered with the Court, including Plaintiffs' counsel and counsel to Objector Robert Matos.

          /s/ Gary C. Tepper
          Gary C. Tepper

Dated:   September 8, 2010