## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| RAMONA TROMBLEY, et al.,<br>on behalf of  herself and all others similarly<br>situated,<br><br>Plaintiffs,<br><br>-v-<br><br>NATIONAL CITY BANK, et al.,<br><br>Defendants. | Case No. 1:10-CV-00232<br><br>The Honorable John D. Bates |

## SUPPLEMENTAL BRIEF AND
## RESPONSE TO OBJECTIONS OF ROBERT MATOS

Plaintiffs Ramona Trombley, Jeff Doehner and Brian Wells, ("Plaintiffs"), individually and on behalf of the Proposed Settlement Class, respectfully submit this Supplemental Brief and Response to Objections of Robert Matos.

In its August 18, 2010 Order, the Court has asked the parties to address two specific issues.  First, the Court asked the parties to address whether subject matter jurisdiction exists over Plaintiffs' claims in light of the recent decision by the Eleventh Circuit. *Cappuccitti v. DirecTV, Inc.*, 611 F.3d 1252 (11th Cir. 2010).  Second, the Court asked the parties to advise the Court of the impact that this proposed settlement will have on other class actions against National City Bank ("National City") and/or the Multidistrict Litigation Proceeding No. 2036, *In re Checking Account Overdraft Litigation* ("MDL Proceedings") pending before the Honorable Judge James Lawrence King in the Southern District of Florida.  This brief addresses those two issues and also responds to the objections raised by objector Robert Matos.

Shortly before Plaintiffs' counsel completed this brief, they received the brief of Objector Matos.  This *ad hominem* attack by our own co-counsel was, to say the least, surprising.

Plaintiffs never anticipated such a vitriolic assault, and appear to have brought a pen to a gun fight.  Plaintiffs' counsel categorically reject the accusations contained within Matos' brief, but are unable to respond in this brief.  For this reason, Plaintiffs' counsel intend to seek leave to file a separate response refuting the unprofessional ambush point-by-point.

Plaintiffs do note that this new brief suggests that the true motive of the PEC appears to centralize all cases in the multi-district litigation over which they preside *at all costs*.  Indeed, it appears that a mantra of "centralization at all costs" has replaced individual evaluation of the merits and facts of each case as will be discussed below.  But what is good for the PEC is not necessarily what is good for proposed class members here.

## I.      INTRODUCTION

**With respect to the first issue raised by the Court**, there is no question of jurisdiction in this putative class action case.  The decision in *Cappuccitti* dealt only with the requirements for diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§1332(d), 1453, and 1711-1715.  Here, Plaintiffs have federal question jurisdiction, as they have alleged a cause of action under the Electronic Funds Transfer Act, 15 U.S.C. §1693 *et seq*.  Plaintiffs raised the issue of *Cappucciti* not because it impacts the question of jurisdiction in their case, but because it is exemplary of the challenges that Plaintiffs could face before ultimate resolution of their claims.

**With respect to the second issue raised by the Court**, there is only one other class action pending against National City for allegations similar to those made here, *Matos  v. National City*, United States District Court for the Southern District of Florida, Case 1:10-cv-21771-JLK.  Matos' case was filed in June 2010 (several months after this case was filed by Plaintiffs) by the attorneys who were previously appointed by Judge King as Plaintiffs' Lead Counsel and the Plaintiffs' Executive Committee ("PEC") in the MDL Proceedings.  The PEC filed Matos' case in the Southern District of Florida (even though Matos lives in Illinois) after Plaintiffs objected to the transfer of their case to the MDL Proceedings.  Contrary to the suggestion by the PEC, they were never specifically designated by Judge King as the official attorneys for the putative class members.  Instead, they appear to have brought their case on behalf of Matos in order to short-circuit the MDL Panel and gain control over the litigation with National City.  This gambit may, however, lead to the dismissal of their case, which is governed by the Eleventh Circuit's *Cappuccitti* decision.  Matos did not allege any federal causes of action.  Thus, if the decision in *Cappuccitti* stands, it is possible that his claims would not have jurisdiction under this new

Eleventh Circuit precedent.  Meanwhile, Judge King has effectively stayed the MDL Proceedings in the wake of *Cappuccitti.*

Settlement here would allow the Plaintiffs and the putative class members to avoid these uncertain and fledgling proceedings.  If the settlement here is ultimately approved, Matos could either join in the settlement or opt-out.  Assuming his case had jurisdiction, he could then continue his case individually, or on behalf of an opt-out class if enough putative class members exclude themselves from the settlement.  If the settlement here is not approved, this case would likely be sent to Judge King and would be coordinated with the *Matos* case.  It would be one of approximately forty similar cases before Judge King.  It would be in the third or fourth "tranche" of cases.  It would take many, many years for the Court to resolve that case.

