# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| RAMONA TROMBLEY, et al.,<br>on behalf of  herself and all others similarly<br>situated,<br><br>Plaintiffs,<br><br>-v-<br><br>NATIONAL CITY BANK, et al.,<br><br>Defendants. | Case No. 1:10-CV-00232 (JDB)<br><br>The Honorable John D. Bates |

## UNOPPOSED MOTION AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs Ramona Trombley, Brian Wells, and Jeff Doehner ("Plaintiffs" or "Representative Plaintiffs"), individually and on behalf of the proposed Settlement Class, respectfully move the Court to grant final approval of the Settlement Agreement, certify the proposed Settlement Class, and enter the Proposed Final Judgment Order ("Motion").

This Motion is accompanied by an incorporated Memorandum of Points and Authorities, the Declaration of Hassan A. Zavareei in Support of Unopposed Motion for Final Approval of Class Action Settlement and Unopposed Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards to Representative Plaintiffs, and Exhibits thereto ("Zavareei Decl."), the Affidavit of Cameron Azari with Exhibits ("Azari Aff."), the Expert Report Of Jesse David and Kevin W. Christensen with Exhibits ("Expert Report"), and a Proposed Final Judgment Order.

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 2

    A.      History................................................................................................... 2

    B.      The Proposed Settlement ..................................................................... 4

        1.      The Settlement Benefits............................................................. 4

        2.      The Settlement Class.................................................................. 4

        3.      Attorneys' Fees, Costs, and Class Representative Awards........................ 5

    C.      The Notice Program............................................................................. 6

    D.      The Claims Process.............................................................................. 8

III.    FINAL APPROVAL OF THE SETTLEMENT SHOULD BE GRANTED.................... 10

    A.      The Settlement is the Product of Arm's Length Negotiations by Experienced
        Settlement Class Counsel................................................................... 12

    B.      Plaintiffs' Recovery is Significant in Relation to the Strength of Plaintiffs' Case,
        As Has Been Confirmed By Expert Analysis ...................................... 15

        1.      The Legal Environment for Overdraft Fee Litigation is Unsettled........... 15

        2.      Expert Analysis Confirms Settlement Class Counsel's Valuation of This
            Case.......................................................................................... 18

    C.      Settlement Class Counsel Had a Full Understanding of the Facts and Legal Risks
        Associated with the Case Prior to Entering into the Settlement ......................... 24

        1.      Settlement Class Counsel Undertook Significant Pre-Settlement Factual
            Investigation, Legal Research, and Damages Evaluation ........................ 25

        2.      Settlement Class Counsel Engaged in Informal and Formal Discovery... 28

        3.      When, as Here, the Outcome of a Case Depends on Disputed Legal Issues,
            Extensive Formal Discovery is Not Required .......................................... 30

    D.      Experienced Settlement Class Counsel Believe the Proposed Settlement is Fair,
        Reasonable, and Adequate .................................................................. 31

    E.      The Reaction of the Class ................................................................... 32

IV.     THE COURT SHOULD CERTIFY THE CLASS .......................................................... 34

    A.      The Criteria for Class Certification under Rule 23(a) are Satisfied...................... 35

        1.      Numerosity................................................................................ 35

2.      Commonality.................................................................................. 36

3.      Typicality ..................................................................................... 37

4.      Adequacy of Representation ....................................................... 38

B.      The Proposed Settlement Class Satisfies the Requirements of Rule 23(b)(3)...... 39

V. CONCLUSION ................................................................................................. 41

# TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................ 34, 35, 39

*AT&T Mobility, LLC v. Concepcion*, No. 09-893, 131 S.Ct. 1740 (2011) .................................. 16

*Baptista v. JP Morgan Chase Bank, N.A.*, 2011 WL 1772657 (11th Cir. May 11, 2011) .......... 16

*Bynum v. Dist. of Columbia*, 214 F.R.D. 27 (D.D.C. 2003) ........................................... 35, 36, 37

*Bynum v. Dist. Of Columbia,* 217 F.R.D. 43, 49 (D.D.C. 2003) .................................................. 40

*Bynum v. Gov't of Dist. of Columbia*, 384 F. Supp. 2d 342 (D.D.C. 2005) ................................... 8

*Cohen v. Chilcott*, 522 F. Supp. 2d 105 (D.D.C. 2007) ........................................................... 36, 37

*Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981) ........................ 40

*Equal Rights Ctr. v. Washington Metro. Area Transit*, 573 F. Supp. 2d 205 (D.D.C. 2008) ....... 24

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) ................................................. 6

*Gutierrez v. Wells Fargo Bank, N.A.,* 730 F. Supp. 2d 1080 (N.D. Cal. 2010) .... 17, 18, 22, 27, 30

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .......................................................... 11

*Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509 (D.N.J. 2009) ................................................. 16

*Hassler v. Sovereign Bank*, 2010 WL 89134 (3d Cir. Mar. 15, 2010) ........................................ 16

*In re Baan Co. Sec. Litig.,* 284 F. Supp. 2d 62 (D.D.C. 2003) .................................................... 20

*In re Lorazepam & Clorazepate Antitrust Litg.*, 202 F.R.D. 12 (D.D.C. 2001) .................... 36, 37

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ............. 8, 15, 24

*In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 2203741 (D.D.C. Jun. 16, 2003) ..... 12

*In re Lupron Mktg. and Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005) ......................... 39

*In re National Student Marketing Litig.*, 68 F.R.D. 151 (D.D.C. 1974) ................................. 11, 32

*In re Newbridge Networks Sec. Litig.*, 1998 WL 765724 (D.D.C. Oct. 23, 1998) ....................... 20

*In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706 (E.D. Pa. 2001) ........................................ 20

*\*In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100 (D.D.C. 2004) ............................... 10, 11, 31

*In re: Checking Account Overdraft Litigation*, No. 1:09-MD-2036 (S.D. Fla.).......................... 16

*\*In re: Vitamins Antitrust Litig.*, 1999 WL 1335318 (D.D.C. Nov. 23, 1999)............................ 24

*Johnson v. Dist. of Columbia*, 248 F.R.D. 46 (D.D.C. 2008) ...................................................... 37

*Lightfoot v. Dist. of Columbia*, 246 F.R.D. 326 (D.D.C. 2007)................................................... 38

*Lindsay v. Govt. Employees Ins. Co.*, 251 F.R.D. 51 (D.D.C. 2008)........................................... 36

*\*Luevano v. Campbell*, 93 F.R.D. 6 (D.D.C. 1981) ............................................................... 15, 34

*Mayfield v. Barr*, 985 F.2d 1090 (D.C. Cir. 1993) .................................................................... 10

*McGuinness v. Parnes*, 1989 WL 29814 (D.D.C. Mar. 22, 1989) ............................................... 11

*McReynolds v. Sodexho Marriott Services, Inc.*, 208 F.R.D. 428 (D.D.C. 2002) ...................... 38

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*, Ltd., 246 F.R.D. 293 (D.D.C. 2007) ............. 35

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* 565 F. Supp. 2d 49 (D.D.C. 2008)... 12, 24

*Moore v. National Assoc. of Sec. Dealers, Inc.*, 762 F.2d 1093 (D.C. Cir.1985)........................ 11

*\*Osher v. SCA Realty I*, 945 F. Supp. 298 (D.D.C. 1996).................................... 11, 12, 24, 30, 32

*Pendleton v. Schlesinger*, 73 F.R.D. 506 (D.D.C. 1977)............................................................. 36

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .......................................................... 6, 40

*Pray v. Lockheed Aircraft Corp.*, 644 F.Supp. 1289 (D.D.C. 1986) .......................................... 11

*\*Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37 (D.D.C. 2010)........................ 18, 19, 23, 28

*Richards v. Delta Air Lines, Inc.*, 453 F.3d 525 (D.C. Cir. 2006) ............................................. 34

*Robert A. Matos, et al., v. National City Bank*, No. 1:10 Civ. 21771 (S.D. FL) .......................... 3

*Stewart v. Rubin*, 948 F. Supp. 1077 (D.D.C. 1996), *aff'd,*
    124 F.3d 1309 (D.C. Cir. 1997)....................................................................................... 11, 31

*Thomas v. Albright*, 139 F.3d 227 (D.C. Cir. 1998) .......................................................... 11, 32, 34

*Vista Healthplan, Inc. v. Bristol-Myers Squibb Co.*, 266 F. Supp. 2d 44 (D.D.C. 2003).............. 8

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.,* 246 F.R.D. 349 (D.D.C. 2007)........... 15

*Walsh v. Ford Motor Co.,* 807 F.2d 1000 (D.C. Cir. 1986)........................................................ 17

*Wells v. Allstate Ins. Co.,* 210 F.R.D. 1, 12 (D.D.C. 2002) ........................................ 40

**Statutes**

U.S.C. §1693c .......................................................................................................... 37

U.S.C. §1693h .......................................................................................................... 37

**Other Authorities**

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, §§ 4.21, 4.25 (1992)............... 37

**Rules**

12 C.F.R. §205.7 ...................................................................................................... 37

12 C.F.R. §205.9 ...................................................................................................... 37

15 U.S.C. §1693c ...................................................................................................... 34

Fed. R Civ. P. 23 ....................................................................................... 5, 32, 34-38

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs Ramona Trombley, Brian Wells and Jeff Doehner, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs" or "Representative Plaintiffs"), submit this Memorandum of Points and Authorities in Support of their Unopposed Motion for Final Approval of the Class Action Settlement.  Final approval of this Settlement[1] is appropriate because the proposed Settlement, which includes $12 million in compensation to the Settlement Class, an additional $1.5 million in notice and administration costs, and direct mail notice to virtually all class members, is the product of arm's length negotiations, and is fair, reasonable, and adequate.

