

**<u>EXPERT REPORT</u>**

Prepared by Jesse David, Ph.D. and Kevin W. Christensen, Ph.D.

*Ramona Trombley, et al. v. National City Bank*

No. 1:10 Civ. 00232 (D.D.C)

## I. THE EXPERTS

1.      Jesse David is an economist and Senior Vice President at Edgeworth Economics LLC ("Edgeworth").  Edgeworth is a consulting firm that provides expert economic and financial analysis for complex litigation and public policy matters.  Prior to founding Edgeworth in 2009 with a group of economists, he was Senior Vice President at Criterion Economics and, before that, a Vice President at National Economics Research Associates, where, for approximately a dozen years, he performed economic analysis for a range of litigation, strategy, and public policy matters.

2.      Dr. David holds a Bachelor's degree in Physics and Economics from Brandeis University and a Ph.D. in Economics from Stanford University.  At Stanford and throughout his professional career, Dr. David has specialized in regulatory and intellectual property economics and other economic issues related to the intersection of business and government.  Dr. David's professional practice has focused on the valuation of patents, trademarks, copyrights, and other intellectual property; the application of statistics and other economic tools to business and regulatory questions; and the calculation of economic damages arising in a variety of types of civil disputes.

3.      Dr. David has presented his research in public speeches, published writings, and expert testimony on numerous occasions.  Dr. David's curriculum vitae, attached as Exhibit A, lists all of the cases in which he has given expert testimony in court or by deposition in the last four years, as well as all publications he authored in the past 10 years.

4.      Kevin W. Christensen is an economist and Vice President at Edgeworth.  Dr. Christensen holds a Ph.D. and M.A. in economics from the University of Florida and a Bachelor's degree in economics from James Madison University.  Before joining Edgeworth, Dr. Christensen was an Economist at The CapAnalysis Group, LLC ("CapAnalysis"), an affiliate of the law firm Howrey LLP.  Prior to joining CapAnalysis, Dr. Chistensen was a graduate student at the University of Florida, where he also served as an instructor in the economics department and researcher for the Bureau of Economic and Business Research.  Before attending graduate school, Dr. Christensen spent three years as a Consultant with Ernst & Young's Quantitative Economics and Statistics practice.

2

5.      Dr. Christensen has previously submitted testimony and written articles for a variety of media, including journals.  His research has been presented at the annual meetings of the Southern Economic Association and the Western Economic Association.

6.      Dr. Christensen has consulted on a variety of matters including antitrust class action litigation, labor and employment class action litigation, mergers and acquisitions, intellectual property litigation and portfolio management, investigations by the Federal Trade Commission, economic impact studies, calculation of economic damages, and public policy.  All told, Dr. Christensen has been a consulting economist for nearly a decade with the last five years of his professional career focused on litigation consulting.  Dr. Christensen's curriculum vitae is included as Exhibit B to this report.

## II.  STATEMENT OF ASSIGNMENT

7.      We were retained by Settlement Class Counsel in *Ramona Trombley, et al. v. National City Bank,* No. 1:10 Civ. 00232 (D.D.C) to quantify the injury to members of the Settlement Class presuming that the allegations in the Complaint regarding the reordering of electronic debit transactions from highest to lowest dollar amount are true and valid.  Thus, we have been asked to calculate the excess amount of overdraft fees collected by National City Bank ("National City"), the banks that National City acquired, and PNC Bank, N.A. ("PNC") (collectively, "Defendant") due to this challenged practice.[1]  These estimates are made for the Settlement Class Period, July 1, 2004 to August 15, 2010 ("Class Period").[2]

8.      As discussed more fully below, we relied on a sample of account-level transaction data provided by Defendant, data previously provided by Defendant to the Notice Administrator for the entire Class Period, other financial and policy information provided by Defendant during confirmatory discovery discussions, court filings and documents produced during in formal and informal discovery, and public information.  A complete list of materials we rely upon is included as Exhibit C.  We reserve the right to revise our opinions if additional materials are provided to us, or if additional research, reflection, or the correction of inadvertent errors leads us to change our opinions.

---

[1] Only fees collected by PNC from former National City customers are included.  In other words, this analysis expressly excludes customers of PNC who were never customers of National City.
[2] Revised Settlement Agreement, ¶ 1.

### III.  REVIEW OF ALLEGATIONS

9.      Plaintiffs allege that accountholders were charged excessive overdraft fees on electronic debit transactions (i.e. debit card, check card, and ATM withdrawals) during the Class Period due to the challenged practice of high-to-low reordering.[3]

10.     Overdraft fees were assessed by Defendant at the end of each business day for transactions that caused the account balance to fall below zero (or further below zero).  Plaintiffs allege that excess overdraft fees were charged as a result of Defendant's policy of reordering electronic debit transactions high-to-low rather than based on the actual time the transactions were initiated by an accountholder.  According to the Complaint, by reordering transactions in descending order by dollar value, the account balances were drawn down more quickly so that excess overdraft fees were imposed.

### IV.     REVIEW OF AVAILABLE DATA

**A.      Sample of Customer Account Transactions**

11.     Our calculation of excess overdraft fees is based on a sample of transactions from September 1, 2010 to September 30, 2010 by PNC accountholders who were previously National City accountholders (the "Sample Data").[4]  We understand that the Sample Data includes all transactions on the day an overdraft fee was charged and the day prior.  With this information we determined the balance at the start of the day, the customer transactions that resulted in an overdraft fee, and the overdraft fees assessed.  We used these components to compare the total overdraft fees charged during the time period covered by the Sample Data to those that would have been charged but for the high-to-low reordering of transactions.

12.     The data we received from Defendant came in three encrypted, fixed-width, ASCII files and included fields for the account number, date of transaction, type of transaction, a transaction description, amount of transaction, and account balance following the transaction.  The data are comprised of approximately 1.3 million transactions during September 2010.

---

[3] The Complaint does not include allegations related to Non-Sufficient Fund ("NSF") fees charged for checks.
[4] We understand that due to the manner in which data was stored and archived by the bank, it was not feasible to obtain a data sample contemporaneous with the Class Period.

