**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| RAMONA TROMBLEY, et al.,<br>on behalf of herself and all others similarly<br>situated,<br><br>Plaintiffs,<br><br>-v-<br><br>NATIONAL CITY BANK, et al.,<br><br>Defendants. | Case No. 1:10-CV-00232<br><br>The Honorable John D. Bates |

**PLAINTIFFS' REPLY IN RESPONSE TO OBJECTIONS TO MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FEE PETITION**

Plaintiffs Ramona Trombley, Jeff Doehner and Brian Wells respectfully submit the following response to the objections to final approval of this Settlement.

## I.    INTRODUCTION AND BACKGROUND

The reaction of the settlement class is an important consideration in evaluating the fairness, adequacy, and reasonableness of a class action settlement.[1]  In this case, notice was provided to over 2.4 million Settlement Class Members.  Dkt. No. 41-4, ¶ 26.  As of July 9, 2011, only 74 Settlement Class Members excluded themselves from the Settlement, and only ten objections were submitted.[2] Three of these objections were filed by lawyers with agendas that do not coincide with the interests of the class, and must, therefore, be considered in that light.[3]  The objections of the Plaintiffs' Executive

---

[1] *See, e.g., Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 305 (D.D.C. 1996) ("In evaluating the Class' own reaction to the settlement's terms, courts look to the number and vociferousness of the objectors"); *Luevano v. Campbell*, 93 F.R.D. 68, 91 (D.D.C. 1981) (low number of objections "is an important indication of [settlement's] fairness and adequacy").

[2] *See* Second Declaration of Hassan A. Zavareei in Support of Final Approval of Class Action Settlement ("Second Zavareei Declaration"), ¶¶ 2-3, filed concurrently herewith as Exhibit 1.

[3] *See In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) ( "I concur with the numerous courts that have recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients."); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 (E.D. Pa. 2003) ("Federal courts are increasingly weary of professional objectors"); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993) (noting that where only twenty objections were made from group of 113,000 class members, the objectors who appealed but did not opt out could be viewed as "spoilers"); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 218 (D. Me. 2003) *judgment entered*, MDL 1361, 2003 WL 21685581 (D. Me. July 18, 2003) ("What is less frequently observed is that the [class action settlement]

Committee ("PEC") in the multi-district litigation ("MDL") pending in Florida are brought to protect the PEC's interests in a separate lawsuit against PNC Bank (which was amended to include National City customers after the Settlement) and the PEC's later-filed lawsuit against National City.[4] Objector Ana Rosen is represented by Theodore Frank, a recognized professional objector[5] who has repeatedly sought fee awards as compensation for his objections.[6] Frank recently labeled plaintiffs' class action lawyers as "parasites," and is motivated by his political interests in stymieing class action litigation.[7] Finally, Sam Cannata is an attorney who has filed virtually identical objections in numerous other cases. Cannata's objections also contain arguments lifted word-for-word from the PEC's objections in this case and another overdraft fee settlement.

Excluding these three lawyer-driven objections, only seven Settlement Class Members submitted documents that might be considered objections. Of those seven class member objections, only three contain complaints about the substance of the Settlement. In light of the fact that over 2.4 million notices were mailed, and that over 172,000 claims have been submitted, this minuscule rate of objection evinces broad support for the Settlement.

Substantively, the objections are insufficient to derail this excellent Settlement, which provides significant and immediate compensation to those Settlement Class Members who elect to participate. The *pro se* class member objections amount to contentions that they are entitled to a refund of all of their overdraft fees together with related damages. As discussed below, complaints that a class

---

process provokes into action an interesting group of professional objectors, who seem to have a variety of agendas, some not always apparent.").

[4] *See, e.g.,* Rhonda Wasserman, *Dueling Class Actions*, 80 B.U. L. Rev. 461, 482 (2000) ("it is likely that class counsel in a dueling class action, appearing on behalf of objectors, are also operating out of self-interest").

[5] *See Dewey v. Volkswagen of Am.,* 728 F. Supp. 2d 546, 575 n.18 (D.N.J. 2010) (including Frank in list of lawyers "described as 'professional objectors'").

[6] *See, e.g., In re: Apple Inc. Securities Litigation,* 2011 WL 1877988, *4-6 (N.D. Cal. May 17, 2011); *Lonardo v. Travelers Indem. Co.,* 706 F.Supp.2d 766, 803-817 (N.D. Ohio 2010).

[7]*Lonardo,* 706 F. Supp. 2d at 785 (N.D. Ohio 2010) ("Class Counsel correctly point out that Mr. Greenberg's brief [filed by Frank] is 'long on ideology and short on law'"); Brendan Kearney, *The Deal Breakers: A look at professional class action objectors in MD*, The Daily Record, May 23, 2010 (Frank describing plaintiffs' class action attorneys as "parasites"); Karen Lee Torre, *Challenging Cy Pres Scams*, Connecticut Law Tribune, November 22, 2010 ("CCAF is a non-profit, public interest law firm dedicated to bringing to light and challenging in court the misdoings of an unholy trinity—the class action bar, special interest groups, and collaborationist jurists").

settlement does not provide enough compensation are not valid objections.  The lawyer-driven

arguments are also without merit.  The class definition properly represents the allegations in this case

that all overdraft fees associated with debit card transactions were unlawful.  And the damages

calculation—based on the impact of high-to-low reordering—is appropriate because that is the

measure of damages that is most likely attainable in this case.  The objections to the allocation plan

have already been rejected.  In any event, the plan was well-devised, awarding greater reimbursement

to Settlement Class Members who were damaged by high-to-low reordering, the key unlawful

practice alleged in the Complaint.  Although Frank argues that the fees should not be based on a

percentage of the fund (and alternatively that 22-25% is too high), that argument is counter to the law.

It is also counter to arguments Frank has made in other cases where he sought a percentage of his

purported improvement to settlements as a fee.  The remaining objections are also meritless.

## II.    DISCUSSION

**A.     Settlement Class Member Objections**

Seven Settlement Class Members who were not represented by attorneys submitted objections

to the Settlement.  Most of these objections did not raise any substantive complaints about the

Settlement.  And the other objections are insufficient to derail a settlement that has received such an

overwhelmingly positive response from the Settlement Class writ large.

1.     **Rochelle Williams** condemned National City's overdraft fee policies and then stated

that she does not believe the Court should approve the Settlement.  She does not make any specific

complaints about the Settlement, and then concludes her objection by stating, "I give my rights for

Hassan A. Zavareei and Jonathan K. Tycko [Settlement Class Counsel] to represent me in this case."

Second Zavareei Decl., Ex. B.  This objection does not in any way indicate any flaws with the

Settlement.  Indeed, it appears to be supportive of the Settlement.

