IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAMONA TROMBLEY, et al.,
on behalf of herself and all others similarly
situated,

Case No. 1:10-CV-00232

Plaintiffs,

The Honorable John D. Bates

-v-

NATIONAL CITY BANK, et al.,

Defendants.

**SUPPLEMENTAL MEMORANDUM OF SETTLING PARTIES
SUBMITTED PURSUANT TO COURT'S ORDER OF JULY 27, 2011**

Plaintiffs Ramona Trombley, Jeff Doehner, and Brian Wells ("Plaintiffs") and Defendant,

National City Bank[1] ("National City") (collectively the "Settling Parties"), hereby jointly submit this

Supplemental Memorandum pursuant to the Court's Order of July 27, 2011. The Settling Parties will

respond to each issue in the sequence presented by the Court.

**DISCUSSION**

A.      **The Burden Of Data Retrieval**

National City has represented to the Court on multiple occasions that, because of the

shutdown of the National City mainframe after the integration of National City into PNC, it would be

extremely burdensome to retrieve and analyze data in the manner demanded by objector Matos—that

is, to retrieve each customer's transactions and re-order each one of them in order to compare the

actually-incurred overdraft fees to the overdraft fees that they would have incurred in a but-for world

---

[1]    As previously noted in the record, National City was merged into PNC Bank, N.A. ("PNC") and is no
longer a legal entity. Because the named defendant is National City, that name will generally be used
here except where the context dictates otherwise.

of either low-to-high or chronological processing.  The Court has directed the parties "to provide specific information regarding the feasibility of obtaining and analyzing such data[.]"

In order to answer the Court's inquiry, PNC engaged Navigant Consulting, a national consulting firm with significant experience in the data collection and management field, both in the banking industry and other industries.  The lead consultant on this project was Steven Visser, a Managing Director at Navigant.  Mr. Visser's Declaration is attached hereto as Exhibit A.  The Declaration largely speaks for itself and we respectfully refer the Court to it for a full explanation for the bases of Mr. Visser's conclusions.  To summarize those conclusions:

- To perform the analyses that the PEC claims the Settling Parties should have performed—reconfiguration of each customer's account to reflect the but-for world of some form of posting order other than high-to-low—would have required not only the extraction of a massive number of files from the decommissioned National City mainframe, but the conversion of those files into "relational databases" from which this work could have been done.

- Assuming that Navigant would have access to all of the reports required for a complete analysis, the costs of obtaining and analyzing the data would be approximately $1,160,000.  This is the amount that Navigant would charge to PNC, and does not account for all internal staff time and other resources necessary to support the Navigant work.

- During the time available for preparing this report, Navigant was not able to determine with certainty whether all necessary reports would in fact be available for a complete reconfiguration of each customer's account data.  In the event that certain reports are not available, Navigant would not be able to complete a full analysis at all.  The less complete analysis would, however, cost approximately $387,000 less.  Thus, in the event that these reports are unavailable, the estimated minimum cost would be $773,000.

- It would take approximately six months to undertake this project.

The foregoing estimates are for the cost and time to locate, extract, and convert data into a format capable of economic and statistical analysis.  The estimates do not include the additional cost of actually analyzing the relational databases once constructed.  That effort was separately estimated to cost between $175,000 to $300,000, depending upon the precise manner in which the data would

be rendered.  *See* Declaration of Jesse David, Ph.D. ("David Decl." or "David Declaration"), attached

hereto as Exhibit B, ¶ 19.

This information fully supports the course of action taken by the Settling Parties.  The

settlement presented to the Court for approval was the subject of hard bargaining between Plaintiffs

and National City.  Not only was there a limit to what National City was going to pay to provide

settlement class data—*over and above the substantial notice and administration costs paid to the*

*third-party notice and claims administrator*—but there was a strong desire not to unreasonably tax

internal resources required for the day-to-day operations of the bank.  The Settling Parties are acutely

aware, based on the work that was done with the Settlement Administrator to construct and refine the

database that was used here, that significant internal staff resources are required in any project of this

nature.

