## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**RAMONA TROMBLEY, et al., on behalf of herself and all others similarly situated,**

      **Plaintiffs,**

      **v.**

      Civil Action No. 10-00232 (JDB)

**NATIONAL CITY BANK,**

      **Defendant.**

### MEMORANDUM OPINION

Presently before the Court are plaintiffs' motions for final approval of the settlement and for approval of attorney fees, reimbursement for costs and expenses, and incentive awards to the representative plaintiffs. For the reasons explained below, the Court concludes that final certification of the class and final approval of the settlement are warranted, and grants the petition for awards, fees, and costs.

### BACKGROUND

### I.  PROCEEDINGS IN THIS CASE

Much of the procedural history and background of this case has been discussed in Trombley v. National City Bank, 759 F. Supp. 2d 20 (D.D.C. 2010), where the Court granted preliminary class certification and preliminary approval of the settlement agreement. Plaintiffs filed their class action complaint on February 17, 2010, alleging that defendant National City Bank[1] engaged in unlawful and deceptive practices by improperly charging its customers

---

[1]  On December 31, 2008, the PNC Financial Services Group acquired National City Bank. Compl. ¶ 7. National City Bank was merged into PNC Bank, N.A. ("PNC") on November 6, 2009 and no longer exists as a legal entity. In the Revised Settlement Agreement, references to "National City" or "defendant" mean National City Bank with references made to the separate entities National City or PNC depending on the context. Similarly, the Court will generally refer to National City, which incorporates and includes both National City and PNC, but may make references to the separate entities depending on the context.

overdraft fees for insufficient funds on debit card transactions in violation of various state and federal laws.  Compl. ¶¶ 2, 13-14.  Specifically, plaintiffs allege that National City Bank "reorder[ed] electronic debit transactions from the highest dollar amount to lowest dollar amount so as to deplete the customer's available funds as quickly as possible while maximizing the number of overdraft fees collected."  Compl. ¶ 2.  Plaintiffs also allege that National City Bank provided false and misleading account balance information and failed properly to disclose its overdraft policies.  Id.

In May 2010, the Court received notification from the U.S. Judicial Panel on Multidistrict Litigation ("MDL Panel") that an order had been entered, directing that this case be conditionally transferred to the Southern District of Florida to Multidistrict Litigation Proceeding No. 2036, In re Checking Account Overdraft Litigation ("MDL No. 2036"),which has been assigned to U.S. District Judge King.  See Docket Entry No. 3.  On July 28, 2010, plaintiffs and National City Bank (collectively, "the parties" or "the settling parties") entered into a settlement agreement and moved for preliminary approval in this Court.   Soon thereafter, the parties informed the MDL Panel that they had reached a settlement, and the MDL Panel vacated its order to transfer the action and returned the case back to this Court to evaluate the proposed settlement.  The MDL Panel's ruling did not bar the future transfer of the case to MDL No. 2036 if this Court did not approve the proposed settlement or fully resolve the case.  See Order Vacating Conditional Transfer Order at 1 n.1, Docket Entry No. 14 (Aug. 9, 2010).

Robert Matos, the named plaintiff in Matos v. National City Bank, No. 10-cv-21771 (S.D. Fla. June 1, 2010), an overlapping class action that became part of MDL No. 2036, objected to the proposed settlement.  Matos is represented by plaintiffs' lead counsel and the plaintiffs' executive committee ("PEC") in the multi-district litigation before Judge King.  The

Court held the preliminary fairness hearing on November 18, 2010 and heard arguments from the settling parties and objections from the PEC on behalf of Matos. On December 17, 2010, the Court held a brief telephone conference with counsel for plaintiffs and National City Bank to discuss several concerns with the notice and release provisions of the settlement agreement. Following that discussion, the parties filed a renewed motion for preliminary approval, a Revised Settlement Agreement, and a revised proposed order. See Docket Entry No. 34 (Dec. 22, 2010). After considering the submissions and arguments from the parties and the objectors, along with the Revised Settlement Agreement, the Court granted preliminary approval of the settlement and the notice plan, certified the settlement class, appointed Tycko & Zavareei LLP as class counsel and Ramona Trombley, Jeff Doehner, and Brian Wells as representative plaintiffs, and scheduled the final fairness hearing. See generally Order, Docket Entry No. 38 (Jan. 11, 2011); Trombley, 759 F. Supp. 2d at 30. The final fairness hearing was held on July 14, 2011, at which time the Court heard argument from the parties and from two of the objectors. After the hearing, the Court requested supplemental briefing from the parties and the objectors, along with a final status report, all of which were duly submitted.

## II. TERMS OF THE SETTLEMENT

The terms of the settlement, which are laid out in the Revised Settlement Agreement, and the subsequent developments to those terms are briefly discussed below. Pursuant to the Revised Settlement Agreement, the Settlement Class was defined as follows:

All persons who hold or ever held a National City Account[2] who at any time during the

---

[2] "National City Account" means "a non-business consumer deposit account originally maintained by or with National City, and includes any account existing on or before November 6, 2009 that was subsequently converted to a PNC account in connection with National City's merger into PNC. Such term does not include accounts originally opened with PNC or one of PNC's predecessor banks (other than National City)." Id. ¶ 1(n).

Class Period incurred at least one Overdraft Fee[3] associated with at least one National City Debit Card Transaction[4] that was not previously reversed, refunded, or returned to the Settlement Class Member by Defendant.

Excluded from the Settlement Class are National City Bank, any parent, subsidiary, affiliate or sister company of National City Bank, and all officers or directors of National City Bank, or any parent, subsidiary, affiliate or sister company at any time during the Class Period, and the legal representatives, heirs, successors, and assigns of any of the foregoing. The Court presiding over any motion to approve the Settlement Agreement is excluded from the Settlement Class. Also excluded from the Settlement Class is any person who timely submits a valid request to be excluded from this Settlement.

Revised Settlement Agreement ("Rev. Settlement Agreement") ¶ 7. The "Class Period" was defined as July 1, 2004 through August 15, 2010. Id. ¶ 1(d). Moreover, customers who originally opened accounts at PNC Bank or PNC Bank's predecessor banks other than National City were not included in the settlement. Id. ¶ 4.

The agreement provided for a $12,000,000 settlement fund, inclusive of all attorneys' fees, costs, expenses, and incentive payments to representative plaintiffs. National City Bank also agreed to provide an additional $500,000 for notice and claims administration costs. On March 14, 2011, the parties advised the Court that National City had agreed to increase its contribution by an additional $1 million for notice and claims administration costs, see Docket Entry Nos. 39-40, followed by an agreement by the parties that National City would pay an

---

[3] "Overdraft Fee" means "an overdraft fee, daily overdraft fee, continuous overdraft fee, or other similar fee charged by [National City Bank] to a holder of a National City Account and associated with a National City Debit Card transaction." Id. ¶ 1(s).

[4] "National City Debit Card" means a "debit card, check card, or any other bank card used for debit purchases and/or automated teller machine ("ATM") transactions from a National City Account." "National City Debit Card" shall also include a "debit card, check card, or any other bank card issued by PNC, following National City's merger into PNC, to customers who were formerly customers of National City." Id. ¶ 1(o). "National City Debit Card Transaction(s) means "transaction(s) effectuated with or relating to such National City Debit Card(s), including but not limited to ATM transactions and point of sale (POS) transactions. . . National City Debit Card Transasction(s) shall also include those transaction(s) effectuated with or relating to PNC Debit Cards for those National City customers whose accounts were converted to PNC accounts upon the merger of National City into PNC. Id. ¶ 1(p).

additional $300,000 towards notice and claims administration costs.  <u>See</u> Ex. C to Final Status

Report (Aug. 31, 2011).  Any costs in excess of the $1.8 million would be deducted henceforth

from the settlement fund.  <u>See</u> Rev. Settlement Agreement ¶ 9-10.  As a result, the ultimate

amount to be paid by National City for the settlement of the claims is $13.8 million.  As part of

the settlement, National City also agreed not to object to incentive awards in the amount of

$5,000 to each of the representative plaintiffs, or an award of attorneys fees of not more than

25% of the settlement fund.  <u>Id.</u> ¶¶ 10, 12.

Pursuant to the Revised Settlement Agreement, class members would receive a maximum

reimbursement of $36 for each eligible overdraft charge incurred during two calendar months

during the class period of July 1, 2004 to August 15, 2010.  Claims would be paid from the

moneys remaining in the settlement fund after attorneys' fees, costs, and other expenses were

paid.  Rev. Settlement Agreement ¶ 31.  If any funds remained after accounting for all the fees,

costs, and claims, the leftover amount would then be distributed to claimants on a pro rata basis.

After that, any amount remaining would be paid out through a <u>cy pres</u> distribution to a mutually-

agreed upon organization subject to approval by the Court.  <u>Id.</u> ¶ 31(b).  At the final fairness

hearing, class counsel stated that because of the number of claimants and the number of

overdrafts per claimant, it was anticipated that there would be no <u>cy pres</u> fund.  Final Fairness

Hr'g Tr. ("Tr.")  9:7-10.

With respect to notifying class members about the settlement, National City provided the

Notice Administrator, Hilsoft Notifications ("Hilsoft"), with the names and last known addresses

of National City customers who had incurred an overdraft fee.  Individual notices were sent out

by first-class mail to potential class members.   Rev. Settlement Agreement  ¶¶ 15, 17-18;

Affidavit of Cameron R. Azari ("Azari Aff.") ¶¶ 25-29 (May 26, 2011).  In addition to

individualized notices, other forms of notice were also employed. Published notice appeared once on a weekday in the highest circulation newspaper in twenty two designated market areas, which comprised 92% of National City branch locations. Rev. Settlement Agreement ¶ 19(a); Azari Aff. ¶¶ 30-33. A press release was issued to 4,490 major press outlets. Rev. Settlement Agreement ¶ 19(b); Azari Aff. ¶ 34. Electronic forms of notice were also provided, including the creation of a website where class members could obtain information about the settlement and documents such as claim forms, and file claims online. PNC's website also posted a notice targeted to former National City customers with online accounts, directing these customers to the aforementioned website. Rev. Settlement Agreement ¶ 19(c)-(d); Azari Aff. ¶¶ 36-37.