In sum, other than as to Matos, settlement of this case would have no impact on the MDL proceedings.

***With respect to Matos' objections***, the PEC first claims that the settlement should not be preliminarily approved because there was not enough discovery.  But discovery is not an end unto itself.  Rather, the question of discovery is relevant to the Court's inquiry of whether the putative class counsel have enough information to "assess the risks of litigation vis-à-vis the probability of success and the range of recovery."  *Radosti v. Envision EMI, LLC*, Civ. A. 09-887 (CKK), 2010 WL 2292343, *13 (D.D.C. June 8, 2010).  In their motion of preliminary approval, Plaintiffs' counsel explained the extensive factual and legal research that they undertook to arrive at a valuation of the case.  Then, they explained the numerous methods of arriving at supportable damages figures.  Rather than addressing the merits of these valuations, the PEC merely dismisses them as insufficient based on the $200 million restitution award in *Gutierrez et al. v. Wells Fargo Bank, NA*, 2010 WL 3155934, (N.D. Cal. 2010).  But the PEC fails to explain

2

how this award should properly compare to the damages in this case.  As discussed herein, the amount of the restitution award in *Guttierrez* serves as an instructive means of evaluating the settlement in this case—even though discovery has shown that the facts in *Gutierrez* are markedly different from the facts in this case.  Proportionally, this comparison shows that the settlement fund amounts to approximately 17% of the award in *Gutierrez.*  In light of the uncertainties in this case (also not discussed by the PEC—even though their cases are in a proverbial ditch) this amount is well within the range of a fair and reasonable.

The PEC also argues that the allocation of the settlement fund is objectionable because it favors certain putative class members over others.  This difference is not arbitrary or accidental as the PEC suggests.  Rather, this difference is driven by the relative strengths of the putative class members' claims.  This case is based predominantly upon allegations that National City failed to give its consumers proper notice of how it assesses overdraft fees.  Informal discovery indicated that National City sent out a separate individual notice to its customers by mail for each overdraft that they incurred.  Kaliel Decl., ¶ 10.  Thus, assuming that the initial disclosures were insufficient, as Plaintiffs believe and allege, the failures of that notice were arguably mitigated by these notices and by other information provided to the National City customers.  Thus, fees charged in short period of time, before the customers could properly comprehend what was happening, are more directly related to the claims in this case and are more representative of damages.  Claims for subsequent fees, on the other hand, are not as strong because there was arguably more notice.   The method proposed by the PEC would essentially punish those customers who took heed of the notice and changed their behavior and reward those who did not.  The PEC has failed to explain how that would be a fair result.

Finally, the PEC argues that the claims process is unfair because (they claim) National City could simply assess the damages and deposit the money in the putative class members' account. This assertion has no factual foundation. Indeed, Plaintiffs' counsel explored this issue with extensive informal discovery and determined that such individualized calculations could not be made based on the data maintained by National City. Kaliel Decl., ¶¶ 9,15, 17. And the use of claim forms in a case such as this—where each class member will receive direct mail notice— is routinely accepted as fair, adequate and reasonable.

## II.   ARGUMENT

## A.   THIS COURT HAS JURISDICTION

### 1.   The Court Has Federal Question Jurisdiction

The *Cappuccitti* decision is limited to the question of diversity jurisdiction, and therefore, has no impact on whether or not this Court has federal question jurisdiction. Here, Plaintiffs have federal question jurisdiction because they alleged that National City violated their rights under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C.A. § 1693m, by failing to disclose the fees it charged for debit card purchases at the point of sale and by failing to explain its overdraft fees on its periodic statements. (Compl., Dkt. No. 1, at ¶143). The EFTA explicitly provides for a private right of action and provides for federal jurisdiction. 15 U.S.C.A. § 1693m(g). And because this case is a civil action arising under federal law, the Court has jurisdiction under 28 U.S.C.A. §1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.")

### 2.   The *Cappuccitti* Decision Appears To Be In Error

In *Cappucitti*, the Eleventh Circuit ruled, *sua sponte*, that, in order for the Court to have subject matter jurisdiction over the plaintiffs' *class* action case, which originated in federal court, at least one plaintiff must meet both the $75,000 amount in controversy requirement of 28 U.S.C.

4

§1332(a) and the requirements of CAFA.  In coming to this conclusion, *Cappuccitti* relied on cases dealing with mass actions to engraft this mass action precedent onto class actions.