The Settlement is an excellent one, and meets all factors D.C. courts consider at final approval.  First, the Settlement is the result of difficult and arm's length negotiations that lasted months.  Zavareei Decl., ¶ 45.  Expert analysis confirms that the monetary recovery included in the Settlement represents between 10.3% and 26% of the Class' best case scenario damages, which is well within the range commonly approved in class action settlements.  *See* Expert Report, ¶ 30.  Settlement Class Counsel performed targeted and valuable informal and formal discovery prior to consummation of the Settlement.  The reaction of the Settlement Class, elicited by a comprehensive and effective Notice Program that reached at least 93.3% of Settlement Class Members, has been overwhelmingly positive.  *See* Azari Aff., ¶ 45.  As of May 26, 2011, the Claims Administrator has received 98,743 claims.  *Id.*, ¶ 43.  In contrast to this high participation rate, only 44 Settlement Class Members have excluded themselves from the

---

[1] All references to the "Settlement" or "Settlement Agreement" herein refer to the Revised Settlement Agreement filed with the Court on December 22, 2010.  Dkt. 34, Exh. 1.

settlement and no actual objections have been filed with the Court (although five letters that could generously be construed as objections were sent to the Claims Administrator, the Court, and/or Settlement Class Counsel). *Id.*, ¶ 42.  Further, experienced Settlement Class Counsel believes the Settlement is more than fair and adequate.  Zavareei Decl., ¶ 68.  Finally, the parties have thoroughly addressed each of the concerns this Court raised in its order preliminarily approving the Settlement.

Representative Plaintiffs respectfully urge the Court to grant final approval of the Settlement.

## II.  STATEMENT OF FACTS

**A.     History**

A full discussion of the history of the litigation is included in Plaintiffs' Unopposed Motion and Incorporated Memorandum of Law in Support of Award of Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards to Representative Plaintiffs, filed concurrently with this Motion.  A brief summary of that history is provided here for the Court's convenience.

Settlement Class Counsel were retained by Representative Plaintiffs to obtain redress for overdraft charges that they believed their bank, National City Bank, N.A. ("National City") improperly changed them.  Like many other banks, National City had posted the debit card transactions of the Representative Plaintiffs in high-to-low order.  This caused them to incur more overdraft fees thank if National City had posted the transactions in the order they were actually made.

After a significant amount of research into National City Bank and its practices, the ongoing litigation against other banks regarding overdraft fees, the individual account details of the Representative Plaintiffs, and potential damages, Settlement Class Counsel filed a complaint

in this Court on February 17, 2010.  Dkt. No. 1.; Zavareei Decl., ¶ 18.  Settlement Class Counsel filed the case amid an uncertain and ever-shifting legal and regulatory landscape regarding checking account overdraft fees associated with debit card transactions.  *Id.*

Several months later, settlement discussions commenced.  *Id.*, ¶ 26.  These discussions consisted of an arduous series of meetings and teleconferences.  *Id.*  Settlement Class Counsel requested National City to provide extensive information to enable them to confirm their damages estimates, and insisted on substantial compliance with the request as a condition of further settlement talks.  *Id.*  Settlement Class Counsel spent a significant amount of time specifically evaluating damages in this case prior to and during settlement negotiations.  *Id.*, ¶ 30.  The parties eventually agreed to a settlement in principle.  There were serious, informed and adversarial negotiations held in arriving at the Settlement, which was filed on July 28, 2010. *Id.*, ¶ 44.

Plaintiffs asked the Court to preliminarily approve the Settlement and certify a settlement class.  Dkt. No. 6.  That request was opposed by Robert Matos, who had filed a separate lawsuit against National City in the Southern District of Florida, where coordinated MDL proceedings were pending before the Honorable Judge James Lawrence King.  *Robert A. Matos v. National City Bank*, No. 1:10 Civ. 21771 (S.D. Fla.).  On January 11, 2011, after substantial briefing and an extensive oral argument, this Court overruled Matos' objections, certified the Settlement Class, and granted preliminary approval of the Settlement set forth in the Revised Settlement Agreement between Representative Plaintiffs and National City Bank.  Dkt. Nos. 37-38.  This Court performed a thorough and detailed analysis of the Settlement in evaluating, and ultimately overruling, Matos' objections.  Because the Settlement was reached before a class had been

3

certified, the Court applied "closer judicial scrutiny" and "'undiluted, even heightened' attention that is of 'vital importance'" to the evaluation of the Settlement.  Dkt. No. 37, at 5.

Subsequent to the Court's order, individual notice was mailed to virtually all potential class members, a website and phone line were launched, a press release was issued, and a notice was published in 23 newspapers.  *See* Azari Aff., ¶ 32.

**B.     The Proposed Settlement**

**1.     The Settlement Benefits**

The Settlement provides monetary compensation for a class of former National City Bank accountholders who were improperly charged overdraft fees between July 1, 2004 and August 15, 2010.  Dkt. No. 34, Exh. 1.  Defendant has agreed to pay $12 million to Settlement Class Members.  *Id*., ¶¶ 9, 27.   In addition, National City will pay up to $1.5 million for published notice, administration of the settlement, and other notice and administrative costs.  *See* Dkt. No. 40.

No portion of the settlement fund will revert to National City.  Settlement Class Members submitting a valid claim are entitled to request reimbursement for Overdraft Fees incurred in the two calendar months (which need not be consecutive) in the Class Period during which they incurred the highest number of Overdraft Fees.  Dkt. No. 34, Exh. 1, ¶ 27.  After the costs of notice and claims administration (to the extent such costs exceed the $1.5 million that National City is required to pay), attorneys' fees, costs, expenses, and incentive awards are distributed, Settlement Class Members will be reimbursed *pro rata* up to $36 for each such Overdraft Fee. *Id*., ¶ 31(b)(ii).

**2.     The Settlement Class**

The Settlement Class is defined as "[a]ll persons in the United States who hold or

ever held a National City Account who at any time during the Class Period incurred at least one Overdraft Fee associated with at least one National City Debit Card Transaction that was not previously reversed, refunded, or returned to the Settlement Class Member by the Defendant." *Id.*, ¶ 7. "National City Account" includes consumer accounts, but does not include business accounts. *Id.*, ¶ 1(n).

Accounts originally opened at PNC Bank or one of PNC Bank's predecessor banks other than National City are not included in the settlement and no claims relating to such accounts will be released by the agreement. *Id.*, ¶ 4. The release of claims against PNC Bank therefore only applies to those claims that are based on accounts opened originally with National City Bank; it does not extend to cases, such as those pending in the overdraft fee multidistrict litigation, concerning PNC Bank accounts with no prior association with National City Bank.

### 3.      Attorneys' Fees, Costs, and Class Representative Awards

Subject to the approval of the Court, attorneys' fees, costs, expenses, and class representative incentive awards shall be paid from the Settlement Fund. National City has agreed not to oppose Settlement Class Counsel's application for payment of 25% ($3 million) of the Settlement Fund for attorneys' fees. *Id*, ¶ 10. Further, National City has agreed to not oppose incentive awards of $5,000 for each of the three class representatives (for a total of $15,000). *Id.*, ¶ 12.

The parties negotiated the terms of the Settlement Agreement relating to attorneys' fees, costs, and incentive awards only after agreeing on the substantive terms of the Settlement Agreement. Zavareei Decl., ¶ 46. In accordance with Fed. R. Civ. P. 23(h) and the Court's Preliminary Approval Order, Settlement Class Counsel is concurrently filing with this Motion an

Unopposed Motion and Incorporated Memorandum of Law in Support of Award of Attorneys'

Fees, Reimbursement of Expenses, and Incentive Awards to Representative Plaintiffs.

## C.    The Notice Program

Constitutional due process requires that absent class members be provided the best notice

practicable, reasonably calculated to apprise them of the pendency of the action and affording

them the opportunity to object.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); Fed.

R. Civ. P. 23(c)(2)(B).  The mechanics of the notice process, however, "are left to the discretion

of the court subject only to the broad 'reasonableness' standard imposed by due process."

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975).

The Notice Program was developed and implemented by Hilsoft Notifications

("Hilsoft"), one of the premier class action notification organizations in the country.  Cameron

Azari is the Director of Legal Notice for Hilsoft, a firm that specializes in designing, developing,

analyzing and implementing large-scale, un-biased, legal notification plans.  Hilsoft has been

involved with some of the most complex and significant notice programs in recent history.

As summarized herein, and explained in detail in Mr. Azari's attached affidavit, National

City was able to identify names and contact information for the large majority of all potential

Settlement Class Members, and Individual Notice reached approximately 93.3% of potential

Settlement Class Members.  Azari Aff., ¶ 48.

A postcard summary notice of the settlement ("Summary Notice") was mailed to

2,430,182 potential Settlement Class Members who incurred more than one Overdraft Fee during

the Class Period in a month in which such Settlement Class Member used a debit card.  *Id.*, ¶ 26.

Prior to mailing, the addresses of potential Settlement Class Members who were former National

City accountholders were verified and, where appropriate, updated.  *Id.*, ¶¶ 18-19.  The Summary

Notices included a prominent "call-out" to alert recipients that important legal information was

contained in the mailing, and provided information on how potential Settlement Class Members could access the settlement website, the 1-800 telephone number established for the settlement (including live operators), and request a detailed notice.  *Id.,* ¶ 41.

Publication notice of the Settlement appeared in a weekday edition of 23 daily newspapers, having a combined daily circulation of over 3.9 million, in markets where National City had a significant number of branch offices.  *Id.,* ¶¶ 31-32.  Additionally, a Court-approved informational release was issued to approximately 9,700 press outlets throughout the United States.  *Id.,* ¶ 34.