13.     In addition, Defendant made available employees knowledgeable about the data provided, posting policies and practices, and financial information.  We engaged in communications with Defendant's employees to discuss these matters.

14.     The Sample Data covers a period of time after the Federal Reserve amended Regulation E, which governs overdraft coverage.  Prior to the revision of Regulation E, accountholders could be automatically enrolled by the bank for overdraft coverage.  Under the revised Regulation E, customers who do not "opt in" do not receive overdraft coverage, and banks may not charge overdraft fees for electronic debit transactions that are in excess of their account balances.  It is possible that the average characteristics and behavior of customers with overdraft protection in the Sample Data are somewhat different from the average characteristics and behavior of customers with such protection prior to Regulation E.  However, for purposes of this report we assume the average characteristics and behavior of customers are the same before and after changes to Regulation E, and therefore that excess overdraft fees calculated using the Sample Data are representative of what would have occurred during the Class Period.

**B.      Data Received from the Notice Administrator**

15.     Defendant provided the Notice Administrator appointed by the Court with "access to the names, available Overdraft Fee account information, and last known address of all National City Customers who incurred an Overdraft Fee."[5]  Defendant provided in this database the total number of electronic debit transactions and overdraft fees (including those for debit cards, check cards, ATM and ACH transactions, and checks) for accounts held by a Class Member on a monthly basis from August 2005 through August 2010.[6]  After executing an information security agreement with Defendant, we received the final database (the "Notice Database") created by the Notice Administrator for use with our damages calculations, described in more detail below.  We assume that the data provided to us by the Notice Administrator (which the Notice Administrator received from Defendant) is complete and accurate.

---

[5]  Revised Settlement Agreement, ¶ 15.

[6]  In approximately 3 percent of the observations, a count of overdraft charges was not available and the Notice Administrator instead received the total dollar amount of overdraft fees charged.  We converted the revenue figures to counts by dividing the revenues by $34.54, which is the average overdraft fee charged by in the Sample Data, and then rounding to the nearest integer.

16.     We understand Defendant provided the Notice Administrator with 11 data files in several different formats and more than 31 million data records.  The files contained both account signer data (name and mailing address) and transactional data (number of overdraft fees by calendar month for each included account) along with unique identifier codes to accurately join these data elements.  We understand that the Notice Administrator evaluated the data provided by Defendant and identified some inconsistencies within the consolidated dataset.  We understand that replacement files were provided by Defendant and processed by the Notice Administrator. In addition, duplicate records were merged together.

17.     For the purposes of damages estimation we only used the transactional database from the Notice Administrator.  That dataset contains approximately 15.4 million observations of individual accounts for each month from August 2005 through August 2010.  There are approximately 2.5 million unique accounts included within the data.

## V.     METHODOLOGY FOR ESTIMATING ECONOMIC DAMAGES

18.     Making use of the data described in the previous section, we estimated damages in four steps:

A.      We estimated the difference (in dollars) between (1) the overdraft fees on electronic debit transactions actually charged in the Sample Data and (2) the fees that would have been charged but for the high-to-low reordering of electronic debit transactions.  We then calculated the actual number of overdraft fees in the Sample Data.  The ratio of the two numbers is a measure of the average excess overdraft fees charged per overdraft fee actually charged.

B.      We estimated the number of overdraft fees incurred by Class Members for electronic debit transactions throughout the Class Period using the Notice Database.

C.      We applied the average excess overdraft fee in the Sample Data from Step A to the number of overdraft fees charged in the Class Period from Step B to obtain the total dollar amount of excess overdraft fees.  Finally, we adjusted for overdraft fees that were reversed or not collected by Defendant.

D.       We made another calculation in an effort to quantify the damages in the event that the Court were to determine that "chronic overdrafters" were not entitled to every overdraft charge incurred as a result of high-to-low reordering.

**A.       Estimating the Excess Overdraft Fees in the Sample Data**

19.     We first came to an understanding of the rules Defendant actually used to determine overdraft fees.  We understand that "batch processing" was used to determine if an overdraft fee should be charged.  At the end of each business day, the Defendant applies credits and banking fees against the account balance and then applies all other transactions to the account after first reordering them from high-to-low by dollar amount.  As each transaction cycles through the system, the available account balance is tracked to determine if a positive or negative balance remains.  If an electronic debit transaction results in a negative account balance, an overdraft fee is recorded the following day.  In the Sample Data, the amount of the overdraft fee varies by account, and ranges from $25 to $36.

20.     We then determined which observed overdraft fees in the Sample Data could be predicted by insufficient funds transactions made on a checking account.[7]  We excluded from our analysis days on which the observed overdraft fees did not match our prediction, based on the order of transactions and the observed account balances.[8]  For the remaining overdraft fees, we estimated the number of overdraft fees that would have occurred for each customer on a given day had Defendant <u>not</u> reordered transactions from high-to-low.  We then calculated the difference between this number of fees and those that actually occurred, and made additional adjustments

---

[7] Overdraft fees are posted to an account the day after the balance insufficiency occurs.

[8] We understand that such inconsistencies could occur if, for example, the "available" balance in a particular account was less than the recorded daily balance in the Sample Data, in which case an overdraft fee could have been imposed even though the reported daily balance in the Sample Data was positive.  We excluded these observations so that we have a comparable set of transactions and overdraft fees in our "actual" and "but-for" scenarios.

for differences between the overdraft fee policies of PNC and National City.[9]  The result is an estimate of the excess electronic debit overdraft fees from the Sample Data.

21.     In order to determine the number of excess overdraft fees charged due to high-to-low reordering, we needed to define the order in which electronic debit transactions should have been posted, based on allegations in the Complaint.  At the direction of counsel, we evaluated excess overdraft fees based on two alternative posting orders:  (a) low-to-high ordering of electronic debit transactions; and (b) a simulated chronological order (*i.e.*, in an approximation of the order in which transactions actually were initiated) of electronic debit transactions.  Because the Complaint pertains only to debit card and ATM transactions and does not allege that Defendant improperly ordered other debits and credits on the account, we did not change the posting order of non-debit card transactions in our damage calculations, and such transactions continued to be ordered high-to-low.