2.     **Linda Bryan** submitted a claim form together with a copy of a complaint she

apparently filed against the Commonwealth of Pennsylvania having nothing to do with banking

issues.  *See* Dkt. No. 41-1, at 24-78.  She did not address the Settlement in any way, and did not state

any substantive objections to the Settlement.  *Id.*

3.     **Elizabeth Garaux** objected to the Settlement because she did not believe National

City's conduct was improper: "I in NO WAY ever felt they were being dishonest about the way they

handled their overdraft fees.  They at NO TIME moved our transaction times to benefit themselves.

That is why I would like to object to this settlement."  Dkt. No. 41-1, at 22.  This sentiment may be

representative of the views of the Settlement Class Members who opted out or chose not to make

claims.  It is not, however, an objection to the substance of the Settlement.  As such, it does not

suggest that the Settlement should not be finally approved.

4.     **Kurt Vierling** submitted a single hand-written letter stating, "I never bank at PNC,

their claims are true."  Dkt. No. 41-1, at 20-21.  Mr. Vierling did not pose any substantive objections

to the Settlement.

5.     **Wayne Harris** objected to "the way overdraft fees are being reimbursed."  Dkt. No.

41-1, at 23.  Specifically, he complained that one overdraft fee can lead to returned checks, which also

leads to other "hidden expenses," including the costs of buying money orders, travel costs, and harm

to his reputation.  *Id.*  Settlement Class Counsel are sympathetic to Mr. Harris' complaints.  Yet the

harm he complains of is very individualized, and was never the subject of this class action.  To the

extent that Mr. Harris, or any other Settlement Class Member, suffered severe individualized damages

that were not capable of resolution through this Settlement, they were entitled to opt out and pursue

those claims individually.  The failure to include such individualized damages in a class action

settlement does not render the Settlement unworthy of final approval.

6.     **Carlton and Mary Niemann** explained in detail the manner in which National City's

overdraft policies caused them serious financial difficulties, including emotional distress and harm to

their credit ratings.  Dkt. No. 41-1, at 79-80.  They did not complain specifically about high-to-low reordering.  Instead, they complained that National City failed to credit their deposits to their account (sometimes for "<u>ENTIRE MONTHS</u>"), which caused severe overdrafts.  *Id.*  They concluded their letter by asking for "<u>$9000 for pain and suffering.</u>"  *Id.* (emphasis in original).  Again, Settlement Class Counsel are sympathetic to the plight of the Niemanns.  But their complaints relate to individualized issues outside the scope of attainable class relief.

7.    **Julie and Tom Williams** explained how National City's failure to credit deposits immediately caused them to incur numerous overdraft fees.  *See* Second Zavareei Decl., Ex. C.  They stated that the purpose of the letter was to "thank you and request the full amount of overdraft fees occurred [sic] from October 2009 to April 2011."  *Id.*  They stated that because "there will be several claimants that will not submit valid claims," they "would like to submit more than just my two highest months to make up for the amount that would be paid out to other class members."  They then listed out the total number of overdraft fees they incurred in several months from 2009-2011, and requested a "Total Refund" of $3,032.  *Id.*  To the extent that this is viewed as a complaint about the Settlement (and it does not appear to be), it is "tantamount to complaining that the settlement should be 'better,' which is not a valid objection."  *Browning v. Yahoo! Inc.,* 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007), at *5.  A settlement is necessarily a compromise, and a full reimbursement of all overdraft fees is not a realistic settlement objective.

The most remarkable thing about these objections submitted by *pro se* Settlement Class Members is that they do not raise any of the objections that the lawyer-driven objectors raise.  They do not complain about the plan of allocation.  They do not complain about the breadth of the class definition.  They do not complain about the early resolution of this matter.  And they do not complain about the fee petition.  All of these purported issues were readily ascertainable from the notices that were sent to over 2.4 million Settlement Class Members.  Yet they were not raised by any of the few

*pro se* objectors.  Settlement Class Counsel submits that the rank and file Settlement Class Members

did not raise these lawyer-driven objections because they are meritless.

**B.      Attorney-Driven Objections**

**1.      Continuing Objections by the PEC**

The objections of Robert Matos and Fernando Hernandez are the latest in a series of attempts

to derail this Settlement by the PEC.  At the outset, it is important to note that these lawyers have

interests beyond those of the Settlement Class Members at stake.  They represent tens of millions of

consumers in related litigation against dozens of other banks.  They have settled one case—the

settlement with the Bank of America ("BofA") which they tout here.  *See* Dkt. No. 43-6.  And it

appears to be important to their broader agenda to ensure that any settlements with other banks are

made under their aegis and under their terms.  The PEC objected to two other overdraft settlements.[8]

Recently, the PEC moved the MDL court to enjoin a bank that was sued first in federal court from

settling a later-filed state class action.[9]  As a result, the settling parties agreed to have the MDL court

preside over that settlement.[10]  Settlement Class Counsel trusts that the PEC's motives are based on its

belief that it has a responsibility—as the leader of the plaintiffs' attorneys in the MDL—to exercise a

degree of control over other class action settlements because those settlements might impact the way

it is able to resolve the cases it has been appointed to litigate.

These may very well be noble motives.  But they are not aligned with the best interests of the

Settlement Class.  Thus, the PEC's objections must be viewed in that light—especially since no *pro se*

Settlement Class Members (out of the 2.4 million given notice) made similar objections.  *See, e.g., In

re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 318 (3d Cir. 1998)

(holding district court did not abuse discretion by discounting "vociferous" objections of "litigants

---

[8] *Petrus, et al. v. Closson, et al., and Bank of America, N.A.*, 2009 WL 5191158 (Cal.App. 1 Dist.) (Appellate Brief); *Schulte, et al. v. Fifth Third Bank*, Case No. 09-cv-06655 (N.D. Ill.), Dkt. No. 39.
[9] *See* Case No. 09-md-2036 (S.D. Fla.), Dkt. No. 1608.
[10] *See* Case No. 09-md-2036 (S.D. Fla.), Dkt. No. 1703.

represented by counsel in cases that compete with or overlap the claims asserted in the Second Amended Complaint"); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 132 (S.D.N.Y. 2009) *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x. 532 (2d Cir. 2010) (holding objections of counsel in competing class action were "motivated entirely by self-interest and of no utility to the Class"); Bruce D. Greenberg, *Keeping The Flies Out Of The Ointment: Restricting Objectors To Class Action Settlements*, 84 St. John's L. Rev. 949, 965 n.65 (2010) (discussing authority regarding self-interested nature of objections by counsel with competing class actions).