Moreover, the Settling Parties did not want to hold up the settlement for six additional

months while databases were reconstructed from a shut-down mainframe.  Indeed, while the Revised

Settlement Agreement (DE No. 6-1, ¶ 14) called for notice to be completed within 100 days of the

Preliminary Approval Order, the Court modified that slightly to "[a]s soon as is possible and in any

event within one hundred (100) days of this Order. . . ."  (DE No. 38, ¶ 12.)  The Settling Parties, too,

shared the Court's concern for prompt notice, which would have been thwarted by seeking to extract

data from the National City mainframe.

In sum, the cost (both in money and in time) of using what the PEC claims is an ideal data set

to seek to identify class membership and determine but-for damages would have been unreasonably

high.  Indeed, as Judge Dow said in approving the settlement in *Schulte v. Fifth Third*, No. 09-6655,

2011 WL 3269340, at *1 (N.D. Ill. July 29, 2011), "there would presumably be costs associated with

investigating how much is owed to each Class Member under the settlement and distributing

payments.  Had the onus of the process been placed on Defendant, there may have been less money

available to pay claims."  *Id.* at *27.  Here, it is fair to infer that the burden would have been

sufficiently great—in dollars, staff resources and time—that there would have been nothing available to pay claims because the settlement simply would not have been consummated had PNC been compelled to recover the mainframe data and do what objector Matos asserts should have been done to identify class members and ascertain their compensation more precisely.

Finally, it bears noting that, while the calculation of a class member's damages using the database that was actually constructed and used did not account for "re-sequencing damages" *per se*, this situation does not present a case in which the relief is untethered to the claims in the lawsuit. The more overdraft fees that a class member incurred in the two heaviest months, the bigger his or her claim. That the Settling Parties could not refine these calculations to limit relief to the incremental number of overdrafts caused by posting order does not undermine the fairness and adequacy of this method of allocation in the context of this settlement.

**B.     The Use Of Post-Regulation E Sample Data**

Plaintiffs' experts utilized account-level transaction sample data from September of 2010 as one part of their calculation for estimating damages for the Class Period. This transaction sample data represents banking activity which occurred very shortly after the implementation of Regulation E for existing customers. As summarized below—and addressed more fully in the David Declaration—the use of this sample data was entirely appropriate and provides no reason to doubt the reliability of Plaintiffs' expert damages analysis.

**1.     Any Variation Of The Rate Of Overdraft Fees Incurred By Accountholders Was Accounted For By Plaintiffs' Damages Methodology**

The most likely significant impact of Regulation E is that it decreased the total rate, or volume, of overdraft fees charged to accountholders and the rate at which accountholders incurred overdraft fees. This is due to the likelihood that at least some persons did not "opt-in" to overdraft coverage for debit card and ATM transactions (as is required by Regulation E). Accordingly, there would be fewer consumers who could actually incur overdraft fees for debit card and ATM

transactions. However, the damages model designed by Plaintiffs' experts, Edgeworth Economics, accounts for any differences in incidence of overdraft fees after Regulation E *by calculating damages on a per-overdraft basis* (not on a per-accountholder basis, a per-month basis, or any other basis dependent on the volume or rate of overdrafts). Any changes to the rate or volume of overdraft fees due to Regulation E are therefore accounted for by the experts' methodology. *See* David Decl., ¶ 6.

Plaintiffs' experts used the post-Regulation E account level sample data ("Sample Data") to determine the likelihood that any given fee was the result of high-to-low reordering. They then assigned a dollar value to each overdraft fee actually charged in the sample data (the "Average Excess Overdraft Fee"). *Id.*, ¶ 7. For instance, Edgeworth determined that the Average Excess Overdraft Fee Amount was $2.15 based upon a re-ordering designed to simulate chronological transaction posting and $5.44 using a low-to-high posting order. This dollar amount represents the probability that any single overdraft fee was the result of high-to-low reordering. *Id.*, ¶ 8.