To receive a refund under the settlement agreement, a class member was required to submit a claim form declaring under penalty of perjury that she or he incurred at least one overdraft fee associated with that member's National City debit card transaction. On the form, the class member could claim compensation for each incurred and eligible overdraft fee during any two calendar months within the Class Period. The two months need not be consecutive. The class member could opt to have the Claim Administrator, Epiq Class Action and Claims Solutions ("Epiq"), determine the two months during the class period in which the member incurred the greatest number of overdraft fees ("Option 1") using data provided by National City. Alternatively, the class member could choose the two months ("Option 2"). Id. ¶¶ 26-27.

As of September 1, 2011, approximately 187,679 "timely claims" have been received and verified, with a remaining number of 10,511 additional claims that are undergoing further analysis. Final Status Report at 1-2. The majority of the claimants (183,339) selected Option 1, allowing Epiq to determine the number of eligible overdrafts. An estimated 4,340 claimants

chose Option 2, in which claimants themselves selected the two months for reimbursement.

Approximately seventy-six requests for opt-outs have been received. Final Status Report at 2;

Ex. B. Through July 31, 2011, Hilsoft has incurred approximately $192,620.00 in fees and

expenses, see Declaration of Robert Oseas ¶ 6 (Sept. 2, 2011); Ex. A to Final Status Report

(Hilsoft Statement of Activity),[5] and Epiq has incurred $1,841,902 in fees and expenses

associated with the settlement. Combined, they together estimate that total notice and claims

costs will ultimately amount to $2.3 million, with $1.8 million of that amount to be paid by

National City, and the remaining amount to be paid out of the settlement fund. Final Status

Report at 3. In other words, the parties expect that approximately $500,000 would be taken out

of the settlement fund proceeds to be paid towards notice and claims administration costs. After

deductions for certain fees, costs, and expenses, including attorneys' fees, class counsel estimate

that approximately $8,407,000 will be available for distribution to claimants. Id. at 4.

The Revised Settlement Agreement also contained a release, discharging the "Released

Parties [6] . . . from any and all rights, claims, liabilities . . . that Releasing Parties [7] ever had . . . or

may have in the future, that result from . . . or relate to in any way to the conduct, omissions,

duties or matters alleged in the Complaint and in the MDL Proceedings (insofar as [they] relate

---

[5] Although the settling parties indicate that the information provided by Hilsoft was accurate as of July 31, 2011, the Hilsoft Statement of Activity states that the data is current through August 2, 2011.

[6] "Released Parties" is defined as "National City and PNC and each of its and their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors and assigns and all of the present and former directors, officers, employees, agents, attorneys, and shareholders of National City and PNC and each of its and their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors and assigns. Revised Settlement Agreement ¶ 1(x).

[7] "Releasing Parties" is defined in relevant part as "[p]laintiffs and the members of the Settlement Class (including members of the proposed National City national class and state subclass in the MDL Proceedings) who do not opt out of the Settlement." Revised Settlement Agreement ¶ 1(y).

to the putative National City national class and state subclass . . .)"  Revised Settlement

Agreement ¶ 37.  This release extended to and included any claims relating to (1) failures to

adequately and fully disclose the procedure for authorizing and approving overdrafts arising out

of debit card transactions, or the manner in which items were posted to accounts, (2) failures to

warn when debit card transactions would cause an account to be withdrawn, (3) authorizing and

approving debit card transactions when they resulted in overdrafts, (4) the use of posting orders,

and (5) violations of the Electronic Funds Transfer Act and Regulation E.  See id. ¶ 37.  After

entering into the Revised Settlement Agreement, PNC agreed to shorten the release period from

August 15, 2010 to June 21, 2010, the date in which PNC's integration of National City accounts

was completed.  See Settling Parties Supp. Mem. ("Supp. Mem.") at 14, Docket Entry No. 52

(Aug. 29, 2011).

The notice provided to class members stated the following regarding the

release of claims:

> Unless you exclude yourself, you give up the right to sue the Defendant for all of
> the claims that the proposed settlement resolves.  You must exclude yourself from
> this Settlement Class to start your own lawsuit or be part of any different lawsuit
> relating to the claims in this case.  For example, unless you exclude yourself, you
> will give up your right to be included in the proposed National City national class
> and state subclass in the litigation currently pending in the U.S. District Court of
> the Southern District of Florida as part of the *In re Checking Account Overdraft
> Litigation*, MDL No. 2036, or any other litigation.

See Exs. 3-5 to Mot. for Prelim. Approval of Rev. Settlement Agreement, Docket Entry No. 34-

1.

## III.    ASSESSMENT OF DAMAGES

Edgeworth Economics ("Edgeworth") was retained by plaintiffs to quantify the injury to

class members arising from the practice of resequencing electronic debt transactions, and prepared a report authored by two economists, Jesse David and Kevin W. Christensen ("Edgeworth Report").  To prepare the report, Edgeworth relied on discussions with and information provided by National City, documents produced through informal and formal discovery, and public information.  Edgeworth Report ¶ 8.

Edgeworth estimated damages for the class period in four steps.  First, evaluating sample data taken during September 2010, Edgeworth estimated the monetary difference between the overdraft fees actually charged on the electronic debit transactions and what would have been charged had National City's resequencing practice not been in place.  From this amount, Edgeworth calculated the average excess overdraft fee charged per each overdraft fee that was actually charged ("Average Excess Overdraft Fee").  Id. ¶ 18A.[8]  Edgeworth engaged in two "but for" scenarios to determine the range of damages.  In the first scenario, where the transactions would have been arranged from low-to-high, Edgeworth calculated an Average Excess Overdraft Fee amount of $5.44 for each overdraft fee actually charged.  Id. ¶ 24.  Posting the transactions in simulated chronological order resulted in an Average Excess Overdraft Fee amount of $2.15.[9]  Second, Edgeworth calculated the number of relevant overdraft fees incurred from August 2005

---

[8] Edgeworth also indicated that National City and PNC had different policies with respect to the maximum number of overdraft fees allowed to be imposed per day, as well as the fee amount.  According to Edgeworth, PNC had a maximum allowable limit of four overdraft fees per day while National City's limit was ten overdraft fees per day.  Moreover, PNC charged $25 for the first overdraft fee in a given day, with other fees assessed at a higher rate of $36 per overdraft.  National City charged $36 for each overdraft fee.  Edgeworth applied a maximum rate of 10 overdraft fees and $36 to replicate National City's policies, which would have been in place during the class period.  Edgeworth Report ¶ 20 n. 9.

[9] There were no time stamps for transactions in the sample data.  Hence, Edgeworth attempted to simulate the chronological posting of the transactions by randomized order of these transactions and repeated such randomized simulations one hundred times.

to August 2010[10] using information provided by National City.  Id. ¶ 18B.  Third, Edgeworth then applied the Average Excess Overdraft Fee to the number of overdraft fees charged during the class period to obtain the total monetary amount of excess overdraft fees, adjusting for fees that had been reversed or not collected by National City. Id. ¶ 18C.  Fourth and finally, Edgeworth made downward adjustments to the amount of projected damages to account for reversed and/or non-collectible overdraft fees and "chronic" overdrafters. Id. ¶ 18.

Edgeworth estimated that a total of 59.7 million overdraft fees were charged by National City during the class period.  Because National City did not keep data distinguishing overdraft fees incurred from electronic debit transactions from other types of transactions, the Edgeworth Report relied on an FDIC study of overdraft programs, which provided an industry-wide estimate that 48.8% of overdraft fees are caused by electronic debit transactions.  Id. ¶¶ 26-27.  Edgeworth also adjusted this amount downward assuming a 26.52% rate of reversed and/or uncollectible fees, which was the median uncollectible and reversed rate used by an expert in Gutierrez v. Wells Fargo Bank, 730 F. Supp. 2d 1080 (N.D. Cal. 2010), concluding that an estimated total number of overdraft fees of 29.2 million during the class period were attributable to electronic debit transactions. Id. ¶ 27.  Multiplying that amount by the Average Excess Overdraft Fee, Edgworth concluded that based on the first scenario of low to high reordering, total damages would have amounted to $116.5 million and, applying the two months with the greatest number of overdraft fees to account for "frequent" or "chronic" overdrafters,  total damages (i.e., excess overdraft fees) would amount to $50.8 million.  See id. ¶¶ 28-29.  Edgeworth concluded if the

---

[10] Because information from July 1, 2004 to July 31, 2005 was unavailable, Edgeworth estimated the number of overdraft events for this time period "using a straight-line extrapolation based on the monthly overdraft events from August 2005 through December 2008."  Edgeworth Report ¶ 26.

transactions had been chronologically ordered (the second scenario), the damages would amount to $46 million and, applying the two months with the greatest number of overdraft fees, total damages (i.e., excess overdraft fees) would amount to $20 million.  Id. ¶¶ 28-29.  Plaintiffs assert that the estimated damages arrived at in the second scenario, representing chronological posting, is more likely a proper representation of damages than the first scenario, where damages would have been based on a requirement that banks post transactions from low to high.  See Mot. for Approval at 22.  In summary, the range of damages spanned from $116.5 million to $46 million, and, discounting for chronic overdrafters, from $50.8 million to $20 million.  Hence, plaintiffs assert that the $12 million settlement fund would be in the range of 10% to 26% of the two damages calculations, and, taking the two months in which a class member incurred the greatest number of overdrafts, 24% to 60% of the possible recovery.  See id. at 20.