However, and as admitted by the *Cappuccitti* court, no court had applied the $75,000 threshold to class actions under CAFA until *Cappuccitti*.  To the contrary, several circuits have stated that the CAFA requirements for subject matter jurisdiction over a Rule 23 class action are limited to minimal diversity, a 100-member or larger class, and an aggregate amount in controversy exceeding $5 million.[1]

In addition to being divergent from numerous other cases, *Cappuccitti* would virtually gut CAFA, a result certainly not intended by the legislature.  By imposing a $75,000 threshold on at least one class member's claim, *Cappuccitti* counters the legislature's goal of moving more class actions from state court to federal court.  *See* Class Action Fairness Act of 2005, § 2(b), 119 Stat. at 5 (listing one of CAFA's purposes as "restor[ing] the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction.").

Thus, Plaintiffs respectfully submit that *Cappuccitti* is incorrect and this Court has both federal question and diversity jurisdiction.

3.       **While *Cappuccitti* Does Not Directly Affect This Case, It Does Affect The MDL Proceedings And Indicates The Level Of Risk Faced By Plaintiffs**

Plaintiffs confirm the Court's suggestion in its August 18, 2010 Order that they referenced the *Cappuccitti* decision in their brief in support of preliminary approval because it is indicative of the risks posed by litigation.  Without warning, this singular anomalous decision

---

[1] *See*, *e.g.*, *Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007); *Morgan v. Gay*, 471 F.3d 469 (3d Cir. 2006); *Moffitt v. Residential Funding Company, LLC*, 604 F.3d 156, 158 (4th Cir. 2010);  *Lowdermilk v. United States Bank National Assoc.*, 479 F.3d 994, 997 (9th Cir. 2007).

has brought the MDL proceedings to a screeching halt.[2]  If the Court does not approve this settlement, it is highly likely that this case would be thrust into this stalled morass.

This sudden and unexpected decision also highlights the fact that there are numerous known legal risks in this case.  Notwithstanding the excellent outcome in California against Wells Fargo, the law governing Plaintiffs' claims is unsettled.  Indeed, the Third Circuit (the only Circuit Court to issue any decision relating to these cases) rejected claims very similar to those raised here and in the MDL proceedings.  *See Hassler v. Sovereign Bank*, 644 F.Supp.2d 509 (D.N.J. 2009).  That one decision (based on New Jersey law) denied an entire class of banking consumers all rights to recovery under theories very similar to those asserted here. Plaintiffs' counsel are cautiously optimistic about how these issues will be resolved, and are currently engaged in litigation against other banks based on similar practices.  But they are also mindful that a single final decision on any number of dispositive issues could render this case worthless.  For instance, it is possible that the Eleventh Circuit could reverse Judge King and rule that all of the state law claims are preempted by the National Bank Act—as all of the banks have argued vociferously.  Or another Circuit could hold that the claims are not actionable under some or all of the numerous applicable state consumer protection laws—some of which specifically exclude banks from their purview.  Plaintiffs are buoyed by the PEC's bravado, but chastened by the cold reality that these cases are premised on unresolved legal theories.

---

[2] After the *Cappuccitti* decision was issued, the Defendant banks in the "first tranche" of cases in the MDL filed a "Joint Suggestion of the Absence of Subject Matter Jurisdiction and Motion for Expedited Resolution.*" MDL Dkt, Doc. 715.  In response, Judge King suspended discovery (and likewise suspended briefing on a motion to compel arbitration) "pending such action as may be taken by the [Eleventh Circuit *en banc*] on the *Cappuccitti* opinion." MDL Dkt, Doc. 737, at 2. Just today, Judge King suspended the September 20, 2010 deadline for filing motion for class certification.  Until the *en banc* petitions are decided, there is no deadline for the class certification motion, and there will be no hearings on pending discovery motions or other discovery matters.

**B.**     **APPROVAL OF THE SETTLEMENT WOULD IMPACT MATOS' RECENTLY FILED CLASS ACTION BUT WOULD NOT IMPACT THE MDL PROCEEDINGS**

This lawsuit, filed in February of 2010, is the first lawsuit brought against National City on behalf of a putative class regarding the bank's overdraft fees.  Shortly before that lawsuit was brought, PNC Bank acquired National City Bank.  Although PNC Bank had been sued for its overdraft fees, that putative class action did *not* include the National City customers.  That lawsuit against PNC Bank was coordinated with the MDL proceedings on February 12, 2010.  On June 1, 2010, the PEC filed Matos' separate class action against National City Bank.  On June 7, 2010, the PEC amended its complaint against PNC include the National City customers.

Objectors may argue that this settlement somehow affects the litigation of their case against PNC.  But this simply is not the case.  First, the transition of National City customers to PNC customers was not completed until June of 2010.  The putative class in this case ends less than three months later, on August 15, 2010.  Any argument that the PNC litigation is affected by the settlement of three months' worth of claims of a subset of current PNC customers is not plausible.  And the PEC clearly did not believe that the PNC litigation adequately represented the interests of the former National City customers, since as discussed above it filed its own action against National City in June.