Notice was also posted on the settlement website, www.NationalCitySettlement.com, in English and Spanish.  *Id.,* ¶ 37. The settlement website allows Settlement Class Members to view information about the Settlement, including copies of the (1) Claim Form, (2) Detailed Notice, (3) Revised Settlement Agreement, (4) Preliminary Approval Order, (5) Settling Parties' Joint Motion for Approval of Increased Contribution of National City to Notice Costs, Revision to Mailed Notice, and for Resetting of Final Fairness Hearing and Associated Dates, and (6) Order Granting Settling Parties' Joint Motion for Approval of Increased Contribution of National City to Notice Costs, Revision to Mailed Notice, and for Resetting of Final Fairness Hearing and Associated Dates.  *Id.*  The settlement website also contains answers to frequently asked questions and contact information for the Claims Administrator.  *Id.*  By visiting the settlement website, Settlement Class Members can view and file a Claim Form electronically or download and print a paper Claim Form.  *Id.*  As of May 26, 2011, there had been 79,560 website visitor sessions in which 787,606 website pages were viewed.  *Id.*, ¶ 39.  Additionally, throughout the notice period, a banner advertisement displaying the notice headline was posted when potential

Settlement Class Members accessed their online accounts at PNC.com, and that advertisement included the address of the settlement website.  *Id.*, ¶ 36.

On March 28, 2011, a toll-free telephone number established by the Claims Administrator became operational.  *Id.,* ¶ 41.  The telephone number allowed Settlement Class Members to speak with an agent and ask specific questions about the Settlement.  A Settlement Class Member could also listen to answers to frequently asked questions and/or request that a copy of the Claim Form or Detailed Notice be mailed to them.  *Id.*  As of May 26. 2011, the toll-free telephone number had handled 10,645 calls representing 64,119 minutes of use.  *Id.*

As described in the affidavit of expert Cameron Azari, these extensive notice efforts provided the Settlement Class with the best notice practicable under the circumstances.  *Id.*, ¶ 9.

**D.      The Claims Process**

As this Court recognized in its Memorandum Opinion, "[c]lass actions often require a claims process to ensure money is fairly distributed for valid claims." Dkt. No. 37, at 12-13 (citing *Bynum v. Gov't of Dist. of Columbia*, 384 F. Supp. 2d 342, 363 (D.D.C. 2005); *Vista Healthplan, Inc. v. Bristol-Myers Squibb Co*., 266 F. Supp. 2d 44, 47 (D.D.C. 2003); *In re Lorazepam & Clorazepate Antitrust Litig*., 205 F.R.D. 369, 381 (D.D.C. 2002)).  Under the Settlement, Settlement Class Members can submit a Claim Form either (1) specifying the two calendar months in the Class Period during which they believe they incurred the highest number of overdraft fees or (2) allowing the Claims Administrator to determine the two months in which they incurred the highest number of overdraft fees, based on National City Bank records.  *See* Dkt. No. 31, Exh. 1, ¶ 27.  Settlement Class Members can submit claims by mail or via the Internet.  *Id*.  The Claim Form requires potential Settlement Class Members to certify that, to the best of their knowledge, the fees were associated with debit cards and were not refunded or rebated.

As of May 25, 2011, over 98,743 claims have been submitted.  Azari Aff., ¶ 44.  This high number of claims confirms this Court's earlier statement that the claim form is "short, clear, and straightforward, requiring only basic information for reimbursement.  Class Members need only provide their name and address and check one of two boxes."  Dkt. No. 37, at 13.  As of May 25, 2011, only 44 class members have excluded themselves from Class.  Azari Aff., ¶ 42. No Settlement Class Members have filed objections pursuant to the requirements of the Court's order granting preliminary approval.  Dkt. No. 38, at 6.  However, the Claims Administrator received three documents that could be liberally construed as objections, and Settlement Class Counsel also received correspondence from two additional Settlement Class Members which, if very liberally construed, might also be considered objections.  For the Court's convenience, all five of these documents are attached to the Zavareei Declaration as Exhibit B.  Even assuming *arguendo* that these documents were filed properly and met the requirements of the Court's order (they were not), none of the five "objections" warrants denial of final approval of the Settlement.

In total, the "opt-outs" represent approximately .0005 percent of the Settlement Class Members who filed claims.  And the "objectors" represent approximately .00005 percent of the Settlement Class Members who filed claims.

The Revised Settlement Agreement requires Defendant to "provide the Notice Administrator with access to the names, available Overdraft Fee account information, and last known addresses of all National City customers who incurred an Overdraft Fee. . . .  This information will be provided in an accessible digital format."  Dkt. No. 34, Exh. 1, at ¶ 15. Defendant complied with these provisions and provided this data to the Notice Administrator (and a related entity, Epiq Claims Administration, which has been appointed by this Court as the Claims Administrator).  Azari Aff., ¶¶ 13-29.  The Notice Administrator further manipulated and

9

analyzed the data to ensure consistency and completeness. *Id.* The Notice Administrator ultimately used the data to identify and mail notice to potential Settlement Class Members. *Id.*

Once the claims deadline passes, the Claims Administrator will also use the database provided by National City, which stores the gross number of overdraft fees assessed by month for a given account, to process the Settlement Class Members' claims. Azari Aff., ¶¶ 22-24. The Settlement Fund will be distributed *pro rata* to the Settlement Class Members based on either claim "Option 1": the number of overdraft fees that the Claims Administrator determines that they incurred during the two months that they incurred the highest number of overdraft fees; or claim "Option 2": the number of overdraft fees that they incurred during any two months of their choosing. Revised Settlement Agreement ¶ 27(a-b). If the claimant selects Option 1, the Claims Administrator will use the database to determine the number of overdraft fees that the claimant incurred during the two months that the claimant incurred the most overdraft fees. If the claimant chooses Option 2, and identifies the months and the number of overdraft fees, the Claims Administrator will use this data to check those claims for accuracy. Azari Aff., ¶ 23.

### III.    FINAL APPROVAL OF THE SETTLEMENT SHOULD BE GRANTED

Approval of the Settlement "lies within the discretion of this Court." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103 (D.D.C. 2004). Courts in this Circuit favor the settlement of class action litigation. *Id.* (expressing a "principle of preference" favoring and encouraging settlements); *see also Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993) (policy of encouraging settlements is particularly appropriate in class actions, which are often complex, protracted, and demanding of limited judicial resources). In ruling on a motion to approve a class action settlement, it is not this Court's duty to undertake the "detailed and thorough investigation that it would undertake if it were actually trying the case." *In re Vitamins*

*Antitrust Litig.*, 305 F. Supp. 2d at 103 (internal citation omitted).  The Court's inquiry "is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

While there is no single test in this Circuit that courts use to determine whether the proposed settlement of a class action should be approved, courts consider the facts and circumstances of each case, identify the most relevant factors under the circumstances, and exercise their discretion in deciding whether the proposed settlement is "fair, adequate and reasonable."  *Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998).  This inquiry may be performed by evaluating:  (1) whether the settlement is the result of arm's length negotiations; (2) the terms of the settlement in relation to the strength of plaintiffs' case; (3) the status of the litigation at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel.  *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104-105 (citing *Thomas v. Albright,* 139 F.3d 227 (D.C. Cir. 1998); *In re National Student Marketing Litig.,* 68 F.R.D. 151, 155 (D.D.C. 1974); *Osher v. SCA Realty I,* 945 F. Supp. 298, 304 (D.D.C. 1996); *Pray v. Lockheed Aircraft Corp.,* 644 F.Supp. 1289, 1290 (D.D.C. 1986); *Moore v. National Assoc. of Sec. Dealers, Inc.,* 762 F.2d 1093, 1106 (D.C. Cir. 1985); *Stewart v. Rubin,* 948 F. Supp. 1077, 1087 (D.D.C. 1996), *aff'd,* 124 F.3d 1309 (D.C. Cir. 1997); *McGuinness v. Parnes,* 1989 WL 29814, *1 (D.D.C. Mar. 22, 1989)).

In its Memorandum Opinion, the Court specifically noted that it would require Plaintiffs to provide the Court with certain information prior to final approval of the Settlement.  First, the Court stated that it would require Plaintiffs to provide a calculation of potential damages.  Dkt. No. 37, at 8.  This information is pertinent to the second factor stated above—the terms of the settlement in relationship to the merits of the case.  Second, the Court stated that it would require

11

Plaintiffs to show that they had a "sufficient appreciation for the merits of the case" prior to settlement. *Id.*, at 10. This showing is pertinent to the third factor stated above—the status of the litigation at the time of settlement. Settlement Class Counsel addresses the Court's specific concerns in the sections herein that are dedicated to those two factors.

As discussed below, this Settlement meets and exceeds all of the factors used to judge class action settlements in this Circuit.

A.     **The Settlement is the Product of Arm's Length Negotiations by Experienced Settlement Class Counsel**

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* 565 F. Supp. 2d 49 (D.D.C. 2008) (citing *In re Vitamins Antitrust Litig.,* 305 F. Supp. 2d 100 at 104); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 2203741, *2 (D.D.C. Jun. 16, 2003). "Absent evidence of fraud or collusion, [class action] settlements are not to be trifled with." *Osher v. SCA Realty I, Inc.,* 945 F. Supp. at 304 (D.D.C. 1996) (internal citation omitted).

These presumptions apply here, where the Settlement Agreement was negotiated by Settlement Class Counsel well-versed in class actions, with a perspective from the plaintiffs' and defendants' bar. Settlement Class Counsel practiced for several years at Gibson, Dunn & Crutcher LLP ("Gibson, Dunn"), a highly regarded international law firm. Zavareei Decl., ¶ 11. While at Gibson, Dunn, Settlement Class Counsel represented Fortune 500 companies in all variety of litigation, including the defense of numerous class actions and mass actions. After forming their own firm in 2002, Settlement Class Counsel continued practicing complex litigation, including commercial litigation, employment litigation, antitrust litigation, intellectual property litigation, and False Claims Act litigation. *Id.* Their practice also includes many class

action lawsuits—but now they are working on behalf of classes of injured plaintiffs. *Id.*  In these cases, Settlement Class Counsel have served, and continue to serve as lead counsel in hotly contested disputes spanning a wide variety of substantive law, including employment law, products liability law, and consumer protection law. *Id.*

Settlement Class Counsel also has special expertise in overdraft fee class action litigation.  Settlement Class Counsel is currently lead counsel or co-counsel (with other law firms throughout the country) in 15 other putative class actions against banks regarding their overdraft fee policies.  Zavareei Decl., ¶ 5.  Most of these cases are currently in active discovery, and Settlement Class Counsel have successfully settled a small number of these cases, including one settlement that recently achieved final approval.  Zavareei Decl., ¶¶ 6-10.  As a result of this broad litigation experience, together with the focused efforts on overdraft class actions, these experienced and capable attorneys were well suited to evaluate and negotiate the settlement of this matter.