22.     In determining how electronic debit transactions should have been posted to an account, we also needed to consider the priority in which the electronic debit transactions are deducted relative to all other transactions types—*i.e.,* whether debit card and ATM transactions are deducted from the account balance *before* all other types of transactions (*e.g.*, ACH, checks, etc.), whether they are deducted *after* all other types of transactions, or whether all transactions are grouped together prior to posting.  We understand that during the Class Period, National City grouped all transaction types together, and then posted them to the account high-to-low.  At the direction of counsel, who advised that provisions of the Uniform Commercial Code likely allow Defendant to post check transactions (though not electronic debit transactions) in the order most advantageous to it, electronic debit transactions were posted after all other transactions for purposes of our "but-for" damages analysis.

23.     Our first "but for" scenario re-orders the electronic debit transactions low-to-high.  As described above, we first posted other transactions (including checks) to the account and then

---

[9] To estimate the fees that actually occurred we made two additional adjustments related to the differences between the rules PNC and National City used to determine overdraft fees.  We understand that PNC instituted a limit of four overdraft fees per day while National City had a limit of ten overdraft fees per day.  We calculated "actual" fees by predicting the number of overdraft fees in the Sample Data under the assumption that the daily limit was ten.  We also understand that, for some customers, PNC charged $25 for the first overdraft fee in a given day and $36 thereafter, while National City charged $36 for all transactions during the day.  In such cases in the Sample Data, we adjusted the "actual" fee from $25 to $36 in order to reflect the charges that would have been imposed during the Class Period by National City.

posted the re-ordered electronic debit transactions from each day at the end of the transaction list for that day. Using this "but-for" posting order and assumption regarding the priority of the electronic debit transactions relative to other types of transactions, we re-posted all transactions in the Sample Data. Whenever the account balance became negative as a result of an electronic debit transaction, we predicted an overdraft fee would occur just as it would in the Defendant's batch process. The resulting overdraft fees are those that would have been charged if Defendant had not grouped all transactions together and then used the highest-to-lowest posting order. The difference between this number of overdraft fees and the overdraft fees that were actually charged constitutes the first step in our estimate of damages.

24.     In order to relate our findings to all Class Members across the Class Period, we divided our estimate of excess overdraft fees by the actual number of relevant overdraft fees in the Sample Data. This results in the excess amount of overdraft fees charged, expressed as a portion of each overdraft fee actually charged ("Average Excess Overdraft Fee Amount"). As shown in Exhibit D, we find that for each overdraft fee observed in the Sample Data, the challenged reordering practice resulted in an Average Excess Overdraft Fee Amount of $5.44 per overdraft fee actually charged, relative to a "but for" world in which a low-to-high ordering policy was used for electronic debit transactions. In other words, $5.44 of every overdraft fee actually charged represents an excess amount, which is equivalent to about 16 percent of the average charge for overdraft fees in the Sample Data.

25.     Our second scenario is based on a simulated chronological re-ordering of electronic debit transactions. Because the Sample Data does not include a "time stamp"—i.e., a record of the time a transaction was initiated during the day—we do not know in what order purchases were authorized by the accountholder. Further, we understand that the electronic debit transaction data retained on Defendant's servers do not include a "time stamp." We therefore simulated chronological posting of electronic debit transactions by randomizing the order of such transactions. If electronic debit transaction amounts are not correlated with the time an accountholder initiates a transaction, this randomizing technique should simulate the impact of chronological ordering of electronic debit transactions. In order to address the possibility of random variation in this method, we repeated the simulation 100 times and used the median of

the average overdraft fees from the 100 simulations in the damages calculations.[10]  As shown in
Exhibit E, we find that for each overdraft fee observed in the Sample Data, the challenged
reordering practice resulted in an Average Excess Overdraft Fee Amount of $2.15 per overdraft
fee actually charged, relative to a "but for" world in which a (simulated) chronological ordering
policy was used for electronic debit transactions.  In other words, $2.15 of every overdraft fee
actually charged represents an excess amount, which is equivalent to about 6 percent of the
average charge for overdraft fees in the Sample Data.

**B.     Counting the Number of Overdraft Fees That Occurred During Class Period**

26.     Using the data in the Notice Database, we counted overdraft fees that actually occurred
each month from August 2005 to August 2010.  Because information was not available for July
1, 2004 through July 31, 2005, we extrapolated the number of overdraft fees that were charged
during this period using the information available from the Administrator.  We estimate the
number of overdraft events from July 1, 2004 through July 31, 2005 using a straight-line
extrapolation based on the monthly overdraft events from August 2005 through December
2008.[11]  We also adjusted the August 2010 data from the Administrator to account for the fact
that the Class Period includes only part of that month.  As shown in Exhibits D and E, we
estimate that a total of approximately 59.7 million overdraft fees were charged during the Class
Period.

27.     The Notice Database includes the number of overdraft fees incurred by accountholders,
including overdraft fees associated with transactions other than electronic debit transactions.  We
understand that Defendant is unable to discern whether the reported overdraft fees resulted from
electronic debit transactions or other types of transactions (such as checks).  Therefore, we relied
on the FDIC Study of Bank Overdraft Programs (2008), which estimates that, industry-wide, an
average of 48.8 percent of overdraft fees are caused by electronic debit transactions.[12]  We
applied this figure to the estimate of total overdraft fees from the Notice Database to estimate the
number of overdraft fees resulting from electronic debit transactions.  As shown in Exhibits D

---

[10] The median result using 100 simulations was within 1 percent of the median result using 25 simulations,
indicating that 100 simulations is sufficient to address the random variation introduced by the procedure.
[11] This time period begins with the first month for which we have data in the Notice Database and ends the month
that PNC acquired National City.
[12] Federal Deposit Insurance Corporation, FDIC Study of Bank Overdraft Programs, p. 78.

and E, we estimated a total number of relevant overdraft fees during the Class Period of 29.2 million.