### a.        The Class Definition Is Not Unduly Broad

The PEC objects that the Settlement Class definition is "overbroad."   The PEC only raised this class definition issue now, *after* two series of written objections, *after* extensive oral argument, and *after* notice has been mailed to over 2.4 million Settlement Class Members.  Yet, the Settlement Class definition has been clear from the beginning, and the supposedly "over-inclusive" nature of the class definition was squarely addressed by the Court in its ruling granting preliminary approval.  *See* Dkt. No. 37, at 11-12.  If the PEC took issue with this definition, it could have, and should have, raised it before preliminary approval.  In any event, this belated objection has no merit.

The PEC's breadth objection is based on the false premise that "[t]his litigation does *not* challenge the right of banks to charge overdraft fees to their customers." (emphasis in original).  Dkt. No. 43, at 2.  According to the PEC, this case is only about high-to-low reordering.  *Id.*  Thus, the PEC concludes that, "the settlement class [which includes all customers who incurred one or more debit-card related overdrafts] is defined so broadly as to have *no relation to the claims pled by Plaintiffs.*"  *Id.*, at 6 (emphasis added).  This is absolutely wrong.  Plaintiffs alleged that Defendant should not have permitted *any* debit card overdrafts without first notifying customers that they would

overdraft their accounts if they completed the transaction.  Dkt. No. 1, at 4-5.[11]  Because Plaintiffs

alleged that all debit card overdrafts are unlawful, the class definition is appropriate.

The PEC also complains that it is improper to analyze damages based on one claim (high-to-

low reordering) when the class definition covers many other claims.   In fact, this approach is

perfectly appropriate.  As the Court stated in its preliminary approval ruling, the pertinent inquiry is

the comparison of the Settlement amount to the "likely recovery that plaintiffs would realize if they

were successful at trial."  Dkt. No.  37, at 6 (citing *Blackman v. District of Columbia,* 454 F. Supp. 2d

1, 8 (D.D.C. 2006)).  Although Settlement Class Counsel had asserted other claims, they believed that

they were more likely to prevail on the claims relating to high-to-low reordering—a belief

subsequently bolstered by the court's ruling in *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d

1080 (N.D. Cal. 2010)[12] and, as discussed immediately below, a recent overdraft fee settlement

entered into by the PEC in *Tornes v. Bank of America, N.A.,* S.D. Fla. Case No. 08-cv-23323-JK

("*Tornes* Settlement").[13]

Valuing and settling a class action based on the class' strongest claims is completely

appropriate, as evidenced by the *Tornes* Settlement.  In that settlement, the PEC settled a large class

based on a damages analysis that only applied to small fraction of that class.  In the *Tornes* case, the

PEC was confronted what it described as an "existential risk[.]"  Dkt. No. 43-5, at 30.  The risk related

to BofA's earlier settlement of a class action brought by Rhonda Closson that covered any BofA

customer who incurred "at least one" overdraft fee related to a debit card transaction from December

---

[11] This is consistent with the PEC's posture in the MDL, where it has repeatedly argued that the debit card overdraft litigation is not only about high-to-low reordering.  *See, e.g.,* PEC Opposition to Omnibus Motion to Dismiss, 1:09-md-02036-JLK, Dkt. No. 265, at 64 ("While the Banks seek to cast the plaintiffs' claims as relating only to the reordering  of transactions, that is only one element of the Banks' abusive scheme to impose overdraft fees 'not reasonably avoidable' by consumers.").

[12] *Compare Gutierrez* Class Action Complaint, Case No. 07-cv-05923-WHA (N.D. Cal.), Dkt. No. 1 (plaintiffs seeking class damages for all overdraft fees incurred when sufficient funds existed), *with Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010) (post-trial order awarding damages based only on high-to-low reordering).

[13] The PEC submitted the *Tornes* settlement agreement (Dkt. No. 43-6) and its motion for preliminary approval of the *Tornes* Settlement (Dkt. No. 43-5) to its objections.

6, 2000 to December 31, 2007 ("*Closson* Settlement").[14]   The PEC objected to the $35 million

settlement, and appealed the final approval order.   *Id.* at 13.   The *Tornes* Settlement has an

overlapping class period of January 1, 2001 through the date of preliminary approval (May 24, 2011).

Dkt. No. 43-6, at 15.   If the final approval of the *Closson* Settlement was upheld, it would "almost

eliminate" the damages of the class members in *Tornes*.   Dkt. No. 43-5, at 29.   The PEC therefore

settled *Tornes* based on a valuation of the damages for the post-*Closson* Settlement—even though the

*Tornes* Class definition included millions of customers from 2001-2007.

On that basis, the PEC argued that the $410 million fund in the *Tornes* Settlement represented

62% of what the PEC could have attained for those *Tornes* class members who were not within the

*Closson* class period—even though the *Tornes* Settlement actually includes all of the members of the

*Closson* class.   Dkt. No. 43-5, at 30.   To be clear, the PEC's 62% figure is not based on the total

damages incurred by the entire class settled by the *Tornes* Settlement.   Rather, it is based on the

purported damages of only a small segment of the class (those class members whose claims are not

settled by the *Closson* Settlement).   *Id.*   When the $410 million *Tornes S*ettlement is applied to the

entire class covered by that settlement, it represents 12.4% of the damages caused by high-to-low

reordering (assuming the validity of the unsupported damages estimates in the PEC's preliminary

approval papers).[15]

The PEC explicitly declares that the reason for applying this 62% figure (when the *Tornes*

Settlement actually provides 12.4% of the class' estimated damages) is that as a practical matter, that

is the measure of damages that the PEC believed were actually attainable.   Thus, the PEC asked the

MDL court to evaluate the *Tornes* Settlement not on the full measure of damages it could have

---

[14] *See Petrus, et al. v. Closson, et al., and Bank of America, N.A.*, 2009 WL 5191158 (Cal.App. 1 Dist.).

[15] According to the PEC's motion for preliminary approval, the damages for the three-year non-*Closson* class period is $660 million. Dkt. No. 43-4, at 26.  The brief also claims that $660 million is approximately 20% of the damages for the total ten-year class period.  As such, the total damages for the entire class period are $3,300,000,000, and the $410 million settlement is approximately 12.4% of the damages for the full class period covered by the *Closson* Settlement.

attained in a perfect world, but upon a realistic assessment of the damages for those claims on which it believed it was most likely to prevail.  Settlement Class Counsel agrees with that approach, and respectfully asks the Court to reject the PEC's insistence on a different standard here.