After determining the Average Excess Overdraft Fee Amount from the Sample Data, Edgeworth applied that amount to an estimate of the number of electronic overdraft fees actually incurred by class members during the entire class period. That number, 59,748,581 total overdraft fees, was derived from the Notice Database, which contained data from customer records prior to the implementation of Regulation E. *Id.*, ¶ 9.

As a result, Edgeworth's damages calculation was based on the actual number of relevant overdrafts that occurred prior to the full implementation of Regulation E. It therefore accounts for any changes in the rate or volume of overdraft events potentially caused by Regulation E.

In other words, Edgeworth did not estimate the total amount of overall excess overdraft revenue (caused by high-to-low reordering) from the Sample Data and then use that amount to extrapolate what might have happened in prior months. Instead, the Average Excess Overdraft Fee Amount was applied to the number of overdraft fees actually incurred by class members prior to Regulation E. *Id.*, ¶ 10.

In short, it is the actual number of relevant overdrafts incurred by Class Members during the Class Period (prior to Regulation E) that exerts the determinative effect on the experts' damages estimate.   The use of September, 2010 Sample Data for the limited purposes outlined in the Expert Report was entirely appropriate, and no volume or rate effects of Regulation E would provide any basis to question the validity of the damages analysis submitted by Plaintiffs.

### 2.   Any Other Changes Due To Regulation E Are Purely Speculative, And Would Not Markedly Affect The Overall Damages Range

A less likely impact of the use of post-Regulation E Sample Data for part of the damages analysis is that Regulation E's opt-in mechanism could have changed either the banking behavior of accountholders, or changed the average composition of accountholders eligible to incur overdraft fees on electronic transactions.   The argument is that such changes could impact the average characteristics of size or order of checking account transactions, compared to such transactions prior to opting-in.   This could alter the impact of the high-to-low reordering policy, which could in turn affect the amount of the Average Excess Overdraft Fee.   However, such speculated changes in behavior are not likely to have any notable impact on the overall damages estimate.   *Id.*, ¶ 13.

**First**, there is no reason to believe any behavioral or compositional changes actually occurred.   Plaintiffs' experts have conducted intensive research and found no economic analysis or even anecdotal evidence that would provide a basis to assume any such effects.   *Id.*, ¶ 14.

**Second**, even if accountholder behavior or composition changes did occur, they would not be likely to vary the experts' overall conclusions in any meaningful way.   By providing a broad damages range of $46 million (using simulated chronological ordering in the but-for world) to $116.5 million (using low-to-high ordering in the but-for world), the methodology itself already includes tolerance for this sort of variation, implicitly accounting for small variations that may occur through Regulation E or other factors.   *Id.*, ¶ 15.   Settlement Class Counsel's valuation of the case (in settlement negotiations and in its motions for approval of the settlement) took into consideration this

wide range of possible damages outcomes. Any additional variation raised by what are likely minor Regulation E composition and/or behavior effects are small, relative to the already-existing range between damages estimates. *Id.*, ¶ 16.

**Third**, it is entirely possible that the use of post-Regulation E data actually *overstates* damages here. It is reasonable to assume that high-frequency users of overdraft protection are more likely to opt-in to coverage than accountholders who have never incurred an overdraft fee. Accordingly, it is possible that the composition of accountholders post-Regulation E included a higher percentage of high-frequency overdrafters than the composition of accountholders prior to Regulation E. As stated in Plaintiffs' Reply Brief (DE 44, at 11), high-frequency overdrafters are likely to have been impacted more by the challenged high-to-low reordering practice than the average accountholder. As a result, the use of post-Regulation E sample data may increase the probability that any given overdraft fee is a result of high-to-low reordering. This would, thereby, increase the amount of the Average Excess Overdraft Fee.