### A.     Impact of Regulation E

Edgeworth, relying on representations made by National City, explained that a data sample containing account-level transaction data contemporaneous with the class period "was not feasible to obtain" because of the way in which the data had been stored and archived when National City merged with PNC.  Id. ¶ 11 n.4.  Instead, Edgeworth extracted a sampling of this information during September 2010, which was taken from PNC account holders who had previously been National City account holders ("sample data").  The sample data consisted of approximately 1.3 million transactions and appeared to include all transactions on the day an overdraft fee had been incurred, as well as all transactions from the previous day.  Id. ¶ 11.  From this information, Edgeworth was able to determine the balance at the start of the day, the transactions that caused the overdraft fee, and the overdraft fees assessed to compare the total

overdraft fees charged to those that would have been charged *but for* the high to low reordering of transactions. Id. ¶ 11.

The sample data was taken during a period of time after the Federal Reserve had made recent amendments to 12 C.F.R. § 205 ("Regulation E"),[11] which imposed certain disclosure and affirmative opt-in requirements on banks before enrolling customers in overdraft protection services. See Gutierrez, 730 F. Supp. 2d at 1135-36 (describing relevant changes to Regulation E). Edgeworth assumed for the purposes of its report that "the average characteristics and behavior of customers are the same before and after changes to Regulation E" and accordingly calculated excess overdraft fees using the sample data as "representative of what would have occurred during the Class Period. " Edgeworth Report ¶ 14. However, Edgeworth also acknowledged that "it is possible that the average characteristics and behavior of customers with overdraft protection . . . are somewhat different from the average characteristics and behavior of customers with such protection prior to Regulation E." Id. ¶ 15.

At the final fairness hearing, the Court expressed concern with the Edgeworth Report's reliance on post-Regulation E data in quantifying the damages that occurred as a result of National City's resequencing policy. Plaintiffs conceded that the effect of Regulation E on the incurrence of overdraft fees was unknown, but nevertheless urged this Court to assume that Regulation E created no impact on the estimated valuation of damages. Tr. 15:4-16:9. The Court directed the parties to submit supplemental memoranda to further substantiate this claim, and to explain why the use of post-Regulation E data by Edgeworth was appropriate in this

_____

[11] Regulation E was issued pursuant to the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.

circumstance, where the damages were incurred by the class prior to the enactment of Regulation E. <u>See</u> Order for Supp. Br. & Final Status Rpt. ¶ 3, Docket Entry No. 47 (July 27, 2011).

In response, Edgeworth claimed that post-Regulation E data was used in only one aspect of calculating damages -- to calculate the "Average Excess Overdraft Fee." According to Edgeworth, data regarding the actual number of overdrafts incurred by the class during the class period (in other words, pre-Regulation E data) was used to determine the frequency or volume of overdraft fees incurred by account holders on a per-day basis. As such, Edgeworth's damages calculation was "based on the actual number of relevant overdrafts that occurred prior to the implementation of Regulation E." David Decl. ¶¶ 5, 10.[12] Edgeworth claims that it "did not simply estimate the total amount of overall excess overdraft revenue (caused by high-to-low reordering) from the post-Regulation E sample period and then use that amount to extrapolate what might have happened in prior months. Instead, [Edgeworth] applied the Average Excess Overdraft Fee Amount to the *actual* number of overdraft fees incurred by class members prior to Regulation E." <u>Id.</u> ¶ 11 (emphasis added). Edgeworth also maintains that both before and after filing its report, it conducted research regarding the effect of Regulation E on daily transactional overdraft behavior (i.e. "the banking behavior of accountholders within the day" or "the average composition of accountholders eligible to incur overdraft fees") and, based on that research, found "no literature" to indicate "that any such changes . . . did occur." <u>Id.</u> ¶ 14. In any event, Edgeworth claims that even if customers' behavior had changed due to Regulation E,

---

[12] Edgeworth was given information with respect to class members for the relevant class period regarding the total number of electronic debit transactions and overdraft fees for class member accounts on a monthly basis from August 2005 to August 2010. Edgeworth Report ¶ 15. The transactional data from the class period includes the number of overdraft fees by calendar month for approximately 2.5 million unique and individual accounts. <u>Id.</u> ¶¶ 16-17. The amount of overdraft fees varied by account, but ranged from $25 to $36. <u>Id.</u> ¶ 19.

Edgeworth's "methodology already includes a certain tolerance for such variation and implicitly accounts for small variations that may occur through such changes." Id. ¶ 15. Hence, according to Edgeworth, its assessment already "accounts for any changes in the rate or volume of overdraft fees potentially caused by Regulation E." Id. ¶ 10.

### B. Data Retrieval and Analysis of Class Period Data

At the final fairness hearing, the Court also expressed concern with respect to the settling parties' generalized assertions that data retrieval and usage of National City Bank data from the class period would be unduly burdensome and costly. The parties were therefore directed "to provide specific information regarding the feasibility of obtaining and analyzing such data, including the estimated cost of obtaining such data as well as the estimated time frames required for providing such data . . . ." Order for Supp. Br. & Final Status Rpt. ¶ 2.

In response, the settling parties submitted a declaration from lead consultant Steven Visser, the Managing Director of Navigant Consulting ("Navigant"). Navigant has significant experience assisting banks in extracting customer transactional data from bank mainframe systems. See Supp. Mem. at 2; Declaration of Steven Visser ("Visser Decl.") ¶ 2 (Aug. 26, 2011). It estimates that the total labor costs associated with locating, extracting, and converting all known and relevant transactional data for National City account holders for the entire class period into a database format would be approximately $620,000 and take approximately six months to complete. Visser Decl. ¶ 16. Navigant also estimated that the additional non-labor costs to support the data retrieval, which include hardware, software, and miscellaneous data center costs, would be approximately $153,000, for a total cost of approximately $773,000. Id. ¶¶ 17-18 & 21. These cost estimates do not account for additional relevant reports with

information about authorizations, holds on deposits, and pending debit transactions, which, if available, would cost an additional $387,000 to extract and convert. Id. ¶ 20. The estimated total cost for the data retrieval project was projected by Navigant to be approximately $1,160,000. Id. ¶ 21. In addition to Navigant's projections, Edgeworth estimates that it would cost an additional $175,000 to $300,000 to assess such data to perform a damages analysis for the class period for each customer. David Decl. ¶ 19. Taking Edgeworth's and Navigant's estimates together, in sum, the total estimated cost for retrieving and analyzing account level data for the class members during the class period is estimated to be around $1,335,000 to $1,460,000.

## IV.    OBJECTIONS

Class counsel have identified ten objections that have been received as of July 9, 2011. Three of these objections were timely filed with the Court and are summarized briefly below.[13] Those three objections are addressed in further detail in the Court's discussion of whether final class certification and settlement approval is warranted.

Robert Matos, represented by the Plaintiffs' Executive Committee, had objected to the preliminary settlement in the case. The PEC renews its objections ("PEC Objectors" or "PEC Objection") to the lack of pre-settlement discovery, the effect of the settlement on the claims of existing PNC Bank customers, and the purpotedly arduous and unduly burdensome claims process. The PEC Objectors now also object to the adequacy and distribution of the settlement

---

[13] Seven other objections were submitted by class members. Of those objections, four do not lodge any particular opposition to the settlement at all, and the remaining three do not alter the Court's finding that the settlement is fair. One objection was premised on "the way overdraft fees are reimbursed" because "[o]verdraft fees in most cases are just a small part of the actual cost involved" and pointed to hidden expenses such as "[b]uying a money order, the travel cost, and the harm it does reputations." See Ex. 41-1. A second objection by a class member participating in the settlement requested "$9000.00 for pain and suffering," which was outside the scope of the class action claims and settlement. Id. Finally, a third objection requests reimbursement for the full amount of overdraft fees incurred. Id.

amount and what they claim is the broad definition of the class.

Ana Rosen is represented by Theodore Frank from the Center for Class Action Fairness. Rosen appeared at the final fairness hearing, objecting to the requested amount of attorneys' fees, the distribution scheme for the settlement fund, and the amount of the $5000.00 incentive fee requested for each of the class representatives. See generally Objection of Ana Rosen, Docket Entry No. 45 (June 27, 2011) ("Rosen Objection"). Rosen also objected to factoring in the notice and administrative costs as part of the settlement when considering the fairness and reasonableness of class counsel's fees request. See generally Rosen Supp. Mem., Docket Entry No. 52 (Sept. 8, 2011).

Sam P. Cannata did not appear at the final fairness hearing, but he filed an objection focusing on (1) the lack of pre-settlement discovery; (2) the sufficiency of the settlement amount itself, as well as the distribution scheme; (3) the use and implementation of cy pres distribution; and (4) the "confusing" claims process. See generally Objection of Sam P. Cannata, Docket Entry No. 46 (June 20, 2011).

## STANDARD OF REVIEW

A class can be certified for "settlement purposes only" and such practice has become increasingly common. See Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 50 (D.D.C. 2010) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997)). However, class actions seeking class certification and settlement at the same time require "closer judicial scrutiny" than settlements that are reached after class certification. Manual for Complex Litigation, Fourth, § 21.612 (2004). Such class actions that settle early in the case "sometimes make meaningful judicial review more difficult and more important." Id; see also Amchem, 521 U.S. at 620

-16-

(observing that "settlement-only class certification" requires "undiluted, even heightened" attention that is "of vital importance"); D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (calling for "a higher degree of scrutiny in assessing [the] fairness" of settlements negotiated prior to class certification and the need to examine the "negotiating process leading up to the settlement as well as the settlement's substantive terms").

Moreover, a proposed class action settlement requires the Court's approval. Fed.R.Civ.Proc. 23(e). The Court has the discretion to approve or reject the proposed settlement. In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 375 (D.D.C. 2002). When deciding whether to grant approval, the Court must strike a balance between a rubber stamp approval and "the detailed and thorough investigation that it would undertake if it were actually trying the case." Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 565 F.Supp.2d 49, 54 (D.D.C. 2008) (internal citation omitted)). Although the Court should undertake careful scrutiny of the settlement terms, the discretion to reject a settlement is "restrained by the 'principle of preference' that encourages settlements." In re Lorazepam, 205 F.R.D. at 375 (quoting Pigford v. Glickman, 185 F.R.D. 82, 103 (D.D.C.1999)); see also United States v. District of Columbia, 933 F.Supp. 42, 47 (D.D.C. 1996) ("The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties.") (internal quotations omitted).