The PEC argues that this settlement would disrupt the orderly prosecution of other MDL cases.  However, the JPML panel already rejected this argument, concluding that this case should not be coordinated with the other MDL proceedings because this settlement could "if approved, will fully resolve *Trombley*."  MDL 2036, Aug. 9, 2010 Order Vacating Conditional Transfer Order.  Thus, the PEC's argument appears to be motivated by its recently declared turf-war and its belief that no cases involving these issues can be resolved without its blessing. Single settlements, like single verdicts, do not obviate or replace the need for block-by-block, bank-by-

7

bank litigation.  MDL or no, each of the cases against each of the banks in the MDL will need to be pursued and litigated individually in the end.

## C.   MATOS' OBJECTIONS ARE WITHOUT MERIT

Approval of class action settlement involves a two-step process.  The first-step, preliminary approval, is limited to an inquiry into whether the settlement seems to be fair, is not obviously deficient, and is "within the range" of possible final approval.  *See In re Nasdaq Mkt.- Makers Antitrust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y. 1997).  The PEC concedes that this settlement must only clear "the relatively low bar applied at the preliminary approval stage. . ." Trombley Dkt, Doc. 11, at 2.  Nonetheless, the PEC poses objections that are not proper for this early stage of the proceedings and do not establish that this settlement is obviously unfair, deficient, or out of the possible range of final approval.

### 1.   Plaintiffs Conducted Sufficient Discovery To Determine That The Amount Of The Proposed Settlement Fund Is Adequate

The PEC argues that the "absence of discovery made it impossible for Plaintiffs to properly evaluate the merits of their claims," and "made it impossible for Plaintiffs to perform any reliable independent analysis of the potential class damages in the case."  Trombley Dkt, Doc. 11, at 3.  As a factual matter, this is wrong because Plaintiffs did in fact engage in extensive formal and informal discovery.  This argument also fails because it treats discovery as an end unto itself.  In fact, under the applicable authority, the question of discovery is more complicated.  The question of whether or not sufficient discovery was conducted cannot be answered based on sheer numbers of documents obtained or depositions taken.  Rather, the question presented to this Court is whether Plaintiffs' counsel obtained enough information evaluate the case and arrive at a fair settlement.  As discussed below, Plaintiffs' counsel

conducted exacting due diligence with respect to this settlement.  And the resulting settlement amount (and procedures) are a product of that diligence.

> a.    *The PEC Misstates And Misinterprets The Applicable Authority Regarding Class Action Discovery*

The PEC argues that Plaintiffs' counsel was required to conduct formal discovery and that "informal" or confirmatory discovery cannot suffice.  This unsupported argument is launched with a misleading cite to a recent decision holding that formal discovery was *not* necessary to the approval of a class action settlement.  *Radosti*, 2010 WL 2292343, *13.  Immediately after the language cited by the PEC, *Radosti* goes on to state that formal discovery is not necessary where, as here, Plaintiffs' counsel conducted sufficient factual investigation to allow them to evaluate the claims:

> In this case, the parties reached a settlement agreement before formal discovery began.  However, as noted above, Plaintiffs' counsel conducted significant factual investigation into possible class claims and the financial situation of Envision prior to the mediation . . . [I]n light of the obstacles that Plaintiffs faced in establishing class certification and the information they obtained about Envision's financial condition, the timing of the settlement agreement raises no cause for concern.

*Radosti*, 2010 WL 2292343, at *19.  The PEC also fails to address other authority from this Court holding that formal discovery is not necessary where the outcome of the case does not depend so much on disputed facts, but upon disputed legal issues—such as this case.  *See Osher v. SCA Realty I, Inc.,* 945 F. Supp. 298, 306 (D.D.C. 1996) (holding that where case depended on disputed legal issues, "[a] fair evaluation of the claims therefore may be made prior to discovery").  And the PEC makes no mention of the cases from this District sanctioning early settlements in complex class actions.  *See In re: Vitamins Antitrust Litig.*, 1999-2 Trade Cas. ¶ 72, 726, 1999 WL 1335318, *4 (D.D.C. Nov. 23, 1999) ("The pursuit of early settlement is a tactic that merits encouragement; it is entirely appropriate to reward expeditious and efficient

9

resolution of disputes") (internal citations omitted); *In re Lorazepam*, 205 F.R.D. 369, 377 (D.D.C. 2002) ("early settlement of these types of cases is encouraged.").