Counsel for National City, Darryl May, is a partner at Ballard Spahr, LLP, a national law firm with 475 attorneys in 13 offices across the country.  He is the partner-in-charge of his firm's Consumer Class Action Litigation Group, and has defended numerous clients in consumer class action lawsuits.  Zavareei Decl., ¶ 76, Exh. D.

The Court previously addressed the arm's length nature of the negotiations in its decision to grant preliminary approval.  Namely, the Court explicitly found that there was no evidence of collusion in the negotiating process.  Dkt. 37, at 14.  As detailed below, the process by which the negotiations ensued was wholly adversarial, resulting in a hard-bargained settlement that provides for excellent relief to the Class.

In May of 2010, counsel for National City indicated that there was some utility in exploring the possibility of an early settlement of the litigation. Zavareei Decl., ¶ 26. The parties agreed to meet by teleconference several times to discuss structural considerations that would be a part of any eventual settlement. *Id.*, ¶ 27. Eventually, the parties agreed to meet in person on June 11, 2010 in Philadelphia. *Id.*, ¶ 28. General considerations were discussed at this meeting, but little progress toward settlement was made. An arduous series of teleconferences ensued. *Id.* Settlement Class Counsel conditioned further negotiations on National City's provision of extensive information required to better value the damages at issue. *Id.*, ¶ 29.

After National City complied, the parties engaged in further negotiations, and the parties again met in person. During this second in-person meeting, they reached a settlement in principle. There were serious, informed, and adversarial negotiations held in arriving at the proposed settlement. *Id.*, ¶ 44. Additional discussions and negotiations ensued as the parties worked out the details of the specific provisions of the Settlement Agreement, which was executed and submitted to the Court for preliminary approval on July 28, 2010. *Id.*, ¶ 45.

The arm's length negotiations continued even after the Settlement was consummated. Specifically, when Plaintiffs' counsel learned that the costs of notice were much higher than previously anticipated by the parties, they insisted on further contribution to the costs of notice and administration from National City. After further negotiations, National City agreed to increase its contribution from $500,000 to $1.5 million. Dkt. No. 38, Exh. A.

In sum, the Settlement was arrived at via arm's length negotiations between capable and experienced counsel who zealously represented their respective clients' interests.

**B.     Plaintiffs' Recovery is Significant in Relation to the Strength of Plaintiffs' Case, As Has Been Confirmed By Expert Analysis**

In judging the strength of the Class' recovery, this court must weigh both the Class' chances of prevailing at trial and the percentage of the recovery procured in the Settlement. *See Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.,* 246 F.R.D. 349, 362 (D.D.C. 2007) ("It is obvious that Plaintiffs faced significant risks in establishing both liability and damages and in continuing to trial, and that the fairness, adequacy, and reasonableness of the settlement must be viewed in light of these circumstances."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 377 (D.D.C. 2002) ("The fact that this settlement amount is less than the total estimated damages is not surprising and ultimately does not render the terms of the settlement unfair, unreasonable, or inadequate in the Court's opinion, as several additional factors should be taken into consideration. Continued litigation of these lawsuits would undoubtedly require substantial additional pretrial preparation and expense, as the defendants have denied all liability. . . .  Further litigation also entails substantial risks[.]").  While Plaintiffs remain confident in the merits of their claims, they nonetheless face difficult obstacles with respect to class certification and proving liability.  Against this uncertainty, the Class' recovery of 10.3% to 60% of calculated damages is an excellent result. *See Luevano v. Campbell*, 93 F.R.D. 68, 89 (D.D.C. 1981) ("Even putting aside all consideration of the risks of litigation, the delay in providing relief to the class if this case were to be litigated is a factor strongly supporting the compromise reached by the parties.").

**1.     The Legal Environment for Overdraft Fee Litigation is Unsettled**

As a recent American Bar Association Litigation Section article succinctly stated, "the only thing certain for overdraft litigation in 2011 is that nothing is certain."  Catha Worthman, *Overdraft Fee Litigation: The Only Certainty Is That Nothing Is Certain*, A.B.A. Class Actions

and Derivative Suits Committee Newsletter, Spring 2011, Vol. 21, No. 3, attached to Zavareei

Decl., at Exh. C.  Indeed, this uncertainty has only intensified since Plaintiffs detailed the

significant legal risks facing the success of this action in previous briefing to this Court.  *See*

Dkt. No. 6, at 7-11; Dkt. No. 19, at 5-6.  For instance, defendant banks have seized upon the

Supreme Court's decision in *AT&T Mobility, LLC v. Concepcion*, No. 09-893, 131 S.Ct. 1740

(2011) in another attempt to bring an end to several overdraft fee cases.  *See In Re: Checking*

*Account Overdraft Litigation*, No. 09-MD-2036, (S.D. Fla.), Dkt. No. 1442.  More relevant to

this case (which does not implicate an arbitration agreement), several defendant banks have

recently asked Judge King, who presides over the MDL litigation, to reconsider their motions to

dismiss based on a new decision from the Eleventh Circuit regarding federal preemption.  *See*

*Id.*, Dkt. No. 1484.  Specifically, those banks argue that the Eleventh Circuit's recent decision in

*Baptista v. JP Morgan Chase Bank, N.A.*, 2011 WL 1772657 (11th Cir. May 11, 2011)

establishes that certain National Bank Act regulations preempt the claims underpinning all of the

overdraft fee lawsuits.  *Id.*  Plaintiffs do not adopt this view of *Baptista*, but the banks' motion

(which would be dispositive if granted) underscores the risks associated with litigation of this

action.

Similarly, there is authority from the Third Circuit Court of Appeals in a case similar to

this one that is unfavorable to Plaintiffs' position.  *See Hassler v. Sovereign Bank*, 2010 WL

89134 (3d Cir. Mar. 15, 2010).  District courts in other debit card overdraft cases have also

rendered opinions unfavorable to Plaintiffs' position here.  *See, e.g., Northampton Restaurant*

*Group, Inc. v. FirstMerit Bank, N.A.,* 2010 WL 3069494 (N.D. Ohio Aug. 3, 2010); *Montgomery*

*v. Bank of America Corp.*, 515 F.Supp.2d 1106 (C.D. Cal. 2007).

Notably, this Settlement was negotiated and executed less than two weeks before the

decision was rendered in the only case regarding allegations of unlawful debit card overdraft

charges that has gone to trial.  *Gutierrez v. Wells Fargo Bank, N.A.,* 730 F.Supp.2d 1080 (N.D.

Cal. 2010).  Although that case resulted in an excellent outcome for the plaintiffs, the $203

million verdict is now on appeal.

Defendant has also previewed the arguments it would make during any litigation of this

matter, including a reliance on the decision in *Hassler.  See* Dkt. No. 17 ("NCB was

headquartered in Ohio and had a substantial portion of its customer base in Ohio, Michigan and

other midwestern states.  In Ohio, that state's consumer protection statute, the Consumer Sales

Practices Act, not only has more stringent elements than [California law], but it does not even

cover financial institutions in the first instance. . . .  Similarly, the Michigan Consumer

Protection Act exempts transactions of a type subject to active regulation by a government

regulator. . . .  Overdraft fees are unquestionably permitted by federal law, even if certain

practices in connection with those fees are challenged, so the Michigan statute does not

apply…*Gutierrez*, based as it is on a California consumer protection statute with no analog in

other states relevant to this lawsuit, is far off the mark and cannot serve as a guide to the fairness

of the settlement here.")

With the significant differences in state law pointed out by Defendant, Plaintiffs would

additionally confront the well-known difficulty of managing a nationwide class action, where the

law from multiple states must be applied to determine liability.  *See Walsh v. Ford Motor Co.,*

807 F.2d 1000, 1012 (D.C. Cir. 1986).  Although this Court need not consider the manageability

of a class action when certifying a class for settlement purposes, the difficulty in obtaining

certification of a nationwide class action weighs in favor of final approval of this settlement.  *See*

*Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 60 (D.D.C. 2010) ("Although this Court need not consider the manageability of a class action when certifying a class for settlement purposes, the Court notes that choice-of-law questions may render the class action unmanageable such that no class-wide recovery would be possible without a settlement.  This factor weighs in favor of approving the parties' agreement.")

A victory at trial and after appeal is far from certain for the Class in this matter, and Settlement Class Counsel were required to evaluate the settlement amount in light of this reality. *See Radosti*, 717 F. Supp. 2d at 39 ("liability cannot be assumed when evaluating a proposed settlement, and [defendant] has defenses to this action that it would continue to assert if the settlement is rejected.  Even setting aside the facts of the case, there are practical and procedural obstacles that stand in the way of success at trial.").

**2.      Expert Analysis Confirms Settlement Class Counsel's Valuation of This Case**

In their motion for preliminary approval, Plaintiffs explained that they had used information provided by National City together with the expert analysis in the *Gutierrez* case to extrapolate the potential damages universe.  Based on that analysis, Settlement Class Counsel believed that an appropriate damages model yielded damages of approximately $52 million to $73 million in this case.  *See* Dkt. No. 6, at 13.  Adjusting this model for defense arguments of mitigation (*i.e.* that class members eventually were given full notice of the bank's reordering practices and should have changed their behavior as a result) yielded damages estimates in the range of $3.75 to $24 million.  *Id.*, at 13-14.  The Court ruled that this information was sufficient to allow the Court to determine that the settlement was within the range of fair, adequate, and reasonable for purposes of preliminary approval.  Dkt. 37, at 9.