## C.      Adjustments for Reversals/Noncollectibles and Damage Calculation

28.      We multiplied the total amount of overdraft fees attributable to electronic debit transactions during the entire Class Period by the per-transaction Average Excess Overdraft Fee Amount calculated above.  Those results were adjusted further to account for the fact that some overdraft fees were not paid by Class Members because they were refunded, reversed or not collected.  Because we could not estimate such events from the Sample Data, we based our adjustment on calculations from other litigation related to overdraft fee reordering.[13]  After making these deductions, we estimated total damages of $116.5 million in our first scenario (low-to-high re-ordering) and $46.0 million in our second scenario (simulated chronological re-ordering).

## D.      Adjustment for Accounts with Frequent Overdraft Fees

29.      We performed an additional analysis to estimate the impact of excluding some of the relevant overdraft fees incurred during the Class Period.  At the request of counsel, for these scenarios we assumed that an individual customer could not claim injury on overdraft fees outside of the two months in which he or she incurred the highest number of overdraft fees.  We understand that this corresponds to the Settlement Agreement distribution plan and the ruling by the Court that "[l]imiting the recovery period to two months also prevents chronic overdrafters, who had notice of National City Bank's overdraft policies yet continued overdrafting anyway, from being unfairly rewarded for their behavior."[14]  We estimated a total of 12.7 million relevant transactions during the Class Period under this set of assumptions.  As shown in Exhibit D, based on this reduced number of relevant transactions, we calculated total damages of $50.8 million in the low-to-high re-ordering scenario.  As shown in Exhibit E, based on this reduced number of

---

[13] In the matter of *Gutierrez v. Wells Fargo, et al.*, which involved similar allegations to this case, the plaintiffs' expert determined that reversed/uncollectible overdraft fees represented approximately 20-30 percent of the total amount of fees charged, with a median figure across all scenarios of 26.52 percent.  We adopted a figure of 26.52 percent to adjust our estimate of excess fees.  *See* Unredacted Supplemental Expert Report of Arthur Olsen, filed April 20, 2010, p. 27.

[14] Memorandum Opinion ,January 11, 2011, at 11.

relevant transactions, we calculated total damages of $20.0 million in the simulated
chronological re-ordering scenario.

## VI.  SUMMARY OF RESULTS

30.    Based on the methodology and assumptions described above, we estimate the total excess
overdraft fees during the Class Period as follows:

A.    Low-to-high re-ordering scenario, all electronic overdraft events:
**$116.5 million.**

B.    Simulated chronological re-ordering scenario, all electronic overdraft events:
**$46.0 million.**

C.    Low-to-high re-ordering scenario, including only electronic overdraft events
during two months with the greatest number of events:
**$50.8 million.**

D.    Simulated chronological re-ordering scenario, including only electronic overdraft
events during two months with the greatest number of events:
**$20.0 million.**


Dated:  May 27, 2011

_____

Jesse David


_____

Kevin W. Christensen

**EXHIBIT A:**


**CURRICULUM VITAE OF JESSE DAVID**



515 S. Flower St.
36th Floor
Los Angeles, CA 90071
(626) 793-4632
jdavid@edgewortheconomics.com

**Jesse David**
**Senior Vice President**

Jesse David heads the Los Angeles office for Edgeworth Economics.  Dr. David is an expert on econometrics and analysis of complex data in a wide range of areas, including labor and employment, the valuation of intangible assets, market definition, and the assessment of economic impacts in complex commercial disputes and regulatory proceedings.  His experience spans labor and employment, antitrust, regulatory, environmental, class certification, and other economic issues related to the intersection of business and government.

Dr. David has provided economic consulting and expert testimony for many industries, including financial services, pharmaceuticals, petroleum products, chemicals, software, and consumer products.  He frequently submits expert reports to and testifies before decision-making bodies, including U.S. federal and state courts, the Federal Energy Regulatory Commission, the National Energy Board of Canada, and various arbitration venues.

### EDUCATION

Stanford University
Ph.D., Economics, 2000

Brandeis University
B.A., *magna cum laude,* Economics and Physics, 1991

### EMPLOYMENT

Edgeworth Economics, LLC, Washington, D.C.
September 2009-present, Senior Vice President

Criterion Economics, LLC, Washington, D.C.
March 2009-September 2009, Senior Vice President

National Economic Research Associates, Inc., White Plains, NY
2004-2009 Vice President
2000-2004 Senior Consultant
1997-1999 Senior Analyst

Stanford University, Palo Alto, CA
1993-1995 Research Assistant/Teaching Assistant

### TESTIMONY AND EXPERT REPORTS

*Investment Technology Group., Inc., et al. vs. Liquidnet Holdings, Inc.*, U.S. District Court for the Southern District of New York.
> Expert report, April 12, 2010.  Deposition, June 2, 2010.

*In Re: Mushroom Direct Purchaser Antitrust Litigation*, U.S. District Court for the Eastern District of Pennsylvania.
> Testimony at mediation, January 5, 2010.

*AOB Properties, Ltd. vs. Laserspine Institute, LLC, et al.*, U.S. District Court for the Middle District of Florida, Tampa Division.
> Expert report, December 11, 2009.

*Glaxo Group Ltd. and SmithKlineBeecham Corporation vs. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of Delaware.
> Expert reports, October 15, 2009 and November 3, 2009.  Declaration, April 9, 2010.  Deposition, November 3, 2009.

*Tyco Healthcare Group LP and Mallinckrodt Inc. vs. Pharmaceutical Holdings Corporation, Mutual Pharmaceutical Company, Inc. and United Research Laboratories, Inc.*, U.S. District Court for the District of New Jersey.
> Declaration, July 22, 2009.  Deposition, July 23, 2009.  Hearing testimony, July 29, 2009.

*Weather Central, Inc. and MyWeather, LLC vs. Reinhart Boerner Van Deuren, S.C., Reinhart Boerner Van Deuren, P.C., Peter J. Manghera and Attorneys' Liability Assurance Society, Inc.*, U.S. District Court for the Western District of Wisconsin.
> Testimony at mediation, July 9, 2009.

*ESCO Corporation vs. Bradken Resources Pty Ltd,* International Chamber of Commerce, International Court of Arbitration.
> Expert reports, June 15, 2009 and December 21, 2009.  Arbitration testimony, January 29, 2009.