The PEC's argument regarding the breadth of the class definition is undermined further by another aspect of the *Tornes* Settlement.  In response to the *Closson* Settlement, the PEC initially took the position (as it does here) that that settlement should not be approved because the class definition (which includes all customers who incurred any overdrafts related to debit card transaction) was broader than the relief sought.  *See Petrus, et al. v. Closson, et al., and Bank of America, N.A.*, 2009 WL 5191158, *32-37 (Cal.App. 1 Dist.).  Yet, later, in order to secure a settlement in *Tornes*, the PEC agreed to drop its appeal of the *Closson* Settlement and to "endeavor to seek the same from all other *Closson* appellants[.]"  Dkt. No. 43-6, at 26.  In effect, as part of its settlement of the *Tornes* class, the PEC incorporated a class definition that is functionally identical to the class definition in this case, and acquiesced to the termination of the claims for those within that broad class definition.

The PEC made its best judgment in *Tornes* as to what it was likely to recover for the entire class, and settled on that basis.  And the PEC asked the MDL Court to "rely upon the judgment of experienced counsel for the parties" in determining whether the value of the settlement was appropriate in relation to the "likely benefits of a successful trial."  Dkt. No. 43-5, at 29 (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977)).  The Court should do no less here.

As noted previously, the "judgment of experienced counsel" in this case was driven in part by the data available to the settling parties.  Contrary to assumptions made by the PEC, the Settling Parties could not "have identified those class members who incurred overdrafts as a result of the reordering, as plaintiffs' expert Arthur Olsen did in *Gutierrez*."  Dkt. No. 43, at 7.  In declarations of Settlement Class Counsel, Plaintiffs explained that National City was unable to obtain and provide data sufficient to allow Settlement Class Counsel to identify only those customers who were charged

overdraft fees due to reordering.  *See* Dkt. No. 20, at 3; Dkt. No. 41-1, at 10.  In light of the PEC's

refusal to accept Settlement Class Counsel's sworn statements on this issue, Plaintiffs recently

attained a verifying declaration from a representative of Defendant.  *See* Declaration of Anthony J.

McIntyre ("McIntyre Decl."), filed herewith as Exhibit 2.

These data limitations are well-known obstacles in overdraft litigation, and the PEC is aware

of the reality of such limitations.  In the *Tornes* Settlement, the PEC claimed that "for the period

January 1, 2001 through September 30, 2003, BofA lacks data that would permit Settlement Class

Counsel and their experts to identify any of the Bank customers who were affected by its Debit Re-

sequencing practices during that period."  Dkt. No. 43-5, at 16.  The PEC's solution to this data

problem is to exclude these unknown Settlement Class Members from the benefits of the settlement

fund, and to revert some portion of the fund to a *cy pres* program.

Here, Settlement Class Counsel was able to attain a more inclusive set of data that closely

matched the Settlement Class definition.  Rather than limiting the Settlement Class to customers who

were victims of reordering, Settlement Class Counsel elected to define the Settlement Class so as to

track the claims made in the Complaint.  This was a fairly negotiated aspect of the Settlement that is

fair and reasonable.

>       **b.**       **The Plan of Allocation and Class Definition Work Together to Fairly**
>                     **Compensate Settlement Class Members**

As discussed above, the Settlement Class definition is the most practicable definition possible

consistent with the Complaint and the Settling Parties' data limitations.  Further, the plan of allocation

is designed to ensure that the Settlement Class Members with the relatively stronger claims (and

greater damages) have a greater share of the Settlement.  The PEC claims that the Settlement Class

definition disadvantages the customers who were victims of the high-to-low reordering because they

must share the Settlement Fund with Settlement Class Members who incurred overdrafts not caused

by reordering: "the settling parties chose . . . to expand the class to the detriment of the truly injured

members." Dkt. No. 43, at 8.   This is wrong for two reasons.   First, based on one of the claims in Plaintiffs' case, all Settlement Class Members were "truly injured."   The PEC's own position in the MDL (alleging that all debit card overdraft fees are unlawful) belie its contention to the contrary here. Second, the Settling Parties designed a plan of allocation that properly favors Settlement Class Members who had high numbers of overdraft fees in short periods of time, and are thereby more likely to be victims of high-to-low reordering. The allocation is based on the Settlement Class Members' two months of the greatest number of overdraft fees.   When overdraft fees are concentrated over such a short period of time, it is more likely that some of those fees were the result of high-to-low reordering.   The plan of allocation thus provides compensation for all Settlement Class Members who choose to participate, with greater compensation for those more likely injured by high-to-low reordering.

**c.**      **The Inclusion in the Settlement of Overdraft Fees Incurred by National City Accountholders After Transition to PNC Is Appropriate**

The Court already addressed the PEC's argument that the Settlement somehow "disrupts" the litigation of their MDL case against PNC Bank, which acquired National City and began to transition the latter's accountholders to PNC in late 2009.  Dkt. No. 37, at 15 ("[t]he Court finds that the Settlement will not adversely impact claims pending against PNC in the MDL litigation in a manner warranting denial of preliminary approval.").   The PEC now repackages its objection as a complaint about the purported lack of pre-settlement discovery that Settlement Class Counsel did with specific regard to the post-transition overdraft fees.   The PEC does not support this contention, nor does it show how such discovery could have made a difference.

It seems that the PEC's argument rests on the fact that the Zavareei Declaration refers to information relating to National City and not PNC Bank.  *See* Dkt. No. 43, at 7 n.3.  Consistent with the terms of the Settlement Agreement, "National City" means both National City and PNC.  *See* Dkt. No. 34-1, ¶1(m).  Accordingly, the Zavareei Declaration makes clear that Plaintiffs were apprised of

12

total overdraft fee revenue at both institutions.  Further, Settlement Class Counsel rightly understood prior to Settlement that the post-transition subset of overdraft fees was a small percentage of overall fees at issue in the case.

Based on this purported lack of information regarding PNC, the PEC also argues more generally that Plaintiffs have not satisfied the Court's request that they "explain in greater detail 'the significant factual investigation' made prior to negotiating a settlement."  Dkt. No. 43, at 12 (quoting Dkt. No. 37, at 10).  The PEC fails, however, to address the extensive details provided by Plaintiffs in their motion for final approval.  *See* Dkt. No. 41, at 24-29.

> **d.      The PEC's Criticisms of the Expert Report Are Unfounded**

The PEC makes several criticisms of the Expert Report of Jesse David, Ph.D. and Kevin Christensen, Ph.D. ("Expert Report").  These criticisms are based either on mischaracterizations of the Expert Report or on a refusal to accept the data limitations that exist in this case.