In sum, there is no reason—other than pure speculation—to expect that any Regulation E composition or behavior changes would bias the damages estimates provided by Plaintiffs' experts. Nor is there any principle of economic theory that would lead the experts to expect that any of these changes would bias their results in any one particular direction. *Id.*, ¶ 17. And to the extent that such speculation is appropriate, it suggests that the use of post-Regulation E Sample Data overstates the damages.

**C.    The Overlap With The PEC's Case Against PNC**

The PEC objected to the fact that the Settlement Class slightly overlaps with the putative classes in the Multidistrict litigation ("MDL") pending in the Southern District of Florida. In response, the Court has directed the Settling Parties to estimate the number of class members who were initially National City customers and who would be anticipated to overlap with any MDL class involving PNC. The Court also directed the parties to address whether it would be appropriate to amend the class period in response to objector Matos's objections.

1.     **Background Of The "Overlapping Classes" Issue**

In response to the Court's concerns, the Settling Parties have agreed to move the release date in the Settlement from August 15, 2010 to June 21, 2010, when the integration of National City customers into PNC was complete.  Before addressing that agreement, however, the Settling Parties think it is important to explain why the "overlapping classes" objection is not well-founded in the first instance.

Conceptually, there are two distinct types of "overlap" between the Settlement Class and the MDL classes.  The first is that the Settlement Class encompasses former National City customers who incurred *National City* overdraft fees.  The MDL proceedings, through the *Matos* and *Hernandez* actions, involve such a National City class as well.  The second area of overlap is that, for a very short period of time within the class period, a portion of former National City customers who became PNC customers incurred overdrafts *while PNC customers*, and therefore those customers may overlap with a PNC class in the MDL proceedings.  The Settling Parties understand the Court's concerns to be directed toward the latter type of overlap, but to ensure that they fully respond to the Court's concerns, both types will be addressed below.

2.     **Trombley Is The First-Filed Case**

The first type of overlap has been addressed before, both in response to Matos's objections to preliminary approval and at the final approval hearing, and thus the Settling Parties will discuss it only briefly.  In short, this case, *Trombley*, is the first-filed case involving a class of National City customers.  No MDL case even touched upon National City until months after this one was filed.  For that reason the MDL Panel directed ***this Court***, ***over Matos's objection***, to evaluate the fairness of the *Trombley* settlement.  Thus the PEC is seeking to improperly interfere with proceedings in this Court, rather than the other way around.  This is amply illustrated by the chronology:

| | |
|---|---|
| October 8, 2009 | *Casayuran* filed in New Jersey.  This case, which was subsequently moved to the MDL, sought a *New Jersey-only class against PNC.*  (National City did not have |

|                    | branches in New Jersey.) |
|--------------------|--------------------------|
| February 17, 2010  | *Trombley* filed in this Court against National City. |
| April 15, 2010     | Conditional Transfer Order No. 16 ("CTO-16") entered. |
| May 14, 2010       | Notices of Opposition to CTO-16 filed by Plaintiffs and National City. |
| June 1, 2010       | *Matos* filed in Southern District of Florida. *Matos* is the first MDL case to involve National City. |
| June 1, 2010       | Each Settling Party files a motion with the MDL Panel to Vacate Conditional Transfer Order. |
| June 25, 2010      | Plaintiffs' Lead Counsel and PEC file Response in Opposition to Plaintiffs' and Defendant's Motions to Vacate CTO-16. This filing informed the MDL Panel that (1) *Matos* was filed against National City on June 1 and (2) National City was acquired by PNC and that *Casayuran* had previously been filed against PNC and transferred to the MDL. |
| June 28 & 30, 2010 | Settling Parties file supplemental submissions with MDL Panel informing it of this settlement. |
| August 9, 2010     | MDL Panel issues Order Vacating CTO-16. CTO vacated because the "moving parties have informed the Panel that they have reached a settlement that, if approved, will fully resolve *Trombley.*" |

This chronology highlights that, by filing the *Matos* action **much** later than *Trombley* (3 and ½ months), but only two weeks after learning that the Settling Parties were seeking to vacate CTO-16, the PEC was attempting to interfere with this Court's proceedings. The MDL Panel rejected this effort, and allowed this Court to decide whether the settlement of the first-filed case against National City should be approved.