**DISCUSSION**

I.    **CLASS CERTIFICATION**

Before considering whether the proposed settlement should be finally approved, the Court first turns to whether the settlement class meets the requirements for certification pursuant to Rule 23. To certify a class for settlement, a court must consider whether the proposed class meets the requirements of Federal Rule of Civil Procedure 23. For the reasons discussed below, the Court concludes that final class certification is appropriate.

    **A**    **Rule 23(a) Requirements**

The proponent for class certification has the burden of establishing that each of the pre-requisite elements of Rule 23(a) are satisfied: (1) the class is so numerous that joinder of all members is impractical ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) claims/defenses of representative parties are typical of the claims common to the class ("typicality") and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). All of these requirements are satisfied here.

    *1.*    *Numerosity*

Rule 23(a)(1) only requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). In this district, courts have found that numerosity is satisfied when a proposed class has at least forty members -- a point not contested by any party here. See Vista Healthplan v. Warner Holdings Co. III Ltd., 246 F.R.D. 349, 357 (D.D.C. 2007) (citing Bynum v. District of Columbia, 214 F.R.D. 27, 32 (D.D.C. 2003)). Plaintiffs point to claims submitted by well over 100,000 class members. The numerosity requirement is clearly met. See Bynum, 214 F.R.D. at 32-33.

-18-

## 2. *Commonality*

Questions of law and fact must be common to the class under Rule 23(a)(2). The "commonality" requirement is satisfied when there is at least one issue, the resolution of which would affect all or a significant number of the putative class members. Vista Healthplan, 246 F.R.D. at 357 (citing In re Lorazepam, 202 F.R.D. at 26). Factual variation amongst class members will not defeat commonality, so long as a single aspect or feature of the claim is common to all proposed class members. See Bynum, 214 F.R.D. at 33. Plaintiffs' complaint alleged various claims and questions that would have been common to all members who incurred overdraft fees during the class period, including allegations that National City failed to properly disclose its overdraft fees to all its customers in breach of contract and the covenant of good faith and fair dealing; that it was unjustly enriched; and that it violated Regulation E and the Electronic Funds Transfer Act. See, e.g., Compl. ¶¶ 100 to 146. Hence, the class satisfies the "commonality" requirement.

## 3. *Typicality*

Rule 23(a)(3) requires a finding that the representative parties' claims or defenses are typical of the claims or defenses of the class. The requirement for "typicality" is satisfied "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." In re Lorazepam, 202 F.R.D. at 27 (quoting Pigford, 182 F.R.D. at 349). The facts and claims of each class member do not have to be identical. See Daskalea v. Wash. Humane Soc'y, 275 F.R.D. 346, 358 (D.D.C. 2011). Instead, courts have found the "typicality requirement" satisfied when class representatives "suffered injuries in the same general fashion

as absent class members." See In re Vitamins Antitrust Litig., 209 F.R.D. 251, 260 (D.D.C. 2002) (internal quotations omitted); see also Daskalea, 275 F.R.D. at 358 ("At bottom, the typicality requirement is used to ascertain 'whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented.'") (citing In re Lorazepam, 202 F.R.D. at 27).

Here, the class representatives, like the other class members, incurred overdraft fees arising out of their debit card transactions with National City and were subject to the same policies, procedures, and conditions for those transactions as other account-holders were.  Mot. for Approval at 38.  Moreover, none of the objectors contest the assertion that the representative plaintiffs' claims are "typical" of the class.  Hence, the Court finds that the typicality requirement is satisfied.

### 4.    *Adequacy*

Under Rule 23(a)(4), the class representative must fairly and adequately protect the interests of the class.  Two criteria are generally recognized for determining the adequacy of class representation -- (1) the interests of the named representative must not be antagonistic to or compete with the interests of the unnamed class members; (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel. Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997) (internal quotations and citations omitted); Vista Healthplan, 246 F.R.D. at 358.

Again, none of the objectors directly asserts that their objections relate to class certification, rather than to the proposed settlement agreement.  However, such objections, even

if broadly construed as a challenge to the adequacy of class representation, would fail. Here, the representative plaintiffs "shared the identical objectives of establishing liability and obtaining damages." See Cohen v. Chilcott, 522 F. Supp. 2d 105, 115 (D.D.C. 2007) (applying this reasoning to find the "adequacy" requirement satisfied). The Court also concludes that class counsel satisfy the adequacy requirement, because they have served in that capacity in several national class actions and in other complex litigation. See Chilcott, 522 F. Supp. 2d at 115-16 (applying same reasoning to find that adequacy requirement as to class counsel was satisfied).

**B.      Rule 23(b)(3) Requirements**

In addition to the Rule 23(a) requirements, proponents for class certification must establish that the class can be maintained under Rule 23(b). Here, plaintiffs have asserted Rule 23(b)(3) as the basis for this class action; therefore, they must demonstrate (1) predominance of common questions of law and fact to the entire class, and (2) superiority of the class action method to other methods of adjudication for the controversy. See Fed. R. Civ. P. 23(b)(3). The proposed class satisfies these two elements.

*1.      Predominance*

Plaintiffs must establish that the common issues in this case pre-dominate over any non-common issues, bearing in mind that "common issues need only be predominant, not dispositive of the litigation." See Chilcott, 522 F. Supp. 2d at 116 (internal citations omitted). Courts in this jurisdiction have observed that "[t]here is no definitive test for determining when common issues predominate," but have found this factor to be satisfied when there is "generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." See, e.g., Vista

Healthplan, 246 F.R.D. at 359 (internal quotations and citations omitted); Chilcott, 522 F. Supp. 2d at 116 (internal citations omitted).

Here, proof of National City's liability would be based on the bank's policies and practices that would have been applicable to all class members. Although this class action is proceeding as a nationwide class, "the existence of minor differences in state law does not preclude the certification of a nationwide class." See Chilcott, 522 F. Supp. 2d at 116 (citing In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 315 (3d Cir. 1998). Hence, the predominance factor is easily met.

### 2. Superiority

The superiority requirement under Rule 23(b)(3) is satisfied when a court determines that a class action is superior to other available forms of adjudication. Vista Healthplan, 246 F.R.D. at 359-60. This requirement ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." Amchem, 521 U.S. at 615. As already discussed above, the size of the class and the uniformity of issues regarding the bank's liability, along with the prohibitive costs of prosecuting complex litigation like this case, weigh strongly in favor of finding that class action adjudication is superior to other forms of adjudication. See Vista Healthplan, 246 F.R.D. at 360 (applying these considerations to find superiority requirement met); Chilcott, 522 F. Supp. 2d at 117 (same). Here, the Court readily concludes that Rule 23(b)(3)'s superiority requirement is met.

## II. THE PROPOSED SETTLEMENT

Because the Court has concluded that class certification is appropriate, it now considers

whether the proposed settlement is "fair, reasonable, and adequate." See Fed. R. Civ. P. 23(e).  In

the D.C. Circuit, there is no single test for determining whether a proposed class action

settlement should be approved and the relevant factors may vary depending on the circumstances.

See In re Lorazepam, 205 F.R.D. at 375 (citing Pigford, 185 F.R.D. at 98 & n. 13).  But

generally, in determining whether a settlement is fair, reasonable, and adequate, courts in this

Circuit have examined the following factors: (a) whether the settlement is the result of

arms-length negotiations; (b) the terms of the settlement in relation to the strength of the case; (c)

the stage of the litigation proceedings at the time of settlement; (d) the reaction of the class; and

(e) the opinion of experienced counsel. In re Lorazaprem, 205 F.R.D. at 375; In re Vitamins

Antitrust Litig., 305 F. Supp. 2d 100, 104 (D.D.C. 2004).

### A.    Arm's Length Negotiations

"A presumption of fairness, adequacy, and reasonableness may attach to a class

settlement reached in arm's-length negotiations between experienced, capable counsel after

meaningful discovery." Meijer, 565 F.Supp.2d at 55 (internal citations omitted).  Class counsel

has described the negotiating process here (as well as the pre-settlement discovery and informal

investigation that was engaged in to determine the strength of plaintiffs' claims), indicating that

the negotiating process was an adversarial one. See, e.g., Zavareei Decl. ¶¶ 17-46; Mot. for

Attorneys' Fees at 6-10.  The process included "dozens of phone calls and two in-person

settlement conferences" as well as "hundreds of hours spent researching, studying, and analyzing

the complex legal issues in this case" over the course of months.  Zavareei Decl. ¶¶ 44-45.

Plaintiffs' counsel also states that "[t]he arm's length negotiations continued even after the

Settlement was consummated," pointing to the additional amounts National City subsequently agreed to pay towards notice and claims administration costs. Mot. for Approval at 14. Moreover, counsel for both parties are clearly experienced and, as the Court already noted when granting preliminary approval, there was no evidence or indication of actual collusion between the parties. See Trombley, 759 F. Supp. 2d at 28. Although the PEC Objectors expressed concerns about the settlement's timing, with particular emphasis on the accomplishment of the settlement shortly before the case was slated to be transferred to the MDL forum, the Court previously observed that this case was filed four months before Matos's lawsuit and that the MDL Panel knew the Matos case was pending when it nevertheless transferred the case back to this Court to evaluate the proposed settlement. Id. Hence, having found no evidence to indicate that the settlement agreement resulted from anything other than arm's length negotiations, the Court finds that this factor weighs in favor of settlement approval.