Rather, the PEC relies upon an inapt decision of the Seventh Circuit to take a swipe at Plaintiffs' counsel by suggesting that this settlement is part of a "practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement. . ." Trombley Dkt, Doc. 11, at 4 (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280-285 (7th Cir. 2002)).  This settlement has nothing in common with the settlement in *Reynolds*, where evidence indicated that the defendants may have collusively negotiated the settlement with sole practitioners before they lawyers even had clients.  Plaintiffs' counsel here are highly qualified and aggressive advocates.  They have successfully tried numerous complex cases (including jury trials lasting several months) and have represented plaintiffs and defendants (at their previous firm, Gibson, Dunn & Crutcher LLP) in numerous class actions for over fifteen years each. Trombley Dkt, Doc. 6-2, at 1-5.  After engaging in this unsupported false innuendo,[3] Objectors' counsel fails to even address the cases holding that the Court should consider the opinions of experienced class action counsel when evaluating the fairness of a proposed settlement.  *See, e.g., Lorazepam v. Mylan Laboratories, Inc.,* MDL 1290 (TFH), 2003 WL 22037741, at *6 (D.D.C. June 16, 2003) ("Opinion of such experienced and informed counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement."). Nor does the PEC challenge the experience or qualifications of Proposed Class Counsel.

Apparently because there is no actual support for the PEC's argument that formal discovery is a prerequisite to a class action settlement, the PEC cites to a decision that actually refutes its arguments and confirms that discovery is not necessary if a case can be evaluated

---

[3] After Plaintiffs' counsel drafted this brief, they learned that this innuendo was merely an opening salvo in their unprofessional attack on their own co-counsel.

without discovery.  Objections at 3 (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 235 (3d Cir. 2001) (holding that informal discovery was sufficient to inform plaintiff of the value of the case)).  The PEC did cite to one case in which the absence of discovery contributed to the rejection of a settlement.  *In re Microsoft Antitrust Litig.*, 185 F. Supp. 2d 519, 526-527 (D.Md. 2002).  But that case involved a complicated settlement with no direct remedy to the class members.  ***Notably, the proponents of that "swift" settlement were from Lieff, Cabraser, Heimann & Bernstein, LLP—the same law firm that purports to oppose the instant settlement.***

> b.  *Plaintiffs' Counsel Engaged in Extensive Due Diligence To Evaluate The Merits Of This Case And Negotiate A Fair Settlement*

As discussed in the Motion for Preliminary Approval ("Motion"), Plaintiffs' counsel are counsel of record in no less than seven putative class actions against banks regarding their overdraft fee practices—including two cases that are now part of the MDL proceedings.[4]  Prior to instituting any of these lawsuits, Plaintiffs' counsel engaged in exhaustive research into the unsettled law surrounding these issues.  *See* Motion at 9 n.6.  This research—which continues daily as the law continues to develop—informed Plaintiffs' counsel regarding the risks attendant to this case.  And they studied public documents and articles regarding the challenged practices.  Mot. at 9.  They also engaged in the direct exchange of information with National City.  And after the settlement, counsel for Plaintiff traveled to Pittsburgh to interview a representative regarding the bank's disclosures and ordering practices.  Kaliel Decl., ¶ 6.  Plaintiffs' counsel separately interviewed another bank employee regarding the storage of overdraft data.  Kaliel Decl., ¶ 16.  Plaintiffs also reviewed the operative disclosures and interviewed personnel

---

[4] *See Luevano v. Campbell*, 93 F.R.D. 68, 86 (D.D.C. 1981)("The fact that counsel for plaintiffs have been involved in similar litigation with the Civil Service Commission over the past ten years indicates that both sides were in an excellent position to assess the risks of litigation in this case.")

regarding National City's marketing practices.  Although Plaintiffs believe these disclosures were inadequate and unlawful, they were not as misleading as those at issue in Wells Fargo.

Through this informal and formal discovery, Plaintiffs' counsel attained valuable nonpublic information, which they used to inform the settlement discussions and test the value of the settlement, including, but not limited to:  the date on which National City began reordering transactions from high-to-low; total overdraft fee revenue during the class period; National City's data storage formats; whether or not data existed which identified the portion of fee revenue traceable to the challenged practices; number of checking accounts that have had one or more overdraft fees assessed during the class period; and PNC Bank's anticipated policies for complying with the revised Regulation E overdraft fee requirements.

    b.  *Discovery supports the damages analysis underlying this Settlement*

Plaintiffs obtained discovery (formal and informal) that was important to many aspects of the valuation of the case.  Most importantly, Plaintiffs attained the facts needed to actually apply the various damages assessments in *Wells Fargo* to National City's overdraft revenue. Specifically, Plaintiffs attained sworn discovery responses enumerating the gross overdraft fees earned by National City in the class period.  Through their analyses of the *Gutierrez* expert reports, Plaintiffs' counsel estimated that National City earned approximately 75% of the fees at issue in *Gutierrez*.  On this analysis, the damages would be approximately $150 million here. However, in arriving at that damages estimate, Judge Alsup relied upon a comment to the California Commercial Code that explicitly states that with respect to checks, "*the bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer.*"  *Id.* at 61 (emphasis in original).  Unlike the California Commercial Code, however, the Uniform