18

But the Court also made it clear that it expected the parties to provide an independent

basis for evaluating the adequacy of the settlement amount beyond comparison other settlements:

> The Court cautions the parties that they must offer evidence that enables the Court to calculate the potential trial recovery in this case in order to obtain final approval of the settlement. The Court should not have to rely entirely on comparisons to other overdraft fee settlements to properly evaluate the settlement and may not approve a settlement exclusively on those grounds.

Dkt. No. 37, at 8 (citing *Radosti*, 717 F. Supp. 2d at 63).   Since the Court issued that ruling,

Settlement Class Counsel engaged economists from the consulting firm Edgeworth Economics to

perform this independent analysis.   *See* Expert Report, filed concurrently herewith, *passim*.

Jesse David, Ph.D., is an economist and Senior Vice President at Edgeworth.   *Id.,* ¶ 1.

Dr. David holds a Bachelor's degree in Physics and Economics from Brandeis University and a

Ph.D. in Economics from Stanford University.   *Id.,* ¶ 2.   Prior to founding Edgeworth in 2009, he

was Senior Vice President at Criterion Economics and, before that, a Vice President at National

Economics Research Associates, where, for approximately a dozen years, he performed

economic analysis for a range of litigation, strategy, and public policy matters.   *Id.,* ¶ 1.   Kevin

Christensen holds a Ph.D. and M.A. in economics from the University of Florida and a

Bachelor's degree in economics from James Madison University.   *Id.,* ¶ 4.   He has been a

consulting economist for approximately ten years.   *Id.,* ¶ 6.   Drs. David and Christensen have

extensive experience providing in providing damages valuations for business and litigation

purposes.   *Id.,* ¶¶ 1-6.

Based on the work that they performed, Drs. David and Christensen opined on the

approximate damages in this case based on four separate scenarios.   *Id.,* ¶ 30.   The first two

scenarios assume Plaintiffs could recover all overdraft fees associated with the challenged

practice.   Assuming that the debit card transactions should have been ordered chronologically

yielded a damages estimate of $46 million.  *Id.*, ¶ 25, 30(B).  Assuming that the debit card

transactions should have been ordered low-to-high yielded a damages estimate of $116.5 million.

*Id.*, ¶¶ 23-24, 30(A).  The $12 million settlement represents a recovery of between 10% and 26%

of these two damages calculations.  At the request of Settlement Class Counsel, Drs. David and

Christensen also made a separate calculation that is designed to take into account the possibility

that the bank could prevail on its argument that consumers should have been on notice of the

bank's reordering practices after a reasonable amount of time.  *Id.*, ¶ 29.  Assuming that

customers would be entitled to damages only for the two months in which they incurred the

greatest number of overdrafts, Drs. David and Christensen calculated the damages to be $20

million (if the debit card transactions had been posted in chronological order) or $50.8 million (if

the debit card transactions had been posed in low-to-high order).  *Id.*, ¶¶ 29, 30(D), 30(C).  The

$12 million settlement would thus represent a recovery of 24% or 60% under these scenarios.

These percentages would rise further if the Court considered the value to the class members of

having the money now, as opposed to waiting an indefinite period of time to see this case

through to trial and completion of all appeals.[2]  Even without adjusting for the time value of

money, these percentages (between 10% and 60%) are consistent with the projections made by

Settlement Class Counsel in their negotiations (between 17% to 52%), and are well within the

realm of settlements previously approved by courts in this District.[4]

---

[2] *See Donovan v. Estate of Frank E. Fitzsimmons*, 778 F.2d 298, n.3 (7th Cir. 1985) (a $2 million settlement sum today is worth the same as a $3.6 million recovery five years from now, at a prime interest rate of 12.5%).

[4] *See In re Baan Co. Sec. Litig.,* 284 F.Supp.2d 62, 65-66 (D.D.C. 2003) (finding that a settlement amount representing more than 16% of plaintiff's potential recovery at trial and between 32.5% and 54% of damages estimated by defendant's expert was within the "range of reasonableness" for settlement); *In re Newbridge Networks Sec. Litig.*, 1998 WL 765724, *2 (D.D.C. Oct. 23, 1998) ("an agreement that secures roughly six to twelve percent of a *potential* trial recovery . . . seems to be within the targeted range of reasonableness"); *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").

In order to facilitate the expert analysis of Drs. David and Christensen, National City provided highly detailed transactional data covering actual checking account transactions made by actual PNC accountholders who were previously National City account holders during the month of September, 2010 ("Sample Data").  *Id.*, ¶¶ 11-12.  This Sample Data includes all account transactions on the day an overdraft fee was charged and the day prior.  *Id.*, ¶ 11.  Settlement Class Counsel provided Edgeworth numerous other documents they had obtained through their independent investigation and through discovery, including general financial information regarding the bank as a whole.  *Id.*, ¶ 8, Exh. C.

This information and data were analyzed and utilized in detail by Edgeworth.  *Id.* National City has also made bank officials available to Settlement Class Counsel and Edgeworth for direct investigation and questioning.  Zavareei Decl., ¶ 64; Expert Report, ¶ 13.  Settlement Class Counsel and Edgeworth participated in several meetings and teleconferences with National City officials during the confirmatory discovery phase.  Zavareei Decl., ¶ 64.  Drs. David and Christensen also relied on data previously provided by National City to the Notice and Claims Administrators, which included the total number of electronic debit transactions and overdraft fees (including those for debit cards, check cards, ATM and ACH transactions, and checks) for each account held by a Class member on a monthly basis from August 2005 through August 2010.  *See* Expert Report, ¶¶ 15-17; Azari Aff., ¶ 15.

In order to calculate the damages for the class period, Drs. David and Christensen "re-arranged" the actual transactions provided in the Sample Data.  Instead of ordering electronic debit transactions from highest to lowest, they instead employed two alternate proposals:  first, ordering these transactions from lowest to highest; and second, simulating a chronological ordering of these transactions (that is, the order initiated by an accountholder).  *Id.*, ¶¶ 23, 25,

30(A) and (B).  They then determined, based on these two posting orders, the average number of overdraft fees that would have been charged "but for" PNC's posting of electronic debit transactions from highest to lowest.  *Id.*, ¶¶ 24-25.

Next, using data contained in the Notice Administrator database, the Experts extrapolated these results over the entire Class Period.  *Id.*, ¶¶ 26-28.  Fees not associated with electronic debit card transactions were excluded.  *Id.*, ¶ 27.  A further adjustment was made for the percentage of overdraft fees that were reversed, refunded, or not collected by National City.  *Id.*, ¶ 28, n.13. Using this methodology, damages are estimated at $45.9 million when, in the "but for" world, electronic debit transactions are ordered chronologically, and $116.5 million when ordered from lowest to highest.  In light of the allegations in the Complaint and the result in *Gutierrez*, Settlement Class Counsel believe that the first estimate ($45.9 million), which approximates chronological posting, is more likely than the second ($116.5 million), which assumes that the Court would hold that the bank was required to post the transactions from low to high.

Defendant has argued that these types of damages analyses significantly overstates the damages in this case because (according to Defendant) Settlement Class Members should not be entitled to compensation for *every* overdraft charge incurred as a result of high-to-low re-ordering since at some point they should have been on notice of the bank's ordering practices. Dkt. No. 17, at 14-15.  In order to account for this possibility during settlement negotiations, Settlement Class Counsel considered the damages calculations of Wells Fargo Bank's expert in the *Gutierrez* case.  Settlement Class Counsel determined that applying Wells Fargo Bank's analysis to this case would yield damages of $3.75 million to $24 million.  Dkt. No. 6, at 14. Although Settlement Class Counsel did not adopt this reasoning, the calculations were helpful in setting a range of reasonable outcomes.  Indeed, the Court itself recognized in its Preliminary

Approval Order that "chronic overdrafters, who had notice of National City Bank's overdraft policies yet continued incurring overdraft fees anyway" could be "unfairly rewarded for their behavior" if they were allowed to receive full compensation for all overdraft fees incurred.  Dkt. No. 37, at 11.

For the same reason, Settlement Class Counsel asked Drs. David and Christensen to calculate the total damages in this case if it was assumed that the Settlement Class Members would only be able to recover the excess overdraft fees caused by high-to-low reordering for the two calendar months where they incurred the highest number of overdrafts.  Drs. Edgeworth and Christensen therefore employed their primary analysis, but limited that analysis to exclude overdraft fees outside of the two months in which an accountholder incurred the highest number of overdraft fees.   When this adjustment for so-called "chronic overdrafters" was made, Drs. David and Christiansen estimated damages at $20 million when, in the "but for" world, electronic debit transactions are ordered chronologically, and $50.8 million when those transactions are ordered from lowest to highest.  Those numbers are consistent with the low-end of damages considered by Plaintiffs during the settlement negotiations.

The expert analysis of Drs. David and Christensen substantially confirms the assumptions made by Settlement Class Counsel regarding the range of damages available to the Settlement Class in this case.  In light of the risks of litigation in this case that involves numerous unsettled issues, the settlement of $12 million (plus $1.5 million in notice and administration costs) represents an outstanding result for the Settlement Class Members.  With this independent analysis of damages, Plaintiffs have exceeded the requirements for final approval.  *See Radosti* 717 F. Supp. 2d at 39 (granting final approval of settlement of coupon settlement over objections

of 22 Attorneys General that "no expert testimony has been proffered by the parties" regarding the valuation of the coupons).