*Schering Corporation and MSP Singapore Company LLC vs. Glenmark Pharmaceuticals Inc., USA and Glenmark Pharmaceuticals Ltd.*, U.S. District Court for the District of New Jersey.
> Expert report, May 8, 2009.  Deposition, June 18, 2009.

*Eli Lilly and Company v. Sicor Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the Southern District of Indiana.
> Expert report, February 24, 2009.  Deposition, March 20, 2009.

*Tobacco Technology, Inc. v. Taiga International N.V., Thomas J. Massetti, and Marie-Paul Voûte*, U.S. District Court for the District of Maryland.
> Expert report, August 21, 2008.  Deposition, November 25, 2008.

*Dow Jones & Company, Inc. v. Ablaise Ltd. and General Inventions Institute A, Inc.*, U.S. District Court for the District of Columbia.
> Expert report, August 20, 2008.

*Aspex Eyewear, Inc. and Contour Optik, Inc. v. Clariti Eyewear, Inc.*, U.S. District Court for the Southern District of New York.
> Expert report, June 20, 2008.

2

*Boldstar Technical, LLC and Michael S. Powell v. The Home Depot, Inc. and Industriaplex, Inc.*, U.S. District Court for the Southern District of Florida, Fort Lauderdale Division.
> Expert reports, April 25, 2008 and May 30, 2008.  Deposition, August 29, 2008.  Trial testimony, February 10-11, 2010.

*Novartis Pharmaceuticals Corporation, Novartis Corporation, and Novartis International AG v. Mylan Pharmaceuticals, Inc. and Mylan Laboratories, Inc.*, U.S. District Court for the District of New Jersey.
> Expert report, March 26, 2008.  Declaration, October 1, 2008.  Deposition, October 9, 2008.

*Gary W. Ogg and Janice Ogg v. Mediacom LLC*, Circuit Court of Clay County, Missouri in Liberty.
> Expert reports, March 5, 2008 and April 3, 2008.  Deposition, April 4, 2008.  Trial testimony, March 13 and 17, 2009.

*Source Search Technologies, LLC v. LendingTree, LLC, et al.*, U.S. District Court for the District of New Jersey.
> Expert report, May 1, 2007.  Deposition, June 21, 2007.

*Federal Insurance Company v. InterDigital Communications Corporation, et al.*, JAMS arbitration.
> Deposition, February 27, 2007.  Arbitration testimony, May 16, 2007.

*Student Lifeline, Inc. v. The Senate of the State of New York, et al.*, U.S. District Court for the Eastern District of New York.
> Expert report, January 29, 2007.  Deposition, July 26, 2007.

*Pediatrix Screening, Inc. et al v. Telechem International, Inc.*, U.S. District Court for the Western District of Pennsylvania.
> Expert reports, December 15, 2006, February 16, 2007, and July 6, 2007.  Deposition, March 28, 2007.  Trial testimony, July 18-19, 2007.

*Green Mountain Chrysler-Plymouth-Dodge-Jeep, et al. v. Torti*, U.S. District Court for the District of Vermont.
> Expert reports, October 9, 2006 and January 17, 2007.

*The Procter & Gamble Company v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of Delaware.
> Expert report, August 31, 2006.  Deposition, October 13, 2006.  Trial testimony, November 6, 2006.

*Central Valley Chrysler Jeep, Inc. et al. v. Witherspoon*, U.S. District Court for the Eastern District of California.
> Expert reports, June 12, 2006, October 9, 2006, and January 16, 2007.  Deposition, October 27, 2006.

*Sierra Club et al. v. Robert B. Flowers, et al.*, U.S. District Court for the Southern District of Florida, Miami Division.
> Depositions, June 6, 2006 and June 20, 2006.  Hearing testimony, October 5, 2006.  Declaration in support of appeal, U.S. Court of Appeals for the Eleventh Circuit, July 27, 2007.

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of Delaware.
> Expert report, April 6, 2006.  Deposition, August 8, 2006.

*Alliance Security Products, Inc. v. Fleming and Company*, Pharmaceuticals, U.S. District Court for the Southern District of New York.
> Expert report, March 30, 2006.  Deposition, May 17, 2006.

*Re Colonial Pipeline Company*, Federal Energy Regulatory Commission.
> Declaration, February 28, 2006.

*Tesoro Canada Supply & Distribution Ltd. in Hearing Order MH-2-2005 Regarding an Application for Priority Destination from Chevron Canada Limited, et al.*, National Energy Board of Canada.
Direct testimony, January 18, 2006.

*McKesson Information Solutions, LLC v. The TriZetto Group, Inc.*, U.S. District Court for the District of Delaware.
Expert report, November 17, 2005.  Deposition, November 30, 2005.

*Touch-n-Buy, Inc. v. Radiant Telecom, Inc., et al.*, U.S. District Court for the Southern District of Florida.
Expert report, November 9, 2005.  Deposition, February 8, 2006.

*Jamaica Recycling Corp., et al. v. The City of New York, et al.*, Supreme Court of the State of New York, County of New York.
Affidavit, August 18, 2005.

*Amerisource Corporation v. RX USA International, Inc., et al.*, U.S. District Court for the Eastern District of New York.
Expert report, August 15, 2005.  Deposition, June 5, 2006.

*Ruth S. King v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Supreme Court of the State of New York, County of New York.
Declaration, August 3, 2005.  Deposition, September 26, 2005.  Also in *Rochelle Suchoff, et al. v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Superior Court of New Jersey, Law Division, Essex County; *Jason Gregory Turner v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Superior Court of the State of California for the County of Los Angeles; *Harry Clendenan v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Circuit Court of Kanawha County, West Virginia; *Elizabeth Leser v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Court of Common Pleas, Erie County, Ohio; *Bobby Allen Green v. McNeil Nutritionals, LLC*, Judicial Court, Fourth Judicial Circuit in and for Duval County, Florida, Division CV-A; and *Jacqueline Burrows, et al. v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Superior Court of Massachusetts, Middlesex County.