For instance, the PEC criticizes the Expert Report because it "relies on a sample of *PNC Bank* data to estimate damages for *National City* customers . . . Even though the experts received some account data information for pre-merger National City customers, they rely solely on *post-merger* PNC Bank data to determine the effects of reordering."  Dkt. No. 43, at 11.  This is false.  Although the account-level data came from a post-merger sample, that was merely a starting point for the analysis.  The results of the analysis of that sample data was applied to a database of "the total number of electronic debit transactions and overdraft fees (including those for debit cards, check cards, ATM and ACH transactions, and checks) for accounts held by a Class Member on a monthly basis from August 2005 through August 2010."  Dkt. 41-3, at 5.  Thus, the Expert Report was fundamentally based upon hard data relating to overdraft fees incurred during the Class Period.

With respect to the sample of account-level data, David and Christensen specifically addressed and controlled for the critical differences between overdraft practices prior to and after the merger:

> To estimate the fees that actually occurred we made two additional adjustments related to the differences between the rules PNC and National City used to determine overdraft fees. We understand that PNC instituted a limit of four overdraft fees per day while National City had a limit of ten overdraft fees per day. We calculated "actual" fees by predicting the number of overdraft fees in the Sample Data under the assumption that the daily limit was ten. We also understand that, for some customers, PNC charged $25 for the first overdraft fee in a given day and $36 thereafter, while National City charged $36 for all transactions during the day. In such cases in the Sample Data, we adjusted the "actual" fee from $25 to $36 in order to reflect the charges that would have been imposed during the Class Period by National City.

Dkt. 41-3, at 8. The PEC does not address these controls.

The PEC also complains that the Expert Report does not calculate the total amount of overdraft fees incurred by any class member "*for any reason.*" Dkt. No. 43, at 10 (emphasis in original). This is simply another version of the PEC's argument that the class definition is too broad, which ignores both well-established class action practice and the PEC's own settlement agreement with BofA.

At bottom, the PEC's quibbles with the Expert Report flow from the PEC's refusal to accept or address the data limitations in this case. This is another example of the PEC attempting to hold this settlement to a higher standard than what it employed in the *Tornes* Settlement, as discussed below.

### e.       The PEC's Criticism of the Claims Process Is Without Merit

The PEC again objects to the use of a claims process in this settlement, claiming that its claim-free *Tornes* Settlement "demonstrates the feasibility of a direct distribution of settlement benefits to Settlement Class Members without the requirement of self-identification." Dkt. No. 43, at 14. This is a vast overstatement, and the PEC's "demonstration" came at an extremely high cost. Specifically, because no data exists to determine and automatically distribute damages for Settlement Class Members who incurred overdraft fees during a three-year period of the *Tornes* Settlement, all such damages are essentially "off limits" to Settlement Class Members. Instead, 5-14% of the Net Settlement Fund will purportedly be "directly distributed" to a *cy pres* fund. *See* Dkt. No. 43-6, at 30,

33.  Instead of demonstrating the superiority of "direct distribution" to Settlement Class Members, the *Tornes* Settlement demonstrates the harsh consequences of insisting on "direct distribution" when perfect data does not exist.

Further, Objectors' assertion that the claims process unduly burdens Class Members is conclusively rebutted by applicable law.  The Court recognized in its Preliminary Approval Order, the use of a claims process to effectuate a class action settlement is common practice.  Dkt. No. 37, at 12-13.  Lastly, Class Members' excellent response to the settlement (over 172,000 claims so far) indicates that the claims process did not discourage participation.

## 2.    Rosen Objection by Attorney Theodore Frank

Attorney Theodore Frank claims that he is not a professional objector because he and his Center for Class Action Fairness ("CCAF") are not motivated by profits.  Rosen Objection, at 2.[16] Rather, Frank asserts, the CCAF is "focused on bringing objections to unfair class action settlements" without engaging in "*quid pro quo*" arrangements.  *Id*.  The records of his prior objections (and repeated requests for fees as a reward for his objections) tell another story.

For example, in *In re Apple Inc. Securities Litigation*, Frank sought a fee award amounting to $2,800 per hour after he argued that his objections resulted in a $2.5 million addition to the total class recovery.  2011 WL 1877988, *4.  The court rejected Frank's request, stating that it was "unclear how drafting [Frank's] limited submissions and making a few short court appearances would have required so much time [104 hours]" on the part of Frank.  *Id*., at *5.  Ultimately, Frank attained an $87,000 fee in that case by agreeing not to appeal the settlement.  *Id*. ("Defendants' counsel stated at the hearing that Defendants would have no objection to utilization of these funds to pay a fee award to [Frank's client] Pezzati, on the condition that Pezzati waive his right to appeal the judgment, which Pezzati

---

[16] As of the date of this filing, the Rosen Objection had not been filed with the Court.  Although Settlement Class Counsel is addressing these objections (having been served via email only), they do not waive any arguments regarding the propriety of considering what appears to be a late-filed (or never-filed) objection.

agreed to do.")

Whatever Frank's motivations, his job is to object to class action settlements.   And he seeks

legal fees (for CCAF, which pays his salary) for his objections.[17]   Accordingly, Frank is a professional

objector,[18] and his objections must be viewed with appropriate skepticism.  *See* Note 1, *supra*.  Like

many of the other courts who have been faced with objections by Frank and/or the CCAF, this Court

should reject Frank's boilerplate objections, which are "long on ideology and short on law."  *Lonardo*,

706 F. Supp. 2d at 785.

> a.      **The Allocation Plan is Fair, Reasonable, and Aligned with the Core
> Claims of the Case**

Frank argues that the allocation of the Settlement Fund is objectionable because it is

"arbitrary" and "unrelated to the relative value of the individual class members' claims[.]"  Rosen

Objection, at 5.  Contrary to Frank's objection, and as this Court has already found in its

Memorandum Opinion Granting Preliminary Approval, the allocation plan is not arbitrary or

accidental.  Dkt. No. 37, at 10-12.  Rather, the plan is constructed to match class member recovery

with the relative strength of his or her claim.

Frank alleges that the allocation is flawed because "class members are being paid based on the

two months with the *highest number* of overdraft fees, not based on the *first* two months of overdraft

fees."  Rosen Objection, at 6.  Yet, these "two highest months" capture the Settlement Class

Members' strongest claims because the concentration of fees in a short period of time increases the

likelihood that a large portion of the fees are the result of high-to-low reordering.

Frank also argues that the allocation plan is unreasonable because some Settlement Class

---

[17] It appears that CCAF finds its objectors by, among other things, soliciting them on its blog.  *See*
http://centerforclassactionfairness.blogspot.com/search?updated-max=2011-05-13T14%3A21%3A00-04%3A00&max-
results=7: ("If there's a member of one of these two classes who would like to timely object to this potential rip-off, the
Center would be happy to represent them *pro bono* to vindicate the protections of Rule 23(h) in all class settlements.").
[18] *See* Greenberg, 84 St. John's L. Rev. at 950-51 (defining "professional objectors" as "attorneys who make their living by
objecting to class action settlements and extracting a part of class counsel's hard-earned attorney fees *or* a payment from
the settling parties for compromising those objections") (emphasis added).