As subsequent proceedings in the MDL show, the PEC understands the controlling nature of the "first-filed" rule. This is vividly illustrated by the PEC's "Verified Motion to Enjoin Copycat Case Under the All Writs Act" filed against a settlement entered into by Iberia Bank and a plaintiff who filed a suit not in the MDL at the time of the settlement. (A copy of the motion ("PEC Iberia

Br.") which is DE 1608 in the MDL, is attached hereto as Exhibit C.)  The PEC relied heavily on the

"first-to-file" rule in arguing that the Iberia Bank settlement should be enjoined.  While the PEC

explicates the first-to-file rule for three pages in its brief, the following paragraph establishes that the

PEC's position here is squarely at odds with what it represented and argued to the MDL court in

seeking to enjoin the Iberia settlement:

> It is undisputed that *Eivet* is the first-filed case against
> IberiaBank.  The "first-to-file rule" developed as a doctrine of federal
> comity because competing lawsuits involving the same parties and the
> same issues in separate jurisdictions are a waste of judicial resources
> and can lead to conflicting results.  *See Thomas Betts Corp. v. Hayes*,
> 222 F. Supp. 2d 994, 996 (W.D. Tenn. 2002)  ("The first filed rule is
> a doctrine of federal comity that promotes judicial efficiency").
> ***Under the "first-to-file rule," the entire action should be decided by
> the court in which the action was first filed.***  *Smith v. S.E.C.*, 129
> F.3d 256, 361 (6th Cir. 1997).   The Eleventh Circuit follows the
> "first-to-file rule."  *See Manuel v. Eonvergys Corp.*, 430 F.3d 1132,
> 1135-36 (11th Cir. 2005) ("[W]here two actions involving
> overlapping issues and parties are pending in two federal courts, there
> is a strong presumption across the federal circuits that favors the
> forum of the first-filed under the first-filed rule").   The fact that this
> Court has been appointed by the JPML to preside over all of these
> actions heightens the importance of respecting the "first-to-file rule"
> when a copycat case is filed against a bank, as is the case here, which
> is already defending a case which has been made part of MDL No.
> 2036.

PEC Iberia Br., at 9 (emphasis added).

The PEC cannot dispute that *Trombley* is the first-filed case.  The PEC also cannot dispute

that "[t]he fact that this Court has been appointed by the JPML to preside over" the settlement of this

action "heightens the importance of respecting the 'first-to-file' rule. . . ."  *Id.*  Accordingly, the

PEC's objections here are unfounded and counter to principles of law that they have previously

championed.

**3.      In Releasing National City Class Claims, It Is Reasonable And Legally Supportable For National City To Seek Full Releases**

The second type of overlap, relating to overdraft fees incurred by former National City customers after becoming PNC customers, is equally unfounded both in terms of the practicalities of the settlement and under relevant legal principles.

<u>**As a practical matter**</u>, the Court has inquired as to the extent of the overlap—how many former National City accounts incurred overdraft fees after becoming PNC customers (and hence potentially putative class members in the MDL proceedings).  PNC believes the number of accounts[4] to be 431,680.  It is important to note that the class members holding these accounts will only be releasing claims against PNC for overdraft fees incurred from the date of the merger to the release date—a few months' worth at most.  It is also important to note that the vast majority of these accounts were open and incurred overdraft fees during the time period before the transition from National City to PNC.  Thus, they would be included in the settlement even if the class definition was narrowed.