> **B.**     **Settlement Terms in Relation to Strength of the Case**

This factor has been called the most important factor a court considers when evaluating a proposed settlement. See, e.g., Blackman v. District of Columbia, 454 F. Supp. 2d 1, 8 (D.D.C. 2006). The Court must evaluate the relief provided in the proposed settlement against the relative strength of plaintiffs' case, including their ability to obtain recovery at trial. See Equal Rights Ctr. v. Wash. Metro. Area Transit, 573 F. Supp. 2d 205, 211 (D.D.C. 2008) (citing Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1988)). Because National City has strong defenses should the case proceed to trial, and given the benefit to class members in having "relatively prompt recovery", see Pigford, 185 F.R.D. at 104-05, this factor weighs in favor of approving the proposed settlement.

As an initial matter, if this case proceeded to litigation, the time until class members would obtain relief for their damages and injuries would be substantially delayed. See Luevano v. Campbell, 93 F.R.D. 68, 89 (D.D.C. 1981) ("[T]he delay in providing relief to the class if this case were to be litigated is a factor strongly supporting the compromise reached by the parties."). Even if plaintiffs could prevail at trial, that verdict would likely be appealed, resulting in even further delay to the final resolution of the case, and the time at which class members would receive any compensation. For instance, the verdict in Gutierrez v. Wells Fargo Bank, No. 07-cv-5923, 2010 WL 3155934 (N.D. Cal. Aug. 10, 2010), in which plaintiffs were awarded $203 million in damages after a bench trial, remains on appeal before the Ninth Circuit.

Moreover, the legal environment for overdraft fee litigation remains unsettled. To demonstrate this point, the settling parties initially relied on Baptista v. JP Morgan Chase Bank, N.A., 640 F.3d 1194 (11th Cir. 2011), which dismissed a class action involving state and common law claims (including unjust enrichment), relying in part on the reasoning that some of the claims were preempted by the National Banking Act ("NBA"), 12 U.S.C. §§ 1 et seq. Relying on the Baptista decision, several banks filed a motion to reconsider in the multi-district litigation, challenging Judge King's denial of their motion to dismiss on similar preemption grounds. Subsequently (and after memoranda already had been filed in this case), the motion for reconsideration was denied in the multi-district litigation. See generally MDL. No. 2036, --- F. Supp. 2d. ----, 2011 WL 2746171 (S.D. Fla. July 13, 2011). In rejecting the motion, Judge King characterized the state statute at issue in Baptista as attempting to regulate a right expressly granted to federally chartered banks by the NBA. Id. at *7. Because the relevant cases in the multi-district litigation involved claims that were not premised on the bank's authority to charge

fees, but instead challenged what was characterized as the "bad-faith manner in which an account is reorganized to justify a larger number of overdraft charges," Judge King found no reason to reconsider his previous denial of dismissal.  See id.  However, the preemption issue is by no means resolved.  Indeed, in his November 22, 2011 order granting final approval of a settlement between class members and Bank of America that raises similar claims and allegations as those raised before this Court,[14] Judge King noted that despite his own rulings, the potential preemption of claims raised by the plaintiffs against Bank of America "remains an open question" and that "no federal appeals court has yet reached the NBA preemption issue in this specific context."  See BofA Order of Final Approval at 21-22.

In any event, the legal landscape for such suits remains challenging and riddled with uncertainty.  The settling parties point to the strength of anticipated arguments by the defendants with respect to certain state consumer protection laws that are arguably more favorable to National City than to plaintiffs. See Mot. for Approval at 17.  Plaintiffs underscore the challenge of "confront[ing] the well-known difficulty of managing a nationwide class action, where the law from multiple states must be applied to determine liability." Id.  Moreover, courts have rejected challenges to the practice of reordering overdraft fees from high to low, and the adequacy of the disclosures relating to such practices that are similar to those alleged in the class action complaint in this case.  See, e.g., Hassler v. Sovereign Bank, 374 Fed. App'x 341, 342 (3d Cir. 2010) (affirming dismissal of action by concluding that reordering did not violate New Jersey Consumer Fraud Act and rejecting other breach of duty claims); Northhampton Rest. Grp. Inc. v.

---

[14]  The Order of Final Approval of Settlement issued by Judge King refers to several  consolidated cases against Bank of America.  See generally Order of Final Approval, In re Checking Account Litig.,MDL No. 2036, Docket Entry No. 2150 (S.D. Fla. Nov. 22, 2011) ("BofA Order of Final Approval").

Firstmerit Bank, N.A., 5:09-cv-2630, 2010 WL 3069494, at *3 (N.D. Ohio Aug. 3, 2010) (granting motion to dismiss on all claims, including class action breach of contract claims premised on bank's reordering practice).

Plaintiffs would also have to contend with the complex factual issues that would need to be resolved in order to demonstrate the damages and injuries of the class members. The claims brought by the plaintiffs should this case proceed to litigation "will not turn on pure legal questions that could govern numerous later cases, but will require fact-bound and situation-specific determinations concerning the terms of the parties' contract and Plaintiff's expectations regarding Defendants' performance." See Joseph v. Commerce Bank, N.A., No. 10-0685, 2010 WL 3733557, at * 4 (W.D. Mo. Sept. 17, 2010).

Against this backdrop and with these considerations in mind, the Court will now consider whether the $13.8 million recovery -- which includes additional notice and administration costs National City has agreed to pay -- falls within the range of reasonableness. At the preliminary approval stage, plaintiffs relied on the expert reports submitted in Gutierrez v. Wells Fargo Bank and applied the expert damage analyses in that case to estimate that the projected recovery at trial would be between $52 million and $72 million. At that time, plaintiffs had claimed that the $12 million settlement amounted to 17% to 24% of the best recovery plaintiffs could expect to obtain if the case went to trial. See Trombley, 759 F. Supp. 2d at 25. The Court granted preliminary approval but required the settling parties to conduct an independent analysis to justify the agreed-upon settlement amount, and warned the parties that they must be able to explain and defend their methodology. Id. at 25.

Plaintiffs provided the Edgeworth Report to support the damages assessment and the $12 million settlement amount. The findings from that report have been summarized and discussed

above, along with the supplemental memoranda and attached exhibits that were provided to the Court subsequent to the final fairness hearing. The PEC Objectors contend that the Edgeworth Report is deficient in several ways. They argue that the report undervalues the potential damages incurred by the class because the settlement amount should have been compared to the total amount of debit overdraft fees incurred by any class member for any reason (as opposed to fees incurred due to resequencing), because that is how the class is defined. They further argue that this approach would have yielded a higher damages amount than the estimated range of $46 to $116.5 million determined by Edgeworth. PEC Objection at 10. The PEC Objectors also challenge Edgeworth's use of post-Regulation E sample data and post-merger PNC Bank data as opposed to pre-merger National City Bank data, which, in the PEC Objectors' view, renders the Edgeworth Report's findings and conclusions unreliable. Id. at 11.

Although the Court initially expressed some concern with respect to the use of post-Regulation E sample data in determining an Average Excess Overdraft Fee amount, it now finds that the settling parties have sufficiently explained why the narrow and limited use of such data was appropriate, given the demonstrable burdens of cost and time associated with the retrieval of account-level transactional information for every class member during the class period. Investigating and analyzing information about each class member to determine, with the level of specificity suggested by the PEC Objectors, what transactions caused an overdraft fee to be triggered due to the practice of re-sequencing, comes with its own costs, resulting in less money available to pay the actual claims. See Schulte v. Fifth Third Bank, --- F. Supp. 2d ---- , 2011 WL 3269340, at *27 (N.D. Ill. July 29, 2011), appeals dismissed, Nos. 11-2922, 11-2963, 11-2964 (7th Cir. 2011) (rejecting challenge to claims process because "there would presumably be costs associated with investigating how much is owed to each Class Member . . . [h]ad the onus

of that process been placed on Defendant, there may have been less money available to pay claims."). The settling parties have submitted support for their contention that significant costs and time would be spent to retrieve the data the PEC Objectors believe this Court should require; they indicate that obtaining and analyzing this information would cost around $1,335,000 to $1,460,000 and take at least six months. In addition, PNC even suggested that the case might not have settled if a condition of the agreement required PNC to mine National City's retired mainframe and computer systems for such data. See Tr. 75:3-7 ("[I]t would have been millions of dollars and months and months and months of time, to the point that it then says, do we really want [to] do this settlement?")

Even if the Court had required PNC to mine National City's systems to retrieve more specific data about the transactions that directly occurred due to the bank's resequencing practices, it is not readily apparent that the data would even be complete. Furthermore, the terms of the settlement agreement should be analyzed based on what information was known at the time the settlement agreement was reached, and the effect of Regulation E on the frequency and monetary amount of overdraft fees was not (and is not) fully known.[15] See In re CIGNA Corp., Civ. Action No. 02-8088, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007) (stating that settlement fairness analysis must consider the risks at the time the settlement was reached, not the risks or absence of risks that arose after the settlement).