Commercial Code in U.C.C. § 4-303(b) (2009) (adopted by D.C. at D.C. Code § 28:4-303) permits banks to order their checks in any order that they choose.[5]

This distinction significantly impacts the damages analysis.  Judge Alsup chose Expert Olsen's "Sequencing Order 2A" to arrive at his restitution figure of $203 million.  That scenario orders transactions in the following way:

1. Credits
2. Priority Debit Transactions
3. Debit Card Transactions with date/time information in chronological order
4. Debit  Card Transactions without date/time information in low to high order
5. Checks and ACH transactions in high to low order.

As discussed, this posting of checks last is contrary to established law outside of California, which allows banks to post checks in whatever order they choose.  This California-only rule is exclude from  Expert Olsen's "Sequencing Order 2C," which is otherwise identical to the analysis adopted by Judge Alsup.  In Sequencing Order 2C, checks and ACH transactions are posted prior to debit card transactions.  All other assumptions are the same.  Using this analysis (which would presumably be the proper analysis outside of California) the estimate falls from $203 million to $93 million.  Proportionally for this case, the same damages estimate would fall from approximately $150 million to approximately $70 million.  The $12 million settlement is approximately 17% of this adjusted damages estimate.  Such a percentage is well within the

---

[5] *See Smith v. First Union Nat'l Bank,*958 S.W.2d 113 (Tenn. Ct. App. 1997) (holding that in light of the UCC, the bank had discretion to pay items in a manner convenient to it and the court could not substitute its judgment for the bank's because doing so would be undermining the fundamental purposes of the statute); *Hill v. St. Paul Fed. Bank for Sav.,* 329 Ill. App. 3d 705, 263, 768 N.E.2d 322 (2002) (holding that there can be no lack of good faith in acting as authorized by the  UCC); *Fetter v. Wells Fargo Bank Tex., N.A.,* 110 S.W.3d 683 (Tex. App. 2003) (adopting the holding in *Hill,* the court recognized that the legislature authorized Wells Fargo's practice of high to low posting); *Daniels v. PNC Bank, N.A.,* 137 Ohio App. 3d 247, 738 N.E.2d 447 (2000) (holding that the plaintiff had the insurmountable task of persuading the court that a statutorily authorized procedure constitutes an act of bad faith and unfair dealing).

standard for fairness and adequacy, and does not even account for any of the other differences between *Gutierrez* and *Trombley*—many of which could force further downward adjustments.

This 17% is within the realm of settlements previously approved by courts in this District (and previously cited by Plaintiffs). *See In re Newbridge Networks Sec. Litig.,* 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) ("an agreement that secures roughly **six to twelve percent** of a *potential* trial recovery, seems to be within the targeted range of reasonableness.") (first emphasis added, second emphasis in original); *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically recovered "between 5.5% and 6.2% of the class members' estimated losses").  And even in light of the decision in *Gutierrez*, this settlement must be viewed in light of the unique litigation risks here (where one legal decision could wipe out the entire case) and the value of Settlement Class Members receiving money now and not three (5) or more years from now, if ever.[6]

Lastly, Plaintiffs must take into consideration arguments asserted by National City (and other banks) that would dramatically reduce the damages available.  Specifically, the banks have argued that these cases are, at bottom, about notice and disclosure.  Accordingly, they argue that any damages analysis must provide for a reduction of fees incurred by those putative class members who were on full notice of the banks' high to low reordering after repeated overdraft transactions which, at National City, were always followed by mailed overdraft fee notices.

---

[6] *See Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.,* 246 F.R.D. 349, 362 (D.D.C. 2007) ("even if Plaintiffs had prevailed at trial, it is likely that any verdict would have been followed by an appeal, which might have further delayed the final resolution of this case [...] [b]y contrast, the settlement negotiated by the parties provides for relatively prompt recovery") (internal citations omitted); *see Lorazepam Antitrust Litig.*, 205 F.R.D. at 375 ("The fact that this settlement amount is less than the total estimated damages is not surprising and ultimately does not render the terms of the settlement unfair, unreasonable, or inadequate in the Court's opinion, as several additional factors should be taken into consideration. Continued litigation of these lawsuits would undoubtedly require substantial additional pretrial preparation and expense, as the defendants have denied all liability [...] [f]urther litigation also entails substantial risks").

Although one court rejected this argument, it was an argument which, if successful, could further reduce the damages to between $3.75 million and $24 million.