**C.      Settlement Class Counsel Had a Full Understanding of the Facts and Legal Risks Associated With the Case Prior to Entering into the Settlement**

As the Court stated in its Preliminary Approval Order, in the D.C. Circuit, district courts have "routinely considered the 'status of litigation at the time of settlement' as a factor in determining whether a proposed settlement warrants final approval" Dkt. No. 37, at 9-10 (citing *Equal Rights Ctr. v. Washington Metro. Area Transit*, 573 F. Supp. 2d 205, 212 (D.D.C. 2008); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 565 F. Supp. 2d at 57-58 (D.D.C. 2008)). The Court also relied on *Radosti* for the proposition that counsel should have "sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery." Dkt. No. 37, at 10.  And the Court recognized that "formal discovery . . . is not necessarily required even for final approval of a proposed settlement . . . ." *Id.*  (citing *Osher v. SCA Realty I, Inc.*, 945 F. Supp. at 306 (D.D.C. 1996).  In general, the pursuit of early settlement in litigation is a virtue that is encouraged by the courts—particularly in class action lawsuits.  *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 377 (D.D.C. 2002) ("early settlement of these types of cases is encouraged."); *In re: Vitamins Antitrust Litig.*, 1999 WL 1335318, *4 (D.D.C. Nov. 23, 1999) ("The pursuit of early settlement is a tactic that merits encouragement; it is entirely appropriate to reward expeditious and efficient resolution of disputes").

Nonetheless, in its Memorandum Opinion, the Court cautioned that "the parties must demonstrate to the Court at the final approval stage their sufficient appreciation for the merits of the case and be able to explain in greater detail the 'significant factual investigation' made prior to negotiating a settlement." Dkt. No. 37, at 10.  As discussed below, Settlement Class

Counsel's pre-settlement investigation, research, and discovery were robust, and Settlement

Class Counsel had a well-founded basis upon which to negotiate this Settlement.

### 1. Settlement Class Counsel Undertook Significant Pre-Settlement Factual Investigation, Legal Research, and Damages Evaluation

In some class action cases, the necessary information to evaluate the strength of a case,

the risks, and potential liability of the claims cannot be gathered without extensive motions

practice and discovery disputes.  This is not such a case.

First, banks are in many ways unique defendants, as they are required to make detailed

public reportings of their revenue sources to the FDIC and SEC.  Settlement Class Counsel

exploited this information from the beginning to generate damages analyses.  Moreover, even

prior to filing this lawsuit, Settlement Class Counsel engaged in exhaustive research into the

unsettled law surrounding bank fees, preemption, and prior decisions on overdraft fee issues.

*See* Preliminary Approval Motion, Dkt. No. 6, at 7-9.  In addition, overdraft fee practices have

been the subject of intense Congressional and regulatory scrutiny, as well as investigation by

numerous public interest organizations.  These investigations together with other litigation and

journalistic investigations have uncovered a wealth of information.  *Id.*, at 9.  Settlement Class

Counsel carefully accumulated, studied, and applied this critical factual information to the

negotiation of the Settlement Agreement.  Zavareei Decl., ¶¶ 16, 19.  And they studied public

documents and articles regarding the challenged practices.  *Id.*

Settlement Class Counsel also spent a significant amount of time specifically evaluating

damages in this case prior to settlement.  During the negotiations, Settlement Class Counsel and

defense counsel exchanged competing confidential damages analyses.  *See* Zavareei Decl., ¶ 30.

Settlement Class Counsel's analyses were based on a close look at data publicly reported by

National City and PNC to the Securities and Exchange Commission ("SEC") and the Federal

Deposit Insurance Corporation ("FDIC")—including "Call Reports," which banks are required to file quarterly with the FDIC and which include a report of income and financial condition. These public documents were a treasure trove of invaluable information—the likes of which are not commonly available for other types of defendants.   In addition, Settlement Class Counsel employed a 2008 FDIC report on overdraft fees across the banking industry and several valuable reports by the Center for Responsible Lending ("CFRL") and other consumer advocacy organizations—all of which helped Settlement Class Counsel fix the damages range in this case by applying industry wide findings on overdraft fees and bank revenues to the specific facts known about National City.  *Id*., ¶¶ 31-34.

Using these sources, Settlement Class Counsel was able to estimate National City's total overdraft fee revenue during the class period.  *Id*.  According to the 2008 FDIC study, 75 percent of "service charges on deposit accounts" (a line item in FDIC Call Reports) is attributable to "NSF-related" fees.  FDIC, *Study of Bank Overdraft Programs*, November 2008, at 56.[5]  "NSF-related fees" include both overdraft fees and NSF fees, the latter which occur when a check is returned unpaid.  (Plaintiffs' complaint is not concerned with NSF fees, but only with overdraft fees.)  Next, Settlement Class Counsel applied the results of the CFRL's "Overdraft Explosion" report, which found that 69% of "NSF-related fees" are attributable to overdraft fees.  CFRL, *Overdraft Explosion: Bank fees for overdrafts increase 35% in two years*, October 6, 2009, at 4.[6]  This ratio was applied to revenue figures for "NSF-related" fees to arrive at a total estimate of National City overdraft fee revenue during the class period.  In short, Settlement Class Counsel

---

[5] This report is available at << http://www.fdic.gov/bank/analytical/overdraft/FDIC138_Report_Final_v508.pdf >>.
[6] This report is available at << http://www.responsiblelending.org/overdraft-loans/research-analysis/crl-overdraft-explosion.pdf >>.

was able to estimate total overdraft fee revenue even *before* such information was provided (as it eventually was) in informal, then formal, discovery.  Zavareei Decl., ¶ 35.

Settlement Class Counsel's next step, before engaging in settlement discussions or procuring any additional data from National City, was to estimate what portion of this overall overdraft fee revenue might be considered damages.  *Id.*, ¶36.  The question presented was:  what percentage of the previously-estimated overdraft fee revenue was attributable to the challenged practice of high–to–low reordering?  It was here that Settlement Class Counsel employed the expert reports in *Gutierrez v. Wells Fargo*, No. 07 Civ. 05923 (N.D. Cal. 2010), Dkt. Nos. 203-25, 203-26, 203-27, 203-28, 203-29, 203-30, 294-2, and 391.  *Id.*, ¶ 36.  Settlement Class Counsel were able to apply that analysis to project damages in this case, as discussed in detail in their brief in support of preliminary approval and during oral argument before this Court.  Dkt. No. 6, at 12-15.

In short, Settlement Class Counsel applied a certain "sequencing order" devised by plaintiffs' expert in *Gutierrez* to the range of overall overdraft fees at issue.  The sequencing order used by Settlement Class Counsel to estimate damages in this case was different from the sequencing order ultimately adopted by the *Gutierrez* court, as *Gutierrez* involved legal claims unique to California and inapplicable here.  *Id.*[7]  Using this analysis, Settlement Class Counsel

---

[7] In its Memorandum Opinion, the Court stated that "plaintiffs must explain why the Court should focus on only one *Gutierrez* model but ignore the fact that $203 million in damages was ultimately awarded based on an alternate model, far exceeding the $69 million to $98 million plaintiffs estimated for *Gutierrez* when calculating the potential recovery in this case."  Dkt. No. 37, at 8.  In short, Settlement Class Counsel could not rely on the model that yielded the $203 million result in *Gutierrez* because it was based on a unique requirement of California law that significantly inflated the damages.  Namely, Judge Alsup relied on a comment to the California Commercial Code that prohibits banks from reordering checks from high-to-low.  *See Gutierrez*, 730 F. Supp. 2d at 1121 ("the bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer") (quoting Cal. Com.Code § 4303(b), Calif. cmt. 7).  The Uniform Commercial Code (and the commercial codes of virtually every other state) does not contain this language.  Accordingly, courts have consistently held that banks are permitted to order check in any manner that they choose.  *See* Dkt. 19, at 13 n.5.  For this reason, the model employed by Judge Alsup, which required Wells

estimated that the $12 million settlement was approximately 17% to 24% of best-case damages.  *Id*.

And when the damages of the so-called "chronic overdrafters" were reduced (as Wells Fargo's expert

advocated), the settlement amounted to between 52% and 333% of the damages.  Dkt. 6, at 13-14.

Thus, before settlement discussions began, and before the provision of informal and

formal discovery, Settlement Class Counsel had an understanding of the "ballpark" of damages

in this case, and negotiated on that basis.  All subsequent data acquired in informal and formal

discovery was applied to this baseline understanding of the potential liability, and helped to

refine the existing internal analysis.  Settlement Class Counsel's analysis has proven to be

substantially accurate, as verified by the Expert Report of Drs. David and Christensen.

### 2.        Settlement Class Counsel Engaged in Informal and Formal Discovery

Formal discovery is not necessary where, as here, Plaintiffs' counsel conducted sufficient

factual investigation to allow them to evaluate the claims:

> In this case, the parties reached a settlement agreement before formal discovery
> began.  However, as noted above, Plaintiffs' counsel conducted significant factual
> investigation into possible class claims and the financial situation of [Defendant]
> prior to the mediation. . . [Objectors] argue that the fact that settlement was
> reached prior to class certification weighs against approval of the Settlement
> Agreement.  However, in light of the obstacles that Plaintiffs faced in establishing
> class certification and the information they obtained about [Defendant's] financial
> condition, the timing of the settlement agreement raises no cause for concern.

*Radosti*, 717 F. Supp. 2d at 55-62.   In this case, Plaintiffs sought and obtained both formal and

informal discovery prior to (and after) consummation of the settlement.

---

Fargo to post checks last, is not applicable outside of California.  For a more detailed discussion of this issue, *see*
Dkt. No. 19, at 12-15.

Prior to the negotiation of the settlement fund amount, National City informally provided detailed financial data, documentation, and information regarding its policies and procedures, including:

- The amount of overdraft fee revenue earned by the Bank during the class period, net of refunds to accountholders;
- All non-business account disclosures during the class period;
- Certain marketing materials;
- A description of posting practices during the class period, including whether National City posted transactions in "baskets" or commingled all transactions;
- The date that high-to-low reordering began;
- The mechanics and effects of the purchase of National City by PNC Bank;
- National City data storage systems and which class period data was available for use in calculating damages and/or administering a settlement, including whether or not data existed that identified the portion of fee revenue traceable to the challenged practices; and
- PNC Bank's anticipated policies for complying with the revised Regulation E overdraft fee requirements.