*Braun GmbH v. Rayovac Corporation*, U.S. District Court for District of Massachusetts.
Expert reports, May 23, 2005 and June 27, 2005.  Deposition, September 8, 2005.

*PediaMed Pharmaceuticals, Inc. v. Breckenridge Pharmaceutical, Inc. and Scientific Laboratories, Inc.*, U.S. District Court for the District of Maryland, Southern Division.
Expert report, October 1, 2004.

*Forrest W. Garvin and E-Netec, Corp. v. McGuireWoods, LLP, et al.*, General Court of Justice, Superior Court Division for the State of North Carolina, Mecklenburg County.
Deposition, July 27, 2004.

*ResQNet.com, Inc. v. LANSA, Inc.*, U.S. District Court for the Southern District of New York.
Expert reports, July 14, 2004 and January 25, 2007.  Deposition, August 9, 2004.  Trial testimony, May 21, 2007.

*Allocco Recycling, Ltd. v. John Doherty*, U.S. District Court for the Southern District of New York.
Expert report, February 4, 2004.  Deposition, December 9, 2004.  Declaration, December 2, 2005.

*Pinnacle Systems, Inc. v. XOS Technologies, Inc., et al.*, U.S. District Court for the Northern District of California.
Expert report, November 7, 2003.  Deposition, January 15, 2004.  Trial testimony, February 11, 2004.

*Sinclair Oil Corporation v. BP Pipelines (North America), Inc.*, Federal Energy Regulatory Commission.
Direct testimony, September 18, 2003.  Rebuttal testimony, March 16, 2004.

### PUBLICATIONS

"Economic Approaches To Royalty Calculations," in *Intellectual Property Law360*, May 25, 2010.

"Intellectual Property Rights in Developing Nations," research paper for NERA Economic Consulting, prepared for the International Intellectual Property Institute (2008), co-authored with Sourav Chatterjee, Fei Deng, Christian Dippon, and Mario Lopez.

"Commercial Success: Economic Principles Applied to Patent Litigation," in <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u> (Gregory K. Leonard & Lauren J. Stiroh, eds. National Economic Research Associates 2005); also in <u>Economic Damages in Intellectual Property</u> (Daniel Slottje ed., John Wiley & Sons 2006); co-authored with Marion B. Stewart.

"Interest and Discount Rates in Intellectual Property Damages," in <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u> (Gregory K. Leonard & Lauren J. Stiroh, eds. National Economic Research Associates 2005), co-authored with Christine Meyer.

"Determining Reasonable Compensation for Employee Inventions in Japan," 6 *Global Intellectual Property Asset Management Report* No. 9 1 (2004), co-authored with Satoshi Nakashima.

"Where is the Market Failure?  A Review of OSHA's Economic Analysis for Its Proposed Ergonomics Standard," 22 *Journal of Labor Research* 75 (2001), co-authored with Mark Berkman.

"Water Subsidies in Southern California, Do They Exist and Have They Contributed to Urban Sprawl?" 37 *California Western Law Review* 121, (2000), co-authored with Mark Berkman.

"The Welfare Implications of Recycled Newsprint Regulation," doctoral dissertation, Stanford University (2000).


### PRESENTATIONS

"The Evolution of a Complex Damages Report," at Edgeworth Economics CLE Seminar, Philadelphia, PA, April 2010

"Economists' Views of Recent Patent Damages Decisions," at Edgeworth Economics CLE Seminar, Washington, DC, April 2010.

"When Does a Damages Expert's Analysis Cross the Daubert Line?" at the *Judicial Education Program* presented by Northwestern University School of Law, Chicago, IL, February 2009.

"Copyright Valuation and Damages Assessment," at Law Seminars International Conference: *Copyright Law Counseling, Management and Litigation*, Seattle, WA, April 2008.

"Trade Secret Valuation and Damages Assessment," at Lexis-Nexis Conference: *Trade Secret Protection: Realizing Best Practices for Trade Secret Protection*, Shanghai, China, December 2007.

"Comparables:  The Use and Misuse of Benchmark Royalty Rates for Patent Damages," at NERA CLE Seminar, San Francisco, CA, January 2007.

"Selecting the Best Type of Expert and Tips for an Effective Working Relationship," at Law Seminars International Conference: *Calculating and Proving Patent Damages*, Philadelphia, PA, October 2006.

"When You Get to the Fork in the Road, Take It!  Alternative Approaches to Defending your Transaction before the Agencies," at *NERA Antitrust Trade and Regulation Conference*, Santa Fe, NM, July 2006.

"The Role of Economic Analysis in Intellectual Property Litigation," at Sonnenschein Nath & Rosenthal CLE Program, Chicago, IL, January 2006; also at *NERA Intellectual Property Roundtable*, Tokyo, Japan, July 2004.

"IP/Antitrust Lawsuits: Relevant Markets and Class Actions," at Practising Law Institute Workshop: *Intellectual Property Antitrust 2005*, New York City, June 2005.

"The Role of Economics in Complex Business Litigation," at Columbus Bar Association CLE Program, Columbus, OH, December 13, 2004.

"Is Bankruptcy the Answer?" at *Asbestos Litigation Conference* sponsored by Glasser LegalWorks, New York, NY, April 2003.

The Secondary Impact of Asbestos Liabilities, at U.S. Chamber of Commerce conference: *Understanding Asbestos Litigation: The Genesis, Scope, and Impact*, Washington, D.C., January 2003.

"Trends in Intellectual Property Litigation," at Licensing Executives Society conference, San Jose, CA, April 2002.

"Environmental Risk and the Bottom Line," at 2001 NAEM *Environmental Management Forum*, San Antonio, TX, October 2001; also at *Financial Executives Summit*, Scottsdale, AZ, May 2001.

"Competitive Analysis in the Refined Petroleum Products Pipeline Industry," at *Advanced Workshop in Regulation and Competition*; Competitive Change in Network Industries 14th Annual Western Conference, San Diego, CA, June 2001.