Members are overcompensated while others are undercompensated.  Rosen Objection, at 6.  No class

settlement allocation can perfectly allocate damages, but the allocation plan here appropriately ensures

that those Settlement Class Members who have likely suffered the greatest monetary damages as a

result of high-to-low reordering are awarded the largest recoveries.

### b.      Frank Has Not Submitted Any Valid Objections To The Fee Request

### (i)      The Percentage of the Fund Method Must Be Followed

Throughout the Rosen Objection, Frank attacks Settlement Class Counsel because counsel

"provide no lodestar estimate" but then also claims that counsel seeks a fee of "nearly $3,000/hour[.]"

Rosen Objection, at 1, 8, 11.  Frank's focus on a lodestar calculation is inappropriate, as he also

concedes that the "D.C. Circuit applies a percentage-of-the-fund technique in awarding attorneys'

fees."  *Id.*, at 9.  And, although Frank claims that the D.C. Circuit "does not prohibit the use of

lodestar as a cross-check to determine the reasonableness of the common-fund award[,]" he neglects

to mention the binding precedent in this Circuit that details the benefits of the percentage of the fund

method, as well as the disadvantages of the lodestar method.  *Id.* (citing *In re Dep't of VA Data Theft*

*Lit.*, 653 F. Supp. 2d 58, 61 (D.D.C. 2009)).

For example, in *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993), the case that

mandates use of the percentage of the fund method in this Circuit, the court listed several benefits of

the method, as well as many significant problems with the alternative lodestar method.  According to

the D.C. Circuit, the lodestar approach "encourages significant elements of inefficiency" because

"attorneys are given incentive to spend as many hours as possible, billable to a firm's most expensive

attorneys" and "there is a strong incentive against early settlement since attorneys will earn more the

longer a litigation lasts."  *Id.*, at 1268-69.  Not only does it breed inefficiency and overbilling by

counsel, the lodestar method "makes considerable demands upon judicial resources since it can be

exceptionally difficult for a court to review attorney billing information over the life of a complex

litigation and make a determination about whether the time devoted to the litigation was necessary or reasonable." *Id*. Such an exacting, and inefficient, review results in second-guessing of counsel's work by the court and only serves to delay distribution of the common fund to the class. *Id*., at 1269.

On the contrary, the percentage of the fund method is efficient, objective, and accurately reflects the realities of modern legal practice. According to *Swedish Hosp.*, the percentage of the fund method tracks the "true measure of success" in a case—the monetary award—and, therefore, it is "most efficient" approach. *Id*. The percentage of the fund method creates the correct incentives for counsel because "inefficiently expended hours only serve to reduce the per hour compensation of the attorney expending them." *Id*.

In another case where he objected, Frank argued that "the percentage of the fund methodology should be used in all cases." *Lonardo*, 706 F. Supp. 2d at 789-90. During the final fairness hearing in that case, Frank argued that policy reasons dictated that the court should disregard the lodestar method and adhere only to the percentage of the fund method:

> I certainly recognize that the Sixth Circuit currently leaves the question of the lodestar [versus] common fund percentage up to the Judge, but I would like to argue as a public policy matter that we should take a firm stand on the common fund percentage, and the Second Circuit is coming around to this position, holding that the percentage method, quote, "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation. In contrast, lodestar creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet eyed review of line item fee audits."

*Id*. Frank further stated, accurately but in direct contravention to his purported position here, that courts employing a lodestar approach "failed to adequately change, consider the change in the law, and the change in direction, and think the trend is certainly toward a percentage, a common fund percentage for these public policy reasons" and that "judicial efficiency militates against performing the lodestar analysis." *Id*. As Settlement Class Counsel detailed in its fee award motion, and as Frank concedes, the percentage of the fund method—not lodestar—is the preferable and established method

in this Circuit and must be applied here.[19]

                              **(ii)**      **The Requested Percentage of 22% to 25% Is on the Low End of the Reasonable Range**

Frank repeatedly maligns Settlement Class Counsel for seeking a fee award of "$3,000 per hour." However, the fee award actually sought by Settlement Class Counsel ($3 million) represents between 22% and 25% of the Settlement Fund and is well within—and actually on the low end—of fee awards entered in this Circuit. *See* Dkt. No. 42, at 7. As he has done in other cases, Frank has staked out a position that is counter to the law of the Circuit, and has failed to cite any authority supporting his argument that a 22-25% fee is too high.

In short, according to the well-established percentage of the fund method, an approach that Frank has vociferously advocated in other cases in which he has acted as a professional objector, Settlement Class Counsel's fee request is not only reasonable, it is low. Indeed, Frank himself argued in favor of an attorneys' fee award of exactly 25% of a common fund. *Lonardo*, 706 F. Supp. 2d at 801.

When the costs of notice and administration are added to the Settlement Fund to create the total class benefit, the percentage requested by Class Counsel is 22%. Despite his claim here that fees should be based on a percentage of the fund *after* costs are deducted, Frank previously argued the opposite position, recognizing that such funds inure to the benefit of class: "Mr. Frank agrees that the Actual Payment to the Settlement Class Members and the Costs of Notice and Administration are legitimate components of the Total Class Benefit." *Lonardo*, 706 F.Supp.2d at 797.

In this District, the starting point for percentage of the fund fee awards is 20%. *Fresh Kist Produce, L.L.C. v. Choi Corp., Inc.*, 362 F. Supp. 2d 118, 128 (D.D.C. 2005). Upward or downward

---

[19] *See, e.g., Democratic Cent. Comm. of the District of Columbia v. Washington Metro. Area Transit Comm'n*, 12 F.3d 269, 271 (D.C. Cir. 1994) (endorsing percentage of the fund method, rather than lodestar method, for common fund cases); *Radosti v. Envision EMI, LLC*, 2011 WL 159662 (D.D.C. Jan. 19, 2011) (same); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741 (D.D.C. June 16, 2003) (same); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839 (D.D.C. July 16, 2001) (same).

adjustments may be warranted based on the seven "*Lorazepam* factors." *Id*. As detailed in Plaintiffs'

Fee Award Motion, each of these factors weighs in favor of the award requested. Dkt. No. 42, at 18-

27. Although Frank argues that the fee request is too high, he fails to specifically address these

factors, let alone dispute Plaintiffs' arguments regarding the same. Instead, he loosely claims that the

fee award should be reduced because the case settled early in the litigation and because, as he alleges,

the case is "part of a series of copycat lawsuits" brought by Settlement Class Counsel that are of little

risk. Rosen Objection, at 10. Frank's arguments fail on both accounts.