The primary impact of narrowing the class definition to exclude the "overlap" would be to limit the compensation that certain Settlement Class Members can attain through this settlement. Including these post-transition months ensures that class members are compensated for the two months with the highest number of overdraft fees, even if that happened after their accounts were transitioned to PNC.  Indeed, the database of overdraft fees that National City first provided to Settlement Class Counsel was limited to those fees incurred by class members while their account was still with National City.  In order to maximize the potential benefit to class members, Settlement Class Counsel sought, and PNC provided, a broader database containing overdraft fees incurred by former National City customers after they became PNC customers by virtue of the merger.  This

---

[4]  The number of accounts, not people, is the appropriate measure because for joint accounts overdraft fees are incurred jointly.

information was valuable because it permitted the class members to be compensated for the two

months with the greatest number of overdraft fees, whether the fees were incurred at National City or

in the few months afterward when class members were transitioned into PNC.[5]  In sum, a narrower

class definition (which is not even a viable option at this point, *see* discussion at 14, *infra*) would

decrease the amount of compensation that a class member could attain through this settlement.  And

if the PEC fails in its later-filed lawsuit that purports to cover the same time period, the class

members would receive nothing for their injuries.  The class members are entitled to the bird in the

hand attained by the lawyers who worked hard for this excellent remedy.

   **As a legal matter**, the law is quite clear that there is nothing inappropriate about a settling

defendant obtaining a complete release with class members.  So, for example, even when a state

court lawsuit overlaps with a federal lawsuit, and the state court lacks jurisdiction to adjudicate the

federal claims, the state court can nonetheless release those claims.  *See Matsushita Elec. Ind. Co.*

*Ltd. v. Epstein*, 576 U.S. 367 (1996).  The converse is true as well.  *See Class Plaintiffs v. City of*

*Seattle*, 955 F.2d 1268 (9th Cir. 1992).  Thus, there is nothing inappropriate about this settlement

resolving claims that are also implicated in a later-filed case by the PEC in another court.

   The law is replete with other class settlements releasing claims in overlapping class litigation.

This is because courts recognize that, without broad releases, class actions would not be settled.  *See*,

*e.g.*, *In re Baldwin-United Corp. Deferred Annuities Ins. Litig.*, 770 F.2d 328, 338 (2d Cir. 1985)

(affirming injunction against states seeking to bring attorney general actions for sale of securities

where overlapping MDL proceedings were pending, some of which had settled; otherwise, "as a

practical matter no defendant . . . could reasonably be expected to consummate a settlement of those

---

[5] Of course, if a customer's heaviest months instead occurred while the customer was a National City customer, the customer would not receive payment for any PNC fees he or she may have incurred after integration, but that is a function of the structure of the settlement (highest two months' fees) rather than any failure to compensate customers for the period of time that the National City customer became a PNC customer.

claims if their claims could be reasserted."); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366-67 (3d Cir. 2001) (same).  There is nothing new and unusual about one settlement extinguishing claims in other putative class actions.  It is commonplace, and defendants would never agree to settle class actions if they could not attain such global peace.  *See, In re Telik, Inc. Securities Litigation*, 576 F.Supp.2d 570, 584 (S.D.N.Y. 2008) ("Without class-wide release defendants would have little incentive to settle."); *TBK Partners, Ltd. v. W. Union Corp.,* 675 F.2d 456, 460 (2d Cir. 1982) ("[I]n order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action[.]").

In any event, the true "overlap" here is very small.  Only 39,196 accounts held by National City customers incurred overdraft fees for the first time after their accounts were transitioned to PNC.  Matos is the only Settlement Class Member who objected to this overlap.  This is quite telling since the Class Notice explicitly informed Settlement Class Members that this Settlement would release their claims in the other litigation against National City in the MDL—with specific reference to the *Matos* action.  If any overlapping Settlement Class Members preferred to continue with the PEC's lawsuit, they were given a full and fair opportunity to opt out of the settlement in favor of remaining a part of the PEC's putative class action.  Notably, Matos himself appears to have no standing to even make this objection, since the overdrafts that are the subject of his lawsuit occurred while he was a National City customer—not after he became a PNC customer.  *See Matos* Complaint, attached hereto as Exhibit D, ¶¶ 62-65, 69.  This phantom overlap problem is lawyer-driven objection aimed at protecting the PEC's turf.