In sum, the Court does not find that the narrow use of sample data from the post-Regulation E period made the settling parties' valuation of damages so unreliable that it rendered

---

[15] The settling parties also suggest that use of post-Regulation E data may even overstate the potential range of damages, because account-holders who have opted-in to overdraft fee protection services might then make vigorous use of such services, and, in turn "are likely to have been impacted more by the . . . reordering practice than the average accountholder;" hence, their data "would, thereby, increase the amount of the Average Excess Overdraft Fee." See Supp. Mem. at 7.

the settlement unfair.  See Schulte, 2011 WL 3269340, at *24.  In assessing potential damages scenarios, Edgeworth's calculations of between $46 million and $116.5 million would yield a recovery range of approximately 10% to 26% without including the additional $1.8 million payment attributable to notice and administration costs; including that additional $1.8 million payment would yield a recovery range of approximately 12% to 30%.  This seems to be within the realm of reasonableness.  See In re Newbridge Networks Sec. Litig., Civ. Action No. 94-1678, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) ("Courts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; but an agreement that secures roughly six to twelve percent of a *potential* trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness.").  In Schulte, Judge Dow found that a settlement amount of approximately $10.1-$10.2 million (which included notice and claims administration costs that the bank agreed to incur),  in light of the potential maximum damage calculation of $96.5 million -- "the most that the class could hope to recover" -- was fair and reasonable under the circumstances.  See Schulte, 2011 WL 3269340, at *14.  And in his opinion granting final approval of a class action settlement involving Bank of America's overdraft fee-charging practices, Judge King found that "nine percent or higher constitutes a fair settlement" and was well within the range of reasonableness.  BofA Order of Final Approval at 20, 27-28.  The recovery in this case, $13.8 million inclusive of notice and claims costs paid by National City, compares favorably with the settlement agreement in those cases,  and with other complex litigation settlements.  See, e.g., In re Rite Aid Corp. Sec. Litig., 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (observing that settlements in securities class actions since 1995 have recovered between 5.5 and 6.2% of the class members' estimated losses).  Undoubtedly, optimal

data is preferable, but considerations of costs, expense, and time to obtain such data must be weighed against the terms of the settlement and the benefit to the class of obtaining relief sooner rather than later. <u>In re Newbridge</u>, 1998 WL 765724, at *2.[16]

Having reviewed the voluminous evidence in the record -- including the parties' and objectors' memoranda with respect to the preliminary settlement approval and certification as well as final settlement approval and certification, the transcripts of the preliminary and the final fairness hearings, and the documents, reports, affidavits, and information that have been filed -- the Court finds that the terms of the settlement agreement are fair and reasonable in relation to the strengths of the case, and weigh in favor of approving the settlement. The Court concludes this, taking fully into consideration the uncertain legal landscape for such claims; the complex, time-consuming and costly further factual investigation that the parties would have to undertake; and the uncertainty as to whether such specific data could even be fully obtained and analyzed regarding the extent of damages incurred from National City's re-sequencing practices or other practices relating to the charging of overdraft fees.

### C.     Status of Litigation Proceedings at Time of Settlement

As a general matter, early settlement is encouraged, although courts must still consider "whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, MDL No. 1290, 2003 WL 22037741, at *4 (D.D.C. June 16,

---

[16]   The settlement finally approved by Judge King in the consolidated cases involving Bank of America instructed that funds due to settlement class members who could not reasonably be identified because of problems obtaining and analyzing the bank's older transaction data would instead be directed to a <u>cy pres</u> program, which Judge King concluded was a reasonable result. <u>See</u> BofA Order of Final Approval at 34-39. Here, through their settlement, the parties sought a way to provide compensation to class members despite the difficulties in obtaining data from National City's systems.

2003). Here, in evaluating the status of litigation proceedings at the time of the settlement, the Court finds that it does not come "too early to be suspicious nor too late to be a waste of resources," but instead "at a desirable point in the litigation for the parties to reach an agreement and to resolve the issues without further delay, expense, and litigation." Vista Healthplan, 246 F.R.D. at 362 (quoting In re Vitamins Antitrust Litig., 305 F. Supp. 2d at 103) (internal quotations omitted).

The Court rejects the objections made by Cannata and the PEC Objectors regarding the sufficiency of pre-settlement discovery, and finds that a sufficient factual investigation was undertaken. Although the settlement occurred prior to any dispositive motions practice and at a relatively early stage, the Court nevertheless concludes that the settling parties have sufficiently established that they each possessed well-founded views of the merits of their positions and the potential for and likely amount of any recovery prior to effectuating the settlement. See Chilcott, 522 F. Supp. 2d at 117.

The Court finds that the amount of factual investigation undertaken by the settling parties is sufficient to establish that the settlement is fair, adequate, and reasonable. As the Court already discussed above in addressing the arm's length negotiations between the parties, class counsel has described the negotiating process, as well as the pre-settlement discovery and informal investigation that it engaged in to determine the strength of plaintiffs' claims. Hence, the negotiating process was an adversarial one and the Court does not find that the early resolution rendered the proposed settlement unfair or otherwise unreasonable. See, e.g., Zavareei Decl. ¶¶ 17-46; Mot. for Attorneys' Fees at 6-10; Schulte, 2011 WL 3269340, at *21-22. Additionally, there has been no actual evidence of collusion, and this Court has already noted that "formal discovery" is not a prerequisite, even for final approval purposes. See Trombley,

759 F. Supp. 2d at 26, 28 (refusing to deny preliminary approval "[a]bsent some evidence of actual collusion" and observing that formal discovery was not always a requirement "even for final approval of a proposed settlement").

## D.     Reaction of the Class

The reaction of the class appears to be positive, which weighs in favor of approval.  See In re Lorazepam, 2003 WL 22037741, at *5.  As of September 1, 2011, approximately 187,679 verified and timely claims had been received by Epiq, the Claims Administrator.  Approximately seventy-six opt-outs were also received.  Final Status Report 1-2.  Class counsel have identified ten objections that have been received as of July 9, 2011, and at least three of these objections have not substantively challenged the proposed settlement agreement in any way.   Accordingly, the relatively low number of objections and opt-outs, in light of the number of claims submitted, weighs in favor of approval of the settlement. See In re Lorazepam, 2003 WL 22037741, at *6 ("[T]he existence of even a relatively few objections certainly counsels in favor of approval.").

### 1.     Objections

To the extent not already addressed above, the Court now addresses the remaining objections to the settlement agreement and explains why they are rejected.

#### a.     Claims Process

Both the PEC Objectors and Cannata challenge the use of a claims process in this case. These objections are unfounded.  Cannata  argues that the claims form is confusing, and that the claims mechanism places the burden on the customer, rather than the bank, to find records, which will deter customers from making claims.  The PEC objectors concede that the use of a claims process, standing alone, is not objectionable, but instead urge for direct distribution of the settlement proceeds.  They point to the claims process in the consolidated cases in the multi-

district litigation involving Bank of America (Exs. E and F to PEC Objection), where settlement class members who are existing customers will have the fees automatically credited to their accounts, and former customers will be sent checks to their most recent address. PEC Objection at 14-15.

The Court has already dealt with this issue in granting preliminary approval of the settlement agreement, including the claims process. See Trombley, 759 F. Supp. 2d at 27-28. The same reasoning applies now, but with even greater force. Almost 188,000 verified and timely claims have been received by Epiq, the Claims Administrator. This result strongly suggests that concerns relating to an unwieldy or confusing claims process were overblown. See Schulte, 2011 WL 3269340, at *24 (reaching same conclusion in observing that "more than 100,000 claims" were filed by class members). The Court has reviewed the notices, as well as the claims forms provided to class members, and concludes that they comport with Federal Rule of Civil Procedure 23, both in content and in the manner by which the information was disseminated. Moreover, as this Court observed in considering the same challenge when granting preliminary approval, a claims process is often used to ensure that money is fairly distributed for valid claims. See Trombley, 759 F. Supp. 2d at 28 (citing cases and observing that "[c]lass actions often require a claims process to ensure money is fairly distributed for valid claims"); see Schulte, 2011 WL 3269340, at * 27 (citing cases and observing that "there is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment"). Indeed, a claims process is frequently employed in common fund cases, where a defendant's payout is capped. See id. (citing Newberg on Class Actions § 8:45 (4th ed.)). And the claims process was a directly negotiated aspect of the settlement, which, the Court concludes, is fair as a whole. See id. (reaching same conclusion and rejecting similar challenge

by the PEC).  Moreover, class members have the option of either specifying the two months or allowing the claims administrator to determine them, and can complete the claims process by mail or the internet.  See Rev. Settlement Agreement ¶ 27.  The form itself was straightforward and required only basic information for reimbursement.  Accordingly, the Court rejects the objections to the proposed settlement premised on the use of a claims process to administer reimbursements to class members from the settlement fund.

### b.    Overly Broad Class and Inclusion of the PNC Class

The PEC Objectors claim that the class as defined is overly broad because it includes *all* customers who incurred an overdraft fee due to an electronic debit card transaction -- not just customers who incurred such fees due to the bank's resequencing practices.   The Court first addresses the PEC Objectors' continued challenge to inclusion of PNC Bank customers within the National City class, then turns to their contention that the class is overly and impermissibly broad.

 The Court considered this argument when it was initially raised in the proceedings for preliminary approval and certification.  At that time, the Court stated that "it has no reason to believe that the settlement will affect the other pending cases against PNC in the MDL litigation." See Trombley, 759 F. Supp. 2d at 29.  The release of claims against PNC only applies to those claims that are based on accounts opened originally with National City Bank; it does not extend to cases concerning PNC accounts with no prior association with National City Bank. See id.

Nevertheless, the PEC Objectors still argue that the settlement unfairly releases the claims of the previous National City (now PNC Bank) customers, because their claims currently pending

in the multi-district litigation will be extinguished.[17]  As this Court observed, "[t]o the extent Objector's claims against PNC are based on accounts that were originally opened at National City Bank, those claims will be extinguished for any Class Member who has not opted out of the settlement if the settlement in this case is approved."  See id. at 29 n.9.

However, the Court finds that the mere overlap of the classes, without more, fails to render the proposed settlement unfair, unreasonable, or inadequate.  Here, the notices stated that a class member's claims would be released, and specifically identified the multi-district litigation in Florida as ongoing litigation.   The Court finds that the notices were reasonably clear as to the release of claims, even informing class members of the pending litigation before Judge King. See Docket Entry 34-1 ("For example, unless you exclude yourself, you will give up your right to be included . . . in the litigation currently pending in the U.S. District Court of the Southern District of Florida as part of the *In re Checking Account Overdraft Litigation*, MDL No. 2036, or any other litigation"); In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 516 (E.D.N.Y. 2003) (nothing improper about overlapping classes and releasing the claims of the overlapping classes, where "the expansive reach of the releases could not have been clearer" and observing that there is "no requirement that the Class be specifically apprised of all pending actions covered by the releases, as long as the releases themselves were reasonably clear").  Even though any claims involving National City arising out of the same transactions would be extinguished in the multi-district litigation, class members retained the perogative of opting-out of this settlement.  The settling parties have also agreed to shorten the release period from August 15, 2010 to June 21, 2010, the date on which PNC's integration of National City accounts was

---

[17] The PEC Objectors had previously informed the Court that a Consolidated Amended Complaint had been filed on December 6, 2010 against PNC as successor to National City Bank.

completed, which will minimize the impact on some customers as to the release of their claims. See Settling Parties Supp. Mem. ("Supp. Mem.") at 14, Docket Entry No. 52 (Aug. 29, 2011).