Objectors propose no alternate valuation of the case, other than vigorously waving the *Wells Fargo* decision in front of the Court.  Although Objector's counsel have detailed knowledge regarding the *Gutierrez* case, they fail to provide details to the Court that separate that case from the litigation currently pending before this Court.  Nor do they provide a comparison of the settlement value, based on data they are privy to.  Certainly the "not enough" refrain, without a proposed better valuation, would serve to derail each and every class action settlement.  *See Thomas v. Albright,* 139 F.3d 227, 234 (D.C.Cir.1998) ("The court should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial.").

### 2.      The PEC's Objections To The Claims Process Are Without Merit

The PEC's complaints about utilizing claim forms, "ignore the rule that a plaintiff in a civil lawsuit bears the burden of proving liability and damages in his or her case." *Mangone, etc. v. First USA Bank, et al.*, 206 F.R.D. 222, 234 (S.D. Ill. 2001) (rejecting similar arguments made by an objector to final approval of a class action settlement) (citations omitted). "Class action status does not alter this basic principle." *Id.*  Here, the claims process in this case is necessary for two reasons.  First, Objector falsely assumes that "National City evidently has access to the records necessary to calculate each class member's share of damages."   Trombley Dkt, Doc. 11, at 1.  In fact, this topic was the subject of great investigation in the informal discovery performed by Proposed Class Counsel before settlement.  Kaliel Decl., ¶ 9.  National City does not have such records in a format susceptible to a Gutierrez-style analysis. National City has further represented to Proposed Class Counsel that the overdraft fee data is not in a form that would allow an analysis similar to the one undertaken by Expert Olsen in the Wells Fargo case with

anything short of a human analysis of individual bank statements.  (Something National City proposes to do as an audit function only.)  *Id.*, ¶ 15.  Even then, Proposed Class Counsel has learned that time stamp data likely does not exist for the large majority of transactions, making a chronological ordering impossible.  *Id.*, ¶ 20.  Lastly, National City's acquisition in 2009 by PNC adds another layer of difficulty and complexity to retrieving relevant overdraft fee information from pre-existing data.  *Id.*, ¶ 14.

Faced with this reality, Proposed Class Counsel worked tirelessly and creatively to leverage what data did exist to create a claims process that approximated the accuracy of the Wells Fargo analysis—while ensuring that class members were not burdened with a difficult claims process.  As part of the settlement, National City agreed to create, at considerable expense, a database of gross overdraft fee revenue, by account, by month.  Since this database does not currently exist, National City will create it from data that was stored at the time overdraft fee notices were mailed out to customers.

Here, to determine with any greater specificity "the distribution of the settlement fund among the myriad claimants" in such a class would require counsel or the district court "to weigh the strengths and weaknesses of the claims of each class member" and would be an "almost impossible task." *Equity Funding,* 603 F.2d at 1365 (9th Cir.1979); *see also In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 219 (5th Cir.1981). In such cases, the requirements of efficiency and administrability "undoubtedly would permit alternative methods of disbursement." *Agent Orange,* 611 F.Supp. at 1403.  Efficiency, ease of administration and conservation of public and private resources are highly relevant to the reasonableness of a settlement particularly where, as here, the issues are complex, the outcome of the litigation unclear, and the class large. *See Women in City Gov't,* 1989 WL 153059 at *5.

Objector's discussion of the *Smith v. Wells Fargo* settlement and claims process is highly misleading.  Under the settlement agreement in that case, class members were allowed to submit a claim form to Wells Fargo **in 2008** stating that they had incurred an overdraft fee during the **twelve-month period following May 24, 2002**.  Wells Fargo would then refund up to $20 in overdraft fees to that class member, subject to an aggregate cap on total claims of three million dollars.  The utter failure of the claims process in that case to distribute the settlement was likely due to several factors, the most obvious of which is that damages were "capped" at $20.  Here, class members may submit claims that are not capped and claims will commonly reach into the hundreds and thousands of dollars.  With this real monetary incentive to participate in the claims process, this settlement is very different from the *Smith* settlement.

In sum, the minimal burden necessitated by the claims process is necessary to ensure the integrity of the settlement fund allocation.  In *In re Lorazepam*, 205 F.R.D. at 379, the Court approved a claim form which was much more burdensome, including attaching proofs of purchase:  "The Court also has significant difficulty understanding how the claim form—which required claimants only to write down their name, address, date of birth, social security number, *answer five "yes or no" questions in order to help them assess their eligibility, sign, date, attach proof of purchases*, and drop the claim in the mail in the postage prepaid envelope provided—is too burdensome." (emphasis added).  The much more minimal burden of the claims process in this case cannot be said to fall afoul of the fair, adequate and reasonable standard—especially when there is a rational and reasonable basis for such a claims process.