Zavareei Decl., ¶ 38.

And prior to finalizing the settlement, Settlement Class Counsel demanded that National City provide sworn interrogatory responses confirming National City's informal disclosures regarding: (1) the net overdraft revenue during the class period; (2) its contention that National City did not record and save time-stamp data for debit card transactions; and (3) the procedures and disclosures that National City had implemented to comply with new regulations governing debit card overdraft charges.  Zavareei Decl., ¶ 42.

Plaintiffs' counsel also reviewed the operative disclosures and interviewed personnel regarding National City's marketing practices during the entire class period.  Zavareei Decl., ¶ 40.  Although Plaintiffs believe these disclosures were inadequate and unlawful, Settlement Class Counsel had to consider the fact that they were quite similar to the disclosures that the District Court and Third Circuit both held were not misleading in the *Hassler* case.  *See* Dkt. No.17, at 12-14 (discussion of National City Bank regarding disclosures).  On the other hand, the

29

disclosures were quite different from the disclosures condemned by Judge Alsup in *Gutierrez*.
*See id.*  Again, this discovery provided valuable information for Settlement Class Counsel to
employ in evaluating the chances of ultimate success in this case.  Zavareei Decl., ¶ 41.

   3.    **When, as Here, the Outcome of a Case Depends on Disputed Legal Issues,
         Extensive Formal Discovery is Not Required**

   Where the outcome of the case does not depend so much on disputed facts, but upon
disputed legal issues, formal discovery is not necessary.  *Osher v. SCA Realty I, Inc.,* 945 F.
Supp. at 306 (D.D.C. 1996) (holding that where claims depended on disputed legal issues, "[a]
fair evaluation of the claims therefore may be made prior to discovery.").

   Here, success at trial would hinge on the outcome of unsettled legal questions, not factual
questions.  Would this Court or others decide that preemption bars state law claims against
national banks?  Were the disclosures sufficient under the myriad state consumer protection laws
at issue?  Did National City's standardized policies violate the contract or the covenant of good
faith and fair dealing?  Settlement Class Counsel believes that the answers to these questions
would ultimately determine the outcome of this litigation.  And because Settlement Class
Counsel already knew the bank's posting practices, overall revenue, and other nonpublic
information, further discovery was not going to help resolve such issues.  Prolonging the
litigation further would have unnecessarily exposed the Class to continued and increasing risks
of adverse court decisions.  Armed with hundreds of hours of research studying and analyzing
these complex legal issues (for this case and for the other numerous other debit card overdraft
cases they were retained for), Settlement Class Counsel determined that this course simply was
not in the interest of the Class in light of the excellent settlement it was able to attain.  Zavareei
Decl., ¶ 44.

To summarize, the question presented to this Court is whether Plaintiffs' counsel obtained enough information to evaluate the case and arrive at a fair settlement. Settlement Class Counsel had a well-founded understanding of the merits of the case, as well as the litigation risks described above. As such, it did not need to engage in needless motions practice or significant discovery disputes. The formal and informal discovery that did take place was targeted and necessary and allowed Settlement Class Counsel to use its best judgment to negotiate a settlement in a fluid and risky legal environment. Moreover, Plaintiffs' due diligence, factual investigation, and discovery is confirmed by an expert analysis, which aligns with their negotiating assumptions and shows the settlement to be more than fair. The end result here vindicates the significant work Settlement Class Counsel did prior to agreeing to the Settlement.

**D. Experienced Settlement Class Counsel Believe the Proposed Settlement is Fair, Reasonable, and Adequate**

Courts should generally "defer to the judgment of experienced counsel" in ruling on proposed class action settlements. *Stewart v. Rubin*, 948 F. Supp. 1077, 1099 (D.D.C. 1996) *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997). "Although the Court will not defer blindly to the views of counsel with regard to the adequacy of a settlement, it must consider that the Settlements were reached after several months of arm's-length negotiation by experienced counsel and that both counsel and all parties involved view the settlements as reasonable." *In re: Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 106 (D.D.C. 2004).

As discussed *supra*, Settlement Class Counsel are seasoned litigators with years of experience litigating complex cases, including class actions. Zavareei Decl., ¶¶ 4-12.

In addition to their general experience in class action litigation, Settlement Class Counsel has a specific expertise in overdraft fee litigation. Over the past few years they have had the

31

privilege to represent millions of class members and putative class members in debit card overdraft cases across the country.  Based on that experience, together with their knowledge of other settlements, judgments, and outright dismissals of these cases, Settlement Class Counsel believe that this settlement is an excellent settlement that is more than fair, adequate, and reasonable.  Zavareei Decl., ¶ 68.

## E.    The Reaction of the Class

The last of the factors typically considered in determining the reasonableness of a settlement is the reaction of the class.  *Thomas*, 139 F.3d at 231-33; *In re Nat'l Student Mktg. Litig.*, 68 F.R.D. at 155; *Osher*, 945 F. Supp. at 304; *Stewart*, 948 F. Supp. at 1057.   Here, the overwhelmingly positive reaction of the Class Members strongly supports final approval.  As of May 25, 2011, the claims administrator had received and processed a total of 98,743 Claim Forms.  Of that number, 51,776 were online claims and 46,967 were sent by postal mail.  Azari Aff., ¶ 44.  As of May 25, 2011, the claims administrator received and processed only 44 requests for exclusion from the Settlement Class.  Azari Aff., ¶ 42.

Although the objection deadline has not yet passed, as of May 25, 2011, no Settlement Class Member has properly filed an objection pursuant to Court's Preliminary Approval Order. Dkt. No. 38, at 6.  The Claims Administrator received three documents that, if liberally construed, may be considered "objections."  Settlement Class Counsel also received correspondence from two additional Settlement Class Members that could also be liberally construed as objections.  For the Court's convenience, all five of these documents are attached to the Zavareei Declaration as Exhibit B.  However, not only do these items fail to comply with the Court's order regarding the proper process for making objections, none of them provide any basis to deny final approval.

One "objection," by Kurt Vierling, simply states, in relevant part, that his account was transferred. It does not contain any objections to the terms of the Settlement. *Id*. The second "objector," Elizabeth Garaux, states that she does not believe that National City was "dishonest" and that she does not believe that her transactions were reordered, a practice that National City has conceded to employing. *Id*. The third objector, Wayne L. Harris, objects to the Settlement because it does not include, as damages, the "other hidden expenses" incurred by consumers as a result of the challenged practices. *Id*. However, seeking the type of "damages" suggested by Mr. Harris on a class wide basis would pose significant challenges and none of overdraft fee cases that have either settled or proceeded to trial have included such damages. Another potential Settlement Class Member, Linda K. Bryan, sent a letter to the Court, which was forwarded to Settlement Class Counsel. This letter included an incomplete but signed Claim Form, and it did not contain any objections to the Settlement. Instead, the letter indicates that Ms. Bryan intends to file suit against National City regarding a claimed unauthorized withdrawal from her bank account by her ex-husband. *Id*. Finally, potential Settlement Class Members Carlton and Mary Niemann sent Settlement Class Counsel a letter in which they detailed the difficulties they have endured as a result of the Bank's challenged practices and state that they "will be included in the class action suit[.]" *Id*. However, they also later make a demand to National City for $9,000 and state that they are "willing to go to court." *Id*. The Niemanns never state that they object to the Settlement. *Id*. In sum, none of these "objections" (if very liberally construed as such) should negatively impact this Court's decision-making process regarding final approval of the Settlement.

Taken together, these objections and exclusions are a fraction of a single percent of all persons who actually responded. These extremely low levels of exclusion and objection are a

strong sign that the Settlement Class supports this Settlement. *See Osher*, 945 F. Supp. at 305

("the Court concludes that the reaction of the Class members is overwhelmingly in favor of the

proposed settlement. Only 30 Class members have requested to be excluded from the Settlement

Class out of the approximately 14,000 Class members given Notice of the proposed settlement.

Furthermore, only one objection to the proposed settlement has been received by Class and

Derivative Counsel."); *Luevano v. Campbell*, 93 F.R.D. at 91 (D.D.C. 1981) ("The fact that only

one-sixth of one percent of the class has chosen to object to the settlement is an important

indication of its fairness and adequacy.").

The extremely favorable reaction of the Class to date strongly supports final approval of

the Settlement.

## IV.     THE COURT SHOULD CERTIFY THE CLASS

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a

certified class may be settled ... only with the court's approval." A court may certify a class for

settlement purposes only, and such classes are common. *See Amchem Prods., Inc. v.*

*Windsor,* 521 U.S. 591, 618 (1997). When certifying a class for settlement purposes only, a

court must consider whether the proposed class meets the requirements of Federal Rule of Civil

Procedure 23, although the court need not determine whether the case, if tried, would present

intractable management problems, as it would otherwise have to do. Id., at 620; *Thomas v.*

*Albright*, 139 F.3d 227, 234 (D.C. Cir. 1998).

The parties have the burden of establishing that each of the elements of Rule 23(a) are

met and that the class is maintainable pursuant to one of Rule 23(b)'s subdivisions.

*Amchem,* 521 U.S. at 614 (1997); Fed. R. Civ. P. 23; *Richards v. Delta Air Lines, Inc.,* 453 F.3d

525, 529 (D.C. Cir. 2006). The four prerequisites to a class action lawsuit under Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). *See* Fed. R. Civ. P. 23(a).  In addition, the parties must demonstrate that the class is maintainable under Rule 23(b).  In the instant case, the parties seek certification under Rule 23(b)(3) (predominance and superiority).  The present action, which is based on a uniform alleged course of conduct by National City common to all members of the Settlement Class, fulfills such requirements.  Indeed, without this class action most class members would be "without effective strength to bring their opponents into court at all."  *Amchem*, 521 U.S. at 617.  *See, e.g., Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 32-41 (D.D.C. 2003) (certifying a settlement class); *see also Meijer, Inc. v. Warner Chilcott Holdings Co. III*, Ltd., 246 F.R.D. 293 (D.D.C. 2007) (certifying a settlement class).