**EXHIBIT B:**


**CURRICULUM VITAE OF KEVIN W. CHRISTENSEN**



1225 19th St, NW
8th Floor
Washington, DC 20036
202-559-4404
kchristensen@edgewortheconomics.com

## Kevin W. Christensen
## Vice President

Dr. Christensen is an industrial organizational economist who applies innovative microeconomic theory and current research principles to a wide range of matters. He is experienced in class action litigation, estimation of damages for antitrust and intellectual property litigation, mergers and acquisitions under review by both the FTC and DOJ, and FIFRA compensation claims. In addition to litigation, Dr. Christensen has provided valuable consultation to clients on a variety of intellectual property issues. These projects have emphasized optimized portfolio management – including competitor benchmarking, portfolio valuation, and recommendations for sale or licensure of intellectual property assets. His broad experience has included work pertaining to agricultural products, consumer goods, pharmaceuticals, natural gas, oil refining, IT vendor services, automated teller machines, medical devices, building insulation, digital audio, and digital data storage industries.

### E D U C A T I O N

University of Florida
Ph.D., Economics, 2006; M.A., Economics, 2004

James Madison University
B.S., Economics 1998
Omicron Delta Epsilon, International Honor Society of Economics

### C U R R E N T   E M P L O Y M E N T

Edgeworth Economics, Washington, D.C.
November 2010-Present, Vice President

### E M P L O Y M E N T   H I S T O R Y

The CapAnalysis Group, L.L.C., Washington, D.C.
June 2006-October 2010, Economist

Ernst & Young L.L.P., Washington, D.C.
1998-2001, Consultant
1998, Intern

NERA Economic Consulting, Washington, D.C.
1997 & 1998, Intern

### EXPERT REPORTS

*District of Columbia Taxi Cab Commission*, Washington DC
        Expert Report (with John Johnson), November 8, 2010

### PUBLICATIONS

Contributor to "Market Definition and Measurement" (with Janusz Mrozek), in R. Schlossberg (ed.) *Mergers and Acquisitions, Third Edition:  Understanding the Antitrust Issues*, American Bar Association, March 2008.

"Report on Trends and Conditions Research: The Impact Of The Internet On Transportation In Florida-Current Economic Perspective And Possibilities For Further Research." (with Dave Denslow and Jim Dewey) March 30, 2002.

"Total Corporate Taxation: 'Hidden,' Above- the- Line, Non-Income Taxes," (with Robert Cline and Tom Neubig) *National Tax Journal*, 5-4, No. 3, September 2001.
        Reprinted: *State Tax Notes*, November 12, 2001.

### PRESENTATIONS

"The Evolution of an Expert Report in a Complex Damages Case"
Cozen O'Connor, Philadelphia, PA, November 2010, with John Johnson and Matthew Milner

National Institute of Trial Advocacy Advanced Trial Advocacy Program, Faculty.  Washington, DC.  2007-2010.

"The Effect of Prudent Investor Laws on Innovation," Southern Economic Association Annual Meeting 2006

"A Model of Venture Capital, Entrepreneurs, and Endogenous Growth," Annual Meeting of Western Economic Association International 2004

### REFEREE OR REVIEWER FOR

Antitrust Law Journal
Review of Development Economics

### TEACHING EXPERIENCE

University of Florida Courses
        The Economics of Science, Technology, and Innovation

## MEMBERSHIPS

American Economic Association
American Bar Association:
- o   Antitrust Section
- o   Intellectual Property Section

National Association of Forensic Economists

## VOLUNTEER ACTIVITIES

American Red Cross, Arlington County Chapter

# EXHIBIT C:

# MATERIALS REFERENCED OR RELIED UPON

## Case Documents

Plaintiff's Class Action Complaint and Jury Demand, filed February 17, 2010

Defendant's Responses to Plaintiff's First Set of Interrogatories Directed to Defendant National City Bank, filed August 27, 2010

Declaration of Jeffrey D. Kaliel In Support of Plaintiff's Supplemental Brief and Response to Objections of Robert Matos, filed August 9, 2010

National City Overdraft Settlement Claim Form

National City Overdraft Settlement Claim Notice

Settling Parties' Joint Motion for Approval of Increased Contribution of National City to Notice Costs, Revision to Mailed Notice, and for Resetting of Final Fairness Hearing and Associated Dates, filed March 14, 2011

Order Granting Settling Parties' Joint Motion for Approval of Increased Contribution of National City to Notice Costs, Revision to Mailed Notice, and for Resetting of Final Fairness Hearing and Associated Dates, filed March 16, 2011

Order of Preliminary Approval of Settlement, Certification of Settlement Class, Approval of the Notice Plan, and Scheduling a Date for a Final Fairness Hearing, Filed January 11, 2011

Revised Settlement Agreement, Filed December 22, 2010

## Documents from Counsel

Bank Statements and Account Activity Summaries for Representative Plaintiffs B. Wells., R. Trombley, and J. Doehner

National City Bank Overdraft Notice Sample

National City Corporation, Service Charges and Fees for Personal Accounts, Effective April 28, 2008

National City Corporation, Service Charges and Fees for Personal Accounts, Effective July 24, 2006

National City Corporation, Service Charges and Fees for Business Accounts, Effective November 1, 2002

National City Corporation, Service Charges and Fees for Personal Accounts, Effective July 1, 2000


**Data from PNC or Notice Administrator**

September 2010 Sample Data (Nsftran_201009a.txt, Nsftran_201009b.txt, Nsftran_201009c.txt)

August 2005 – August 2010 Notice Database (Trombley v NC Extract-Transaction Info 5-18-2011.txt, Trombley v NC Extract-Cust Info 5-18-2011.txt)


**Additional Documents**

2010 Federal Reserve Payments Study, April 5, 2011

National City Corporation, 2007 Form 10-K, filed February 13, 2008

National City Corporation, 2006 Form 10-K, filed February 8, 2007

National City Corporation, 2005 Form 10-K, filed February 6, 2006

National City Corporation, 2004 Form 10-K, filed February 14, 2005

PNC Financial Services Group, 2010 Form 10-K, filed March 11, 2011

PNC Financial Services Group, PNC Corporate Profile

PRNewsire via COMTEX, "PNC Successfully Converts 6 Million Customers and 1,300 Branches from National City in Seven Months", June 21, 2010