     First, early resolution of cases is encouraged, especially class actions. *See In re Lorazepam*,

205 F.R.D. at 377 ("early settlement of these types of cases is encouraged."); *In re: Vitamins Antitrust

Litig.*, 1999 WL 1335318, *4 (D.D.C. Nov. 23, 1999) ("The pursuit of early settlement is a tactic that

merits encouragement; it is entirely appropriate to reward expeditious and efficient resolution of

disputes"). In another one of his recent objections to a class action settlement, Frank admitted that the

timing of a settlement is not determinative of its fairness or reasonableness: a "court, in reviewing a

settlement, should not give any predetermined weight either to the fact that the case was pending for a

substantial period of time before a settlement was reached or to the fact that a settlement was reached

early in the case." *Cobell, et al. v. Salazar et al.*, Case No. 1:96-cv-01285 (D.D.C.), Dkt. No. 3782

(filed May 31, 2011). Frank has admitted that Settlement Class Counsel should be rewarded, not

punished, for negotiating an excellent settlement in a timely and efficient manner.

     Second, it is simply untrue that this case is a mere "copycat" with "no risk." Instead, and as

explained at length in Plaintiff's Final Approval Motion, the litigation was brought during a time of

great uncertainty as to the legal merits of the claims and that uncertainty continues. Dkt. No. 41, at

15-18. Defendant banks in similar cases continue to advance novel legal arguments based on recently

decided case law that could greatly, and adversely, impact this outcome of this case. *Id*. Frank fails to

address *any* of these risks in the Rosen Objection; instead, he simply states that there is no risk at all

because Settlement Class Counsel can recycle legal research it has done in other cases.  Rosen

Objection, at 10.  Not only is this argument illogical, it is factually inaccurate.  Although Settlement

Class Counsel is involved in other overdraft fee litigation, each of the cases is factually unique and

presents its own set of challenges.  For example, each case involves different contract language and

bank policies, and the data produced by each defendant bank varies (and, in turn, the issues created by

such data).  The outgrowth of other overdraft fee litigation does not, by any means, make this

litigation (which was filed and settled before the decision in *Gutierrez*) zero-risk.  If anything, the

large number of overdraft fee cases creates a complicated, and ever-changing, legal environment that

Class Counsel has had to closely monitor, analyze, and navigate.

> **(iii)     The Requested Fee Award Is Fair, Reasonable, and in Line
> with Awards in Similar Cases in This Circuit**

Frank also argues that the very low number of objections to the Settlement is not indicative of

support of the consumer class because: (1) the requirements for objecting are too onerous; (2) the cost

of hiring an attorney are too high; and (3) the class was not put on notice of the requested attorneys'

fee award.  Rosen Objection, at 14.  None of these allegations have merit.

As a threshold matter, silence of the class is indeed indicative of endorsement.  *See, e.g., In re*

*Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, 553 F. Supp. 2d

442, 474 (E.D. Pa. 2008) (holding that relatively "few objections" [eleven objections to fee award

from four million class members] "signifies that the requested award has been viewed by interested

parties to this action as fair.").[20]  Furthermore, Frank inflates the supposed impediments to objecting.

The requirements for objecting, approved by this Court, were laid out clearly and concisely and are

---

[20] *See also, Osher v. SCA Realty I, Inc.,* 945 F. Supp. 298, 305 (D.D.C. 1996) (low level of objections indicates support of settlement)*; Luevano v. Campbell,* 93 F.R.D. 68, 91 (D.D.C. 1981) (small percentage of objections "is an important indication of [settlement's] fairness and adequacy."); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 318 (3d Cir. 1998); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir. 1990) (10% objection rate indicates class favors settlement); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 (3d Cir. 1993); *Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995) *aff'd,* 66 F.3d 314 (3d Cir. 1995) (a small percentage of objections allows an inference that a majority silently consents).

similar to the steps required in other cases.  And, contrary to Frank's suggestion, representation by

counsel is not a requirement of a valid objection.  Finally, Frank's claim that Settlement Class

Members did not object, but would have, had they been put on notice of the fee award requested is

simply false.  The amount of the fee award requested was included in the notices, which clearly stated

that Settlement Class Counsel would apply for an award of fees of not more than 25% ($3,000,000) of

the Settlement Fund, plus reimbursement of all costs and expenses.  Other than the professional

objectors (including Frank), no objections to this fee award have been received.

In short, rather than focus on the boilerplate dissents of professional objectors, the Court

should consider the response of the true beneficiaries of the Settlement.  That response has been

overwhelmingly positive and supports final approval of the Settlement.

### c.       The Requested Incentive Awards Are Reasonable

Plaintiffs have requested incentive awards of $5,000 for each Representative Plaintiff.  In

support of these awards, Plaintiffs described the meaningful contributions made by each

Representative Plaintiff.  Dkt. No. 42, at 34-36.  Frank does not dispute, or even address, these facts.

Instead, Frank claims that Representative Plaintiffs deserve a "modest" award of only $5,000 total

(approximately $1,666 each) because they did not face discovery or sit for deposition.  Rosen

Objection, at 12.  While Representative Plaintiffs were not deposed, their private and personal

banking records were analyzed and exchanged, and details regarding their financial difficulties and

history were made public.  Such exposure is not without its own costs and risks.

Further, the incentive awards sought are within the low range of awards in similar cases.  In

fact, courts have often awarded *double* (or more) the amount requested here.  *See, e.g., In re Ins.

Brokerage Antitrust Litig.*, 579 F.3d 241, 285 (3d Cir. 2009) (affirming final approval of a settlement

that included incentive awards of $10,000 each); *Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27, 32

(E.D. Pa. 1985) (granting incentive awards of $20,000 to each class representative); *Dewey v.*

*Volkswagen of America*, 728 F. Supp. 2d 546, 577-78 (D.N.J. 2010) (awarding incentive awards of $10,000 each).

### 3.      Cannata Objection

Mr. Cannata is an attorney and a "professional objector," having objected in at least seven other class action settlements, including the Fifth Third overdraft fees settlement.[21]   As graphically demonstrated by Exhibit D of the Second Zavareei Declaration, the great bulk of the Cannata objection was copied from previous objections by the PEC (in this case and another) and (to a lesser degree) Cannata's own earlier objection in an unrelated case.  These "canned" and copied objections are entitled to little weight.[22]

### a.      Plaintiffs Have Already Presented Evidence of Potential Value of Class Members' Claims

Cannata states that "[t]he parties should present evidence that would enable the Court to determine the potential value of Class Members' claims."  Cannata Objection, at 1.  Plaintiffs have provided this evidence, having submitted an Expert Report doing precisely that three full weeks before Cannata submitted his objections.  Cannata makes no reference to this evidence.