The original *Matos* complaint itself reveals that the PEC's overlap argument is a red herring. In that complaint, which as noted was filed June 1, 2010, Matos alleged:

> Although National City was recently acquired by PNC Financial Services Group ("PNC"), ***National City continues to do business under its own name***.

*Matos* Complaint, ¶ 13 (emphasis added).  The complaint sought damages from National City on a

going-forward basis as well as retroactively, and sought a declaration against National City.  So the

very thing the PEC complains about—sweeping "PNC overdrafts" into a class of National City

customers—is precisely how the PEC pled the *Matos* action.  Thus, the *Matos* complaint itself

demonstrates that the scope of the settlement class here is entirely appropriate.

> **4.      PNC Will Nonetheless Agree To Shorten The Release Date To June 21, 2010, When The Integration Was Complete**

The Court has inquired whether the class period should be amended to end at the time of the

merger between PNC and National City or at the time the integration was completed, which was in

June, 2010.

Preliminarily, the Settling Parties respectfully point out that it would not be feasible to amend

the class period itself.  At great cost, the Settling Parties mailed notice to over 2.4 million Settlement

Class members notifying them that the class period ends August 15, 2010.  That notice made it clear

that Settlement Class Members would be entitled to compensation under the terms of the Settlement

Agreement for the their highest two months of overdraft fees—even if that happened after their

accounts were transitioned to PNC.  If the Settling Parties agreed to shorten the class period, it would

preclude some class members from attaining such compensation.  This would be to the detriment of

these Settlement Class members, and would therefore require re-noticing of the entire settlement.

In deference to the Court's concerns, however, PNC can, and will, shorten the period of the

release that is provided to PNC by all Settlement Class Members who do not opt out of the

Settlement ("Release Period").  Because a Release Period that is shorter than the class period works

only to the detriment of PNC, and not to any class member, no re-noticing is required.  PRINCIPLES

OF AGGREGATE LITIGATION § 3.05(e)(2009)(a modification to the terms of a class settlement

does not require new notice to the class if the class members are not "substantially adversely affected

by the change.");  *Kluge v. Crews Lake Road & Bride District*, No. 82-933, 1985 U.S. Dist. LEXIS

15511, at *6 (M.D. Fla. Sept. 27, 1985)(no new notice is required where amendment to settlement does not constitute a "material modification" nor "adverse[ly] change" the rights of the settling parties.).

PNC declines to shorten the Release Period to the date of the legal merger. The legal date of the merger is an irrelevancy for present purposes. Until a customer was integrated into PNC, the customer's banking experience would not change. This point is driven home by the above-cited averment of the June 1 *Matos* complaint ("National City continues to do business under its own name"). PNC will agree however, to shorten the end date of the Release Period to the conclusion of the integration process: June 21, 2010. The Settling Parties believe this is a more-than-fair accommodation of the PEC's objections, particularly because those objections are unfounded in the first instance and because, as explained above, some Settlement Class members will receive compensation for overdrafts incurred during a period of time outside of the Release Period.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons previously stated in the Settling Parties' papers and oral presentations, the Settling Parties request that their settlement be granted final approval.


Dated:  August 29, 2011                                      Respectfully submitted,


<u>/s/  Darryl J. May</u>                                         <u>/s/  Hassan A. Zavareei</u>
Darryl J. May                                                Hassan A. Zavareei
Ballard Spahr LLP                                            Jonathan K. Tycko
1735 Market Street, 51st Floor                               Tycko & Zavareei LLP
Philadelphia, PA 19103                                       Suite 808
(215) 864-8103                                               2000 L Street, N.W.
                                                             Washington, D.C. 20036
*Counsel for National City*                                  (202) 973-0900

                                                             *Settlement Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Hassan Zavareei, Settlement Class Counsel and one of the attorneys for Plaintiffs hereby certify that the preceding document was caused to be served electronically this 29th day of August, 2011, pursuant to ECF as to Filing users, and that I shall comply with LR 5.5.


_/s/_ Hassan Zavareei