In a related objection, the PEC Objectors also challenge the class definition, composition, and distribution of the settlement amount on the basis of intraclass equity. Specifically, the PEC objectors argue that class members who incurred overdraft fees because of reordering "are forced to share settlement proceeds with non-injured Settlement Class Members." PEC Objection at 7. They also suggest that the settling parties could have narrowed the class to those customers who incurred more than one debit card or ATM overdraft fee on the same day, because the current class definition arguably does not account for National City's practice of reordering debit transactions from high to low in order to maximize overdraft fees.

While admittedly the gravamen of the complaint focuses on resequencing, the distribution scheme for the settlement proceeds already accounts for the strength of the claims based on resequencing from high to low by limiting reimbursement to a two month period. This allows the settlement proceeds to go to the unwitting victim rather than the chronic overdrafter, who could be construed as having received constructive notice of the bank's resequencing practice and, hence, has a weaker claim. See Schulte, 2011 WL 3269340, at *23-24 ("[I]t is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed . . . . By reimbursing customers for damages incurred in a 45-day period, the settlement recognizes that customers who incurred 'surprise' charges have stronger claims than the 'chronic overdrafters' who paid many fees over a long period of time . . . . The way in which the settlement allocates benefits is fair.").

Moreover, the complaint reached issues beyond resequencing. The PEC Objectors claim that the class is overly broad, see PEC Objection at 6-8, but in In re Adelphia Communications

Corp. Securities and Derivative Litigation, 272 Fed. App'x 9 (2d Cir. 2008), the Second Circuit rejected similar contentions that a class was "overly broad," reasoning that the investment losses suffered by all class members shared a common factual predicate, even if the particular losses had been the result of reliance on different documents. Id. at 13. The Adelphia court further explained that a court could release not just the claims alleged in the complaint, but also claims that *could have been alleged* in connection to any fact or matter set forth in the complaint. Here, the complaint involved more than an attack on National City's resequencing policy. It also challenged the bank's policy of assessing overdraft fees on electronic debit card transactions without proper or good-faith disclosures, amongst other charges. But the class definition was arrived at appropriately, as discussed above. Having found no impropriety or unfairness in the overlap of classes, the class definition, or any problems with intraclass equity, the Court rejects these objections raised by the PEC Objectors.

<strong>c.     Adequacy of the Settlement Amount and <em>Cy Pres</em></strong>

Both Cannata and the PEC Objectors contend that the settlement amount is inadequate, pointing to Gutierrez and the settlement in the consolidated multi-district litigation cases involving Bank of America, which awarded account holders $203 million and $410 million respectively. However, as Judge Dow in Schulte observed, and which is equally applicable here, the $203 million award obtained in Gutierrez is "not an appropriate basis for comparison." Schulte, 2011 WL 3269340, at *19. The award in Gutierrez was a result of a bench trial and, in any event, involved claims under California state law, which explicitly prohibited the practice of resequencing. See id. (distinguishing Gutierrez).

With respect to the recent Bank of America settlement, which was finally approved by Judge King on November 22, 2011, the $410 million award extends to a class of over 13 million

class members.  Moreover, as Judge King noted in rejecting similar assertions about the inadequacy of the $410 million settlement amount in that case, "while the business practices of banks may be similar, the manner in which those practices were implemented . . . may vary, potentially leading to different findings and liability."  <u>See</u> BofA Order of Final Approval at 28 n.13.

In any event, the Court's analysis of the fairness of the settlement considers what was known to the settling parties at the time the agreement was reached. <u>See</u> <u>In re CIGNA Corp.</u>, 2007 WL 2071898, at * 3 (stating that settlement fairness analysis must consider the risks at the time the settlement was reached, not the risks or absence of risks that arose after the settlement); <u>see</u> BofA Order of Final Approval at 21 (applying the same reasoning).  And it is not the Court's role to use its own business judgment in place of the parties' assessment in determining the fairness of the proposed settlement.  <u>See</u> BofA Order of Final Approval at 27-29.  Here, the Court finds that the settlement amount is not so unfair, inadequate, and unreasonable as a whole as to warrant rejection of the settlement.  And when considering the difficulties in obtaining and analyzing data, and the other challenges identified  by this Court that would face plaintiffs, the proposed settlement provides a favorable result for class members.

Finally, while the Court has already addressed many of Cannata's objections and explained why they are unwarranted, the Court also rejects Cannata's concerns regarding the use and implementation of <u>cy</u> <u>pres</u> distribution.  Class counsel indicated at the final fairness hearing that the fund was likely to be exhausted before <u>cy</u> <u>pres</u> would even be implicated.  Tr.  9:7-10.  Hence, there is no real basis for objection.  In any event, the Court would have approval to oversee the funds distributed to a <u>cy</u> <u>pres</u> fund and the orderly administration of such funds.

### E.    Opinion of Experienced Counsel

Class counsel is experienced in litigating and resolving complex cases, including other class actions against banks involving their overdraft fee policies.  See Zavareei Decl. ¶¶ 4-12. Because the Court finds that the settlement was reached through arm's length negotiation, and that an adequate factual investigation had been undertaken, counsel's opinion with respect to the fairness, adequacy, and reasonableness of the proposed settlement will be credited.  See In re Lorazepam, 205 F.R.D. at 399.

### III.    ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS

Having concluded that the terms of the proposed settlement agreement are fair, reasonable and adequate, the Court now turns to the attorneys' fees, expenses and incentive awards requested by the plaintiffs in their petition.   Plaintiffs request $3 million in attorneys' fees, which it calculates as equal to 25% of the $12 million settlement fund, or 22% of the overall settlement (factoring in the additional amount National City will pay for notice and administrative costs).  Mot. for Attorneys' Fees at 1.  Plaintiffs also request $77,857 in reimbursement for their expenses, the majority of which is attributable to a $75,000 fee for the services incurred by Edgeworth in preparing the damages report, and a $5,000 incentive award payable to each of the three class representatives.   These requests are dealt with in turn below.

### A.    Attorneys' Fees

Courts have a duty to ensure that claims for attorneys' fees are reasonable.  Chilcott, 522 F. Supp. 2d at 122.  To evaluate whether a fee request is reasonable, a court can consider (1) the size of the fund created and the number of persons benefitted, (2) the presence or absence of substantial objections by class members to the settlement terms or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of litigation, (5)

the risk of non-payment, (6) the time devoted to the case by plaintiffs' counsel, and (7) awards in similar cases.  See In re Lorazepam, 2003 WL 22037741, at *8.

Plaintiffs assert that notice was sent to 2.4 million class members and as of September 1, 2011 approximately 187,679 timely and verified claims have been received.  Final Status Report at 1-2.  The ultimate amount incurred by National City for the settlement of the claims is $13.8 million.  After deductions for notice and claims administration costs, the requested fees, costs and expenses (including attorneys' fees and incentive fee awards), class counsel estimate that approximately $8,407,000 will be distributed to claimants pursuant to the revised settlement agreement.  Id. at 4.  The award requested for attorneys' fees is comparable to the fees requested regarding a similar proposed class size and common fund.  See Chilcott, 522 F. Supp. 2d at 122 (analyzing Lorazepam factors in light of an estimated class of two million consumers and a common fund of $8.3 million).  As to the skill and efficiency of the attorneys involved and the complexity and duration of litigation, the Court has previously noted that class counsel is experienced in litigating and resolving complex cases, including other class actions against banks involving their overdraft fee policies.  See Zavareei Decl. ¶¶ 4-12.  Hence, this factor weighs in support of an attorneys' fee award of $3 million.  Further, the settlement was obtained "in the face of substantial defenses."  See Chilcott, 522 F. Supp. 2d at 122.  Although the duration of litigation was relatively short (there were no dispositive motions filed), the issues to be resolved in this case were complex.  See Schulte, 2011 WL 3269340, at *32 (observing, in similar case, that the stakes were high given the class size, the scale of the challenged activity and the complexity and costs of the case).

The risk of non-payment also weighs in plaintiffs' favor.  Class counsel have been litigating this case on a contingency fee basis, and have not yet received any fees or payment for

litigating this action.  Mot. for Attorneys' Fees at 25-26.  Moreover, the chance of recovery was

by no means assured given the risks -- as identified above -- including the likelihood of appeal,

the difficulty in ascertaining and quantifying damages, and the substantive defenses possessed by

the defendants to the charges lodged against them.  See Schulte, 2011 WL 3269340, at *30

(noting that 33% attorneys' fee award was reasonable given "the number of potentially

meritorious defenses" possessed by Fifth Third Bank, the contingency fee arrangement, and the

high risks associated with litigating the case).

As to the number of objections, there have been few substantial objections to the

settlement terms, and only one objection regarding the request for attorneys' fees.  Only Rosen

appears to object to the amount of attorneys' fees and the method by which the fees are

calculated.[18]  Rosen argues that an award of $3 million for attorneys' fees is unreasonably high

given the lack of risk in bringing this case and suggests that 10% of the common fund is a more

appropriate figure.  See Rosen Objection at 1.  Rosen also suggests that class counsel should

have supplied a lodestar, though she acknowledges that the D.C. Circuit applies a "percentage of

fund" method for determining attorneys' fees in common fund cases like this one.  Id. at 9.

Finally, Rosen urges the Court to base the award of attorneys' fees on amounts actually received

by their clients, rather than the "theoretical" size of the award.  Id. at 12.

As an initial matter, the Court rejects Rosen's objection to class counsel's calculation of

attorneys' fees without reference to a lodestar.  In cases involving common funds (such as this

case), the D.C. Circuit has indicated a preference for applying a "percentage of the fund" method

for awarding attorneys' fees.  See Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1266-67 (D.C.