### 3.      The Proposed Fund Allocation Fairly Compensates for Class Members' Actual Harm

Objector's Counsel argue that, "[t]he proposed allocation has no relation to…class members' actual harm."  Trombley Dkt, Doc. 11, at 1.  This is wholly wrong, as discussed in the

17

Plaintiffs' Motion for Preliminary Approval.  Trombley Dkt, Doc. 6, at 11-17.   No allocation

plan was necessary in *Wells Fargo* because the case went to trial and every Plaintiff was entitled

to obtain the entirety of his or her damages.  But in a settlement of civil litigation, it is often the

case that something less than all possible damages are returned.   Plaintiffs often accept less than

100% of total damages because of the uncertainty, costs and time involved in prevailing at trial.

This is the essence of compromise.  Accordingly, scarce settlement funds must be *allocated*, that

is, assigned or allotted to various class members—with the necessary implication that not every

class member will get a full recovery of actual damages.

Because this case is essentially a case about failure to disclose—in short, Plaintiffs allege

that no lay customer could have possibly known how National City would assess these fees and

reorder transactions, until actually being subject to such fees—it is more difficult to mount a

persuasive legal argument for reimbursement of an overdraft incurred well after the first

overdraft fee.  In short, the farther one gets from the first few series of overdrafts, the more

difficult to prove a legal injury due to the fee.  "Cognizable differences" thus exist between the

"likelihood of ultimate success" for overdraft fees incurred well after the first series.  *See In re*

*Lucent Technologies,* 307 F. Supp. 2d 633, 649 (D.N.J. 2004) (the allocation plan is fair,

adequate, and reasonable despite treating class members differently; "[a] plan of allocation that

reimburses class members based on the type and extent of their injuries is generally reasonable.")

As such, any "differences in the treatment of class members" are eminently reasonable.

And Objector's citation to  *In re Paine Webber*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) for

the proposition that "[c]ourts have approved this type of merit-based weighting *only where*

certain class members have asserted additional claims or substantially different claims from other

class members" is flatly incorrect.  First, in *Paine Webber*, an objector faulted a settlement for

18

*not* accounting for differences in class members' claims.  The court stated:  "it is obvious that in the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision."  *Id.*, at 133.   The Court went on to say that "when real and cognizable differences exist between the *likelihood of ultimate success* for different plaintiffs, it is appropriate to weigh distribution of the settlement ... in favor of plaintiffs *whose claims comprise the set that was more likely to succeed*."  *Id*. (emphases added) (internal citations omitted).  "Such merit-based weighting has been approved by courts in this Circuit and elsewhere where…the injuries claimed by different class members have been sustained under significantly different legal or factual circumstances." *Id.*  That is precisely what the settlement agreement does here – weighting claims by when it emphasizing the first few series of overdraft fees assessed against any one customer.

The PEC also misleadingly quotes *In re Lucent Technologies, Inc. Sec. Litig*., 307 F. Supp.2d 633, 649 (D.N.J. 2004).  The PEC's brief reads, "[w]hile courts have on occasion [tolerated] differences in distributing settlement funds, they have done so only 'when real and cognizable differences exist' between the 'likelihood of ultimate success' for different plaintiffs."  Objectors' Brief at 10 (quoting *Lucent*).  But the actual quote is:

> Courts have **_routinely approved_** plans of allocation that provide different payments to class members. '[W]hen real and cognizable differences exist between the 'likelihood of ultimate success' for different plaintiffs, 'it is appropriate to weigh 'distribution of the settlement ... in favor of plaintiffs whose claims comprise the set' that was more likely to succeed.' (citations omitted) (emphasis added).

*Lucent* at 648.

In sum, this Court's review of the proposed Plan of Allocation must be informed by the goal of matching each plaintiff's recovery to the strength of his or her claim, *City of Detroit et al. v. Grinnell Corp. et al.,* 495 F.2d 448, 455 (2d Cir. 1974), *abrogated on other grounds* by

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), and also "by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement."  *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir. 1982).  Thus, when Objector argues that "many class members would recover a small fraction of their damages," he overstates his argument.  The participating class members will get a significant portion of their damages and are eligible for a multiplier.  But their "damages" are simply calculated in a way that does not unduly favor those putative class members who continued to overdraft their accounts after they were arguably given reasonable notice.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully urge the Court to grant preliminary approval of their proposed settlement with National City.

Dated: September 8, 2010                   *Proposed Settlement Class Counsel*,

                                           __/s/ Hassan Zavareei_____
                                           Hassan A. Zavareei
                                           Jonathan K. Tycko
                                           Jeffrey D. Kaliel
                                           **Tycko & Zavareei LLP**
                                           Suite 808
                                           2000 L Street, N.W.
                                           Washington, D.C. 20036
                                           (202) 973-0900