The Settling Parties have stipulated, for settlement purposes only, to the following definition of the Settlement Class:

> All persons who hold or ever held a National City Account who at any time during the Class Period incurred at least one Overdraft Fee associated with at least one National City Debit Card Transaction that was not previously reversed, refunded, or returned to the Settlement Class Member by Defendant.

Dkt. No. 34, Exh. 1, ¶ 7.

This Settlement Class meets all standards for certification, and Plaintiffs respectfully request that the Class be certified.

## A.     The Criteria for Class Certification under Rule 23(a) are Satisfied

### 1.     Numerosity

This Court "ha[s] generally found that the numerosity requirement is satisfied and that

joinder is impracticable where a proposed class has at least forty members." *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007) (citing cases); *see also Lindsay v. Govt. Employees Ins. Co.*, 251 F.R.D. 51, 55 (D.D.C. 2008).  The proposed Settlement Class easily meets this standard.  Almost 100,000 Class Members have submitted claims thus far.  The Settlement Class is therefore sufficiently numerous.

> **2.       Commonality**

The second requirement of Rule 23(a) is that "there are questions of law or fact common to the class."  Fed. R Civ. P. 23(a)(2).  This requirement is satisfied where "'there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Cohen*, 522 F. Supp. 2d at 114 (quoting *In re Lorazepam & Clorazepate Antitrust Litg.*, 202 F.R.D. 12, 26 (D.D.C. 2001)); *see also Pendleton v. Schlesinger*, 73 F.R.D. 506, 509 (D.D.C. 1977) (holding that the "proper inquiry" for commonality "is, as the language (of FRCP23(a)(2)) suggests, whether there is some aspect or feature of  the claims which is common to all"); *see also Bynum*, 214 F.R.D. at 33 (holding that "a single factual dissimilarity does not suffice to defeat the commonality requirement.").  A class meets the commonality requirement if "a single aspect or feature of the claim is common to all proposed class members." *Id*.  Commonality is especially easily satisfied when "the most crucial issues . . .  are common to every member of the proposed class." *Lindsay v. Gov't. Employees Ins. Co.*, 251 F.R.D. 51, 55 (D.D.C. 2008).

Here, the following questions of law and fact are common to all Class Members:

a.       Whether National City's practice of re-sequencing Settlement Class Members' debit/check card transactions in descending order before posting such transactions violated applicable consumer protection statutes;

b.       Whether National City's deposit agreement with Settlement Class Members constitutes an enforceable contract, and, if so, whether said

deposit agreement expressly authorized National City to re-sequence Class Members' debit/check card transactions by monetary value prior to posting such transactions;

c.     Whether National City's practice of re-sequencing Settlement Class Members' debit/check card transactions by monetary value prior to processing such transactions breached the covenant of good faith implied in any contract between Class Members and National City Bank;

d.     Whether Defendant was unjustly enriched as the result of re-sequencing Class Members' debit/check card transactions from highest to lowest amount prior to processing such transactions; and

e.     Whether Defendant violated Regulation E, including 12 C.F.R. §205.7 and 12 C.F.R. §205.9, and the Electronic Funds Transfer Act, including 15 U.S.C. §1693c and §1693h.

These legal and factual questions are common to each member of the Settlement Class. Therefore, the commonality requirement is satisfied.

### 3.     Typicality

Rule 23(a) next requires that claims of Representative Plaintiffs be typical of those of the class.  Fed. R Civ. P. 23(a)(3).  "The typicality requirement is satisfied 'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liabilty.'" *Cohen*, 522 F. Supp. 2d at 115 (quoting *Lorazepam*, 202 F.R.D. at 27); *see also Johnson v. Dist. of Columbia*, 248 F.R.D. 46, 53 (D.D.C. 2008).  The typicality requirement "has been liberally construed by courts."  *See Bynum*, 214 F.RD. at 34 (holding that "factual variations between the claims of class representatives and the claims of other class members. . . do not negate typicality.").  Typicality "refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff. . .and] "is satisfied 'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class

member makes similar legal arguments to prove the defendant's liability.'" *Lightfoot v. Dist. of Columbia*, 246 F.R.D. 326, 338 (D.D.C. 2007) (citations omitted).

Representative Plaintiffs' claims arise from the same uniform course of conduct as the other Class Members' claims.  Representative Plaintiffs and all other Class Members were subject to the same policy of National City of re-sequencing certain debit/check card transactions, and all incurred overdraft fees.  Additionally, Representative Plaintiffs and all other Settlement Class Members' claims are premised on the same legal theories.  Thus, the typicality requirement is satisfied.

### 4.      Adequacy of Representation

The fourth and final requirement of Rule 23(a) requires that the court determine whether the proposed representatives can adequately represent the interests of the class.  In making this determination, the court must be assured that (1) the proposed representative does not have any conflicts of interest with other class members; and (2) that the representative will vigorously prosecute the interests of the class through qualified counsel.  *McReynolds v. Sodexho Marriott Services, Inc.,* 208 F.R.D. 428, 446 (D.D.C. 2002).  Here, Representative Plaintiffs' interests are aligned with those of the Settlement Class as a whole.  Like all other class members, they seek to maximize their recovery against the banks for practices that caused them to suffer financial loss.  There is nothing unique or different about their particular claims or situations that put them at odds with any other members of the Settlement Class.  Additionally, Settlement Class Counsel are experienced and well qualified to represent the Settlement Class.  Settlement Class Counsel undertook a substantial investigation regarding the claims asserted and the potential damages in this case, and have negotiated an excellent settlement for the Class.  *See, generally,* Sections III (A-C) above.

**B.      The Proposed Settlement Class Satisfies the Requirements of Rule 23(b)(3)**

The parties have elected to move for certification of a damages Settlement Class under

Rule 23(b)(3).  Rule 23(b)(3) authorizes class actions to proceed where "questions of law or fact

common to the members of the class predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fair and efficient

adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  "The matters pertinent to the findings

include: (A) the interest of members of the class individually controlling the prosecution or

defense of separate actions; (B) the extent and nature of any litigation concerning the controversy

already begun by or against members of the class; (C) the desirability or undesirability of

concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be

encountered in the management of a class action."  *Id.*   "In adding 'predominance' and

'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover

cases 'in which a class action would achieve economies of time, effort, and expense, and

promote . . . uniformity of decision as to persons similarly situated, without sacrificing

procedural fairness or bringing about other undesirable results."  *In re Lupron Mktg. and Sales*

*Practices Litig.*, 228 F.R.D. 75, 92 (D. Mass. 2005) (citing *Amchem Products, Inc. v. Windsor*,

521 U.S. 591, 615 (1997)).  Where, as here, a court is deciding on the certification question in

the context of a proposed settlement class, questions regarding the manageability of the case for

trial purposes do not have to be considered.  *Amchem*, 521 U.S. 591, 619 (1997).  The remaining

elements or Rule 23, however, continue to apply in settlement-only certification situations.  *Id.* at

619.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  *In re Lupron*, 228 F.R.D. at 91 (*citing*

*Amchem*, 521 U.S. at 623).  "Rule 23(b)(3) does not require that *all* questions of law or fact be

common; it only requires that the common questions *predominate* over individual questions."
*Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981) (emphasis added);
s*ee generally* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, §§ 4.21, 4.25
(1992).  As demonstrated *supra* at Section VII(A)(2), as to commonality, several issues of law
and fact common to all Settlement Class Members are present in this mater.  These common
issues of law and fact predominate over any potential individual issues which may arise.  In
addition, a claims and allocation process has been devised to roughly account for individual
variations in damages.  Thus, the predominance requirement of Rule 23(b)(3) is satisfied.

Additionally, the superiority requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.  Under
this requirement, "maintaining the present action as a class action must be deemed by the court
to be superior to other available methods of adjudication.  A case will often meet this standard
when 'common questions of law or fact permit the court to consolidate otherwise identical
actions into a single efficient unit.'"  *Bynum v. Dist. of Columbia,* 217 F.R.D. 43, 49 (D.D.C.
2003) (citations omitted).  *See also Wells v. Allstate Ins. Co.,* 210 F.R.D. 1, 12 (D.D.C.
2002) ("Rule 23(b)(3) favors class actions where common questions of law or fact permit the
court to 'consolidate otherwise identical actions into a single efficient unit.'").

A class action is not only the most desirable, efficient, and convenient mechanism to
resolve the claims of the Settlement Class, but it is almost certainly the *only* means available to
adjudicate such claims.  *See, e.g., Phillips Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("[c]lass
actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate
individually . . . [in such a case,] most of the plaintiffs would have no realistic day in court if a
class action were not available").  Individual Settlement Class Members likely would be unable
or unwilling to shoulder the great expense of litigating the claims at issue against Defendant

given the comparatively small size of each individual Settlement Class Member's claims. Thus, it is desirable to adjudicate this matter as a class action.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant final approval to the Settlement Agreement, final certification of the proposed Settlement Class, and enter the concurrently filed Proposed Judgment Order.


Dated: May 27, 2011                                   *Settlement Class Counsel*,


                                          _    /s/ Hassan Zavareei_____

                                          Hassan A. Zavareei
                                          Jonathan K. Tycko
                                          Jeffrey D. Kaliel
                                          Andrea Gold
                                          **Tycko & Zavareei LLP**
                                          Suite 808
                                          2000 L Street, N.W.
                                          Washington, D.C. 20036
                                          (202) 973-0900

## CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Hassan A. Zavareei, one of the attorneys for Plaintiffs, hereby certify that the proceeding document was caused to be served electronically this 27th day of May 2011, pursuant to ECF as to Filing users, and that I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.


/s/ Hassan Zavareei