PRNewsire via COMTEX, "PNC Completes Largest Phase of National City Conversion", April 19, 2010

PRNewsire-FirstCall, "PNC Completes First Half of National City Conversion", March 1, 2010

PRNewsire-FirstCall, "PNC Completes First Phase of National City Conversion", November 16, 2009

PRNewsire-FirstCall, "PNC Reports Preliminary 2008 Earnings and Impact of National City Acquisition", January 21, 2009

PRNewsire-FirstCall, "PNC Completes Acquisition of National City", December 31, 2008

PNC Financial Services Group, "PNC to Acquire National City", October 24, 2008

PNC Financial Services Group, Geographic Location of PNC and National City Branches, October 23, 2008

PNC Bank, Consumer Schedule of Service Charges and Fees, Effective March 27, 2011

National City Corporation, National City Facts, March 31, 2007

Electronic Funds Transfer Act, Regulation E

Center for Responsible Lending, Banks Collect Overdraft Opt-ins Through Misleading Marketing, April 2011

Center for Responsible Lending, Overdraft Fees and Opting In, March 2009

Bretton Woods, Inc., Fee Analysis of Bank and Credit Union Non-Sufficient Funds and Overdraft Protection Programs, February 2010

The Pew Health Group, Hidden Risks: The Case for Safe and Transparent Checking Accounts, April 2011

Federal Deposit Insurance Corporation, FDIC Study of Bank Overdraft Programs, November 2008

Unredacted Supplemental Expert Report of Arthur Olsen, Veronica Guiterrez, et. Al. v. Wells Fargo & Company, et al., April 12, 2010

**EXHIBIT D**

**SUMMARY OF CALCULATED DAMAGES FOR SETTLEMENT CLASS**
**LOW-TO-HIGH ORDERING OF TRANSACTIONS AS "BUT-FOR" WORLD**
**JULY 1, 2004 - AUGUST 15, 2010**

|  | All Overdraft Fees[1] | Including Only Each Accounts' Two Highest Months of Overdraft Fees |
|---|---|---|
| **Average Excess Overdraft Fee Amount** | $5.44 | $5.44 |
| **Number of Overdraft Fees:[2]** | | |
| July 1, 2004 - July 31, 2005 | 7,671,437 | 3,618,663 |
| August 1, 2005 - August 15, 2010 | 52,077,144 | 22,454,114 |
| Total Number of Overdraft Fees | 59,748,581 | 26,072,777 |
| Total Number of Overdraft Fees From Debit Card and ATM Transactions[3] | 29,157,307 | 12,723,515 |
| **Damages:** | | |
| Damages Before Uncollectibles and Reversals | $158,553,849 | $69,188,908 |
| Less Uncollectibles and Reversals[4] | $42,050,578 | $18,349,814 |
| Total Damages | $116,503,271 | $50,839,094 |

<u>**Notes and Sources:**</u>

[1] Includes all overdraft fees in the data received from the Notice Administrator.

[2] Data received from the Notice Administrator begins in August 2005 and ends in August 2010.

Data from July 2004 through July 2005 is estimated using straight-line extrapolation on data from August 2005 through December 2008. The following equations are used:

All Overdraft Fees: Overdraft = 510,837.74 + 11,324.688*Month

Including Only Each Accounts' Two Highest Months of Overdraft Fees: Overdraft = 250,603.65 + 3,965.0054*Month

We adjust for the mid-month end of the class period by multiplying the number of overdraft fees in August 2010 by (15/31).

[3] Electronic debit transactions comprise 48.8% of all overdraft fees. (Federal Deposit Insurance Corporation, *FDIC Study of Bank Overdraft Programs*, November 2008, p. 78.)

[4] We assume the uncollectible and reversal percentage is 26.52%, equivalent to the median uncollectible and reversal adjustment used in Unredacted Supplemental Expert Report of Arthur Olsen, p. 27.

**EXHIBIT E**

**SUMMARY OF CALCULATED DAMAGES FOR SETTLEMENT CLASS
SIMULATED CHRONOLOGICAL ORDERING (RANDOM SORTING) AS "BUT FOR" WORLD
JULY 1, 2004 - AUGUST 15, 2010**

|  | All Overdraft Fees[1] | Including Only Each Accounts' Two Highest Months of Overdraft Fees |
|---|---|---|
| **Average Excess Overdraft Fee Amount** | $2.15 | $2.15 |
| **Number of Overdraft Fees:[2]** | | |
| July 1, 2004 - July 31, 2005 | 7,671,437 | 3,618,663 |
| August 1, 2005 - August 15, 2010 | 52,077,144 | 22,454,114 |
| Total Number of Overdraft Fees | 59,748,581 | 26,072,777 |
| Total Number of Overdraft Fees From Debit Card and ATM Transactions[3] | 29,157,307 | 12,723,515 |
| **Damages:** | | |
| Damages Before Uncollectibles and Reversals | $62,647,653 | $27,337,859 |
| Less Uncollectibles and Reversals[4] | $16,614,986 | $7,250,362 |
| Total Damages | $46,032,667 | $20,087,497 |

**Notes and Sources:**

[1] Includes all overdraft fees in the data received from the Notice Administrator.

[2] Data received from the Notice Administrator begins in August 2005 and ends in August 2010.

Data from July 2004 through July 2005 is estimated using straight-line extrapolation on data from August 2005 through December 2008. The following equations are used:

All Overdraft Fees: $Overdraft = 510{,}837.74 + 11{,}324.688 * Month$

Including Only Each Accounts' Two Highest Months of Overdraft Fees: $Overdraft = 250{,}603.65 + 3{,}965.0054 * Month$

We adjust for the mid-month end of the class period by multiplying the number of overdraft fees in August 2010 by (15/31).

[3] Electronic debit transactions comprise 48.8% of all overdraft fees. (Federal Deposit Insurance Corporation, *FDIC Study of Bank Overdraft Programs*, November 2008, p. 78.)

[4] We assume the uncollectible and reversal percentage is 26.52%, equivalent to the median uncollectible and reversal adjustment used in Unredacted Supplemental Expert Report of Arthur Olsen, p. 27.