### b.      The Plan of Allocation

Cannata states that "[t]he Settlement Agreement does not offer any rationale or justification for failing to allocate the settlement proceeds in proportion to the damages sustained by Class

---

[21] *See Hartless v. Clorox Co.*, No. 06-CV-02705-CAB (S.D. Cal.), Objections, Dkt. No. 102; *In re Vytorin/Zetia Mktg. Sales Practices and Prods. Liab. Litig.,* No. 00285 (D.N.J.), Objections, Dkt. Nos. 203, 205); *Marskyyan v.Mercedes-Benz USA, LLC,* No. 08-cv-04876-AHM (C.D. Cal.),Objections to Class Action Settlement, Dkt. No. 102; *Gemalas v. The Dannon Co., Inc.,* No. 1:08-cv-00236 (N.D.Ohio), Objection to Class Action Settlement and Request for Attorneys' Fees, and Notice of Intent to Appear, Dkt. No. 60); *In re Lawnmower,* No. 2:08-md-01999 (E.D. Wis.), Objections (E.D.Wis.), Dkt. No. 315; *Smith v.Wm. Wrigley, Jr. Co.,* No. 09-60646 (S.D. Fla.), Dkt. Nos. 95, 96); *Schulte v. Fifth Third Bank*, No. 09-cv-06655 (N.D. Ill.), Objections (Dkt. No. 103-14).

[22] *See, e.g., In re Holocaust Victim Assets Litig.*, 311 F. Supp. 2d 363, 372, 381-82 (E.D.N.Y. 2004) (objector's counsel simply retooled research done by his client for another case), *aff'd*, 424 F.3d 150, 154 (2d Cir. 2005); *In re AOL Time Warner, Inc., Sec. & ERISA Litig.*, 2006 WL 903236, *17 n.22 (S.D.N.Y. Apr. 6, 2006) (noting that criticism of objector's counsel as submitting "canned objections" might be correct, since he had copied whole sentences from prior judicial opinion without attribution); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) (criticizing objector counsel for filing "canned" objections); *see also Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 241 n.22 (D.N.J. 2005) (recognizing that "many of the objections that have been raised by the so-called 'professional objectors' have been raised in other courts in other class actions").

Members[.]"  Cannata Objection, at 4.   This issue has been briefed extensively as well, and is discussed more fully above.

      **c.**      **The Amount of Discovery Engaged in at the Time of Settlement**

Cannata asserts that no discovery was conducted prior to settlement.  But as discussed at length in Plaintiffs' final approval motion and fee petition (Dkt. No. 41, at 28-30 and Dkt. No. 42, at 6-7), Settlement Class Counsel engaged in substantial informal discovery, limited formal discovery, and were well-apprised of the facts and law relating to this litigation when they entered into the Settlement Agreement.  Additionally, Settlement Class Counsel engaged in substantial confirmatory discovery, which established that the settlement is fair, reasonable, and adequate.

      **d.**      **The Scheduling of the Final Fairness Hearing Comports With Common Class Action Practice**

Cannata argues that the final fairness hearing should be scheduled after the claims submission deadline.  This would supposedly allow the Court to learn the actual number of claims prior to making its final approval decision.  However, Cannata's request that the Court delay the Final Fairness Hearing ignores the fact that no unclaimed Settlement Funds (due to the robust response) will revert to Defendant.  Further, delaying the Final Fairness Hearing is contrary to the interests of the Settlement Class and established class action practice and procedure.  The approved schedule ensures Settlement Class Members will receive the benefits of the settlement as soon as possible.  In proposing the approved schedule, Settlement Class Counsel acted in furtherance of their duty to the Settlement Class and in accordance with established class action procedure.

Plaintiffs note that an identical objection was made in the Fifth Third Bank overdraft settlement by the PEC and the court there refused to make any changes to the schedule of the final fairness hearing.  *Schulte v. Fifth Third Bank*, 1:09-cv-06655 (N.D. Ill.), Dkt. No. 68.  Cannata provides no basis to change the schedule which has already been approved by this Court—and about which 2.4 million Settlement Class Members have already been notified.

### e.     The Claims Process Does Not Create a "Paperwork Nightmare"

The claims process has been designed specifically to avoid the sort of "paperwork nightmare" Cannata predicts.  Indeed, a claimant can choose to have the settlement administrator determine the number of eligible overdraft fees.  There is no need for a class member to "unearth nearly six years of account statements."  Cannata Objection, at 6.  This objection is unfounded.

### f.     The Settlement Is Structured to Benefit Settlement Class Members Prior to Any *Cy Pres* Distribution

Cannata complains that unclaimed funds should go to Settlement Class Members before any *cy pres* distribution.  Yet, this Objection is premised on the incorrect factual assumption that Settlement Class Members' claims will not exhaust the Settlement Fund.  As noted above, Settlement Class Members' reaction to the Settlement has been overwhelmingly positive, and it is almost certain that the claims will exhaust the Settlement Fund.

### g.     There Is No "Clear Sailing" Provision

Cannata complains about a "clear sailing" provision that does not exist in this case.  The amount of attorneys' fees, costs, and expenses, along with incentive awards, were not discussed between the Settling Parties until after the settlement terms were agreed upon.  *See* Second Zavareei Declaration, ¶ 1.  Only after the common fund was agreed upon (together with all other material terms of the Settlement) did the Settling Parties even discuss attorneys' fees.  Additionally, the issues of attorneys' fees, costs, and expenses, and incentive awards, are intended to be considered by the Court separately from the Court's consideration of the approval of the Settlement.  Dkt. No. 34-1, at ¶10(b).  Thus, this is not a clear-sailing agreement.

## III.     CONCLUSION

WHEREFORE, based on foregoing, Plaintiffs respectfully request that the Court overrule all the objections and enter the proposed Final Approval Order.

Dated: July 11, 2011                    *Settlement Class Counsel,*


                              _____/s/_____
                              Hassan A. Zavareei
                              Jonathan K. Tycko
                              Jeffrey D. Kaliel
                              **Tycko & Zavareei LLP**
                              Suite 808
                              2000 L Street, N.W.
                              Washington, D.C. 20036
                              (202) 973-0900

## Certificate of Service by Electronic Means

      I, Hassan A. Zavareei, one of the attorneys for Plaintiffs, hereby certify that the proceeding document was caused to be served electronically this 11th of July 2011, pursuant to ECF as to Filing users, and that I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.


                    /s/ Hassan Zavareei