---

[18]  At the final fairness hearing, the PEC Objectors stated that they had no issue with the awarding of
attorneys fees by the percentage of the fund method.  See Tr. 62:11-14.

Cir. 1993). Rosen does not contend otherwise. The benefit of applying a percentage of the fund recovery method for awarding attorneys' fees is that it "directly aligns the interests of the Class and its counsel for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." In re Lorazepam, 205 F.R.D. at 383 (citing In re Am. Bank Note Holographics, Inc. Sec. Litig., 127 F. Supp. 2d 418, 431-32 (S.D.N.Y. 2001)).

The Court also rejects Rosen's contention that 10% of the common fund is a more appropriate award of attorneys' fees. It has been observed that fee awards nationally appear to fall in a range of 20% to 30% of the common fund, and that the fees in this Circuit mirror those nationwide numbers. See, e.g., In re Dep't of Veterans Affairs (VA) Data Theft Litig., 653 F. Supp. 2d 58, 61 (D.D.C. 2009) (citing cases where fees in D.C. Circuit have ranged from 20 to 30%). In some cases, the percentage has been even greater. See Radosti, 760 F. Supp. 2d at 78 (granting award of 33% of the common fund). The attorneys' fee award of 22% or 25% here (depending on the calculation) is still within this range of reasonableness. Class members also were on notice of the proposed fee amount, because the notices clearly state that class counsel would be requesting an award of attorneys fees of not more than 25% ($3 million) of the settlement fund, plus reimbursement of all costs and expenses. Tellingly, only one objection was received, which counsels in favor of granting class counsel's requested fee award. See Schulte, 2011 WL 3269340, at * 30 (noting that plaintiff's authorization to her attorney to seek a fee of up to 33.3% of the potential recovery at the onset of the suit as evidence that the risks undertaken by counsel were relatively high). The attorneys' fees were also negotiated separately, and after the substantive terms of the settlement agreement had been reached. Zavareei Decl. ¶ 1. Moreover, it is appropriate to award attorneys' fees out of the amount recovered, not just the actual amount paid, because class members benefitted from class counsel's efforts at negotiating

the entire settlement agreement -- including National City's agreement to pay certain notice and administration costs, which were not an insignificant sum.  See BofA Order of Final Approval at 41 ("It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to . . . attorneys' fees based upon the benefit obtained.") (internal citations omitted); see also Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (noting that the Supreme Court "has recognized consistently that a . . . lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").

As for the time devoted to the case, and awards in similar cases, these also support plaintiffs' requested award of $3 million.  Plaintiffs claim that "over 1000 hours of attorney and litigation support time" were spent by their firm.  Zavareei Decl. ¶ 69; Mot. for Attorneys' Fees at 25.  These hours included research into National City Bank and its practices; analyses of potential damages; engaging in formal and informal discovery; the filing of the class action complaint; settlement negotiations; the process of obtaining preliminary approval of the proposed settlement, including responding to objections and revising the settlement agreement. See generally Zavareei Decl.  Class counsel has also spent additional time responding to objections, attending the fairness hearing, and responding to the Court's request for supplemental briefing.

Finally, in comparing this award to the award of attorneys' fees in other cases, the Court concludes that $3 million is a reasonable figure. In Mathena v. Webster Bank, 3:10 Civ. 01448 (D. Conn), a case involving the same class counsel, Judge Underhill approved a $2.8 million settlement, and awarded $700,000 in attorneys fees, $4,577 in costs, and a $5,000 incentive award to the representative plaintiff.   The attorneys' fee amounted to 25% of the common fund.

In Closson v. Bank of America, Case No. CGC 04436877, a case involving overdraft fees in the California Superior Court, the parties settled the suit with a fund of $35 million, with a maximum of $8.125 million for attorneys' fees and costs and a $10,000 incentive award, with attorneys' fees and costs thus amounting to about 23% of the common fund.[19]  In Schulte v. Fifth Third Bank, an overdraft fees class action case involving a $9.5 million settlement, Judge Dow awarded $3,166,666 in attorneys' fees, or approximately 33% of the fund.  See Schulte, 2011 WL 3269340, at *31-32.  In the consolidated cases against Bank of America in the multi-district litigation, Judge King awarded attorneys' fees amounting to 30% of a $410 settlement fund, finding that the fee was appropriate and comported with customary fee awards in similar cases. See BofA Order of Final Approval at 54.  And, as previously noted, the award requested for attorneys' fees is comparable to the fees requested regarding a similar proposed class size and common fund in this jurisdiction, see Chilcott, 522 F. Supp. 2d at 122, and is within what the D.C. Circuit has concluded as the realm of reasonableness for attorneys' fees in common fund cases, see Swedish Hosp. Corp., 1 F.3d at 1272 ("[A] majority of common fund class action fee awards fall between twenty and thirty percent.").  In considering and weighing these factors and the record as a whole, then, the Court finds that class counsel is entitled to the requested amount of attorneys' fees and will grant the petition and award the sum of $3 million in attorneys' fees to class counsel.

---

[19] At the final fairness hearing, plaintiffs indicated that the Closson settlement was pending on appeal, but that the PEC had withdrawn its objections to the settlement.  See Tr. 80:21-81:5.  From a review of the case dockets, it appears that some, if not all, of the appeals have been voluntarily dismissed or abandoned.  See Closson v. Bank of Am., Case Nos. A127018, A126608, A126606, A125963 (Cal. App. 1st Dep't Super. Ct.).

### B. Incentive Awards

"[I]ncentive awards to named plaintiffs are not uncommon in class action litigation, particularly where a common fund has been created for the benefit of the entire class." <u>See</u> <u>In re</u> <u>Lorazepam</u>, 2003 WL 22037741, at *10. Indeed, "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." <u>Id.</u> (internal quotation marks omitted). To determine whether incentive awards should be granted, and the proper amount of such awards, "courts consider factors such as 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." <u>Id.</u> (quoting <u>Cook v. Niedert</u>, 142 F. 3d 1004, 1016 (7th Cir. 1998)).

Here, class counsel requests incentive awards in the amount of $5,000 to each representative plaintiff, which defendant agreed not to oppose as part of the terms of the agreement. <u>See</u> Rev. Settlement Agreement ¶¶ 10, 12. Rosen challenges the proposed $15,000 incentive fee paid to the three class representatives and suggests that $5,000 total for the three class plaintiffs is a more appropriate number. Plaintiffs respond that the representative plaintiffs "actively assisted in the prosecution and settlement of this case" by participating in "many phone calls" and providing "detailed descriptions of their banking behavior and experiences as well as documentary evidence . . . that supported their allegations." Zavareei Decl. ¶¶ 71-72. Moreover, plaintiff Trombley "made herself available for repeated consultations during settlement negotiations." <u>Id.</u> at ¶ 72.

Admittedly, representative plaintiffs in other cases have participated in the litigation to a far greater extent than was true here. <u>See, e.g.</u>, <u>Chilcott</u>, 522 F. Supp. 2d at 124 ($7500 incentive

award to named plaintiffs who provided documents and aid to counsel, and underwent cross-examination for their depositions); Wells v. Allstate Ins. Co., 597 F. Supp. 2d 1, 9 (D.D.C. 2008) ($10,000 incentive awards granted to representative plaintiffs who were deposed twice, attended the two-day class certification hearing, produced documents, and assisted in responding to interrogatories). But the representative plaintiffs in those cases were rewarded accordingly, and received greater incentive awards than the representative plaintiffs request here. In any event, the court's function "is not to modify the terms of a proposed settlement; but rather to approve or disapprove of the proposed settlement 'as a whole.'" See Schulte, 2011 WL 3269340, at *25 (citing Newberg on Class Actions § 24:126 (4th ed.)). The Court therefore concludes that the $5000 award for each representative plaintiff falls within the range of reasonableness and grants the incentive fee awards requested.

### C. Reimbursement of Costs

In addition to attorneys' fees, class counsel may request reimbursement for reasonable litigation expenses from the common fund. See Lorazepam, 2003 WL 22037741, at *10. Class counsel requests $77,857.05 in costs and expenses. No objections were lodged with respect to this amount and the itemization of class counsel's costs and expenses appears reasonable. The largest expense incurred was for "Experts/Investigators," which was listed at $75,000. See Ex. A to Zavareei Decl. Class counsel attests, however, that this amount was incurred entirely by the services rendered by Edgeworth and is discounted by $22,278 from the $97,278 that would normally have been charged by Edgeworth, in order to comport with Edgeworth's pre-retention fee estimates. Zavareei Decl. ¶ 69. Class counsel also states that such expenses incurred by the firm were "necessary to the successful prosecution of this case." See Zavareei Decl. ¶¶ 69-70. Indeed, the work by Edgeworth focused on an issue raised by this Court

as a matter of concern.  In addition, these fees and expense requests do not include an additional

declaration submitted by Edgeworth or the retention of Navigant Consulting in response to the

Court's request for supplemental briefing.  The other fees and expenses -- including for example,

travel, meals, and lodging; legal research; court fees; photocopies; and telephone calls -- amount

to $2857.05, and are the kinds of expenses expected and anticipated during the ordinary course of

litigation.  Accordingly, because these fees all appear to be reasonable, and because no objections

have been made as to the amount, the Court will grant class counsel's request and award

$77,857.05 in costs and expenses.

## **CONCLUSION**

For the reasons set forth above, the Court grants final certification of the class and final

approval of the settlement, finding that it is fair, reasonable, and adequate.  The Court also grants

class counsel's request for attorneys' fees in the amount of $ 3,000,000.00 and $77,857.05 in

costs and expenses.  Finally, the Court awards $5000.00 incentive fees to each of the three

representative plaintiffs, Ramona Trombley, Brian Wells, and Jeff Doehner.  A separate order

shall accompany this memorandum opinion.


_____
          /s/
        JOHN D. BATES
    United States District Judge



Date: December 1, 2011